# EXHIBIT 1

# BlueWillow's Markman Presentation

## November 15, 2022

Foley & Lardner LLP

*Trutek Corp. v. BlueWillow Biologics, Inc.*,

Case No. 2:21-cv-10312 (E.D. Michigan)

# U.S. Patent No. 8,163,802



- "Electrostatically Charged Multi-Acting Nasal Application, Product, and Method"

- 4 asserted claims

  - Claims 1 and 2 (independent claims)

  - Claims 6 and 7 (dependent claims)

# U.S. Patent No. 8,163,802

## Independent Claim 1

I claim:

**1**. A method for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein a formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said method comprising:

a) electrostatically attracting the particulate matter to the thin film;

b) holding the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and,

c) inactivating the particulate matter by adding at least one ingredient that would render said particulate matter harmless.

# U.S. Patent No. 8,163,802

## Independent Claim 2

**2**. A formulation for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein the formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said formulation comprising at least one cationic agent and at least one biocidic agent, and wherein said formulation, once applied:

a) electrostatically attracts the particulate matter to the thin film;

b) holds the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and

c) inactivates the particulate matter and renders said particulate matter harmless.

# U.S. Patent No. 8,163,802

contaminants to the nasal passages by capturing the contaminants and keeping them from entering the body. In the present invention, these electrostatically charged nasal application products capture and hold the contaminants including viruses, bacteria, and other harmful microorganisms or toxic particulates, inactivate them dermally outside the body and render them harmless.

'802 patent at 2:2-7

Emergencies of Anthrax lead to the concept of avoidance of inhaling airborne microscopic and sub-microscopic contaminants. It is the intention of the Present Invention to filter and render harmless materials such as anthrax spores, human corona virus, smallpox virus, influenza virus, avian flu virus, swine flu virus, rhino virus, and other biological or chemical elements/toxins/irritants, and the like, prior to their entering the nasal passages.

'802 patent at 3:53-60

| VIRAL DISEASES (virus type in brackets) | BACTERIAL DISEASES (bacterial name in brackets) |
|---|---|
| Chickenpox (Varicella) | Whooping cough (*Bordetella pertussis*) |
| Flu (Influenza) | Meningitis (*Neisseria* species) |
| Measles (Rubeola) | Diphtheria (*Corynebacterium* |
| German measles (Rubella) | *diphtheriae*) |
| Mumps (Mumps) | Pneumonia (*Mycoplasma pneumoniae*, |
| Smallpox (Variola) | *Streptococcus* species) |
| SARS (Human Corona) | Tuberculosis (*Mycobacterium* |
| | *tuberculosis*) |
| | Anthrax (*Anthracsis* bacterium) |

'802 patent at 4:5-16

| ENVIRONMENTAL PARTICULATE DISEASES | SOURCE |
|---|---|
| Psittacosis (*Chlamydia psittaci*) | Dried, powdery droppings from infected birds (parrots, pigeons, etc.) |
| Legionnaire's disease (*Legionella pneumophila*) | Droplets from air-conditioning systems, water storage tanks, etc., where the bacterium grows. |
| Acute allergic alveolitis (various fungal and actinomycete spores) | Fungal or actinomycete spores from decomposing organic matter (composts, grain stores, hay, etc.) |
| Aspergillosis (*Aspergillus fumigatus, A. flavus, A. niger*) | Fungal spores inhaled from decomposing organic matter. |
| Histoplasmosis (*Histoplasma capsulatum*) | Spores of the fungus, in old, weathered bat or bird droppings. |
| Coccidioidomycosis (*Coccidioides immitis*) | Spores in air-blown dust in desert regions (Central, South and North America) where the fungus grows in the soil. |

'802 patent at 4:22-38

5

# U.S. Patent No. 8,163,802

A formulation of the invention comprises:
water,
at least one quaternary thickener,
a preservative,
a conditioner,
an emulsifier,
a biocidic agent, and
a neutralizing agent added to adjust and achieve a pH in the
range of 5.0 to 6.8.

'802 patent at 4:65 – 5:7

All of the formulations described in TABLE 1-10 representing various embodiments of the Present Invention operate in the manner that was disclosed herein. The same results may be achieved by varying the percentages for the active and inactive ingredients. Varying the percentages for the active ingredients affects the potency of the formulation. Varying the percentages for the inactive ingredients affects the consistency of the formulation. The desired results may be

'802 patent at 10:8-15

| TABLE 2 | | |
|---|---|---|
| Ingredient | Percent Range | Function |
| Water | 72%-88% | Solvent, Moisturizer |
| Phenoxyethanol | 1% | Preservative |
| Methylparaben, Propylparaben, Butylparaben, Ethylparaben, Isobutylparaben | | |
| Lysine HCL | 1% | Conditioner, Biocide |
| Polyquaternium - 67 | 3%-6% | Conditioner, Quaternary |
| Nonoxynol - 10 | 2%-4% | Surfactant |
| Cocodimonium Hydroxypropyl Hydrolyzed Keratin | 0.5%-2% | Conditioner, Quaternary |
| Polyquaternium - 72 | 0.5%-2% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-4% | Conditioner, Quaternary |
| Cetearyl Alcohol, Glyceryl Stearate Emulsifier, PEG - 40 Stearate, Ceteareth - 20 | 1%-4% | Emulsifier |
| Cetearyl Alcohol, Dicetyl Phosphate, Ceteth - 10 Phosphate | 0.5% | Emulsifier |
| Benzalkonium Chloride | 0.25%-1% | Cationic, Quaternary, Biocide |
| Hydroxypropyltrimonium Wheat Protein | 1% | Conditioner, Quaternary |
| Sodium Hydroxide | 0.01%-0.05% | Neutralizing Agent |

'802 patent at Table 2 (6:18-42)

# Claim Construction Disputes

- (1) Indefiniteness under 35 U.S.C. § 112, paragraph 2
  - "Electrostatically attract"
  - "Electrostatically inhibit"
  - "Adequate impermeability"
  - "Renders said particulate matter harmless"

- (2) Trutek's Proposed Constructions

# Legal Standards – Indefiniteness

A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims.

Indefiniteness, therefore, like claim construction, is a question of law.

*Atmel Corp. v. Info. Storage Devices, Inc.*,
198 F.3d 1374, 1378 (Fed. Cir. 1999)

Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction.

*Exxon Rsch. & Eng'g Co. v. United States*, 265
F.3d 1371, 1376 (Fed. Cir. 2001)

Definiteness is to be evaluated from the perspective of someone skilled in the relevant art.

A lack of definiteness renders invalid "the patent or any claim in suit."

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898, 902, 908 (2014)

# Legal Standards – Indefiniteness

According to the Federal Circuit, a patent claim passes the §112, ¶2 threshold so long as the claim is "amenable to construction," and the claim, as construed, is not "insolubly ambiguous."

We conclude that the Federal Circuit's formulation, which tolerates some ambiguous claims but not others, does not satisfy the statute's definiteness requirement. In place of the "insolubly ambiguous" standard, we hold that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

[A] patent must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them."

It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims.

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898, 901, 909, 911 (2014)

# U.S. Patent No. 8,163,802

## Indefinite Claim Terms

**1.** A method for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein a formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said method comprising:

a) electrostatically attracting the particulate matter to the thin film;

b) holding the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and,

c) inactivating the particulate matter by adding at least one ingredient that would render said particulate matter harmless.

10

# Trutek's Expert – Dr. Lemmo

56.  Patent claims are often incomprehensible by lay persons because the words and sentence structure are purposed as legal instruments rather than as narratives to be understood by the general public.  Claims are long run-on sentences containing words that may be unfamiliar to the layman.  Claims are not written with proper English syntax.  However, in the case of claims 1, 2, 6, and 7 of the '802 Patent, the words appear to have been given their plain meaning and the clauses are separately enumerated.  In my opinion, a person of ordinary skill (*i.e.*, a formulator of pharmaceutical preparations) would be able to read these claims in light of the specification, understand their meanings, and from them he or she would have no difficulty in creating the disclosed embodiment compositions without undue experimentation.

Lemmo Declaration at ¶ 56

45.  I am not an attorney.  I understand that the property of a claim being indefinite is a legal determination, which is in the province of the Court.  Therefore, I will not use this terminology.  Instead, I will opine on whether the disputed claim terms are sufficiently unambiguous to enable one of ordinary skill to understand and practice the inventions set forth in the claims.

Lemmo Declaration at ¶ 45

```
22        Q.  Okay.  So that was the standard that you
23   applied here, "sufficiently clear and unambiguous
24   to a person of ordinary skill"?
25        A.  Yes, that's correct.
```

Lemmo Deposition at 139:22-25

The meaning of this phrase is clear and apparent.

The meaning of this term is apparent and unambiguous.

Lemmo Declaration at ¶ 48 ("electrostatically inhibiting")
and ¶ 50 ("electrostatically attracting")

# Electrostatically Inhibiting and Attracting

- '802 Patent does not provide any objective parameters to allow a POSA to assess whether a formulation operates to "electrostatically attract" and "electrostatically inhibit" harmful particulate matter
  - Amiji Declaration at ¶¶ 32-36
    - No quantitative parameters for electrostatic field
    - What magnitude is necessary to attract oppositely charged contaminants?
    - Distance of electrostatic field from surface?

Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention.

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)

# Adequate Impermeability

- "Adequate" is both subjective and a term of degree
- '802 Patent does not provide any objective guidance to POSA as to level of impermeability required or how to assess whether any thin film has "adequate" impermeability
  - Amiji Declaration at ¶ 37

Thus, **adequate impermeability** is a property of the applied formulation that allows the harmful particles to be held in place for a sufficient time to be inactivated.

Lemmo Declaration at ¶ 37

Determination of adequate permeability is a term of degree, and the material composition to accomplish the intended purpose depends on the desired efficacy. The '802 Patent specification provides examples of the

Lemmo Declaration at ¶ 53

# Adequate Impermeability

```
 9        Q.   Now, "sufficient time," that's another
10   relative term; right?
11        A.   Yes.  Again, we don't know when an
12   individual will come in contact with a harmful
13   microorganism that's in the airstream.  So as I
```

Lemmo Deposition at 142:9-13

```
11        Q.   Okay.  So to the best of your knowledge,
12   the patent doesn't define how much time is
13   sufficient to hold the harmful particles in place
14   to allow them to be inactivated; right?
15        A.   Yeah, at this point that's what I'm
16   assuming, yes.
17        Q.   Okay.  So, I mean, how much time is
18   sufficient?  Is an hour good enough?
20             THE WITNESS:  It's very vague.  That's a
21   very vague question of how much time.  Because as
```

Lemmo Deposition at 143:11-21

# Adequate Impermeability

```
21        Q.    Okay.  So the amount of time that's
22   sufficient, it depends on the circumstances;
23   right?
24        A.   Yes, I agree with that, yes.
25        Q.    Okay.  So it could depend on where the
 1   individual who's using the product is located?
 2        A.    Yes.  If you're in a highly polluted
 3   area, not necessarily pollution relative to
 4   bacterial pollution but irritants that may be in
 5   the air, if you happen to visit a place where
 6   people are smoking and you're highly sensitive to
 7   cigarette smoke or tobacco smoke, that may be a
 8   benefit for a person to possibly reapply.  But I
 9   can't say definitely because I haven't done that
10   testing.
11        Q.    So the amount of time that's sufficient,
12   it could depend on the environment.  It could
13   depend on the particular sensitivities of the
14   individual, as well; right?
15        A.   Yes.
16        Q.    It could also depend on the nature of
17   the material that's in the air; right?
18        A.   Yes.
```

Lemmo Deposition at 144:21 – 145:18

15

# Adequate Impermeability

```
15        Q.    Okay.  So the impermeable barrier is a
16   result of the adhesive and cohesive properties of
17   the formulation?
18        A.    That's how I interpret it, yes.
19        Q.    And those adhesive and cohesive
20   properties can be different depending on the
21   ingredients and the percentages of those
22   ingredients in the formulation; right?
23        A.    Yes.
24        Q.    Which in turn can impact the level of
25   impermeability?
1         A.    Probably, yes.
2         Q.    And the ability of -- or the amount of
3    time that the thin film acts as a barrier?
4         A.    Correct.  But these would all be tests
5    performed on the product beyond the scope of the
6    patent.  So, in other words, what I reiterated
```

Lemmo Deposition at 147:15 – 148:6

```
10        Q.    Okay.  But just even more simply, the
11   patent doesn't describe the results of any testing
12   of that nature of any of the formulations that are
13   listed; right?
14        A.    No.
```

Lemmo Deposition at 149:10-14

```
18        Q.    So the -- to achieve the adequate
19   impermeability recited in the claims, that's also
20   going to depend on how the product is applied by
21   the user?
22        A.    I would assume so, yes.
```

Lemmo Deposition at 168:18-22

# Renders Said Particulate Matter Harmless

- Whether something is "rendered harmless" is subjective and context dependent, depending on the nature of the harmful particulate matter, the formulation, and the individual
  - Amiji Declaration at ¶ 38
    - Wide range of harmful particulate matter disclosed and claimed
    - What amount of harmful particulate matter must be held to render it harmless?
    - No objective criteria to allow POSA to assess whether the harmful particulate matter is rendered harmless

In other words, a given embodiment would simultaneously infringe and not infringe the claims, depending on the particular bacteria . . . . That is the epitome of indefiniteness.

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
349 F.3d 1373, 1384 (Fed. Cir. 2003)

# Renders Said Particulate Matter Harmless

25      Q.    So right at the top of this page, you
1   state that, "Determination of adequate perm
2   ability is a term of degree"; right?
3       A.    Yes.
4       Q.    And that in turn is going to depend on
5   the desired efficacy?
6       A.    Yes.
7       Q.    And the desired efficacy could also
8   depend on the nature of the harmful particles to
9   be captured by the formulation and infection
10  inhibited by?
11      A.    Yes.

14  grammar.  But just for clarification, my
15  understanding, again, it depends on, in a
16  microbiological standpoint, the type of organism,
17  the quantity of organism that a person would be
18  coming in contact with.

Lemmo Deposition at 160:25 – 161:18

7       Q.    Okay.  And so using that example then,
8   if we're in allergy season where there's a high
9   amount of allergens in the air, you might need a
10  formulation that has increased adhesive and
11  cohesive properties with a more impermeable
12  barrier in order to sufficiently capture and hold
13  those particles and preventing them from -- or
14  inhibiting them from infecting the individual;
15  right?
16      A.    Or you may want to apply the product
17  more frequently.  So I --
18      Q.    And that would be because the adhesive
19  properties would impact how long the formulation
20  stays as a thin film?
21      A.    Well, how long it's going -- well, how
22  much you're coming in contact with -- you know,
23  some people come in contact with very polluted
24  environments, but on an average basis -- again,
25  this is not a prescription, but on an average
1   basis a product that you have sold
2   over-the-counter is something that's left up to
3   the individual to make a judgment as far as how
4   much and how often they use the product.

Lemmo Deposition at 163:7 – 164:4

# Legal Standards – Claim Construction

[T]he claim construction inquiry . . . begins and ends in all cases with the actual words of the claim.

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243, 1248 (Fed. Cir. 1998)

[T]he claims of a patent define the invention to which the patentee is entitled to exclude.

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)

# Legal Standards – Claim Construction

[T]he words of a claim "are generally given their ordinary and customary meaning."

We have made clear . . . that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.

In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.

*Philips v. AWH Corp.*, 415 F.3d 1303, 1312-14
(Fed. Cir. 2005) (*en banc*)

# Legal Standards – Claim Construction

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)



**Claim Language**
- Context of words
- Related claims
- Canons of claim construction

**Specification**
- Special definitions
- Consistent use of term in particular manner
- Description of invention

**Prosecution History**
- Arguments made to/from PTO
- Disclaimers

**Extrinsic Evidence**
- Inventor testimony
- Expert testimony
- Dictionaries and treatises

# Legal Standards – Claim Construction

[W]hen a word is changed during prosecution, the change tends to suggest that the new word differs in meaning in some way from the original word.

*Ajimototo Co., Inc. v. Int'l Trade Comm'n,*
932 F3d 1342, 1351 (Fed. Cir. 2019)

[T]his court has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.,*
887 F.2d 1050, 1053 (Fed. Cir. 1989)

# Legal Standards – Claim Construction

The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554, 1568 (Fed. Cir. 1997)

# U.S. Patent No. 8,163,802

## Trutek's Proposed Constructions

### CLAIM 1

| PATENT CLAIM LANGUAGE | INTERPRETATION |
|---|---|
| **A method** for electrostatically **inhibiting harmful particulate matter** from infecting an individual through nasal inhalation wherein **a formulation** is **applied to skin or tissue of nasal passages** of the individual in **a thin film**, said method **comprising**: | Claim 1 is a method claim, which recites preventing an individual from becoming infected from inhaling harmful airborne contaminant particles.<br><br>A formulation, which exhibits a static electrical charge, is applied to the individual's nostrils, and it forms a statically charged thin film thereon. |
| a) electrostatically **attracting** the particulate matter to the thin film; | The formulation's electrostatically charged thin film attracts oppositely charged harmful particles. |
| b) **holding** the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and, | The thin film formulation is designed to adhere to the skin or tissue of the nostrils and to be impermeable.<br><br>The thin film having a electrostatic charge captures and holds the oppositely charged harmful particles (that were attracted to it) in place. |
| c) **inactivating** the particulate matter by adding at least one ingredient that would render said particulate matter harmless. | The formulation contains at least one ingredient that inactivates the captured harmful particles and renders one or more of them harmless by killing or inactivating them.. |

# U.S. Patent No. 8,163,802

## Trutek's Proposed Constructions

### CLAIM 2

| PATENT CLAIM LANGUAGE | INTERPRETATION |
|---|---|
| **A formulation** for electrostatically **inhibiting harmful particulate matter** from infecting an individual through nasal inhalation wherein the formulation is **applied to skin or tissue of nasal passages** of the individual in **a thin film**, said formulation **comprising** at least one **cationic agent** and at least one **biocidic agent**, and wherein said formulation, once applied: | A formulation, when applied to a person's nostrils, forms a thin film therein and prevents that person from becoming infected from inhaling harmful airborne contaminant particles.<br><br>The formulation contains at least one cationic agent. A cationic agent produces a positive electrostatic charge. The formulation also contains a biocide. |
| a) electro statically **attracts** the particulate matter to the thin film; | Oppositely statically charged harmful particles are attracted to the formulation's thin film. The thin film is positively charged (cationic), and most harmful particles are negatively charged. |
| b) **holds** the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and, | The thin film formulation is designed to adhere to the skin or tissue of the nostrils and to be impermeable.<br><br>The thin film having a electrostatic charge captures and holds the oppositely charged harmful particles (that were attracted to it) in place. |
| c) **inactivates** the particulate matter and renders said particulate matter harmless. | The biocide in the formulation inactivates the captured harmful particles and renders them harmless. |

# U.S. Patent No. 8,163,802

## Trutek's Proposed Constructions

### CLAIM 6

| PATENT CLAIM LANGUAGE | INTERPRETATION |
|---|---|
| The formulation of claim **2** wherein | This claim depends from claim 2. All of the features and limitations of claim 2 are incorporated by reference into this claim. |
| the at least one cationic agent is Benzalkonium Chloride. | The "at least one cationic agent" referred to in claim 2 is Benzalkonium Chloride, which is a known cationic agent. |

### CLAIM 7

| PATENT CLAIM LANGUAGE | INTERPRETATION |
|---|---|
| The formulation of claim **2** wherein | This claim depends from claim 2. All of the features and limitations of claim 2 are incorporated by reference into this claim. |
| the at least one biocidic agent is Benzalkonium Chloride. | The "at least one biocidic agent" referred to in claim 2 is Benzalkonium Chloride, which is a known biocidic agent. |

# U.S. Patent No. 8,163,802

## Independent Claims 1 and 2

1. A method for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein a formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said method comprising:

   a) electrostatically attracting the particulate matter to the thin film;

   b) holding the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and,

   c) inactivating the particulate matter by adding at least one ingredient that would render said particulate matter harmless.

2. A formulation for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein the formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said formulation comprising at least one cationic agent and at least one biocidic agent, and wherein said formulation, once applied:

   a) electrostatically attracts the particulate matter to the thin film;

   b) holds the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and,

   c) inactivates the particulate matter and renders said particulate matter harmless.