# EXHIBIT 2

**Page 1**

```
1            UNITED STATES DISTRICT COURT
2            EASTERN DISTRICT OF MICHIGAN
3                 SOUTHERN DIVISION
4   --------------------------------X
5   TRUTEK CORP.,                   :
6       Plaintiff/Counter-Defendant,:
7       v.                          :   Case No.:
                                        2:21-cv-10312
8   BLUEWILLOW BIOLOGICS, INC.      :
9       Defendant/Counter-Plaintiff,:
10  ROBIN ROE 1 through 10          :
11  (fictitious names); ABC         :
12  CORPORATION 1 through 10        :
13  (fictitious names),             :
14      Defendants.                 :
15  --------------------------------X
16
17      Deposition of EDWARD A. LEMMO, PH.D.
18           Conducted Remotely
19         Monday, October 24, 2022
20              10:00 a.m.
21
22
23  Job No.: 468438
24  Pages: 1-283
25  Reported by: Matthew Goldstein, RMR, CRR
```

**Page 2**

```
1       Deposition of EDWARD LEMMO, PH.D., conducted
2   remotely:
3
4
5
6
7
8
9       Pursuant to Notice, before Matthew Goldstein,
10  RMR, CRR, Notary Public in and for the State of
11  Maryland.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF, TRUTEK CORP.:
3   STANLEY H. KREMEN, ESQUIRE
4   4 Lenape Lane
5   East Brunswick, New Jersey 08816
6   732.593.7294
7
8   ON BEHALF OF THE DEFENDANT, BLUEWILLOW
9   BIOLOGICS, INC.:
10  LIANE M. PETERSON, ESQUIRE
11  FOLEY & LARDNER
12  3000 K Street, NW
13  Suite 600
14  Washington, D.C. 20007
15  202.672.5300
16
17  ALSO PRESENT:
18  JENNIFER PODIS - REMOTE TECHNICIAN
19  JOHN PARKMAN - VIDEOGRAPHER
20  ASHOK WAHI
21
22
23
24
25
```

**Page 4**

```
1               C O N T E N T S
2   EXAMINATION OF EDWARD ANTHONY LEMMO        PAGE
3
4   By MS. PETERSON                             8
5            E X H I B I T S
6               (Attached)
7   LEMMO      DEPOSITION EXHIBIT              PAGE
8
9   Exhibit 2    Previously Marked, United      41
                 States Patent No. 8,163,802
10  Exhibit 12   Deposition Notice of Edward A. 12
                 Lemmo
11
12  Exhibit 13   Plaintiff's Opening Technical  54
                 Report
13  Exhibit 14   Plaintiff's Expert Report of   54
                 Edward A. Lemmo, Ph.D.
14               Responsive to and in Rebuttal
                 of Defendant's Opening Expert
15               Report of Mansoor M. Amiji
16  Exhibit 15   Report of Edward A. Lemmo,     55
                 Ph.D. in Reply to Defendant's
17               Expert Report on
                 Non-infringement
18
19  Exhibit 16   Curriculum Vitae of Edward A.  66
                 Lemmo, Ph.D
20  Exhibit 17   Declaration of Edward A. Lemmo,136
                 Ph.D. in Support of Trutek
21               Corp.'s Claim Construction
                 Brief
22
23
24
25
```

---

5

1  (Continued)

2                    E X H I B I T S

3  Exhibit 18    Materials Reviewed for Report    216
               Preparation
4
   Exhibit 19    Skin Models for the Testing of   274
5                Transdermal Drugs

6  Exhibit 20    Formation and Stability of       275
               oil-in-water Nanoemulsions
7                Containing Rice Bran Oil: In
               Vitro and In Vivo Assessments
8
   Exhibit 21    United States Patent             275
9                Application Publication
               2004/0071757
10
   Exhibit 22    Declaration of Dr. Edward Lemmo  276
11               in Trutek v. Matrixx

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

7

1  No. 2:21-cv-10312.

2       Today's date is Monday, October 24th,

3  2022.  The time on the video monitor is now

4  10 a.m. Eastern Time.

5       The remote videographer today is John

6  Parkman representing Planet Depos.

7       All parties to this video deposition are

8  attending remotely.

9       Would counsel please voice identify

10 themselves and state whom they represent.

11      MR. KREMEN:  Stanley Kremen for the

12 plaintiff.

13      MS. PETERSON:  And Liane Peterson from

14 Foley & Lardner LLP, on behalf of the plaintiff,

15 BlueWillow Biologics -- or sorry, on behalf of the

16 defendant, BlueWillow Biologics.

17      THE VIDEOGRAPHER:  The court reporter

18 today is Matthew Goldstein also representing

19 Planet Depos.

20      Would the reporter please swear in the

21 witness.

22

23

24

25

---

6

1       THE REMOTE TECHNICIAN:  Thank you to

2  everyone for attending this proceeding remotely,

3  which we anticipate will run smoothly.

4       Please remember to speak slowly.  Do

5  your best not to talk over one another.  Please be

6  aware that we are recording this proceeding for

7  backup purposes.

8       Any off-the-record discussions should be

9  had away from the computer.  Please remember to

10 mute your mic for those conversations.

11      Please have your video enabled to help

12 the reporter identify who is speaking.  If you're

13 unable to connect with video and connecting via

14 phone, please identify yourself each time before

15 speaking.

16      I apologize in advance for any

17 technical-related interruptions.  Thank you.

18      THE VIDEOGRAPHER:  All right.  Just a

19 moment, please, and I'll get us on the record.

20      Here begins media No. 1 in the

21 videotaped deposition of Dr. Edward A. Lemmo in

22 the matter of Trutek Corporation versus BlueWillow

23 Biologics Incorporated, et al., in the United

24 States District Court Eastern District of

25 Michigan, Southern Division, Case

---

8

1            P R O C E E D I N G S

2  Whereupon,

3            EDWARD LEMMO, PH.D.,

4  being first duly sworn or affirmed to testify to

5  the truth, the whole truth, and nothing but the

6  truth, was examined and testified as follows:

7       EXAMINATION BY COUNSEL FOR THE DEFENDANT

8  BY MS. PETERSON:

9       Q.  Good morning.  Can you please state your

10 full name and address for the record?

11      **A.  Yes.  My name is Edward, middle name is**

12 **Anthony, last name is Lemmo.  And my home address**

13 **is 60 Gilroy Street, Staten Island, New York**

14 **10309.**

15      Q.  And just to introduce myself, my name is

16 Liane Peterson.  I'm with the law firm of Foley &

17 Lardner.  And I am counsel representing the

18 defendant, BlueWillow Biologics, in this case.  So

19 I'll be asking the questions today.

20      Can I ask you, Dr. Lemmo, where are you

21 located today?

22      **A.  I'm located in my home.**

23      Q.  Is there anybody else in the room with

24 you?

25      **A.  No.**

9

1    Q.  And, Dr. Lemmo, have you had your
2  deposition taken before?
3    **A.  I've never given a deposition.**
4    Q.  And I assume that would be no deposition
5  in an expert capacity; correct?
6    **A.  That's correct.**
7    Q.  And you've never had your deposition
8  taken in any other capacity, like in your personal
9  capacity?
10   **A.  No, unless you consider something like**
11 **traffic court.**
12   Q.  Okay.  Well, let me just run through a
13 few ground rules just to kind of familiarize you
14 with the process.
15       So I'll be asking you a series of
16 questions throughout the day.  I would ask that
17 you wait until I finish with my question before
18 responding.  And, of course, I'll try to do the
19 same when you're speaking.  I'll try to wait to
20 ask my next question until when you're done.
21       Is that okay?
22   **A.  That's fine.  Thank you.**
23   Q.  And, of course, it's really important
24 that we try not to speak over each other because
25 that will help Matthew, our court reporter, take

10

1  down a clean and accurate record of the deposition
2  today.  Okay?
3    **A.  Thank you.  Yes.**
4    Q.  I would also ask that you provide verbal
5  responses and answers to my questions rather than
6  shaking your head or nodding or saying "uh-huh."
7        Is that fine?
8    **A.  That's fine.**
9    Q.  Okay.  And let me know at any point if
10 you don't understand my question.  I can rephrase
11 it if you need me to.  Otherwise, if you don't ask
12 me for clarification, I'll assume that you
13 understand the question.  Okay?
14   **A.  Yes.  Thank you.**
15   Q.  And, Dr. Lemmo, are you aware of any
16 reason why you would be unable to provide complete
17 and truthful testimony during this deposition
18 today?
19   **A.  No.**
20   Q.  Okay.  Now, one other kind of
21 housekeeping note, so Jennifer, our technician,
22 will be displaying the exhibits up on the screen,
23 and she can move through those if we need to look
24 at any particular sections.  And at the same time,
25 when the exhibit is marked, she's going to put a

11

1  copy of the exhibit in the chat -- in the chat
2  room.  And so you can directly open up the
3  document from there.  Once we use a document, you
4  can open it from the chat, and then that way you
5  can look at it separately on your own, as well.
6  Okay?
7    **A.  Okay.  Okay.**
8    Q.  And that will be available to everybody.
9        MR. KREMEN:  Can I ask a question,
10 Liane?  We last time -- at the last deposition we
11 agreed that we would have universal numbering of
12 exhibits.  So that -- Exhibits 1 through 11 have
13 already been numbered.
14       Is that okay with you?
15       MS. PETERSON:  Yeah, so we'll start with
16 any new exhibits today with 12.  Yep, that's the
17 plan.
18       MR. KREMEN:  Sorry for interrupting.
19       MS. PETERSON:  Okay.  Let's go ahead and
20 pull up the first exhibit.  And this is going to
21 be the deposition notice of Dr. Lemmo.  And we'll
22 mark that as Exhibit 12.
23       (Lemmo Deposition Exhibit 12 was marked
24 for identification and attached to the
25 transcript.)

12

1  BY MS. PETERSON:
2    Q.  Dr. Lemmo, have you seen Exhibit 12
3  before?
4    **A.  No, I have not.**
5    Q.  But you understand that you are
6  appearing today pursuant to this deposition notice
7  that's been marked as Exhibit 12?
8    **A.  Yes.**
9        MS. PETERSON:  We can take that down.
10 BY MS. PETERSON:
11   Q.  Dr. Lemmo, have you been retained as an
12 expert, either in a testifying or consulting
13 capacity, for any matter other than this matter in
14 the past four years?
15       MR. KREMEN:  Objection to the form of
16 the question.
17       THE WITNESS:  Yes.
18 BY MS. PETERSON:
19   Q.  And how many matters?
20   **A.  In a -- as a consultant -- can you just**
21 **repeat the question?**
22   Q.  Have you been retained as an expert --
23 I'll break it down.
24       Have you been retained as a testifying
25 expert in any other matters in the past

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

4 (13 to 16)

13

1  four years, apart from this matter involving
2  Trutek?
3      A.  No.
4      Q.  Have you been retained as a consulting
5  expert to provide consulting expert analysis in
6  connection with any litigation matter in the past
7  four years?
8      A.  Yes.
9      Q.  How many times?
10     A.  One time.
11     Q.  And who were the parties involved?
12     A.  Trutek and Matrixx Initiatives.
13     Q.  And in connection with that prior matter
14 for Trutek involving Matrixx, did you prepare any
15 expert reports?
16     A.  Yes.
17     Q.  How many?
18     A.  I believe it was three.  I may be wrong.
19     Q.  And do you recall the general subject
20 matter of those three reports?
21     A.  Not offhand.  I spoke about the
22 infringement of the patent, the patent by Trutek,
23 by Matrixx representing the Zicam product line.
24     Q.  And did all three reports that you
25 prepared in connection with the Trutek Matrixx

14

1  matter involving infringement of the Zicam
2  product?
3      A.  It was the Zicam product infringing on
4  the technology of Trutek.
5      Q.  Okay.  But did all three of the reports
6  that you prepared, did they all relate to those
7  issues of infringement, or did they cover other
8  issues, as well?
9      A.  I don't remember.
10     Q.  And did you -- have you ever prepared a
11 declaration or some other type of sworn statement
12 for any prior litigation proceeding involving
13 Trutek?
14     A.  No.
15     Q.  And what about apart from litigation,
16 have you prepared or signed any declarations or
17 expert reports in connection with any other
18 contested proceedings such as an IPR involving
19 Trutek?
20     A.  Yes.
21     Q.  How many times?
22     A.  I believe once or twice.
23     Q.  And were those IPR proceedings or
24 something else?
25     A.  IPR proceedings.

15

1      Q.  And do you know what patent was the
2  subject of those IPR proceedings?
3      A.  I'm sorry, can you explain that?
4      Q.  Well, you understand that an IPR
5  proceeding challenges the validity of a patent at
6  the United States Patent and Trademark Office;
7  correct?
8      A.  Yes.
9      Q.  Do you know what patents were being
10 challenged in those IPR proceedings for which you
11 prepared declarations?
12     A.  I believe it was the Trutek '802 patent.
13     Q.  And have you ever been retained by any
14 other entity or any other party to provide any
15 declaration or expert testimony in any other IPR
16 proceeding?
17     A.  No.
18     Q.  What about a PGR proceeding?
19     A.  I don't know what a PGR proceeding is.
20     Q.  Okay.  What about a reexamination, are
21 you familiar with that?
22     A.  No.
23     Q.  So you haven't prepared any declarations
24 or provided any testimony in connection with a
25 reexamination either?

16

1      A.  No.
2          MR. KREMEN:  Objection to the form of
3  the question.
4  BY MS. PETERSON:
5      Q.  And to the best of your knowledge, are
6  you -- actually, let me back up.
7          Going back to those IPR proceedings for
8  which you were retained by Trutek, how many
9  declarations did you prepare?
10     A.  Again, I believe it was either one or
11 two.
12     Q.  Okay.  To the best of your knowledge,
13 are you aware if your proposed testimony or
14 opinions has ever been challenged or excluded by a
15 court or the patent office?
16         MR. KREMEN:  Objection to the form of
17 the question.
18         THE WITNESS:  Can you rephrase that for
19 me?
20 BY MS. PETERSON:
21     Q.  Just if you even know, to the best of
22 your knowledge, has your proposed opinions
23 contained in any of your prior reports or
24 declarations, has it ever been challenged in terms
25 of whether it's admissible?

17

1     A.   Not to my knowledge.
2     Q.   And have you -- apart from the work that
3   you've done in connection with the prior Trutek
4   matter involving Matrixx and the current Trutek
5   matter involving BlueWillow, have you ever
6   provided any consulting services in connection
7   with any nasal antiseptic products?
8     A.   No.
9     Q.   And so I would also assume that you
10  haven't prepared any reports or any declarations
11  in connection with any analysis of any nasal
12  antiseptic products for purposes of acting as a
13  testifying expert either?
14    A.   Correct.
15    Q.   And have you ever provided any
16  consulting services for any other company apart
17  from these two matters with respect to
18  compositions intended to be applied to the nasal
19  passages for reducing the risk of infection by
20  either bacteria or viruses?
21    A.   No.
22       MR. KREMEN:  Objection to the form of
23  the question.
24  BY MS. PETERSON:
25    Q.   And I assume you haven't been retained

18

1   as an expert to testify on any such matters
2   either; is that correct?
3     A.   That's correct.
4     Q.   Have you ever been retained by Trutek to
5   provide any expert or consulting services on any
6   other matters beyond this BlueWillow and the prior
7   Matrixx matter?
8     A.   No.
9     Q.   Have you ever been retained by Trutek's
10  counsel, Mr. Stanley Kremen, previously on any
11  other matter?
12    A.   No.
13    Q.   And have you ever been retained by
14  Trutek's other attorney, Keith Altman of the
15  Altman law firm, on any other matter?
16    A.   No.
17    Q.   And what about Amirali Haidri -- I don't
18  know if I said that name correct -- have you ever
19  been retained by him or his firm to provide any
20  expert or consulting services?
21    A.   No.
22    Q.   Dr. Lemmo, when were you retained by
23  Trutek for this matter?
24    A.   I believe it was sometime in 2021.
25    Q.   And do you recall when you were retained

19

1   by Trutek for the Matrixx matter?
2     A.   I believe that was in 2019.
3     Q.   And so prior to your retention in 2019,
4   as I understand it, you had no prior contact or
5   any involvement with Trutek; is that correct?
6     A.   That's correct.
7     Q.   Or any employees of Trutek?
8     A.   That's correct.
9     Q.   Or any of the lawyers representing
10  Trutek?
11    A.   That's correct.
12    Q.   And who were you retained by for this
13  matter?
14    A.   Mr. Kremen.
15    Q.   Okay.  Do you intend to testify at the
16  trial in this case?
17    A.   If necessary --
18    Q.   And what about --
19    A.   -- yes.
20    Q.   What about the Markman hearing, do you
21  intend to testify there?
22    A.   If necessary, yes.
23    Q.   Have you been asked to?
24    A.   No.
25    Q.   And will you be compensated for

20

1   testifying at trial?
2     A.   I believe so, yes.
3     Q.   And what is your hourly rate that you're
4   charging Trutek for this matter?
5     A.   $250 per hour.
6     Q.   And is that the same rate that you
7   charge for providing testimony, whether by
8   deposition or at trial?
9     A.   Yes.
10    Q.   Approximately how many hours have you
11  accrued to date working on this matter?
12    A.   From the beginning you're referring to,
13  from when I was first retained in 2021?
14    Q.   Yes.
15    A.   It's hard for me to say.  I could give
16  you an estimate, if that's okay.
17    Q.   Yeah, give me an estimate.
18    A.   I would say perhaps 60 hours.
19    Q.   And that's your best estimate sitting
20  here today?
21    A.   That's my best estimate.  It's difficult
22  without information in front of me for how many
23  times I either had to do reviews of material or
24  had conversation with the attorney or any matter
25  related to this.

21

1    Q.  Do you keep records of how much time you
2  spend working on this matter?
3    A.  Yes.
4    Q.  And do you send invoices to Mr. Kremen?
5    A.  I send invoices directly to Trutek.
6    Q.  Okay.  And whose attention are those
7  sent to?
8    A.  They're sent to Ashok Wahi, and I copy
9  Mr. Kremen.
10    Q.  Okay.
11       Okay.  So just generally speaking, I
12  don't want to know necessarily the subject of any
13  conversations, but I would like to know the names
14  of the people that you have spoken with in
15  connection with your work on this matter involving
16  BlueWillow.
17    A.  Conversations include Stan Kremen, Ashok
18  Wahi, Alexi Ermakov, and Shane Burns.
19    Q.  Okay.  Now, let's start with Alex
20  Ermakov.  How many times have you spoken with him?
21    A.  One time.
22    Q.  When was that?
23    A.  It was in October.  I believe it was
24  October 14th.
25    Q.  Of what year?

22

1    A.  2022.
2    Q.  Okay.  So a little over a week ago?
3    A.  About two weeks ago, yes.
4    Q.  Okay.  And that's the only conversation
5  you've had with Dr. Ermakov.
6    A.  Yes.
7    Q.  What was the subject matter of your
8  conversation?
9    A.  To get clarification and also to see the
10  design of his study.  I met him at his laboratory.
11    Q.  And where is his laboratory located?
12    A.  Rutgers University.
13    Q.  And what were you seeking clarification
14  on?
15    A.  I wanted clarification on how he
16  conducted the measurement for surface charge.
17    Q.  Okay.  And then you also mentioned
18  speaking to him or to see the design of his study.
19  What did that involve?
20    A.  To visit his laboratory and see the
21  equipment itself.
22    Q.  So you viewed the equipment that he
23  used?
24    A.  Yes.
25    Q.  Did you watch it in operation?

23

1    A.  Yes.
2    Q.  Did you watch the actual study that
3  Dr. Ermakov conducted?
4    A.  No.
5    Q.  Did he replicate that study for you when
6  you visited him on October 14th, 2022?
7    A.  He did not replicate it.
8    Q.  And then just to confirm, I would expect
9  that since the only time you spoke to Dr. Ermakov
10  or met with him in person was about ten days ago,
11  would it be fair to say that you did not speak
12  with him prior to submitting your opening report
13  or your reply report in this matter?
14    A.  Yes.
15    Q.  And you did not view the equipment that
16  he used in this study prior to preparing any of
17  your expert reports either; correct?
18    A.  Only on the report diagram where the
19  equipment is shown as a pictorial.
20    Q.  Okay.  So apart from what was contained
21  within Dr. Ermakov's report, you did not view the
22  equipment or visit his laboratory prior to
23  preparing any of your expert reports?
24    A.  Correct.
25    Q.  Okay.  And what about Mr. Burns, how

24

1  many times did you speak with him?
2    A.  One time.
3    Q.  And was that also an in-person visit?
4    A.  Yes.
5    Q.  And where is he located?
6    A.  Pennsylvania.
7    Q.  And where did you visit him
8  specifically?
9    A.  At his laboratory.
10    Q.  And when was that visit?
11    A.  About a week later.  So it would be --
12  I'd have to look, but I think it was the 21st.
13    Q.  And apart from that meeting with
14  Mr. Burns on October 21st -- actually, let me
15  confirm.  That's October 21st, 2022?
16    A.  2022, correct.
17    Q.  Okay.  So apart from that one meeting
18  with Dr. Burns on October 21st, 2022, is it
19  correct that you had no other conversations with
20  Mr. Burns at any time regarding the subject matter
21  of his testing?
22    A.  That's correct.
23    Q.  Did you ever meet with Dr. Ermakov or
24  Mr. Burns to discuss the testing that they
25  conducted on the Matrixx products?

25

1  A.  No.
2  Q.  And no conversations, telephone or Zoom,
3  with Dr. Ermakov or Mr. Burns to discuss the
4  testing conducted on the Matrixx products?
5  A.  No.
6  Q.  And what was the reason why you met with
7  Mr. Burns on October 21st, 2022?
8  A.  To, again, view his equipment, how he
9  conducted the test.
10  Q.  And prior to your visit on October 21st,
11  2022, you had not viewed the equipment or
12  personally overseen how he conducted the test?
13  A.  Correct.
14  Q.  And when you visited him on
15  October 21st, 2022, did he repeat or replicate the
16  testing that he did?
17  A.  He simply gave a demonstration of the
18  equipment, but did not repeat the test.
19  Q.  And what equipment did he demonstrate?
20  A.  He used a NanoCoulomb Meter, and he used
21  a Faraday cup.
22  Q.  And was he actually testing anything, or
23  did he just show how the products operate?
24  A.  He just showed how the product operates.
25  Q.  So he didn't --

26

1  A.  Or how the -- I'm sorry, how the
2  equipment operates.
3  Q.  Okay.  So he didn't take a particular
4  substrate and apply something to it and conduct
5  any measurements?
6  A.  No.
7  Q.  Okay.  And so I will also assume that he
8  didn't demonstrate anything to you about how he
9  used the pig's skin in his experiments?
10  A.  No.
11  Q.  And why -- well, did you ask to set up
12  these meetings with Dr. Burns -- or sorry,
13  Mr. Burns or Dr. Ermakov, or was it counsel's
14  suggestion?
15  A.  I think it was a combination of getting
16  clarification to see what actually transpired in
17  the laboratory.  So collaboration with both
18  counsel as well as myself.
19  Q.  And why did you feel it was necessary to
20  get that clarification?
21  A.  When you look at the reports of both
22  Dr. Ermakov and Mr. Burns, there are pictures and
23  descriptive terminology, but since I am not a
24  specialist in that particular area, I wanted to
25  see the equipment and how the equipment operates

27

1  just to feel more comfortable that my
2  understanding of what testing they did was
3  accurate.
4  Q.  And apart from the meetings with
5  Mr. Burns and Dr. Ermakov in October of 2022, what
6  else did you do to confirm your understanding of
7  the accuracy of their testing?
8  A.  The only other items was to review in
9  the literature how surface charge is measured.
10  Q.  So just to make sure I understand.
11  Apart from your meetings with Dr. Burns --
12  Mr. Burns and Dr. Ermakov to view the equipment
13  that was used and a literature search concerning
14  how surface charge is measured, you did not do
15  anything else to confirm your understanding of the
16  accuracy of the Burns and Ermakov testing;
17  correct?
18  A.  That's correct.
19  Q.  Now, you also mentioned that you're not
20  a specialist in that type of testing; is that
21  correct?
22  A.  Yes.
23  Q.  And so I assume that's why you didn't do
24  the testing yourself?
25  A.  Yes.

28

1  Q.  Have you ever conducted that type of
2  testing of the surface charge measurements?
3  A.  No.
4  Q.  Have you ever performed any testing to
5  determine the conductivity of materials on a
6  substrate?
7  A.  No.
8  Q.  Okay.  Going backwards a little bit now.
9  You also mentioned that you spoke with -- in
10  connection with your work on this matter, that you
11  also spoke with Mr. Kremen and Mr. Wahi; correct?
12  A.  Correct.
13  Q.  Do you recall speaking with anybody else
14  other than those four individuals in connection
15  with your work on this matter?
16  A.  No.
17  Q.  Okay.  And how many times did you speak
18  with Mr. Wahi?
19  A.  In person, two times.
20  Q.  Okay.  And how about either by telephone
21  or by video?
22  A.  Maybe eight times.
23  Q.  That's a lot of meetings.  I'm not going
24  to ask you to remember the details of every single
25  one of them, but do you recall when the first

29

1  meeting was?
2      A.  With Mr. Wahi?
3      Q.  Yeah.
4      A.  Regarding this matter, he contacted me,
5  I believe it was November of 2021.  I may be
6  wrong, but I believe it was November.
7      Q.  And was that before or after you had
8  been retained for the matter?
9      A.  Yes.
10     Q.  And what was the subject matter of that
11 discussion?
12     A.  He approached me to utilize me as a
13 consultant expert to evaluate the matter.
14     Q.  And what matter are you referring to?
15     A.  The matter of Trutek versus BlueWillow.
16     Q.  Okay.  Did Mr. Wahi ever contact you or
17 ask you to work as a consultant on any matter
18 other than the ones directed to Matrixx and
19 BlueWillow?
20     A.  No.
21     Q.  Okay.  And when was the most recent
22 meeting that you had with Mr. Wahi?
23     A.  By telephone.
24     Q.  And when was that?
25     A.  By telephone, it was Friday the 21st.

30

1      Q.  And what was the purpose for that
2  meeting?
3      A.  He asked me if I needed any further
4  clarification on the matter.
5      Q.  And did you?
6      A.  No.
7      Q.  Okay.  And when were the two in-person
8  meetings that you had with Mr. Wahi?
9      A.  Well, one they were several weeks back
10 to discuss, you know, at his facility just to,
11 again, get clarification and then on another
12 occasion to talk about the tests of Dr. Ermakov
13 and Mr. Burns.
14     Q.  Okay.  And what clarification were you
15 seeking in that first meeting?
16     A.  The understanding of the claims that are
17 utilized in the '802 patent by Mr. Wahi.
18     Q.  And that meeting you said was several
19 weeks ago?
20     A.  Several weeks ago, yes.
21     Q.  So sometime in September or October of
22 2022?
23     A.  Probably.  I'm not certain to the exact
24 date again.  I'd have to look that up.
25     Q.  Okay.  But it would have been after you

31

1  prepared your expert reports in this matter?
2      A.  Yes.
3      Q.  Okay.  And I assume the same is true
4  about the second in-person meeting to talk about
5  the Ermakov and Burns test, was that also within
6  the last couple of weeks?
7      A.  Yes.
8      Q.  And what did you discuss with Mr. Wahi
9  concerning the Ermakov and Burns test?
10     A.  The question of measurement being
11 surface charge versus the statement that Dr. Amiji
12 raised regarding conductivity.
13     Q.  Okay.  And what did you discuss?
14     A.  Simply to have a better understanding of
15 the measurement technique, whether it was, in
16 fact, a measurement of surface charge, or was it
17 conductivity that was measured.
18     Q.  And would it be fair to say that you had
19 that conversation because you were unsure of that
20 yourself based on your own experience?
21     A.  Just to get reinforcement of the
22 subject.
23     Q.  And did that conversation change your
24 understanding in any way --
25     A.  No.

32

1      Q.  -- that you had prior --
2      A.  No.
3      Q.  So if you already had an understanding,
4  why did you feel it necessary to confirm it?
5      A.  Again, the question of -- that I like to
6  see things and also to ask questions of the people
7  involved so that my understanding of the situation
8  is exactly the same as how they see it.
9      Q.  And did you have any conversations with
10 Mr. Wahi prior to preparing your expert reports?
11     A.  No.
12     Q.  So all of your meetings with Mr. Wahi,
13 whether by phone or video or in person, have been
14 sometime in just the last month or two of 2022; is
15 that correct?
16     A.  Correct.
17     Q.  But that would be other than the first
18 meeting --
19     A.  Yes.
20     Q.  -- where Mr. Wahi contacted you about
21 the matter?
22     A.  Yes.  I'm sorry I interrupted you.  Yes,
23 that's correct.
24     Q.  Okay.  So as best you can remember, the
25 most recent meeting that you had with Mr. Wahi would have

33

1  been after you prepared your expert reports?
2      A.  Yes.
3      Q.  Okay.  What about your work on the
4  Matrixx matter, did you ever have any
5  conversations with Mr. Wahi in connection with
6  that matter?
7      A.  No.
8      Q.  Okay.  So apart from Mr. Kremen,
9  Mr. Wahi, Mr. Burns, and Dr. Ermakov, is there
10  anybody else that you had any discussions with,
11  whether by phone or video or in person, regarding
12  the subject matter of this dispute?
13      A.  No.
14      Q.  Did you speak with anybody else at
15  Trutek?
16      A.  Well, not regarding the matter.  There
17  are people there, and so I did greet them, if
18  that's what you're referring to.  No.  But no.
19  The answer is no.
20      Q.  No, I'm talking -- yeah, I'm talking
21  about substantive conversations about the issues
22  raised in the matter.
23      A.  No.
24      Q.  Okay.  Have you had any conversations
25  with Mr. Haidri regarding this matter?

34

1      A.  No.
2      Q.  And did anyone else assist you in
3  formulating your opinions provided in this matter?
4      A.  No.
5      Q.  I should also ask -- you mentioned the
6  expert that's retained by my client, BlueWillow,
7  and that's Dr. Amiji.  Do you know him?
8      A.  No, I do not.
9      Q.  Dr. Lemmo, just very generally speaking,
10  in your understanding, what was the nature of your
11  assignment for this matter?
12      A.  The nature of my assignment was to
13  provide expertise to demonstrate that the
14  BlueWillow product was infringing on the patent of
15  Trutek, the '802 patent, in the claims that
16  NanoBio makes and is commercially available.
17      Q.  I'm sorry, what do you mean by "the
18  claims that NanoBio makes"?
19      A.  The product that's marketed by
20  BlueWillow as NanoBio Protect provides claims in
21  their advertising and on their packaging that
22  resemble the Trutek product that is known as
23  NasalGuard.
24      Q.  Okay.  So you're referring to the
25  statements from BlueWillow's website that are

35

1  referenced throughout your report?
2      A.  Yes.
3      Q.  Okay.  And then with respect to
4  commercial availability, you understand that
5  NanoBio Protect is no longer being sold?
6      A.  Yes.
7      Q.  Okay.  So you also mentioned a Trutek
8  product that's known as NasalGuard; correct?
9      A.  Yes.
10      Q.  So you're familiar with that product, as
11  well?
12      A.  Yes, I use it.
13      Q.  And how many products are within that
14  line?
15      A.  There are two products, NasalGuard
16  scented and unscented, and then there's a spray
17  product.
18      Q.  And those are the products that are sold
19  in the United States?
20      A.  They're sold, I believe, in the United
21  States as well as overseas.
22      Q.  Do you know if there are any other
23  NasalGuard products sold overseas?
24      A.  I'm not familiar with that.
25      Q.  Okay.  Do -- are you familiar with the

36

1  formulation and the ingredients of the NasalGuard
2  product?
3      A.  Yes.
4      Q.  Do they all have the same formulation?
5      A.  Yes, with the exception of the scented
6  component.  I'm referring primarily to the
7  composition for the product that's sold in the
8  tube.
9      Q.  And what's different about the scented
10  composition?
11      A.  Just that it contains a scent as opposed
12  to unscented.
13      Q.  And do you know what that scent is?
14      A.  I don't use the scented product, I'm
15  sorry.
16      Q.  But other than the scent that's included
17  in the scented formulation, it's your
18  understanding that the formulation and composition
19  of all the Trutek NasalGuard products are the
20  same?
21      A.  Yes.
22      Q.  And are you familiar with the specific
23  ingredients that are used in NasalGuard?
24      A.  Yes.
25      Q.  And how do you know that information?

37

1    A.  They're listed in the patent, the '802
2  patent.  And, also, if you visit the NasalGuard
3  website and you click on the ingredients, they're
4  listed there, as well.
5    Q.  And the ingredients that are listed on
6  the website, do they provide the specific amounts
7  of each ingredient that are included in the
8  NasalGuard product?
9    A.  No.
10   Q.  So it's just a list of ingredients?
11   A.  Yes.
12   Q.  And do you know the specific amount of
13 each ingredient that's used in NasalGuard?
14   A.  No.
15   Q.  Have you ever asked for that
16 information?
17   A.  Excuse me?
18   Q.  Have you ever asked Trutek for that
19 information?
20   A.  Yes.
21   Q.  Did they provide it to you?
22   A.  Yes.  And percentages.
23   Q.  Okay.
24   A.  Not the quantification.  So, in other
25 words, what I'm saying is that of 100 percent,

38

1  they'll tell me how much of every ingredient is,
2  but not the specific quantities that are used.
3    Q.  Okay.  So you have -- so you are aware
4  of the percentage of the entire composition for
5  each ingredient --
6    A.  Yes.
7    Q.  -- of NasalGuard?
8    A.  Yes.
9    Q.  And when was that information provided
10 to you?
11   A.  Within the past two weeks.
12   Q.  So you did not have the information
13 about the percentage of the individual ingredients
14 within the NasalGuard products prior to preparing
15 your reports; correct?
16   A.  Only the information that was available
17 online.
18   Q.  And that would be just the list of
19 ingredients without their percentages?
20   A.  That's correct.
21   Q.  And why did you ask for the percentages
22 for the ingredients two weeks ago?
23   A.  For further clarification.  These
24 matters are usually -- they're usually private or
25 considered confidential.  And so in order to

39

1  prepare for this deposition, I felt it necessary
2  to have a better understanding of those amounts.
3    Q.  But you didn't think it was necessary to
4  have an understanding of the amounts or the
5  percentages at the time that you formed your
6  opinions as stated in your reports?
7    A.  Well, the percentages were available to
8  me at that time, but the amounts were not.
9    Q.  Okay.  Let's back up.  I thought you
10 said that you received the percentages two weeks
11 ago?
12   A.  Yes, but the percentages are on the
13 website.
14   Q.  Okay.  Earlier you testified that the
15 website only has the list of ingredients, not the
16 percentages; is that correct?
17   A.  Yes.  All right.  I misspoke, I'm sorry.
18   Q.  That's okay.  I know it's -- it can be
19 tough keeping track of everything, especially when
20 I keep peppering you with questions.  And, you
21 know, I apologize for that.  If you need me ever
22 to restate my question just to make sure you
23 understand it, I'm always happy to do that.  Okay?
24   A.  Thank you.  I appreciate that.
25   Q.  I also have the advantage of being able

40

1  to see everything written out while you'll just
2  have to listen.  So I know it's difficult.
3      Okay.  So let's just back up to make
4  sure I understand.  The website includes the list
5  of ingredients, but not the percentages; correct?
6    A.  That's correct.
7    Q.  And you had that information about the
8  list of ingredients at the time of preparing your
9  expert reports; correct?
10   A.  That's correct.
11   Q.  Okay.  You did not have the percentages
12 of the ingredients or the actual amounts of the
13 ingredients at the time of preparing your reports;
14 correct?
15   A.  Well, I relied on the information that
16 was in the patent.  So there are -- there is in
17 the Wahi '802 patent, there are tables that
18 include all of the ingredients or any permutation
19 of those ingredients in the ten different -- I'd
20 have to specifically, if I have it here, pull it
21 up so that I could take a look at it.
22   Q.  Yeah, we can pull that up right now.
23   A.  Yeah.
24   MS. PETERSON:  Can we pull up the
25 exhibit that was previously marked as Exhibit 2.

41

1    THE REMOTE TECHNICIAN:  Yes, stand by,
2  Counsel.
3    (Deposition Exhibit 2, Previously
4  Marked.)
5    THE REMOTE TECHNICIAN:  It's on the
6  screen.
7  BY MS. PETERSON:
8    Q.  Okay.  And is it also -- Dr. Lemmo, if
9  you don't have a copy handy, if you go to the
10  chat, you should be able to open up a copy of the
11  patent, as well, directly if it's easier for you
12  to scroll through it.
13    A.  All right.
14    Q.  Or we could ask Jennifer to scroll
15  through to the tables.  What would you prefer?
16    A.  Yeah, if Jennifer can scroll through it,
17  it will make it easier for me because I'm opening
18  a lot of windows here, and I prefer not to.  If
19  you scroll down --
20    MS. PETERSON:  Yeah, I think we want to
21  go to the fourth page of the PDF, starting with
22  Column 5.
23  BY MS. PETERSON:
24    Q.  Are these the tables you were referring
25  to?

42

1    A.  These are the tables I'm referring to,
2  yes.
3    Q.  Okay.  And where -- specifically which
4  table contains the formulation for NasalGuard?
5    A.  I don't have the exact reference to the
6  table for that because each is that it contains --
7  it could contain this ingredient, the other
8  ingredient, et cetera.  So I don't have that
9  information handy to say that it's Table 2 or
10  Table 4 or whatever.
11    Q.  Okay.  But to your understanding, does
12  at least one of these tables in the '802 patent
13  contain the exact list of ingredients in
14  NasalGuard?
15    A.  I believe so.
16    Q.  Okay.  Now, if you look at the tables,
17  you see that for many of the ingredients that are
18  listed they're provided with a range, a percentage
19  range; correct?
20    A.  Yes.
21    Q.  Okay.  So is it fair to say that with
22  respect to the specific NasalGuard formulation,
23  you don't know the precise percentage of the
24  ingredients, but rather just what ranges are
25  reported in the tables of the '802 patent?

43

1    A.  Yes.
2    Q.  Okay.  So you had this information --
3  certainly you had the '802 patent in your
4  possession and considered it in forming your
5  opinions as stated in your expert reports; right?
6    A.  Yes.
7    Q.  Okay.  At the time you prepared your
8  reports, did you know which exact table of the
9  '802 patent matched with the NasalGuard
10  formulation?
11    A.  No.
12    Q.  Okay.  And you also did not know the
13  specific percentages of the ingredients in
14  NasalGuard at the time that you prepared your
15  reports; correct?
16    A.  Correct.
17    Q.  Okay.  Did you not think it was
18  necessary or important to have an understanding of
19  the percentages of the ingredients in NasalGuard
20  at the time that you formed your opinions provided
21  in this matter?
22    A.  At the time I formed my opinion on the
23  matter, I focused on specific things that were
24  recited in the claims.
25    Q.  Okay.  But you didn't think it was

44

1  important to have an understanding of the specific
2  percentages of ingredients contained within
3  NanoBio Protect in the course of forming your
4  opinions; is that right?
5    MR. KREMEN:  Objection to the form of
6  the question.
7    THE WITNESS:  Can you just clarify that
8  for me, I'm sorry?
9  BY MS. PETERSON:
10    Q.  So at the time that you formed your
11  opinions as stated in your reports, you didn't
12  think it was important to understand the specific
13  percentages of ingredients contained within
14  NanoBio Protect?
15    A.  Yes.
16    Q.  And what about the ingredients for --
17  oh, I'm sorry, I might have -- I asked a bad
18  question there.  Let me try that again.
19    At the time that you formed your
20  opinions as stated in your reports, you didn't
21  think it was important to understand the specific
22  percentages of ingredients contained within
23  Trutek's NasalGuard product?
24    A.  Yes.
25    Q.  And I think I had asked you that same

**45**

1 question with respect to NanoBio Protect. So let
2 me just clarify that.
3     When you prepared your -- formed your
4 opinions and prepared your expert reports, did you
5 know the specific ingredients that were contained
6 within NanoBio Protect?
7     **A. Not the specific ingredients, the --**
8 **there was one ingredient that I primarily focused**
9 **on and that was benzalkonium chloride.**
10     Q. Okay. But you were not aware of any of
11 the other ingredients contained within NanoBio
12 Protect when forming your opinions and preparing
13 your expert reports; correct?
14     **A. That's correct.**
15     Q. And would it be fair to assume, then,
16 that you were also not aware of the percentages of
17 the ingredients contained within NanoBio Protect
18 when forming your opinions and preparing your
19 expert reports?
20     **A. Yes.**
21     Q. Did your assignment in this matter
22 include anything other than assessing and
23 providing opinions on whether NanoBio Protect
24 infringes the '802 patent claims?
25     **A. No.**

**46**

1     Q. So you are not offering any opinions
2 concerning the validity of the '802 patent?
3     **A. The validity of the '802 patent relative**
4 **to the claims that it makes?**
5     Q. Well, you understand that a patent has a
6 number of claims at the end of it; right?
7     **A. Yes.**
8     Q. And those claims are what defines the
9 invention?
10     **A. Yes.**
11     Q. And is it your understanding that for an
12 infringement analysis, you have to compare those
13 claims and all of the elements to the accused
14 product to determine if they're all present?
15     **A. Yes.**
16     Q. And you also understand that those
17 patent claims could be found either by the patent
18 office or by a court or by a jury to be invalid
19 under any number of invalidity grounds?
20     **A. Yes.**
21     Q. So, for example, like obviousness,
22 anticipation, enablement, are you familiar with --
23 or have you heard of those terms before?
24     **A. Yes, I've heard of the terms.**
25     Q. So are you offering any opinions in this

**47**

1 matter relating to those issues of invalidity, for
2 example, in response to Dr. Amiji's report?
3     **A. I believe I did.**
4     Q. And are all of your opinions on the
5 subject matters of -- or the issue of infringement
6 and patent validity, are those contained within
7 your three expert reports?
8     **A. Yes.**
9     Q. Okay. Let's go ahead -- actually, let's
10 skip that for now.
11     Dr. Lemmo, what did you do to prepare
12 for your deposition?
13     **A. I reviewed the materials that are --**
14 **that I wrote, and I reviewed the exhibits that you**
15 **provided or were provided to me by Mr. Kremen.**
16     Q. And what exhibits were those?
17     **A. The list of exhibits that were -- that**
18 **we referred to such as this one, '802 patent, as**
19 **well as the statements by Dr. Amiji in his reports**
20 **and the other documents that accompanied that**
21 **group. So there was a list of exhibits.**
22     Q. Okay. The list of exhibits, is that
23 something that was contained in one of the expert
24 reports in this matter, or is that a list that was
25 prepared by Mr. Kremen?

**48**

1     **A. It was the list that was supplied by**
2 **Mr. Kremen.**
3     Q. Okay. Did you review the deposition
4 transcript of Dr. Amiji to prepare for today's
5 deposition?
6     **A. Yes.**
7     Q. Now, the documents that were provided to
8 you that you reviewed in connection with your
9 preparation for this deposition, did you receive
10 any documents that you hadn't already seen before?
11     MR. KREMEN: Objection to the form of
12 the question.
13     THE WITNESS: I'm curious what you're
14 referring to. Because I did receive the patent,
15 which is one of the documents in the packet and
16 the statements from Dr. Amiji so that I could
17 provide a response to that. So I don't know if
18 there was anything else that you're referring to.
19 BY MS. PETERSON:
20     Q. Okay. So -- well, I'll break it down.
21 So in preparation for your deposition, Mr. Kremen
22 provided you with some documents; correct?
23     **A. Correct.**
24     Q. Okay. Had you seen all of those
25 documents before in the course of your preparing

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

13 (49 to 52)

49

1 your expert reports?
2 **A. Not all of them.**
3 Q. Okay. What documents were new?
4 **A. Some of the documents related to the**
5 **terminology referring to the use of the word**
6 **"inhibition" or "inhibiting" versus the term**
7 **"preventing."**
8 Q. Okay. Anything else?
9 **A. Offhand, I would have to look at my list**
10 **of documents to be specific. I'm using two**
11 **computers because I keep everything on electronic.**
12 **You have to forgive me.**
13 Q. No problem.
14 **A. But I have to pull it up on the other**
15 **computer.**
16 **The -- let's see, I have the notice of**
17 **deposition. I believe that was for Dr. Amiji.**
18 Q. Okay. And, Dr. Lemmo, just to be clear
19 here, I don't need you to read the list of
20 everything.
21 **A. Oh.**
22 Q. I'm just wondering if there was anything
23 new that you reviewed in preparation for your
24 deposition that you had not already considered
25 when forming your opinions and preparing your

50

1 expert reports?
2 **A. No.**
3 Q. Okay. Thank you.
4 Did you meet with anyone to prepare for
5 your deposition today?
6 **A. No.**
7 Q. Did you meet with Mr. Kremen at all to
8 prepare for the deposition?
9 **A. We spoke on the telephone.**
10 Q. Okay. How long did you speak with
11 Mr. Kremen on the telephone?
12 **A. In total, maybe two to three hours.**
13 Q. Was anybody else present for that
14 conversation?
15 **A. No.**
16 Q. Did you have any conversations with
17 Mr. Wahi in preparation for your deposition?
18 **A. I believe so, yes.**
19 Q. And what did you discuss during that
20 conversation?
21 **A. Again, it focused primarily on the '802**
22 **patent and the statements of the claims. Just the**
23 **clarification, once again.**
24 Q. The clarification of what exactly?
25 **A. The terms that are used in the claims.**

51

1 Q. So a clarification of his understanding
2 of the claim terms as the named inventor on the
3 patent?
4 **A. My understanding of what he stated in**
5 **his claims.**
6 Q. Okay.
7 **A. So that we were -- I'm sorry. So that**
8 **we were on the same page, that I, in fact, read**
9 **the claims accurately.**
10 Q. Okay. And in terms of what -- when you
11 say what he stated in the claims, you're talking
12 about what Mr. Wahi stated in the claims as the
13 named inventor on the patent?
14 **A. Yes.**
15 Q. Okay. Did you meet with Mr. Altman or
16 have any phone conversations with Mr. Altman to
17 prepare for your deposition?
18 **A. I don't know Mr. Altman.**
19 Q. Okay. You never --
20 **A. I've never spoken with Mr. Altman.**
21 Q. Okay.
22 **A. I don't know who he is.**
23 MR. KREMEN: Are we on any line of
24 questioning that we can't interrupt for just a
25 break? Because we've been going for an hour. I

52

1 think Dr. Lemmo needs -- might need a little bit
2 of a break, unless you want to continue on.
3 MS. PETERSON: Yeah, let me just ask,
4 like, one or two more questions, and then that
5 will be a great breaking point.
6 BY MS. PETERSON:
7 Q. And then just to confirm, did you meet
8 with or have any conversations with anybody else
9 at Trutek to prepare for your deposition?
10 **A. No.**
11 Q. And approximately how much time did you
12 spend reviewing the materials and the reports and
13 the deposition transcript to prepare for your
14 deposition today?
15 MR. KREMEN: Objection to the form of
16 the question.
17 THE WITNESS: Can you just spell it out
18 for me again?
19 BY MS. PETERSON:
20 Q. Yeah. How much time did you spend
21 personally preparing for the deposition today?
22 **A. Oh, to read everything -- I'm a slow**
23 **reader, I'm sorry. To read everything and just to**
24 **review, to refresh my memory, because some of the**
25 **documents are a few months old, I would say**

53

1    five hours. But that's not a solid five hours.
2    It's when I have the time to read different
3    documents, I did.
4        Q.  Okay. Thank you.
5        MS. PETERSON:  Why don't we go off the
6    record.
7        THE VIDEOGRAPHER:  We're going off the
8    record. The time is now 11:03 a.m.
9        (Recess from the record.)
10       THE VIDEOGRAPHER:  We're back on the
11   record. The time is now 11:13 a.m.
12   BY MS. PETERSON:
13       Q.  Welcome back, Dr. Lemmo.
14       A.  Thank you.
15       Q.  Have you been asked to provide any
16   opinions on anything else beyond what has been
17   contained in your three expert reports?
18       A.  No.
19       Q.  Okay. Now, you have submitted three
20   reports in this case; right?
21       A.  It was three or four. I forget. But I
22   think it was three.
23       Q.  Okay. So let's go ahead and mark and
24   identify those for the record.
25       MS. PETERSON:  So we will mark as

54

1    Exhibit 13 a copy of Dr. Lemmo's opening report.
2        (Lemmo Deposition Exhibit 13 was marked
3    for identification and attached to the
4    transcript.)
5        THE REMOTE TECHNICIAN:  Stand by.
6    BY MS. PETERSON:
7        Q.  Dr. Lemmo, do you recognize Exhibit 13
8    as your opening report?
9        A.  I believe so, yes.
10       Q.  And looking at page 16 of the PDF, is
11   that your signature?
12       A.  I can only see the first page. If
13   Jennifer can move that just to confirm it.
14       Yes, that's my signature.
15       Q.  Okay.
16       MS. PETERSON:  And then let's mark as
17   Exhibit 14 a copy of Dr. Lemmo's responsive
18   report.
19       (Lemmo Deposition Exhibit 14 was marked
20   for identification and attached to the
21   transcript.)
22       THE REMOTE TECHNICIAN:  Stand by.
23   BY MS. PETERSON:
24       Q.  Dr. Lemmo, do you recognize Exhibit 14
25   as your expert report responsive to and in

55

1    rebuttal of defendant's opening expert report of
2    Mansoor M. Amiji?
3        A.  Yes.
4        MS. PETERSON:  And if we could turn to
5    page 14 of the PDF, please.
6    BY MS. PETERSON:
7        Q.  Is that your signature, Dr. Lemmo?
8        A.  That's my signature, yes.
9        Q.  And the report is dated August 23rd,
10   2022?
11       A.  Yes.
12       MS. PETERSON:  And then let's mark as
13   Exhibit 15 a copy of Dr. Lemmo's reply expert
14   report.
15       (Lemmo Deposition Exhibit 15 was marked
16   for identification and attached to the
17   transcript.)
18       THE REMOTE TECHNICIAN:  Stand by.
19       MR. KREMEN:  Can we see a little more of
20   that.
21       Can we see a little bit more of what's
22   on that page because all I see is the caption.
23       MS. PETERSON:  Yeah, can we scroll down
24   a little bit on that page? There we go.
25

56

1    BY MS. PETERSON:
2        Q.  Dr. Lemmo, do you recognize Exhibit 15
3    as a copy of your reply expert report,
4    specifically in reply to defendant's expert report
5    on noninfringement?
6        A.  Yes.
7        MS. PETERSON:  And then if we could turn
8    to page 13 of the PDF.
9    BY MS. PETERSON:
10       Q.  Is that your signature, Dr. Lemmo?
11       A.  Yes.
12       Q.  And this report was dated September 29,
13   2022; correct?
14       A.  Yes.
15       Q.  Okay.
16       MR. KREMEN:  Liane, are we going to
17   include -- add as an exhibit his declaration on
18   claim construction?
19       MS. PETERSON:  Yeah, I have that. I'll
20   bring it up later.
21       MR. KREMEN:  Okay. Fine. I just wanted
22   to know. So we have four documents total from
23   Dr. Lemmo; right?
24       MS. PETERSON:  I'm focusing on the
25   expert reports currently, but later we'll look at

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

15 (57 to 60)

57

1 the declaration.
2     MR. KREMEN:  Sure.
3 BY MS. PETERSON:
4     Q.  Dr. Lemmo --
5     MS. PETERSON:  Actually, if we could go
6 back and pull up Exhibit 14 now.  This is the
7 responsive report.
8     And let's take a look at the second
9 page.  Yeah, right there.  If we could scroll down
10 a little bit to see the -- okay.
11 BY MS. PETERSON:
12     Q.  So now, with respect to the validity of
13 the '802 patent and responding to Dr. Amiji on
14 these issues, Dr. Lemmo, you've offered four
15 opinions in this responsive report; correct?
16     **A.  Yes.**
17     Q.  And those would be the level of skill in
18 the art, scientific and technical aspects of the
19 "hold" function of the '802 patent, enablement of
20 the disclosure in the Rolf prior art
21 publication --
22     MS. PETERSON:  And then if we scroll
23 down to the next page.
24 BY MS. PETERSON:
25     Q.  -- the fourth topic is the relevance of

58

1 the commercial success of Trutek's products.
2     **A.  Yes.**
3     Q.  Those are the four opinions that you've
4 offered in response to Dr. Amiji's opening report?
5     **A.  Yes.**
6     Q.  Does Exhibit 14, your responsive report,
7 contain all of the opinions that you have formed
8 directed to the issues of validity of the '802
9 patent?
10     **A.  Yes.**
11     Q.  And does your responsive report contain
12 a complete statement of all the bases for your
13 opinions?
14     **A.  Yes.**
15     Q.  Are there any statements in your
16 responsive report that constitute the opinions of
17 others?
18     **A.  No.**
19     Q.  And did you make any assumptions in
20 formulating the opinions provided in your
21 responsive report?
22     MR. KREMEN:  Objection to the form.
23     THE WITNESS:  I don't understand what
24 you mean by "assumption."
25

59

1 BY MS. PETERSON:
2     Q.  Well, in reaching the opinions and
3 conclusions that you've stated in the report, did
4 you have to make any assumptions about anything?
5     MR. KREMEN:  Objection to the form of
6 the question.
7     THE WITNESS:  I'm not really clear as
8 far as what you're asking me.
9 BY MS. PETERSON:
10     Q.  Okay.  And just to be clear then, this
11 report contains all of your opinions on
12 invalidity, meaning you're not providing any --
13 you have not been -- or you have not provided any
14 opinions directed to anticipation of the '802
15 patent?
16     **A.  There's a report that talks about those**
17 **terms relative to anticipation and obviousness.**
18 **Is that what you're referring to?**
19     Q.  I'm asking you if you have offered any
20 opinions in this report or formed any opinions as
21 shown in this report on the issue of anticipation?
22     **A.  I believe I did.**
23     Q.  Okay.  Can you identify where that is?
24     **A.  I'd have to scroll through the report.**
25 **I'm only seeing -- I'm only seeing a short form**

60

1 **here.  And I believe this is -- I can't scroll**
2 **through the report.**
3     THE REMOTE TECHNICIAN:  Counsel, I can
4 give him access to --
5     MS. PETERSON:  Okay.  That's fine.
6     THE REMOTE TECHNICIAN:  -- control, and
7 he can scroll on his own --
8     MS. PETERSON:  Sure.
9     THE REMOTE TECHNICIAN:  -- if that works
10 for you.
11     Dr. Lemmo, will that work for you?
12     THE WITNESS:  We'll try.
13     THE REMOTE TECHNICIAN:  Okay.  Stand by.
14     Now, you should be able to with your
15 mouse take control.  If you click on the document,
16 you should be able to take control.
17     THE WITNESS:  A person having ordinary
18 skill.  We talked about the "hold" function.  Just
19 bear with me with this as I scroll through it.
20     This is the discussion of Rolf and what
21 commercial success indicates.
22     Okay.  Okay.  I think I'm getting that
23 confused with another document where I do talk
24 about anticipation and obviousness.

61

1  BY MS. PETERSON:
2      Q. Okay. What document is that? Because I
3  haven't seen that in any of your reports.
4      A. All right. No, I think Dr. Amiji talks
5  about it, and I think I responded to it.
6      Q. Okay. That's correct. Dr. Amiji did
7  talk about anticipation --
8      A. Yeah.
9      Q. -- and obviousness.
10     A. Yes.
11     Q. However, you are not responding to those
12  issues of anticipation or obviousness in your
13  responsive report marked as Exhibit 14; correct?
14     A. That's correct.
15     Q. Okay. And you also did not form any
16  opinions responding to Dr. Amiji on issues of
17  Section 101 or otherwise known as subject matter
18  eligibility; is that correct?
19     A. That's correct.
20     Q. And you also did not form any opinions
21  responding to Dr. Amiji on issues under
22  Section 112, including written description,
23  utility, or enablement; is that correct?
24     A. That's correct.
25         MR. KREMEN: Objection; calls for a

62

1  legal conclusion.
2          MS. PETERSON: We can take that exhibit
3  down.
4  BY MS. PETERSON:
5      Q. Now, you've submitted two expert reports
6  on issues of infringement. That would be your
7  opening report and your reply report; right?
8      A. Yes.
9      Q. Okay. And do those two reports, your
10  opening report and reply report, contain all of
11  the opinions you formed on issues directed to
12  infringement?
13     A. Yes.
14     Q. Do the opening and reply reports contain
15  a complete statement of all of the bases for your
16  opinions?
17     A. Yes.
18     Q. And are there any statements or opinions
19  in your opening report or reply report that
20  constitute the opinions of others?
21     A. No.
22     Q. Dr. Lemmo, did you draft your three
23  expert reports that we just marked as Exhibit 13,
24  14, and 15 by yourself, or did you have
25  assistance?

63

1      A. No, I drafted them myself.
2      Q. Are there any portions of any of the
3  three reports that you did not draft yourself?
4      A. No.
5      Q. And I'm sorry, I might be going back
6  over something we already covered, but just to
7  make sure, you are aware that Trutek has retained
8  Mr. Haidri to also opine on issues relating to
9  invalidity.
10         Is that your understanding?
11     A. Yes.
12     Q. Okay. Did you have any conversations or
13  any meetings with Mr. Haidri when either he was
14  working on his responsive report or when you
15  prepared your responsive report?
16     A. No, I've never had a conversation with
17  Mr. Haidri.
18     Q. Okay. Have you reviewed Mr. Haidri's
19  report?
20     A. No.
21     Q. Do you know why you were asked to only
22  address certain of the issues in response to
23  Dr. Amiji on issues of invalidity?
24         MR. KREMEN: Objection to the form of
25  the question.

64

1          THE WITNESS: Maybe you could rephrase
2  that for me.
3  BY MS. PETERSON:
4      Q. Okay. Well, you understand that
5  Dr. Amiji offered opinions on invalidity of the
6  '802 patent; right?
7      A. Yes.
8      Q. And you reviewed his report; correct?
9      A. Yes.
10     Q. But you did not form opinions in
11  response to each of the issues raised by
12  Dr. Amiji; correct?
13     A. Correct.
14     Q. Okay. Do you know why you were asked to
15  only address those four issues that are contained
16  in your responsive report?
17         MR. KREMEN: Objection to the form of
18  the question.
19         THE WITNESS: Maybe you could rephrase
20  that for me again, sorry.
21  BY MS. PETERSON:
22     Q. Why did you only respond to those four
23  issues in your responsive report?
24     A. I think they were most important. Those
25  were the four most important issues.

**65**

1    Q.  Those were the four most important
2  issues in terms of having a disagreement with
3  Dr. Amiji?
4        MR. KREMEN:  Objection to form.
5        THE WITNESS:  If we could just take a
6  look at those four, not necessarily a disagreement
7  with Dr. Amiji, but to express my opinion.
8  BY MS. PETERSON:
9    Q.  Okay.  So I just want to understand the
10 basis for your understanding that those were the
11 four most important issues.  Why were they
12 important to you?
13   **A.  If we could -- you know, if we could**
14 **pull those up, this way I could --**
15   Q.  Yeah, let's go back to Exhibit --
16   **A.  That would be great.**
17   Q.  Yeah.
18   **A.  Yeah, that would be great.**
19       MS. PETERSON:  Exhibit 14 -- Exhibit 14,
20 page 2, please.
21       THE WITNESS:  Yeah, that will make it
22 easier for me.  Okay.
23 BY MS. PETERSON:
24   Q.  Actually, you know what, let me ask you
25 another question first.  For these four issues you

**66**

1  addressed in your responsive report, did you
2  identify these issues, or were you asked by
3  counsel to provide your opinion on these four
4  topics?
5    **A.  I think it was a combination of both.**
6    Q.  Did counsel for Trutek ask you to
7  provide opinions on any other issues beyond these
8  four with respect to the invalidity of the patent?
9    **A.  Not to my recollection, no.**
10   Q.  Okay.  Yeah, I think that answers my
11 question.
12       MS. PETERSON:  So we can take that down.
13       THE WITNESS:  Okay.
14       MS. PETERSON:  Let's mark as another
15 Exhibit -- we'll mark this as Exhibit 16.  Let's
16 pull up a copy of Dr. Lemmo's CV.
17       (Lemmo Deposition Exhibit 16 was marked
18 for identification and attached to the
19 transcript.)
20       MS. PETERSON:  Jennifer, this is
21 identified as No. 6 in the file.
22       THE REMOTE TECHNICIAN:  Yes, I see it.
23 Thank you.
24 BY MS. PETERSON:
25   Q.  Okay.  Dr. Lemmo, do you recognize

**67**

1  Exhibit 16 as a copy of your CV?
2    **A.  Yes.**
3    Q.  Do you have any changes to make to it,
4  or is it current?
5    **A.  That's current.**
6    Q.  Do you have any patents?
7    **A.  No.**
8    Q.  And have you ever published any
9  articles?
10   **A.  Yes.**
11   Q.  Scientific papers?
12   **A.  Yes.**
13   Q.  Okay.  Are those publications listed in
14 your CV?  I don't think they are.
15   **A.  I don't think so.**
16   Q.  Okay.  Approximately how many papers
17 have you published over the last -- or in general,
18 do you know a rough number?
19   **A.  Not that many.  The publications related**
20 **to my degrees, my dissertation research, as well**
21 **as my master's degree, and also publications that**
22 **were either in the form of newsletters, booklets**
23 **that were asked of me by corporations to write or**
24 **internal documents.  So in total, I would say 10**
25 **to 15 would be a maximum number.**

**68**

1    Q.  And what about any -- like any
2  conferences, did you -- have you ever prepared or
3  given any abstracts or any presentations at
4  conferences within your field of study?
5    **A.  Yes.**
6    Q.  Approximately how many?
7    **A.  A presentation of my research work for**
8  **my Ph.D., as well as my research work on my**
9  **master's degree.  I've also served as an invited**
10 **speaker at various conferences, professional**
11 **meetings.  But, again, it's not -- it's based upon**
12 **materials that were part of the conference.  So,**
13 **for example, I would give lectures on various**
14 **aspects of nutrition or aspects of the corporate**
15 **sector and how science and regulatory affairs are**
16 **integrated into the development of products.**
17   Q.  Okay.  And just to confirm, those aren't
18 listed in your CV either; right?
19   **A.  That's correct.  I did not list that.**
20   Q.  Okay.  So, Dr. Lemmo, I believe you
21 described yourself as a consumer health care
22 corporate consultant; is that right?
23   **A.  Yeah, a consumer health care related to**
24 **products that are sold over-the-counter, OTC**
25 **products primarily.**

69

1    Q.  Okay.  And would that primarily relate
2 to products such as nutritional supplements and
3 vitamins, so products in those categories?
4    A.  Yes, those as well as some other
5 categories, primarily in the area of homeopathic
6 medicines and some other roles that I've been
7 involved in in the -- for example, in BioBalance,
8 a probiotic product that was used in the treatment
9 of specific kinds of conditions, gastrointestinal
10 disorders.
11    Q.  And what do you -- just so we can be
12 clear on terminology, what are you referring to as
13 homeopathic medicines?
14    A.  Homeopathic medicine is the use of
15 natural remedies.  They're extracts of botanicals.
16 These are used as tinctures.  And in Eastern
17 European traditions, homeopathy is a very
18 significant part of medicine.  And so I've given
19 lectures on homeopathic medicine, you know, both
20 in a corporate setting as well as in professional
21 meetings.
22    Q.  Okay.  And you have a bachelor's degree
23 in chemistry; right?
24    A.  That's correct.
25    Q.  And a master's and a Ph.D. in nutrition

70

1 science; right?
2    A.  That's correct.
3    Q.  Okay.  And it looks like you have for
4 the last 15 years, primarily, you've been acting
5 as a consultant for a consumer health care
6 corporate consultant?
7    A.  Yes, and also working in academia, you
8 know, as an either part-timer or full time for a
9 college or university in the vicinity.
10    Q.  Okay.  And those -- the college teaching
11 experience that you have, that is listed in your
12 CV; right?
13    A.  Yes.
14    Q.  Is that complete?
15    A.  Yes, it is.
16    Q.  Okay.  Now, looking --
17    MS. PETERSON:  Could we scroll down to
18 the third page.
19 BY MS. PETERSON:
20    Q.  Do you see there's a heading here that
21 says "Corporate Consulting Experience"?
22    A.  Yes.
23    Q.  Now, I only see one consulting
24 assignment here listed within that time frame
25 after 2007.  Is that the only consulting job you

71

1 had over that time frame, from 2007 to the
2 present?
3    A.  Consultant -- well, the only one that's
4 not there is Trutek.  So in 2011, I served as a
5 consultant for Matrixx Initiatives.
6    Q.  Okay.
7    A.  And then the -- that's correct.  There's
8 no other consulting that was done other than those
9 two.  Because it was mostly academic work that I
10 did.
11    Q.  Okay.  So from 2011 to the present, you
12 have the consulting work obviously with Trutek,
13 and then the rest of your, I guess we'll just say
14 employment, for use of a better term, that's been
15 with respect to your academic teaching
16 assignments?
17    A.  That's correct.  Because for the most
18 part I've been retired since 2000 -- let's see,
19 2018.  So I reached retirement age in 2018.  And
20 so I simply do consulting work at this point.  I
21 no longer do academic work.
22    Q.  Okay.  And then have you done any other
23 consulting work since 2018 apart from the
24 consulting services provided to Trutek?
25    A.  No.

72

1    Q.  Okay.  So looking at this most recent
2 corporate consulting experience you have listed
3 for Matrixx, I see there's one item identified as
4 relating to an oral zinc product; is that correct?
5    A.  Yes, that's correct.
6    Q.  Okay.
7    MS. PETERSON:  If we could go back and
8 look at the first page.
9 BY MS. PETERSON:
10    Q.  So the consumer health care corporate
11 consultant work from 2007 to the present, that's
12 been focused on the Matrixx assignment and the
13 work with Trutek; right?
14    A.  Correct.  Or if a colleague or someone I
15 knew in the corporate sector reached out to me to
16 review a product and just to provide them with
17 some guidance, particularly for claim construction
18 or regulatory affairs, it might have been
19 something that surfaced but it was nothing
20 significant and I did not really include that.
21    Q.  Okay.  You provided consulting services
22 for claim construction?  Did I hear you correctly?
23    A.  Yes, claim construction on a product.
24 Primarily, if a company wants to market a product,
25 I'll use an example of a dietary supplement, there

73

1  are guidelines that the company must follow in
2  order to make the claim that it has adequate
3  substantiation attached to the claim.
4      Q.  I understand.  Okay.
5      A.  So that's essentially it.
6      Q.  Okay.  Thank you.
7          Okay.  So then prior to that, you were
8  with BioBalance Corporation, and that involved the
9  probiotic product you mentioned earlier?
10     A.  Yes.
11     Q.  Okay.  And then it looks like you were
12  with Wyeth Consumer Healthcare in product
13  development for about six years; right?
14     A.  That's correct.  Until the company was
15  purchased by Pfizer.
16     Q.  Okay.  And your work at Wyeth with
17  respect to product development, that was focused
18  on, it looks like, a few brands:  Solgar, Centrum
19  and Caltrate; correct?
20     A.  That's correct.
21     Q.  Those are vitamins or calcium
22  supplements?
23     A.  That's correct.
24     Q.  And then when you say that you managed
25  the product development of those brands, what did

74

1  that involve?
2      A.  Well, it involves either the creation of
3  new product -- if I could just backtrack, Solgar
4  Vitamin and Herb Company was acquired by Wyeth
5  Consumer Healthcare around the time -- I believe
6  it was 1998, and I was hired by the company to
7  kind of head up their scientific division for that
8  division.
9          In addition to that, I was employed by
10  Wyeth in their business development unit in the
11  evaluation any products that would be coming into
12  the OTC area as one of the scientists who worked
13  on that team.
14         So I provided expertise, opinions on the
15  validity of the products that would be presented
16  to be incorporated into the portfolio, as well as
17  if the company was interested in doing
18  acquisitions of the business or acquisition of a
19  product, I would be on that review team.
20     Q.  Okay.  And so that work focused on
21  evaluating the technical aspects of the products?
22     A.  Yes.
23     Q.  And would it be fair to say that in the
24  course of your product development work while at
25  Wyeth, it was not focused on actually developing

75

1  new formulations or products in the laboratory?
2          MR. KREMEN:  Objection to form.
3          THE WITNESS:  Well, it did include
4  supervision of the laboratory, as well as the
5  formulation of the product within the
6  manufacturing sector.  So if I could elaborate, my
7  function was in the creation of a new product to
8  work with both the analytical segment of the
9  company, and those were more of the pharmaceutical
10  people, as well as the manufacturing element of
11  the concept so that the concept, the idea, would
12  come to fruition as a finished product.
13  BY MS. PETERSON:
14     Q.  Okay.  Thank you.
15         And it looks like prior to that you were
16  with General Nutrition Centers, GNC?
17     A.  Yes.
18     Q.  And your work there was directed to
19  nutritional supplements?
20     A.  Primarily, yes.  The General Nutrition
21  Centers, Incorporated, the retail outlets coast to
22  coast, had a major presence particularly relative
23  to the passage of the Dietary Supplement Health
24  and Education Act, known as DSHA, and the company
25  needed representation with respect to that

76

1  litigation being finalized.  So I played a major
2  role for them in that respect.
3          But I also helped in the development or
4  the change of focus of the product line so that it
5  would incorporate more of the kinds of products
6  that you see at GNC in today's market as opposed
7  to at the time that I started there.
8      Q.  And what were those new kinds of
9  products that were being sold by GNC?
10     A.  Well, I'll give you one example.  The
11  product that was known as Cold-EEZE, which is a
12  zinc lozenge, very similar to the Zicam product,
13  was presented to me by the inventor.  And he
14  wanted to market that product in a retail outlet.
15  And so I had to review his data to substantiate
16  the claims that he was making about his product.
17  GNC did not decide to take that product into their
18  portfolio, and so they had to market it elsewhere.
19     Q.  Okay.  And that would be an example of
20  what you were describing earlier as a homeopathic
21  medicine?
22     A.  Yes.  And they have a line of
23  homeopathic products, as well, tinctures and other
24  types of products along those lines that might
25  have been used as more of the cosmetic area.  And

77

1  so you see that today in a lot of products where
2  extracts of botanicals, et cetera, which are based
3  on homeopathic medicine may be found in commercial
4  products in today's market.
5      Q.  Okay.  And then your work at Pall
6  Biomedical Products, that looks like it was
7  focused more on the device side; is that correct?
8      A.  Yes, Pall Biomedical Products was a very
9  interesting assignment for me.  Dr. David Pall was
10 an expert in filtration systems.  And the company
11 was looking to move into the area of application
12 in the biomedical field, so biomedical products or
13 medical devices, so to speak.
14     And so the technology that Dr. Pall had
15 created in his filtration technology was to be
16 extended for applications primarily in a hospital,
17 either in filtration of blood and other fluids or
18 in the filtration of air particles, heat and
19 moisture exchanges that would be given to a
20 patient during the time that they were under
21 anesthesia.
22     Q.  And then, lastly, looking at ICN
23 Pharmaceuticals, this looks like another
24 assignment focused on nutritional supplements?
25     A.  Yes, that was.  ICN Pharmaceutical

78

1  wanted to branch out into the traditional area,
2  and so I was retained with the acquisition of what
3  was known as Faraday Laboratories, it no longer
4  exists, and brands that were primarily marketed to
5  allied health professionals.  And the majority of
6  them would be in the chiropractic market.
7      Q.  And then on the next page, it looks like
8  there's one other piece of employment listed --
9      MR. KREMEN:  Excuse me.  The only thing
10 that's visible on the screen is the first page of
11 his résumé.
12     MS. PETERSON:  Okay.  Let's look at
13 page 3, please.  Can we turn to page 3.
14 BY MS. PETERSON:
15     Q.  At the top here, it looks like this was
16 your first employment experience listed at
17 Pharmacia Laboratories.  It looks like this was
18 following your undergraduate degree?
19     A.  Actually, this was during the time of my
20 master's degree.
21     Q.  Okay.
22     A.  So I had an undergraduate degree, but
23 this was a job that -- because Pharmacia was very
24 closely located near Rutgers University, and they
25 were interested in developing a product known as

79

1  HEALON, which is hyaluronate acid.  And it was
2  primarily used for injecting into the joints of
3  racehorses.  And so my job was to do the blood
4  analysis work, the samples, in the laboratory that
5  I had at Rutgers University while I was a graduate
6  student.
7      Q.  Okay.  And then looking at the rest of
8  this page, your earlier consulting experience,
9  would it be fair to say that that also generally
10 relates to vitamins and other dietary supplements?
11     A.  Yes, and primarily on a technical basis.
12 Again, as I said, many of these products -- excuse
13 me, many of these products were in need of
14 technical support, whether it was documentation or
15 support for claims that the company wanted to
16 make, as well as advisement relevant to regulatory
17 matters, and that's where I provided the help.
18     Q.  Okay.  Thank you for that.
19     So is it correct that you do not have
20 any experience in the formulation or development
21 of oil-in-water nanoemulsions?
22     MR. KREMEN:  Objection to the form of
23 the question.
24     THE WITNESS:  Well, let me just use the
25 example where in the vitamin industry, there are

80

1  products such as the fat soluble vitamins that
2  are -- utilize a delivery system that's known as a
3  micellar complex.  And so you take a fat soluble
4  vitamin, and it's treated with surfactants or
5  whatever in order to make it more water soluble or
6  more miscible with the human body.
7  BY MS. PETERSON:
8      Q.  Okay.
9      A.  So that's essentially what my experience
10 has been.
11     Q.  Okay.  And just to confirm, those
12 products, those would be administered orally?
13     A.  Yes.
14     Q.  Not through the nasal passages?
15     A.  No.
16     Q.  Okay.  And did you -- I mean, were you
17 aware of these fat soluble vitamins just as a
18 course of your work within the industry, or did
19 you actually develop and formulate any yourself?
20     A.  No, they were developed by other people,
21 and I was -- I served as a scientific liaison to
22 give an explanation of the technology of these
23 other companies for the parent company that I was
24 employed by.
25     Q.  Oh, okay.  So you became aware of these

81

1 as a result of investigating them for potential
2 acquisition by your employer?
3 **A. That's correct.**
4    Q. Okay. And so that would be the extent
5 of your experience that you said related to
6 oil-in-water nanoemulsions?
7       MR. KREMEN: Objection to the form of
8 the question.
9       THE WITNESS: I would say that my
10 experience with that was twofold. That's the
11 corporate side of it. But, also, on a personal
12 level, in order to document what's going on, this
13 is not a very simplistic concept for people in
14 marketing and people in corporate positions. So I
15 had to do a lot of investigating on my own about
16 the technology. So I had to learn the technology
17 myself in order to present it on behalf of that
18 company.
19 BY MS. PETERSON:
20    Q. And what company was that presented to?
21 **A. Well, that was presented in several**
22 **companies. It was presented in ICN**
23 **pharmaceutical, but it was also presented at**
24 **General Nutrition Centers.**
25    Q. Okay. And then I assume you don't have

82

1 any experience in the formulation or development
2 of oil-in-water nanoemulsions for nasal
3 administration; correct?
4 **A. That's correct.**
5    Q. Okay. And you do not have any
6 experience in the formulation or development of
7 oil-in-water nanoemulsions for use as a vaccine
8 adjuvant?
9 **A. That's correct.**
10    Q. And it sounds like you don't have any
11 experience in the formulation or development of
12 pharmaceutical compositions that are intended to
13 be administered nasally to humans?
14       MR. KREMEN: Objection to the form of
15 the question.
16       THE WITNESS: Maybe you could rephrase
17 that for me.
18 BY MS. PETERSON:
19    Q. You do not have any experience in the
20 formulation of pharmaceutical compositions that
21 are intended to be administered nasally to humans?
22 **A. My only exposure to that was with the**
23 **activities at Matrixx and Zicam because Zicam had**
24 **a product that was administered nasally.**
25    Q. Okay. But the product that you

83

1 consulted for Matrixx was an oral zinc lozenge
2 product; correct?
3 **A. Actually, it was -- at the time the**
4 **portfolio included a nasal product, but I focused**
5 **primarily on the oral zinc product.**
6    Q. And you don't have any experience in the
7 formulation or development of pharmaceutical
8 compositions that are intended to inhibit or
9 prevent infection caused by various bacteria?
10       MR. KREMEN: Objection to the form of
11 the question.
12       THE WITNESS: That experience, no. The
13 experience -- hands-on experience in development,
14 no.
15 BY MS. PETERSON:
16    Q. And is it correct that you do not have
17 any experience in the formulation or development
18 of pharmaceutical compositions to inhibit or
19 prevent infection caused by viruses?
20 **A. That's correct.**
21    Q. Apart from your work on these two
22 litigation matters for Trutek, is it correct that
23 you do not have any experience in the formulation
24 or development of pharmaceutical compositions to
25 inhibit or prevent the nasal inhalation of any

84

1 type of particulate matter into the nose?
2       MR. KREMEN: Objection to the form of
3 the question.
4       THE WITNESS: If I refer back to my
5 experience with Pall Corporation, with the
6 development of a medical device that was used for
7 the respiratory system, that's the only experience
8 that I can recall.
9 BY MS. PETERSON:
10    Q. And that would be -- since it's a
11 medical device, that wouldn't be a composition
12 that's applied directly to a patient's skin;
13 correct?
14 **A. No, it's applied directly over the nose**
15 **as a mask.**
16    Q. And I saw in your CV for Pall Biomedical
17 that -- is it correct that this work was related
18 to addressing issues of patients breathing cold
19 dry gas during surgery?
20 **A. That's correct.**
21    Q. Okay. Is it correct that you do not
22 have any experience in the formulation or
23 development of pharmaceutical products intended to
24 kill or inactivate bacteria or viruses within a
25 human nasal passage?

85

1        MR. KREMEN:  Objection to the form of
2    the question.
3        THE WITNESS:  I have no experience of
4    development of those types of pharmaceuticals.
5    BY MS. PETERSON:
6    Q.   And you do not have any experience in
7    the formulation or development of vaccines?
8    A.   That's correct.
9    Q.   And apart from your work in connection
10   with this matter, you do not have any experience
11   in the formulation of pharmaceutical products
12   intended to capture and hold particulate matter
13   within the nose or nasal passage?
14       MR. KREMEN:  Objection to the form of
15   the question.
16       THE WITNESS:  Just -- can you repeat
17   that question?
18   BY MS. PETERSON:
19   Q.   So apart from the work that you're doing
20   in connection with these litigations --
21   A.   Yes.
22   Q.   -- you do not have any experience in
23   formulating or developing pharmaceutical products
24   intended to capture and hold particulate matter
25   within the nose or nasal passages?

86

1    A.   Yes.
2        MR. KREMEN:  Objection to the form of
3    the question.
4        THE WITNESS:  Yes, just simply what I
5    referred to as far as the mask in Pall Biomedical.
6    BY MS. PETERSON:
7    Q.   Okay.  And that was a physical barrier,
8    the mask; correct?
9    A.   Yes, that's a filtration device of a
10   certain dimension to trap particles.
11   Q.   And is it correct that you do not have
12   any experience in formulating or developing
13   pharmaceutical products intended to capture and
14   hold particulate matter within the nasal passage
15   by means of electrostatic attraction?
16       MR. KREMEN:  Objection to the form of
17   the question.
18       THE WITNESS:  Yes.
19   BY MS. PETERSON:
20   Q.   And just to confirm, when you say yes,
21   that means yes, that's correct, you do not have
22   the experience?
23   A.   Yes, that's correct.
24   Q.   Okay.  And the same is true for my other
25   answers?

87

1    A.   Yes, it relates to anything that I've
2    been employed.  That's how I'm answering yes.  So
3    it's -- these are not situations where during the
4    time that I was employed that I had experience
5    with that type of application.
6    Q.   Okay.  Thank you.
7        And I would assume then that in addition
8    to not having the experience in developing or
9    formulating those types of products for those
10   applications that you also wouldn't have any
11   experience in testing those products either?
12       MR. KREMEN:  Objection to the form of
13   the question.
14       THE WITNESS:  Testing the products would
15   not be part of my assignments in any of my
16   employment.
17   BY MS. PETERSON:
18   Q.   Okay.  And that would include any in
19   vitro testing?
20   A.   To my knowledge, yes.
21   Q.   Okay.  So in vitro testing would not
22   have been part of your assignments for any of your
23   work?
24   A.   Correct.
25   Q.   Okay.  And in vivo testing in animals,

88

1    that also would not be part of your work
2    experience?
3    A.   My only experience in vivo would relate
4    to what I did at Pharmacia with the blood testing
5    and for my doctorate and my master's degree where
6    I did experimentation with animals.
7    Q.   And what type of experimentation were
8    you doing as part of your thesis work?
9    A.   Body compositional analysis of the
10   animals under specific types of dietary
11   restrictions as well as focusing on calcium
12   nutriture as it relates to the development of
13   osteoporosis under stressful conditions.
14   Q.   Okay.  So that work also did not involve
15   any testing or development or -- development of
16   products intended to inhibit or prevent infection
17   of disease in those animals?
18   A.   No.
19   Q.   Okay.  Dr. Lemmo, do you consider
20   yourself to have any particular expertise in
21   patent law?
22   A.   No.
23   Q.   And you do not have an economics degree?
24   A.   Economics?
25   Q.   Yeah.

Transcript of Edward A. Lemmo, Ph.D.

23 (89 to 92)

October 24, 2022

---

89

1    A.    No, no economics degree.

2    Q.    You don't have an accounting degree?

3    A.    No.

4    Q.    And then with respect to your sales and

5    marketing experience from your prior employment,

6    was that focused on making sure that the claims

7    made in those marketing or advertising materials

8    complied with applicable regulations?

9          MR. KREMEN:  Objection to the form of

10   the question.

11         THE WITNESS:  Well, let me explain.  It

12   did apply to the regulations, but it also applied

13   to having adequate substantiation, scientific

14   substantiation for any of the claims associated

15   with the products that were marketed so that

16   those -- the science evolves going forward, and so

17   claims will expire.  And my function was to make

18   certain that the claims were substantiated in

19   light of any new developments.

20   BY MS. PETERSON:

21   Q.    So the marketing and advertising work

22   was focused on substantiating the claims that were

23   made in those materials with respect to the

24   products?

25   **A.    Yes, and also training the marketing and**

---

90

1    **salespeople regarding the product.**

2    Q.    Okay.  And is it correct that you do not

3    have any experience in developing or formulating

4    pharmaceutical products to prevent infection

5    caused by anthrax?

6    **A.    Yes.**

7    Q.    Yes, meaning you do not have that

8    experience?

9    **A.    I do not have that experience, no.**

10   Q.    You also don't have any experience in

11   developing or formulating pharmaceutical products

12   to prevent infection or to inhibit infection

13   caused by coronavirus?

14   **A.    I have no experience in that.**

15   Q.    Any experience with smallpox?

16   **A.    No experience in that.**

17   Q.    What about influenza?

18   **A.    Same, no experience in that.**

19   Q.    What about avian flu?

20   **A.    No experience in that.**

21   Q.    Swine flu?

22   **A.    No experience in swine flu.**

23   Q.    Rhinovirus?

24   **A.    Well, I've had rhinovirus.  That's my**

25   **only experience, but no, not in the development of**

---

91

1    that.

2    Q.    What about any experience with chemical

3    toxins?

4    **A.    You're referring to xenobiotics.**

5    Q.    Sure.  That would be an example.

6    **A.    Pollutants, pollutants and ways to boost**

7    **the immune system, but they would be primarily**

8    **with products that would enhance the natural**

9    **immunity of the body.**

10   Q.    Okay.

11   **A.    So in that respect, yes.**

12   Q.    And where did you do that work?

13   **A.    Well, those products would be at GNC.**

14   Q.    Okay.

15   **A.    That -- we did a line of product called**

16   **cell support, and they were essentially**

17   **antioxidant products that were developed.**

18   Q.    And then what about do you have any

19   experience in developing or formulating

20   pharmaceutical products intended to inhibit

21   infection caused by fungal spores?

22   **A.    No.**

23   Q.    Okay.

24         MS. PETERSON:  We've been going about an

25   hour.  Do you want to take a short break at this

---

92

1    point?

2          MR. KREMEN:  When do you want to -- do

3    you want to break for lunch at any point?

4          MS. PETERSON:  Let's go off the record.

5          THE VIDEOGRAPHER:  We're going off the

6    record.  The time is now 12:05 p.m.

7          (Recess from the record.)

8          THE VIDEOGRAPHER:  We're back on the

9    record.  The time is now 12:48 p.m.

10   BY MS. PETERSON:

11   Q.    Dr. Lemmo, did you have any

12   conversations with anyone on either of the breaks

13   that we've taken today about the substance of your

14   testimony that you've given?

15   **A.    No, I have not.**

16   Q.    Now, Dr. Lemmo, we touched on this

17   briefly, but you have provided opinions on what

18   you consider to be the appropriate level of skill

19   of a person of ordinary skill in the art in this

20   matter; right?

21   **A.    Correct.**

22   Q.    And what do you consider to be the field

23   of the invention of the '802 patent?

24   **A.    Well, I see it really two ways.  I see**

25   **it essentially as a medical device, but as an**

---

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

93

1  application which could be considered like a
2  cosmetic. But I do see it as a medical device.
3      Q. And you understand that the claims are
4  directed to a formulation?
5      A. Yes, that's correct. But the method of
6  delivering the formulation relates more in my
7  opinion to a medical device.
8      Q. And how is the formulation to be
9  delivered?
10     A. Well, as a medical device, since it's
11 applied to the skin and not in the nose, per se,
12 taken internally, I see it really as being
13 something that you're using that's applied to the
14 skin in the nasal passage area and possibly a
15 small distance into the nose, but not necessarily
16 something that is considered typically as a
17 pharmaceutical agent that you would be either
18 ingesting or somehow becoming more invasive.
19     Q. So would you consider all pharmaceutical
20 products that are administered to the skin to be
21 devices?
22     A. No. Some of them are topical agents
23 that are specific for the treatment of skin
24 conditions.
25     Q. And topical -- drugs that are delivered

94

1  topically can also be used for systemic treatment,
2  as well; right?
3      A. Yes, that's correct. Both in humans as
4  well as in animals.
5      Q. And the formulation that's described in
6  the '802 patent, it doesn't require any special
7  device for a person to apply it to their skin
8  around the nasal passages; correct?
9      A. That's correct. You could apply it with
10 your finger.
11     Q. So if it's a gel or a cream, it would
12 just be applied directly?
13     A. That's correct.
14     Q. And you also mentioned that it was
15 similar to a cosmetic, but you understand that the
16 claims also require, I guess what we would call,
17 active ingredients to prevent or inhibit
18 infection; correct?
19     MR. KREMEN: Objection to the form of
20 the question.
21     THE WITNESS: The composition contains
22 ingredients that are moisturizing to the skin.
23 They may be emollients there that are moisturizing
24 to the skin, and that's why I would consider that
25 composition similar to a cosmetic.

95

1  BY MS. PETERSON:
2      Q. But the object of the invention is not
3  to moisturize the skin; is it?
4      A. No, it's not.
5      Q. The object of the invention is to
6  inhibit infection by microorganisms in an
7  individual?
8      A. I think it's to inhibit particle flow
9  into the respiratory system. It doesn't restrict
10 itself to microorganisms.
11     Q. Sure.
12         So microorganisms, though, are
13 encompassed by the claims; correct?
14     A. Yes, anything that would be in the
15 airflow stream that would be entering the
16 respiratory system, according to the way I read
17 it, would be included in that, yes.
18     Q. So that would include microorganisms;
19 right?
20     A. Pollen, microorganisms, bacteria,
21 viruses, animal dander, a number of items that
22 potentially are in the airstream. There could be
23 even pollutants, as I mentioned before, with the
24 xenobiotics, chemical entity, smoke can all be in
25 your airstream, depending on your environment.

96

1      Q. And cosmetics aren't typically used to
2  treat or inhibit infection caused by
3  microorganisms or bacteria or viruses; correct?
4      A. Cosmetics are -- can you just repeat
5  that? You said are --
6      Q. Cosmetic products are not typically used
7  to treat or inhibit infection caused by
8  microorganisms such as bacteria or viruses that
9  enter the respiratory system?
10     A. Yes. Yes, I would consider cosmetics to
11 be, as their name implies, either something that
12 you're applying to the skin to improve the
13 appearance or the condition of the skin.
14 Essentially it's different.
15     Q. Okay. Now, I -- okay. So going back to
16 your opinions on what you believe to be the person
17 of ordinary skill in the art, has your opinion
18 changed since you provided it in your reports?
19     A. Based upon what I've read, as far as its
20 definition, and since I'm not legally trained on
21 how it's used legally, I have to base my opinion
22 on what I read. But I have not changed my opinion
23 on what you consider to be a person of ordinary
24 skill in the art.
25     Q. Okay. No, I just want to understand if

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

97

1  your opinion is still the same as how it's
2  explained in your reports?
3  **A.  Absolutely, I understand that.  Yes,**
4  **it's the same.**
5     Q.  Okay.  And you said that your opinion
6  was based on what you read.  What materials did
7  you read that informed your opinion?
8     **A.  Well, essentially, I went online to see**
9  **what the definition is from a patent standpoint.**
10 **There are references to both a person of ordinary**
11 **skill, as well as a person of extraordinary skill.**
12 **So I tried to educate myself before I wrote**
13 **anything regarding an opinion on what I've read.**
14    Q.  Okay.  And do you -- I don't think those
15 online definitions were cited in your report.  Do
16 you recall what references or materials you viewed
17 online to obtain this information?
18    **A.  Yeah, quite honestly, at this point I**
19 **don't remember when I did that.**
20    Q.  Okay.  And you understand that Dr. Amiji
21 has offered a differing opinion of the level of
22 skill?
23    **A.  Yes, I read his reports, and I do**
24 **respect his -- you know, his experience and his**
25 **comments, but I differ.**

98

1     Q.  Yeah, I understand.
2        Do you consider yourself to be a person
3  of ordinary skill in the art directed to the '802
4  patent under your definition?
5     **A.  Considering everything that I've read**
6  **over time, I would have to exclude myself as a**
7  **person of ordinary skill and more towards the**
8  **person of extraordinary skill, since I've spent a**
9  **good deal of time, not only in this particular**
10 **case but in the previous case with Matrixx, trying**
11 **to understand and grasp the concept.**
12    Q.  So that would be based on your research
13 and the work that you did in forming your opinions
14 in both the Matrixx litigation matter as well this
15 present litigation matter?
16    **A.  Yes, and I --**
17       MR. KREMEN:  Objection to the form of
18 the question.
19       THE WITNESS:  You might want to repeat
20 that question as far as I got into -- there was an
21 interference, I'm sorry.
22 BY MS. PETERSON:
23    Q.  I think you said it was -- your prior
24 comment that it was based on the research and the
25 work that you've done in forming your opinions in

99

1  the Matrixx matter and in this matter.
2        Did I understand that correctly?
3     **A.  Yes, that's correct.**
4     Q.  Okay.  I just want to make sure I didn't
5  miss anything.  You did not provide any opinions
6  in this matter directed to infringement using
7  Dr. Amiji's standard of a person of ordinary skill
8  in the art?
9        MR. KREMEN:  Objection to the form of
10 the question.
11 BY MS. PETERSON:
12    Q.  Let me rephrase.
13       So your opinions that you provided in
14 this matter as reflected in your expert reports
15 and in your declaration, you applied your
16 understanding of the level of a person of ordinary
17 skill in the art; correct?
18    **A.  That's correct.**
19    Q.  Did you provide any alternative or
20 different opinions on those same issues but
21 instead using Dr. Amiji's definition?
22       MR. KREMEN:  Objection to the form of
23 the question.
24       THE WITNESS:  No.
25

100

1  BY MS. PETERSON:
2     Q.  Okay.  Let's pull up your responsive
3  report.
4        MS. PETERSON:  This is Exhibit 14.  And
5  we'll go to page 2 of the report.
6        And could we go down one page.
7  BY MS. PETERSON:
8     Q.  Okay.  So you see here on this page we
9  have your section titled "A Person Having Ordinary
10 Skill In The Art"; correct?
11    **A.  Yes.**
12    Q.  Okay.  Looking at the last full sentence
13 on this page, you state that the person --
14 actually, the POSITA -- could we use that phrase?
15 Is that okay?
16    **A.  Yes, that's fine.**
17    Q.  Okay.  So at the bottom of page 2, you
18 state that the POSITA "is a person who does not
19 possess special or distinct knowledge or
20 capability in a discipline"; correct?
21    **A.  That's correct.**
22    Q.  And then going on, you explain, "This
23 person would have a basic skill set or talent
24 related to the technology related to the art";
25 right?

101

1    A.  Yes, that's correct.
2    Q.  And so, in your opinion, it would be a
3  technician?
4    A.  A technician would qualify, yes.
5    Q.  Okay.  And I think if we look maybe four
6  sentences down or so on the page, you say, "A
7  PHOSITA is primarily a technician in his chosen
8  field"--
9    A.  Yes.
10    Q.  -- "and his skills are those ordinarily
11  associated with such a technician"; correct?
12    A.  That's correct.
13    Q.  Okay.
14      MS. PETERSON:  If we could scroll down a
15  little bit more to the bottom of this page.
16  BY MS. PETERSON:
17    Q.  The last paragraph, it looks like you're
18  drawing on your experience as a college professor.
19  And it looks like teaching both students who are
20  non-majors as well as students who are majoring in
21  that particular discipline; correct?
22    A.  That's correct.
23    Q.  And is it your opinion that the POSITA
24  for the '802 patent would be someone who took
25  general courses in the relevant subject matter but

102

1  did not major or focus on that field at any level?
2    A.  That's correct.
3    Q.  So all of this discussion that we just
4  went through right now, that would be your general
5  understanding of what a person of ordinary skill
6  in the art should be?
7      MR. KREMEN:  Objection to form.
8      THE WITNESS:  The -- could you just
9  repeat that question for me, I'm sorry?
10  BY MS. PETERSON:
11    Q.  Yeah.
12      So all of those statements that we just
13  went through, those reflect your general
14  understanding of what a person of ordinary skill
15  in the art should be?
16    A.  Yes, the qualifications that I would
17  consider.
18    Q.  Okay.  And the basis for that
19  understanding is in part based on what you
20  reviewed online about the standard?
21    A.  My readings and I think from my
22  experience in product development as far as the
23  basic concepts that are employed by in getting a
24  product from concept to finished product, the
25  people who would be involved in that process and

103

1  their level of -- their level of sophistication or
2  level of education that they need in order to
3  carry out that function.
4    Q.  Okay.  Did Mr. Kremen or any other
5  counsel for Trutek provide you with any
6  explanation or framework for how to determine the
7  level of skill for a POSITA as it relates to the
8  '802 patent?
9    A.  I've had discussion with Mr. Kremen
10  regarding the person of ordinary skill from the
11  legal standpoint just to see if, in fact, in
12  reviewing the material, you know, if I was on the
13  right track, I was explaining it correctly.
14    Q.  Okay.  And the -- those legal stand --
15  let me start over.
16      The legal framework or guidelines or
17  framework that Mr. Kremen provided to you, you
18  don't have that explained or set out in your
19  report; correct?
20    A.  That's correct.
21    Q.  Okay.  Now, in the laboratory setting,
22  what is your understanding of the difference
23  between a technician and as, say, you know, someone
24  with more experience who's running the lab or
25  supervising the research?

104

1      MR. KREMEN:  Objection to the form of
2  the question.
3      THE WITNESS:  You might have to rephrase
4  that for me.
5  BY MS. PETERSON:
6    Q.  Well, you've said that you think the
7  appropriate level of skill is that of a
8  technician, and so I just want to understand, you
9  know, what is a technician?  Like what are their
10  basic qualifications, especially relative to other
11  people with more experience?
12    A.  Okay.  Based on my professional
13  experience in the corporate setting, the
14  laboratory was headed or directed by a person who
15  would be a Ph.D. level scientist.  That person
16  would be my peer as a Ph.D. scientist who is in
17  charge of the development product -- the
18  development of products.  But carrying out
19  responsibility of getting the concept to the steps
20  necessary to either quantify or quality of the
21  materials used in the product would be individuals
22  who would be at a lower level.
23      On the manufacturing side, the person
24  who would be formulating the product, making the
25  physical product from the concept that I designed,

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

105

1 developed, created, whatever terminology you wish
2 to use, that individual may not have an advanced
3 degree but has the experience or capacity to carry
4 it out from the concept that I explain to the
5 finished product that the consumer would receive.
6     Q. Okay. So the technician then that
7 you're referring to, that would be someone who on
8 the manufacturing side has the experience
9 necessary to carry out the instructions for how to
10 make the product, how to formulate the product;
11 right?
12     A. Yes. For example, if a product has to
13 be produced in a specific dosage form -- tablet,
14 capsule, liquid, whatever -- and there is
15 equipment involved, that technician would know
16 about binder, fillers, other agents that might be
17 necessary to get the concept of the active
18 ingredient that I want to create in this product
19 into a form that maintains its stability and in a
20 form that will be easy and understandable by the
21 end user.
22     Q. And so the technician would then
23 primarily be someone who is following directions
24 provided by the more experienced supervisor?
25     A. Yes, or from me, as far as the

106

1 appearance of the product that I'm looking to
2 create, whatever the case may be. Or that person
3 might, in fact, as you say, go to a supervisor and
4 get advice from that individual from a more
5 technical standpoint, yes.
6     Q. Would a technician typically be
7 designing their own experiments, or would they be
8 looking to the supervisor for input on that type
9 of work?
10     A. I think you've got two things working
11 here. The technician could carry out the
12 experimentation because it's almost like a
13 cookbook for the experimentation. It doesn't
14 really require a person -- if you've been doing
15 this, you pretty much know how to do it from that
16 standpoint. From the manufacturing standpoint, I
17 think it's also the technician who could carry it
18 out to get it through that process so that you
19 have uniformity at the end.
20     Q. Okay. So on the experimentation piece
21 then, the technician is able to conduct the
22 experiment because he or she either knows what
23 experiment to conduct and they've done it before
24 or they're provided instructions that they're able
25 to follow; is that right?

107

1     MR. KREMEN: Objection to form.
2     THE WITNESS: The way I understand that,
3 for what you're asking me, is that a person who's
4 carrying out an experiment could carry out that
5 experiment once they've had the experience as a
6 reason -- not necessarily formal education
7 experience. I could go back to also my statement
8 regarding the student.
9     In my experience in teaching students
10 laboratory procedure, the students should be able
11 to, after the instruction was given by me, carry
12 out those laboratory experiments, even though that
13 student may not even have a degree.
14 BY MS. PETERSON:
15     Q. Okay. So as long as the required
16 instruction is provided to the student or the
17 technician, they should be able to carry out that
18 experimentation?
19     MR. KREMEN: Objection to form.
20     THE WITNESS: They should recognize
21 certain elements of what would be necessary to
22 carry out the procedure.
23 BY MS. PETERSON:
24     Q. Would a technician or a non-major
25 student typically be expected to design their own

108

1 experiment to test a particular feature of a
2 product if they haven't been given instructions or
3 haven't had the experience in testing for that
4 feature?
5     A. I could only address my own experience
6 in that capacity. When I was a college student,
7 one of the courses that I had to take was design
8 of experiment. And so without an advanced degree,
9 I essentially had to design an experiment. And of
10 course it was presented to the professor to see
11 whether or not I did it correctly. But the answer
12 is yes, you can definitely design experiments.
13 You can do things or carry out procedures
14 accordingly, even though the person may not have
15 an advanced degree.
16     And just as a follow-up to that, in
17 reading some of the comments by Dr. Amiji on a
18 person of ordinary skill, he does comment in a
19 similar way to me in his report on invalidity, and
20 he clearly stated that a person of ordinary skill
21 in the art would know about things like viscosity
22 and relative to the term of "adequate
23 impermeability."
24     So I think there's definitely somewhat
25 of an understanding here. You know, this term --

109

1  this term is something that needs to be
2  interpreted so we can have some agreements
3  regarding that. And I would refer you essentially
4  to his report on invalidity. I think it was
5  page 51, as I remember, because I remember reading
6  that.
7      Q. Okay. Would a student taking a certain
8  course outside of his or her major typically be
9  expected to be familiar with scientific literature
10 in that field outside of what is taught in the
11 course?
12     A. That's really subject to the professor
13 whether -- in my courses, for example, I always
14 provided students with opportunity to visit the
15 library and do independent study, whether they
16 were majors or not. So, you know, I feel that
17 that's part of the learning process to learn on
18 your own as opposed to just reiterating what the
19 professor has taught. It creates for you an
20 independent thinker.
21     Q. And going back to the laboratory or the
22 manufacturing setting, if a technician were to run
23 into a problem or an issue in carrying out the
24 concept or the instructions, would they typically
25 look to that more experienced supervisor for

110

1  advice or guidance on how to address the issue?
2      A. I would encourage that. If the
3  technician comes back to me, for example, with
4  choices of a component that I would like to use in
5  the product and suggests to me that this would
6  work better but it's in the same category, I would
7  give that person the opportunity to go ahead and
8  do that, go forward and use that as a substitute.
9  And I've done that in my experience.
10     Q. Okay. I think my question was a little
11 bit different, directed to a circumstance where a
12 technician runs into a problem, like the
13 instructions that were provided aren't working.
14 What would the technician do next? Would they go
15 to the supervisor for --
16     A. Yes.
17     Q. -- input on how to correct that problem?
18     A. Yes, I would expect them to.
19     Q. Now, I think you also explained that it
20 is your understanding that the POSA also knows of
21 and understands all of the prior art in his field
22 of endeavor; correct?
23     A. Yes.
24     Q. Okay. So if a claimed invention is new
25 and not described in the prior art, then that

111

1  knowledge and understanding of the prior art would
2  not necessarily inform the POSA about how to make
3  and use the claimed invention; right?
4      MR. KREMEN: Objection to the form of
5  the question. If you understand it.
6      THE WITNESS: I don't understand the
7  question. You might want to clarify that for me.
8  BY MS. PETERSON:
9      Q. So we have, you know, a claimed
10 invention described in a patent and it's new, it's
11 not described in the prior art. So just having
12 knowledge of the prior art would not necessarily
13 inform the person of skill about how to make and
14 use the claimed invention; right?
15     MR. KREMEN: Objection to form.
16     THE WITNESS: I think it's a matter of
17 the terminology that's used.
18 BY MS. PETERSON:
19     Q. Well, I guess another way to look at it
20 is if the instructions or explanation for how to
21 make and use the claimed invention are not in the
22 prior art, then they would have to be provided
23 directly in the patent; correct?
24     A. I think that's a matter of patent law.
25 So I would agree. But that should not preclude

112

1  the person from learning from reading the patent,
2  even though it's novel.
3      Q. No, understood. Absolutely, you can
4  read and -- I agree with you.
5      A. Yes.
6      Q. You can read and understand what is
7  explained in the patent.
8      A. Yes.
9      Q. Okay. Is it also your opinion that the
10 person of ordinary skill in the art must
11 necessarily be able to make and use the claimed
12 invention?
13     A. Again, I'm not clear on making and using
14 the claimed invention. Maybe can you just give me
15 a clarification on that again, I'm sorry?
16     Q. Sure. Give me one second because I
17 think this is --
18     A. Sure.
19     Q. -- mostly a direct quote from your
20 report.
21     A. Sure. Yeah, if you identify where it
22 is, I can read the statement again. This way I'm
23 clearer.
24     Q. Okay. Let's take a look at -- oh, we're
25 on the right page, page 3.

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

113

1        MS. PETERSON:  Can we scroll up to the
2  top?
3  BY MS. PETERSON:
4      Q.  The second full sentence, you state, "He
5  must have sufficient experience in his art so as
6  to become competent and understand and interpret
7  the prior art related to a patent so that he can
8  make and use the invention described and claimed
9  in the patent."
10     **A.  Yes.**
11     Q.  So that's your opinion?
12     **A.  Yes, it is.**
13     Q.  Okay.
14     **A.  Yeah.  Yeah, I wasn't sure what you were**
15  **referring to.  Thank you for identifying it.**
16     Q.  I was paraphrasing.  I should have
17  pointed directly to the report, I apologize.
18     **A.  Not a -- no need to.**
19     Q.  But just to understand, so it is your
20  opinion that a person of skill in the art will
21  necessarily be able to make and use the claimed
22  invention as described in the patent?
23     **A.  Yes.**
24     Q.  Now, all of this is in contrast, I
25  think, to what you described as an extraordinary

114

1  skilled person?
2      **A.  Yes.**
3      Q.  And that would be someone who has an
4  advanced degree?
5      **A.  Yes, and I think who qualifies as a**
6  **person of advanced skill in the area.  There are**
7  **many individuals who I respect and read their**
8  **scientific views on things, and those are the**
9  **people that I consider to be extraordinary.**
10     Q.  Okay.  And that extraordinarily skilled
11  person could also be a student who is majoring in
12  that particular subject matter?
13     **A.  Yes, I think that a person who is**
14  **extraordinary in their skill has some fundamental**
15  **knowledge of concepts.  In this particular case,**
16  **some of these concepts are essentially taught to**
17  **us in a high school setting or in an undergraduate**
18  **setting.  And then based on those skills or that**
19  **knowledge, that person can proceed to reach an**
20  **advanced degree but always hold on to those basic**
21  **skills.**
22     Q.  Okay.  Let's move forward two pages to
23  page 5.
24     **A.  Okay.**
25     Q.  And I think here on page 5, now you're

115

1  providing your explanation as to the specific
2  level of skill possessed by a person of ordinary
3  skill in the art for the '802 patent; correct?
4      **A.  Yes, that's correct.**
5      Q.  And so specifically, it would be the
6  level of skill of that of a chemical or a
7  pharmaceutical formulator?
8      **A.  Yes.  And as I said previously, it could**
9  **be an individual who is not classified in that**
10  **terminology or in that manner but could be an**
11  **individual who, again, has read extensively on the**
12  **subject matter.**
13     Q.  Okay.  And then you set out two
14  qualifications for the person of ordinary skill in
15  the art; correct?
16     **A.  Yes, I have two related but separate**
17  **qualifications, yes.**
18     Q.  Okay.  And the first qualification, is
19  that after reading the '802 patent, he should be
20  able to create the formulations described in the
21  patent; right?
22     **A.  Yes, that's stated.**
23     Q.  And then the second qualification is
24  that the person of skill in the art must be
25  positioned in time just prior to the effective

116

1  filing date of the '802 patent; right?
2      **A.  Yes.**
3      Q.  So that's referring to the time period
4  that we're looking at as opposed to any particular
5  qualifications of the person of ordinary skill in
6  the art?
7      **A.  Yes.**
8      Q.  Okay.
9      **A.  And my thought -- you know, that's just**
10  **a reflection of my thought process at the time.**
11  **So at the time we have to go back to that year, or**
12  **whatever year we're looking at, what was the level**
13  **of knowledge within the scientific community**
14  **related to the subject.**
15     Q.  Okay.  And then you provide some
16  additional explanation on this same page
17  indicating that the person of ordinary skill in
18  the art would have the skill and experience to
19  duplicate the formulations listed in the '802
20  patent; right?
21     **A.  Yes.**
22     Q.  Okay.  And then looking on the next
23  page?
24     **A.  Page 6?**
25     Q.  Yep.

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

117

1      A.  Yes.
2      Q.  The very last sentence, you explain, I
3   think what you identified, as your key requirement
4   for the person of ordinary skill in the art; is
5   that right?
6      A.  Yes.
7      Q.  And that would be the required
8   experience --
9          MR. KREMEN:  Where are we?
10         THE WITNESS:  Page 6.  Page 6, first
11  paragraph.
12         MS. PETERSON:  There you go.
13  BY MS. PETERSON:
14     Q.  Okay.  So the key requirement, in your
15  opinion, is that the person of ordinary skill in
16  the art is -- has acquired experience -- or it is
17  the acquired experience necessary to create a wide
18  variety of formulations from the class of
19  ingredients disclosed in the '802 patent; right?
20     A.  Yes, that's what I described earlier,
21  where if there are options that as stated, if you
22  remember our previous conversation relative to the
23  '802 patent with the various tables of
24  ingredients, but they identify categories, and so
25  that person of ordinary skill in the art would be

118

1   able to decipher or understand the various options
2   that they have available to them as recited in the
3   patent.
4      Q.  Okay.
5          MS. PETERSON:  We can pull that exhibit
6   down.
7   BY MS. PETERSON:
8      Q.  And let's go back and take a look at
9   Exhibit 2.  This is the '802 patent.
10     A.  I think I have a copy instead of an
11  electronic copy here.  It's easier for me to read.
12     Q.  Yep, that's fine.
13     A.  My eyesight in my advanced years is --
14  it's easier to look at it here.  I have it.
15     Q.  Okay.  So you've reviewed the '802
16  patent in its entirety; right?
17     A.  Yes.
18     Q.  The specification as well as all of the
19  claims?
20     A.  Yes.
21     Q.  Okay.  And let's take a look at Claim 1.
22         MR. KREMEN:  Can we do that on the
23  screen?
24  BY MS. PETERSON:
25     Q.  So it will be page 6 of the PDF.

119

1          Okay.  So looking at Claim 1, it starts
2   out with what we call a preamble.  That would be
3   the opening phrase.
4          Do you see that?
5      A.  Yes.
6      Q.  And it refers to "A method for
7   electrostatically inhibiting harmful particulate
8   matter from infecting an individual through nasal
9   inhalation wherein a formulation is applied to
10  skin or tissue of nasal passages of the individual
11  in a thin film"; correct?
12     A.  That's correct.
13     Q.  Okay.  And then following that there are
14  three other claim elements, A, B, and C; right?
15     A.  Yes.
16     Q.  And I think those are what you refer to
17  respectively as capturing, holding, and killing;
18  is that right?
19     A.  Yes, it's a -- forgive me for doing
20  that, but it's how I try to convey messages
21  sometimes to an audience that may not be
22  scientifically directed.  So it's a habit.
23     Q.  Okay.  And then looking at Claim 2,
24  Claim 2 is very similar to Claim 1 except that it
25  recites a formulation instead of a method; right?

120

1      A.  That's correct.
2      Q.  Okay.  And in addition to those elements
3   of Claim 1 that we just walked through, Claim 2
4   also adds the express requirement that the
5   formulation contains at least one cationic agent
6   and at least one biocidic agent; right?
7      A.  That's correct.
8      Q.  And then if we look at Claims 6 and 7,
9   which are at the bottom of the page, those are
10  dependent claims where the cationic agent and the
11  biocidic agent specifically are benzalkonium
12  chloride; right?
13     A.  That's correct.
14     Q.  Or in the case of Claim 7, the biocidic
15  agent can be benzalkonium chloride or Lysine HCL?
16     A.  Hydrochloride, correct.
17     Q.  Okay.  Now, you understand that because
18  these claims use the word "comprising" that the
19  formulations can also include additional
20  ingredients; right?
21     A.  Yes.
22     Q.  Okay.
23         MR. KREMEN:  Calls for a legal
24  conclusion.
25

BY MS. PETERSON:
Q. And you would also agree that Claims 1 and 2, they do not just recite a formulation having certain ingredients; right?
MR. KREMEN: Objection to the form of the question.
THE WITNESS: Well, Claim 1 is a method.
BY MS. PETERSON:
Q. Yeah, it's a method of using a formulation; right?
**A. Yes, you said Claim 1 and 2.**
Q. Okay. So -- but Claim 1 does refer to a method of using the formulation; right?
**A. Yes.**
Q. Okay. And you agree that Claims 1 and 2 do not just recite a formulation having certain ingredients or a method of using a formulation having certain ingredients; right?
MR. KREMEN: Objection to the form.
THE WITNESS: Your question is a little bit confusing to me if you could restate it.
BY MS. PETERSON:
Q. Okay. Let's look at just Claim 2.
Would you agree that Claim 2 does not just recite a formulation having certain



categories of ingredients?
MR. KREMEN: Objection to form.
THE WITNESS: In Claim 2, if we look at that information, it's -- it doesn't really spell out exactly what you're saying, I think. I may be a little bit confused as far as how you're interpreting that claim.
BY MS. PETERSON:
Q. Okay. Well, it doesn't read a formulation containing a biocidic agent and a cationic agent period. There are other elements to the claim; right?
**A. Yes.**
Q. So the formulation that is described in Claim 2 also has another -- has a number of other elements or functions that the formulation will perform; right?
**A. Yes, and they're recited in the tables in the body of the patent.**
Q. The ingredients are recited in the tables?
**A. Yes, that's correct.**
Q. Okay. But looking at Claim 2, Claim 2 recites specific functions that the formulation should be able to perform; right?



**A. That's correct.**
Q. It must be able to electrostatically inhibit harmful particulate matter from infecting an individual through nasal inhalation?
**A. That's correct.**
Q. And the formulation must also be applied to the skin or tissue of nasal passages in a thin film?
**A. Yes, that's correct.**
Q. And Claim 2 also requires that the thin film applied or formed upon application of the formulation must electrostatically attract particulate matter to the thin film?
**A. That's correct.**
Q. And the claims also require that the thin film must hold the particulate matter in place?
**A. Correct.**
Q. And the formulation must also provide adequate impermeability to the thin film?
**A. Correct.**
Q. Okay. So those are all functions that the claim requires the formulation to provide; right?
**A. Correct. Yes.**



Q. And those same functions are recited in Claim 1, as well; right?
**A. That's correct.**
Q. Okay. Now, I think we all understand this, but is it your understanding that all cationic agents will have a positive charge?
**A. Yes.**
Q. Okay. And the functions recited in the claims of electrostatically inhibiting and electrostatically attracting, those are the results of the positive charge of a cationic agent; right?
MR. KREMEN: Objection to the form.
THE WITNESS: Of the formulation.
BY MS. PETERSON:
Q. So it's the positive charge of the formulation?
**A. Yes.**
Q. Okay. So you understand that even if a particular formulation includes a cationic agent with a positive charge, that other components or ingredients in the formulation could impact the overall charge of the formulation?
MR. KREMEN: Objection to the form of the question.

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

125

1    THE WITNESS:  You may want to clarify
2  that.
3  BY MS. PETERSON:
4    Q.  So the formulation we're talking about
5  here, it doesn't just exist of only a cationic
6  agent; right?
7    **A.  That's correct.**
8    Q.  Okay.  And you understand that other
9  ingredients in the formulation could impact the
10 overall charge of the formulation; right?
11   MR. KREMEN:  Objection to form.
12   THE WITNESS:  Other ingredients are in
13 the formula and may contribute cationic charge.
14 BY MS. PETERSON:
15   Q.  And they could also make the charge
16 lower, as well; right?
17   **A.  If the ingredient is neutralizing the**
18 **cation.**
19   Q.  Okay.  Yeah.  So there could be
20 ingredients included in a formulation that could
21 neutralize the charge of the cationic agent
22 altogether; right?
23   **A.  It depends on the amount that's present**
24 **in the formula.**
25   Q.  Okay.  And would you also agree that the

126

1  pH of a formulation could impact the charge of the
2  formulation?
3    **A.  Yes.**
4    Q.  And the pH of the environment where the
5  formulation is applied could also impact the
6  surface charge; right?
7    **A.  Yes.**
8    Q.  Okay.  So we also understand from
9  Claims 1 and 2 that the formulation is being used
10 in a manner to inhibit harmful particulate matter
11 from infecting an individual through nasal
12 inhalation; correct?
13   **A.  That's correct.**
14   Q.  And the '802 patent provides examples of
15 those harmful particulate matters; right?
16   **A.  That's correct.**
17   Q.  And it includes things like anthrax,
18 spores, various viruses like coronavirus, smallpox
19 virus, influenza, avian flu, swine flu, and
20 rhinovirus?
21   **A.  I would classify all of those as**
22 **negatively charged particles.**
23   Q.  Sure.  But the patent describes a wide
24 variety of different viruses.
25   **A.  Yes.**

127

1    Q.  Okay.  The patent also describes a
2  number of biological or chemical elements, toxins,
3  and irritants, as well, that can be addressed by
4  the claimed invention; right?
5    **A.  Yes.  Yes, that's correct.**
6    Q.  And the '802 patent also describes
7  preventing or inhibiting the infection of airborne
8  microorganisms?
9    **A.  I think the correct term here is**
10 **"inhibiting" them.**
11   Q.  Okay.  So the '802 describes airborne --
12 or the '802 patent describes airborne
13 microorganisms as another example of harmful
14 particulate matter that the claimed invention is
15 intended to inhibit the infection of; right?
16   **A.  If it's an infecting agent, yes.**
17   Q.  Also airborne fungal spores?
18   **A.  Any agent that would be in the airstream**
19 **at a concentration when a person is coming in**
20 **contact with it with a concentration of those**
21 **particles are irritants, negatively charged items,**
22 **they would all be classified as those that would**
23 **come in contact with the formulation and be**
24 **rendered, held onto as it states in Claim 1,**
25 **Section B.  So that holding aspect is a very**

128

1  **important aspect of what's claimed here.**
2    Q.  Okay.  And still looking at the types of
3  harmful particulate matters identified by the '802
4  patent, there's also a group of bacterial diseases
5  that are identified for which infection can be
6  inhibited; right?
7    **A.  Yes, absolutely.**
8    Q.  And that would include the bacteria that
9  are responsible for causing whooping cough,
10 meningitis, diphtheria, pneumonia, tuberculosis,
11 and anthrax?
12   **A.  Yeah, any of the bacteria that would**
13 **have a membrane structure that you've recited**
14 **would be affected by virtue of the cationic nature**
15 **of the formulation.**
16   Q.  Oh, okay.  So, in other words, the --
17 it's that membrane structure -- that membrane
18 structure would be disrupted by the cationic agent
19 or the biocidic agent?
20   **A.  That's correct.**
21   Q.  Okay.  And as long as the harmful
22 particulate matter is negatively charged, then the
23 claimed invention will capture and hold those
24 harmful particulate matters, as well?
25   MR. KREMEN:  Object to form.

129

1    Which claim are you talking about, 1 or
2    2?
3        MS. PETERSON:  Both.
4        MR. KREMEN:  Okay.  You can answer.
5        THE WITNESS:  Yes, in 1, we're talking
6    about attracting because of the charge difference
7    and then holding it and essentially reaching that
8    point of adequate impermeability where the product
9    then -- or the bacteria, if that's what we're
10   referring to -- becomes inactivated by means of
11   the agents that are present.  And that
12   inactivation is essentially going to apply to
13   those negatively charged particles that are in the
14   airstream that could potentially create a problem
15   for the individual.
16       So it's just a matter of looking at it
17   from a particulate matter standpoint.  And that's
18   why I used the expression earlier that I viewed it
19   more as a medical device that happens to employ a
20   formulation.  If I've made myself clear.
21   BY MS. PETERSON:
22   Q.  I'm not sure that that was clear, but
23   that's okay.  We can move on.
24   A.  Okay.
25   Q.  So benzalkonium chloride, you're

130

1    familiar with that agent; right?
2    A.  Yes.  Yes, I am.
3    Q.  And when you used as a biocide, it works
4    by disrupting or breaking up the cell membrane of
5    an organism; right?
6    A.  That's correct.  That's correct.
7    Q.  So it won't have the same effect on
8    something where the cell membrane isn't present or
9    protected, like in a fungal spore or an anthrax
10   spore; right?
11   A.  If there was a membrane --
12       MR. KREMEN:  Objection to form.
13       THE WITNESS:  If there was a membrane
14   present, we're looking at what -- let me give you
15   an example.  If you're looking at enveloped
16   viruses, there are some that have a membrane.
17   Others do not.  So what you're looking at is the
18   effect -- and it's a chemical effect, essentially,
19   of the action of the benzalkonium chloride on the
20   membrane of the microorganism that we're
21   questioning.
22   BY MS. PETERSON:
23   Q.  Okay.  And that biocidic activity of
24   benzalkonium chloride, that's something that's
25   been known and it's been used for that purpose for

131

1    decades; right?
2    A.  Oh, I believe since the 1930s from the
3    literature that I've read on the subject, yes.
4    Q.  Okay.  Let's take a look at Column 4 of
5    the patent.
6        MR. KREMEN:  You have to scroll up.
7    Keep going.  One more.
8        MS. PETERSON:  Yeah, so down at the
9    bottom of that page.  If we can go all the way
10   down to the bottom.
11   BY MS. PETERSON:
12   Q.  Do you see at the very bottom, starting
13   at line 65, the '802 patent describes a
14   formulation of the invention comprises and then
15   there's a list of ingredients, including water, at
16   least one quarternary thickener --
17       MS. PETERSON:  And then if we scroll
18   down --
19   BY MS. PETERSON:
20   Q.  -- a preservative, a conditioner, an
21   emulsifier, a biocidic agent, and a neutralizing
22   agent added to adjust and achieve a pH in the
23   range of 5.0 to 6.8?
24       Do you see that?
25   A.  Yes.

132

1    Q.  So to function as described in the
2    claims of the '802 patent, does the formulation
3    need to have all of those ingredients?
4    A.  I believe they do.  That it does, yes.
5    Q.  And then you mentioned this earlier, but
6    the patent goes on and includes ten tables
7    describing typical formulations; right?
8    A.  Yes.
9    Q.  Okay.  And it's not a specific
10   individual formulation disclosed in those tables,
11   but rather a list of ingredients with ranges for
12   the amounts of each ingredient; right?
13   A.  Yes.
14   Q.  So within each table, there can be some
15   variation in terms of how much of each ingredient
16   is used; right?
17   A.  Yes.
18   Q.  So would it be fair to say then that the
19   patent lists more than just ten discrete
20   formulations?
21   A.  Multiples.  In the cases of each of the
22   tables it can give you a variety of choices.
23   Q.  Yeah, because I think water is the
24   primary ingredient in most of these, and it ranges
25   anywhere from 52 to 88 percent; right?

133

1     A.  Yes.  And it's an important component
2  for the other materials to function.
3     Q.  Okay.  And then these tables include
4  anywhere between 12 to 18 ingredients each; right?
5     A.  I would safely -- I haven't counted
6  them, but I would safely say yes.  I assume that
7  you did count it to give me that number.  That's
8  fine.
9     Q.  It's pretty specific.
10       Okay.  And then I saw that a few of the
11 tables also list benzalkonium chloride?
12    A.  Yes.
13    Q.  And benzalkonium chloride is always
14 identified in the range of .25 to 1 percent.
15    A.  Yes, I think that's related to the
16 standard that's allowable.
17    Q.  Okay.  So is that the effective
18 concentration of benzalkonium chloride that's
19 needed to function in the claimed invention?
20    A.  I believe so.
21    Q.  Okay.
22    A.  Yes.
23    Q.  Okay.
24       MS. PETERSON:  We could take that down.
25       MR. KREMEN:  It's now 1:47.  Do you

134

1  think we might want to have a break at this point?
2        MS. PETERSON:  Yeah, sure, we can do
3  that.
4        MR. KREMEN:  Ten minutes?
5        MS. PETERSON:  Yep, that's good.
6        THE VIDEOGRAPHER:  We're going off the
7  record.  The time is 1:48 p.m.
8        (Recess from the record.)
9        THE VIDEOGRAPHER:  We're back on the
10 record.  The time is now 2 p.m.
11 BY MS. PETERSON:
12    Q.  Okay.  Dr. Lemmo, I actually had just
13 one other follow-up question about the
14 formulations listed in the '802 patent.
15    A.  Sure.
16    Q.  Would you agree that varying the
17 percentage of the ingredients listed in those
18 formulations can change the potency of the
19 formulation?
20    A.  It depends on the ingredient, yes.  So
21 that if, for example -- I don't see it in the --
22 you know, I've have to scan it again.  But if in
23 the case of benzalkonium chloride, if it's
24 exceeding that threshold limit, that could be very
25 irritating for the user and, therefore, that may

135

1  present itself as more of a problem than a benefit
2  associated with using that ingredient in the
3  formula.
4     Q.  Okay.
5     A.  So in any formulation, regardless if
6  it's nutritional or otherwise, we, in formulating
7  the product, have to consider what is the
8  tolerance level for ingredients and what would be
9  the benefit level to effect the outcome of the
10 formulation.
11    Q.  Sure.
12       And so, likewise, varying the percentage
13 of the ingredients could also change the potency
14 or the efficacy of the formulation; right?
15    A.  Absolutely.  Absolutely.
16    Q.  And varying the percentage of
17 ingredients could also change the consistency of
18 the formulation?
19    A.  Yes, it could fall out of uniformity.
20 And that's why in many instance stability studies
21 are conducted on formulas when they are
22 conceptualized to the point where, as we were
23 speaking before, are brought into the laboratory
24 setting for the testing that's required to
25 demonstrate uniformity of dose and consistency of

136

1  ingredient and stability studies.  That's all
2  something that would then be evaluated that the
3  formula does, in fact, do what you claim it's
4  going to do.
5     Q.  And changing the ingredients or the
6  percentage of the ingredients could also have an
7  impact on the adhesive properties of the
8  formulation?
9     A.  If it's one of the ingredients that is
10 associated with either adhesion or cohesion, the
11 answer is yes.
12    Q.  Okay.
13       MS. PETERSON:  Let's pull up Dr. Lemmo's
14 claim construction declaration, and we will mark
15 this as Exhibit 17.
16       (Lemmo Deposition Exhibit 17 was marked
17 for identification and attached to the
18 transcript.)
19       THE REMOTE TECHNICIAN:  Stand by.
20 BY MS. PETERSON:
21    Q.  Dr. Lemmo, do you recognize Exhibit 17
22 as a copy of your declaration in support of Trutek
23 Corporation's claim construction brief?
24    A.  Yes, I do.
25    Q.  Okay.  And if we move to the last page.

137

1  Is that your signature?
2      A.  Yes, that is.  And it's dated
3  September 24th, 2022.
4      Q.  Okay.  And do you see up at the top of
5  the page there's a header in blue that indicates
6  it was filed on September 27th, 2022?
7      A.  Yes, I see that.
8      Q.  Okay.  Now, I notice that you do not
9  have a separate list of materials that you
10  reviewed in connection with preparing this
11  declaration; correct?
12      A.  That's correct.
13      Q.  Is everything that you considered or
14  reviewed in forming the opinions expressed in the
15  declaration mentioned directly in the declaration?
16      A.  Yes.  I'd have to just review that
17  document again as we go through it.
18      Q.  Okay.  Well, as of right now, are you
19  aware of anything else that you reviewed in
20  connection with preparing this declaration that
21  you didn't identify?
22      A.  No.
23      Q.  And of course you prepared this
24  declaration in support of Trutek's claim
25  construction positions in the litigation; right?

138

1      A.  Correct, yes.
2      Q.  Okay.  Let's go back to page 2.  And,
3  actually, we're going to be -- actually, page 3.
4  Let's go to the next page.  This paragraph 5 --
5  nope, one page earlier.
6          MR. KREMEN:  Liane, unfortunately, the
7  page numbers are hard to read.  So I guess if we
8  could also identify the page by just the first
9  sentence on the top, it would be helpful.
10          MS. PETERSON:  Yeah.  And where there's
11  a clear paragraph number, I identify it that way
12  so that there's no ambiguity.  It's just for
13  Jennifer sometimes it's easier to go to the page
14  of the PDF so we can move through the document
15  quickly.
16  BY MS. PETERSON:
17      Q.  But looking at this page, which I think
18  is page 3, we have paragraph -- do you see
19  paragraph 5C?
20      A.  It got cut off at the bottom.
21          MR. KREMEN:  It's 5C, though; right?
22  Okay.
23          MS. PETERSON:  5C.
24          MR. KREMEN:  E or --
25          MS. PETERSON:  C as in cat.

139

1          MR. KREMEN:  Yeah.  Right.
2  BY MS. PETERSON:
3      Q.  "Based on the disclosures," you see
4  that?
5          So, Dr. Lemmo, in this declaration
6  you're expressing the opinion that the claim
7  terms, "electrostatically inhibiting,"
8  "electrostatically attracting," "adequate
9  impermeability," and "renders said particulate
10  matter harmless" are sufficiently clear and
11  unambiguous; correct?
12      A.  That's correct.
13      Q.  Okay.
14          MR. KREMEN:  You're --
15          THE WITNESS:  Particularly to a person
16  of ordinary skill in the art.
17  BY MS. PETERSON:
18      Q.  Okay.
19      A.  And that's what I referred to earlier
20  for this terminology relative to Dr. Amiji's
21  report.
22      Q.  Okay.  So that was the standard that you
23  applied here, "sufficiently clear and unambiguous
24  to a person of ordinary skill"?
25      A.  Yes, that's correct.

140

1      Q.  Okay.  So let's move ahead to paragraph
2  32, which is going to be page 13 of the PDF.
3          MR. KREMEN:  32.
4          THE WITNESS:  Thank you for increasing
5  the print size.
6          MR. KREMEN:  Yeah, that helps.
7          THE WITNESS:  It's very helpful.
8          MR. KREMEN:  That really helps.
9          THE WITNESS:  It's a lot of eyestrain.
10  BY MS. PETERSON:
11      Q.  Okay.  And here, Dr. Lemmo, you're
12  referring to what you discuss as the "hold"
13  function?
14      A.  Yes.
15      Q.  Of the claimed invention?
16      A.  Yes.
17      Q.  And you say that holding is based on the
18  adhesive and cohesive properties of the
19  formulation?
20      A.  Yes, that's correct.
21      Q.  Okay.  And looking at the next
22  paragraph, 33, where you're talking about
23  adhesion, the very last sentence you state that,
24  "This sets up a barrier of impermeability" --
25      A.  Correct.

141

1      Q.  -- that -- "trapping a significant" --
2   let me -- the entire sentence reads that, "This
3   sets up a barrier of impermeability trapping a
4   significant number of these particles outside the
5   nasal passageway"; right?
6      **A.  Correct.**
7      Q.  Okay.  So the claimed formulation, once
8   applied, it creates a thin film on the surface of
9   the skin; right?
10     **A.  That's correct.**
11     Q.  And that thin film, as recited in the
12  claims, is impermeable, meaning that it creates a
13  physical barrier?
14     **A.  It -- yes, it creates a physical barrier**
15  **outside of the body.**
16     Q.  Okay.  And then that physical barrier
17  traps those harmful particles from being inhaled
18  into the respiratory system; right?
19     **A.  That's correct.**
20     Q.  Okay.  Let's move ahead two pages to
21  paragraph 37.
22         In paragraph 37, you conclude that the
23  claim term "adequate impermeability is a property
24  of the applied formulation that allows the harmful
25  particles to be held in place for a sufficient

142

1   time to be inactivated"; right?
2      **A.  That's correct.**
3      Q.  Okay.  And so like we just talked about,
4   that's a physical barrier that allows the harmful
5   particles to be held in place --
6      **A.  That's correct.**
7      Q.  -- for a sufficient time?  Okay.
8      **A.  That's right.**
9      Q.  Now, "sufficient time," that's another
10  relative term; right?
11     **A.  Yes.  Again, we don't know when an**
12  **individual will come in contact with a harmful**
13  **microorganism that's in the airstream.  So as I**
14  **remember, the statements regarding the use of the**
15  **product is to use the product for a specific**
16  **period of time before a person may want to**
17  **reapply.**
18     Q.  And then what does the patent say about
19  how much -- what does the '802 patent say about
20  how much time is sufficient?
21     **A.  I believe it was a four-hour window.  I**
22  **have to go back and check that to be exact.**
23     Q.  So you think four hours is specified in
24  the patent.
25     **A.  For the use of the ingredients, I**

143

1   **believe it's four hours.  You know, a lot happens**
2   **within a four-hour window.  So I believe that's**
3   **what -- you know, what's -- but I'm not certain.**
4   **You know, don't hold me to that one.**
5      Q.  Is it possible you're thinking of
6   marketing claims of the products that you looked
7   at in the case?
8      **A.  Thinking about it, it may not have been**
9   **in the patent itself that I specifically saw that.**
10  **It was probably on the website for the product.**
11     Q.  Okay.  So to the best of your knowledge,
12  the patent doesn't define how much time is
13  sufficient to hold the harmful particles in place
14  to allow them to be inactivated; right?
15     **A.  Yeah, at this point that's what I'm**
16  **assuming, yes.**
17     Q.  Okay.  So, I mean, how much time is
18  sufficient?  Is an hour good enough?
19         MR. KREMEN:  Objection to form.
20         THE WITNESS:  It's very vague.  That's a
21  very vague question of how much time.  Because as
22  I said earlier, I use the product.  I use the
23  product primarily during times when I'm in the
24  company of strangers, but in my own home where I
25  am now speaking to you, I'm not using the product.

144

1   So I don't feel that I need it.  I may be coming
2   in contact with animal dander, but I'm not
3   sensitive to the animal dander just because I have
4   two cats.
5   BY MS. PETERSON:
6      Q.  Okay.  So the amount of time that is
7   sufficient, I guess it depends on the
8   circumstances of where the individual is or the
9   particular sensitivities of the individual or even
10  the nature of the material that's in the air?
11     **A.  I would --**
12         MR. KREMEN:  Objection to form.
13         THE WITNESS:  I'm sorry, I didn't hear
14  what --
15         MR. KREMEN:  I said objection to the
16  form of the question.
17         You may answer.
18         THE WITNESS:  Okay.  Just repeat, I'm
19  sorry, I lost my train of thought.
20  BY MS. PETERSON:
21     Q.  Okay.  So the amount of time that's
22  sufficient, it depends on the circumstances;
23  right?
24     **A.  Yes, I agree with that, yes.**
25     Q.  Okay.  So it could depend on where the

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

145

1  individual who's using the product is located?
2      A.  Yes.  If you're in a highly polluted
3  area, not necessarily pollution relative to
4  bacterial pollution but irritants that may be in
5  the air, if you happen to visit a place where
6  people are smoking and you're highly sensitive to
7  cigarette smoke or tobacco smoke, that may be a
8  benefit for a person to possibly reapply.  But I
9  can't say definitely because I haven't done that
10  testing.
11      Q.  So the amount of time that's sufficient,
12  it could depend on the environment.  It could
13  depend on the particular sensitivities of the
14  individual, as well; right?
15      A.  Yes.
16      Q.  It could also depend on the nature of
17  the material that's in the air; right?
18      A.  Yes.
19      Q.  So certainly --
20      A.  Humidity.  Humidity.
21      Q.  I'm sorry, I cut you off.
22      A.  No, humidity, a number of things that --
23  you know, a person might actually touch their face
24  a number of times, and by touching the face affect
25  that which they applied.  Not everyone can say

146

1  without touching their face for a significant
2  period of time.  There are studies that
3  demonstrate that.  Exactly, Liane.
4      Q.  I do it all the time.
5      A.  Thank you for demonstrating.
6      Q.  I just broke my rule.  I was just wiping
7  my nose for people reading the transcript.
8      A.  Okay.
9      Q.  Okay.  So in turn, that sufficient
10  time -- I think you've also explained that the
11  impermeability of the film is also related to this
12  concept of allowing enough time to hold those
13  particles in place; right?
14      A.  Yes, and it's also the stickiness, the
15  tackiness of the material that plays an important
16  part relative to the cohesive property of the
17  material.  And it's that cohesive property that
18  sets up that impermeable barrier.  And that's --
19  when considered with the adhesive property and the
20  cohesive property, as the patent states, that's
21  the ability to hold.  And it's essentially holding
22  it outside of the body as opposed to depending
23  upon that which is naturally present in the
24  nostrils to try to protect an individual along
25  with their immune system.  That's how I interpret

147

1  it.
2      Q.  Okay.  So the cohesive property is what
3  sets up the impermeable barrier; right?
4      A.  Along with that adhesive property.  I
5  think it's a combination of the two.
6      Q.  Okay.  And then how --
7      A.  Because it's a -- I'm sorry, because
8  it's a thin film.
9      Q.  Okay.
10      A.  So I think you have to have both, the
11  ability to hold it to the skin and at the same
12  time have that cohesive property that will act to
13  attract any of those harmful agents, particles,
14  that might be in the airflow.
15      Q.  Okay.  So the impermeable barrier is a
16  result of the adhesive and cohesive properties of
17  the formulation?
18      A.  That's how I interpret it, yes.
19      Q.  And those adhesive and cohesive
20  properties can be different depending on the
21  ingredients and the percentages of those
22  ingredients in the formulation; right?
23      A.  Yes.
24      Q.  Which in turn can impact the level of
25  impermeability?

148

1      A.  Probably, yes.
2      Q.  And the ability of -- or the amount of
3  time that the thin film acts as a barrier?
4      A.  Correct.  But these would all be tests
5  performed on the product beyond the scope of the
6  patent.  So, in other words, what I reiterated
7  previously, in my experience in getting products
8  on the market, if you have to do testing of your
9  product, you have to -- in order to make the
10  claims for your product, you need to generate the
11  substantiation to support what you're saying about
12  the product.
13          So if I were putting a product on the
14  market and I say reapply in four hours, I'm not
15  taking that as an ambiguous period of time.  I'm
16  basing that on some sort of test parameter that I
17  conducted in my laboratory or in the laboratory of
18  the company before I go ahead and market that
19  concept commercially.
20      Q.  Okay.  And I think at the beginning of
21  that answer you referred to that as being tests
22  performed on the product beyond the scope of the
23  patent.  So is that referring to the fact that the
24  patent doesn't describe any such testing of any of
25  the formulations listed in the patent?

149

1      A.  Well, it proposes -- the patent proposes
2   the concept of how it's going to work and its
3   methodology.  Okay.  There -- I don't think that
4   it's necessary to provide in the patent the end
5   point, you know, what exactly you're going to see
6   clinically.  It's essentially presented as the
7   concept in the patent and then any subsequent
8   information that I'm referring to in the testing
9   would be done post patent, if that makes it clear.
10     Q.  Okay.  But just even more simply, the
11  patent doesn't describe the results of any testing
12  of that nature of any of the formulations that are
13  listed; right?
14     A.  No.
15     Q.  Okay.  Let's look at paragraph 39.
16  Here, you state that the specification has a list
17  of the formulation's generic ingredients.
18      Do you see that?
19     A.  Yes.
20     Q.  So this would be the categories of
21  ingredients; right?
22     A.  That's what I referred to previously,
23  and I believe that's in the patent.  It's recited
24  in the patent.
25     Q.  Okay.  And is it your understanding that

150

1   each of these are required in order for a
2   formulation to function as claimed in the patent?
3      A.  I believe so, yes.
4      Q.  So a quarternary thickener would be
5   necessary?
6      A.  Yes, and that would be benzalkonium
7   chloride that would be utilized.  And some of
8   these components may have multiple roles.  That so
9   benzalkonium chloride may act as a thickener but
10  it may also act as a preservative and it may also
11  act in the capacity of the cation contributor.  It
12  will also act as the biocide.
13     Q.  Okay.  And conditioner would be required
14  for the formulation to function as claimed in the
15  patent?
16     A.  Yeah, I believe that's there primarily
17  because it's coming in contact with the skin and
18  so that certain ingredients or certain
19  components -- as a formulator you would
20  anticipate, you know, how the product is going to
21  be used and that you don't want to apply something
22  to the skin that's going to be irritating to the
23  skin.
24      Also, sometimes ingredients, in order to
25  blend together, you know, when you're making

151

1   combinations, require certain components that
2   might facilitate a better mixing of the
3   ingredients and holding together.  It's kind of
4   like a jar of mayonnaise, you don't want -- you
5   can make your own mayonnaise and it can separate
6   out, but if you do it correctly, it should be
7   consistent.
8      Q.  And an emulsifier would be required in
9   order for a formulation to function as claimed in
10  the patent?
11     A.  Yes.
12     Q.  And a neutralizing agent is necessary
13  for a formulation to function as claimed in the
14  patent?
15     A.  In that specific range, yes.
16     Q.  Okay.  And an emollient would also be
17  necessary to function as claimed in the patent?
18     A.  Yes, because it's applied to the skin.
19     Q.  Okay.  Looking at the next page -- well,
20  actually, just starting at 41, here you're talking
21  about the ten example formulations in the patent;
22  right?
23     A.  Yes.
24     Q.  Okay.  And then moving on to the next
25  page, you state, "As long as the composition of

152

1   ingredients remains within the specified ranges,
2   the example formulations should function as
3   disclosed."
4      Do you see that?
5      A.  Yes.
6      Q.  Okay.  And what's the basis for that
7   statement?
8      A.  That is what I mentioned earlier so
9   that, if I go back to my benzalkonium chloride --
10  sometimes people will abbreviate that as BZK, just
11  so that it's not a mouthful of words.  But
12  essentially what I'm saying is you really want to
13  have a level of ingredient that is safe and
14  effective as two key components.  You don't want
15  to exceed that because it can potentially be
16  irritating.
17      Remember, it's used as a disinfecting
18  agent, and if you touch detergent or some other
19  caustic material, you can get skin irritation, and
20  degree of sensitivity varies from person to
21  person.
22     Q.  Okay.  I guess I was wondering about --
23  I also had a question about your conclusion that
24  the formulations should function as disclosed as
25  long as the ingredients remain within the

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

153

1 specified ranges. So you're not offering the
2 opinion that as long as the ingredients remain
3 within those specified ranges, they will
4 necessarily and will always function as claimed?
5 **A. The ingredients should support the claim**
6 **that's made for the product.**
7 Q. I'm not sure I understand that.
8 **A. So, for example, if you're including --**
9 **if you're including in your claim that the product**
10 **contains a biocide, you should have a biocide in**
11 **your product. And it should be at a range that is**
12 **useful and applicable for that type of a product.**
13 **That's essentially what I'm referring to.**
14 Q. Okay. But we looked at the claims
15 earlier, and the claims don't recite all of these
16 different categories of ingredients; right?
17 **A. Right. That's correct.**
18 Q. Okay. So I guess what I'm asking is
19 based on what I see you say in paragraph 41, it
20 doesn't appear that you're providing the opinion
21 that as long as the ingredients in those ten
22 formulations remain within the specified ranges,
23 they will necessarily function as claims in the
24 '802 patent?
25 MR. KREMEN: Objection; form.

154

1 THE WITNESS: I'll try to clarify, if
2 that's okay. Some ingredients in products -- and
3 you'll see this on labels -- are considered inert.
4 They are really not there for a specific
5 functional property, but they are inert because
6 they're needed as a vehicle or a protective agent
7 or a cohesive agent, whatever that might be.
8 So certain ingredients are placed, I'll
9 give you an example, in some formulations to
10 deliver simply a vitamin. You may put an
11 ingredient that's nonnutritive because to deliver
12 it, it would not be appropriate on its own. So
13 you have to provide it with something else. So
14 they facilitate -- as inert ingredients, they
15 facilitate the delivery of the product. That's
16 not site specific delivery, but just delivery of
17 the product in the specified form.
18 So in this particular case where it is a
19 thin film that's going to be applied in and around
20 the nostrils, you don't want that material to drip
21 out, go into the channel, whatever area of the
22 face. You want it to remain in place, to hold it
23 in place for a specific period of time. And
24 ingredients facilitate each other in working kind
25 of like a concert when a formulation is developed.

155

1 BY MS. PETERSON:
2 Q. Okay. And so as long as you stay within
3 the ranges in the tables of the patent, then the
4 formulation should work. It should have the right
5 level of adhesion and cohesion --
6 **A. I would hope so.**
7 (Cross talk.)
8 **A. I would hope so, yes.**
9 Q. And how do you -- do you know for
10 certain that every formulation within the stated
11 ranges will have that sufficient level of adhesion
12 and cohesion in order to create an impermeable
13 thin film that will work as described in the
14 claimed invention?
15 MR. KREMEN: Objection; form.
16 THE WITNESS: But I will answer. It
17 goes back to the categories. It goes back to the
18 categories that were mentioned previously. For
19 each recitation of the tables, I have not
20 personally done any work to test if that will work
21 the same, if Table 5 works the same as Table 7.
22 At this point for what I've been exposed
23 to and what I've read, I cannot tell you in
24 certainty that 5 and 7 will work identically. I
25 assume that they do, but I haven't done any

156

1 testing on it. It would be unfair of me to make
2 that judgment.
3 BY MS. PETERSON:
4 Q. And what is that assumption based on?
5 **A. My experience primarily, my experience**
6 **in putting formulas together.**
7 Q. Okay. So that assumption, it's not
8 based on any information or testing that you read
9 in the patent; right?
10 **A. No, it's not.**
11 Q. Okay. Let's go to the next page of your
12 declaration. And do you see here there's a
13 heading that says "Disputed Claim Terms of the
14 '802 Patent"?
15 **A. Yes.**
16 Q. In this first paragraph, 45, you start
17 off by saying, "I am not an attorney. I
18 understand that the property of a claim being
19 indefinite is a legal determination, which is in
20 the province of the Court."
21 And then you go on to say, "I will opine
22 on whether the disputed claim terms are
23 sufficiently unambiguous to enable one of ordinary
24 skill to understand and practice the inventions
25 set forth in the claims."

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

40 (157 to 160)

157

1        Do you see that?
2    **A.  Yes.**
3    Q.   Okay.  So that last sentence, does that
4 accurately describe the standard that you applied
5 in forming your opinions?
6    **A.  Yes, because I'm not a patent attorney,**
7 **and my experience with patents has been primarily**
8 **to review patents that were presented to me to**
9 **give an opinion on.  And that may be related to**
10 **my -- not necessarily my academic experience but**
11 **more so in my corporate experience and as a**
12 **consultant to advise people if this is junk**
13 **science, does this mean anything, can you use it.**
14 **Many people would come to a corporation**
15 **presenting their products or their concepts of a**
16 **product or whatever in order to get the necessary**
17 **corporation to back it and to do the necessary**
18 **support to do further testing.  And so to protect**
19 **the corporation, people like myself would be**
20 **employed to do the evaluation.  But I'm not an**
21 **attorney.  In every corporate setting I've worked**
22 **with attorneys like yourself and Mr. Kremen, and**
23 **they have asked me as many questions as you do,**
24 **but not under these circumstances.**
25    Q.   So did Mr. Kremen provide you with an

158

1 explanation of the legal standard that the
2 court --
3    **A.  I had asked --**
4    Q.   -- uses to determine --
5    **A.  Yeah, I had -- I'm sorry.**
6    Q.   -- whether a claim term is indefinite?
7    **A.  I have asked him what the meaning is,**
8 **yes.**
9    Q.   And did you include his explanation in
10 your report?
11    **A.  In my own words, yes.**
12    Q.   Okay.  And those words are what we read
13 here on paragraph 45?
14    **A.  That's correct.**
15    Q.   Okay.
16    **A.  Again, as a non-attorney, it's very**
17 **difficult for me to write legalese.  I cannot do**
18 **that.  I tried my best, but I cannot.**
19    Q.   Okay.
20        MS. PETERSON:  Let's go to the next
21 page, please.
22 BY MS. PETERSON:
23    Q.   Paragraph 48, here you're discussing the
24 claim term "electrostatically inhibiting"; right?
25    **A.  Yes, that's correct.**

159

1    Q.   So about halfway through this paragraph,
2 you have a sentence that starts, "From the
3 remainder of each of Claim 1 or 2."
4        Do you see that?  It's about halfway
5 through the paragraph.
6    **A.  Is it about halfway?  I'm just trying to**
7 **find the -- but you can go forward.  I'll follow**
8 **you.**
9    Q.   Yeah, I'm just going to read from your
10 report.  So you explain that, "From the remainder
11 of each Claim 1 or 2, supported by the
12 specification, the claim elements involve
13 electrostatic fields" --
14    **A.  Yes.**
15    Q.   -- right?
16        Okay.  So it's your understanding, then,
17 that Claims 1 and 2 are directed to using these
18 electrostatic fields; right?
19    **A.  The electrostatic field that's generated**
20 **by the formulation, yes.**
21    Q.   Okay.  And then you also go on to say
22 that, "Claims 1 and 2 refer to electrostatic
23 attraction, which is a well-known scientific
24 phenomenon even to a high school physics student";
25 right?

160

1    **A.  That's correct.**
2    Q.   Okay.  And the formulation that's
3 claimed in the '802 patent, it operates by this
4 phenomenon of electrostatic attraction; right?
5    **A.  Yes, it's positive charged particles**
6 **that attract the negative charged particles and**
7 **repel all the positive charged particles that may**
8 **be in the atmosphere.**
9    Q.   Okay.
10        MS. PETERSON:  Let's move ahead two
11 pages, and we'll look at paragraph 51.
12 BY MS. PETERSON:
13    Q.   And, again, here you're viewing the
14 claim term "adequate impermeability" in the
15 context of what you describe as the "hold"
16 function of the claims; right?
17    **A.  That's correct.  I consider that to be**
18 **one of the most important elements of the product.**
19    Q.   Okay.
20    **A.  Or the patent.**
21    Q.   Okay.
22        MS. PETERSON:  Let's go on to the next
23 page, which is a continuation of paragraph 53.
24 BY MS. PETERSON:
25    Q.   So right at the top of this page, you

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

161

1  state that, "Determination of adequate perm
2  ability is a term of degree"; right?
3      A.  Yes.
4      Q.  And that in turn is going to depend on
5  the desired efficacy?
6      A.  Yes.
7      Q.  And the desired efficacy could also
8  depend on the nature of the harmful particles to
9  be captured by the formulation and infection
10  inhibited by?
11      A.  Yes.
12      Q.  That was a bad sentence.
13      A.  I know.  I'm not correcting your
14  grammar.  But just for clarification, my
15  understanding, again, it depends on, in a
16  microbiological standpoint, the type of organism,
17  the quantity of organism that a person would be
18  coming in contact with.
19          So you are assuming that you have this
20  capacity to trap -- and I think that's one of the
21  reasons why one of the -- one of the reasons why
22  they decided to change it from "preventing" to the
23  term "inhibiting" so that it's to trap a quantity
24  of harmful bacteria, you know, as best as you can
25  so that you reduce that tighter load that might

162

1  be -- that the individual who would be classified
2  as the host would be experiencing.
3      Q.  And so, of course, you know, the
4  particular nature of the particles will have an
5  impact on how many need to be held by the
6  impermeable thin film in order to prevent
7  infection; right?
8      A.  That's correct.  And that ties in with
9  my statement previously regarding the stickiness
10  or the tackiness of that material.  It's very
11  important.  Because you don't want these particles
12  to be bouncing off and going into the nasal
13  passage, at least that's how I understand the
14  concept.
15      Q.  Okay.  So if one were to design a
16  formulation that has, you know, reasonable
17  adhesion and cohesion and creates a thin film of
18  reasonable impermeability, that might be enough to
19  prevent infection by, you know, some microorganism
20  that's not particularly harmful or where the
21  tighter or the amount in the environment is
22  relatively low; right?
23      A.  Yes, I think the example would be during
24  pollen season when you have high pollen counts.
25  Whether you have a pollen sensitivity or not, we

163

1  all tend to sneeze a little bit more during those
2  periods of time.  It's because the levels are very
3  high.  But throughout the year, we're exposed to
4  pollens, and it may not give us any degree of eye
5  irritation or nasal irritation causing us to
6  sneeze.
7      Q.  Okay.  And so using that example then,
8  if we're in allergy season where there's a high
9  amount of allergens in the air, you might need a
10  formulation that has increased adhesive and
11  cohesive properties with a more impermeable
12  barrier in order to sufficiently capture and hold
13  those particles and preventing them from -- or
14  inhibiting them from infecting the individual;
15  right?
16      A.  Or you may want to apply the product
17  more frequently.  So I --
18      Q.  And that would be because the adhesive
19  properties would impact how long the formulation
20  stays as a thin film?
21      A.  Well, how long it's going -- well, how
22  much you're coming in contact with -- you know,
23  some people come in contact with very polluted
24  environments, but on an average basis -- again,
25  this is not a prescription, but on an average

164

1  basis a product that you have sold
2  over-the-counter is something that's left up to
3  the individual to make a judgment as far as how
4  much and how often they use the product.
5          As I said earlier, in my own personal
6  experience of using the product, I use it when I'm
7  in a setting where I do have individuals who are
8  unknown to me.  So if I get on a bus, I'm
9  definitely going to use this product.
10      Q.  Okay.  And then from the formulator
11  perspective, how does the formulator determine
12  what the desired level of permeability is?
13      A.  The formulator would make that judgment
14  on the -- as I said earlier, the degree of
15  stickiness or tackiness of the actual product.
16  So, again, you would probably conduct experiments
17  to do that.
18          In this particular case, the process was
19  tested on the basis of the electrostatic surface
20  charge so that if the levels were there to
21  adequately meet a standard that they are claiming
22  that the product can do to attract these
23  particles, you would have that as your -- at least
24  in part, your substantiation that you set up that
25  field.

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

42 (165 to 168)

165

1    Q.  Okay.  Isn't it also your opinion that
2  the electrostatic field that is generated alone is
3  not sufficient to meet the claim elements of
4  capturing and holding?
5    **A.  The electrostatic --**
6       MR. KREMEN:  Objection to the form of
7  the question.
8       THE WITNESS:  You may want to rephrase
9  that for me.
10 BY MS. PETERSON:
11   Q.  Isn't it also your opinion that the
12 electrostatic field that's generated from the
13 formulation, that alone is not sufficient to
14 achieve the claim elements of capturing and
15 holding?
16      MR. KREMEN:  Same objection.
17      THE WITNESS:  And my answer is no.  The
18 electrostatic field is -- or the electrostatic
19 charge that's set up is an important element of
20 how this product works.  That's the methodology.
21 BY MS. PETERSON:
22   Q.  Okay.  And how does that relate, then,
23 to everything you were just discussing here about
24 the need to have adequate adhesion and cohesion
25 and impermeability to the thin film?

166

1    **A.  They all tie in, because the charge is**
2  **generated by those ingredients that's setting up**
3  **that impermeable setting.  You don't want it to**
4  **bypass it.  You want it to hold on to those**
5  **contaminants, be it biological or otherwise, so**
6  **that the person does not inhale large quantities.**
7  **And you want to do that outside of the respiratory**
8  **track, per se.**
9    Q.  Okay.  So I asked you earlier how
10 does -- from a formulator perspective, how do they
11 achieve the desired permeability and you referred
12 to the adhesive and cohesive properties of the
13 formulation.
14      Do you recall that?
15   **A.  Yes.**
16   Q.  And how does the formulator -- oh,
17 sorry, strike that.
18      Those adhesive and cohesive properties
19 can be different depending on the ingredients and
20 the percentages of ingredients used in the
21 formulation; right?
22   **A.  Yes.**
23   Q.  So how does the formulator decide how
24 adhesive it needs to be?
25   **A.  Well, that's the testing that would be**

167

1  **done.  And I think the testing for the properties**
2  **that we're looking at relate back to the type of**
3  **surface charge that the product possesses.  So**
4  **you're looking for -- as I'm speaking I'm shaking**
5  **the monitor here, I'm sorry.**
6       **What you're doing is you're looking**
7  **essentially to set up that field where you're**
8  **setting up that barrier.**
9    Q.  Right.  So --
10   **A.  And you're measuring that electrostatic**
11 **charge.  Because, again, you're looking at**
12 **positive and negative particles that have to be**
13 **trapped -- or negative particles that are in the**
14 **airstream that have to be trapped by the positive**
15 **field that's set up on that barrier.**
16      **So, you know, you could look at it in**
17 **different ways.  You could look at it from its**
18 **chemistry, but you could also look at it from the**
19 **physics of it, which is more related to that**
20 **electrostatic charge.**
21   Q.  So when you say these concepts are
22 related, does that mean that you could have a
23 lower level of adhesion and cohesion in the
24 formulation as long as the formulation exhibits a
25 high electrostatic charge?

168

1       MR. KREMEN:  Objection to the form of
2  the question.
3       THE WITNESS:  Can I answer?
4       MR. KREMEN:  Yeah, you can answer.
5       THE WITNESS:  I mean, I feel that,
6  again, the amounts -- the amounts -- what has to
7  be provided is that you are able to set up that
8  impermeable field, that it has to be adequately
9  supplied.  So, for example, if I simply take my
10 finger and touch, you know, the product and just
11 put it at the tip of my nose, I won't probably get
12 the same kind of effect as taking the product,
13 putting an adequate amount and spreading it around
14 the whole surface of the nose and maybe putting a
15 little bit in the nostrils to give me that much
16 more barrier of protection.
17 BY MS. PETERSON:
18   Q.  So the -- to achieve the adequate
19 impermeability recited in the claims, that's also
20 going to depend on how the product is applied by
21 the user?
22   **A.  I would assume so, yes.**
23   Q.  Okay.
24   **A.  But, again, a lot of that is tied in**
25 **with any of the materials that are supplied --**

169

1  excuse me, any of the materials that are supplied
2  with the product. So in my experience, when a
3  product has to be taken by mouth, you have to tell
4  the person, take by mouth because you don't know
5  how that person is going to utilize that product.
6      Q. Okay. So you're talking about
7  instructions that are provided with a commercial
8  product?
9      A. That's correct.
10     Q. You're not talking about instructions
11 that are provided in the '802 patent; right?
12     A. Not in the patent; correct.
13     Q. Okay. And what does the patent say
14 about what the desired level of impermeability is
15 for inhibiting infection caused by influenza
16 virus?
17     A. I don't remember exactly if it states
18 that. So I'm at a disadvantage to respond to that
19 question right now.
20     Q. So you're not aware of anything in the
21 '802 patent that identifies what the appropriate
22 level of permeability is for inhibiting infection
23 for any of the specific organisms or diseases that
24 are listed in the patent; right?
25     MR. KREMEN: Objection to form.

170

1      THE WITNESS: I don't think that was
2  necessary at the time that the patent was written.
3  It's simply presenting the concept of how this
4  thing should work, but not -- there's no efficacy
5  data, at least in my understanding, that would be
6  required to incorporate into the patent.
7  BY MS. PETERSON:
8      Q. Okay. Well, putting aside whether it's
9  required or not, you didn't see anything like that
10 in the patent; right?
11     A. Not to my recollection.
12     Q. No recommendations or instructions as to
13 the level of impermeability that's required for
14 particular harmful properties?
15     A. At this point, I probably -- I don't
16 recall if it is there. I may have read it, and I
17 just don't remember. I'm sorry.
18     Q. I didn't see it. I just want to make
19 sure that there isn't something that I was
20 missing. And it sounds like there wasn't?
21     MR. KREMEN: Objection.
22     THE WITNESS: I think I've read, you
23 know, the patent a number of times to feel
24 comfortable with it before I speak to you or
25 anybody else about it. But I can't remember at

171

1  this point if there is.
2  BY MS. PETERSON:
3      Q. Okay. So that's your answer, you don't
4  remember?
5      A. I don't remember.
6      Q. Okay.
7      MS. PETERSON: Let's go to the next
8  page.
9  BY MS. PETERSON:
10     Q. And for reference, this is a
11 continuation of paragraph 55 of your declaration.
12 Here, you're talking about the claim term "renders
13 said particulate matter harmless"; right?
14     A. Yes.
15     Q. This is a long paragraph, but do you see
16 in the middle of the screen there's a
17 sentence that says -- it starts "Further" and then
18 it says (at 3 -- that's Column 3, line 12 of the
19 patent.
20     Do you see that?
21     A. Yes.
22     Q. Okay. So you're referring to Column 3,
23 line 12 of the patent specification here. And you
24 quote a sentence that includes the language
25 "simultaneously inactivate, kill, or render

172

1  harmless the microorganisms so trapped."
2      Do you see that?
3      A. Yes.
4      Q. And then you go on to say that, "The
5  significance of this statement is the correlative
6  conjunction 'or'"?
7      A. Yes.
8      Q. What's the significant of "or" to you
9  here?
10     A. Well, my interpretation is that the
11 benzalkonium chloride as the biocide should kill
12 the live organism or render it unavailable to the
13 host, render harmless -- or render harmless,
14 meaning if you have something that's not something
15 to be virulent but it can be irritant, that's what
16 I'm referring to.
17     So you could have -- as I mentioned
18 earlier, you could have exposure to particles in
19 smoke-filled air. You could have particles that
20 are classified as pollutants or xenobiotics, and
21 they do not necessarily pose a serious health
22 threat to the host, but they could be rendered
23 harmless by being neutralized by that
24 electrostatic charge that's on that membrane or as
25 a result of using the product around the nose.

173

1    Q.  So rendered harmless, in your
2  understanding then, can mean either inactivation
3  or killing?
4    A.  More so trapping, trapping them so
5  that -- if it's not a viable material, why would
6  you want to kill it?  You want to trap it.  You
7  want to stop it from going into or prevent it
8  somehow from going into the nasal passages.
9  Inhibiting is going to slow things down.
10 Preventing is pretty much going to stop it.
11      So I think what you want to do is you
12 could come in contact with the pollen at a lower
13 concentration and maybe the result of that will be
14 simply to sneeze, but you're not going to have a
15 severe allergic reaction.  So it renders it
16 harmless.  That's how I understood it.
17    Q.  Okay.  I'm not sure I followed all of
18 that.  So render harmless, it means trapped?
19    A.  I see that more as trapping it, yes.
20    Q.  Okay.
21    A.  Stopping it outside of the nasal cavity.
22    Q.  Okay.  And that trapping relates to the
23 electrostatic attraction?
24    A.  Correct.
25    Q.  Okay.

174

1    A.  Or that electrostatic charge that's set
2  up as the barrier.  Because if you look at it as a
3  wall of positive charge, anything that's going to
4  pass towards that wall that's set up is going to
5  stick to it.
6    Q.  Okay.  Now, you also looked at the
7  prosecution history of the '802 patent; right?
8    A.  Yes.
9    Q.  Okay.  And you recall that the claim
10 terms were changed from "preventing" to
11 "inhibiting"; right?
12    A.  Yes.
13    Q.  And the examiner's rationale was that
14 preventing implies that all harmful particulate
15 matter is captured --
16    A.  Yes.
17    Q.  -- as opposed to inhibiting, which could
18 allow some of the harmful particulate matter
19 through?
20    A.  Yes.
21    Q.  Okay.  Would you agree that something
22 that's very toxic or, you know, extremely
23 virulent, like anthrax, if even a small amount
24 gets through, that that would not be rendering it
25 harmless?

175

1    A.  No, that could be -- I would consider
2  that to be an extreme microorganism where large
3  numbers of those spores could potentially be very
4  detrimental to a person coming in contact with
5  that.
6    Q.  Okay.  But --
7    A.  No, I'm sorry.  No, that's fine.  You
8  can go forward.
9    Q.  Okay.  But there are some microorganisms
10 where even if only a few of the organisms make it
11 into the body, that will be sufficient to cause
12 infection in that individual?
13    A.  Yes, that can happen, yes.
14    Q.  Let's move forward to -- one more page,
15 I think it's the last page of your declaration.
16    A.  Okay.
17    Q.  And here in paragraph 56, you're talking
18 about how patent claims are often incomprehensible
19 by laypersons; right?
20    A.  Yes.
21    Q.  But you here are offering the opinion
22 that in the case of Claims 1, 2, 6, and 7 of the
23 '802 patent, the words appear to have their plain
24 meaning; right?
25    A.  Yes.

176

1    Q.  Okay.  So you would agree that the claim
2  terms as used in the Claims 1, 2, 6, and 7 of the
3  '802 patent just use their plain and ordinary
4  meaning as understood by a person of skill in the
5  art?
6    A.  By a person of ordinary --
7      MR. KREMEN:  Objection to form.
8      THE WITNESS:  Can I answer?
9      MR. KREMEN:  Yeah, go ahead.
10      THE WITNESS:  I felt that a person of
11 ordinary skill reading the claim -- and, again,
12 going back to my example of a student in high
13 school understanding basic physics and positive
14 and negative charges would be able to navigate
15 those statements.
16      In my experience reading patents, some
17 of the patent claims are extremely written for a
18 person of very high-level understanding.  And it
19 prohibits that average layperson to pick that up
20 and be able to interpret what is recited in the
21 body of the patent, as well as in the specific
22 claims.
23 BY MS. PETERSON:
24    Q.  Okay.  But that's not what you
25 understand to be the case for the '802 patent

177

1 claims; right?
2 **A. I understand that the '802 patent claims**
3 **are written in language that should be understood**
4 **by a person of ordinary skill.**
5 Q. Okay. So there's no particular
6 essential meaning to any of the particular claims
7 apart from what a person of ordinary skill in the
8 art would understand to be their plain and
9 ordinary meaning?
10 MR. KREMEN: Objection.
11 THE WITNESS: To be perfectly honest, I
12 looked at that patent, and I see a very simple
13 concept being presented with a simple solution so
14 that a person of ordinary skill should be able to
15 read that and have some degree of understanding of
16 what's in those claims.
17 MS. PETERSON: Okay. I'm at a good
18 stopping point right now. Let's go off the
19 record.
20 THE WITNESS: Okay.
21 THE VIDEOGRAPHER: We're going off the
22 record. The time is now 3 p.m.
23 (Recess from the record.)
24 THE VIDEOGRAPHER: We're back on the
25 record. The time is now 3:12 p.m.

178

1 BY MS. PETERSON:
2 Q. Dr. Lemmo, I'll ask you again, have you
3 discussed the substance of your deposition
4 testimony with anybody during any of the breaks
5 that we've taken today?
6 **A. No, I did not.**
7 Q. Okay. Thank you.
8 Okay. I'd like to turn back to your
9 responsive report.
10 MS. PETERSON: We can pull that up.
11 It's Exhibit 14.
12 MR. KREMEN: 14. Responsive report on
13 validity.
14 BY MS. PETERSON:
15 Q. So, Dr. Lemmo, I did not see a separate
16 list of materials that you reviewed in connection
17 with preparing this report; is that right?
18 **A. That's correct. Anything, if I had**
19 **additional materials, would have been submitted.**
20 Q. Okay. So would it be fair to say, then,
21 that everything you reviewed or considered in
22 forming the opinions expressed in your responsive
23 report would have been cited directly in your
24 report?
25 **A. Yes.**

179

1 Q. Okay. And you're not aware of anything
2 else any other documents or information that you
3 reviewed in forming your opinions that aren't
4 mentioned in the report?
5 **A. I'm sorry, I was just distracted by**
6 **something. Just please repeat the question, I'm**
7 **sorry.**
8 Q. You're not aware of anything else, any
9 other documents or other information that you
10 reviewed in forming your opinions that aren't
11 specifically mentioned in the report?
12 **A. No. No, there's nothing else.**
13 Q. Okay. And I think we established this
14 earlier, this report was prepared in response to
15 Dr. Amiji's opening expert report on invalidity;
16 correct?
17 **A. That's correct.**
18 Q. Okay. And other than your opinion
19 directed to the enablement of the Rolf patent
20 application, your report does not provide any
21 other opinions with respect to any of the other
22 prior art identified and relied upon by Dr. Amiji;
23 right?
24 **A. That's correct.**
25 Q. And with respect to the Rolf patent

180

1 application, your report does not provide any
2 opinions with respect to whether the claims of the
3 '802 patent would be obvious in view of Rolf in
4 combination with any other prior art; right?
5 **A. That's correct.**
6 Q. Okay.
7 MS. PETERSON: Let's turn to page 6,
8 which is page 7 of the PDF.
9 BY MS. PETERSON:
10 Q. And this is the section of your opinion
11 relating to the "hold" function; right?
12 **A. Yes.**
13 Q. Okay. So looking at the second
14 sentence, your opinion is that the claimed
15 invention uses electrostatic forces to attract
16 particulate matter before entering the nasal
17 passageway; right?
18 **A. That's correct.**
19 Q. But that's --
20 MR. KREMEN: That's -- you're
21 misquoting. Before entering the body's
22 respiratory system.
23 MS. PETERSON: Okay.
24 BY MS. PETERSON:
25 Q. Well, looking at the beginning of the

181

1  sentence, it states that "the product attracts
2  particulate matter from the airflow before
3  entering the nasal passageway using [sic]
4  electrostatic forces"; correct?
5      **A.  That's correct.  And the nasal passage**
6  **is considered physiologically a part of the**
7  **respiratory system.**
8      Q.  Okay.  Now, you go on to then say,
9  though, that "this alone in insufficient to
10  protect the individual from harmful particulate
11  matter entering the body's respiratory system";
12  right?
13     **A.  That's correct.**
14     Q.  Okay.  So the electrostatic force
15  created by the formulation alone does not protect
16  the individual from harmful particulate matter
17  entering the body, and likewise would not protect
18  that individual or inhibit infection from those
19  materials; right?
20     MR. KREMEN:  Objection to form.
21     You may answer.
22     THE WITNESS:  The electrostatic charge
23  addresses the negatively charged particles that
24  are in the airflow, but it does not address
25  anything else.  So if particles in the airflow are

182

1  negatively charged, the positive charge of the
2  product is going to be a significant player.
3      I think my point in this paragraph is
4  the importance of the "hold" function.  You don't
5  want particles to be bouncing off that surface
6  where the product had been applied and then picked
7  up into the nasal passage.
8  BY MS. PETERSON:
9      Q.  Okay.
10     **A.  So hold -- I keep going back to that**
11  **"hold" function because it's inhibiting them from**
12  **going into that respiratory system.**
13     Q.  Okay.  So, in other words, the
14  electrostatic charge of the formulation alone is
15  not sufficient for a product to function,
16  according to the claim.  It also requires this
17  "hold" function that's recited in the claim, as
18  well; right?
19     **A.  Yes.  I would agree with that, yes.**
20     Q.  Okay.  And that "hold" function -- we've
21  covered this repeatedly, but it's related to those
22  adhesive and cohesive properties of the
23  formulation and the permeability of the film upon
24  application of the formulation; correct?
25     **A.  Exactly, yes.**

183

1      Q.  Okay.  So a formulation that exhibits an
2  electrostatic charge upon application to the skin
3  might not necessarily have the right amount of
4  adhesion or cohesion to perform that "hold"
5  function of the claims; right?
6      **A.  That's correct.**
7      MR. KREMEN:  Objection to form.
8  BY MS. PETERSON:
9      Q.  So, in other words, a formulation or a
10  composition would need more than just a positive
11  charge to meet Claims 1 and 2 of the '802 patent?
12     **A.  Well, you want the material to adhere,**
13  **or you want it to remain being held by the**
14  **material that you're applying to the skin.  And**
15  **that's what I see as an important thing.  Just**
16  **having the electrostatic charge without the**
17  **ability to hold the product, an electrostatic**
18  **field could either repel or attract different**
19  **things.  And that's -- you know, that's one aspect**
20  **of it.**
21     **I think the other part is really -- or**
22  **what I consider to be an extremely important part**
23  **is that "hold" function, and that's why I probably**
24  **was more focused at the time that I wrote this**
25  **document.**

184

1      Q.  So let me just see if I can repeat that
2  because I just want to make sure I have an answer
3  to my question.
4      So a formulation that exhibits an
5  electrostatic charge upon the application to the
6  skin might not necessarily have the right amount
7  of adhesion or cohesion to perform that hold
8  function, which is also a necessary component of
9  the claims; right?
10     **A.  Yes, that's correct.**
11     Q.  Okay.  Let's move ahead to -- I think
12  it's page 9 of your report.  It's page 10 of the
13  PDF.  And this is the section where you discuss
14  the Rolf patent application; correct?
15     **A.  Yes, that's correct.**
16     MR. KREMEN:  That's the -- where it says
17  paragraph 3, "The Rolf Patent Application"?
18     MS. PETERSON:  Yeah, I'm not sure if
19  it's a paragraph or a section heading, but yes.
20     MR. KREMEN:  Yeah, right.
21     MS. PETERSON:  "3, Rolf Patent
22  Application, that's where we are.
23  BY MS. PETERSON:
24     Q.  Okay.  You understand that essential
25  oils are cationic; right?

185

1     A.   That's correct.
2     Q.   Okay.  And so when essential oils are
3 applied to the skin, they will exhibit a surface
4 electrostatic charge?
5     A.   That's correct.
6     Q.   Okay.  On the next page, if we scroll
7 down, the first full paragraph, you note that
8 there are some "limitations associated with the
9 use of essential oils"; right?
10    A.   Yes, that's correct.
11    Q.   So they may have skin irritating
12 properties?
13    A.   Correct.
14    Q.   Or severe toxicity profiles?
15    A.   Correct.
16    Q.   And that would depend on the amount that
17 is used of the essential oil; right?
18    A.   That would be one component, yes.
19    Q.   And that would also depend on the
20 concentration of the essential oil within the
21 product; right?
22    A.   Correct.
23    Q.   So not all essential oils in all
24 concentrations and in all amounts will cause skin
25 irritation; right?

186

1     A.   Correct.
2     Q.   And not all essential oils in all
3 concentrations and in all amounts will be toxic
4 either; right?
5     A.   That's correct.
6     Q.   Okay.  So in the second sentence here
7 you refer to reports in the literature.
8     A.   Yes.
9     Q.   Do you see that?
10    A.   Yes.
11    Q.   What literature are you referring to?
12         MR. KREMEN:  Where are you referring to?
13         THE WITNESS:  Second paragraph.  Line 2,
14 second paragraph.
15         MR. KREMEN:  Starting with "While the
16 patent application suggests a mechanism"?
17         THE WITNESS:  No, above that.
18         MR. KREMEN:  Okay.
19 BY MS. PETERSON:
20    Q.   So what literature are you referring to
21 here?
22    A.   A number of -- I did not specify in this
23 document the literature that I referred to on
24 essential oil.  Because in the natural products
25 industry, essential oils are employed in a variety

187

1 of applications, particularly for therapeutic --
2 excuse me, their therapeutic uses.  One of the
3 problems associated with essential oils -- I've
4 got something in my throat.
5         One of the problems associated with
6 essential oil is that essential oils need to be
7 standardized.  That indicates the fact that a
8 standardized essential oil is derived from the
9 same part of the plant.  It's a seasonal variation
10 component.  Its chemistry may change, and there
11 could be also some changes in its relative ratios
12 to other components within that plant.
13        So for that reason some of these
14 products or some of these oils, like limonene, for
15 example, can present itself as a very useful item
16 in something like a hand sanitizer, but not
17 necessarily a useful item when applied to the
18 skin.
19        When I read the Rolf patent, I took into
20 consideration reports that I've reviewed or papers
21 that have been written on the subject matter, I
22 did not spell them out but just wanted to call the
23 attention to anybody who would read my report to
24 the fact that there is documented evidence for
25 irritating properties.

188

1     Q.   Okay.  My question was just a little bit
2 more basic.  The literature that you are referring
3 to, it's not cited in your report; right?
4     A.   That's correct.
5     Q.   So we have no way of knowing what
6 essential oils are being discussed under what
7 context; right?
8     A.   That's correct.
9     Q.   Okay.
10    A.   That's correct.
11    Q.   And were these reports in the literature
12 something that you reviewed in connection with
13 forming your opinions, or are these just things
14 that you remember reading over the course of your
15 career?
16    A.   I think it's a combination of both.
17    Q.   Okay.  So there are some literature
18 references that you reviewed when performing -- or
19 when forming your opinions and writing this report
20 that are not actually identified here?
21    A.   That's correct.  That's correct.
22    Q.   Okay.  And I assume that those reports
23 that you're referring to in the literature, those
24 were to specific essential oils as opposed to
25 general statements about all essential oils;

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

189

1  right?
2      **A. Yes, that's correct. Because many**
3  **essential oils are used in cosmetic agents, as**
4  **well. And they're applied to the skin. So**
5  **they're not irritating at the levels that they are**
6  **recommended.**
7      Q. Yeah. And I would assume that if
8  they're used in cosmetics, they would be applied
9  to skin on the face --
10     **A. Yes.**
11     Q. -- near the nose?
12     **A. Yes, or wherever. But, yes, you're**
13  **absolutely right. And if they're used in a soap,**
14  **you're applying it all over the body.**
15     Q. Okay. Would you agree that whether a
16  particular ingredient exhibits an electrostatic
17  charge that's an inherent feature or property of
18  that ingredient?
19     **A. Yes.**
20     Q. And the '802 patent claimed invention is
21  relying on that inherent feature of those
22  ingredients that have positive charges; correct?
23     **A. That's correct.**
24     Q. And you read the Rolf patent
25  application; right?

190

1      **A. Yes, I did.**
2      Q. And you understand that Rolf explains
3  that the formulations it discloses have biocidic
4  properties; right?
5      **A. Yes. Yes, I have.**
6      Q. Yes, you understand that Rolf discloses
7  that its formulations have biocidic properties?
8      **A. Yes, that's correct.**
9      Q. Okay. And those formulations disclosed
10  in Rolf, Rolf explains that they can be used for
11  the prevention of diseases associated with
12  airborne pathogens and respiratory tract
13  pathogens?
14     **A. Yes.**
15         MR. KREMEN: Objection to form.
16  BY MS. PETERSON:
17     Q. And it's also your understanding that
18  Rolf explains that these airborne pathogens and
19  respiratory tract pathogens are inactivated upon
20  contact with the essential oil?
21     **A. Yes.**
22     Q. And you also understand that Rolf
23  discloses the use of additional ingredients in its
24  formulation, including antimicrobial agents such
25  as benzalkonium chloride?

191

1      A. Yes.
2      Q. Now, looking at -- let's skip ahead two
3  pages to the last paragraph of your section on
4  Rolf. So this would be page 12 of the PDF. Okay.
5  So --
6         MS. PETERSON: Can you go up a little
7  bit? That's great.
8  BY MS. PETERSON:
9      Q. So you also offer the opinion that the
10  patch described in Rolf would not function as
11  described in that application; right?
12     **A. That's correct.**
13     Q. Okay. And so that would be your opinion
14  that the Rolf patent application is not enabled?
15     **A. Yes, that's my conclusion. I felt that**
16  **it wasn't really -- the way it's presented, that**
17  **the claims really would not work as they're**
18  **stated.**
19     Q. Okay. So your opinion is based on the
20  conclusion that the claims of Rolf would not work?
21         MR. KREMEN: Objection to form.
22         THE WITNESS: The fact that he's using
23  essential oils as the primary component, I just
24  felt in my review of the patent that it really
25  wasn't -- I didn't think of it as really a quality

192

1  scientific proposal in the patent.
2  BY MS. PETERSON:
3      Q. Okay.
4      **A. And so I kind of discredited the Rolf**
5  **patent as a useful argument against the '802**
6  **patent.**
7      Q. Okay. And so the basis for your
8  opinion, then, is centered on the fact that it
9  uses essential oils; is that right?
10         MR. KREMEN: Objection to form.
11         THE WITNESS: It's a questionable
12  application and a questionable theory that's being
13  presented. And some of the points of the
14  essential oil, as I mentioned before, has to do
15  with standardization of those oils. You may see
16  it sometimes. You may not always. So I didn't
17  feel that it provided adequate foundation.
18  BY MS. PETERSON:
19     Q. Do you dispute Rolf's point that
20  essential oils can be used to inactivate airborne
21  pathogens and respiratory tract pathogens?
22         MR. KREMEN: Objection to the form.
23         THE WITNESS: Only on the basis that
24  it's cationic in nature. So it's providing a
25  positive charge. There's no reference in Rolf to

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

193

1  the whole concept of holding. There's no holding
2  mentioned in Rolf. And that, as I go back to my
3  previous statements, was an important aspect of
4  the '802 patent.
5  BY MS. PETERSON:
6      Q. Okay. But you do agree that the
7  essential oils in Rolf are cationic and therefore
8  would exhibit an electrostatic charge; right?
9      A. Yes.
10     Q. And you testified earlier that that
11 concept is related to the holding concept; right?
12     MR. KREMEN: Objection.
13     THE WITNESS: It is related, but there's
14 more to that.
15 BY MS. PETERSON:
16     Q. Okay. Now, the adhesive -- the level of
17 adhesion and the level of cohesion provided by a
18 formulation, those would also be inherent
19 properties of a particular formulation; right?
20     A. Correct.
21     Q. Okay.
22     MR. KREMEN: Liane, are we still
23 speaking about Rolf?
24     MS. PETERSON: Yeah.
25     MR. KREMEN: Okay.

194

1      MS. PETERSON: We're discussing Rolf.
2      MR. KREMEN: Okay.
3      MS. PETERSON: But also generally asking
4  to confirm his understanding of some of the points
5  we've discussed.
6      MR. KREMEN: Okay. I just wanted to
7  make sure that we had some context.
8  BY MS. PETERSON:
9      Q. So, Dr. Lemmo, then is it correct to
10 understand that you don't have any issue with Rolf
11 using -- or applying the formulation through a
12 device, like a patch?
13     A. No, I have no objection to that.
14     Q. Okay. The last section of your
15 responsive report relates to commercial success.
16 Do you see that heading, No. 4?
17     A. Yes.
18     Q. What standard did you use when
19 determining whether Trutek's products demonstrate
20 commercial success as being relevant to the
21 question of nonobviousness?
22     A. Well, I felt that commercial success was
23 based upon the number of units that the product
24 was -- that the product has been sold. I use
25 that. I'm trying to understand the relationship

195

1  that you bring up for nonobviousness.
2      Q. Okay. Let me -- I can break that down
3  for you a little bit better.
4      A. Yeah, it would be helpful.
5      Q. Okay. So you say right here in the
6  first sentence that, "I understand that commercial
7  success of a patented product tends to show that
8  the patented claims are not obvious provided that
9  the commercial success is due solely to the
10 patented claims."
11     Do you see that?
12     A. Right. Yes.
13     Q. So is that the standard that you applied
14 in your analysis?
15     A. Right. In other words, what I was
16 trying to say here, if in the '802 patent, if it
17 doesn't do what they say it's doing, you won't
18 have 7 million sales worldwide or whatever that
19 number is domestically, et cetera. People would
20 not be using the product. It doesn't work. So
21 that contributes to the fact that it is a novel
22 invention, because it's continuously being used
23 and continues to be sold.
24     Q. Now, you would agree that there could be
25 non-patented features of a product that drive

196

1  demand for the product; right?
2      A. Sure.
3      Q. Did you consider whether any
4  non-patented features of Trutek's products
5  contributed to its sales?
6      MR. KREMEN: Objection to form.
7      THE WITNESS: I don't know what those
8  might be.
9  BY MS. PETERSON:
10     Q. Okay. So that answer is no, I guess?
11     A. If you could give me -- no, the reason
12 why I say that is, you know, if you could give me
13 an example of what you're referring to, I might be
14 able to give you an opinion.
15     Q. I don't have a specific example, I'm
16 just asking you if you considered whether there is
17 a possibility that non-patented features of
18 Trutek's product could drive the demand for the
19 product?
20     A. It's possible.
21     MR. KREMEN: Objection.
22 BY MS. PETERSON:
23     Q. And you did not consider that in your
24 analysis; right?
25     A. No.

197

1    Q.  Okay.  Now, this statement in the first
2  sentence of Section 4, where did you obtain that
3  understanding from?
4    A.  I don't remember exactly that.  As I
5  said, my thought process for the concept -- the
6  novel concept.  I tried to tie that in with my
7  understanding of what happens with products on the
8  market.  That was my thinking at the time that I
9  wrote this.
10    Q.  Okay.  Now, in the next sentence, you
11  refer to, "Since the time the '802 patent was
12  issued in 2012, approximately seven million units
13  of the product based on this patent, have been
14  sold in the United States and internationally."
15       Do you see that?
16    A.  Yes.
17    Q.  What product are you referring to?
18    A.  I'm referring to the nasal ointment, the
19  gel that was used.
20    Q.  So I'm sorry, is this NasalGuard?
21    A.  NasalGuard, yes.
22    Q.  Okay.  And is it all iterations of
23  NasalGuard or just one specific NasalGuard
24  product?
25    A.  I had -- I generated that piece of

198

1  information as a result of asking Mr. Wahi.
2    Q.  Okay.  So Mr. Wahi provided you with
3  information about how many units of a particular
4  NasalGuard product had been sold in the United
5  States?
6    A.  And internationally.
7       MR. KREMEN:  Objection.
8  BY MS. PETERSON:
9    Q.  And do you know why -- or did you only
10  ask for information on sales for that one specific
11  product?
12       MR. KREMEN:  Objection.
13       THE WITNESS:  Yes.
14  BY MS. PETERSON:
15    Q.  Why did you only ask for that one
16  product?
17    A.  Because I wanted to just understand how
18  much of the product is being sold.  It was for my
19  own knowledge that the product has repeat sales.
20  In the document, I believe I go on to talk about
21  repeat sales of a unit.
22    Q.  Okay.
23    A.  And that's how I was educated on
24  commercial success of a product.
25    Q.  Okay.

199

1    A.  As a result --
2    Q.  Okay.  So repeat sales --
3    A.  I'm sorry, so repeat sales is a
4  measure -- as I've been educated in the corporate
5  setting, repeat sales of a unit is a measure of
6  the product's success.  And that's what keeps it
7  novel.
8    Q.  Okay.  So repeat sales is a factor that
9  you considered with respect to commercial success;
10  correct?
11    A.  Yes, that's correct.
12    Q.  And your understanding that repeat sales
13  is relevant comes from your corporate experience?
14    A.  Yes, I relied on that in making my
15  statements.
16    Q.  Okay.
17    A.  And in order to do that -- in order for
18  me to do that, because I can't find that sales
19  data or anything, I had to go back to Trutek and
20  find out from them -- I had to find out from them,
21  you know, what are you selling?  How much do you
22  sell?  Do you sell 500 units in 12 years or
23  whatever the period of time was?  I have to get
24  some sense of how successful this is.
25    Q.  Okay.  And going back, you said that you

200

1  asked for information on one specific NasalGuard
2  product because of the fact of these repeat sales;
3  right?
4    A.  That's correct.
5       MR. KREMEN:  Objection to form.
6  BY MS. PETERSON:
7    Q.  So does that mean that Trutek's other
8  NasalGuard products don't have repeat sales?
9    A.  I don't know.  I would assume that they
10  do.
11    Q.  So how did you know that this particular
12  NasalGuard product had repeat sales?
13    A.  I did not know that before I asked
14  Mr. Wahi for the number of sales of the product he
15  has.
16    Q.  So --
17    A.  I don't have sales data or marketing
18  information at my fingerprints.
19    Q.  Okay.  So Mr. Wahi provided you with the
20  information about the one particular NasalGuard
21  product that had repeat sales?
22       MR. KREMEN:  Objection.
23       THE WITNESS:  That was one that I asked
24  about.  I didn't ask about any other product.
25

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

51 (201 to 204)

201

1 BY MS. PETERSON:
2    Q.  And going back to that again, why did
3 you only ask about that one product?
4    **A.  Because that's the product that I use.**
5    Q.  Okay.  So do you know anything about the
6 sales of any of the other Trutek NasalGuard
7 products?
8    **A.  No, I don't.**
9    Q.  So you have no idea if they're being
10 sold at the same levels?
11    **A.  I don't know.**
12    Q.  But it is your understanding that all of
13 the NasalGuard products have the same exact
14 formulation, with the exception of the scented
15 product which includes an additional ingredient
16 providing that scent; that's correct?
17    **A.  That's the way I understand it.**
18    MR. KREMEN:  Objection.
19 BY MS. PETERSON:
20    Q.  Okay.  Let's go to the next page.
21    In the first paragraph, the second full
22 sentence, you also explain that -- it looks like
23 you're explaining another factor you considered,
24 which is that, "Patent protection offers
25 additional support for a product to be considered

202

1 as a success," right?
2    **A.  Yes.**
3    Q.  Okay.  So it's your opinion that part of
4 the success of Trutek's NasalGuard product is the
5 result of it having patent protection?
6    **A.  Yes.**
7    Q.  And when you refer to patent protection,
8 I assume you're talking about all of Trutek's
9 patents?
10    **A.  Just the '802 patent.**
11    Q.  You've reviewed Trutek's other patents;
12 correct?
13    **A.  Correct.**
14    Q.  Do those other patents read on -- or do
15 those other patents cover the Trutek products?
16    **A.  I primarily focused on the '802 patent.**
17    Q.  Okay.  So you aren't sure one way or the
18 other whether any of Trutek's other patents cover
19 the Trutek NasalGuard products?
20    MR. KREMEN:  Objection.
21    THE WITNESS:  As I said previously, I
22 focused primarily on the '802 patent.
23 BY MS. PETERSON:
24    Q.  I mean, did you look at Trutek's other
25 patents?

203

1    **A.  Yes.**
2    Q.  But you're not sure whether those other
3 Trutek patents that you reviewed cover the
4 NasalGuard products?
5    MR. KREMEN:  That's not what he said.
6 BY MS. PETERSON:
7    Q.  Can you answer, please?
8    **A.  Just repeat the question, I'm sorry.**
9    Q.  Okay.  You did look at Trutek's other
10 patents; correct?
11    **A.  Yes.  Yes, I did.**
12    Q.  Okay.  And you said you focused
13 primarily on the '802 patent
14    **A.  Correct.  I looked at the '488 patent.**
15 **I looked at the '481 patent.**
16    Q.  And do those --
17    **A.  Those are patents that I -- they**
18 **focused -- one focused mostly on the method.  The**
19 **other one was on the formulation.**
20    Q.  And are you talking about the claims of
21 those patents --
22    **A.  Yes.**
23    Q.  -- or the disclosure of the patent?
24    **A.  The claims.**
25    Q.  And do the claims of the patent covering

204

1 the formulation, do those read on the Trutek
2 NasalGuard product?
3    **A.  It's been a while since I looked at it.**
4 **I would have to go back and look at it again.**
5    Q.  Okay.  So as we're sitting here today,
6 you're not the sure either way, whether the claims
7 of the earlier Trutek formulation patent cover the
8 NasalGuard product?
9    MR. KREMEN:  Objection.
10    THE WITNESS:  I would have to refresh my
11 memory and reread.
12 BY MS. PETERSON:
13    Q.  Okay.  Do you know when NasalGuard was
14 first offered for sale in the United States?
15    **A.  I believe that was the 2012.  It's**
16 **possible, but I'm not certain.  I do post a year.**
17    Q.  And when you obtained this information
18 from Mr. Wahi, did he just give you the
19 number 7 million units, or did he give you, like,
20 sales records for that product?
21    **A.  No sales records, no.**
22    Q.  So he --
23    **A.  He just gave me -- he just mentioned it**
24 **to me.**
25    Q.  Okay.  So you had a conversation with

205

1 Mr. Wahi, and he told you that the particular
2 NasalGuard product that you use has sold 7 million
3 units sales since 2012?
4     A. Yes.
5     Q. Okay. In that same sentence we were
6 just looking at, you also say that because the
7 Trutek products "have been marketed successfully
8 for ten years, this product line stands tall among
9 products in this category."
10     Do you see that?
11     A. Yes.
12     Q. And here, now it looks like you're
13 talking about the entire Trutek NasalGuard product
14 line?
15     A. Probably. As I said, to my knowledge,
16 there is an unscented version and a scented
17 version. And that's what I'm referring to.
18     Q. Okay. So you would agree then that the
19 sales of the Trutek NasalGuard products are due at
20 least in part to their marketing efforts?
21     MR. KREMEN: Objection.
22     THE WITNESS: The sales are essentially
23 based on the buy the consumer. So regardless
24 of what their marketing efforts may be, even if
25 they don't do anything -- and they don't really.

207

1     THE WITNESS: That is one good example.
2 I could tell you from personal experience products
3 that I've developed sell sometimes better in a
4 foreign country because of the nature of the
5 product as opposed to domestically.
6 BY MS. PETERSON:
7     Q. Okay. So the next sentence says that,
8 "The product has a domestic and international
9 presence which demonstrates that it has been
10 reviewed for human use without prescription for
11 the claimed properties established in the patent."
12     A. Yes.
13     Q. Can you explain what you mean by that?
14     A. Okay. When a product is placed on the
15 market domestically and you make claims for the
16 product, the claims have to be substantiated and
17 usually submitted to one of the regulatory bodies.
18 Within a corporation, you have an internal
19 regulatory body who reviews the product and
20 reviews the claims that you're making about the
21 product and affirms the fact that what you're
22 saying about the product will, in fact, do what
23 you state on your labeling.
24     Q. Okay. So those are all related to
25 statements made in the labeling for a product or

206

1 I don't see much advertising for the product, to
2 be honest. But the sales of the product are
3 really based upon, as I said before, repeat sales.
4 If I buy the product, I buy a tube of the product,
5 and I find that I'm -- I like the use of the
6 product and I feel comfortable using the product,
7 I would go out and buy it again.
8 BY MS. PETERSON:
9     Q. When did you first start using
10 NasalGuard?
11     A. The first time that I used it was when
12 we had discussion related to Matrixx Initiatives.
13     Q. So you were not using NasalGuard prior
14 to being contacted by Trutek.
15     A. I had no idea of the product.
16     Q. Would you also agree that the sales of a
17 product can depend, at least in part, on where
18 those products are being sold?
19     A. Yes.
20     Q. So certainly, like, a sale on Amazon
21 where consumers can identify the product by
22 searching, you know, that would be easier for a
23 consumer to purchase than if it was only available
24 through a distributor?
25     MR. KREMEN: Objection.

208

1 in the advertisement for a product; correct?
2     A. Correct. And it relates primarily to
3 the regulatory affairs department.
4     Q. Okay. So you're not suggesting here
5 that the FDA reviewed information to confirm that
6 NasalGuard practices each and every element of the
7 '802 patent claims; right?
8     MR. KREMEN: Objection.
9     THE WITNESS: No, I'm not saying that.
10 BY MS. PETERSON:
11     Q. So, rather, you're talking about
12 the product being reviewed to substantiate claims
13 that Trutek makes in its website or product
14 packaging or product labeling to make sure that
15 they're accurate?
16     A. If a product is on the market and in
17 violation of the FDA, you would receive an FDA
18 letter, a warning letter, that your product is
19 either misbranded or mislabeled. And to my
20 knowledge, that doesn't exist. Otherwise, that
21 product would be off the market at this point. No
22 retailer would carry that product.
23     Q. Sure. Okay.
24     Now, at the bottom of this page, you
25 talk a little bit how the Trutek NasalGuard

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

53 (209 to 212)

209

1  products operate.
2      A.  The page has to be raised.  I'm not
3  seeing --
4          MS. PETERSON:  Yeah, can you scroll down
5  a little bit.  I'm looking at the last full
6  paragraph.  The last paragraph, so starting with
7  "The commercial" -- there we go.
8  BY MS. PETERSON:
9      Q.  Okay.  So you talk about how "The '802
10 patent claims a product that electrostatically
11 inhibits harmful airborne particles from infecting
12 an individual."
13         And then you go on to say, "This product
14 effectively prevents that from happening by
15 creating a positive electrostatic charge that
16 attracts the particles and holds the particles in
17 place until a biocide can inactivate them and
18 render them harmless"; correct?
19     A.  That's correct.
20     Q.  So that's your understanding of how
21 NasalGuard operates.
22     A.  That's my understanding of the
23 mechanism, yes.
24     Q.  Okay.  So that electrostatic charge both
25 attracts the particles and holds the particles in

210

1  place; correct?
2          MR. KREMEN:  Objection.
3          THE WITNESS:  I think I reiterated the
4  fact that the holding, that cohesive nature, was
5  aside from, that related primarily to that
6  impermeability that was related.  There were other
7  ingredients.
8  BY MS. PETERSON:
9      Q.  But here you're saying that the
10 electrostatic charge attracts the particles and
11 holds the particles in place; correct?
12     A.  Yes.  Yes.
13     Q.  Okay.
14     A.  But there are other components to the
15 product.
16     Q.  Okay.
17     A.  For the holding function.
18     Q.  But certainly the electrostatic charge,
19 in your opinion, here with respect to NasalGuard
20 performs both of those functions?
21     A.  Yes.
22     Q.  Okay.  Now, you did not do a
23 claim-by-claim analysis of whether the Trutek
24 NasalGuard products practice each and every
25 element of the '802 patent claims; correct?

211

1      A.  I did not conduct any of that, no.
2      Q.  Okay.  But you did rely on some testing
3  of NasalGuard conducted by Dr. Burns and --
4  Mr. Burns and Dr. Ermakov; correct?
5      A.  Yes, that's correct.
6      Q.  Okay.  And that of course was the
7  testing with respect to the conductivity or the
8  electrostatic charge of the formulation?
9      A.  The electrostatic charge, not the
10 conductivity.
11     Q.  Well, they were testing -- you don't
12 disagree that they were testing the conductivity;
13 right?
14     A.  They were not testing conductivity.
15 They were testing electrostatic charge.
16     Q.  Well, no.
17     A.  Conductivity --
18     Q.  That's what they ultimately reported.
19     A.  Conductivity --
20     Q.  But they were actually --
21     A.  No.
22     Q.  -- measuring --
23     A.  No.  My understanding of conductivity is
24 the placement of the electrode into the solution.
25 The electrode -- and that's one of the reasons why

212

1  I wanted to witness this, to go there and see what
2  they did.
3      Q.  Okay.  Regardless, the testing that you
4  relied on with respect to whether Trutek products
5  practice the '802 patent claims, that would be the
6  Burns and Ermakov testing about the surface
7  electrostatic charge of the products; correct?
8      A.  That's correct.
9      Q.  Okay.  And that's the information that
10 you relied on in forming your opinion that the
11 commercial success of NasalGuard is due to the
12 claimed invention?
13         MR. KREMEN:  Jeez, objection to form.
14         THE WITNESS:  There's a -- the testing
15 demonstrates the fact that there is an
16 electrostatic charge.  So the claim that the
17 mechanism utilizing the electrostatic charge is
18 substantiated by the work of Dr. Ermakov as well
19 as Mr. Burns in separate studies using either a
20 piece of paper or a physiologically useful agent,
21 namely, the pigskin that was done by Mr. Burns.
22 BY MS. PETERSON:
23     Q.  Okay.  And you didn't do any other
24 testing of the level of adhesion or cohesion
25 provided by the NasalGuard formulation?

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

54 (213 to 216)

213

1    A.  Me personally, no.
2    Q.  And you're not aware of anybody else
3  conducting that testing; correct?
4    A.  I'm not aware of it, that's correct.
5    Q.  And you didn't rely on it; right?
6    A.  I would have mentioned it.
7    Q.  And, similarly, you didn't rely on any
8  testing or -- you did not rely on any testing of
9  the level of permeability of any thin film formed
10 by NasalGuard upon application of the product?
11   A.  No, I did not.
12   Q.  Okay.
13       MS. PETERSON:  Last page, can we turn
14 one more page forward.
15 BY MS. PETERSON:
16   Q.  You also conclude here that, "The patent
17 number of the '802 patent is clearly marked for
18 every unit sold in the United States."
19       Do you see that?
20   A.  Yes.
21   Q.  And what's the basis for that assertion?
22   A.  That's for patent protection but that
23 the person -- again, if a person tries to market a
24 similar product without that patent number, that
25 could be a violation, in my opinion.

214

1    Q.  Okay.  Yeah, no, my question was just
2  how do you know that the patent number of the '802
3  patent is clearly marked for every unit sold in
4  the United States?
5    A.  Oh, because I use the product.
6    Q.  Okay.  So you looked at one of your
7  products, and you saw the patent number listed?
8    A.  Yeah.  And, you know, it would be
9  unusual for me to get a product that has a serial
10 number and someone else get it without.  That's
11 just part of quality control and quality assurance
12 in the manufacturing sector of a business.
13   Q.  And it's your understanding that there
14 could be potential liability if a company does not
15 include a patent marking on its product?
16       MR. KREMEN:  Objection to form.
17       THE WITNESS:  It's not so much
18 liability.  It's more so protection of your
19 product that it is patented.
20 BY MS. PETERSON:
21   Q.  Now, you only --
22   A.  Because if it --
23   Q.  -- started using NasalGuard in 2020 --
24   A.  Probably it was early 2020.  I had some
25 serious illness in 2019, and as a result, I

215

1  started using the product in 2020.  It was in and
2  around the time that we started learning more
3  about coronavirus, and I was looking for ways that
4  I can protect myself in addition to wearing the
5  mask and being vaccinated.
6    Q.  Okay.  So you did not use NasalGuard
7  prior to 2020; right?
8    A.  I wasn't familiar with the product, as I
9  stated earlier.
10   Q.  Okay.  So you don't know for certain
11 whether the '802 patent was marked on NasalGuard
12 products that were sold prior to 2020; right?
13   A.  No, I don't know that.
14   Q.  Okay.
15       MS. PETERSON:  We can take that exhibit
16 down.
17 BY MS. PETERSON:
18   Q.  I'd like to take a look at your -- let's
19 mark another exhibit.  This is a list of materials
20 that you reviewed that was attached to your
21 opening report.
22       MS. PETERSON:  Jennifer, I think it's
23 item No. 7.  It says "Lemmo Materials Reviewed."
24 We'll mark this as Exhibit 17.
25       (Lemmo Deposition Exhibit 18 was marked

216

1  for identification and attached to the
2  transcript.)
3        MR. KREMEN:  18.  17 was --
4        MS. PETERSON:  Oh, yes, 18.  Thank you.
5  BY MS. PETERSON:
6    Q.  Okay.  Dr. Lemmo, do you recognize
7  Exhibit 18?
8    A.  Yes.
9    Q.  And this is a list of materials that you
10 reviewed that you prepared and attached to your
11 opening report; correct?
12   A.  That's correct.
13   Q.  Okay.  Other than the materials listed
14 here on Exhibit 18, did you review anything else
15 in forming your opinions stated in your opening
16 report?
17   A.  Only the ones that are listed here.
18   Q.  Okay.  Did you identify personally each
19 of these -- well, never mind.  Strike that.
20       Okay.  Item No. 6 refers to "Information
21 on the NanoBio Protect product packaging."
22       Do you see that?
23   A.  Yes.
24   Q.  And that would be your own personal
25 copies of the product packaging that you had in

Transcript of Edward A. Lemmo, Ph.D.

October 24, 2022

55 (217 to 220)

217

1  your possession?
2      A.  Whatever I was able to obtain on the
3  website for NanoBio.
4      Q.  Okay.  Item No. 5, copies of the portion
5  of the BlueWillow website.
6          Do you see that?
7      A.  Yes.
8      Q.  Did you identify those sections of the
9  website yourself personally, or were you provided
10 them or directed to them by counsel?
11     A.  When I was retained by Mr. Wahi and he
12 told me a little bit about the case, routinely in
13 order to familiarize myself, I'll do a quick
14 search in the literature to what I could find out
15 about the company.  BlueWillow was not a company
16 that I was familiar with before Mr. Wahi had
17 contacted me at that time.
18     Q.  And I assume that means you weren't
19 familiar with the NanoBio Protect product either?
20     A.  Not at all.
21     Q.  Never came across it?
22     A.  Not at all.
23     Q.  Okay.  And, actually, I just realized I
24 mischaracterized something in that list.  Item
25 No. 6, I can't remember if I said that that was

218

1  NasalGuard product packaging or NanoBio Protect
2  product packaged.  So let me ask you again.
3          This NanoBio Protect product packaging
4  that you're referring to, is that something you
5  purchased, or was it provided to you?
6      A.  No, it was what I found on the Internet.
7      Q.  Okay.
8      A.  Any image -- what I generally do is I'll
9  search for images of the product, and I'll try to
10 zoom in on the content -- the label content,
11 information that's posted on the label.
12     Q.  Okay.
13     A.  But I never had physically the label in
14 my hands.
15     Q.  Okay.  Items No. 7 and 8 contain a list
16 of patents in a published patent application.
17         Do you see that?
18     A.  Yes.
19     Q.  Why did you review those?
20     A.  They were probably to give me foundation
21 information so that I can evaluate -- I'd have to
22 go back and look at my files -- so that I could
23 evaluate and give a response to the plaintiff as
24 far as what I reviewed.  Before I can make a
25 judgment on a thing or give advice to a company,

219

1  be it to Mr. Kremen or Mr. Wahi or any other
2  clients that I may have in the past or in the
3  hopefully future, you know, I provide them with
4  background information that I find.  I'll do a
5  patent search.
6      Q.  Okay.  So is it your recollection that
7  these patents are directed to different
8  oil-in-water emulsions?
9      A.  It's possible that that's the case.
10 Offhand, I don't have -- I apologize for not
11 listing the patent number and the descriptor on
12 this as a list.  But I do have those files.
13     Q.  But they were identified by you and
14 reviewed by you for background purposes?
15     A.  Yes, that's correct.
16     Q.  To further inform you about the products
17 at issue in the case?
18     A.  Yes.  Just to familiarize myself with
19 what was going on.  It's very difficult,
20 especially when you're looking at a product that
21 you have no knowledge of and claims that are being
22 made, especially for the NanoBio product and what
23 NanoBio was attempting to do with their
24 products -- or rather -- I'm sorry, rather what
25 BlueWillow was attempting to do with their

220

1  products, including the NanoBio Protect product,
2  so that I get a clearer picture of what the
3  entity, what this business was all about.
4      Q.  Okay.  And then to the best of your
5  recollection, there wasn't anything specific
6  within any of these patents that you specifically
7  relied on and mentioned in your report; correct?
8          MR. KREMEN:  Objection.
9          THE WITNESS:  Not to my knowledge.  I
10 cannot spell it out at this point.  Because,
11 again, I need to see what the title of the patent
12 was to clarify it.  At this point, looking at
13 patent numbers is kind of like looking at a
14 foreign language for me.
15 BY MS. PETERSON:
16     Q.  Sure.  Okay.  And then the rest of the
17 items on your list, it's a number of publications;
18 correct?
19     A.  That's correct.
20     Q.  And what was the purpose for reviewing
21 these?
22     A.  Again, to familiarize myself more so
23 with what nanoemulsions are as well as what
24 nanotechnology involved.  Having done the research
25 in terms of what BlueWillow was doing as research,

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

56 (221 to 224)

221

1  not necessarily for the commercial aspect but the
2  research work that they were doing, to better
3  familiarize myself so that I can express myself
4  relative to what the nanotechnology and
5  microemulsions in their applications really meant.
6       Q.   Okay.  And these patents and
7  publications, these are general materials relating
8  to nanoemulsion, not necessarily directed to
9  specific research being conducted by BlueWillow;
10 right?
11      A.   Yes, that's correct.
12      Q.   Okay.
13      A.   It was for my own edification so that I
14 would be able to speak about it.
15      Q.   Okay.
16           MS. PETERSON:  We can take that down.
17           MR. KREMEN:  Would it be a good time for
18 a break right now?
19           MS. PETERSON:  Sure.  We can go off the
20 record.
21           THE VIDEOGRAPHER:  We're going off the
22 record.  The time is now 4:12 p.m.
23           (Recess from the record.)
24           THE VIDEOGRAPHER:  We're back on the
25 record.  The time is now 4:24 p.m.

222

1            MS. PETERSON:  Okay.  Let's pull up
2  Exhibit 13, which is Dr. Lemmo's opening expert
3  report.
4            THE REMOTE TECHNICIAN:  Stand by.
5            MS. PETERSON:  And this one at least has
6  legible page numbers.  So hopefully that will help
7  out.  But if we could turn to page 8 of the
8  report, which is page 11 of the PDF.
9  BY MS. PETERSON:
10      Q.   Okay.  So at the top of this page,
11 Section 3, Dr. Lemmo, you included an explanation
12 of nanoemulsion technology, correct?
13      A.   That's correct.
14      Q.   Why did you include this?
15      A.   I wanted to reiterate what I said
16 earlier about those references in that I read -- I
17 read references about the nanoemulsion process,
18 the technology, acting as an interesting delivery
19 system as opposed to a person who was just -- had
20 not pretty much done their homework in reviewing
21 the material.  So it was essentially to get a
22 foundation started.
23      Q.   Okay.  And you understand that NanoBio
24 Protect is a nanoemulsion product?
25      A.   Yes.

223

1       Q.   Okay.  So at the bottom of this
2  paragraph, you have a sentence that's underlined
3  where you state that, "By their very nature,
4  nanoemulsion droplets exhibit an electrostatic
5  charge which causes them to repel one-another" --
6       A.   Yes.
7       Q.   -- correct?
8       A.   Yes.
9       Q.   Okay.  So when a nanoemulsion is applied
10 to the skin, it exists as individual droplets?
11      A.   Yes.
12      Q.   And then after application to the skin,
13 they remain as separate droplets on the skin --
14      A.   Right.
15      Q.   -- as a result of that electrostatic
16 charge; right?
17      A.   Right.  I believe that's the way it is.
18 And they would coalescent to a single liquid mass
19 if they were not electrostatically charged.
20      Q.   So, in other words, when applied to the
21 skin, they don't form a continuous layer on the
22 skin.  They still exist as droplets?
23      A.   That is my understanding of how the
24 technology works.  Because you have positive and
25 negative charge built into the structure of the

224

1  nanoemulsion.
2       Q.   Okay.  Now, you -- we touched on this
3  briefly, but you also relied on reports prepared
4  by Dr. Ermakov and Mr. Burns about some testing
5  that they did --
6       A.   Yes.
7       Q.   -- in forming your opinions as stated in
8  your opening report; correct?
9       A.   Yes, that's correct.
10      Q.   Okay.  So on page 9 --
11           MS. PETERSON:  If we can turn to that,
12 please.
13           If you go down a little bit farther.
14 Okay.  The paragraph that starts on January 11th.
15 BY MS. PETERSON:
16      Q.   About halfway through that paragraph,
17 you state, "I reviewed this report" -- and here
18 we're referring to Dr. Ermakov -- "and found
19 Dr. Ermakov's methodology and conclusions to be
20 sound."
21      A.   Yes, that's correct.
22      Q.   That's your position?
23      A.   Yes.
24      Q.   Okay.  And then on the next page, you
25 make the same statement regarding Mr. Burns, as

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

57 (225 to 228)

225

1 well; correct?
2    **A. That's correct.**
3    Q. So you also found Mr. Burns' methodology
4 and conclusions to be sound --
5    **A. Yes.**
6    Q. -- based on what you reviewed in his
7 report?
8    **A. Based on his report, yes. As well as**
9 **Dr. Ermakov's report.**
10    Q. Okay. And I think we established this
11 earlier, but you did not have any meetings or
12 discussions with Mr. Burns or Dr. Ermakov prior to
13 preparing your report; right?
14    **A. That's correct. I relied solely on the**
15 **written report.**
16    Q. Okay. So I assume, then, also that you
17 did not participate or make the decision to have
18 Dr. Ermakov and Mr. Burns conduct the testing?
19    **A. I had no involvement in those decisions.**
20    Q. And I also assume you did not identify
21 Dr. Ermakov or Mr. Burns as candidates to oversee
22 and design that testing?
23    **A. That's correct. I did not know either**
24 **one of them.**
25    Q. Okay. You anticipated my next question.

226

1 So you never worked with either one before?
2    **A. Neither one.**
3    Q. Okay. Not aware of either of them prior
4 to reviewing their reports?
5    **A. Not at all.**
6    MR. KREMEN: Um -- okay. Go ahead.
7    THE WITNESS: Perhaps -- you know, the
8 only thing that I can say is if they were part of
9 the discussion related to the case against
10 Matrixx Initiatives, it's possible that I read
11 reports if that was employed. But at this point
12 I'm not certain. So I can't commit to that.
13 BY MS. PETERSON:
14    Q. So if you were aware of them prior to
15 preparing this opening report, it would have been
16 in connection with them preparing reports of a
17 similar nature for use in the Matrixx?
18    **A. That's correct. Yes, that's correct.**
19 **But I did not know either one of them. They are**
20 **complete strangers to me.**
21    Q. So you were not aware of either of them
22 outside of the work on your matter involving
23 BlueWillow or Matrixx?
24    **A. That's correct.**
25    Q. Okay. Now, neither of the reports by

227

1 Dr. Ermakov or Mr. Burns include a CV; correct?
2    **A. That's correct.**
3    Q. Did you -- have you reviewed or -- did
4 you review any résumés or CV for Mr. Burns or
5 Dr. Ermakov --
6    **A. No, I have --**
7    Q. -- prior to preparing your report?
8    **A. No, I never checked on their academic**
9 **credentials or their employment status.**
10    Q. So you didn't do anything to investigate
11 their qualifications before relying on their
12 testing?
13    **A. No, I did not.**
14    Q. I assume you also did not have any role
15 or participate in designing the test methods used
16 by Dr. Ermakov and Mr. Burns?
17    **A. I had no involvement.**
18    Q. Did you review those test methods or
19 protocols prior to them performing the
20 experiments?
21    **A. No.**
22    Q. And no role in designing the conditions
23 under which the testing occurred?
24    **A. I'm sorry, I missed the beginning of**
25 **your statement. Can you just repeat that for me?**

228

1    Q. You didn't have any role or participate
2 in designing the conditions under which the
3 testing occurred?
4    **A. Oh, no, I had absolutely no involvement**
5 **with either one of them.**
6    Q. Did you have any role or participate in
7 the decision to decide that the products should be
8 tested on paper and on dried pigskin?
9    **A. No, not at all.**
10    Q. And did you have any role or participate
11 in any discussions about what equipment should be
12 used in the testing?
13    **A. No, no involvement.**
14    Q. It is your understanding that Mr. Burns
15 and Dr. Ermakov used different equipment; correct?
16    **A. Yes.**
17    Q. Do you know why that is?
18    **A. I would -- again, this is an assumption**
19 **on my part, it's just the manner in which they**
20 **conduct their tests in their independent**
21 **laboratories. So how Dr. Ermakov did his testing**
22 **for surface charge versus how Mr. Burns did his**
23 **testing using the equipment for the measurements,**
24 **I had no knowledge of that except for what I read**
25 **in these reports.**

229

1    Q.  Okay.  So looking then at these
2  statements in -- on pages 9 and 10 of your report,
3  what did you base your conclusion that their
4  methodology was sound?
5    **A.  Just on what I read.  I assumed that**
6  **their methodology -- one being in a respected**
7  **university of which I'm a graduate, I'm assuming**
8  **that he would utilize methodology that would be**
9  **sound.  Mr. Burns worked for -- I believe it's a**
10 **private laboratory, outside laboratory.  In my**
11 **past experience, I've used outside laboratories**
12 **for analytical purposes, and I assume that they**
13 **have the necessary credentialing and**
14 **certifications that are afforded to these**
15 **laboratories to be responsible with the results**
16 **that they provide.**
17   Q.  Okay.  So, in other words, to confirm
18 that their methodology was sound, you relied on
19 what they contained in their -- of what they
20 provided in their reports?
21   **A.  Yes, that's correct.**
22   Q.  And you didn't do any other independent
23 investigation to assess the accuracy of the
24 methodology other than what was written in the
25 reports?

230

1    **A.  No, I didn't think that it was necessary**
2  **for me to do so.  I took it at face value that it**
3  **was reliable.**
4    Q.  And I don't have the name of his
5  laboratory, but the laboratory that Dr. Burns --
6  Mr. Burns is associated with, have you ever worked
7  with --
8    **A.  ETS.  ETS.**
9    Q.  ETS.  Thank you.
10   **A.  Yes.**
11   Q.  Have you ever worked with ETS
12 previously?
13   **A.  No, not at all.**
14   Q.  Had you ever heard of ETS?
15   **A.  No.**
16   Q.  Do you know what type of testing ETS is
17 typically engaged in?
18   **A.  I never investigated it in great detail.**
19   Q.  Do you know how often Mr. Burns or
20 Dr. Ermakov performed tests of the nature
21 described in their reports?
22   **A.  I did not inquire on that, no.**
23   Q.  Do you know if Dr. Burns or -- Mr. Burns
24 or Dr. Ermakov typically conduct this type of
25 testing in the normal course of business?

231

1    **A.  I don't know the answer to that, but I**
2  **would assume that they do that routinely only**
3  **because of what I witnessed their facilities.**
4    Q.  And that's something that you learned
5  after preparing your report.
6    **A.  That's correct.**
7    Q.  Okay.  How did you determine that the
8  appropriate equipment was used by Mr. Burns and
9  Dr. Ermakov at the time that you prepared your
10 opening and reply reports on infringement?
11   **A.  I relied exclusively on what they wrote.**
12   Q.  Okay.
13   **A.  So I just -- I pretty much just use that**
14 **as reference that what they were stating was**
15 **factual.**
16   Q.  Okay.  Bear with me for one second.
17   **A.  Sure.**
18   Q.  Do you know when -- okay.  So both
19 Mr. Burns and Dr. Ermakov, they both tested Trutek
20 samples as well BlueWillow NanoBio Protect
21 samples; correct?
22   **A.  That's correct.**
23   Q.  Do you know when those samples were
24 manufactured?
25   **A.  I don't know.**

232

1    Q.  Do you know what their expiration date
2  was?
3    **A.  I don't know.**
4    Q.  Do you know what lot numbers the samples
5  were that were tested?
6    **A.  I don't think that they were reported in**
7  **the body of the reports.  They may have had**
8  **coding, but I offhand at this point can't recall.**
9       THE WITNESS:  Bless you.
10      MR. KREMEN:  Thank you.
11 BY MS. PETERSON:
12   Q.  So you don't know if the products -- if
13 they were expired or not at the time of testing?
14   **A.  I assumed that they were not, but I**
15 **don't know that.**
16   Q.  Okay.  Did Mr. Burns run any
17 standards --
18   **A.  In my --**
19   Q.  -- over the course of his experiment in
20 order to calibrate the equipment and ensure the
21 accuracy of the test method?
22   **A.  Actually, I asked him that question, and**
23 **the answer is yes.**
24   Q.  And is that reflected in his report?
25   **A.  I think the reason why I asked him that**

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

59 (233 to 236)

233

1  question was I may have been uncertain as far as
2  what was reported in the document itself.  So I
3  needed to confirm that based upon my own
4  experience working in a laboratory when I was a
5  graduate student standardizing the equipment that
6  I used on a routine basis.  So I simply asked him.
7      Q.  And that's a pretty typical thing that
8  you would expect that the equipment would be
9  standardized using --
10     A.  Yes.
11     Q.  -- a tool with a known value; right?
12     A.  Yes, absolutely.  And that's how I was
13  taught.  So, you know, you standardize your
14  equipment before you use it.  And particularly in
15  a case like this, you really want to have it
16  standardized because you're writing a report
17  regarding a legal matter.
18     Q.  And that information was not contained
19  within Mr. Burns' report; correct?
20     A.  I don't remember.  I don't think so.
21     Q.  And that's why you asked him about it at
22  your meeting within the last couple of weeks?
23     A.  Yes.  It was just to confirm how they go
24  about standardizing their equipment.  And I
25  explained my own experience working in the

234

1  laboratory how I learned to standardize equipment
2  during an instrumentation course as well as during
3  the time that I was in grad school.
4      Q.  So at the time that you formed and
5  prepared your opinions on infringement, you had no
6  way of knowing whether Mr. Burns actually
7  calibrated his equipment with a known standard?
8      A.  I would assume that he did because he
9  works for what I saw as a reliable company.  And
10  Dr. Ermakov, being at Rutgers University -- from
11  my experience at Rutgers University as a grad
12  student there, I know that the equipment routinely
13  gets standardized.  It's kind of standard
14  procedure when you're in an institution of that
15  nature.
16     Q.  And did Dr. Ermakov's report indicate
17  that he ran any known standards to calibrate the
18  equipment or to ensure the accuracy of the test
19  method?
20     A.  I think when you look at the test
21  results where he's comparing it to a blank
22  substrate and then each of the test features, I
23  think there are three or four more, I needed to
24  understand how he arrived at the conclusions that
25  he reached in his result.  So I asked him to

235

1  demonstrate for me to understand how he carried
2  out his test.
3      Q.  Right.  And --
4      A.  And I did the same -- I'm sorry.  I did
5  the same with Mr. Burns when I visited his
6  facility.  I requested just to witness it so that
7  I can again feel more comfortable in having this
8  conversation.
9      Q.  Okay.  So, again, that was all after you
10  prepared your reports and formed your --
11     A.  Yes.
12     Q.  -- opinions; right?
13     A.  Yes, that's correct.
14     Q.  So going back to what you said about
15  Dr. Ermakov's report and testing, you mentioned
16  looking at his test results where he compares it
17  to a blank substrate; right?
18     A.  That's correct.
19     Q.  So is that what you're referring to with
20  respect --
21     A.  Yes.
22     Q.  -- to whether Dr. Ermakov -- I mean,
23  that's a control; right?
24     A.  That's a control, yes.
25     Q.  Okay.

236

1      A.  But you're talking about standardization
2  of the equipment --
3      Q.  Yeah.
4      A.  -- and the routine standard -- that the
5  equipment is functioning accurately.  And that's
6  not reflected in that report, to my knowledge.
7      Q.  Okay.
8      A.  And I don't think he was -- I don't
9  think he needed to indicate that in his -- based
10  upon the nature of his report.  It was basically a
11  comparative study.  So we assume that everything
12  was standardized.  But, again, I can't swear to
13  that.
14     Q.  So you're assuming that everything is
15  standardized because you're just comparing the
16  results between two products?
17     A.  No, I'm assuming that it's all
18  standardized because of the nature in which it was
19  conducted.  At Rutgers University, that's a
20  standard protocol for laboratories.  It's not --
21  you know, it's in the chemistry department, and
22  routinely there's quality control and quality
23  assurance and people who will walk around the
24  laboratory making sure that everything is working
25  correctly.

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

237

1       I also think in a commercial laboratory
2   like ETS that they, too, have guidelines for
3   standardization of their equipment before they run
4   any samples for any clients.
5       Q.  Right.  So your expectation was that
6   they would have run standards to calibrate the
7   equipment, but you can't be certain whether or not
8   they did?
9       A.  Yeah, I wasn't there.
10      Q.  Okay.  So while we're talking about
11  controls, did Dr. Burns run any controls in his
12  experiment?
13      A.  Yes.
14      Q.  And what were those?  What was the
15  control that he ran?
16      A.  I believe it was simply the pigskin by
17  itself in the Faraday cup.
18      Q.  Okay.  And does he -- but he doesn't
19  report the results of any testing of the plain
20  pigskin prior to application of the formulations;
21  correct?
22      A.  You know, to be honest, I'd have to look
23  again at the report to see, but I'm assuming the
24  answer is that he did not identify that.
25      Q.  I mean, I know in Dr. Ermakov's report

238

1   he did test the blank paper and reported results?
2       A.  Yes.  Yes.
3       Q.  But I did not see that in Mr. Burns.
4   Okay.
5       A.  Yeah, I did not.  Yeah.
6       Q.  Okay.  Going back to Dr. Ermakov, the
7   control that he used, it was just a plain piece of
8   paper; right?
9       A.  That's correct.  I believe it was kind
10  of like a cardboard or that which you would find
11  like an index card of that nature.
12      Q.  Okay.  And he was able to detect a
13  surface charge on that substrate; correct?
14      A.  That's correct.
15      Q.  Would you expect to see a surface charge
16  on untreated paper?
17      A.  Yes.
18      Q.  Is paper conductive?
19      A.  I think liquids are more conductive, but
20  I think that surface charge -- particle charge
21  would be on any surface.
22      Q.  Let's -- actually, going back to
23  Mr. Burns, is it your recollection that the
24  controls were not just plain pigskin, but pigskin
25  that had been ionized to neutralize the existing

239

1   charge?
2       A.  That's a question that I would refer you
3   to Mr. Burns, as far as exactly what he did, if he
4   did anything, to the control.
5       Q.  Okay.
6       A.  I'm not -- I'm not comfortable in giving
7   you an answer that I may be misleading you.
8       Q.  Okay.  If you were going to measure the
9   surface charge of a product applied to a
10  substrate, would it be important to make sure that
11  that substrate doesn't have a surface charge of
12  its own?
13      A.  The substrate routinely would have a
14  surface charge.  And the way in which the
15  experiments were both conducted was to use the
16  substrate with each area of the material being
17  tested where each test sample had its own built-in
18  control so that if there was a surface charge to
19  the paper, in the case of Dr. Ermakov's
20  investigation, that would be reflected as the
21  natural surface charge of the paper by itself,
22  which should be, in fact, equivalent or in very
23  close proximity to the surface charge that was
24  found in the plain paper control.
25          And when the test material is placed in

240

1   the apparatus and spun under the electrode, the
2   electrode is not on the surface of the test
3   material, but it's above, it basically is going to
4   give a reading that would reflect the fact that
5   half of the test material has no application of
6   the test material, is plain paper, and the other
7   half has got the actual material on it that's
8   being tested.
9          So it's kind of like acting -- each of
10  the tests are kind of like acting on the basis
11  that you've got the control and the active being
12  incorporated to negate what may be contributed by
13  the substrate.
14      Q.  Okay.  Let me make sure I understand
15  that.  So you're saying that the way these tests
16  were conducted is that it's not just measuring the
17  surface charge in the location where the
18  formulation is applied, but both in that spot as
19  well as outside where it's just the plain
20  substrate?
21      A.  Yes, because the material is spun under
22  an electrode.  So it's acting as a control within
23  the test material itself.  So there is a control
24  built in, in that if the surface is going to have
25  a charge, anything you're adding to that surface

Transcript of Edward A. Lemmo, Ph.D.

October 24, 2022

241

1  will boost that level of charge because of the
2  charge that's existent on the material itself that
3  you're questioning. So you've got the surface --
4  the substrate as the surface, and then you have
5  the test sample added to half of that piece of
6  paper in the case of Dr. Ermakov.
7      Q.  Okay. And is this something that you
8  learned from your conversations with Mr. Burns and
9  Dr. Ermakov.
10     A.  It was the result of my visit to ask
11 them to demonstrate it for me. Because this is
12 not something that I have a great deal of
13 experience in, and as a result, I could read the
14 test results and I can understand his conclusion
15 based upon that, but it's very different when you
16 actually witness what the investigator did in the
17 test procedure. Since I had no involvement in
18 requesting the tests or any knowledge whatsoever
19 about the nature of the laboratory that it was
20 done, it was best for me to witness it, and that's
21 what I did.
22     Q.  That's what you did when you met with
23 them earlier this month?
24     A.  Yes.
25     Q.  Okay.

242

1      A.  Yes.
2      Q.  Now, both sets of tests, they were
3  conducted at room temperature; correct?
4      A.  I believe so, yes.
5      Q.  And that's lower than what you would
6  expect for human body temperature?
7      A.  Yes.
8      Q.  Now, Mr. Burns used pigskin as a
9  substrate for his testing; right?
10     A.  That's correct.
11     Q.  And at the time that you prepared your
12 report, what did you do to determine whether that
13 was an appropriate substrate for purposes of this
14 test?
15     A.  I simply looked at the literature on the
16 use of either artificial skin or using another
17 example. And my understanding simply from my
18 experience in physiology and my teaching
19 experience, I've been well aware and I've taught
20 about the subject. In the case of valve
21 replacements in hearts, the valves are usually
22 derived from animals such as pig. So it's a
23 suitable physiologically significant tissue to use
24 to demonstrate what would happen in the case of
25 human skin.

243

1      Q.  Okay. So you're talking there about an
2  organ like a heart as opposed to specifically
3  human skin; right?
4      A.  Well, if you have to use -- if you have
5  to use an animal model, you really want to have an
6  animal model that is as closely resembling the
7  human in which the agent is going to be tested. I
8  would not be testing, for example, a digestive
9  function of a cow who has a four-compartment
10 stomach and compare that to a human because we
11 only have a one-compartment. So I want to find a
12 molding that is as closely physiologically
13 similar. And I think Mr. Burns made that
14 selection on that basis.
15     Q.  Okay.
16     A.  But that's a question that you'd
17 probably have to pose to him to better explain it.
18     Q.  Yeah. But I'm wondering about what you
19 did to independently confirm that the methodology
20 was sound with respect to the substrate that was
21 selected here. So it sounds like you did some
22 research on your own in the literature?
23     A.  I tried to find as much as I could in
24 order to -- again, if you're asking for an opinion
25 from me, I can't just pull it out of thin air. I

244

1  have to go back and look at references and see
2  what other people may have used in these kind of
3  determinations. And, also, one of my concerns is
4  always is this a standard test? Is this something
5  that routinely if I were going to investigate this
6  as part of my research project, is this the
7  protocol that I would use? That's just my own
8  nature of how I would be investigating things.
9      Q.  Okay. And I have a few follow-up
10 questions there.
11        So the literature that you researched,
12 that would be the paper that you've cited in your
13 reply report; correct?
14     A.  That's correct.
15     Q.  Okay.
16     A.  Yes, I think the researcher -- I'm not
17 certain -- it has a three-letter word, Abd or Adb.
18 That's the person that I relied on, yes.
19     Q.  Okay. So that was something that you
20 did in connection with forming your opinions in
21 your reply report; right?
22     A.  That's correct. That's correct.
23     Q.  Now, you also mentioned one of your
24 concerns in research projects is whether something
25 is a standard test. Have you ever had the need to

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

---

245

1 measure the surface charge of a pharmaceutical
2 formulation over the course of your career?
3      A.  No.
4           MR. KREMEN:  Objection to form.
5 BY MS. PETERSON:
6      Q.  So the testing that Mr. Burns and
7 Dr. Ermakov did, you've never had occasion to
8 consider such testing or rely on any such testing
9 apart from your work for Trutek in these matters;
10 right?
11          MR. KREMEN:  Objection to the form of
12 the question.
13          THE WITNESS:  Well, I've never had the
14 opportunity to investigate it like that.  That was
15 not something that I've ever done.
16 BY MS. PETERSON:
17     Q.  Okay.
18     A.  So no other client has come to me to
19 investigate surface charge.
20     Q.  Okay.
21     A.  If that's what you want to know.
22     Q.  Okay.  And you never did that over the
23 course of your work through the various companies
24 that you've worked with over your career either;
25 right?

---

246

1      A.  No, the only closely resembling activity
2 would have been in my instrumentation and my
3 honor's course in chemistry and measuring ion and
4 absorption to services.  That would pretty much be
5 the only connection that I can relate to.
6      Q.  Okay.  Now, going back to something else
7 you said, you said it was important to use an
8 animal model that closely resembles or is similar
9 to the intended test subject; correct?
10     A.  That's correct.
11     Q.  Are you aware of the fact that human
12 cadaver skin is also available for testing?
13     A.  Yes.  And you could also use artificial
14 skin.  So there are options that could be used.
15     Q.  Would you find human skin to be a more
16 accurate reflection of how a surface charge will
17 exhibit upon application of these products to
18 human skin as compared to pigskin?
19     A.  I can't really comment on that
20 accurately.  So I would say I'm not really
21 certain.  I can make assumptions, but one of the
22 key features is really if, in fact, the skin
23 physiologically is going to be the same.  And it's
24 also a question of availability, whether or not
25 that's something that the laboratory would be

---

247

1 using.  I don't know what the restrictions are or
2 the legalities relative to the types of skin that
3 might be employed in a laboratory setting like
4 ETS.
5      Q.  Okay.  Do you know what part of the pig
6 the skin samples came from?
7      A.  No, I don't.
8      Q.  Do you know what the physiological
9 differences are between pigskin and human skin?
10     A.  Well, in my reading, it indicates the
11 fact that they are very similar.
12     Q.  Do you know whether there are any
13 differences between pigskin and human skin,
14 particularly within, like, the area of the nostril
15 and nasal passages?
16     A.  I couldn't really comment.  I would have
17 to do another investigation as far as cellular
18 composition of the skin.
19     Q.  Now, Dr. Ermakov used paper as a
20 substrate in his testing; right?
21     A.  That's correct.
22     Q.  And did you do anything to independently
23 determine whether paper was an appropriate
24 substrate for purposes of this test?
25     A.  When I reviewed Dr. Ermakov's work, I

---

248

1 assumed that it was to establish some degree of
2 baseline that, in fact, the test materials would
3 have a surface charge.  So regardless of what he
4 used, I think he probably had evidence that paper
5 would be a good substrate, an adequate substrate
6 to conduct this kind of investigation to establish
7 a baseline for surface charge.
8      Also, when I met with him, asked him
9 if he had done this work previously, and he has.
10 So if he's doing this, he must know that this
11 works appropriately, particularly to establish a
12 baseline.  The work by Burns would be a step above
13 the work by Ermakov in establishing it in a more
14 physiological or physiologically similar condition
15 using the pigskin to what you would see in human
16 flesh.
17     Q.  So when you refer to Dr. Ermakov's work
18 as establishing a baseline, you're referring to
19 the fact that it's measuring surface charge but
20 not on a substrate that really is reflective of
21 how the products are going to be used in -- under
22 actual real life conditions?
23     A.  I think that the purpose of his study
24 was simply to establish whether or not there was a
25 charge and how you are comparing those examples.

249

1  So he had to use something.  It's similar to what
2  you would do in any kind of experiment.  You have
3  to start someplace.
4      Q.  Okay.  And then all of that explanation
5  that you just got about Dr. Ermakov, again, that
6  was from your conversation with him a couple of
7  weeks ago?
8      A.  Yes.
9      Q.  That was not information that you were
10 aware of at the time you prepared your reports on
11 infringement; correct?
12     A.  No, that's correct.
13     Q.  So over the course of your career, when
14 you've used equipment to conduct various tests, is
15 it important to run a number of tests to confirm
16 reliability of the method?
17     A.  I'm not following your question when you
18 say --
19     Q.  Well, if you wanted to -- let's say you
20 wanted to measure the surface charge of something.
21 Would it be important to you to run the test in
22 multiple replications so that you can ensure --
23     A.  Oh, yes.
24     Q.  -- the reliability and precision of the
25 method?

250

1      A.  Yes, absolutely.  Absolutely.  And, you
2  know, typically, whenever -- at the time when I
3  was conducting research work at Rutgers
4  University, you know, we would run multiple
5  samples so that we would get an average value, and
6  that average value was then statistically analyzed
7  so that we would have a framework.
8          But before we would go to the
9  statistical analysis of it, we had to establish
10 some basics that, in fact, what we were doing was
11 appropriate, that we were getting a reading.  So
12 we established that baseline.
13     Q.  Okay.  And so before relying on the
14 results of that testing, you would run the
15 experiment with a number of replicates, you would
16 determine the average, the standard deviation, and
17 then determine whether those results were
18 statistically significant?
19     A.  Yes.
20     Q.  Okay.
21         MR. KREMEN:  Objection.
22         THE WITNESS:  But that wasn't relevant
23 to what he did.
24 BY MS. PETERSON:
25     Q.  Now, you recall from reviewing the

251

1  results that for the most part the measurements
2  obtained by Dr. Burns and Ermakov were pretty
3  consistent with each other; right?
4      A.  Yes.
5      Q.  With one exception, do you recall that
6  the results obtained from the measurement by
7  Dr. Burns of the BlueWillow product, that there
8  was actually a pretty wide variation in those
9  results?
10     A.  Yes, that's to be expected.
11     Q.  And why is that to be expected?
12     A.  There could be any number of factors
13 that can contribute to that.  But the purpose of
14 the study was just to establish whether or not
15 there was a surface charge.
16     Q.  Okay.
17     A.  It wasn't a -- in doing experimentation,
18 there are different goals, and it's either a
19 quantifiable goal or just the identification goal.
20 And the goal in both of these studies, to my
21 knowledge, was to identify the fact that the
22 samples that were tested, in fact, exerted a
23 surface charge.
24     Q.  So for purposes of your analysis and
25 your opinions, you were relying on the fact that a

252

1  surface charge was measured; correct?
2      A.  That's correct.  That's my
3  understanding, yes.
4      Q.  Okay.  You weren't concerned necessarily
5  with what those particular measurements were.
6      A.  No.  And I wasn't concerned about
7  statistical significance relative to these kinds
8  of trials.  If we were to look at things where we
9  were measuring a value that's found in a sample
10 where the reliability of the test protocol that's
11 used is going to give me a closer measure or
12 measurements, as you see in some of the samples,
13 you know, that would be something that I would be
14 interested in.  But I don't think that that was
15 the purpose of either one of these trials.
16     Q.  Now, if you saw a wide variability in
17 results of the same testing procedure on the same
18 sample, would that suggest to you that there might
19 be some flaw in the method?
20     A.  I would first repeat the test just to
21 confirm what I'm witnessing for why there is
22 variability.  If it's a factor that I can control
23 or correct, I would execute that factor to correct
24 the problem.  So with both of these -- even though
25 there is variability in that test that was done by

253

1  Burns, the point is that this still was surface
2  charge and --
3      Q.  No, I understand.  You were still just
4  looking --
5      A.  Yes.
6      Q.  -- for a surface charge measurement, but
7  I --
8      A.  That's all it was.
9      Q.  I'm asking a more basic question.  If
10 you see wide variability, that could suggest a
11 flaw in the method; right?
12     A.  It could.  It could.
13     Q.  It could also suggest that the
14 particular method is not very accurate?
15     A.  It could question the accuracy.  It can
16 question even the conditions in which the study
17 was conducted.
18     Q.  And it could also question the
19 reliability of the method; right?
20     A.  Well, considering the nature of what was
21 found in the one study -- or the one sample versus
22 the others, there seemed to be more consistency in
23 the other study -- or the other samples as
24 compared to the one of the NanoBio product.
25         The problem there is, at least I

254

1  investigated this a little bit further, in looking
2  at things like the water content, the products
3  reflect the fact that they utilized water.  And in
4  my investigation, of course this is after the
5  fact, but looking at things like purified water
6  versus distilled deionized water, deionized water
7  would be removing those cations, whereas purified
8  water may, in fact, contribute some cations.  So
9  that might be a factor.  But, again, I can't
10 confirm that because I didn't do any additional
11 testing.
12     Q.  Okay.  Now, the conclusion that you
13 relied on from the Burns and Ermakov testing was
14 that both the Trutek products and the NanoBio
15 Protect product exhibited a surface charge, and
16 that surface charge was of the same order of
17 magnitude; correct?
18     A.  That's correct.
19     Q.  And why was it important to you that the
20 surface charge was of the same order of magnitude
21 between the two products?
22     A.  Just to determine the amount.  That was
23 pretty much it.  Is it there or not?  Does it
24 contribute any cationic charge?
25     Q.  Okay.

255

1      A.  Because that was part of the '802
2  patent's claim, is that it has this electrostatic
3  charge and it is cationic.
4      Q.  But if all you were interested in
5  knowing was that the products exhibited an
6  electrostatic charge, why did it matter to you
7  that they were of the same order of magnitude?
8      A.  Just to see how closely resembling they
9  are.  The cation that is used, if it's
10 benzalkonium chloride, and the quantification
11 therein, should be similar if the amounts are the
12 same.
13     Q.  And why was it important to you to know
14 whether the surface electrostatic charge was
15 similar between NanoBio Protect and NasalGuard?
16     A.  Well, because the claims are being made
17 about the product.  And that's the basis of this
18 whole proceeding, is that the two items have
19 similarity.  NanoBio and Trutek's NasalGuard
20 products, they are similar.
21     Q.  Okay.  So when you just referred to the
22 claims being made about the product, you're not
23 talking about the patent claims here.  You're
24 talking about the statements made about the
25 products on, like, the websites and non-product

256

1  labeling; right?
2      A.  Right.  Right.
3      Q.  I just wanted to get some terminology
4  clear because we have "claims" used in two
5  contexts.
6      A.  Yeah.
7      Q.  So how did you use the conclusion that
8  NanoBio Protect and Trutek's NasalGuard products
9  exhibited an electrostatic charge of the same
10 order of magnitude in reaching your opinion on
11 infringement?
12         MR. KREMEN:  Objection to form.
13         THE WITNESS:  I simply relied on the
14 documentation that was supplied --
15 BY MS. PETERSON:
16     Q.  Okay.
17     A.  -- by both of the researchers.
18     Q.  But how did you use that in reaching
19 your opinion?  How was it relevant to your opinion
20 on infringement?
21     A.  Because you have to see whether or not,
22 in fact, if the existence of the patent -- the
23 '802 patent preceded the marketing of the product
24 to NanoBio, then that NanoBio product is
25 infringing on the patented protected product of

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

65 (257 to 260)

257

1  **Trutek. I'm looking at it from that standpoint.**
2   Q.  Okay.  Let me try asking the question
3  again.  So you relied on the conclusion from Burns
4  and Ermakov that Trutek's products and
5  BlueWillow's product exhibited an electrostatic
6  charge of the same order of magnitude; correct?
7   **A.  That's correct.**
8   Q.  And how did you use that information to
9  determine whether NanoBio Protect satisfies the
10  elements of the '802 patent claims?
11   **A.  Because of where it's stated in the '802**
12  **patent. The '802 patent talks about the**
13  **electrostatic charge. That's a significant factor**
14  **for the methodology of how that product works.**
15   Q.  The '802 patent claims, they don't
16  require an electrostatic charge; correct?
17   MR. KREMEN:  Objection.
18  BY MS. PETERSON:
19   Q.  That language is not in the claims;
20  right?
21   **A.  I have to go back and take a look**
22  **exactly. I'm sorry, it's late in the day.**
23   Q.  Yeah, sure.  No problem.  We can pull
24  that back up.  Do you have that copy of the patent
25  handy still?

258

1   THE REMOTE TECHNICIAN:  I'm sorry,
2  Ms. Peterson, are you speaking to me if I have
3  that copy handy?
4   MS. PETERSON:  No, I was asking
5  Dr. Lemmo.
6   THE WITNESS:  Oh, I don't have it -- no,
7  I don't have it physically near me.  That's why
8  I'm just -- I'm rummaging around.
9   MS. PETERSON:  Okay.  Then, yeah, can we
10  pull up on the screen Exhibit 2 and go to --
11   THE WITNESS:  Oh, I found it.  All
12  right.
13   THE REMOTE TECHNICIAN:  Of course I can
14  pull it up.
15   MR. KREMEN:  He has it.
16   THE WITNESS:  I have it.
17  BY MS. PETERSON:
18   Q.  Okay.  Let's look at Claim 1.
19   **A.  Yeah.**
20   Q.  It talks about electrostatically
21  inhibiting; right?
22   **A.  Right. Right.**
23   Q.  And electrostatically attracting; right?
24   **A.  Right.**
25   Q.  But the claims don't require a

259

1  particular electrostatic charge.
2   **A.  Quantified?**
3   Q.  Correct.
4   **A.  No, it doesn't.**
5   Q.  Okay.
6   **A.  There's no quantification that's listed**
7  **here, no.**
8   Q.  And you would also agree that the
9  results of the Burns and Ermakov testing actually
10  show that the electrostatic charge exhibited by
11  the Trutek and BlueWillow products was actually
12  different; right?
13   **A.  Quantifiably, yes.**
14   Q.  Right.
15   **A.  But, again, I go back to my statement**
16  **that it wasn't a quantification. It was more of**
17  **an identification that both products exhibited the**
18  **electrostatic charge when applied to the**
19  **substrate.**
20   Q.  Okay.
21   **A.  That's how I understood it.**
22   Q.  Okay.  So if your analysis was focused
23  on determining whether NanoBio Protect --
24   **A.  Yes.**
25   Q.  -- infringes the '802 patent claims, why

260

1  was it relevant to you that NanoBio Protect had a
2  surface electrostatic charge of the same order of
3  magnitude as NasalGuard?
4   **A.  Well, it would probably -- again, it**
5  **would probably reflect the composition of the**
6  **NanoBio Protect relative to the amount of cation**
7  **that's being contributed by the ingredients of the**
8  **NanoBio Protect. So, in other words, if I look at**
9  **the benzalkonium chloride content of both**
10  **products, they're both going to contribute cation.**
11  **And that's going to be a significant factor as far**
12  **as how that product will work.**
13   Q.  Okay.  So, in other words, you're
14  assuming that because the two products had the
15  same order of magnitude of electrostatic surface
16  charge, they had the same ingredients?
17   MR. KREMEN:  Objection.
18   THE WITNESS:  I can't make that
19  assumption because there are multiple ingredients
20  in both products.
21  BY MS. PETERSON:
22   Q.  But because they have the same order of
23  magnitude, you're assuming that the products
24  operate in the same manner?
25   **A.  They have similarity.**

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

261

1    Q.  Okay.  And so you considered -- so, in
2  other words, you considered the surface
3  electrostatic charge of NasalGuard and how it
4  operates as part of your analysis of whether
5  NanoBio Protect practices the elements of the '802
6  patent claims?
7    **A.  Yes.**
8    Q.  Okay.  Let's take a look at your reply
9  report now.
10      MR. KREMEN:  Which one?
11      MS. PETERSON:  It was marked as
12  Exhibit 15.
13      MR. KREMEN:  Okay.  Exhibit 15.
14      THE REMOTE TECHNICIAN:  Would you like
15  me to screen share that?
16      MS. PETERSON:  Yes, please.
17      THE WITNESS:  Yes, please.
18      MR. KREMEN:  His reply report, 15?
19  Yeah, okay.  Yeah, noninfringement.  Okay.
20      MS. PETERSON:  And if we could go to
21  page 7, which is page 8 of the PDF.
22  BY MS. PETERSON:
23    Q.  You see here we have a section titled
24  "Charge Destiny Measurement Theory"?
25    **A.  Yes.**

262

1    Q.  Okay.  The explanation that you provided
2  in this section, is that based on your own
3  personal knowledge, or did you obtain this
4  explanation from materials that you reviewed?
5    **A.  A combination of things.  The materials**
6  **that I reviewed, the ETS model equipment, the**
7  **indicator that it was employed.  So I relied**
8  **primarily on that.**
9    Q.  You mean you relied primarily on the --
10    **A.  Written materials.**
11    Q.  -- explanation of the equipment used in
12  Mr. Burns' report?
13    **A.  I relied on Mr. Burns' report and what I**
14  **could find also to complement that in the**
15  **literature.**
16    Q.  Okay.  Now, whatever you found in the
17  literature, you don't have it cited here; right?
18    **A.  Sometimes I do.  Sometimes I don't.  And**
19  **I think in this particular case I did not cite**
20  **anything except for the question as far as**
21  **Bernardi, there was a paper that spoke about**
22  **nanoemulsions.  And a copy of that paper is**
23  **attached.  That's on the following page.**
24      **But I think much of what I wrote in**
25  **reply to Dr. Amiji, because Dr. Amiji brought up**

263

1  **the question of conductivity versus surface charge**
2  **and whether they measured conductivity or they**
3  **measured surface charge.**
4    Q.  Okay.
5    **A.  And so I needed clarification to**
6  **understand what they tested and why Dr. Amiji**
7  **thought that it was the measurement of**
8  **conductivity as opposed to surface charge.**
9    Q.  So to just break that down a little bit,
10  the Bernardi paper that you cite on page 8, that's
11  related to assessing the stability of
12  nanoemulsions; right?
13    **A.  Yes.  Yes.**
14    Q.  And one of the ways that the stability
15  was measured or assessed was by measuring the
16  conductivity of the nanoemulsion; right?
17    **A.  Right.  And, again, it depends on how**
18  **the electrode -- if the electrode is actually**
19  **touching the surface of the material or it's**
20  **somewhere in proximity to the material.  And**
21  **that's the way I understand the difference between**
22  **the two.**
23    Q.  Okay.  But this was for the purpose of
24  assessing the stability of the product, right, not
25  determining whether there was a charge destiny?

264

1    **A.  Yes.**
2    Q.  Okay.  Yeah, I think your charge destiny
3  discussion on page 7 might be separate from why
4  you cited Bernardi; is that correct?
5    **A.  Yeah, it's possible that, you know, at**
6  **the time I was trying to link a few factors**
7  **together.**
8    Q.  Okay.  So just to go back to the section
9  where you explain charge destiny measurement
10  theory, just to confirm, you did look at
11  literature, but that's not cited here in your
12  report; right?
13    **A.  Yes, that's correct.  This is that which**
14  **I found out in the literature.**
15    Q.  But the literature that you relied on is
16  not identified; right?
17    **A.  Yes, that's correct.  It's not**
18  **identified in my report.**
19    Q.  Okay.  Now, that Bernardi paper, the
20  particular oil-in-water nanoemulsion assessed in
21  that paper, that was a rice brand oil
22  nanoemulsion?
23    **A.  Yes.**
24    Q.  And, again, there was no discussion in
25  that paper of measuring electrostatic charge of

265

1  the nanoemulsion; right?
2     **A.  No, it was mostly reflective of**
3  **Dr. Amiji's reference to conductivity.  And, you**
4  **know, I included the Bernardi paper really in the**
5  **statement that precedes where I indicate in 2011**
6  **that conductivity of the nanoemulsion is usually**
7  **measured to determine the stability.  The testing**
8  **was not intended -- or at least what I was trying**
9  **to express was that the testing that was done in**
10 **the two laboratory settings was not to determine**
11 **stability.  It was to determine the presence of**
12 **the charge.**
13    Q.  Okay.  So Bernardi measured conductivity
14 to assess stability of the nanoemulsion?
15    **A.  Yes.  Yes.**
16    Q.  And you cited the Bernardi paper to
17 support your understanding that Burns and Ermakov
18 were testing surface charge, not conductivity?
19    **A.  That's correct.**
20    Q.  Okay.  And you're aware that -- never
21 mind.  We can move on to [sic] that.
22        Now, another paper that you mentioned
23 earlier -- and it's cited on the next page of your
24 report if we move forward a page.
25        So on page 8, in the second full

266

1  paragraph, this is your discussion of that -- or
2  sorry, third full paragraph --
3        MS. PETERSON:  If you scroll down some
4  more.
5  BY MS. PETERSON:
6     Q.  This is the paper that you mentioned
7  regarding alternative skin models by --
8     **A.  Yes.**
9     Q.  -- Abd?
10    **A.  Abd, yes.  I don't --**
11    Q.  Abd?
12    **A.  I don't know how they pronounce it, but**
13 **I -- Abd, I would say.**
14    Q.  Okay.  Now, you understand that this
15 paper is directed to assessing whether it's
16 appropriate to use alternative skin models for
17 assessing drug permeation through the skin; right?
18    **A.  Yes.  Yes.**
19    Q.  So, in other words, that's the ability
20 of a drug or a formulation to pass through the
21 various layers of the skin into the bloodstream?
22    **A.  Right.  Right.  My goal was to simply**
23 **state that you can use animal models other than**
24 **using human skin.**
25    Q.  Okay.  This paper doesn't say anything

267

1  about what skin -- alternative skin models might
2  be appropriate for measuring electrostatic charge
3  of a product applied to human skin; right?
4     **A.  No, that's correct.**
5     Q.  Okay.  Let's move forward to page 10 of
6  your reply report.
7     **A.  Sure.**
8     Q.  Okay.  And here we have a situation that
9  we have titled as "Admissions Made Directly By
10 BlueWillow"; correct?
11    **A.  Yes, that's correct.**
12    Q.  Okay.  And this would be the various
13 statements that you identified on BlueWillow's
14 website; correct?
15    **A.  Yes, you're correct.**
16    Q.  Okay.  You didn't review any other
17 documents showing any testing or providing any
18 other information to substantiate that the product
19 operates in a manner described by BlueWillow on
20 its website; right?
21    **A.  No, I did not see that.**
22    Q.  Okay.  We can go to the next page.  This
23 is page 11 of your reply report.  There are four
24 bullet points listed.  And these are statements
25 that you relied on from Nano -- from the NanoBio

268

1  Protect website; correct?
2     **A.  Yes, from BlueWillow's website on the**
3  **product NanoBio.**
4     Q.  Okay.  So -- hang on a second.
5        That's interesting.  You have four
6  statements listed on page 10 of your -- never
7  mind.
8        You've got four bullet points listed on
9  your opening report, but they don't match up with
10 the same four bullet points listed in your reply
11 report, but I think we can use this.
12    **A.  Yeah, and it's possible what I was**
13 **addressing at the time -- at different times that**
14 **they were submitted.**
15    Q.  Okay.  So looking at the third bullet
16 point here, it says, "Dry skin allows germs to
17 penetrate.  Nanodroplets hydrate the skin,
18 preventing dryness and cracking"; right?
19    **A.  Yes.**
20    Q.  And presumably that reference to the
21 nanodroplets, that would be the nanodroplets of
22 the NanoBio Protect product?
23    **A.  Yes, because I believe it comes directly**
24 **from their website.**
25    Q.  Okay.  So here BlueWillow is explaining

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

269

1  that the nanodroplets hydrate the skin, prevents
2  dryness and cracking, which could otherwise allow
3  germs to penetrate the skin; correct?
4      A.  That's correct.
5      Q.  Okay.
6      MS. PETERSON:  And then if we scroll --
7  can we scroll down a little bit to see the rest of
8  the page.
9  BY MS. PETERSON:
10     Q.  Okay.  So then there's a sentence that
11  starts, "The NanoBio Protect product adheres to
12  the nasal tissue in a thin film.  If this were not
13  so, the liquid would immediately drip out";
14  correct?
15     A.  Yes.  Yes.
16     Q.  Did you test a NanoBio Protect product
17  to see if it forms a thin film upon application to
18  the skin?
19     A.  No.
20     Q.  Did you test a NanoBio Protect product
21  to see if any of the liquid drips out upon
22  application?
23     A.  No.
24     Q.  Okay.  You then go on to say that, "The
25  nanoemulsion becomes impermeable, not allowing

270

1  'germs to penetrate'"; right?
2      A.  Correct.
3      Q.  Okay.  So that impermeable -- that's
4  what we're talking about when you referenced
5  earlier about having adequate impermeability to
6  create a physical barrier that prevents the germs
7  from penetrating; correct?
8      A.  That's correct.
9      Q.  Okay.
10     MS. PETERSON:  Now, if you can just go
11  up a little bit more so we can see those bullet
12  points again.
13  BY MS. PETERSON:
14     Q.  Here, wouldn't you agree that BlueWillow
15  is saying that its product is operating to prevent
16  germs from penetrating the skin, not by creating
17  an impermeable thin film or a physical barrier,
18  but rather by hydrating the skin; right?
19     A.  Again, what we're talking about is a
20  product that's intended not as a skin protective,
21  but as a product that's going to help trap
22  contaminants from entering the nasal passage.
23  While, yes, this is going to have a benefit in
24  hydrating the skin, but if you go back to the '802
25  patent with the formulations, there is also

271

1  component parts that will add to protecting and
2  hydrating the skin.
3      Q.  Okay.
4      A.  So it's not going to irritate.  So there
5  are similarities, definite similarities,
6  intentional or otherwise, but I'm recognizing the
7  similarities.
8      Q.  Okay.  But these statements don't
9  reference a thin film being used to trap or hold
10  particles; correct?
11     A.  No, that's correct.
12     Q.  Okay.  And you would also agree that
13  hydrating the skin to prevent germs from entering,
14  that that's not the same as creating a physical
15  barrier that blocks those germs from entering?
16     MR. KREMEN:  Objection to the form of
17  the question.
18     THE WITNESS:  Can you repeat that or
19  restate it?
20  BY MS. PETERSON:
21     Q.  Would you also agree that hydrating the
22  skin to prevent germs from penetrating the skin,
23  that that's a different mechanism of action from
24  creating a physical barrier on the skin to prevent
25  the germs from going any farther?

272

1      MR. KREMEN:  Same objection.
2      THE WITNESS:  Well, from going farther
3  and setting up -- setting up a barrier so that
4  they don't leave the treated surface to enter the
5  nasal passage.
6  BY MS. PETERSON:
7      Q.  Okay.
8      A.  My concern was not focused on protecting
9  dry skin as a vehicle or an entry point for
10  microorganisms to invade.  The goal, or at least
11  the way I'm understanding it, is the role of the
12  two products in preventing the inhalation of the
13  harmful particles.  So you see the similarities.
14  There are --
15     Q.  Yeah, I see the similarity in that both
16  prevents germs from entering the system.
17     A.  Right.
18     Q.  But do you agree with me that they are
19  prevented from entering the system through
20  different physical means?
21     A.  Yes, that's correct.  One is a
22  nanoemulsion, and the other one is not identified
23  as an emulsion.  It's a gel.
24     Q.  Okay.
25     A.  So physically, when you look at the

273

1  products or at least -- I don't have that product.
2  I don't have the physical product NanoBio. So I
3  don't know what [inaudible].
4     Q. Okay. I think we're talking about two
5  completely separate things here. The two things
6  you were envisioning in your mind were NanoBio
7  Protect and then Trutek's NasalGuard?
8     A. Right.
9     Q. Okay. I'm asking about something
10  completely different.
11     A. Okay. All right. Let's go back over
12  that.
13     Q. I'm just asking whether -- I'm asking
14  whether hydrating the skin to prevent germs from
15  penetrating is a different mechanism of action
16  from creating a physical barrier on the skin?
17     A. Yes.
18     Q. Okay.
19     A. Yes.
20        MS. PETERSON: Let's go off the record.
21        THE VIDEOGRAPHER: We're going off the
22  record. The time is now 5:37 p.m.
23        (Recess from the record.)
24        THE VIDEOGRAPHER: We're back on the
25  record. The time is now 5:46 p.m.

274

1  BY MS. PETERSON:
2     Q. Okay. Dr. Lemmo, I appreciate all of
3  your time today. I know it's been a long day.
4  I'm almost done. I just have a few other little
5  housekeeping things to finish up on.
6     A. Fine. That's fine.
7        MS. PETERSON: Can we please mark as --
8  sorry, I just had a helicopter flying overhead.
9        MR. KREMEN: We're not going to mark
10  that.
11        MS. PETERSON: Can we please mark as
12  Exhibit 19 a copy of the Abd paper.
13        (Lemmo Deposition Exhibit 19 was marked
14  for identification and attached to the
15  transcript.)
16        MS. PETERSON: This is item No. 13 in my
17  materials, Jennifer.
18        THE REMOTE TECHNICIAN: Yes, stand by.
19  BY MS. PETERSON:
20     Q. Okay. Dr. Lemmo, do you recognize
21  Exhibit 19 as the paper by Eman Abd that you cited
22  and attached to your reply expert report?
23     A. Yes, I do.
24     Q. Okay.
25        MS. PETERSON: We can take that down.

275

1        And then let's mark as Exhibit 20 a copy
2  of the Bernardi paper. This is item No. 14.
3        (Lemmo Deposition Exhibit 20 was marked
4  for identification and attached to the
5  transcript.)
6        THE REMOTE TECHNICIAN: Stand by.
7  BY MS. PETERSON:
8     Q. Dr. Lemmo, do you recognize Exhibit 20
9  as a copy of the Bernardi paper that you cited and
10  attached to your reply expert report?
11     A. Yes.
12     Q. Great. Okay.
13        MS. PETERSON: Next let's mark as
14  Exhibit 21 a copy of the Rolf patent application,
15  which is item No. 17 in my materials.
16        (Lemmo Deposition Exhibit 21 was marked
17  for identification and attached to the
18  transcript.)
19  BY MS. PETERSON:
20     Q. Dr. Lemmo, do you recognize Exhibit 21
21  as a copy of United States Patent Application
22  Publication No. U.S. 2004/0071757 issued to Rolf?
23     A. Yes.
24     Q. And this is the Rolf application that
25  you addressed in your responsive report; correct?

276

1     A. That's correct.
2     Q. Okay.
3        MS. PETERSON: We can take that down.
4        One final document. Let's mark as
5  Exhibit 22 a copy of -- it's titled "Declaration
6  Lemmo." This is the last document that I
7  uploaded.
8        (Lemmo Deposition Exhibit 22 was marked
9  for identification and attached to the
10  transcript.)
11        MR. KREMEN: What is it specifically?
12  Oh, okay. That's for the Matrixx case.
13  BY MS. PETERSON:
14     Q. Yeah. So, Dr. Lemmo, do you recognize
15  Exhibit 22 as a copy of a declaration that you
16  prepared in connection with the Matrixx litigation
17  pending in New Jersey?
18     A. Yes.
19        MR. KREMEN: Can you go down to the
20  signature page just to make sure that --
21        MS. PETERSON: Yeah, I was going to get
22  to that, Stan.
23        MR. KREMEN: I want to make sure that he
24  identifies it because it's been a long time.
25        MS. PETERSON: Sure.

277

1    So can we go to the final page,
2  please -- actually, not the final page.  Go to
3  page 7 of the PDF.
4  BY MS. PETERSON:
5    Q.  Dr. Lemmo, that's your signature on --
6    **A.  That's --**
7    Q.  -- page 7; correct?
8    **A.  Yes, that's my signature.**
9    Q.  This declaration was executed on
10 January 23rd, 2020; correct?
11   **A.  That's correct.**
12   Q.  Okay.
13     MS. PETERSON:  Can we go back up to the
14 top of this document.
15 BY MS. PETERSON:
16   Q.  Do you see up at the top here that
17 Amirali Haidri is identified on this document?
18   **A.  Yes.**
19   Q.  Did you have any discussions or
20 conversations or meetings with Mr. Haidri in
21 connection with the preparation of this
22 declaration?
23   **A.  No.**
24   Q.  Okay.
25     MR. KREMEN:  May I clarify something

278

1  just for clarification?  Amirali Haidri was a
2  local counsel in this case.  I was lead counsel --
3     MS. PETERSON:  Okay.  Thank you.
4     MR. KREMEN:  -- out of state.
5     MS. PETERSON:  Okay.  Thank you,
6  Mr. Kremen.
7     Can we scroll to page 3 of this
8  declaration.
9  BY MS. PETERSON:
10   Q.  Okay.  And here in paragraph 8 of your
11 declaration, Dr. Lemmo, you've provided a list of
12 documents that you reviewed as part of your
13 investigation; correct?
14   **A.  That's correct.**
15   Q.  And then if you go down and look at the
16 eighth bullet point, you see the --
17     MR. KREMEN:  What line?
18     MS. PETERSON:  Bullet point 8.  It's the
19 eighth one down on the list.  It's identified
20 as --
21     MR. KREMEN:  There's a line number.  So
22 if you could point out the --
23     MS. PETERSON:  Line 13.
24     MR. KREMEN:  Okay.
25

279

1  BY MS. PETERSON:
2    Q.  Okay.  So one of the documents that you
3  reviewed as part of your investigation was the
4  "Determination of Surface Electrostatic Charge On
5  Nasal Application Test Products - Test Conducted
6  and Report Prepared by Dr. Alexei Ermakov."
7    Do you see that?
8    **A.  Yes.**
9    Q.  Okay.  So based on this, is it your
10 understanding that you also received a copy of and
11 reviewed the results of Dr. Ermakov's testing of
12 the electrostatic charge of the NasalGuard and
13 Matrixx products?
14   **A.  Yes.**
15   Q.  Okay.  And then looking at the next item
16 in the list, it's identified as "Surface
17 Electrostatic Charge Evaluation of Nasal
18 Application Products - Technical Report," prepared
19 by Shane Burns of Electro-Tech Systems; right?
20   **A.  Correct.**
21   Q.  So based on this, is it also your
22 recollection and understanding that you received a
23 copy of and reviewed the results of Mr. Burns'
24 testing of the electrostatic charge of the
25 NasalGuard and Matrixx products?

280

1    **A.  Yes.**
2    Q.  Okay.
3      MS. PETERSON:  Thank you, Dr. Lemmo.  I
4  do not have any further questions for you.
5      THE WITNESS:  Thank you.
6      MR. KREMEN:  Okay.  Let's see, who am I
7  talking to?  Jennifer?  Can you go up --
8      MS. PETERSON:  Stan, do you have any
9  questions for the witness?
10     MR. KREMEN:  No, no.  I'm sorry, I
11 thought we were off the record.
12     MS. PETERSON:  Yeah.  So --
13     THE VIDEOGRAPHER:  No, we haven't closed
14 out the record just yet.
15     MR. KREMEN:  I'm sorry.
16     MS. PETERSON:  So I'm done.  It sounds
17 like Mr. Kremen doesn't have any questions.  So I
18 think we can conclude the deposition.
19     THE WITNESS:  Okay.  So I can sign off?
20 Have a great day.  Thank you.
21     THE VIDEOGRAPHER:  All right.  Just a
22 moment, please.
23     This marks the end of the deposition of
24 Dr. Edward A. Lemmo.  We're going off the record.
25 The time is now 5:55 p.m.

Transcript of Edward A. Lemmo, Ph.D.
October 24, 2022

281

1  (Off the record at 5:55 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

282

1       A C K N O W L E D G E M E N T
2
3  STATE OF MARYLAND      )
                                    ss
4  COUNTY OF MONTGOMERY  )
5
6       I, EDWARD LEMMO, PH.D., hereby
7  certify, I have read the transcript of my
8  testimony taken under oath in my deposition of
9  October 24, 2022; that the transcript is a true,
10 complete and correct record of what was asked,
11 answered and said during this deposition, and that
12 the answers on the record as given by me are true
13 and correct.
14
15       _____
              EDWARD LEMMO, PH.D.
16
17
18 Sworn and subscribed to before me
19 this ____ day of _____, 2022.
20
21 _____
         Notary Public
22
23
24
25

283

1  STATE OF MARYLAND     )
2             ss:
3  COUNTY OF MONTGOMERY )
4
5       I, Matthew Goldstein, Notary Public
6  within and for the State of Maryland, do hereby
7  certify:
8
9       That I reported the proceedings in the
10 within entitled matter, and that the within
11 transcript is a true record of said proceedings.
12
13      I further certify that I am not related
14 to any of the parties to the action by blood or
15 marriage, and that I am in no way interested in
16 the outcome of this matter.
17
18      IN WITNESS WHEREOF, I have hereunto set
19 my hand this 24th day of October, 2022.
20
21       _____
22       Matthew Goldstein, RMR, CRR
23
24
25