# EXHIBIT 3

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4     - - - - - - - - - - - - - - - - x
 5     TRUTEK CORP.,              :
 6        Plaintiff/Counter-Defendant, :
 7        v.                      :  Case No.
 8     BLUEWILLOW BIOLOGICS, INC., : 2:21-cv-10312
 9        Defendant/Counter-Plaintiff, :
10     ROBIN ROE 1 through 10     :
11     (fictitious names); ABC    :
12     CORPORATION 1 through 10   :
13     (fictitious names),        :
14        Defendants.             :
15     - - - - - - - - - - - - - - - - X
16
17            Videotaped Deposition of
18          AMIRALI Y. HAIDRI, ESQUIRE
19              Conducted Virtually
20          Friday, October 28, 2022
21                10:08 a.m. EDT
22
23     Job No.:  468441
24     Pages 1 - 96
25     Reported by:  Debra A. Whitehead
```

**Page 2**

```
 1      Videotaped Deposition of AMIRALI Y. HAIDRI,
 2    ESQUIRE, conducted virtually.
 3
 4
 5      Pursuant to notice, before Debra Ann Whitehead,
 6    E-Notary Public in and for the State of Maryland.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF/COUNTER-DEFENDANT:
 3        STANLEY H. KREMEN, ESQUIRE
 4        SHK-DPLC
 5        4 Lenape Lane
 6        East Brunswick, New Jersey 08816
 7        (732) 593-7294
 8        shk@shk-dplc.com
 9
10    ON BEHALF OF DEFENDANT/COUNTER-PLAINTIFF:
11        LIANE M. PETERSON, ESQUIRE
12        FOLEY & LARDNER LLP
13        3000 K Street, NW
14        Suite 600
15        Washington, DC 20007
16        (202) 672-5300
17        lpeterson@foley.com
18
19
20    ALSO PRESENT:
21        JOHN PARKMAN, Video Specialist
22        JENNIFER POSIS, A/V Technician
23        ASHOK WAHI
24
25
```

**Page 4**

```
 1                C O N T E N T S
 2    EXAMINATION OF AMIRALI Y. HAIDRI, ESQUIRE      PAGE
 3      By Ms. Peterson                               6
 4
 5        EXHIBITS MARKED IN TODAY'S SESSION
 6          (Attached to the Transcript)
 7    DEPOSITION EXHIBIT                             PAGE
 8      Exhibit 31   Deposition Notice                8
 9      Exhibit 32   Curriculum Vitae, Amirali Y.    44
10                   Haidri
11      Exhibit 33   Plaintiff's Expert Report of    67
12                   Amirali Y. Haidri, Esq.,
13                   Responsive to and in Rebuttal of
14                   Defendant's Opening Expert Report
15                   of Mansoor M. Amiji
16      Exhibit 34   Clinical Study Report, March 7, 86
17                   2012
18
19        EXHIBITS MARKED IN PRIOR SESSIONS
20              (Not Attached)
21    DEPOSITION EXHIBIT                             PAGE
22      Exhibit 2    U.S. Patent No. 8,163,802       56
23
24
25
```

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

---

5

P R O C E E D I N G S

VIDEO SPECIALIST:  Here begins Media Number 1 in the video-recorded deposition of Amirali Haidri in the matter of Trutek Corporation versus BlueWillow Biologics, Incorporated, et al.; in the United States District Court, Eastern District of Michigan, Southern Division;  Case Number 2:21-cv-10312.

Today's date is Friday, October 28, 2022. The time on the video monitor is now 10:08 a.m. eastern time.  The remote videographer today is John Parkman, representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. KREMEN:  Stanley Kremen, representing the plaintiff Trutek Corporation.

MS. PETERSON:  Liane Peterson from Foley & Lardner, LLP, representing the defendant BlueWillow Biologics.

VIDEO SPECIALIST:  The court reporter today is Debbie Whitehead, representing Planet Depos.

Would the reporter please swear in the

---

6

witness.

AMIRALI Y. HAIDRI, ESQUIRE,
having been duly sworn, testified as follows:
EXAMINATION BY COUNSEL FOR
DEFENDANT/COUNTER-PLAINTIFF
BY MS. PETERSON:

Q    Good morning.

Q    Could you please state your full name and address, for the record.

**A    Amirali Y. Haidri.  Residential address 202 Hillside Avenue, Springfield, New Jersey, 07081.**

Q    Thank you.  And my name is Liane Peterson.  I am one of the lawyers who is representing the defendant BlueWillow Biologics in this case, and I'll be taking your deposition.

It's nice to meet you.

**A    Thank you.  My pleasure.**

Q    And, Mr. Haidri, where are you physically located today?

**A    I am in the office of Stanley Kremen.**

Q    And I know that Mr. Kremen is sitting there in the office with you.  Right?

**A    Yes.**

Q    Is there anybody else in the room with

---

7

you, besides Mr. Kremen?

**A    No, there isn't.**

Q    Mr. Haidri, have you had your deposition taken before?

**A    Yes, I have.**

Q    How many times?

**A    Once.**

Q    And was your prior deposition, was that in the context of providing expert testimony or in some other capacity?

**A    As a plaintiff.**

Q    So you were the named plaintiff, and your deposition was taken in that capacity?

**A    That is correct.**

Q    Generally speaking, what was the subject matter of that case?

**A    I was a victim of an automobile accident. That is what the matter was all about.**

Q    Thank you.

Well, I will just briefly go over some ground rules, particularly since we're doing this remotely, so that we can make sure that the deposition runs smoothly.  Okay?

**A    Yeah.  Please go ahead.**

Q    I'm going to ask that you wait until I

---

8

finish with my questions before you start to respond, and I'll try to do the same when you are speaking.  Okay?

**A    Yes.**

Q    I'm going to also ask that you provide verbal answers to my questions, rather than shaking your head or nodding or saying uh-huh.

Is that okay?

**A    Yes, that is okay.**

Q    And if at any point you do not understand one of my questions or you need me to repeat the question, please just ask.  Otherwise I will assume that you understood the question.  Okay?

**A    Okay, I'll ask if I need clarification.**

Q    Mr. Haidri, are you aware of any reason why you would be unable to provide complete and truthful testimony during your deposition today?

**A    No.**

MS. PETERSON:  Let's mark as Exhibit 31 the deposition notice of Mr. Haidri, please.

(Exhibit 31 marked for identification and is attached to the transcript.)

Q    Mr. Haidri, do you recognize Exhibit 31? Have you seen it before?

**A    I have not seen it before.**

---

**9**

1  Q   But you understand that you are appearing
2  today for your deposition pursuant to a deposition
3  notice that was served in the Trutek versus
4  BlueWillow Biologics matter.  Correct?
5  **A   That is what I have been informed of.  I**
6  **have not seen this notice before.**
7       MS. PETERSON:  We can take that down.
8  Q   Mr. Haidri, have you ever been retained
9  to provide opinions as a testifying expert in the
10 past four years?
11 **A   No, I have not.**
12 Q   Have you ever been retained to provide
13 opinions as a testifying expert at any time?
14 **A   No, I have not.**
15 Q   Have you ever prepared any type of expert
16 report or declaration for any type of contested
17 proceeding?
18 **A   Well, not really a contested proceeding,**
19 **but I'm a member of certain committees where issue**
20 **joint opinions, and I have signed on on those,**
21 **onto those opinions.**
22 Q   So that would be opinions that were
23 issued for I guess certain bar-related committees
24 that you're a member of?
25 **A   That is correct.**

**10**

1  Q   Mr. Haidri, have you ever been retained
2  by Trutek to provide either testifying or
3  consulting expert services on any other matter?
4  **A   No, I have not.**
5  Q   Have you ever been retained by
6  Trutek's -- I'm sorry, let me start that over
7  again.
8       Have you ever been retained by Trutek
9  previously in any context?
10 **A   I have been.**
11 Q   Can you explain, please.
12 **A   I was the local counsel in a certain**
13 **federal court matter against a corporation called**
14 **Matrixx Initiatives.**
15 Q   Apart from the federal court matter
16 against Matrixx Initiatives, have you ever been
17 retained by Trutek in any other context?
18 **A   I have been.**
19 Q   What other times have you been retained
20 by Trutek?
21 **A   In a commercial litigation matter**
22 **involving a breach of contract.**
23      (Clarification by the court reporter.)
24 Q   Are there any other instances when you've
25 been retained by Trutek?

**11**

1  **A   No, I have not been.**
2  Q   So just the Matrixx Initiatives matter
3  and the commercial litigation matter involving
4  breach of contract, those are the only two times
5  you've been retained by Trutek?
6  **A   That is correct, as of today.**
7  Q   When was the commercial litigation matter
8  filed?
9  **A   As best as I recall it, it was in April**
10 **2021.**
11 Q   And what court was that filed in?
12 **A   Superior Court of New Jersey, Somerset**
13 **County.**
14 Q   And who was the other party?
15 **A   Their name is Jintec America, Inc.**
16 Q   And what products were involved in that
17 case?
18 **A   It was a case of sales of the NasalGuard**
19 **product that Jintec was contractually obligated to**
20 **buy and pay for.**
21 Q   And what was Jintec, Incorporated's, role
22 with respect to the sales of NasalGuard?
23 **A   Can you please repeat that?  I can't**
24 **understand your question.**
25 Q   What was -- the other party --

**12**

1  **A   The defendant.  Okay?**
2  Q   Okay.  They were the defendant.  And what
3  was their involvement with NasalGuard?
4  **A   They entered into two different contracts**
5  **for foreign markets, and they were obligated to**
6  **place certain orders according to the contract.**
7  **And with one particular territory they failed to**
8  **place the order.  And with respect to another**
9  **territory, they placed an order but did not follow**
10 **up with the necessary payment for the**
11 **manufactured -- manufacturing of the goods**
12 **involved to take place.**
13      **And -- okay.**
14 Q   And is it correct that the contracts were
15 for purchasing NasalGuard outside of the United
16 States?
17 **A   That is correct, for foreign markets.**
18 Q   Is that litigation still pending?
19 **A   It is pending.**
20 Q   I'd like to talk about the other matter
21 you identified, the matter involving Matrixx
22 Initiatives.
23      That matter was filed in the District
24 Court of New Jersey.  Correct?
25 **A   That is correct.**

13

1    Q   And that case against Matrixx involved
2  Trutek's claims of infringement of the '802
3  patent.  Correct?
4    A   It is correct, yes.
5    Q   And that's the same '802 patent that's
6  being asserted by Trutek in this matter against
7  BlueWillow Biologics.  Right?
8    A   That is my understanding.
9    Q   What was your role in representing Trutek
10 in the New Jersey litigation against Matrixx?
11   A   I was the local counsel for Trutek.
12   Q   And what did you do in that role?
13   A   I filed a complaint and served motions,
14 pleadings, and appearances.
15   Q   Anything else?
16   A   Settlement -- mediation conference.
17   Q   So you also participated in a settlement
18 or a mediation conference with Matrixx?
19     Is that what you said?
20   A   Yeah, I did participate in the mediation.
21   Q   And was that one mediation conference
22 that you participated in, or were there multiple?
23   A   Only one.
24   Q   Did you participate in any other
25 discussions concerning settlement over the course

14

1  of your representation of Trutek in the Matrixx
2  matter?
3    A   Beyond the mediation, I do not recall
4  anything.
5    Q   And I understand that Mr. Kremen was also
6  counsel representing Trutek in that Matrixx
7  litigation.
8      Is that correct?
9    A   That is correct, he was my pro hac vice
10 counsel and, in fact, lead counsel.
11   Q   Approximately how long did the Matrixx
12 litigation last?
13   A   As best as I can recall, it has been
14 close for a year or two.
15   Q   But do you --
16   A   A year and a half is what I would say was
17 the length of it.
18   Q   And do you recall when the litigation
19 against Matrixx was filed?
20   A   Well, if I recollect -- I can't really
21 say that I recall for certain -- it would be about
22 three to three-and-a-half years before now.
23   Q   Was Mr. Kremen the lead counsel for
24 Trutek when the complaint was first filed against
25 Matrixx?

15

1    A   No; I was the only counsel.  And then I
2  filed a motion for Mr. Kremen to be waived in as
3  pro hac vice counsel.
4    Q   And Mr. Kremen was not admitted pro hac
5  to the New Jersey Matrixx matter until about nine
6  months after the litigation was filed.  Right?
7    A   Probably.  Sounds right.
8    Q   So for the first nine months of the
9  litigation, you were Trutek's only attorney
10 representing it in the matter?
11   A   Yeah, I was the only attorney of record.
12   Q   Do you know why you were retained by
13 Trutek for the Matrixx litigation?
14     MR. KREMEN:  Objection to form.
15   A   It's because I'm an attorney admitted in
16 the State of New Jersey, and as a registered
17 patent attorney in the bar again.
18   Q   Did you know Mr. Kremen before filing the
19 litigation against Matrixx?
20   A   I certainly did.
21   Q   In what context?
22   A   I was -- I was and still am a Master in
23 the John C. Lifland American Inn of Court, and
24 Mr. Kremen had joined a year or two before me.
25 And that's how we met each other.

16

1    Q   And did you know Mr. Wahi or anybody at
2  Trutek before you were retained by them to file
3  the litigation matter against Matrixx?
4    A   I'm not sure what you mean by whether I
5  knew Mr. Wahi.  In what context?
6      Can you please clarify?
7    Q   Had you ever met Mr. Wahi before filing
8  the case against Matrixx?
9    A   Obviously I met with him so that he could
10 instruct me to file the complaint.
11   Q   Yeah, of course.
12     When were you first contacted by Mr. Wahi
13 to discuss filing a complaint against Matrixx?
14   A   Let's say, if I go by my memory, if the
15 complaint was filed three-and-a-half years ago,
16 then I probably met Mr. Wahi a couple of months
17 before then to discuss what he wanted me to do.
18   Q   So prior to the time that Mr. Wahi
19 contacted you to discuss the potential litigation
20 against Matrixx, you had never met him before?
21   A   No, I had not.
22   Q   So just to confirm, it was Mr. Wahi who
23 contacted you about filing the case against
24 Matrixx, and not Mr. Kremen?
25   A   Actually, it's not as simple as that.

Transcript of Amirali Y. Haidri, Esquire

October 28, 2022

17

1      Mr. Kremen introduced me to Mr. Wahi.
2    Q    And then after Mr. Kremen introduced you
3 to Mr. Wahi, you had some meetings or discussions
4 with Mr. Wahi to discuss the potential litigation
5 matter against Matrixx.
6      Is that right?
7    A    That is correct.
8    Q    Okay.  So would it be fair to say then
9 that during the course of your representation of
10 Trutek in the Matrixx matter, you did communicate
11 directly with Mr. Wahi of Trutek?
12    A    And his office, Trutek Corporation, yes.
13    Q    Who else did you communicate with at
14 Trutek in connection with the Matrixx litigation
15 matter?
16    A    The president of Trutek and another
17 vice-president.
18    Q    Do you recall their names?
19    A    I do.
20    Q    What are their names?
21    A    The president is called Shaheda Ashtekar.
22    Q    And then who was the other vice-president
23 that you communicated with in connection with the
24 Matrixx litigation matter?
25    A    Kanika Wahi.

18

1    Q    What was the first name?
2    A    Kanika.
3    Q    Kanika?
4    A    Do you want me to spell it?
5    Q    Sure.
6    A    K for Kenneth, A for apple, N for Nancy,
7 I for Irene, K for Kenneth, A for apple.
8    Q    Is that Mr. Wahi's daughter?
9    A    That's what I'm told.
10    Q    Could you spell the name of the President
11 of Trutek that you identified earlier?
12    A    Indeed I will.  S for Sam, H for Harry, A
13 for apple, H for Harry, I for Irene, D for dog, A
14 for apple.  Shaheda.
15    Q    And that's his first name or last name?
16    A    It's her first name.
17    Q    Her first name.  Okay.  What is her last
18 name?
19    A    Ashtekar.
20    Q    Ashtekar?
21    A    Ashtekar, yes.
22    Q    Okay.  Thank you.
23      Now, with respect to Ms. Wahi, do you
24 know what she was vice-president of?  Did she have
25 a -- was she responsible for certain things in

19

1 that role?
2    A    I'm sure she was.  I'm  not aware of what
3 exactly her responsibilities.
4    Q    Do you know, like, was she a
5 vice-president in charge of some particular
6 operation of Trutek?
7    A    I'd rather not guess.  But she was
8 vice-president, that's all I can say.
9    Q    Okay.
10    A    Still is, as a matter of fact.
11    Q    Now, during the course of your
12 representation of Trutek in the Matrixx matter,
13 did you also communicate directly with opposing
14 counsel representing Matrixx?
15    A    I did.
16    Q    And you understand that Matrixx also
17 filed a petition for inter partes review at the
18 Patent and Trademark Office with respect to the
19 '802 patent.  Right?
20    A    That is what I'm told.  I don't know
21 anything more about it.
22    Q    Did you have any role or did you
23 participate at all in that IPR proceeding
24 involving the '802 patent?
25    A    No, I was not involved.

20

1    Q    At the time of the Matrixx litigation,
2 did you review or -- did you review the petition
3 for the IPR?
4    A    I believe I saw it.  I can't recall
5 exactly anything about it.
6    Q    Were you asked by anyone to review the
7 petition and provide your analysis of the
8 petition?
9    A    No, I was not.
10    Q    During the nine-month period after the
11 Matrixx litigation was filed, before Mr. Kremen
12 entered an appearance, what was your
13 responsibility for handling the litigation matter
14 for Trutek?
15    A    Well, I was the counsel.
16      That's all I can say.
17    Q    So would it be fair to say that you were
18 responsible for running that litigation and
19 overseeing all aspects of the litigation during
20 that time period?
21    A    Doing what I needed to do with the court
22 and opposing counsel.
23    Q    And you understand that Matrixx raised
24 several allegations of invalidity of the '802
25 patent in that litigation pending in New Jersey.

21

1    Correct?
2    A   Well, they have the usual defenses any
3  infringer raises.
4    Q   And so you were responsible for assessing
5  those defenses and considering responses to them.
6  Right?
7    A   I have to, yes.
8    Q   Approximately how much time do you think
9  you devoted to handling the Trutek litigation
10 matter pending in New Jersey over that
11 year-and-a-half period?
12   A   I can't give you an exact estimate.  It
13 would be hundreds of hours, I'm sure.
14   Q   And over the course of representing
15 Trutek in the Matrixx litigation, did you review
16 the '802 patent?
17   A   Yes, I reviewed it a few times.
18   Q   And did you consider the disclosure of
19 the '802 patent?
20   A   I have seen it, yes.
21   Q   And I'm asking specifically, did you
22 consider or review the disclosure of the '802
23 patent in the context of your work in representing
24 Trutek in the Matrixx litigation matter?
25   A   Broadly speaking, yes.

22

1    Q   And did you assess the claim scope of the
2  '802 patent over the course of your representation
3  of Trutek in the Matrixx litigation matter?
4    A   Will you please repeat that question?
5    Q   Did you assess the claim scope of the
6  '802 patent over the course of representing Trutek
7  in the Matrixx litigation matter?
8    A   Yes, I did.
9    Q   Did you assess Trutek's claims of
10 infringement of the '802 patent over the course of
11 representing Trutek in the Matrixx litigation
12 matter?
13   A   Yes.
14   Q   Did you assess claim construction of the
15 '802 patent in the course of representing Trutek
16 in the Matrixx litigation matter?
17   A   Informally, yes.
18   Q   And when you say "informally," that's
19 because the court never conducted formal Markman
20 proceedings in the Matrixx matter.
21 Is that correct?
22   A   There was no Markman hearing.
23   Q   And did you assess the validity of the
24 '802 patent in the course of representing Trutek
25 in the Matrixx litigation matter?

23

1    A   I certainly considered it to be valid, if
2  that is your question.
3    Q   Did you assess the validity of the '802
4  patent in response to invalidity defenses raised
5  by Matrixx --
6        MR. KREMEN:  Objection.  Form.
7    Q   -- while representing Trutek?
8        MR. KREMEN:  I'm sorry.  Objection to
9  form.
10   A   And I didn't quite understand.  That was
11 a long question.
12   Q   Well, I'll try to rephrase the question
13 and get it all out at once.
14   A   Okay.
15   Q   While representing Trutek in the Matrixx
16 litigation matter, did you assess the validity of
17 the '802 patent in response to the invalidity
18 defenses raised by Matrixx?
19   A   Yes, I did.
20   Q   So would it be fair to say that over the
21 course of representing Trutek in the Matrixx
22 litigation, you obtained an understanding of the
23 '802 patent and the prior art?
24   A   Yes.
25   Q   And your experience in representing

24

1  Trutek in the Matrixx litigation informed your
2  understanding of the '802 patent and the prior
3  art.  Right?
4    A   That is correct.
5    Q   Did you draw on what you learned while
6  representing Trutek in the Matrixx litigation when
7  forming your expert opinions that you prepared for
8  the present litigation?
9    A   Yeah, somewhat.
10   Q   In what context, or how did they inform
11 your opinions?
12   A   Well, I was aware of the art cited
13 against the '802 patent, the one and only office
14 action there was, and what the patent as granted
15 truly stands for.
16   Q   And when you say what the patent as
17 granted stands for, you're talking about the
18 disclosure of the patent and the invention claimed
19 in the patent.  Correct?
20   A   Yes, that is true.
21   Q   And your understanding of the disclosure
22 of the '802 patent and the invention claimed in
23 the '802 patent, did that come from discussions
24 with Mr. Wahi or anybody at Trutek?
25   A   Not really.  I just studied the papers

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

25

1  connected with the patent and what led to it.
2      Q    Did you ever discuss with Mr. Wahi over
3  the course of representing Trutek in the Matrixx
4  litigation his view of the '802 patent and what it
5  discloses and what it claims?
6      A    No, I did not.
7      Q    Did you discuss with Mr. Kremen while
8  representing Trutek in the Matrixx litigation the
9  disclosure of the '802 patent --
10     A    Yes.
11     Q    -- and what it claims?
12     A    Yes.
13     Q    Did you discuss with Mr. Kremen while
14 representing Trutek in the Matrixx litigation any
15 issues addressed to the invalidity challenges to
16 the '802 patent?
17     A    I don't recall.  I don't think I did.
18     Q    In your meetings with Mr. Wahi leading up
19 to the filing of the Matrixx litigation, did
20 Mr. Wahi provide you any information about his
21 view of the '802 patent?
22     A    No, I don't think so.
23     Q    Have you ever been retained by Mr. Kremen
24 previously on any other matter?
25     A    Well, we jointly represented a certain

26

1  plaintiff in a patent case.
2      Q    That's a different patent case not
3  involving Trutek?
4      A    Nothing to do with Trutek.
5      Q    And that was a litigation matter?
6      A    Two of them.  They were both litigation
7  matters.
8      Q    And who was the party that you jointly
9  represented with Mr. Kremen?
10     A    You mean the name of the plaintiff?
11     Q    Yes.
12     A    William Araujo.
13     Q    Can you spell that last name?
14     A    A-R-A-U-J-O.
15     Q    Was that a patent infringement matter?
16     A    Yes, there were.
17     Q    When were those filed?
18     A    One was filed in the District of New
19 Jersey.
20     Q    Okay.  Where was the other filed?
21     A    Southern District of New York.
22     Q    And when were those two litigations
23 filed?
24     A    Time frame?
25     Q    Yes.

27

1      A    The first one would have been over about
2  a couple of years ago.  Second one just came to an
3  end within this month.
4      Q    And those two litigation matters, you
5  said the name of the plaintiff that you
6  represented was William Araujo.  Right?
7      A    Araujo, right.
8      Q    Was he the inventor on the patent?
9      A    He was.
10     Q    Other than those two litigation matters
11 representing Mr. Araujo, have you ever jointly
12 represented a party in litigation with Mr. Kremen?
13     A    Well, there was a trademark infringement
14 matter where he was a consultant with me, but not
15 an attorney of record.
16     Q    Okay.  Anything else?
17     A    No, nothing else.
18     Q    And what about Mr. Keith Altman; have you
19 ever worked with Mr. Altman on any litigation
20 matters before this one?
21     A    Never met him.
22     Q    And apart from the Trutek matter filed
23 against Matrixx, the present Trutek matter filed
24 against BlueWillow Biologics, and the
25 breach-of-contract action that you identified,

28

1  have you ever been retained by Trutek on any other
2  matter?
3      A    No, I don't think so.  In fact, I have
4  not been.
5      Q    I'd like to focus now on your retention
6  for this particular matter involving BlueWillow
7  Biologics.  Okay?
8      A    Okay, I'm listening.
9      Q    When were you retained as an expert in
10 this matter?
11     A    It will be about three or four months
12 ago.
13     Q    And who were you retained by?
14     A    By Mr. Kremen.
15     Q    And what did Mr. Kremen explain to you
16 about what you were going to be requested to do?
17     A    Well, he explained that I had to provide
18 a report defending the validity of the '802
19 patent.
20     Q    Did Mr. Kremen provide you with any
21 materials that he asked you to consider in forming
22 your opinions regarding the validity of the '802
23 patent?
24     A    Yeah, I received some materials.
25     Q    What did you receive?

29

1    A   A report from Dr. Amiji and prosecution
2  history of the '802 patent, other prior
3  publications that may have some relevance.
4    Q   Can you identify those prior publications
5  for me?
6    A   As best as I recall, there are two
7  patents of some -- that have been mentioned a few
8  times, called Wadstrom and Rolf.  And they are
9  not, in fact, patents, but they are publications.
10    Q   And do you recall any other materials
11  that Mr. Kremen provided you with in connection
12  with forming your opinions regarding the validity
13  of the '802 patent?
14    A   Many other materials.  Names I recall are
15  Baker and Khaled.
16    Q   So basically that's the prior art that's
17  addressed in your report.  Right?
18    A   If you want to call it prior art, that's
19  what it is.
20    Q   Did Mr. Kremen provide you any other
21  materials or documents or information that you
22  used to form your opinions that are not
23  specifically identified in your report?
24    A   No, I can't say he did.
25    Q   Mr. Haidri, do you intend to testify at

30

1  the trial if it occurs in this matter?
2    A   Well, it will be up to the parties and
3  Mr. -- if I'm asked, I will testify, yes.  I
4  haven't been asked.
5    Q   And will you be -- if you are asked to
6  testify at the trial if one occurs, will you be
7  compensated for your testimony?
8    A   I would expect that that's the usual
9  thing in litigation.
10    Q   And what rate will you be compensated at
11  for your testimony at trial?
12    A   Well, it depends on when the trial takes
13  place.  But my billing rate at present is $350 an
14  hour.
15    Q   And that's the rate that you have billed
16  Trutek for the work that you have conducted in
17  this matter filed against BlueWillow?
18    A   That is right.
19    Q   How many hours have you spent on this
20  matter involving BlueWillow in preparing your
21  opinions?
22    A   I don't have my billing sheet before me,
23  but my best estimate is it's 40 to 50 hours.
24    Q   Did you speak with anybody other than
25  Mr. Kremen in connection with your work on this

31

1  matter involving BlueWillow Biologics?
2    A   No, I have not.
3    Q   So you have not had any conversations
4  with Mr. Wahi since you have been retained as an
5  expert in this matter?
6    A   Well, that's not so simple to answer.
7  But, no, in this context, I have not spoken to
8  Mr. Wahi.  I have the other litigation pending,
9  therefore I will speak to him regularly.
10    Q   That would be the breach-of-contract
11  litigation?
12    A   That is correct.
13    Q   Did you speak with anybody else at Trutek
14  since -- strike that.
15        Did you speak with anybody else at Trutek
16  in connection with forming your opinions on the
17  BlueWillow Biologics matter after being retained?
18    A   No.
19    Q   Did Mr. Wahi or anybody else at Trutek
20  provide you with any information that you used to
21  form your opinions in this matter?
22    A   No.
23    Q   Did you rely on any information provided
24  by Mr. Wahi during the earlier litigation when
25  forming your opinions on the BlueWillow Biologics

32

1  matter?
2    A   I'm not sure I understand your question,
3  but I think -- I think the answer is no.
4    Q   I can rephrase that.
5        Did you receive any information or any
6  documents from Mr. Wahi at any time that you used
7  or considered when forming your opinions in the
8  BlueWillow Biologics matter?
9    A   Then I stand with my answer.  The answer
10  is no.
11    Q   Did you receive any information or any
12  documents from anybody at Trutek at any time that
13  you used or considered when forming your opinions
14  in the BlueWillow Biologics matter?
15    A   No.
16    Q   Now, over the entire course of your
17  representation of Trutek, how many times do you
18  think you've spoken to Mr. Wahi?
19    A   Dozens of times, in various different
20  context, not just the -- not just the Matrixx
21  matter or the breach-of-contract matter.
22    Q   How many times do you think you spoke to
23  Mr. Wahi in connection with one of the matters
24  involving the '802 patent?
25    A   How many times I cannot possibly recall.

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

33

1       Must be dozens of times.
2       Q    And did any of those conversations relate
3   to prior art asserted against the '802 patent?
4       A    I don't think so.  I cannot recall that.
5       Q    I'm sorry.  Is your answer that you don't
6   remember or that you don't believe so?
7       A    I don't believe so.
8       Q    Did any of your dozens of conversations
9   with Mr. Wahi relate to the disclosure of the '802
10  patent?
11          MR. KREMEN:  Objection to the form of the
12  question.
13      A    The answer is no.
14      Q    So Mr. Wahi never explained to you what
15  he invented in the '802 patent?
16      A    No, he didn't.  I just know what the
17  patent says.
18      Q    Did any of your conversations with
19  Mr. Wahi relate to his claims that other companies
20  have been infringing the '802 patent?
21      A    Obviously he informed me that Matrixx
22  Initiatives was infringing.  Or that that was his
23  opinion.
24      Q    Did he explain to you his explanation for
25  why he believes that Matrixx was infringing?

34

1       A    Yeah, he explained.
2       Q    And in the context of providing that
3   explanation, did he provide any explanation about
4   the scope of the '802 patent or the claimed
5   invention of the '802 patent?
6       A    Indirectly.  He just pointed out what the
7   Matrixx product called Zicam involved, and how it
8   read upon the claims of the '802 patent.
9       Q    And you understand that Trutek has
10  retained the services of other experts in this
11  present litigation.  Correct?
12      A    I'm aware of a few names, yes.
13      Q    Have you spoken with any of the other
14  experts retained by Trutek in this litigation?
15      A    I know one of them, but I haven't spoken
16  to him in the context of this litigation.
17      Q    And who is that?
18      A    Dr. Lemmo.
19      Q    And how do you know Dr. Lemmo?
20      A    He was an expert in the Matrixx
21  litigation.
22      Q    What was he asked to opine on in the
23  Matrixx litigation?
24      A    Broadly on the subject of infringement.
25      Q    Anything else?

35

1       A    I don't recall now.
2       Q    Did you speak to Mr. -- or, I'm sorry,
3   did you speak to Dr. Lemmo in connection with the
4   Matrixx litigation?
5       A    No, I have not.
6       Q    So have you ever had any conversation
7   with Dr. Lemmo at any point in time?
8       A    Well, not since the conclusion of the
9   Matrixx litigation I haven't spoken to him.
10      Q    Did you have any conversations with
11  Dr. Lemmo during the course of the Matrixx
12  litigation?
13      A    Yeah, I met him one time and may have
14  spoken to him by telephone a few times.
15      Q    And what was the purpose for that one
16  meeting with Dr. Lemmo?
17      A    He was retained as an expert for Trutek
18  in that litigation.
19      Q    So why did you meet with him?  What did
20  you discuss at that meeting?
21      A    The scope of the patent claims, and more
22  importantly what the composition of the Zicam
23  product was and if it read upon the claims and we
24  had a basis for proving infringement.
25      Q    Did you have any conversations with

36

1   Dr. Lemmo during the course of the Matrixx
2   litigation concerning any invalidity challenges
3   raised against the '802 patent?
4       A    No, I was not involved.
5       Q    Who was involved in those?
6       A    Mr. Kremen.
7       Q    And just to confirm, you have not met
8   with or spoken to Dr. Lemmo since the Matrixx
9   litigation concluded?
10      A    I have already said that.
11          Yes, I have not.
12      Q    Have you reviewed any of the reports that
13  Dr. Lemmo prepared in this litigation filed
14  against BlueWillow Biologics?
15      A    Yes, I have.
16      Q    Which of Dr. Lemmo's reports or
17  declarations have you reviewed?
18      A    They're not before me, so I cannot tell
19  you exactly what, but he did render an opinion
20  that I have read.
21      Q    And do you recall when you read that
22  opinion rendered by Dr. Lemmo?
23      A    It will be sometime this month.
24      Q    So --
25      A    October, that is.  October 2022.

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

37

1    Q    So you reviewed at least one of
2  Dr. Lemmo's reports sometime this month.
3    A    That is correct.
4    Q    Did you review any of Dr. Lemmo's reports
5  or declarations before you formed the opinions
6  that you provided in your expert report?
7    A    Actually, I don't think so.
8  Chronologically I probably saw his report after
9  mine was prepared.
10   Q    And then what about the other two experts
11 retained by Trutek in this matter, Mr. Burns and
12 Dr. Ermakov.  Do you know those names?
13   A    I've heard those names.  I haven't met
14 them.
15   Q    You have never met Mr. Burns in any
16 context.
17        Is that correct?
18   A    That is correct.
19   Q    And have you ever met Dr. Ermakov in any
20 context?
21   A    No.
22   Q    Did you meet with Mr. Burns or have any
23 conversations with Mr. Burns in connection with
24 the Matrixx matter?
25   A    No.

38

1    Q    Did you meet with Dr. Ermakov or have any
2  conversations with Dr. Ermakov in connection with
3  the Matrixx matter?
4    A    No.
5    Q    And you understand that Mr. Burns and
6  Dr. Ermakov conducted testing in connection with
7  the Matrixx matter.  Correct?
8    A    I cannot say that I know that for sure.
9         I've just been told that.
10   Q    Well, the testing that Dr. Ermakov and
11 Mr. Burns conducted on the Matrixx products, that
12 was part of the record in the Matrixx litigation,
13 was it not?
14   A    I do not recall that.
15   Q    Were you involved in the decision to
16 engage Mr. Burns or Dr. Ermakov to conduct any
17 testing for Trutek in either litigation matter?
18   A    No.
19   Q    Have you reviewed any of the reports
20 prepared by Mr. Burns or Dr. Ermakov in either of
21 the litigation matters?
22   A    No.
23   Q    Now, specifically with respect to this
24 litigation, did anybody else assist you in
25 formulating the opinions that are contained in

39

1  your expert report?
2    A    No.
3    Q    Now, you've submitted one expert report
4  in this matter.  Correct?
5    A    Yes.
6    Q    What was the nature of your assignment?
7    A    To rebut the allegations of invalidity
8  put forth by your expert, Dr. Amiji.
9    Q    Does your responsive report contain all
10 of the opinions that you have formed directed to
11 the issue of validity of the '802 patent?
12        MR. KREMEN:  Objection to the form of the
13 question.
14   A    Well, I don't want to put myself in some
15 kind of a conundrum, but yes.  Basically,
16 generally speaking, the answer is yes.  But I
17 reserve the right to issue any amendments.
18   Q    But as of today you do not have any
19 amendments or any changes to your report?
20   A    No.
21   Q    Does your responsive report contain a
22 complete statement of all of the bases for your
23 opinions?
24   A    Complete statement as of the time it was
25 prepared.  But as I said earlier, supplements and

40

1  amendments are still a possibility.
2    Q    Yeah, of course.  I'm just referring to
3  the report as it was prepared.
4         So the answer is, yes, the report as
5  prepared contains a complete statement of all of
6  the bases for your opinions?
7    A    Yes, on the date it was prepared.  Yes.
8    Q    And does your responsive report contain a
9  complete statement of your qualifications directed
10 to the subject matter of your opinions?
11   A    My qualifications are what they are,
12 yeah.
13   Q    Did you draft the expert report by
14 yourself?
15   A    Yes, I did.
16   Q    Did you receive any assistance in
17 drafting your report?
18   A    No; only background materials that were
19 supplied to me, including in particular
20 Dr. Amiji's report and whatever Dr. Amiji refers
21 to.
22   Q    What other background materials were
23 supplied to you?
24   A    Well, as I said to you before -- it's
25 already on the record -- the Wadstrom and the Rolf

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

41

1 patents, Khaled, Baker, and a few others.
2    Q   So you're talking about the references
3 discussed by Dr. Amiji.  Correct?
4    A   Prior publications, yes.
5    Q   What I'm asking about is whether there
6 are -- strike that.
7        So every section of your responsive
8 report is your own opinion and drafted in your own
9 words.
10       Is that correct?
11    A   That is correct.
12    Q   Mr. Haidri, what did you do to prepare
13 for your deposition today?
14    A   I reviewed -- rereviewed my own report
15 and deposition of Dr. Lemmo and the reports of
16 Dr. Amiji.
17    Q   Did you review the deposition transcript
18 of Dr. Amiji?
19    A   Yes.
20    Q   Did you review any other materials to
21 prepare for your deposition today, besides your
22 report, Dr. Lemmo's transcript, Dr. Amiji's report
23 on invalidity, and Dr. Amiji's deposition
24 transcript?
25    A   That is correct.  I can't say that that's

42

1 everything, but I did look at the prior art
2 citations and the first office action that issued
3 in the '802 patent.
4    Q   So you reviewed each of those items, in
5 addition to some prior art, as well as the first
6 office action issued in the '802 patent.
7        Is that correct?
8    A   Broadly speaking, yes.
9    Q   Do you recall any -- never mind.
10       Did you meet with anybody to prepare for
11 your deposition today?
12    A   I met with Mr. Kremen.
13    Q   For how long?
14    A   A few hours.
15    Q   And when did that meeting occur?
16    A   Over a couple of weeks on and off.
17    Q   So you spoke with Mr. Kremen on a few
18 occasions over the last few weeks for a few hours
19 in total.
20       Does that sound about right?
21    A   That is right.
22    Q   Did you meet with or speak to anybody
23 else to prepare for your deposition today?
24    A   Nobody else.
25    Q   Did you meet with or speak to anybody at

43

1 Trutek to prepare for your deposition today?
2    A   No.
3        MS. PETERSON:  How about we go off the
4 record.
5        VIDEO SPECIALIST:  We're going off the
6 record.  The time is now 11:09 a.m.
7        (A recess was taken.)
8        VIDEO SPECIALIST:  We're back on the
9 record.  The time is now 11:20 a.m.
10 BY MS. PETERSON:
11    Q   Mr. Haidri, one other question about the
12 Matrixx litigation.
13       Why did Mr. Kremen not apply for pro hac
14 vice admission for the Matrixx litigation matter
15 until nine months after the complaint was filed?
16       MR. KREMEN:  Objection to form.
17    A   It's because Mr. Kremen was not a member
18 of any bar at the time the complaint was filed.
19    Q   So for the nine months leading up to that
20 point in time, you were the only attorney
21 representing Trutek that was a member of any state
22 bar of the United States?
23    A   I was, yes, only attorney.
24    Q   Mr. Haidri, we're going to show you a
25 couple of exhibits during the rest -- the

44

1 remainder of the deposition.  Jennifer is going to
2 put those up on the screen.  And if you would like
3 us to move through them just ask us, and we can
4 zoom in or we can scroll through.  Okay?
5    A   All right.
6        MS. PETERSON:  So let's mark as Exhibit
7 32 a copy of Mr. Haidri's CV.
8        A/V TECHNICIAN:  Stand by, please.
9        (Deposition Exhibit 32 marked for
10 identification and is attached to the transcript.)
11    Q   Mr. Haidri, do you recognize Exhibit 32
12 as a copy of your CV?
13    A   It is.  It is, yes.
14    Q   Is it complete?
15    A   Complete as of today, yes.  About to make
16 some revisions.
17    Q   You have some revisions to include.
18 Would that be more recent information, to include
19 in the CV?
20    A   More recent, yes.
21    Q   Do you have any other revisions to make
22 apart from the more recent things to include?
23    A   No, there are no revisions to make as of
24 today, but there will be some coming.
25    Q   Now, it looks like you obtained your

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

12 (45 to 48)

---

45

1 bachelor's degree in 1971. Correct?
2    **A   Yes.**
3    Q   And at that point in time -- actually, we
4 could scroll down to the second page.
5    **A   Okay.**
6    Q   Actually, I take that back. Let's go to
7 the very last page.
8         There we go. And we can start at the
9 bottom.
10        So after obtaining your bachelor's degree
11 in 1971, you started to work for W.P. Thompson &
12 Company. Correct?
13   **A   Correct.**
14   Q   And that involved trademark work?
15   **A   Yes.**
16   Q   And from there you went to Haseltine &
17 Lake from 1972 to 1981. Correct?
18   **A   Correct.**
19   Q   And that also involved trademark work?
20   **A   Yes.**
21   Q   And then it looks like in 1980, over that
22 time frame, that's when you obtained your J.D.?
23   **A   In '80, yes.**
24   Q   And then in 1981, from 1982, you worked
25 for the Texaco Development Corporation?

---

46

1    **A   Yes.**
2    Q   And your responsibilities at Texaco were
3 as a patent attorney. Correct?
4    **A   Correct.**
5    Q   We can scroll up.
6         And then from 1982 to 1984 you were
7 employed by Lever Brothers Company, also has a
8 patent attorney. Correct?
9    **A   Yes.**
10   Q   And scroll up, please. There we go.
11 That's good.
12        And then it looks like from 1984 to 1988
13 you were a partner in the law firm of Haidri,
14 Glazer & Kamel.
15        Is that correct?
16   **A   Yes.**
17   Q   And your practice at that law firm
18 concentrated in personal injury and workers'
19 compensation claims.
20        Is that correct?
21   **A   Substantially, yes.**
22   Q   And then starting in 1988 to the present,
23 it says that you have been a solo practitioner.
24        Right?
25   **A   Yes.**

---

47

1    Q   And what would be -- what would you say
2 is the primary focus of your work over that time
3 frame as a solo practitioner?
4    **A   It had been tort and insurance law up to**
5 **about two, three years ago. But I began to return**
6 **to patent and trademark and commercial litigation**
7 **practice.**
8    Q   So from 1988 up until about two to three
9 years ago, your practice had been tort and
10 insurance law?
11        Is that right?
12   **A   Yes.**
13   Q   And then about two to three years ago you
14 returned to patent, trademark, and commercial
15 litigation practice.
16        Is that correct?
17   **A   I began to diversify then, and that would**
18 **be correct.**
19   Q   So over the last two to three years, are
20 you still engaged in tort and insurance law
21 claims?
22   **A   Yes. Yes, I am.**
23   Q   Over the last two to three years, what
24 would you say has been the approximate percentage
25 of your work relating to patents?

---

48

1    **A   Possibly 20 percent.**
2    Q   And would most of that work relating to
3 patents involve the matters on which you have been
4 engaged by Trutek?
5    **A   And Mr. Araujo.**
6    Q   Mr. Haidri, you do not have any
7 experience in the formulation or development of
8 oil and water nanoemulsions. Correct?
9    **A   No; I have to disagree.**
10   Q   What experience do you have in the
11 formulation or development of oil and water
12 nanoemulsions?
13   **A   In Texaco Development Corporation, they**
14 **had work of that kind going on in patents directed**
15 **to it. And also in Lever Brothers Company, which**
16 **is a rather diversified company; not just**
17 **concentrating in soaps and detergents and**
18 **toothpaste.**
19   Q   So would it be fair to say that your
20 experience with nanoemulsions at Texaco and with
21 Lever Brothers was from the context of being a
22 patent lawyer?
23   **A   Yes; not as an inventor, but I was a**
24 **patent attorney. Yes.**
25   Q   So you were not in the laboratory at

---

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

49

1  Texaco or at Lever Brothers actually making any
2  nanoemulsions or testing any nanoemulsions.
3      Correct?
4      A   Well, I would say yes, I had frequent
5  contact with the inventors and went into the
6  laboratories in both corporations.
7      Q   But you, personally, were not involved in
8  the production or formulation of any nanoemulsions
9  while employed by Texaco or Lever Brothers.
10     Right?
11     MR. KREMEN:  Objection to form.
12     A   I did not personally do it, do that.
13     Q   And the work that was being conducted at
14 Texaco and Lever Brothers with respect to
15 nanoemulsions, those were not nanoemulsions
16 intended for nasal administration.  Correct?
17     A   I would not agree, no.
18     Q   Okay.  Can you explain?
19     A   Not at Texaco but At Lever, they were
20 engaged in personal products, and some of them
21 would be for just any kind of human application.
22     Q   And that would be the soaps?
23     A   Not really.  They had -- during my time
24 there, they had different certain uses for
25 something called Sanosil analytes, and they

50

1  believed that that would be beneficial in human
2  used in just about any bodily cavity.
3      Q   Would it be fair to say that you do not
4  have any hands-on experience in preparing any
5  nanoemulsion -- any nanoemulsions?
6      A   Not during my employment, but certainly
7  during the laboratories of my alma maters and my
8  high school.
9      Q   So you're telling me that you prepared
10 nanoemulsions in high school?
11     A   Emulsions of various kinds, not
12 necessarily nano.  But we were taught how
13 emulsions are made, and we made them.
14     Q   In what high school course were you
15 taught about emulsions and how to make them?
16     A   Physics and chemistry and biology.
17     Q   So you're talking about high school level
18 of physics, chemistry, and biology courses?
19     A   Yes.
20     Q   Dr. Haidri, do you have any hands-on
21 experience in formulating pharmaceutical
22 compositions that are intended to be applied to
23 the nose?
24     A   No hands-on experience, but I had
25 involvement as a patent attorney, or inventors who

51

1  were doing that.
2      Q   And was that experience something that
3  you obtained from representing Trutek?
4      A   No.  That was at Lever Brothers.
5      Q   Lever products.  Okay.
6          Do you have any hands-on experience in
7  formulating pharmaceutical compositions that are
8  intended to inhibit infection caused by bacteria?
9      A   No hands-on experience, but only as a
10 patent attorney.
11     Q   And that would be from reviewing
12 materials provided by the inventors for purposes
13 of applying for a patent?
14     A   That is correct.
15     Q   Do you have any hands-on experience in
16 formulating pharmaceutical compositions that are
17 intended to inhibit infection caused by viruses?
18     A   As a patent attorney, you have to
19 understand that an inventor provides you just a
20 very sketchy idea of it, of an invention.  And the
21 patent attorney has to put meat on the skeleton.
22 So I have been involved in that.
23     Q   Now, apart from your work as a patent
24 attorney, do you have any hands-on experience in
25 formulating pharmaceutical compositions that are

52

1  intended to inhibit infection caused by viruses?
2      A   No.
3      Q   Apart from your work as a patent
4  attorney, do you have any hands-on experience in
5  formulating pharmaceutical compositions that are
6  intended to inhibit the nasal inhalation of any
7  environmental particulate matters?
8      A   No.
9      Q   Apart from your work as a patent
10 attorney, do you have any hands-on experience in
11 formulating pharmaceutical compositions that are
12 intended to capture and hold particulate matter
13 within the human nose?
14     A   No.
15     Q   Apart from your work as a patent
16 attorney, do you have any hands-on experience in
17 formulating pharmaceutical compositions that
18 comprise cationic or anionic agents?
19     A   No.
20     Q   Apart from your work as a patent
21 attorney, do you have any hands-on experience in
22 formulating pharmaceutical compositions that
23 comprise biocidic agents?
24     I'm sorry, are you still thinking about
25 my question, or do you need me to repeat it?

53

1    A   I didn't hear your question.
2    Q   Okay.  So apart from your work as a
3 patent attorney, do you have any hands-on
4 experience in formulating pharmaceutical
5 compositions that comprise biocidic agents?
6    A   No.
7    Q   Apart from your work as a patent
8 attorney, do you have any hands-on experience in
9 formulating pharmaceutical compositions with
10 biocidic agents for application for nasal
11 administration?
12    A   No.
13    Q   Apart from your work as a patent
14 attorney, do you have any hands-on experience in
15 formulating pharmaceutical compositions comprising
16 biocidic agents to use them to inhibit infection
17 by bacteria or viruses?
18    A   Please repeat that question.  That was
19 rather long.
20    Q   Okay.  No problem.
21        Apart from your work as a patent
22 attorney, do you have any hands-on experience in
23 formulating pharmaceutical compositions that use
24 biocidic agents for the purpose of inhibiting
25 infection by bacteria or viruses?

54

1    A   No.
2    Q   Do you have any hands-on experience in
3 testing any pharmaceutical compositions to confirm
4 whether they will work for their intended purpose?
5        MR. KREMEN:  Objection to the form of the
6 question.
7    A   No.
8    Q   Do you have any hands-on experience in
9 testing pharmaceutical compositions to determine
10 if they are affective to capture and hold
11 particulate matter within the nose or nasal
12 passage?
13    A   No.
14    Q   Do you have any hands-on experience in
15 testing pharmaceutical compositions to determine
16 if they are effective to inhibit infection by
17 bacteria and viruses?
18    A   No.
19    Q   Do you have any hands-on experience in
20 developing or formulating pharmaceutical products
21 intended to prevent infection caused by the common
22 cold?
23        MR. KREMEN:  Would you repeat that again?
24 I lost -- I got lost in the middle of it.
25        MS. PETERSON:  Sure, I can repeat it.

55

1    Q   Mr. Haidri, do you have any hands-on
2 experience in developing or formulating
3 pharmaceutical products intended to prevent
4 infection caused by the common cold?
5    A   No.
6    Q   Do you have any hands-on experience in
7 developing or formulating pharmaceutical products
8 intended to prevent infection caused by the flu?
9    A   Hard for me to say.  But broadly
10 speaking, I will say no.
11    Q   Mr. Haidri, you do not have an economics
12 or accounting degree.  Correct?
13    A   Technically, yes; except that I had
14 economics courses in my education.
15    Q   Mr. Haidri, would it be fair to say that
16 over the course of your career working for private
17 companies, you were not primarily engaged in the
18 sales or marketing or advertising of any
19 commercial products?
20    A   No.
21    Q   I'm sorry, I need to clarify.  No, you
22 were not engaged in the sales or marketing or
23 advertising of any commercial products?
24        Is that correct?
25    A   Yes, that is correct.

56

1    Q   And would it also be fair to say that
2 over the course of your career working for private
3 companies, you did not have any job
4 responsibilities for product development?
5    A   No.
6    Q   So no, you did not have any
7 responsibility for product development of any
8 commercial products at your prior employers?
9    A   No; only as a support patent attorney.
10    Q   And at your prior employment, did you
11 have any responsibility for any clinical testing
12 or clinical development of commercial products?
13    A   Not with prior employments, employers,
14 no.
15    Q   But you did as a patent attorney?
16    A   No.
17    Q   Do you have any experience in human
18 clinical testing?
19    A   No, not personally.
20        MS. PETERSON:  Okay.  We could take down
21 that exhibit.
22        Next I would like to pull up a copy of
23 Exhibit 2, which had been previously marked.  This
24 is a copy of the '802 patent.
25        (Exhibit 2, previously marked, not

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

57

1  attached.)
2      Q   Mr. Haidri, we've put up on the screen
3  here a copy of U.S. Patent Number 8,163,802, which
4  has been marked as Exhibit 2.
5          Do you recognize this?
6      **A   Yes, I do.**
7      Q   And you recognize this as a copy of the
8  '802 patent that's being asserted in this
9  litigation against BlueWillow.  Correct?
10     **A   That is what I have been informed.**
11     Q   This is the patent that you considered in
12  your expert report.  Right?
13     **A   Yes.**
14     Q   Let's scroll down to the last page.
15         MR. KREMEN:  Excuse me.  Debbie or
16  whoever, could we zoom in one level so that it
17  fills the screen?  Because Mr. Haidri has
18  difficulty seeing it.  Thank you so much.
19         THE WITNESS:  Thank you.
20         MS. PETERSON:  Could we go to the last
21  page of the exhibit, please.  Actually, I'm sorry,
22  second-to-last page.  Yep.  And maybe scroll down
23  a little bit.  And then -- okay.
24     Q   Mr. Haidri, do you see Claims 1 and 2
25  listed on the screen in front of you?

58

1      **A   Yes.**
2      Q   So I'd like to focus on Claim 1.  You'd
3  agree with me that Claim 1 has a preamble?
4      **A   A method -- yeah, okay, I see the**
5  **preamble.**
6      Q   And then following the preamble of Claim
7  1, there are three claim elements.  Right?  A, B,
8  and C?
9      **A   Yes.**
10     Q   Element -- and looking at the preamble,
11  it refers to a method for electrostatically
12  inhibiting harmful particulate matter from
13  infecting an individual through nasal inhalation.
14  Correct?
15     **A   That's what it says.**
16     Q   And then going on, Wherein a formulation
17  is applied to skin or tissue of nasal passages of
18  the individual in a thin film.
19  Correct?
20     **A   Yes.**
21     Q   And it's your understanding that this
22  language of the preamble is limiting.  Right?
23     **A   Limiting in what sense?  I didn't follow**
24  **you.**
25     Q   Is it a claim limitation?

59

1      **A   It's not a limitation.  That's what the**
2  **claim says.**
3      Q   For a product to read on the claim, is it
4  necessary to satisfy the elements of the claim
5  preamble?
6      **A   The claim as a whole.  You cannot split**
7  **it into different parts and say, for this reason**
8  **this doesn't read.  You have to consider the claim**
9  **as a whole.**
10     Q   But you agree with me that every element
11  of the claim must be present in an accused product
12  for it to read on the claim.  Correct?
13     **A   Generally speaking, yes.**
14     Q   And that would include the elements of
15  the claim preamble.  Right?
16     **A   It would.**
17     Q   So looking at Element A, it recites,
18  "Electrostatically attracting the particulate
19  matter to the thin film."
20         Right?
21     **A   That's what it says.**
22     Q   And that's what you referred to in your
23  report as capturing?
24     **A   It's an equivalent term, yes.**
25     Q   Well, you did use the phrase "capturing"

60

1  in your report with respect to Element A of the
2  claims.  Right?
3      **A   Yes.**
4      Q   And then Element B recites, "Holding the
5  particulate matter in place by adjusting the
6  adhesion of the thin film to permit said thin film
7  to stick to the skin or tissue and by adjusting
8  the cohesion of the formulation to provide
9  adequate impermeability to the thin film."
10         That's the element that you referred to
11  in your report as holding.  Right?
12     **A   Yes, it is holding in general.**
13     Q   And then the final element of Claim 1 is,
14  "Inactivating the particulate matter by adding at
15  least one ingredient that would render said
16  particulate matter harmless."
17         That would be the element you referred to
18  in your report as killing.  Correct?
19     **A   Killing or biocide, yes.**
20         MS. PETERSON:  Can we scroll down a
21  little bit to look at Claim 2.
22     Q   Claim 2 is another independent claim,
23  except that it recites a formulation instead of a
24  method.  Correct?
25     **A   Yes.**

61

1    Q   But it requires those same three elements
2  of catching, holding, and killing as you described
3  in your report?
4    A   That is correct.
5    Q   Now, do you agree that Claims 1 and 2 do
6  not recite just a formulation having certain
7  ingredients?
8    A   Would I agree with what?  I'm not sure
9  what you mean.
10   Q   Well, Claims 1 and 2 are not drafted as a
11 formulation containing a list of ingredients.
12     Correct?
13   A   No, no formulations are included.
14   Q   Rather, the claims are drafted with
15 respect to the catching, holding, and killing
16 functions that you identified.  Right?
17   A   Only the functions, yes.
18     MS. PETERSON:  Could we zoom that out and
19 move forward a few pages to --
20     MR. KREMEN:  Go one more page.
21     MS. PETERSON:  -- Page 4 of the PDF?
22     A/V TECHNICIAN:  I'm sorry, Counsel,
23 which page?
24     MS. PETERSON:  Page 4 of the PDF.
25   Q   And, Mr. Haidri, you understand that the

62

1  '802 patent contains ten tables with a list of
2  formulations.  Correct?
3    A   Yes.
4    Q   And the formulations provided in those
5  ten tables contain a number of ingredients listed.
6      Right?
7    A   That is correct.
8    Q   And for many of those ingredients, rather
9  than providing a specific amount of the
10 ingredient, it's provided in terms of a range.
11     Right?
12   A   It is correct.
13   Q   And you understand that there is nothing
14 in the '802 patent indicating that any of these
15 formulations were made.  Correctly -- correct?
16     MR. KREMEN:  Object to the form of the
17 question.
18   Q   Let me ask that question again.  That was
19 bad.
20     You understand that there is nothing in
21 the '802 patent specifically stating that any of
22 these formulations were made.  Correct?
23     MR. KREMEN:  Objection.
24   A   There is no indication as to whether the,
25 formulations were made or not made.  That is not

63

1  clear from the specification.
2    Q   And there's nothing in the '802 patent
3  specification indicating that any of these
4  formulations were tested to whether they performed
5  the functions recited in the '802 patent claims.
6      Right?
7    A   Again, I repeat my previous answer.  You
8  cannot say yes or no.  But this is not included in
9  the specification.
10   Q   So the specification does not include
11 anything about any testing of the formulations to
12 determine whether they perform the functions
13 recited in the '802 patent claims.  Right?
14   A   There is no such recitation in the
15 specification.
16   Q   And there is no -- nothing in the '802
17 patent that reports the surface charge of any of
18 the formulations listed in Tables 1 through 10?
19   A   Can you repeat that?  I don't understand
20 what you mean by "surface charge."
21   Q   Is there anything in the '802 patent that
22 reports the testing of any of the formulations
23 listed in the tables to determine whether they
24 exhibit an electrostatic charge?
25   A   It is not mentioned explicitly, but there

64

1  are compounds here which are known to be cationic.
2    Q   Is there anything in the '802 patent that
3  reports the testing of any of the formulations
4  listed in the table to determine whether they
5  exhibit an electrostatic charge when applied to
6  the skin in or around the nose of a human?
7      MR. KREMEN:  Objection to the form of the
8  question.
9    A   I would ask that that question be
10 repeated.  It's a little too long and convoluted.
11   Q   It might help too, if I can get the
12 entire question stated on the record before anyone
13 else speaks.  But I can certainly repeat it.
14     Is there anything in the '802 patent that
15 reports the testing of any of the formulations
16 listed in the tables to determine whether they
17 exhibited an electrostatic charge when applied to
18 a human nose?
19   A   There is no such expletive mentioned,
20 yes.
21   Q   Does the '802 patent identify any
22 specific test that someone could use to determine
23 whether a formulation electrostatically inhibits
24 harmful particulate matter from infecting an
25 individual through nasal inhalation?

Transcript of Amirali Y. Haidri, Esquire

October 28, 2022

65

1    A    That is a -- that is a general teaching
2  of the specification, and that's what it's
3  intended for.
4    Q    But does the '802 patent identify any
5  type of test or procedure that someone could use
6  to determine whether their product
7  electrostatically inhibits harmful particulate
8  matter from infecting an individual through nasal
9  inhalation?
10   A    Again, the teaching is there in general,
11 but with no specific example.
12   Q    So there's no specific example or
13 explanation of any test that could be used to
14 determine whether something is electrostatically
15 inhibiting harmful particulate matter from
16 infecting an individual through nasal inhalation.
17   A    No such test is mentioned.
18   Q    Does the '802 patent mention any test
19 that can be used to determine whether a product
20 forms a thin film when applied to the skin or
21 tissue of nasal passages?
22   A    The specification teaches as much.
23   Q    And your position is that the
24 specification teaches that the formulations form a
25 thin film when applied to the skin.  Correct?

66

1    A    Yes.
2    Q    My question is a little bit different.
3        Does the '802 patent mention any type of
4  test that can be used to determine whether a
5  product forms a thin film when applied to the skin
6  or tissue of nasal passages?
7    A    No test is mentioned.
8    Q    Does the '802 patent mention any type of
9  test that can be used to determine whether the
10 thin film electrostatically attracts particulate
11 matter?
12   A    No test is mentioned.
13   Q    Does the '802 patent mention any type of
14 test that can be used to determine whether the
15 thin film holds particulate matter in place?
16   A    No.
17   Q    Does the '802 patent mention any type of
18 test that can be used to determine whether the
19 formulation provides adequate impermeability to
20 the thin film?
21   A    No such test is mentioned.
22       MS. PETERSON:  Okay.  We can take that
23 exhibit down.
24       I'd like to mark next a copy of
25 Mr. Haidri's responsive report.  We'll mark this

67

1  as Exhibit 33.
2        A/V TECHNICIAN:  Stand by.
3        (Exhibit 33 marked for identification and
4  is attached to the transcript.)
5        MS. PETERSON:  Maybe if you could scroll
6  down to the bottom of the page so we can look at
7  the entire first page.  Yeah.  Okay.
8        For the record, Exhibit 33 is a copy of
9  plaintiff's expert report of -- I'm sorry.
10 Mr. Haidri's responsive to -- let me start this
11 over again.  I didn't want to mispronounce your
12 name.
13   Q    Mr. Haidri, do you recognize Exhibit 33
14 as a copy of your responsive report that you
15 prepared in this matter involving BlueWillow?
16   A    Yeah, the first page, I recognize it.
17   Q    Thank you.
18       MS. PETERSON:  And then let's move to
19 Page 87 of the PDF.
20   Q    Mr. Haidri, is that your signature on the
21 final page of the report?
22   A    It is indeed.
23   Q    And the report was signed and executed on
24 August 12, 2022.  Correct?
25   A    Yes, correct.

68

1    Q    Now, Mr. Haidri, I did not see that you
2  prepared a separate list of materials that you
3  reviewed in forming your opinions.
4        Is that correct?
5    A    A glossary?  No, there's no glossary.
6    Q    So would it be fair to say that the
7  materials and documents and information that you
8  considered in forming your opinions is all
9  mentioned specifically within the report itself?
10   A    Yeah, within its four corners.
11       MS. PETERSON:  Could we go back to Page 2
12 of the report, which I believe is at Page 10 of
13 the PDF.
14   Q    And here on Page 2 of your report,
15 Mr. Haidri, you have a list of your findings and
16 conclusions.  Correct?
17   A    Yes, that's correct.
18       MR. KREMEN:  Could you zoom in?
19       Mr. Haidri has eyesight problems.
20       THE WITNESS:  Thank you.
21   A    Okay.  Go ahead.
22   Q    So this list has a list of seven opinions
23 that you have formed.  Correct?
24   A    All seven are not seen here.  But, yes,
25 that is correct.

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

18 (69 to 72)

69

1    Q   And so specifically the opinions that you
2  formed are that the Amiji report did not make a
3  clear and convincing showing that Claims 1, 2, 6,
4  and 7 are invalid for each of the grounds that are
5  listed in Items 1 through 7.  Correct?
6    A   Yes, that is true.
7        MS. PETERSON:  Let's take a look at the
8  next page, please.
9    Q   And here in Section III of your report
10 you have laid out what you have identified as the
11 Relevant Patent Statutes.  Correct?
12   A   That is correct.
13   Q   And these are the versions of 35 U.S.C.
14 that you applied in forming your opinions.
15       Correct?
16   A   Yes.
17   Q   These are the versions of the patent
18 statute known as the AIA version.  Correct?
19   A   That is correct.
20   Q   So you did not consider the pre-AIA
21 version of 35 U.S.C. when forming your opinions.
22       Correct?
23   A   Correct.  There was no substantial
24 change.
25       MS. PETERSON:  Let's go to the next page.

70

1  Actually, I'm sorry, let's go to Section IV.  So
2  this is going to be Page 6 of your report, Page 14
3  of the PDF.
4    Q   And here in Section IV, this is the
5  beginning of some sections that contain the legal
6  standards that you applied in forming your
7  opinions.  Correct?
8    A   That is right.
9    Q   So specifically Section IV has several
10 pages concerning the clear and convincing standard
11 of proof.  Right?
12   A   That is correct.
13       MS. PETERSON:  And then let's move
14 forward to Page 8 of the report.  Yeah, that's
15 good right there.
16   Q   Now, in the first paragraph on Page 8 of
17 your report, there is a discussion about the Wahi
18 references that were cited during prosecution of
19 the '802 patent.  Correct?
20   A   Yes.
21   Q   And then looking at the second-to-last
22 sentence of this paragraph, you state that, "These
23 three references must be given special deference
24 because they were considered by the USPTO prior to
25 issuing a Notice of Allowance."

71

1        Right?
2    A   That is correct.
3    Q   And then in the next sentence you state,
4  "Under a clear and convincing standard, it is a
5  finding of fact that should be overturned only
6  upon a finding that no reasonable examiner would
7  have allowed the claims in light of the considered
8  prior art."
9        That's the standard that you applied in
10 forming your opinions with respect to the Wahi
11 patents?
12       Is that right?
13   A   That is right.
14   Q   I don't see that you've cited any case
15 law or any other authority in support of that
16 standard.
17       Where did you obtain that standard from?
18   A   But it follows underneath, as you can
19 see.
20   Q   So it's based on the Microsoft Supreme
21 Court decision?
22   A   If you scroll down you will see more.
23       But yes, Microsoft is the beginning.
24   Q   So that language, "no reasonable examiner
25 would have allowed the claims," you're basing that

72

1  on the Microsoft case?
2    A   Literally the words of the Supreme Court,
3  yes.
4    Q   Now, throughout these sections describing
5  the legal standards that you applied, you
6  contained -- or included a number of citations to
7  the MPEP.  Correct?
8    A   That is right.
9    Q   And that would be the Manual of Patent
10 Examining Procedure that's used by the U.S. Patent
11 and Trademark Office.  Correct?
12   A   That is correct.
13   Q   Why did you include citations, and why
14 did you rely on the MPEP in forming your opinions?
15       MR. KREMEN:  Objection to the form of the
16 question.
17   A   Well, that is the guide for examiners to
18 follow in issuing patents.
19   Q   And is that the guide that a court or a
20 jury follows when assessing the validity of a
21 patent in litigation?
22   A   It is entitled great deference under a
23 case that is not mentioned here, but you will
24 recall the name.  It's called the Chevron
25 deference.

73

1    Q   But you understand that the MPEP is not
2 binding on courts.  Correct?
3    **A   True enough, except that the Chevron**
4 **deference applies, and the findings of an**
5 **administrative agency are not likely overturned.**
6    Q   So that would apply -- what you're
7 referring to as "Chevron deference," that would
8 apply to the decisions of the examining agency.
9       Correct?
10   **A   That is correct.**
11   Q   But the specific requirements of the
12 MPEP, those are not bound -- or the courts are not
13 bound by those.  Right?
14   **A   They're entitled to deference, but not**
15 **binding -- but not be binding.**
16   Q   And throughout these sections on legal
17 standards, do you feel like you have appropriately
18 cited the applicable legal authority for all of
19 the standards that you've provided in your report?
20   **A   Well, I'm satisfied that there is the**
21 **correct status of the law.**
22      MS. PETERSON:  Let's move forward to Page
23 9.
24   Q   And you'll see here in Section V, now we
25 have a section titled Standards For Inquiry Into

74

1 Patent Invalidity.  Correct?
2    **A   Yes.**
3    Q   And your first section is on Section 101?
4    **A   Yes, correct.**
5       MS. PETERSON:  Let's take a look at the
6 next page.  If we can focus, maybe go down just a
7 little bit more.  That looks good.
8    Q   So here for Section 101, you've
9 identified a two-step analysis.  Correct?
10   **A   Yes.**
11   Q   And I see again you have a section of the
12 MPEP cited, Section 2106.  Right?
13   **A   That is correct.**
14   Q   Are those the PTO guidelines on subject
15 matter eligibility?
16   **A   That is what I understand.**
17   Q   And these are the standards that you
18 applied in forming your opinions.  Correct?
19   **A   Yes.**
20      MS. PETERSON:  Okay.  Let's move forward
21 to Page 19 of the report.  I think it's at Page 27
22 of the PDF.  Yeah.
23   Q   Here you have a Section D titled
24 Rejections Based on Prior Art.
25      Why did you use the word "rejections"

75

1 here?
2    **A   That is the language the PTO uses.**
3    Q   Okay.
4    **A   Any time a claim is disallowed, they say**
5 **claims are rejected.**
6    Q   So that's the term that's used when the
7 USPTO determines that an application under
8 examination does not satisfy its requirements for
9 patentability?
10   **A   Broadly speaking, yes.**
11      MS. PETERSON:  And then let's move
12 forward another several pages to Page 23.  Yeah.
13 And we can focus there on the bottom.
14   Q   Here you have a section addressing
15 secondary considerations, and specifically
16 commercial success.  Correct?
17   **A   That is correct.**
18   Q   And this section sets out what you
19 understand to be the controlling legal precedent
20 with respect to secondary considerations?
21   **A   Yeah, more legal considerations.  But**
22 **they first were enunciated by the Supreme Court in**
23 **Graham V John Deere.  So the court of federal --**
24 **the CAFC is just repeating those considerations**
25 **from the Graham case.**

76

1    Q   And then if we go to the next page, I see
2 you also have some references to requirements from
3 the MPEP as well.  Right?
4    **A   Yes.**
5       MS. PETERSON:  Let's go -- let's scroll
6 down to the bottom of this page.
7    Q   Section VI, this is a section that you
8 have prepared addressing the person having
9 ordinary skill in the art.  Correct?
10   **A   That is correct.**
11      MS. PETERSON:  Let's go to the next page.
12   Q   I see you have a case cited at the very
13 top of this page.  And we might need to go back up
14 to the page before it.
15      But this case that you cite that
16 addresses the proposition that, An incorrect
17 determination as to level of skill or an incorrect
18 finding may constitute reversible error if it
19 influences the ultimate conclusion on obviousness.
20      Is that right?
21   **A   I see only that sentence, but ...**
22   Q   But you see on the next page, there's a
23 case citation to Custom Accessories?
24   **A   Let me read this, please.**
25   Q   Yeah.  Sure.  Take your time.

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

---

77

1    MR. KREMEN:  Do you want to read above
2 that?
3    THE WITNESS:  That's what I meant, is
4 being given to me all the text.
5    Q   Yeah, if you need to move up and down,
6 just let us know, we can do that.
7    **A   Okay.  Now we are fine.  So let me read**
8 **this.  Because I didn't want to answer your**
9 **question out of context.**
10    Q   Sure.
11    **A   All right.  Very good.  Please.**
12    Q   So --
13    **A   Please repeat your question now.**
14    Q   Sure.  So the key citation to custom
15 accessories, that's with respect to the statement
16 that immediately precedes it about an incorrect
17 determination as to the level of skill.  Correct?
18    **A   That is correct, yes.**
19    MS. PETERSON:  So I'd like to go down a
20 little bit farther onto the next page.  And,
21 actually, can you -- yeah.  Still at the top of
22 the page, please.  Yeah.  That's great.
23    **A   Okay.**
24    Q   So the case -- or, sorry, the next
25 sentence here at the top of Page 25 says, "Care

---

78

1 must be taken not to select a person of
2 extraordinary skill."
3    I don't see any case citation here.
4    What is that based on?
5    **A   It's based on a general practice in**
6 **various judicial opinions about a person of**
7 **ordinary skill in the art.  Explicitly mentioned**
8 **in Section 103 and implicitly in Section 112.  So,**
9 **anyway, that's where you can form that kind of an**
10 **opinion with reasonable support in the statute and**
11 **case law.**
12    Q   And what cases use that language,
13 "extraordinary skill"?
14    **A   Well, there aren't any that I know of.**
15    Q   Let's scroll down.  If we could look at
16 the -- actually, you don't need to scroll down.
17 But I'd like to look at the next paragraph right
18 here on the screen.
19    Towards the bottom of that paragraph you
20 state that, According to 112, he is the person who
21 is able to make and use the claimed invention at
22 the earliest filing date without undue
23 experimentation.
24    Do you see that?
25    **A   Yes, I do.**

---

79

1    Q   So that's your understanding of how the
2 level of skill of a person of ordinary skill in
3 the art should be set?
4    **A   Yes, it is my understanding, and I**
5 **believe it's generally the case.**
6    Q   So a person of ordinary skill is going to
7 be someone who can necessarily make and use the
8 claimed invention without undue experimentation.
9    **A   Yes, correct.**
10    Q   And that's based on the language of 35
11 U.S.C. 112?
12    **A   112 does not use the word "ordinary**
13 **skill," just "personal skill in the art."  But**
14 **that is the usual understanding of the patent bar**
15 **of the judiciary.**
16    Q   Could somebody be a person skilled in the
17 art but still be unable to make the claimed
18 invention without undue experimentation?
19    MR. KREMEN:  Objection to the form of the
20 question.
21    **A   Again, there will be no straightforward**
22 **answer to your question.  One or two individuals**
23 **may not be able to, but generally a person of**
24 **skill in the art should be able to.**
25    Q   But you agree that there may be

---

80

1 circumstances where a person skilled in the art is
2 not actually able to make and use the claimed
3 invention without undue experimentation.  Correct?
4    MR. KREMEN:  Objection to the form of the
5 question.
6    **A   Such a person would exist, I'm sure,**
7 **statistically speaking, but that would be the**
8 **exception, not the rule.**
9    Q   Well, would you agree with me that if the
10 person skilled in the art is necessarily always
11 able to make and use the claimed invention without
12 undue experimentation, then we would never have
13 any courts or juries finding patents invalid for
14 lack of enablement?
15    MR. KREMEN:  Objection to form.
16    **A   Once again, I don't understand the**
17 **question.  You have to repeat that slowly.**
18    Q   That's okay, I can skip it.
19    MS. PETERSON:  Okay.  Let's move ahead to
20 Page 27.  Actually, no, Page 26.  And scroll down
21 a little bit to the bottom.
22    Q   This Section B titled The Level of
23 Ordinary Skill, this contains your opinions
24 regarding the level of ordinary skill in the art.
25 Correct?

---

81

1    A   Correct.
2    Q   Did you discuss your understanding of the
3 level of ordinary skill in the art with Dr. Lemmo
4 while you were formulating your opinion?
5    A   No, I did not consult Dr. Lemmo.
6    Q   And did Dr. Lemmo consult you at any
7 point in time about the level of ordinary skill in
8 the art as it applies to the '802 patent?
9    A   No, not in the context of this
10 litigation.
11   Q   Did Dr. Lemmo consult you at any point in
12 time, for example in the Matrixx litigation, about
13 the level of ordinary skill in the art?
14   A   Yeah, that possibly happened, but I don't
15 recall that.
16   Q   Okay.
17       MS. PETERSON:  I'm at a good breaking
18 point.  How about we go off the record now.
19       THE WITNESS:  Thank you.  I was going to
20 ask --
21       VIDEO SPECIALIST:  We are going off the
22 record.  The time is now 12:28 p.m.
23       (A recess was taken.)
24       VIDEO SPECIALIST:  We're back on the
25 record.  The time is now 1:31 p.m.

82

1 BY MS. PETERSON:
2    Q   Mr. Haidri, did you have any
3 conversations with anyone during any of the breaks
4 of today's deposition about the substance of your
5 testimony?
6    A   No, I did not.
7    Q   Okay.  Thank you.
8       MS. PETERSON:  Let's go back to Mr.
9 Haidri's expert report, Exhibit 33.  And I'd like
10 to go to Page 45 of the PDF.  And if you could
11 scroll down to the last paragraph, please.  Great.
12   Q   Mr. Haidri, in the last paragraph on Page
13 37 of your report I see you refer to a Trutek
14 product that was initially named NasalGuard MAPB.
15      Do you see that?
16   A   Yes.
17   Q   And you state it was formulated based
18 upon the example formulations shown in the
19 specification of the '802 patent.  Correct?
20   A   Yes, that is right.
21   Q   What is the formulation of NasalGuard, do
22 you know?
23   A   Basically it contains the ingredients
24 mentioned in the ten examples of the '802 patent.
25 Most importantly, there's benzalkonium chloride,

83

1 there's an adhesive film, and benzalkonium
2 chloride also functions as a biocide.
3    Q   And is the actual formulation of
4 NasalGuard -- which example -- sorry.  Let me
5 start over again.
6       Which of the ten tables in the '802
7 patent contains the formulation of NasalGuard, do
8 you know?
9    A   One of them does.  I can't say which one.
10   Q   And does the '802 patent identify the
11 exact percentage of the ingredients in NasalGuard?
12   A   Every one of this table provides ranges.
13 None of them is an exact percentage of the active
14 ingredients.
15   Q   So none of the tables in the '802 patent
16 specifically identify the precise percentages of
17 the ingredients of NasalGuard.  Correct?
18   A   No, not an exact percentage.  It's always
19 a range.
20   Q   And how do you know that the ingredients
21 of NasalGuard are listed in one of the ten tables?
22   A   I don't know that explicitly, but I've
23 been told that the product being currently
24 marketed does follow one of the examples.
25   Q   And who were you told that by?

84

1    A   Mr. Kremen.
2    Q   I'd like to move forward in your report
3 to Page 49.  That's fine right there.
4       So starting on Page 49 of your report,
5 you have a section addressing written description.
6       Correct?
7    A   Enablement, yes.
8    Q   But I'm talking about this particular
9 section.
10      Is this Section D shown on Page 49
11 related to written description?
12   A   Yes.  I see that.
13      MS. PETERSON:  And then let's move, let's
14 scroll through this section until we get to Page
15 51.  And if we go down, yeah, to look at that
16 paragraph right there, that's great.
17   Q   So in the second paragraph of Page 51, do
18 you provide here in this paragraph an explanation
19 of the applicable legal standard for written
20 description?
21   A   Let me read that.
22      All right.  Go ahead.
23   Q   So on Page 51 of your report, you set out
24 the legal standard that you applied for written
25 description stating that the written description

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

85

1  requirement of 35 U.S.C. Section 112 (A) is that
2  it must be complete enough as to enable a person
3  of ordinary skill to make and use the invention.
4      Correct?
5      A   Yes.
6      Q   And then you go on to say, "It does not
7  need to teach the prior art to those who are
8  unfamiliar with it."
9      Correct?
10     A   That is correct.
11     Q   And so that's the standard that you
12 applied in your written description analysis?
13     A   Yes.
14     Q   And then you go on to refer to a clinical
15 study that you attached as Exhibit D to your
16 report.  Correct?
17     A   Yes.
18     Q   And did you rely on that clinical study
19 report attached as Exhibit D as evidence of
20 written description?
21     A   Yes, you can say that.
22     Q   Now, nothing from that clinical study was
23 described in the '802 patent.  Correct?
24     A   Yes.
25     Q   So yes, you agree with me that the '802

86

1  patent does not contain any reference or any
2  information from that clinical study.  Right?
3      A   I agree.
4      MS. PETERSON:  Let's take this exhibit
5  down.  And I'd like to mark that clinical study
6  report now.  We'll mark that as Exhibit 34.
7      A/V TECHNICIAN:  Stand by.
8      (Exhibit 34 marked for identification and
9  is attached to the transcript.)
10     MR. KREMEN:  What exhibit is that to his
11 report?
12     MS. PETERSON:  Exhibit D, as in dog.
13     MR. KREMEN:  Thank you.
14     Q   Okay.  Mr. Haidri, do you recognize
15 Exhibit 34 as a copy of the clinical study report
16 that you had attached to your expert report as
17 Exhibit D?
18     A   That is the first page.
19     Q   Okay.  And we can scroll through it if
20 you need to confirm the rest of the pages that you
21 attached.
22     Would you like us to do that?
23     A   Yes, please.  Okay.
24     MS. PETERSON:  Can you scroll down
25 through to the end, please.

87

1      Q   So, Mr. Haidri, do you recognize Exhibit
2  34 as a copy of the clinical study report that you
3  attached to your expert report as Exhibit D?
4      A   Yes, I do.
5      MS. PETERSON:  And if we could go back up
6  to the second page of the report.  One more page,
7  then.  There we go.
8      Q   So on Page 3 of the clinical study
9  report, do you see there is an objective of the
10 study that is provided?
11     A   Yes.
12     Q   And the primary objective of the study
13 was to evaluate the efficacy of MAPB nasal
14 application gel in the prevention of the common
15 cold and/or flu.  Correct?
16     A   That's what it says.
17     MS. PETERSON:  And then if we could go to
18 the next page?
19     Q   And up here at the top you see there is a
20 reference to Primary Endpoint?
21     MR. KREMEN:  Where is that?
22     A   Yes.
23     MR. KREMEN:  I don't see it.
24     THE WITNESS:  It is the second box -- or
25 the fourth.

88

1      MR. KREMEN:  Oh, okay.  Got it.
2      Q   So the primary endpoint of this study was
3  the percentage of subjects that were cold and/or
4  flu-free in the treatment group at the end of the
5  study as compared to the subjects who were cold
6  and/or flu-free in the no-treatment group.
7      Correct?
8      A   Yes.
9      Q   Would you agree with me that that
10 endpoint that's provided here in the clinical
11 study report, that's a subjective determination?
12     A   Subjective, can't quite agree.  But, all
13 right.  Overall, yes.
14     Q   Now, the clinical study only assessed
15 whether the subjects had either the common cold or
16 the flu at the end of the study.  Right?
17     A   Yes.
18     Q   The study did not evaluate the use of
19 MAPB in any infections related to any other
20 diseases.  Correct?
21     I'm sorry, did you respond?
22     A   I said "correct."
23     Q   And is it also your opinion that this
24 clinical study demonstrated that the ten
25 formulations listed in the '802 patent work?

89

1    A   It does show that, yes.
2    Q   Now, would you agree that the clinical
3  study that we're looking at, it did not test
4  whether NasalGuard electrostatically inhibits
5  harmful particulate matter from infecting an
6  individual?
7         MR. KREMEN:  Objection to form.
8    A   I did not quite follow this question.
9  Where does electrostatic infection come in?
10   Q   Well, that's what I'm wondering.
11       Did the clinical study test anything
12 about the electrostatic attraction or
13 electrostatic inhibition of NasalGuard?
14   A   I don't think it's mentioned by name.
15   Q   Did the clinical study test whether
16 NasalGuard forms a thin film when applied to the
17 skin or tissue of nasal passages?
18   A   Is that a complete question?  Can you
19 please repeat that?
20   Q   Is there anything in the clinical study
21 report indicating that the investigators tested
22 whether NasalGuard forms a thin film when applied
23 to the skin or tissue of nasal passages?
24   A   No, no such thing is mentioned.
25   Q   Is there anything in the clinical study

90

1  report indicating that the investigators tested
2  whether a thin film electrostatically attracts
3  particulate matter?
4    A   It could have done, but the investigators
5  don't say so.
6    Q   So you don't see anything along those
7  lines mentioned in the report.  Correct?
8    A   Not mentioned by name or explicitly.
9    Q   Is there anything in the clinical study
10 report indicating that the investigators tested
11 whether a thin film holds the particulate matter
12 in place?
13   A   No.  Subject to my qualification, the
14 answer is no.
15   Q   So there's no express reference to
16 whether the investigators tested whether a thin
17 film holds the particulate matter in place?
18   A   Agreed.
19   Q   So in other words, the clinical study
20 report showed that fewer people in the treatment
21 group had the cold or flu at the end of the study,
22 but there's no discussion of why that was the
23 case.
24   A   No discussion, that is right.
25       MS. PETERSON:  Okay.  We can take that

91

1  report down.  And let's go back to Mr. Haidri's
2  expert report, Exhibit 33.
3        And let me get you a page number.
4        I'd like to go to Page 78 of his report,
5  which is maybe Page 86 of the document, 86 of the
6  PDF.  And if you could scroll down a little bit.
7  That looks good.
8    Q   In the second paragraph on Page 78 of
9  your report you state that, Since 2012,
10 approximately 7 million tubes of the '802 patented
11 products have been sold worldwide.
12       Do you see that sentence?
13   A   Yes.
14   Q   What products specifically are you
15 referring to?
16   A   The NasalGuard product.
17   Q   So that 7 million tubes refers to sales
18 of all NasalGuard products?
19   A   I will think so, or say so.
20   Q   And where did you obtain that 7 million
21 number from?
22   A   From Mr. Kremen.
23   Q   And if you could look a few sentences
24 down in that same paragraph, do you see a sentence
25 that starts with the word "satisfaction"?

92

1    A   Yes.
2    Q   So you state in your report that,
3  "Satisfaction is necessarily based on the ability
4  of the product to inhibit harmful particles from
5  infecting the purchaser through nasal inhalation."
6        Correct?
7    A   Yes.
8    Q   What did you do to analyze whether
9  purchasers' satisfaction with NasalGuard was the
10 result of the ability of the product to inhibit
11 harmful particles from infecting the purchaser
12 through nasal inhalation?
13   A   From the large number of sales, which
14 also implies repeat sales, repeat use by
15 consumers, and the absence of any complaints.
16   Q   Did you consider whether any customer
17 satisfaction could be attributed to some other
18 feature of the product?
19   A   No consumer dissatisfaction has been
20 brought to my attention.
21   Q   No.  I was asking you something a little
22 bit different.  Did you consider whether that
23 customer satisfaction you're referring to, whether
24 it could be attributed to some other feature of
25 NasalGuard?

Transcript of Amirali Y. Haidri, Esquire
October 28, 2022

24 (93 to 96)

93

1    A   Well, I did not consider them, but I
2  don't think it's particularly relevant.
3    Q   Why not?
4    A   Because there is only one function of
5  this product and, obviously, the users are
6  satisfied with it.
7    Q   Is the product also intended to reduce
8  the effects of seasonal allergies?
9    A   As long as it contain negatively charge
10 harmful particles, yes.
11   Q   And would you consider allergies caused
12 by pollen to be an infection?
13   A   It is not an infection, but it can cause
14 an allergy.
15   Q   Did you consider whether any other
16 attributes, for example the ability of the product
17 to moisturize the skin?
18   A   No, I did not.
19       MS. PETERSON:  Okay.  Well, Mr. Haidri,
20 thank you so much for your time today.  I actually
21 don't have any other questions for you.
22       MR. KREMEN:  Oh, okay.
23       THE WITNESS:  Okay.  Are we done?
24       MR. KREMEN:  I don't have any others
25 either.

94

1        MS. PETERSON:  Okay.  So I think we're
2  done.  We can go off the record.
3        THE WITNESS:  Thank you.
4        VIDEO SPECIALIST:  All right.  Just a
5  moment, please.
6        This marks the end of the deposition of
7  Amirali Haidri.  We are going off the record.  The
8  time is now 1:54 p.m.
9        COURT REPORTER:  Mr. Kremen, do you need
10 a copy of the transcript?
11       MR. KREMEN:  Yeah, I do.  But in the
12 regular course of -- I don't need an expedited
13 copy.  So but, yes, I do need a copy.
14       (Off the record at 1:54 p.m. EDT.)
15
16
17
18
19
20
21
22
23
24
25

95

1            ACKNOWLEDGMENT OF DEPONENT
2        I, AMIRALI Y. HAIDRI, ESQUIRE, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me, and any corrections appear
7  on the attached Errata sheet signed by me.
8
9  _____    _____
10   (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

96

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2    I, Debra A. Whitehead, the officer before whom the
3  foregoing proceedings were taken, do hereby certify
4  that the foregoing transcript is a true and correct
5  record of the proceedings; that said proceedings
6  were taken by me stenographically and thereafter
7  reduced to typewriting under my supervision; that
8  reading and signing was not requested; and that I am
9  neither counsel for, related to, nor employed by any
10 of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12   IN WITNESS WHEREOF, I have hereunto set my hand and
13 affixed my notarial seal this 7th day of November,
14 2022.
15
16 My commission expires:
17 April 30, 2023
18
19
20
21 ----------------------------
22 E-NOTARY PUBLIC IN AND FOR THE
23 STATE OF MARYLAND
24
25