# EXHIBIT 3

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2         EASTERN DISTRICT OF MICHIGAN
 3              SOUTHERN DIVISION
 4  --------------------------------X
 5  TRUTEK CORP.,                   :
 6      Plaintiff/Counter-Defendant,:
                                        Case No.:
 7    v.                            :
                                        2:21-cv-10312
 8  BLUEWILLOW BIOLOGICS, INC.      :
 9      Defendant/Counter-Plaintiff,:
10  ROBIN ROE 1 through 10          :
11  (fictitious names); ABC         :
12  CORPORATION 1 through 10        :
13  (fictitious names),             :
14      Defendants.                 :
15  --------------------------------X
16
17      Deposition of ALEXEI ERMAKOV, PH.D.,
18           Conducted Remotely
19       Wednesday, October 26, 2022
20              10:02 a.m.
21
22
23  Job No.: 468440
24  Pages: 1-128
25  Reported by: Matthew Goldstein, RMR, CRR
```

**Page 2**

```
 1      Deposition of ALEXEI ERMAKOV, PH.D.,
 2  conducted remotely:
 3
 4
 5
 6
 7
 8
 9      Pursuant to Notice, before Matthew Goldstein,
10  RMR, CRR, Notary Public in and for the State of
11  Maryland.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1          A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF, TRUTEK CORP.:
 3  STANLEY H. KREMEN, ESQUIRE
 4  4 Lenape Lane
 5  East Brunswick, New Jersey 08816
 6  732.593.7294
 7
 8  ON BEHALF OF THE DEFENDANT, BLUEWILLOW
 9  BIOLOGICS, INC.:
10  LIANE M. PETERSON, ESQUIRE
11  FOLEY & LARDNER
12  3000 K Street, NW
13  Suite 600
14  Washington, D.C. 20007
15  202.672.5300
16
17  ALSO PRESENT:
18  EMILY DUNN - REMOTE TECHNICIAN
19  JOHN PARKMAN - VIDEOGRAPHER
20  ASHOK WAHI
21
22
23
24
25
```

**Page 4**

```
 1              C O N T E N T S
 2  EXAMINATION OF ALEXI ERMAKOV, PH.D.         PAGE
 3
 4  By MS. PETERSON                              8
 5          E X H I B I T S
 6            (Attached)
 7  ERMAKOV      DEPOSITION EXHIBIT             PAGE
 8
 9  Exhibit 27   Previously Marked,             35
                 Determination of Surface
10               Electrostatic Charge on Nasal
                 Application Test Products Test
11               Conducted and Report Prepared
                 by Alexei Ermakov; Ph. D.
12               (Physics), Sr. Consultant
13  Exhibit 28   Deposition Notice              59
     Exhibit 29   Curriculum Vitae of Alexei    65
14               Ermakov
15  Exhibit 30   Determination of Surface       124
                 Electrostatic Charge on Nasal
16               Application Test Products Test
                 Conducted and Report Prepared
17               by Alexei Ermakov; Ph.D.
                 (Physics), Sr. Consultant
18
19
20
21
22
23
24
25
```

**5**

1 THE REMOTE TECHNICIAN: Thank you to
2 everyone for attending this proceeding remotely,
3 which we anticipate will run smoothly. Please
4 remember to speak slowly and do your best not to
5 talk over one another. And please be aware that
6 we are recording this proceeding for backup
7 purposes.
8 Any off-the-record discussions should be
9 had away from the computer. And please remember
10 to mute your mic for those conversations.
11 Please have your video enabled to help
12 the reporter identify who is speaking. And if you
13 are unable connect with video or connecting via
14 phone, please identify yourself each time before
15 speaking.
16 I apologize in advance for any
17 technical-related interruptions.
18 Thank you.
19 THE VIDEOGRAPHER: All right. Just a
20 moment please, and I'll get us on the record.
21 Here begins Media No. 1 in the
22 video-recorded deposition of Dr. Alexei Ermakov,
23 in the matter of Trutek Corporation versus
24 BlueWillow Biologics Incorporated, et al., in the
25 United States District Court for the Eastern

**6**

1 District of Michigan Southern Division, Case
2 No. 2:21-cv-10312.
3 Today's date is Wednesday, October 26th,
4 2022. The time on the video monitor is now
5 10:02 a.m. Eastern Time.
6 The remote videographer today is John
7 Parkman representing Planet Depos.
8 All parties of this video deposition are
9 attending remotely.
10 Would counsel please voice identify
11 themselves and state whom they represent.
12 MR. KREMEN: Stanley Kremen for the
13 plaintiff, Trutek Corporation.
14 MS. PETERSON: Liane Peterson from Foley
15 & Lardner LLP on behalf of the defendant,
16 BlueWillow Biologics.
17 THE VIDEOGRAPHER: The court reporter
18 today is Matthew Goldstein, also representing
19 Planet Depos.
20 Would the reporter please swear in the
21 witness.
22 MR. KREMEN: Can we have one matter of
23 housekeeping, and I wanted that on the record. As
24 of the other depositions, we do not agree to the
25 usual stipulations. However, we agree that

**7**

1 objections other than objections to form will be
2 reserved till time of trial.
3 MS. PETERSON: Okay.
4 MR. KREMEN: Proceed, please.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**8**

1 P R O C E E D I N G S
2 Whereupon,
3 ALEXEI ERMAKOV, PH.D.,
4 being first duly sworn or affirmed to testify to
5 the truth, the whole truth, and nothing but the
6 truth, was examined and testified as follows:
7 EXAMINATION BY COUNSEL FOR THE DEFENDANT
8 BY MS. PETERSON:
9 Q. Good morning.
10 Can you please state your full name and
11 address for the record?
12 **A. I'm Alexei Ermakov. And my home address**
13 **is 731 Liberty Court, Piscataway, New Jersey.**
14 Q. Thank you.
15 And my name is Liane Peterson. I'm one
16 of the lawyers that is representing the defendant
17 in this litigation, BlueWillow Biologics. And I
18 will be taking your deposition today. It's nice
19 to meet you.
20 **A. Nice to meet you, too.**
21 Q. Dr. Ermakov, have you -- so are you
22 located at home today?
23 **A. Uh-huh. Yes.**
24 Q. Is there anybody else in the room with
25 you?

9

1     A. No, there's no one else.
2     Q. Okay. Thank you.
3         Have you had your deposition taken
4 before?
5     A. No, never.
6     Q. So this is your first time?
7     A. Yes.
8     Q. Well, I'm going to just cover a few
9 ground rules with you so that we can try to make
10 sure that the deposition goes easily for
11 everybody. So I will be asking you a series of
12 questions that you will need to respond to.
13 Please wait until I finish my question before you
14 start to speak, and I will try to do the same when
15 you are speaking.
16        Is that okay?
17     A. Yeah, that's okay.
18     Q. Okay. And I will also ask that you
19 provide a verbal response to my questions rather
20 than shaking your head or nodding or saying --
21     A. Okay.
22     Q. -- "uh-huh." That way we can make sure
23 that the court reporter can take a clear record of
24 your answers.
25     A. Okay.

10

1     Q. If at any point in time you do not
2 understand my question or if you need me to repeat
3 it, please just ask me, and I can restate.
4 Otherwise, I will assume that you understood the
5 question.
6        Is that okay?
7     A. Yeah, that's okay.
8     Q. Okay. Dr. Ermakov, are you aware of any
9 reason why you would be unable to provide complete
10 and truthful testimony during your deposition
11 today?
12     A. No, I'm not aware of any reason.
13     Q. Okay. Thank you.
14        Now, Dr. Ermakov, have you ever been
15 retained or engaged to provide expert testimony in
16 connection with a litigation matter?
17     A. No, I have not been retained before.
18 That's the first time.
19     Q. Okay. Have you ever been retained by a
20 company just to provide testing services in
21 connection with a litigation, even if you were not
22 testifying?
23     A. Yes. Well, I've been retained by Trutek
24 company --
25     Q. Okay. Yeah, I understand that --

11

1     A. -- for testing.
2     Q. Yes, I understand that you've been
3 engaged by Trutek to provide testing in this
4 matter. I'm wondering have you ever been engaged
5 by another company to provide testing services or
6 consulting services related to a litigation?
7     A. No, never been.
8     Q. Okay. And I understand that with
9 respect to your work for Trutek, you have
10 performed two rounds of testing for Trutek; is
11 that correct?
12     A. Yeah, that's correct.
13     Q. Have you ever been retained by Trutek to
14 provide testing services apart from those two
15 instances?
16     A. No.
17     Q. So there was one round of testing that
18 occurred in 2019 -- or 20 -- okay.
19        So the first round of testing occurred
20 in 2019; is that correct?
21     A. I think so.
22     Q. And then you were asked to perform a
23 second round of testing in 2021; is that correct?
24     A. I think so. I don't remember exact
25 dates.

12

1     Q. So apart from those two times, those are
2 the only times that Trutek has asked you to
3 perform any testing on their behalf?
4     A. Yeah. As far as I remember, that's
5 correct, yeah.
6     Q. Okay. Has Trutek or Trutek's lawyers
7 asked you to conduct any further testing in the
8 future?
9     A. No.
10     Q. Okay. And do you know if you have ever
11 been retained by any of Trutek's lawyers to
12 provide consulting services or testing services in
13 the past?
14     A. No.
15     Q. Dr. Ermakov, do you recall when you were
16 first contacted by Trutek in this matter?
17     A. No, I don't remember exact date.
18     Q. Do you remember the year?
19     A. The year, it was the same year when I
20 done my first measurement. So that's...
21     Q. So you were first contacted by Trutek
22 around the time that you conducted the first round
23 of testing; is that correct?
24     A. Yes, that's correct. Yeah.
25     Q. Okay. And who contacted you?

Transcript of Alexei Ermakov, Ph.D.
October 26, 2022

4 (13 to 16)

---

13

1     **A.  Ashok Wahi contacted me.**
2     Q.  And did Mr. Wahi contact you directly or
3  did he first get in touch with Rutgers University?
4     **A.  He contacted me directly because it was**
5  **not related to any work I've done at Rutgers.**
6     Q.  And do you have -- oh, go ahead.
7     **A.  There was no need to contact Rutgers to**
8  **do this testing.**
9     Q.  And do you have an understanding of why
10 Mr. Wahi contacted you to perform the testing?
11    **A.  I think so.**
12    Q.  What is that understanding?
13    **A.  Well, I could provide the measurements**
14 **that he required.  That's why.**
15    Q.  And what types of measurements did he
16 require?
17    **A.  He required to measure charge, surface**
18 **charge on samples that was produced by application**
19 **of different chemicals.  So that's what I**
20 **measured.**
21    Q.  So when Mr. Wahi contacted you, he
22 explained what type of testing he needed, and you
23 confirmed that you would be able to provide that
24 type of testing for him; is that correct?
25    **A.  Yeah, that's correct.**

---

14

1     Q.  Dr. Ermakov, if you are asked to testify
2  at the trial in this matter, do you plan to do so?
3     **A.  Yes, I plan to do so.**
4     Q.  And will you be compensated for
5  testifying at trial?
6     **A.  Yes, I think so.**
7     Q.  And what amount or what hourly rate will
8  you be compensated for testifying at trial?
9     **A.  $350 an hour.**
10    Q.  And is $350 an hour the rate that you
11 have billed Trutek for the testing services that
12 you have provided in this matter?
13    **A.  Well, that's the rate I'm charging for**
14 **legal services.  There was a different rate for**
15 **providing the consulting that I did on**
16 **measurement.**
17    Q.  Okay.  And what is the rate that you
18 charged Trutek for the consulting services and the
19 measurement that you did?
20    **A.  The measurement -- for the measurements**
21 **I charged $100 an hour.**
22    Q.  And did you also charge Trutek $100 an
23 hour for preparing the report that described the
24 measurements that you took?
25    **A.  Yes.  That's what I mean.**

---

15

1     Q.  And how did you determine or decide to
2  charge Trutek $100 an hour for the measurements
3  that you conducted for Trutek?
4     **A.  Well, it's a reasonable rate at the**
5  **time.**
6     Q.  Have you conducted measurements as a
7  consultant for any other company in the past?
8     **A.  No, that was the first time I did any**
9  **measurements for anyone.**
10    Q.  And how did you determine that you would
11 charge Trutek $350 an hour for your time spent
12 testifying?
13    **A.  Well, it seems like it's a reasonable**
14 **rate right now.**
15    Q.  And it seemed reasonable to charge a
16 different rate for testimony that's higher than
17 the rate that you charged for the testing
18 services?
19    **A.  Yes.**
20    Q.  Okay.  How much -- how many hours have
21 you billed to Trutek so far on this matter?
22    **A.  I don't remember exact number.**
23    Q.  Can you give me an estimate, please?
24    **A.  Well, approximately ten hours.**
25    Q.  And is that for both rounds of testing?

---

16

1     **A.  Yes, for both, everything.**
2     Q.  So approximately ten hours for the two
3  rounds of testing and for preparation of the two
4  reports; is that correct?
5     **A.  Uh-huh.  Yes, that's correct.**
6     Q.  Okay.  And out of those approximately
7  ten hours, how long did it take you to design the
8  measurements -- or design the testing that you
9  were going to perform to conduct the measurements?
10    **A.  That was about one hour.**
11    Q.  And approximately how much time did it
12 take to complete the measurements?
13    **A.  Well, it depends on the number of**
14 **samples tested.  It takes a few hours.**
15    Q.  And approximately how much time did you
16 spend preparing the two reports?
17    **A.  Well, also a few hours.  I don't**
18 **remember exactly.**
19    Q.  So you mentioned speaking to Mr. Wahi
20 about the testing that he required.  Did you speak
21 to anybody else associated with Trutek prior to
22 starting your work on this matter?
23    **A.  No, I was speaking only to Wahi.**
24    Q.  And -- okay.  So you did not speak with
25 anybody other than Mr. Wahi prior to conducting

---

17

1  the measurements?
2      A.  No.  Well, there were other people
3  present in the room when Wahi explained what needs
4  to be done.  I didn't speak to anyone else.
5      Q.  Okay.  Are you talking about the first
6  conversation that you had with Mr. Wahi --
7      A.  Yes.
8      Q.  -- when you said that there were other
9  people present?
10     A.  Yes.
11     Q.  Do you know who those other people were?
12     A.  Some people who was working with Wahi,
13 yes, partners.
14     Q.  So maybe some of Mr. Wahi's employees
15 from Trutek.
16     A.  I think so.
17     Q.  And that first meeting with Mr. Wahi,
18 was that a telephone conversation, or did you meet
19 with him in person?
20     A.  I met with him in person.
21     Q.  Okay.  And where did that meeting occur?
22     A.  At the Trutek.
23     Q.  And how long did that meeting last?
24     A.  About an hour.
25     Q.  Okay.  And what did Mr. Wahi explain to

18

1  you at that meeting about the testing services he
2  required?
3      A.  He explained that he needs to measure a
4  charge produced by application of chemicals.  So
5  that's what I measured.
6      Q.  Did he explain to you whether those
7  chemicals to be applied would be a liquid or some
8  other composition?
9      A.  Yeah, he did show different kinds of
10 chemicals, some liquid, some gel, and that kind of
11 stuff.
12     Q.  And did Mr. Wahi explain how he wanted
13 those products to be applied to a substrate for
14 testing?
15     MR. KREMEN:  Objection to the form of
16 the question.
17     You may answer.
18     THE WITNESS:  Yes, he did explain.
19 BY MS. PETERSON:
20     Q.  Okay.  What did he explain to you about
21 the substrate?
22     A.  Well, he said apply a reasonable amount.
23 Kind of just the way they would be applied when
24 normally used.
25     Q.  Okay.  And did he explain what type of

19

1  substrate that reasonable amount should be applied
2  to?
3      A.  Yes, he explained that.
4      Q.  What did he tell you?
5      A.  Well, he suggested to use printer paper
6  for that.
7      Q.  And did you agree with Mr. Wahi that
8  printer paper would be an appropriate substrate
9  for your test and measurements?
10     A.  Yes, it seemed a good choice and was
11 easy to do the testing on.
12     Q.  Okay.
13     A.  And was a good substrate for those
14 measurements.
15     Q.  So you understood that the printer paper
16 would be a good choice because it would be easy to
17 do the testing on; is that correct?
18     MR. KREMEN:  Objection to the form of
19 the question.
20     You may answer.
21     THE WITNESS:  Yes, there were several
22 different factors in play, and it seems that
23 printer paper would satisfy many of them.
24 BY MS. PETERSON:
25     Q.  Okay.

20

1      A.  It was a good choice.
2      Q.  Okay.  And what were those several
3  different factors in play?
4      A.  Well, one of them was ease of sample
5  preparation, sample weight, and the way printer
6  paper holds chemicals.
7      Q.  Okay.  Any other factors?
8      A.  No, that's all.
9      Q.  And then you said that it seemed that
10 printer paper would satisfy many of those factors;
11 right?
12     A.  Uh-huh.
13     Q.  Is that a "yes"?
14     A.  Yes.
15     Q.  Okay.  Are there any factors that you
16 believed would be relevant that printer paper
17 would not satisfy?
18     A.  No, it's a good choice.
19     Q.  Okay.  Approximately how long after that
20 first meeting with Mr. Wahi did you start the
21 first round of testing?
22     A.  It was a few days.
23     Q.  And did you do the testing in your
24 laboratory at Rutgers?
25     A.  Well, it was done in my office.

21

1   Q.  Okay.  And is that your office in
2   Rutgers or your home office?
3       A.  It's my office at Rutgers.
4       Q.  And just to make sure I understand, do
5   you also have a laboratory that you work out of at
6   Rutgers?
7       A.  Yeah, I have a laboratory, as well.
8       Q.  Okay.
9       A.  This setup was not related to any work I
10  do at Rutgers.  So it could be done anywhere, like
11  in my home.  It just was easy to do in my office
12  at Rutgers.
13      Q.  So the setup was not related to
14  any of the work that you do at Rutgers, but rather
15  it could be conducted anywhere.  Is that what you
16  said?
17      A.  Yes, that's correct.
18      Q.  Okay.  So you did the setup and testing
19  in your office at Rutgers?
20      A.  Uh-huh.  Yes.
21      Q.  Okay.  Did you have any other
22  conversations with Mr. Wahi or anyone else at
23  Trutek before starting the testing?
24      A.  Well, I had conversations -- so I had
25  some discussions before we went to do the testing.

22

1   So that's -- if that's the question.
2       Q.  Okay.  How many conversations did you
3   have with Mr. Wahi before conducting the first
4   round of testing?
5       A.  I don't remember exactly.
6       Q.  Was it more than one?
7       A.  We may have discussed something over the
8   phone, like before he would come, but that was
9   mostly some technical -- well, just how to -- when
10  he would come and what kind of samples he will
11  bring.
12      Q.  Okay.  Did Mr. Wahi provide any other
13  instructions to you about the testing in addition
14  to -- sorry, let me start over again.
15          Did Mr. Wahi provide any other
16  instructions to you about the testing other than
17  using printer paper as the substrate?
18      A.  No.  He just said that here are the
19  chemicals that needs to be tested.
20      Q.  And so --
21      A.  We decided to use printer paper.
22      Q.  Okay.  Did Mr. Wahi make any suggestions
23  to you about what equipment should be used to
24  measure the charge?
25      A.  No, it was my choice to build the

23

1   apparatus specifically for that, for those
2   measurements.
3       Q.  And just so I can make sure I heard that
4   correctly, you said that you built the apparatus
5   that you used to measure the charge specifically
6   for these testing experiments for Trutek; is that
7   correct?
8       A.  Yeah, that's correct.
9       Q.  Okay.  The apparatus that you used to
10  measure the charge in the testing that you
11  conducted for Trutek, have you used that for any
12  other purpose before?
13      A.  No, I didn't use it for any purpose
14  before.  Well, it was the first time I used it for
15  anything.
16      Q.  Okay.  And have you used that apparatus
17  for any other testing?
18      A.  I have used it later on, but unrelated
19  testing.
20      Q.  Okay.  Did Mr. Wahi make any suggestions
21  to you about how many times the samples should be
22  tested?
23      A.  Yes, he suggested to test several times
24  a sample.
25      Q.  And did Mr. Wahi make any suggestions to

24

1   you about what type of controls should be used in
2   your testing?
3       A.  Could you clarify what kind of controls?
4   What do you mean by control?
5       Q.  Well, so, for example, in the second
6   round of testing, you measured the charge on a
7   blank piece of paper.  Do you recall that?
8       A.  Uh-huh.  Yes.
9       Q.  Okay.  Was that your decision to use a
10  control or did Mr. Wahi suggest that you add a
11  control for the second round of testing?
12      A.  Well, that's common sense to use a
13  control to check what's the measurement without
14  any chemical.
15      Q.  Okay.  Did Mr. Wahi make any suggestions
16  to you about the size of the printer paper
17  substrate to be used?
18      A.  No, that was my decision.  It was
19  optimum size for that apparatus.
20      Q.  And did Mr. Wahi make any suggestions to
21  you about the area of the substrate on which the
22  samples should be applied?
23      A.  No, that was my decision.  Because I was
24  designing the apparatus, and that's the sample
25  that was required for that apparatus.

**25**

1    Q.  And after you designed the apparatus for
2  this testing, did you explain to Mr. Wahi what you
3  planned to do?
4    **A.  Yes, we discussed -- well, I explained**
5  **to him at our meeting how I'm going to measure the**
6  **charge and what kind of apparatus I'm going to**
7  **build.**
8    Q.  Okay.  And after you explained that to
9  Mr. Wahi, did he offer any further suggestions or
10 ask for any changes?
11    **A.  No, he didn't ask for any changes.**
12    Q.  Okay.  Do you understand that Trutek
13 also hired another individual to conduct testing
14 on the charge of the test samples?
15    **A.  Yes.**
16    Q.  Okay.  And his name is Mr. Shane Burns;
17 correct?
18    **A.  Uh-huh.  Yes.**
19    Q.  Have you ever met Mr. Burns?
20    **A.  Yes, I met him once.**
21    Q.  When did you meet him?
22    **A.  It was -- I don't remember exact date,**
23 **but it was a couple of weeks ago.**
24    Q.  Okay.
25    **A.  Maybe a month ago.**

**26**

1    Q.  Okay.  And where was that meeting?
2    **A.  It was in my office.**
3    Q.  So Mr. Burns came to your office in
4  Rutgers?
5    **A.  Uh-huh.**
6    Q.  Is that a "yes"?
7    **A.  Yes.**
8    Q.  Okay.  So Mr. Burns came to your office
9  in Rutgers sometime within the last month;
10 correct?
11    **A.  It depends -- well, at -- you know,**
12 **maybe I don't remember.  Maybe he didn't.  Let me**
13 **see.  No, I don't remember.  I'm not good with**
14 **names.**
15    Q.  Oh, I'm not suggesting that it didn't
16 happen.  I'm just trying to figure out --
17    **A.  Maybe I -- let me check something.**
18    **Yes.  Okay.  All right.  Continue.**
19    Q.  Okay.  Were you able to confirm whether
20 you met with Mr. Burns in your office previously?
21    **A.  Yes.**
22    Q.  Okay.  So when did the meeting with
23 Mr. Burns occur?
24    **A.  About a month ago.**
25    Q.  And what did you and Mr. Burns discuss

**27**

1  at that meeting?
2    **A.  Well, I did show my apparatus, and**
3  **that's about it.**
4    Q.  And why did Mr. Burns come to meet with
5  you in your office about a month ago?
6    **A.  It was in preparation for my testimony,**
7  **for my deposition.**
8    Q.  Was there anybody else at this meeting
9  besides you and Mr. Burns?
10    **A.  There was Attorney Stanley Kremen and**
11 **Ashok present.**
12    Q.  So Mr. Kremen and Mr. Wahi were present?
13    **A.  Yes.**
14    Q.  What about Dr. Lemmo, was he at that
15 meeting?
16    **A.  Lemmo?**
17    Q.  Do you know that name, Dr. Lemmo?
18    **A.  Yes, I know that name.**
19    Q.  Okay.  Was Dr. Lemmo at the meeting in
20 your office with Mr. Burns, Mr. Kremen, and
21 Mr. Wahi?
22    **A.  No.**
23    Q.  Did you have a separate meeting with
24 Dr. Lemmo at some point in time?
25    **A.  Well, as I said before, I cannot -- I'm**

**28**

1  **not good remembering names.  Can I -- well, let me**
2  **make sure.  Well, can I --**
3    Q.  You --
4    **A.  Can I ask Stanley to confirm?**
5    Q.  I'm sorry --
6    **A.  I'm not --**
7    Q.  Hang on one second.  Hang on.
8      What are you asking to confirm?
9      THE WITNESS:  Who was at that meeting?
10 Lemmo or --
11      MS. PETERSON:  Mr. Kremen, can you
12 confirm who was at that meeting?
13      MR. KREMEN:  Yes.  Yes, I'm glad you
14 asked me.  Okay.  It was Dr. Lemmo, Ashok Wahi,
15 and myself.  To my knowledge, Dr. Ermakov has
16 never met Shane Burns.
17      MS. PETERSON:  Okay.
18      THE WITNESS:  Right.  Yeah, that is what
19 I was asking.  I was struggling with it.
20 BY MS. PETERSON:
21    Q.  Okay.
22    **A.  I didn't remember names.  So...**
23    Q.  Okay.  So at this meeting in your
24 office, you showed your apparatus to Dr. Lemmo; is
25 that correct?

29

1    A.  Yes, that's correct.
2    Q.  Okay.  And why did Dr. Lemmo come to
3  view your apparatus?
4        MR. KREMEN:  Objection to the form of
5  the question.
6        THE WITNESS:  Can I answer?
7        MR. KREMEN:  Yeah, go ahead.
8        THE WITNESS:  Well, I guess he wanted to
9  see the way I measured the charge.
10 BY MS. PETERSON:
11   Q.  Okay.  So I understand based on
12 counsel's representation that Mr. Burns was not at
13 that meeting.  However, Dr. Ermakov, I would like
14 to know if you've ever had a telephone
15 conversation with Mr. Burns?
16   A.  No, I never had.
17   Q.  So you've never spoken to Mr. Burns.
18   A.  No.
19   Q.  Have you ever heard of the company that
20 he is employed by, Electro-Tech Systems?
21   A.  No, I never heard about that company.
22   Q.  Okay.  Dr. Ermakov, did you speak with
23 anybody at Rutgers, any of your colleagues at
24 Rutgers, while you were designing the test that
25 you were going to conduct for Trutek?

30

1    A.  No, I didn't speak to anyone.
2    Q.  Okay.  So you did not consult with any
3  of your colleagues at Rutgers regarding the
4  testing process?
5    A.  No, it was only my idea and design.  I
6  didn't speak to anyone.
7    Q.  And you did not speak to anyone else
8  apart from Mr. Wahi when designing the experiment
9  that you conducted for Trutek?
10   A.  No, I didn't speak to anyone else.
11   Q.  Okay.  Did you consult with anybody else
12 after conducting the test when interpreting the
13 results?
14   A.  No, I just did the measurement and
15 didn't talk to anyone.
16   Q.  Okay.  And after you prepared your first
17 report, who did you provide a copy of it to?
18   A.  I provided it to Ashok.
19   Q.  And did Mr. Wahi request any changes or
20 anything additional to be included in that first
21 report after you provided him the draft?
22   A.  No, I just provided the data and report.
23 That was it.
24   Q.  Okay.  After you prepared your second
25 report, who did you provide a copy to?

31

1    A.  Same, I provided to Ashok.
2    Q.  And after you provided the second report
3  to Mr. Wahi, did he request any changes or ask
4  that anything be added to the report?
5    A.  No, he didn't ask anything.
6    Q.  He did not ask for any changes to be
7  made to the second report; is that correct?
8    A.  Yeah, that's correct.
9    Q.  Okay.  When you met with Mr. Wahi to
10 discuss the testing, did Mr. Wahi explain to you
11 how your measurements would be used by Trutek?
12   A.  Yes, he explained about -- to do the
13 measurement for his patent litigation, what he was
14 in.
15   Q.  Okay.  So Mr. Wahi explained that the
16 measurements would be used for a patent
17 litigation; correct?
18   A.  Yes, that's correct.
19   Q.  Did he provide any other explanation
20 about how he intended to use the results?
21   A.  No, he just explained that he needs to
22 measure whether there is any charge produced by
23 chemicals.  That's all there is.
24   Q.  Did Mr. Wahi provide you with any
25 explanation about the subject matter of the

32

1  patent?
2    A.  Yes, he explained his patent.
3    Q.  What did he explain to you?
4    A.  He explained that the presence of the
5  charge is important for function of his chemicals
6  that is for the product that he's making.  So it's
7  really important.  That's all there is.  And
8  that's the point of the patent.
9    Q.  Okay.  Did Mr. Wahi tell you anything
10 else about the samples that he was going to ask
11 you to test other than that they contained
12 chemicals and were liquid and a gel?
13   A.  No, he just said that here are the
14 chemicals that needs to be tested.  That's all.
15   Q.  Okay.  Did Mr. Wahi explain to you how
16 the products were going to be used?
17   A.  Yes, he explained his product that he
18 uses those chemicals to prevent the allergen
19 getting into the nose and pollen or whatever.
20   Q.  Okay.  So he explained to you that the
21 products were intended to be applied to the nose
22 of a person; is that right?
23   A.  Uh-huh.
24   Q.  Is that a "yes"?
25   A.  Yes.

33

1    Q.  Okay.  Thank you.
2        Given that the products were intended to
3  be applied to the nose of a person, was that a
4  factor that you considered in assessing whether
5  printer paper was an appropriate substrate for the
6  measurements?
7        MR. KREMEN:  Objection to form.
8        You may answer.
9        THE WITNESS:  Well, the substrate
10 actually didn't matter much in those measurements
11 because the measurement measures chemicals
12 themselves.  Substrate is irrelevant in my
13 apparatus how it's used.  So the only
14 consideration was use of sample preparation.
15 BY MS. PETERSON:
16    Q.  When you say the measurement measures
17 the chemicals themselves, what do you mean by
18 that?
19    **A.  That the way how apparatus is designed,**
20 **it measures -- the sample rotates and only half of**
21 **the sample is covered with the chemicals.  So the**
22 **apparatus looks at the difference between their**
23 **substrate and the substrate covered with the**
24 **chemicals.  So whatever contribution of substrate**
25 **is eliminated automatically.  So --**

34

1    Q.  Okay.
2    **A.  -- it doesn't matter what kind of**
3  **substrate it used.  It measures the chemicals**
4  **themselves.**
5    Q.  Okay.  But what I was wondering is what
6  were you measuring in those chemicals?
7    **A.  It measures -- it directly measures the**
8  **charge of the chemical.  So the way how apparatus**
9  **is designed, we can calculate its calibration just**
10 **from measuring parts of apparatus, the size of**
11 **electrode and of the amplifier and stuff like**
12 **that.  And we can get pretty good -- well, better**
13 **than order of magnitude accuracy of measurement**
14 **with no need of any reference of calibration.**
15 **Just so you can get a good measurement of**
16 **chemicals themselves.**
17    Q.  Okay.  So you were just explaining how
18 the apparatus was designed so that you could get a
19 measurement of the charge of just the chemical as
20 opposed to the substrate; is that right?
21    **A.  Uh-huh.  Yes, that's right.**
22    Q.  Now, in terms of the measurement itself,
23 the direct measurement was induced current;
24 correct?
25    **A.  Yes, that's correct.  The measurement --**

35

1  **measured charge.  It's not the current.**
2    Q.  Okay.
3    **A.  So --**
4    Q.  Let's pull up a copy of your report and
5  take a look at it.
6        MR. KREMEN:  That was Exhibit --
7        MS. PETERSON:  This was marked yesterday
8  as Exhibit 27.  Can we pull that up and share it
9  on the screen, please.
10       (Deposition Exhibit 27, Previously
11 Marked.)
12       THE REMOTE TECHNICIAN:  Exhibit 27, you
13 said, Counsel?
14       MS. PETERSON:  Yes.
15       THE REMOTE TECHNICIAN:  Stand by.
16       My apologies, Counsel, it doesn't seem
17 that I have 27 in the exhibits that were uploaded.
18       MS. PETERSON:  Okay.
19       THE REMOTE TECHNICIAN:  The last number
20 I have marked is 22.
21       MS. PETERSON:  Okay.  Let me see
22 something real quick.
23       MR. KREMEN:  Liane, do you need a list
24 of what the exhibits for 23 are, or do you have
25 those?

36

1        MS. PETERSON:  No, I have that.
2        MR. KREMEN:  Okay.  I just thought I'd
3  help.
4        MS. PETERSON:  Thank you.
5        So, Emily, do you see a file that says 9
6  Ermakov?
7        THE REMOTE TECHNICIAN:  Yes.
8        MS. PETERSON:  Okay.  That's the same
9  document.  We can pull that up.  It's just not a
10 marked copy.
11       THE REMOTE TECHNICIAN:  Okay.  Stand by.
12 BY MS. PETERSON:
13    Q.  Okay.  So for the record, this is a copy
14 of a document titled "Determination of Surface
15 Electrostatic Charge on Nasal Application Test
16 Products.  Test Conducted and Report Prepared by
17 Alexei Ermakov; Ph.D. (Physics), Sr. Consultant."
18       And this was previously marked as
19 Exhibit 27.
20       MS. PETERSON:  If we could scroll down
21 to the bottom of this first page.
22 BY MS. PETERSON:
23    Q.  The date on the report is January 11th,
24 2021.
25       Dr. Ermakov, do you recognize this

**37**

1  report?
2  **A. Yes, that's the report I prepared.**
3  Q. Okay. And this is the second report
4  that you prepared; correct?
5  **A. Yes, that's correct.**
6  Q. Okay.
7      MS. PETERSON: And then if we could look
8  at the last page, please. And scroll down to the
9  bottom.
10 BY MS. PETERSON:
11   Q. Is that your signature on the final
12 page?
13   **A. Yes, that's my signature.**
14   Q. Okay.
15      MS. PETERSON: Let's go back to the
16 second page.
17      And we'll go to the bottom of the page,
18 please. That's good.
19 BY MS. PETERSON:
20   Q. So, Dr. Ermakov, the last paragraph on
21 this report, it refers to -- it states, "During
22 the sample spinning, treated and untreated surface
23 repeatedly moved under the sensing electrode..."
24      Do you see that?
25   **A. Yes.**

**38**

1    Q. Okay. And then you go on to explain
2  that "the induced image creates an AC electrical
3  current in the circuitry connected to the sensing
4  electrode of the apparatus."
5      Is that an accurate description of the
6  process?
7    **A. Yes. That's part of the process, yes.**
8    Q. Okay. And then the final sentence says,
9  "The induced current is measured and is
10 proportional to the surface electrostatic charge";
11 is that correct?
12   **A. Well, it's not entirely accurate**
13 **because -- well, I should maybe phrase it**
14 **differently because the induced current, actually**
15 **it's applied to the capacitor. Like you have to**
16 **look at the diagram of the apparatus. And the**
17 **capacitor voltage across the capacitor is**
18 **proportional to the charge. So this sentence**
19 **doesn't go all the way to explain what's being**
20 **measured unfortunately.**
21   Q. Okay. So you're telling me that this
22 final sentence in your report is not entirely
23 accurate?
24   **A. Well, it was meant as a brief report,**
25 **and not like all the details got into this report.**

**39**

1    **So it's not quite complete explanation of how the**
2  **apparatus works. But it's a -- it's all explained**
3  **later. Like on the next page, if you go to the**
4  **formula that shows -- so surface charge**
5  **calculates. So that completes the explanation of**
6  **how apparatus works.**
7    Q. Okay. So you calculated the surface
8  charge Q.
9    **A. Uh-huh.**
10   Q. Is that a "yes"?
11   **A. Yes.**
12   Q. Okay. So you calculated the surface
13 charge Q by inputting the voltage that was
14 measured on the sensing electrode; right?
15   **A. Yeah, the voltage that is measured on**
16 **the capacitor. Capacitor is an important part of**
17 **this apparatus. Because the voltage across the**
18 **capacitor is proportional to the charge that went**
19 **into the capacitor. So that's how it measures**
20 **charge.**
21   Q. Okay. So you directly measured the
22 voltage, and then from that you were able to
23 calculate the charge; is that correct?
24   **A. That's correct. Yes.**
25   Q. Okay. And while we're talking about

**40**

1  this, you also have in the formula A, which is the
2  area of the sample under the sensing electrode;
3  right?
4    **A. Yes, that's correct. Yeah.**
5    Q. And what was that area that you applied
6  in the formula?
7    **A. It was about 10 square millimeters. So**
8  **that area was measured from actual size of the**
9  **electrode in the apparatus was about 1 millimeter**
10 **wide and 10 millimeters long.**
11   Q. Oh, so the area is based on the size of
12 the sensing electrode; is that correct?
13   **A. Yes, that's correct. Yeah.**
14   Q. So it's not based on the size of
15 the substrate itself?
16   **A. No.**
17   Q. Okay. So you measured the bottom of the
18 sensing electrode, and it was 1 millimeter wide by
19 10 millimeters long?
20   **A. Yes, that's correct. Yes.**
21   Q. Okay. Did Mr. Wahi contact you sometime
22 in 2021 to conduct the second round of testing
23 that's described in this report marked as
24 Exhibit 27?
25   **A. Yes, he did.**

**41**

Q. Do you recall when he contacted you?

A. No, I don't remember exact date, but sometime before.

Q. So sometime like maybe a few weeks before the testing occurred?

A. Yeah, maybe a few weeks. It's been a while. My memory is kind of hazy.

Q. Okay. And when Mr. Wahi contacted you about the second round of testing, was that by phone, or did you have another in-person meeting?

A. I think it was by phone.

Q. And did anybody else join that telephone conference?

A. No, he just said that he needs to do more testing. But that's all.

Q. Okay. But I'm wondering was there anybody else on that telephone besides you and Mr. Wahi?

A. No, there was no one else.

Q. Okay. And Mr. Wahi told you that he needed to do more testing; is that correct?

A. Yes.

Q. Can you -- why did he say he needed to do more testing?

MR. KREMEN: Objection to the form of

**42**

the question.

You may answer.

THE WITNESS: Well, he didn't explain.

BY MS. PETERSON:

Q. Did he explain to you that the testing should be -- would be different from your first round of testing?

A. No, just more testing, that's all.

Q. So same -- so basically Mr. Wahi asked you to run the same test, just with new samples?

A. Yeah, just repeat test just to confirm the results of the first measurement.

Q. Is it your understanding that you were testing different chemical products for the second round of testing?

A. No, I have no idea what kind of chemicals.

Q. Okay.

A. They were unmarked chemicals. And I don't know exactly what was the measures in the second. That was kind of blind test in a sense.

Q. Okay. What do you mean that they were unmarked chemicals?

A. Well, there were some bottles, like one, two, three.

**43**

Q. How were they labeled?

A. Just some numbers, as I remember.

Q. Okay. If you look up on --

MS. PETERSON: Let's scroll up to page 2, a little further on page 2. Yeah, right here.

BY MS. PETERSON:

Q. Do you see there are three products listed here, TTK-APB is the first product; right?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay. And then there's a second product identified as TTK-NS?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. And then the final product is BW-NBP?

A. Yes.

Q. Is that -- okay.

So the unmarked containers that you received from Mr. Wahi, did they have these labels on them?

A. I don't really remember that.

Q. So do you remember anything about what

**44**

numbers were marked on the bottles that you received from Mr. Wahi for testing?

A. No, I don't remember. It's been a long time ago.

Q. Did you take any pictures of the containers or the bottles that you were asked to test?

A. No, I didn't take any pictures.

Q. Okay. When Mr. Wahi contacted you about the second round of testing, did he ask you to make any changes to your test method?

A. No, he didn't ask me to do any changes.

Q. Okay. So he simply asked you to repeat the same test using new samples?

A. Right. Yeah, to do the same thing. Yes, asked me to repeat, to do more testing.

Q. Okay. Can you recall anything else that Mr. Wahi might have explained to you during that conversation about the second testing?

A. No, I don't think he explained anything, any more than was the first time.

MS. PETERSON: Okay. We've been going for about an hour. How about we go off the record and take a break now.

THE WITNESS: Okay.

Transcript of Alexei Ermakov, Ph.D.
October 26, 2022

12 (45 to 48)

45

1    THE VIDEOGRAPHER:  We're going off the
2  record.  The time is now 11:04 a.m.
3    (Recess from the record.)
4    THE VIDEOGRAPHER:  We're back on the
5  record.  The time is now 11:18 a.m.
6  BY MS. PETERSON:
7    Q.  Welcome back, Dr. Ermakov.  Did you
8  speak with anybody during the break about the
9  testimony that you've given so far in this
10  deposition?
11    **A.  No, I didn't speak to anyone.**
12    Q.  Okay.  Thank you.
13    So focusing again on the second round of
14  testing that you did for Trutek, I think you
15  explained that you followed the same test method
16  that you did in the first round of testing;
17  correct?
18    **A.  Yes, that's correct.**
19    Q.  Okay.  So you did not make any changes
20  to the apparatus --
21    **A.  No.**
22    Q.  -- in conducting the second round of
23  testing?
24    **A.  No, I did not make any changes.**
25    Q.  And no other changes to the process for

46

1  sample preparation either; is that correct?
2    **A.  Yes, that's correct.**
3    Q.  Okay.  So the only difference was that
4  you were testing new samples?
5    **A.  Yeah, that's my understanding.**
6    Q.  Okay.  Before conducting the second
7  round of testing, did you consult with any of your
8  colleagues about the test method that you were
9  planning to use?
10    **A.  No, I did not.**
11    Q.  Okay.  So you did not consult with
12  anybody about the test method that you were
13  planning to use for the second round of testing
14  apart from your discussion with Mr. Wahi; is that
15  correct?
16    **A.  Yes.  Yes, that's correct.**
17    Q.  Okay.  And going back to Mr. Burns, the
18  other individual who conducted testing for Trutek,
19  did you receive a copy of either of his test
20  reports?
21    **A.  Well, I have a copy of at least one**
22  **report.**
23    Q.  Okay.  You have a copy of at least one
24  of Mr. Burns' reports; is that correct?
25    **A.  Uh-huh.  Yes, that's correct.**

47

1    Q.  Did you review that report?
2    **A.  Yes, I looked through it.**
3    Q.  Okay.  So you understand that he used a
4  different method than you to measure surface
5  charge; correct?
6    **A.  Uh-huh.  Yes, that's correct.**
7    Q.  And he used different equipment, as
8  well?
9    **A.  Uh-huh.**
10    Q.  Is that yes?
11    **A.  Yes.**
12    Q.  Mr. Burns also tested the compositions
13  on a different substrate, as well; right?
14    **A.  Yes, that's right.**
15    Q.  Okay.  He used pigskin instead of
16  printer paper?
17    **A.  Uh-huh.  Yes.**
18    Q.  Have you ever used pigskin as a
19  substrate for measuring electrostatic surface
20  charge before?
21    **A.  No, I never used pigskin.**
22    Q.  Okay.  Did Mr. Wahi ask you if you could
23  conduct your measurements of surface charge on
24  pigskin?
25    **A.  Well, he explained different ways how it**

48

1  **was measured before, but for this apparatus it was**
2  **not -- well, the printer paper seemed a better**
3  **choice --**
4    Q.  Okay.
5    **A.  -- since the substrate doesn't matter in**
6  **my method.**
7    Q.  So Mr. Wahi --
8    **A.  It won't make any difference whether**
9  **it's pigskin or printer paper.**
10    Q.  Okay.  But Mr. Wahi did discuss
11  potentially using other substrates with you in
12  your test method?
13    **A.  Well, he had said that he had already**
14  **done some measurements and used pigskin in some of**
15  **the methods of measurements.**
16    Q.  So are you saying that Mr. Wahi had
17  already conducted his own testing using pigskin;
18  is that right?
19    **A.  Yes.  Well, he mentioned that pigskin**
20  **would be used as a substrate, that's what he said.**
21    Q.  Did he say who was going to be testing
22  surface charge on pigskin?
23    **A.  No, he didn't say.**
24    Q.  Okay.  But it's your understanding that
25  Mr. Wahi was going to do that himself?

Transcript of Alexei Ermakov, Ph.D.

October 26, 2022

13 (49 to 52)

49

1      A.  No, he didn't say that he was going to
2  do that himself, just described like possible ways
3  to test the product.
4      Q.  Okay.  Did Mr. Wahi ask you your opinion
5  about whether pigskin would be an acceptable
6  substrate for your testing?
7      A.  Yes, he asked what kind of substrate
8  would be best for my testing.
9      Q.  Okay.  And you recommended printer
10  paper?
11      A.  Yes, because the sample needs to spin,
12  and you want it to be as light as possible.
13      Q.  Okay.
14      A.  And since the substrate -- there's --
15  effect of substrate is negated by the method
16  itself.  It doesn't matter whether you use pigskin
17  or printer paper.
18      Q.  And can you just explain that to me
19  again, how the effect of the substrate is negated
20  by the method?
21      A.  So as I explained before and as the
22  report states, the substrate -- the chemicals are
23  covering half of the substrate, and as the
24  substrate rotates, it's like half of the chemicals
25  comes under electrode, and then as it turns

50

1  halfway, the substrate comes under electrodes.
2          So what electrode senses, it senses the
3  difference between the part with chemicals and
4  without the chemicals.  So whatever effect
5  substrate has by its own, it's all the same as it
6  rotates, but the part that has chemicals in it,
7  that's what makes -- produces the signal.  So
8  that's how the effect of the substrate is
9  eliminated.
10          Does that explain?
11      Q.  So for half of the time that the
12  electrode is taking measurements, it's measuring
13  just the substrate, and then for the other half of
14  the time, it's measuring the chemicals?
15      A.  Yes, that's correct, substrate plus
16  chemicals.  And the difference is measured.  So
17  the difference would be produced by the chemicals.
18      Q.  Okay.
19          MS. PETERSON:  Let's pull up
20  Dr. Ermakov's report again.  And let's go -- yep,
21  right there, that's good.
22  BY MS. PETERSON:
23      Q.  So this is a picture that you took,
24  Mr. -- or, Dr. Ermakov, of the four substrates
25  that you tested in the second round of testing;

51

1  correct?
2      A.  Yes, that's correct.
3      Q.  Okay.  And so each of these pieces of
4  paper, how large were they?
5      A.  About a square inch.
6      Q.  Okay.  And where was the chemical test
7  sample applied on the piece of paper?
8      A.  Yes, so there's a line across the
9  sample.  So bottom half was covered with chemical,
10  and the top was bare.
11      Q.  Okay.  And then what are the diagonal
12  lines for?
13      A.  Those only for just to cut squares.
14      Q.  Okay.  And did you -- it looks like you
15  wrote on these samples as well with -- or sorry,
16  it looks like you wrote on the paper which each of
17  the papers would be coated with; right?
18      A.  Well, the writing was done after the
19  measurement was completed.
20      Q.  Oh, okay.  Was the -- but the lines --
21  the diagonal lines and the horizontal line, that
22  was on the paper at the time of the measurement;
23  right?
24      A.  Yes.
25      Q.  Okay.  So you used a pen to write the

52

1  diagonal lines to cut the paper; right?
2      A.  Uh-huh.  Yes.
3      Q.  And then you drew a horizontal line to
4  indicate where the sample should be applied;
5  correct?
6      A.  Yes, that's correct.
7      Q.  Okay.  Then you applied the sample to
8  the bottom half of the paper?
9      A.  Uh-huh.
10      Q.  Yes?
11      A.  Or it could be top half.  I don't
12  remember.
13      Q.  Okay.
14      A.  Yeah, most likely it was the top --
15  well, you can look at the pictures, actually --
16  yeah, that was the top half.  If you look at the
17  rightmost sample.  You can see the paper is kind
18  of changes shape because the chemical was applied.
19      Q.  Okay.  So you applied the test samples
20  to the top half of the paper; right?
21      A.  Uh-huh.  Yes.
22      Q.  And then you measured them?
23      A.  Yes, then measured.  And then the
24  samples were marked for taking the picture.
25      Q.  Okay.  So after you measured the

**53**

1  samples, then you labeled them?
2      A.  Uh-huh.
3      Q.  Yes?
4      A.  Yes.
5      Q.  Okay.  And then you took the picture?
6      A.  Yes.
7      Q.  Okay.  What kind of -- so did you use a
8  pen or a marker to mark those diagonal lines and
9  horizontal lines on the paper?
10      A.  Diagonal lines are pencil.
11      Q.  Okay.
12      A.  Horizontal line is pen.
13      Q.  Okay.  And so would it be fair to
14  assume, then, that the surface charge that you
15  were measuring in your experiment also picked up
16  on whether there was a charge associated with the
17  pencil and the pen that you used to mark the
18  papers?
19      A.  Well, it's clear because we use a blank,
20  as well.  It has the same markings.
21      Q.  Okay.
22      A.  And there's a clear difference between
23  blank sample and other samples.
24      Q.  Okay.  But if there was a charge
25  associated with the pen and the pencil that was

**54**

1  used to mark the pauper, that charge, whatever it
2  contributed, would be measured in addition to the
3  substrate and the test samples; correct?
4      A.  It would not be measured for the reason
5  that it's -- it has different shape.  You need
6  half of the sample to get measurement.  And if
7  that -- and you see the mark, it goes kind of all
8  the way across.  So that would create different
9  signal -- each timing of that signal would be
10  different.
11          Well, there are many reasons why those
12  markings don't contribute to the measurement --
13  well, to the degree of considered [inaudible]
14  result.  And as confirmation of that is just the
15  measurement of the blank sample.
16      Q.  Yeah, I understand the markings are on
17  the blank sample, as well.  But I'm just trying to
18  understand as a matter of basic principle if the
19  marker and the pen --
20      A.  Well, the pen -- like as the sample
21  rotates, you can see that the pen -- the line
22  that's made with the pencil or the pen that will
23  come under the electrode, it's like twice or four
24  times the frequency.  And we measure the frequency
25  of the rotation of the sample.  So that signal was

**55**

1  -- if there is any, you just ignore it.
2      Q.  Okay.
3          MS. PETERSON:  Let's scroll down to the
4  next page, please, where the results are listed.
5  BY MS. PETERSON:
6      Q.  Okay.  So because of the spinning, you
7  said that for half of the time the electrode is
8  taking measurements it's measuring just the
9  substrate, and then for the other half of the time
10  it's measuring the substrate plus the chemicals;
11  correct?
12      A.  Yes, that's correct.
13      Q.  So for -- let's look at the NasalGuard
14  Airborne Particle Blocker TTK-APB.  Do you see
15  that?
16      A.  Uh-huh.
17      Q.  Yes?
18      A.  Yes, I see that.
19      Q.  Okay.  So the -- you measured the output
20  in volts; correct?
21      A.  Yes, that's correct.  Yeah.
22      Q.  Okay.  So that measurement that's
23  reported here for TTK-APB, is that the total
24  voltage that was measured over the course of the
25  entire time the substrate was spinning or just for

**56**

1  that -- those half periods of times where it was
2  recording the substrate plus the chemicals?
3      A.  Yeah, that's the difference measured for
4  half the time.  An oscilloscope was used to do the
5  measurement, and it was set to measure peak to
6  peak.  So you get -- because the sample is
7  spinning, you get time varying signal, the
8  difference of that sample rotation.
9          And most accurate measurement to
10  calculate the charge would be peak -- to measure
11  peak, like maximum to minimum of that oscillating
12  voltage.  So that's what it was.  So it's a
13  difference of the voltage run the sample bears
14  that substrate is under electrode minus the
15  voltage that's the chemical on the substrate under
16  electrode.
17      Q.  Okay.  And then for the blank uncoated
18  substrate, what did you use?  Because there
19  wouldn't have been any peaks; right?
20      A.  Well, it still produced some peaks
21  because of variation in the substrate.
22      Q.  Okay.  And then how was this -- the
23  oscilloscope that you used, what kind of data was
24  outputted from this?  Is it recorded somewhere in
25  a file?

---

**57**

1    A.  Well, no, it was just a readout on a
2  screen that was recorded.  But that's the number
3  that you see there.
4    Q.  So there was a screen with a readout,
5  and you would just handwrite the values that you
6  were seeing?
7    A.  Yes.  That's how it was done, yeah.
8    Q.  Okay.  And how many times did you spin
9  it, each sample?
10   A.  Well, that was spun for, like, a minute
11  or two just to see how stable the readings are,
12  whether they're changing or not changing.
13   Q.  And so how many individual measurements
14  did you hand record for each sample?
15   A.  It was one measurement for each sample.
16  So as the sample spins, the oscilloscope will get
17  kind of averaged different --
18   Q.  Okay.  But how did you obtain the
19  average?  Wouldn't you have to record each output
20  in order to determine the average?
21   A.  No, it was -- the oscilloscope just does
22  this measurement.  That's how it was done.
23   Q.  So there's just one reading that comes
24  out of the oscilloscope at the end of the
25  proceeding?

**58**

1    A.  Yes.  That's right, yeah.
2    Q.  Okay.  And how did you determine the
3  approximate uncertainty of plus or minus .10?
4    A.  Well, that's just some estimate that was
5  applied like from how accurate the oscilloscope
6  measured the voltage.  So that's the accuracy,
7  basically.  So the accuracy shows -- yeah.
8    Q.  How do you know that .10 is the range of
9  accuracy for the oscilloscope?
10   A.  Well, that's from specification of
11  oscilloscope.  That's how accurate its internal
12  workings.
13   Q.  So the product documentation for the
14  oscilloscope indicated that it provides voltage
15  readings with an accuracy of plus or minus .10 --
16   A.  Yes.
17   Q.  -- volts?
18   A.  Uh-huh.
19   Q.  Okay.
20      MS. PETERSON:  We could take that down.
21  I'll have some other questions about this that
22  we'll come to a little bit later, but we can take
23  it down for now.
24      Can we mark as Exhibit 28 a copy of the
25  deposition notice of Dr. Ermakov, please.

**59**

1      (Ermakov Deposition Exhibit 28 was
2  marked for identification and attached to the
3  transcript.)
4      THE REMOTE TECHNICIAN:  Stand by.
5      MR. KREMEN:  It's 28, Liane?
6      MS. PETERSON:  Yep.
7      MR. KREMEN:  Thank you.
8  BY MS. PETERSON:
9    Q.  Okay.  We've marked as Exhibit 28 a copy
10  of the deposition notice for Dr. Ermakov.
11      Dr. Ermakov, have you seen this before?
12   A.  No.
13   Q.  Well, do you understand that you are
14  appearing today to provide your deposition for a
15  litigation and that you're appearing subject to
16  this deposition notice?
17   A.  Yes, I do.
18   Q.  Okay.
19      MS. PETERSON:  We can take that down.
20  BY MS. PETERSON:
21   Q.  Dr. Ermakov, what did you do to prepare
22  for your deposition today?
23   A.  Well, I looked through other report
24  about the measurement of charge using Faraday cup.
25  That's about it.

**60**

1    Q.  You mean you looked through your two
2  reports?
3    A.  Yeah, I refreshed my memory about my
4  reports.  And I had a copy of other expert report
5  that I looked through.
6    Q.  Okay.  And then the other expert reports
7  that you looked through, did that include
8  Mr. Burns' report?
9    A.  Yes.
10   Q.  Did you review any other documents to
11  prepare for your deposition?
12   A.  I saw the report of the opposing expert.
13   Q.  Oh, Dr. Amiji?
14   A.  Uh-huh.
15   Q.  Yes?
16   A.  Yes.
17   Q.  Okay.  Did you look at the report -- any
18  of the reports prepared by Dr. Lemmo?
19   A.  I don't think so, no.
20   Q.  Okay.  How much time did you spend
21  reviewing those materials to prepare for your
22  deposition?
23   A.  About a couple of hours.
24   Q.  And can you think of any other documents
25  or information that you reviewed to prepare for

61

1  today?
2      A.  No, I don't think so.
3      Q.  Okay.  And did you have any meetings or
4  phone calls or video conferences to prepare for
5  today's deposition?
6      A.  I had one meeting with attorneys,
7  Stanley Kremen.
8      Q.  Okay.  When was that meeting with
9  Mr. Kremen?
10     A.  I don't remember exact date.  A few
11 weeks ago.
12     Q.  Okay.  Was there anybody else at that
13 meeting besides you and Mr. Kremen?
14     A.  Yeah, there was Ashok and another
15 person.  What's his name?  Lemmo.
16     Q.  Dr. Lemmo was at that meeting?
17     A.  Yeah, I think so.
18     Q.  Okay.  And how long did that meeting
19 last with Mr. Kremen and Mr. Wahi and Dr. Lemmo?
20     A.  It was a couple of hours.
21     Q.  And to the best that you remember, it
22 was sometime in the last couple of weeks?
23     A.  Yeah, I think so.  Or maybe a month ago.
24     Q.  Okay.  Did you meet with or prepare with
25 anyone else for the deposition other than those

62

1  three individuals?
2      A.  No.
3      Q.  Okay.  Did you have any phone
4  conversations or meetings this week about your
5  deposition?
6      A.  No, I didn't have any.
7      Q.  So after your meeting with Mr. Kremen
8  sometime a few weeks ago or a month ago, you
9  haven't had any further phone calls or meetings
10 with Mr. Kremen?
11     A.  Well, maybe there was one or two just to
12 confirm when to be at the deposition.
13     Q.  Okay.  And did you have any other
14 meetings or phone calls with Mr. Wahi leading up
15 to deposition?
16     A.  Yeah, it was the same, a brief
17 conversation that we're going to do the deposition
18 over Zoom, and that's it.
19     Q.  Okay.  When was the most recent
20 conversation that you had with Mr. Kremen?
21     A.  A few days ago, maybe.  Just when this
22 deposition was coming up.
23     Q.  And --
24     A.  And information about Zoom.
25     Q.  Was it on Monday or Tuesday this week?

63

1      A.  Well, I don't remember exactly.
2      Q.  That's fine.
3          When was the most recent conversation
4  that you had with Mr. Wahi leading up to your
5  deposition?
6      A.  That's the same, about the same thing.
7      Q.  Okay.  Did Mr. Kremen or Mr. Wahi tell
8  you anything about depositions that had already
9  taken place?
10     A.  Not really.  Well, they said that there
11 was some depositions.
12     Q.  Okay.  But they didn't talk to you about
13 the -- about what was discussed at those
14 depositions?
15     A.  No.
16     Q.  Okay.  Dr. Ermakov, have you reviewed
17 the deposition transcripts of any depositions that
18 have already occurred in this case?
19     A.  No, I did not.
20     Q.  Dr. Ermakov, what is your current
21 occupation?
22     A.  I'm a director of chemical
23 instrumentation at the Department of Chemistry,
24 Rutgers University.
25     Q.  So that was director of chemical

64

1  instrumentation in the Department of Chemistry at
2  Rutgers University; is that right?
3      A.  Uh-huh.  Yes, that's right.
4      Q.  Okay.  And how long have you held that
5  position?
6      A.  About 20 years.
7      Q.  Dr. Ermakov, what would you consider to
8  be your field of expertise?
9      A.  My field of expertise is instrumentation
10 that's used to conduct experiments and do the
11 measurements of all sorts of kinds.  So this
12 charge measurement, that's kind of my direct
13 expertise.
14     Q.  Okay.  So you said your field of
15 expertise is instrumentation to conduct
16 experiments, but is that expertise, is it focused
17 on one particular scientific or technical area?
18     A.  No, it's kind of all sorts of different
19 instruments.
20     Q.  Okay.  So you would consider your
21 expertise to be general in the sense that it's
22 focused on instrumentation of any type of nature
23 for any technical --
24     A.  Uh-huh.
25     Q.  -- for any technical issue; is that

**65**

1 correct?
2     A. Yes, that's correct.
3     Q. Okay.
4         MS. PETERSON:  Let's mark as Exhibit 29
5 a copy of Dr. Ermakov's CV, please.
6         (Ermakov Deposition Exhibit 29 was
7 marked for identification and attached to the
8 transcript.)
9 BY MS. PETERSON:
10     Q. Dr. Ermakov, do you recognize Exhibit 29
11 as your CV?
12     A. Yes, I do.
13     Q. Okay.  Do you have any changes to make
14 to this, or is it current?
15     A. It's current.
16     Q. Okay.  And looking at your education, it
17 looks like you received a Ph.D. in physics in
18 1992; is that correct?
19     A. Yes, that's correct.
20     Q. Okay.  And as director of instruments in
21 the chemistry department at Rutgers, what are your
22 typical job responsibilities?
23     A. Responsibilities, just solve any
24 problems if they occur, instrumentation.  Think of
25 sometimes design, some experiments, or I come up

**66**

1 with design of new instruments if it's required
2 sometimes.  So that's what I do.  Just make sure
3 and oversee operation of different kinds of
4 instrumentation that's used in the chemistry
5 department.
6     Q. Okay.  So like if somebody else in the
7 chemistry department has a problem with some of
8 the instrumentation, then it's your job to help
9 solve that problem and fix it?
10     A. Yeah, exactly.  Say it could be a
11 problem with the instrument or with the use of the
12 instrument or setup of the experiment itself
13 that's done.  So it might not produce.
14     Q. Okay.  And how often does -- or how
15 frequently does someone in the chemistry
16 department ask you to design a new instrument?
17         MR. KREMEN:  Form.
18         You may answer.
19         THE WITNESS:  Okay.  Well, let's say,
20 like, maybe once a year or something like that.
21 BY MS. PETERSON:
22     Q. Okay.
23     A. It's not, like, somebody give -- some
24 instruments that were built in our department,
25 they require continuous attention.  Like I might

**67**

1 do some work on them for maintenance, but an
2 entirely new instrument, that's obviously not too
3 often occasion to do that.
4     Q. Okay.  Do your job responsibilities at
5 Rutgers ever involve providing consulting work to
6 companies outside of Rutgers?
7     A. No.
8     Q. Have you ever provided consulting work
9 or testing services to an outside company before
10 your work for Trutek?
11     A. No, never.
12     Q. Okay.  Looking at the next section, you
13 indicate for a research area, the development of
14 new techniques and instrumentation for research in
15 surface science, chemistry, and nanotechnology.
16         Do you see that?
17     A. Uh-huh.  Yes.
18     Q. What percent of your work at Rutgers is
19 devoted to developing new techniques and
20 instrumentation as part of your overall job
21 responsibilities?
22     A. Well, that's -- perhaps a total
23 percentage -- oh, maybe 30 percent.  I don't know.
24 Twenty percent.
25     Q. Okay.  And has any of your research into

**68**

1 techniques and instrumentation involved the
2 measurement of electrostatic surface charge?
3     A. No, it was unique in the requirement to
4 make this apparatus.
5     Q. Okay.  So what Trutek asked you to do,
6 that was unique to that testing.
7     A. Yeah, it was different from, like,
8 anything else I have done.
9     Q. Okay.  Has any of your research at
10 Rutgers ever focused on techniques or
11 instrumentation for measuring electrostatic
12 surface charge of pharmaceutical formulations?
13     A. No.
14     Q. What about for measuring electrostatic
15 surface charge of water-in-oil nanoemulsions?
16     A. No, I haven't done research like that.
17     Q. And what about has any of your research
18 ever focused on techniques or instrumentation for
19 measuring electrostatic surface charge of
20 pharmaceutical products that are intended to be
21 applied to human skin?
22     A. No.
23     Q. And has any of your research at Rutgers
24 ever focused on techniques or instrumentation to
25 measure the electrostatic surface charge of

Transcript of Alexei Ermakov, Ph.D.

October 26, 2022

18 (69 to 72)

69

1 pharmaceutical products that function through
2 electrostatic forces?
3 **A. No.**
4 Q. Okay.
5 MS. PETERSON: Let's go to the next
6 page.
7 BY MS. PETERSON:
8 Q. Here, I see you have an overview of some
9 of your research experience over the past -- I
10 guess going all the way from 1984 up through the
11 present; correct?
12 **A. Yes, that's correct.**
13 Q. Okay. Is this a complete list -- or a
14 complete description?
15 **A. Well, that's a major points, although**
16 **there's some things kind of might be missing --**
17 **something might be missing, but it's mostly**
18 **complete, I would say.**
19 Q. Okay. And then if we go to page 3 of
20 your CV, the final page, I see you have a list
21 here of your top ten major publications; right?
22 **A. Uh-huh.**
23 Q. Yes?
24 **A. Yes.**
25 Q. Okay. And have you had any other

70

1 publications that were published in the past
2 ten years that are not on this list?
3 **A. Yes, I have a number of publications.**
4 Q. So there are a number of other
5 publications from the past ten years that are not
6 listed on your CV?
7 **A. Yes, the ones that are listed are the**
8 **most referenced. That's how they were selected as**
9 **the major publications.**
10 Q. Oh, so you selected these based on the
11 ones that have been cited the most by other
12 people?
13 **A. Exactly, yes.**
14 Q. Okay.
15 MS. PETERSON: We can take that exhibit
16 down.
17 BY MS. PETERSON:
18 Q. Dr. Ermakov, do you have any experience
19 in testing nasal antiseptic products for use in
20 humans?
21 **A. Well, could you clarify what kind of**
22 **testing?**
23 Q. I guess do you have any experience in
24 testing them for surface charge?
25 **A. Well, that's what I did for Dr. Wahi was**

71

1 for that experiment.
2 Q. Okay. So your experience in testing
3 products for surface products is limited to the work
4 that you did for Trutek; is that correct?
5 **A. Yes, that's correct.**
6 Q. So there's no other instances that you
7 can recall where you tested the electrostatic
8 surface charge in any experiment?
9 **A. Well, later on I tested something else**
10 **for electrostatic charge, some filters. It's not**
11 **a product that you put on something, it's just**
12 **some material that has electrostatic charge.**
13 Q. Okay. So after your work for Trutek,
14 you did test electrostatic charge on a filter
15 product?
16 **A. Uh-huh.**
17 Q. Is that a "yes"?
18 **A. Yes, filter products -- well, I cannot**
19 **go in too much detail because it's another kind of**
20 **company that requested.**
21 Q. Okay. So --
22 **A. Something so serious. There was also**
23 **some product applied to material that is going to**
24 **be used as a filter. It's like a mask or**
25 **something.**

72

1 Q. Okay. So sometime after your work for
2 Trutek, you were contacted by another company to
3 test electrostatic charge on a filter product; is
4 that correct?
5 **A. That's correct, yeah.**
6 Q. Okay. And that company was not Trutek?
7 **A. No, it was not Trutek.**
8 Q. And was Mr. Wahi involved in that
9 testing?
10 **A. No, it was completely independent.**
11 Q. Okay. So other than the work for Trutek
12 and then the subsequent work for this other
13 company, there are no other instances that you can
14 recall where you tested or measured the
15 electrostatic surface charge of a product?
16 **A. No.**
17 Q. Okay. Now, would you expect a chemical
18 that's applied to human skin, would you expect it
19 to exhibit the same surface electrostatic charge
20 as when it's applied on paper?
21 **A. Yes, that's the property of the**
22 **chemical.**
23 Q. Okay. Does the temperature or the
24 humidity of the environments impact the
25 electrostatic charge exhibited by an object?

Transcript of Alexei Ermakov, Ph.D.
October 26, 2022

---

73

1    A.  No, it does not because it's a property
2  of the molecules.  They have a certain charge,
3  permanent charge.  The environment doesn't matter
4  here.
5    Q.  Okay.  Going back to the apparatus and
6  test method that you designed for your experiments
7  for Trutek, how did you test the technique to
8  determine it would be accurate?
9    A.  Well, I can do a simple test to see what
10 kind of signal they're getting with or without
11 sample rotation, for example.  When the sample is
12 not rotating, then there's virtually zero.
13   Q.  Did you do that here?
14   A.  Yes.  So when the sample is rotating,
15 then we observe the signal and the accuracy that
16 the apparatus is based on the simple basic
17 principles of electrostatic and electricity.  So
18 there's no need for much testing.  You can just
19 calculate what's the result, what's the charge,
20 actual charge once you measure the voltage and
21 measure all the parameters that's involved, like
22 capacitance and size of the electrode.
23   Q.  Did you run a test without the rotation
24 to see what kind of signal you got?
25   A.  Yes.  Yes, that's one first basic test

---

74

1  that's done.
2    Q.  Okay.  And that's not documented in your
3  report; correct?
4    A.  No, it was kind of -- kind of simple
5  thing that I didn't think I needed to mention it.
6    Q.  Did you ask anybody else to take a look
7  at your apparatus and test method --
8    A.  No.
9    Q.  -- to determine that it would accurately
10 perform as intended?
11   A.  No, there was no need to ask anyone else
12 because I am confident in the accuracy of the
13 apparatus just from the basic principles of how it
14 operates.  Because it's so simple it doesn't
15 require any additional expertise to figure out the
16 accuracy of the apparatus.
17   Q.  So why did you have to design and build
18 this apparatus yourself then?  How come it's never
19 been used before?
20   A.  Well, I was just -- because usual
21 thinking what's the best way to solve this
22 problem.  So I was presented with the problem to
23 measure surface charge, and I was thinking what's
24 the most sensitive and robust way to measure.
25   Q.  Okay.

---

75

1    A.  So I came up with this thing, and it
2  seemed to be simple -- quite simple apparatus that
3  I could put together in, like, less than an hour.
4    Q.  Okay.  So you weren't aware of any
5  existing equipment or apparatus that you could use
6  that would fit to the problem that you were asked
7  to address; is that right?
8    A.  No, I was aware.  I designed this
9  apparatus because it can provide much greater
10 accuracy and sensitivity.
11   Q.  Okay.  Are you aware of whether this
12 test method that you used and the apparatus that
13 you built, are you aware of whether that's ever
14 been published by anybody else in the field?
15   A.  No.  I never saw any publications
16 similar to this.
17   Q.  Okay.  And are you aware of whether your
18 test method and apparatus have ever been used by
19 anyone else before in your field?
20   A.  No, I am not aware.
21   Q.  Okay.  And has the test method and
22 apparatus that you used for your testing ever been
23 reviewed by any of your colleagues or peers?
24   A.  No, it was not reviewed by anyone.
25   Q.  Do you know if the test method and

---

76

1  apparatus you used has a known rate of error?
2    A.  Well, what kind of -- well, can you
3  clarify what kind of error you're talking about?
4    Q.  Yeah, I mean, just error in the
5  measurements that are recorded.
6    A.  You mean as far as accuracy?
7    Q.  Yeah.
8    A.  Well, it's -- the accuracy of the
9  apparatus is -- of the measurement is determined
10 by how accurate we can measure in all parts of
11 apparatus, such as surface area of the electrode
12 and other parameters, like capacitance, how
13 accurately it can measure the voltage.  But that's
14 the sort of things.
15       And all these errors that were
16 introduced by accuracy of those measurements,
17 they're orders of magnitude smaller than kind of
18 desired accuracy of the measurement of the surface
19 charge because --
20   Q.  How do you know that all of the errors
21 that are introduced by accuracy of the
22 measurements will be of an order of magnitude
23 smaller?
24   A.  Well, the problem was to measure -- the
25 problem as was stated to me was to measure the

77

1  charge and the order of magnitude.  And all the
2  parameters we can measure the accuracy of percent
3  of something.  So, obviously, you can achieve this
4  accuracy of -- order of magnitude quite easily
5  without any problems.
6      Q.  Okay.  So when you say all of the
7  parameters you can measure the accuracy of, are
8  you talking about all of the parameters that went
9  into the formula that you used to calculate
10 charge?
11     A.  Yes, that's what I'm talking about.
12     Q.  Okay.  And so what is that error rate
13 for measuring the voltage in your test method?
14     A.  So that one is actually kind of -- in
15 the report it's .101.
16     Q.  Okay.  And then what about the
17 capacitance, what's the error rate for the
18 capacitance measurements that --
19     A.  The capacitance, yes, it was measured
20 using instrument design to measure capacitance.
21 And the accuracy of that instrument is about a few
22 percent.  1 or 2 percent, that's how it's rated.
23     Q.  So that's based on the instrumentation
24 itself?
25     A.  Yeah, that's right.

78

1      Q.  Okay.  And then the area, how was the
2  area measured?
3      A.  Well, it was measured using a ruler.
4  That's the accuracy of the ruler.
5      Q.  Okay.  So you measured the that using a
6  ruler?
7      A.  Uh-huh.
8      Q.  Okay.  What about the accuracy of the
9  spinner, was there any kind of error rate that we
10 can look to there to assess the accuracy of --
11     A.  No, as long as it spins fast enough.
12     Q.  How fast does it spin?
13     A.  Well, it spins 100 revolutions per
14 second.
15     Q.  And how was that measured?
16     A.  Well, the oscilloscope provides that
17 measurement, the signal providing that frequency.
18     Q.  Okay.
19     A.  And that's not critical.  It could spin
20 twice as fast or half as fast and get the same
21 measurement.  So the spinner is not a critical
22 part at all.
23     Q.  Okay.  Let's go back to your report now.
24     MS. PETERSON:  This is Exhibit --
25     MR. KREMEN:  27.

79

1      MS. PETERSON:  Yep, Exhibit 27.  Thank
2  you, Stan.
3  BY MS. PETERSON:
4      Q.  Dr. Ermakov, did you review any other
5  materials or any other information when conducting
6  the testing that's described in this report?
7      A.  What kind of information are you talking
8  about?
9      Q.  I'm just wondering if you received any
10 information about the test samples?
11     A.  No, it was just some chemicals.  That's
12 all.
13     Q.  Did you review any scientific literature
14 or any other publications related to measurements
15 for electrostatic surface charge?
16     A.  No, I did not.
17     Q.  Did you review any textbooks?
18     A.  Well, no.  There's no need for me to
19 review any textbooks, because I had all the
20 information I needed, I already was aware of.
21     Q.  Okay.  So, generally, that's what I'm
22 asking.  Did you have to review or do any research
23 on any areas in order to come up with the test
24 method that you used?
25     A.  Okay.  Well, there was no need to do any

80

1  research or review.
2      Q.  Okay.  Now, the report is dated
3  January 11th, 2021; correct?
4      A.  Uh-huh.
5      Q.  Yes?
6      A.  Yes.
7      Q.  Okay.  When did you conduct the test?
8      A.  It was shortly before that.
9      Q.  So sometime in the, like, week before
10 that?
11     A.  Yeah, something like that.  Yeah.
12     Q.  Okay.  How long did it take to complete
13 the test?  Was it completed in one day?
14     A.  Yes, it was completed in one day.
15     Q.  And did you -- was there anybody else
16 present with you in your office when you conducted
17 the test?
18     A.  I don't really remember.
19     Q.  You don't remember if you were by
20 yourself or if there was somebody else with you
21 when you conducted the test?
22     A.  There was someone else, maybe.
23     Q.  Who was it?
24     A.  The person who brought the samples.
25     Q.  Okay.  Who brought the samples?

81

1    A.  Well, I don't remember that exactly.
2    Q.  Did you keep any records or any notes as
3 you conducted the test in 2021?
4    A.  I had some notes as I took the
5 measurements, and then I used them to create the
6 report.
7    Q.  And what did you do with those notes as
8 you took the measurements -- what did you do with
9 those notes after you created the report?
10   A.  Well, I think that you just threw them
11 away.
12   Q.  Okay.  Did those notes that you took,
13 indicate what samples you had received?
14   A.  No, it was just whatever was labeled.
15   Q.  I know, but did you write down on your
16 notes what those labels were?
17   A.  Well, it was, like, sample 1, sample 2.
18   Q.  Okay.  Did you write down in your notes
19 who it was that provided you with the samples in
20 January 2021?
21   A.  No, I didn't write that down.
22   Q.  Okay.  Do you know if it was somebody
23 from Trutek who came to your office to give you
24 the samples?
25   A.  Yes, I think so.

82

1    Q.  Was it Mr. Wahi?
2    A.  That, I don't remember.  It could be him
3 or someone else.
4    Q.  But you're fairly certain that it was
5 somebody from Trutek who came to your office in
6 January 2021, gave you the samples, and was
7 present during the testing; is that correct?
8    A.  Yes.  Yes.
9        MR. KREMEN:  Objection.
10 BY MS. PETERSON:
11   Q.  Okay.  Did you run the entire experiment
12 by yourself personally, or did the person from
13 Trutek participate in any way?
14   A.  No, I run experiments -- all the
15 experiments myself personally.  And the other
16 person's job was just to bring the samples, and
17 that's it.
18   Q.  Okay.  So looking at the first page of
19 your report, at the bottom.
20       MS. PETERSON:  If we could scroll up in
21 the report, please.  Thanks.
22       Can we scroll up to the first page,
23 please, the bottom of it, to the picture.  Yeah.
24 BY MS. PETERSON:
25   Q.  Okay.  So, Dr. Ermakov, you created

83

1 this -- you set up the apparatus that's shown here
2 in Figure 1 yourself; right?
3    A.  Yes.
4    Q.  Okay.
5        MS. PETERSON:  And then let's go to the
6 next page.
7 BY MS. PETERSON:
8    Q.  The second paragraph talks about how the
9 printer paper was prepared and how the test
10 product was coated on the paper.  Do you see that?
11   A.  Uh-huh.
12   Q.  Did you prepare the printer paper
13 yourself personally?
14   A.  Yes, I did.  I cut the paper and put
15 some reasonable amount of chemicals on it.
16   Q.  Okay.  So you personally applied the
17 test samples to each of the paper substrates;
18 correct?
19   A.  Yes, that's correct.
20   Q.  How did you determine what would be a
21 reasonable amount to apply to each paper
22 substrate?
23   A.  Well, I applied it until I got some
24 uniform coating on the substrate.
25   Q.  How did you apply it?

84

1    A.  I think I used a swab to apply.
2    Q.  You think you used a swab to apply it,
3 but you're not sure?
4    A.  Well, the chemicals, liquid or gel, I
5 used a swab.  And I think the other one was kind
6 of spray.  So just sprayed it.
7    Q.  Okay.  For the spray, how did you ensure
8 that you uniformly coated just the top half of the
9 substrate?
10   A.  The other half was shielded with another
11 piece of paper.
12   Q.  Oh, so you covered up the other half of
13 the piece of paper --
14   A.  Yeah, it was covered, and half of it was
15 coated.
16   Q.  Okay.  So for the spray product, you
17 sprayed it directly onto the paper.  And then for
18 the gel and the solution, you applied those by a
19 swab?
20   A.  Yes, that's correct.
21   Q.  Did you use your own swab, or was it a
22 swab that was included with the packaging?
23   A.  I used my own swabs.
24   Q.  Okay.  And just to confirm, you do not
25 have any pictures of the containers that the

---

85

1  samples were provided to you in?
2     A.  No, I don't have any pictures.
3     Q.  Can you estimate at all how much of each
4  product was applied to the test substrates?
5     A.  Not really.  It was applied until
6  about -- usually it was about the same, same
7  amount.  But just that the purpose of this
8  measurement was to determine order of magnitude
9  charge.  So I didn't bother with really accurate
10  measurements of how much sample was applied.
11     Q.  Okay.  So you don't know how much was
12  applied of each product to the paper substrate?
13     A.  No, it was about the same amount, but
14  definitely within an order of magnitude about --
15  well, I can say same, within order of magnitude.
16  If you had ten times more of one product over
17  another one, I think that would be quite obvious.
18  That was not the case, though.
19     Q.  If you didn't measure how much was
20  applied, how can you say that you applied the same
21  amounts within the same order of magnitude?
22     A.  Just from visual measurement.
23     Q.  Okay.  After you applied the test
24  substances to the paper substrate, did the -- were
25  they absorbed into the paper?

86

1     A.  Yes.  Some of it was absorbed into the
2  paper, yes.
3     Q.  Okay.  And what did you do to ensure
4  that none of the test material was absorbed into
5  the other half of the paper substrate?
6     A.  Well, with the swab, that's easy.  Just
7  apply it to one half.  It doesn't --
8     Q.  Yeah --
9     A.  Well, it doesn't soak much into the
10  paper.  So there was no problem, and you can --
11  well, if anything like that would happen, that
12  would only reduce the observed signals.
13     Q.  Okay.  When -- did the person from
14  Trutek who was in your office at the time of the
15  testing, did that person help you at all or --
16     A.  No.
17     Q.  -- participate at all in preparing the
18  substrates and coating the material on the
19  substrate?
20     A.  No, they did not.
21     Q.  Okay.  So this report that's dated
22  January 11th, did anybody else review it before
23  you finalized it?
24     A.  No, I don't think so.
25     Q.  Are there any other drafts or versions

87

1  of your report?
2     A.  No, that's the report that I wrote.
3     Q.  So the report that we're looking here
4  at -- marked as Exhibit 27, that's -- it's
5  identical to the final report that you provided to
6  Mr. Wahi?
7     A.  Yeah, except maybe I didn't have the
8  names of the product.  That was added later.
9     Q.  You're talking about the Items 2, 3, and
10  4 on page 2 of your report?
11     A.  Right.  But that's the only difference,
12  yeah.
13     Q.  So what did you have in the earlier
14  version of the report, just sample 1, sample 2,
15  sample 3?
16     A.  Yeah, that's right.
17     Q.  Okay.  And how did you know which sample
18  was for which product?
19     A.  Because they are in that specific order,
20  1, 2, 3.
21     Q.  Yeah, but how do you -- if you didn't
22  know what you were testing, how did you know what
23  order you were testing them in?
24     A.  Oh, they might have the letters
25  abbreviation that mainly mean nothing to me.

88

1     Q.  Oh, so the first draft of your report
2  had the letter abbreviations, but maybe not the
3  full product name?
4     A.  That's right, yeah.
5     Q.  Okay.
6     MS. PETERSON:  How about we go off the
7  record and take a break right now.
8     MR. KREMEN:  Can we go for lunch?
9     MS. PETERSON:  Yeah, let's go off the
10  record first.
11     THE VIDEOGRAPHER:  We're going off the
12  record.  The time is now 12:25 p.m.
13     (Recess from the record.)
14     THE VIDEOGRAPHER:  We're back on the
15  record.  The time is now 1:17 p.m.
16  BY MS. PETERSON:
17     Q.  Welcome back, Dr. Ermakov.  I would like
18  to go back to your report that you prepared
19  directed to your second round of testing.  So this
20  is Exhibit 27.
21     MS. PETERSON:  If we could pull that up,
22  and go to the top of the first page.
23  BY MS. PETERSON:
24     Q.  Okay.  So in the first section we have
25  the test objective stated here; correct?

89

1    A.  Yes, that's correct.
2    Q.  And did you formulate this objective for
3  the test, or was this provided to you by Trutek?
4    A.  Well, that was kind of what was I asked
5  to do, to determine surface charge.
6    Q.  So this summarizes what Trutek asked you
7  to do in the testing; is that right?
8    A.  Yes, that's right.
9    Q.  Okay.  So you were asked to determine
10 the magnitude, meaning the amount, of the surface
11 electrostatic charge by means of application of a
12 solution serum and spray containing permanently
13 ionized molecules; is that correct?
14   A.  Uh-huh.  Yes, that's correct.
15   Q.  Okay.  So you weren't just asked to
16 determine whether the solution, serum, and spray
17 exhibited a surface electrostatic charge, but you
18 were also asked to determine the magnitude or the
19 amounts of that charge; right?
20   A.  Yes, that's right.
21   Q.  Okay.  And you weren't asked to just
22 determine whether the solution, serum, and spray
23 exhibited an electrostatic charge, but rather what
24 the amount of that charge would be when it was
25 applied to a surface; correct?

90

1    A.  Well, I was asked to determine
2  whether -- like about the order of magnitude of
3  the charge, not to do exact measurement.
4    Q.  But the objective here says that you
5  were asked to determine the magnitude of the
6  charge?
7    A.  Yes.
8    Q.  And the amount of the charge; right?
9    A.  Yeah, that's right.  Yeah.
10   Q.  Okay.  And you were asked to determine
11 the amount of the charge upon its application to a
12 substrate; correct?
13   A.  Yes, that's correct.
14   Q.  So it wasn't just the amount of the
15 charge exhibited by the solution, serum, and
16 spray, but rather the amount of charge that was
17 exhibited once applied to some material; correct?
18   A.  Yes, that's correct.
19   Q.  Okay.  And then in the next section,
20 we've got a description of your apparatus setup;
21 right?
22   A.  Uh-huh.
23   Q.  Okay.  And I see that we have a
24 reference here to a metal box containing a test
25 sample spinner and a sensing electrode.  Do you

91

1  see that?
2    A.  Uh-huh.
3    Q.  Yes?
4    A.  Yes.
5    Q.  Okay.  So the metal box --
6      MR. KREMEN:  Where is that, Liane?
7      MS. PETERSON:  Excuse me, Stan?
8      MR. KREMEN:  Where do you see that?  Are
9  you talking about the photograph below?
10     MS. PETERSON:  No, I'm just talking
11 about the language that's written under "Apparatus
12 Setup."
13     MR. KREMEN:  Metal box.  Okay.  Right.
14 Okay.  I see it.  Okay.
15 BY MS. PETERSON:
16   Q.  Okay.  So, Dr. Ermakov, the metal box
17 containing the test sample spinner and the sensing
18 electrode, that would be the equipment or the
19 apparatus that you put together yourself; correct?
20   A.  Yes, that's correct.
21   Q.  Okay.  And then that metal box was
22 connected to a Keithley Instruments 823 Nanovolt
23 Amplifier; right?
24   A.  Yes, that's right.
25   Q.  So that was a piece of equipment that

92

1  you had acquired from some other manufacturer;
2  correct?
3    A.  Yes, that's correct.
4    Q.  Okay.  But apart from the Keithley
5  Instruments 823 Nanovolt Amplifier, you
6  constructed yourself everything else that was part
7  of the apparatus; right?
8    A.  Yes, that's right.
9    Q.  Okay.
10     MS. PETERSON:  If we could scroll down.
11 BY MS. PETERSON:
12   Q.  So Figure 2, that contains a photo of
13 the apparatus; right?
14   A.  Uh-huh.
15   Q.  Yes?
16   A.  Yes.
17   Q.  Okay.  And then at the very bottom of
18 the page, you indicate that the sensing electrode
19 was made of 1.3-millimeter diameter copper wire.
20     So how did you choose to construct the
21 sensing electrode out of 1.3-millimeter diameter
22 copper wire?
23   A.  Well, that was optimum diameter of the
24 wire that can be easily formed into required shape
25 yet remains steady and wouldn't change its shape

93

1  during use.
2     Q.  Okay.  And how did you determine what
3  the optimum diameter would be and what the
4  required shape should be?
5     A.  Well, the shape -- well, obviously, they
6  wanted some electrode that would be in a close
7  proximity to half of the sample.  So that's the
8  shape.  So when the box is closed and this part of
9  the wire that you can see bent upward here will be
10 very close to the sample surface.
11    Q.  Okay.  And how did you determine the
12 optimum diameter of the wire?
13    A.  It's just from experimental -- from
14 experience from the different diameters of the
15 wires.  Any thicker wire would be difficult to
16 bend and form into the required shape than thinner
17 one would bend by itself if you accidentally touch
18 on it or something like that.  And there's a
19 certain choice of wires that I had on hand.  So
20 this one was the only one that I could use that
21 satisfied all the requirements.
22    Q.  Okay.  And was that -- that copper wire
23 that you used, was that something that you already
24 had in your possession, or did you have to acquire
25 it for this test?

94

1     A.  Yeah, that's something I already had on
2  hand.
3     Q.  Okay.  So it was the best diameter and
4  material that you had available to you when you
5  did the testing?
6     A.  Yeah, that's correct.
7     Q.  Okay.  And how did you determine that it
8  would be appropriate to use copper wire as the
9  material?
10    A.  Well, any conductive wire would do.  So
11 copper has certain properties that are
12 advantageous for this application.  Most
13 importantly, I could shape it into the shape I
14 wanted, and it would remain that shape.  But,
15 otherwise, any metal wire will produce the exact
16 same result if it can be shaped into this.
17    Q.  And this apparatus setup that you
18 constructed, was that based on any scientific
19 publications or literature that you reviewed
20 describing a similar apparatus being used for
21 measuring surface electrostatic charge?
22    A.  No, it just -- it employs several
23 different -- several techniques that are used for
24 surface measurements, not maybe exactly surface
25 charge.  But, otherwise, it's based on some really

95

1  simple physics.  It doesn't require any reference
2  or anything other than a textbook.
3     Q.  But I just wanted to confirm that you
4  did not base this apparatus setup on any
5  particular scientific publication or literature --
6     A.  No.
7     Q.  -- where you had seen the same apparatus
8  being used for measuring surface electrostatic
9  charge?
10    A.  No, that was completely new design.  I'm
11 not aware of any.
12    Q.  Okay.  And did you do anything to
13 calibrate this apparatus before the testing?
14    A.  Well, calibration was purely based on
15 the measurements of the dimensions of electrodes
16 and capacitance of all this stuff, and it was
17 calculated.
18    Q.  So you're talking about the calibration
19 was purely based on the measurements that you
20 conducted over the course of the testing?
21    A.  Yeah, it was calculated calibration.
22    Q.  Okay.  So you didn't do any specific
23 calibration of the apparatus or the equipment
24 prior to taking your measurements?
25    A.  No, that would require some known

96

1  sample, which I don't have.
2     Q.  Okay.  So you did not calibrate the
3  equipment using a known sample of a known surface
4  charge.
5     A.  No.  And that was not actually required
6  because the purpose was mostly to compare one
7  sample to another.
8     Q.  Okay.
9     A.  And that doesn't require any
10 calibration, just make sure that they're getting
11 some reading.  That's all.
12    Q.  Okay.  But if we go back up and look at
13 the test objective, your test objective was not to
14 compare measurements.  Your test objective was to
15 measure and determine the magnitude and the amount
16 of the electrostatic charge; right?
17    A.  Yes.  That's what I did, yeah.
18    Q.  Okay.  So even though you were asked to
19 determine the magnitude and amount of the charge,
20 you did not calibrate the equipment with a known
21 standard of a known charge; right?
22    A.  Yes, that's right.
23    Q.  Okay.  Did you perform any tests before
24 running your measurements to make sure that the
25 equipment was operating correctly?

97

1    A.  Yes, I tested it in on a blank sample
2  and some samples that I could come up with and see
3  whether it produces any measured -- measurable
4  signal.  It was performing really well with all
5  the requirements that I could think of.
6    Q.  Okay.  Let's go to the second page up at
7  the top.  And here we have a Section 3 titled
8  "Method."
9        Do you see that?
10   A.  Uh-huh.  Yes.
11   Q.  Okay.  So under "Method," you indicate
12 in your report that using your apparatus, "the
13 amount of surface charge can be determined by
14 means of measurement of induced image charges in
15 the sensing electrode."
16       Is that an accurate statement of the
17 theory underlying your method?
18   A.  Yes, that's accurate.
19   Q.  Okay.  And then you go on to say that,
20 "The polarity of charge, i.e. cationic or anionic,
21 was not the objective of this test measurement."
22       Why is that?
23   A.  Because that would require some
24 enhancement of the apparatus in order to
25 determine.  So you just measured presence of any

98

1  charge.
2    Q.  Okay.  So your apparatus only measured
3  the presence of charge and the amount of charge,
4  but not the polarity of the charge; is that
5  correct?
6    A.  Yeah, that's correct.
7    Q.  Okay.  So the results that you report,
8  we don't know if those are positive charges or
9  negative charges; right?
10   A.  Yeah.  Well, from the measurement
11 itself, we don't know.  But from what the
12 chemicals are that I -- supposed to have a
13 positive charge.  So --
14   Q.  But you don't know what those chemicals
15 are.  So just based on your testing alone --
16   A.  Right.
17   Q.  -- we don't --
18   A.  Yes.  So that's why there's this phrase
19 in there.
20   Q.  Okay.  If you could just let me finish
21 my question, please, before you start talking, I
22 would appreciate it.
23       Okay.  So just based on your testing and
24 the measurements alone, we don't know whether the
25 charge that you reported and measured, we don't

99

1  know whether that charge is positive or negative;
2  correct?
3    A.  Correct.
4    Q.  Okay.  In other words, we don't know if
5  the charge is cationic -- or we don't know if the
6  composition is cationic or anionic; right?
7    A.  Yes.
8    Q.  Okay.  Do you know if printer paper is a
9  commonly used substrate for testing the
10 electrostatic surface charge of liquids?
11   A.  Well, I don't have much knowledge of
12 other instances where someone needed to test the
13 charge of some substance.  So I don't have that
14 information.
15   Q.  Okay.  And then looking at the list of
16 the product test samples now on this second page,
17 I see there are two Trutek products listed;
18 correct?
19   A.  Yes, that's correct.
20   Q.  Do you know when the Trutek NasalGuard
21 samples were manufactured?
22   A.  No, I don't know.
23   Q.  Do you know what their expiration date
24 was?
25       MR. KREMEN:  Objection to the form.

100

1        THE WITNESS:  No, I don't know anything
2  about the sample.
3  BY MS. PETERSON:
4    Q.  Do you know what lot number or batch
5  number the Trutek NasalGuard products came from?
6        MR. KREMEN:  Same objection.
7        THE WITNESS:  No, I don't know.
8        MS. PETERSON:  Stan, what's the basis
9  for your objection to that question?
10       MR. KREMEN:  It is -- there's a lack of
11 foundation there.
12       MS. PETERSON:  Okay.  And that's based
13 on Dr. Ermakov's statement that he doesn't know
14 anything about the source of the samples?
15       MR. KREMEN:  That is correct.
16       MS. PETERSON:  Okay.
17 BY MS. PETERSON:
18   Q.  Dr. Ermakov, do you know when the
19 BlueWillow NanoBio Protect product was
20 manufactured?
21   A.  No, I don't know.
22   Q.  Okay.  And do you know when or what the
23 expiration date was of the BlueWillow NanoBio
24 Protect product?
25   A.  No, I don't know.

Transcript of Alexei Ermakov, Ph.D.
October 26, 2022

101

1    Q.  And do you know what lot number or batch
2  number the BlueWillow NanoBio Protect product came
3  from?
4    **A.  No, I don't know.**
5    Q.  Okay.
6       MS. PETERSON:  If we could look at the
7  second paragraph under "Method."
8  BY MS. PETERSON:
9    Q.  In the second sentence, you state that,
10 "Each of these samples was prepared by coating the
11 test product on 1-inch square substrate by a
12 product under test."
13      Do you see that?
14   **A.  Yes.**
15   Q.  So the 1-inch square substrate, that
16 would be the entire piece of the paper that was
17 placed on your apparatus; right?
18   **A.  Yeah, that's the whole paper.**
19   Q.  Okay.  And in your report here, I don't
20 see any reference to what portion of that 1-inch
21 square paper was coated with the test product.
22   **A.  Well, there's an indirect reference in**
23 **the method description.  It has to be half of the**
24 **substrate.**
25   Q.  Okay.  How is there an indirect

102

1  reference to that?  What are you -- what part of
2  your report are you talking about?
3    **A.  There are at least two places.  One is**
4  **when you look at the diagram on the apparatus, we**
5  **can see the charge is only one half of the sample.**
6  **Another --**
7    Q.  I'm sorry, can you stop right there.
8  You said one is when you look at the diagram of
9  the apparatus?
10   **A.  Yes, if you scroll up to the diagram,**
11 **there's clearly -- clearly shows the charge is**
12 **present on one half of the sample.**
13   Q.  Can you point to me exactly on what
14 you're talking about?
15   **A.  Well, if you scroll up to the diagram,**
16 **which is Figure 1.**
17      MR. KREMEN:  Which diagram are we
18 talking about, the photograph or the diagram?
19      THE WITNESS:  The diagram, apparatus
20 setup.
21 BY MS. PETERSON:
22   Q.  Okay.  So can you explain this diagram?
23   **A.  So there's a substrate and coated sample**
24 **is clearly on one half of the substrate.**
25   Q.  Oh, okay.  So the coated sample is

103

1  supposed to be represented by those, I guess, red
2  dots?
3    **A.  Red dots, yeah, those represent charges.**
4    Q.  Okay.  Okay.
5    **A.  And another reference to coating half of**
6  **the sample is in the description, verbal**
7  **description, how it operates.  It says that the**
8  **charges move in and out as the sample rotates.**
9  **It's where the formula is.**
10   Q.  Okay.
11   **A.  It's on page 2 at the bottom.**
12   Q.  Okay. I see that.
13   **A.  Yeah.**
14      MS. PETERSON:  So if we could go back up
15 to the sample preparation, which is at the top of
16 this page. Yeah.
17 BY MS. PETERSON:
18   Q.  So the samples were prepared by coating
19 the test product on the -- on one half of each
20 1-inch square substrate of paper.
21      Did you prepare all four substrates and
22 then measure them, or did you prepare one, measure
23 it, and then prepare a second and measure it?
24      Do you understand what I'm asking?
25   **A.  Uh-huh.**

104

1       MR. KREMEN:  Form.
2  BY MS. PETERSON:
3    Q.  What did you do?
4    **A.  The samples were prepared, dried up for**
5  **a while and then measured.**
6    Q.  Okay.  So you prepared all four samples,
7  and then you let them dry?
8    **A.  Uh-huh.**
9    Q.  Is that a "yes"?
10   **A.  Yes.**
11   Q.  Okay.  How long did you let them dry
12 for?
13   **A.  Well, until they looked dry.  About**
14 **ten minutes, maybe.**
15   Q.  How did you know they were dry at that
16 point?
17   **A.  Well, I just -- visually they looked**
18 **dry.**
19   Q.  So visually they looked dry?
20   **A.  Uh-huh.**
21   Q.  Yes?
22   **A.  Yes.**
23   Q.  Okay.  So you waited approximately
24 ten minutes for the samples to dry, and then you
25 measured them; correct?

**Page 105**

1  A.  That's correct.  That's correct, yeah.
2  Q.  And then for that measurement process
3  where the samples are spinning, how long did that
4  take for each sample?
5  A.  It takes about a minute.
6  Q.  Okay.  How did you determine that
7  ten minutes would be an appropriate time to take
8  an accurate measurement of each sample?
9  A.  Well, they looked dry, and then during
10 the measurement, I observed --
11 Q.  You know, I'm not asking about the
12 drying time here.  I'm asking about the
13 measurement process.
14 A.  Oh, measurement.
15 Q.  You allowed the samples to spin on the
16 apparatus for ten minutes, you said?
17 A.  Oh, one minute.
18 Q.  Oh, one minute.
19 A.  Uh-huh.
20 Q.  Okay.
21 A.  Just as long as it takes to see the
22 reading on the oscilloscope and just confirm that
23 it's stable, it doesn't kind of change in any
24 direction quickly.
25 Q.  Okay.  So you were able to confirm over

**Page 106**

1  just a period of one minute that the readings were
2  stable and didn't change in any direction quickly?
3  A.  Uh-huh.  Yes.
4  Q.  Yes?
5  A.  That's correct.  Uh-huh.
6  Q.  Did you run any of the samples for a
7  longer period of time to see if you got different
8  results?
9  A.  Yes.  And, in fact, I tried to run
10 samples, like, a while later and got the exact
11 same result.  So there was no point.  Once this
12 signal is stable, it doesn't change.
13 Q.  And did you run each of the samples for
14 the exact same amount of time?
15 A.  Yes.  That's what I did, yeah.
16 Q.  And so did you use, like, a stopwatch or
17 a timer to measure that?
18 A.  I used my watch.
19 Q.  Okay.
20 MS. PETERSON:  Could we go to the next
21 page, please.
22 BY MS. PETERSON:
23 Q.  So I see here under -- in the table with
24 the results that for each product you have three
25 measurements reported; correct?

**Page 107**

1  A.  Yes, that's correct.
2  Q.  Okay.  So did you take -- did you
3  prepare one test substrate for each sample and
4  test it three times?
5  A.  No, three substrates for each sample.
6  Q.  So you prepared three substrates
7  for each test sample and then ran each of those
8  substrates one time?
9  A.  Yes, that's correct.
10 Q.  Okay.  So you did not repeat the
11 measurement with the same test sample more than
12 once?
13 A.  Well, that's -- as experience showed
14 that there was no difference in the reading, like
15 we have done this with one sample.
16 Q.  What --
17 A.  We didn't expect any change either.  So
18 there's no reason for the readings to change.  So
19 you get the exact same reading.
20 Q.  Okay.  So you didn't run any additional
21 replicates of the samples because you didn't
22 expect there to be any change in the reading?
23 A.  That's correct, yeah.
24 Q.  Okay.  How did you place the samples on
25 to the spinner?

**Page 108**

1  A.  They are being held in place with a tiny
2  magnet that clamped down the paper.
3  Q.  Okay.  But, I mean, how did you
4  physically get the paper -- how did you move it
5  from wherever you prepared the paper to place it
6  onto the spinner?
7  A.  Yeah, we used tweezers to place the
8  paper.  I think it's in my report, actually.
9  Q.  Okay.  And why did you use -- why did
10 you select to use tweezers to do that?
11 A.  Just to avoid any possibility of
12 depositing any charges from, like, handling it
13 with hands because it's a common practice not to
14 use your hands when handling any samples that --
15 for sensitive measurements because you can deposit
16 some oils from your hands and stuff like that.
17 Q.  Okay.
18 A.  It will produce some signal and so on.
19 Q.  Okay.  And in the -- I believe somewhere
20 else in your report you mentioned that the
21 electrode was about 1.5 millimeters above the
22 sample surface once the lid on the box was closed;
23 is that right?
24 A.  Uh-huh.  Yeah, that's right.
25 Q.  Okay.  Does -- did the box -- the lid on

109

1  the box need to be closed to take the
2  measurements, or was that done just because the
3  electrode was mounted to the lid?
4  **A. No, it had to be closed. Actually, the**
5  **box does it on purpose on this instrument. And**
6  **the fact that it's a metal box, it provides very**
7  **good shielding against any external electrical**
8  **fields. So it has to be closed -- well, it's**
9  **quite obvious from operation of the instrument.**
10 **When the box is open, you can see some signal**
11 **picked up from just from the air. When it's**
12 **closed, there's zero.**
13 Q. Okay. Was the box sealed in any way so
14 that no air could enter?
15 **A. No, it was not sealed.**
16 Q. Did you do anything to, like, remove the
17 ambient air from the box before running the
18 experiment?
19 **A. No, it had ambient air in it.**
20 Q. Okay.
21    MS. PETERSON: Let's scroll down to the
22 bottom of this page for the conclusion.
23 BY MS. PETERSON:
24 Q. So I see you have two points listed here
25 under your conclusion. The first conclusion you

110

1  reached was that the test products all
2  demonstrated the presence of a surface
3  electrostatic charge; correct?
4  **A. Yes, that's correct.**
5  Q. Okay. And then your second conclusion
6  says that, "The surface electrostatic charge
7  measured was determined to be approximately (in
8  order of magnitude) similar in all three product
9  samples tested."
10    Do you see that?
11 **A. Yes, that's correct.**
12 Q. Why did you compare the measurement of
13 the charge across the samples on the basis of
14 their order of magnitude?
15 **A. Well, the purpose was to measure the**
16 **charge. And as you can see from the measurements,**
17 **there was some variation. So this conclusion says**
18 **what we can determine for sure, that it's**
19 **definitely within the order of magnitude.**
20 Q. Okay. And by "order of magnitude,"
21 you're talking about like a --
22 **A. Like times ten.**
23 Q. I'm sorry, what?
24 **A. Order of magnitude means that it's ten**
25 **times.**

111

1  Q. Ten times. Okay.
2     So if the results were more than --
3  **A. Ten times more or ten times less, yeah,**
4  **then you can say that.**
5  Q. Okay. If the results were more than an
6  order of magnitude apart, what would that tell you
7  about the surface charge exhibited by the two
8  products?
9  **A. Well, then we can say that the products**
10 **have different charges with more than order of**
11 **magnitude difference. For example, if some**
12 **product doesn't create a charge, then that would**
13 **be obvious.**
14 Q. If there was a 100-fold difference in
15 order of magnitude, would that be pretty
16 significant to you?
17 **A. Yes, certainly, yes.**
18 Q. If you got 100-fold difference in order
19 of magnitude using the same product and the same
20 test method, would that suggest perhaps that
21 there's a flaw in the method or that the method is
22 inaccurate?
23 **A. Well, if you're using the same method**
24 **and same protocol and you get the difference, then**
25 **you certainly should be looking for some reason**

112

1  **why the difference has happened.**
2  Q. And if there is such a difference when
3  you're using the same product and the same method,
4  would that suggest that the method is unreliable
5  or inaccurate?
6     MR. KREMEN: Objection to form.
7     THE WITNESS: Not necessarily. There
8  might be some factors that -- the method itself
9  might be accurate, but there could be something
10 else that affects the measurements.
11 BY MS. PETERSON:
12 Q. Like what?
13 **A. Like, I don't know, the product is not**
14 **the same or something else. Some factors that are**
15 **not accounted for.**
16 Q. But if the product is the same, then one
17 reason that could account for 100-fold difference
18 could be an indication about a problem with the
19 method; right?
20    MR. KREMEN: Objection to form.
21    THE WITNESS: It could be -- well, not
22 necessarily. You have to be more specific with
23 what kind of measurement is done, what kind of
24 method, what preparation of the sample.
25

113

1  BY MS. PETERSON:
2      Q.  Yeah, I understand you're saying it
3  isn't necessarily a result of the method, but it
4  could be the result of the method; right?
5          MR. KREMEN:  Same objection.
6          THE WITNESS:  Well, if the method takes
7  this, it implies that it's reliable to a certain
8  degree.  So if you get 100-fold difference and the
9  method already proven to give -- test proven that
10 it's accurate, let's say within one order of
11 magnitude, then there might be some other reason
12 for two orders of magnitude difference, not the
13 method.
14 BY MS. PETERSON:
15     Q.  Yeah, and I'm not talking about your
16 method specifically here.  So I think your answer
17 that you just gave, that was based on the results
18 that you got that were within the same order of
19 magnitude; right?
20     A.  Uh-huh.
21     Q.  Yes?
22     A.  Yes.
23     Q.  I'm just saying generally speaking, if
24 someone were to develop a new method and tried it
25 a couple of times following the same method with

114

1  the same product and got results that differed by,
2  like, 100-fold order of magnitude, that could
3  suggest that there's a problem with the method;
4  right?
5          MR. KREMEN:  Same objection.
6          THE WITNESS:  Well, I guess it could
7  suggest.  But, again, I have to get more specific
8  on what kind of method and what measurement of
9  sample preparations.
10 BY MS. PETERSON:
11     Q.  Okay.  And looking at --
12         MS. PETERSON:  And if we could scroll
13 back up so we could see the whole table, please.
14 BY MS. PETERSON:
15     Q.  Looking at your results now, you have
16 the three measurements reported for each sample,
17 and then you take the average; right?
18     A.  Uh-huh.  Yes.
19     Q.  And for the charge that you report,
20 that's reported in coulombs per square inch; is
21 that correct?
22     A.  Square centimeter.
23     Q.  I'm looking at the --
24     A.  Oh, inch, yeah.  Yes, that's correct.
25 Yes.

115

1      Q.  So where it says IN.SQ., that's square
2  inch; right?
3      A.  Yes, that's correct.
4      Q.  Okay.  So just to confirm, you reported
5  the charge in coulombs per square inch; right?
6      A.  Uh-huh.  Yes.
7      Q.  And how did you determine that error
8  range that's associated for each of the --
9      A.  Well, that's just -- just for
10 illustration purposes.  That's error of sample
11 voltage measurement translated to the end results.
12 That's all there is.  So, actually, error might be
13 much larger than that.  There are other factors
14 and measurements of the volts contributing to
15 uncertainty off the end result.
16     Q.  Okay.  So the error range that's
17 reported in your charge column was for
18 illustration purposes, and it came from the error
19 range indicated for the volts?
20     A.  Volts, yes.  Uh-huh.
21     Q.  But there could be other error that
22 might have -- that might contribute to uncertainty
23 in the end result.  Is that what you said?
24     A.  Yes, that's exactly.
25     Q.  Okay.  And that additional error is not

116

1  accounted for in your charge column in your table
2  of results in Exhibit 27; correct?
3      A.  Yes, that's correct.  But you can see
4  the difference, like, in a second product where
5  it's quite a lot because -- most likely because a
6  different amount of product was on a sample.
7      Q.  Which product are you referring to?
8      A.  TTK-APB, the second after blank -- I
9  mean, the next after blank.  Well, actually, I can
10 see it's all of them.  There's quite significant
11 variation.  And that's expected because we didn't
12 put exact same amount of each product on the
13 substrate.
14     Q.  Okay.  And then you report the average
15 for each test product; right?
16     A.  Uh-huh.  Yes.
17     Q.  And it looks like the average charge for
18 the two Trutek products is greater than the
19 BlueWillow NanoBio Protect product; correct?
20     A.  Well, yes, but the uncertainty of this
21 measurement -- for certain -- for certain I can
22 say it's within an order of magnitude accuracy.
23     Q.  But the average result that you've
24 reported, certainly it is greater for both of the
25 NasalGuard products than the BlueWillow product;

Transcript of Alexei Ermakov, Ph.D.
October 26, 2022

117

1 correct?
2      A.  Yes, that's correct.
3      Q.  Okay.  And that charge, I think you said
4 that's a property of the composition; right?
5      A.  Yes, that's right.
6      Q.  So if you were to test these same
7 products using a different method, you would
8 expect to see that same result, with one product
9 exhibiting a higher charge than the other product;
10 right?
11      MR. KREMEN:  Objection to form.
12      THE WITNESS:  Yeah, with this kind of a
13 difference, there might be other factors in play,
14 like amount of product in a test sample.  It could
15 easily be, like, twice as much of product in one
16 sample than another sample.
17 BY MS. PETERSON:
18      Q.  Okay.  What other kind of factors might
19 come into play?
20      A.  Well, mostly amount of the chemical
21 because the other factors are pretty much the same
22 for all the samples and measurements.  Only
23 difference between them, the variable is how much
24 of the chemical is on the sample.
25      Q.  Okay.  You said that the other factors

118

1 are pretty much the same for all the samples and
2 measurements.  What are you referring to there?
3 Are you comparing these results to something else?
4      A.  This results between themselves, within
5 this set of measurements.
6      Q.  Okay.
7      A.  So if you want to compare one product to
8 another, well, you can easily do this.  But the
9 difference -- 50 percent difference.  Like here it
10 could be accounted for with different amount of
11 product.
12      Q.  And what exactly are you referring to as
13 the 50 percent difference here?  What numbers are
14 you looking at?
15      A.  Like if you look at the charge, like if
16 you have BlueWillow average charge 4 and minus 14
17 and a half -- let's say the next one up is 7.  So
18 that's about -- that's the difference.
19      Q.  Okay.  And so you're attributing that
20 the -- or strike that.
21      So in your opinion, that difference in
22 the charge between the BlueWillow and the
23 NasalGuard products is most likely a result of the
24 amount of the product that was applied to the
25 substrate?

119

1      A.  I think so.  Because, again, it's saying
2 similar difference for different samples of the
3 same product.
4      Q.  So if you had applied even more of the
5 NasalGuard product to the substrate, would you
6 have expected to see a charge that was a tenfold
7 greater than BlueWillow?
8      A.  Well, I guess -- well, if it -- if you
9 could physically do that.  There are some limits,
10 just physical limitations how much you can apply.
11 If you applied ten times less, then you would get
12 ten times less signal.  That's for sure.  Ten
13 times more, that's difficult to do, because it
14 will just kind of drip.  While the sample is
15 spinning, it will fly off the surface.
16      Q.  Okay.  So, basically, the amount of
17 charge that you measured is proportional to the
18 amount of the test product that was applied to the
19 substrate?
20      A.  Yes.
21      MR. KREMEN:  Objection to form.
22 BY MS. PETERSON:
23      Q.  Okay.  I apologize if I already asked
24 you this, but after you prepared this report and
25 finalized it, did anybody from Trutek or Trutek's

120

1 lawyers ask you to make any changes to the report?
2      A.  No.  No one asked me to do any changing.
3      Q.  I don't see anything reported in your
4 report about the temperature of the room where the
5 measurement was taken.  Do you know what the
6 temperature was?
7      A.  It was 72 degrees.
8      Q.  How do you know that?
9      A.  Because I have a thermometer in my room,
10 and the thermostat is set to that temperature.
11      Q.  Okay.  And what about the relative
12 humidity, did you happen to measure that?
13      A.  Yeah, it was about 40 percent.  I
14 measured that, too.
15      Q.  Okay.  So you --
16      A.  None of that is relevant to this
17 measurement.
18      Q.  Okay.
19      A.  Because the method measures a charge of
20 the chemical regardless of external conditions.
21      Q.  Okay.  But going back to the relative
22 humidity, you actually measured the relative
23 humidity in your office prior to conducting this
24 test?
25      A.  Yes, I have a meter in my office.

121

1    Q.  Okay.
2    **A.  And that was about -- that's how much**
3 **humidity.**
4    Q.  Okay.  And is the relative humidity
5 always set to 40 percent in your office?
6    **A.  It depends on the kind of weather and**
7 **everything.**
8    Q.  So how do you know it was 40 percent on
9 the day of this testing?
10   **A.  Well, I happen to look at humidity that**
11 **day.**
12   Q.  Okay.  So on someday in January 2021,
13 when you conducted this test, you remember looking
14 at the humidity meter, and you remember exactly
15 what the humidity level was?
16   **A.  Yeah, but that's what it is in**
17 **wintertime.  In the summertime, it could be**
18 **8 percent.**
19   Q.  Okay.  So it's based on your
20 recollection on what the humidity typically is in
21 your office during wintertime?
22   **A.  Uh-huh.  Yes.**
23   Q.  Yes?  Okay.
24   **A.  Uh-huh.**
25   Q.  Are you aware of whether there are any

122

1 standard test methods that would apply to testing
2 products for electrostatic charge?
3    **A.  No, I'm not aware of any methods that**
4 **would report charge per square area.**
5    Q.  Yeah, I'm not talking about a method
6 that would report charge per square area.  I'm
7 asking are you aware of any standard test methods
8 that would apply that you should follow when
9 testing products for electrostatic charge?
10   **A.  Well, I just created the standard method**
11 **which is described in this report.  That's what I**
12 **follow.**
13   Q.  Okay.  So you didn't look to any
14 guidance on any standard test methods that may
15 apply to your procedure?
16   **A.  There is no such guidance.  That was**
17 **first time created.  So that's the protocol that**
18 **we followed, what's described here in this report.**
19   Q.  Okay.
20      MS. PETERSON:  Let's go off the record
21 and take a short break.
22      THE VIDEOGRAPHER:  We're going off the
23 record.  The time is now 2:07 p.m.
24      (Recess from the record.)
25      THE VIDEOGRAPHER:  We're back on the

123

1 record.  The time is now 2:16 p.m.
2 BY MS. PETERSON:
3    Q.  Thank you.  Dr. Ermakov, just to
4 double-check again, did you have any conversations
5 with anybody during any of the breaks during the
6 deposition today about your deposition testimony?
7    **A.  No.**
8    Q.  Okay.  And then I just have one other
9 point I want to clarify about your testing in the
10 second round of testing that we've been talking
11 about.  So you prepared three paper substrates for
12 each test sample; correct?
13   **A.  Yes, that's correct.**
14   Q.  Did you prepare any other substrates or
15 samples that you measured that are not included in
16 your report?
17   **A.  No, I did not.**
18   Q.  Okay.  And then I have just one other
19 document that I want to mark.
20      MS. PETERSON:  Can we pull up
21 Dr. Ermakov's earlier report?
22      Emily, this is the one that I uploaded.
23 It's got an 11 in front of it.
24      MR. KREMEN:  And what is the exhibit
25 number?

124

1      MS. PETERSON:  We'll mark this as
2 Exhibit 30.
3      (Ermakov Deposition Exhibit 30 was
4 marked for identification and attached to the
5 transcript.)
6 BY MS. PETERSON:
7    Q.  Okay.  So Exhibit 30 is another report.
8      MS. PETERSON:  If you could scroll up to
9 the top, please.  Yeah.
10 BY MS. PETERSON:
11   Q.  So this report is titled "Determination
12 of Surface Electrostatic Charge on Nasal
13 Application Test Products.  Test Conducted and
14 Report Prepared by Alexei Ermakov; Ph.D.
15 (Physics), Sr. Consultant."
16      MS. PETERSON:  And if we could scroll
17 down to the bottom of the page.
18 BY MS. PETERSON:
19   Q.  The report is dated July 16, 2019.
20      Dr. Ermakov, do you recognize this as
21 the report that you prepared on July 16, 2019,
22 with respect to your first round of testing that
23 you conducted for Trutek?
24   **A.  Yes.**
25   Q.  Okay.

**125**

1    MS. PETERSON: And then if we could
2 scroll to the final page.
3 BY MS. PETERSON:
4    Q. Is that your signature on the bottom of
5 page 3?
6    **A. Yes, that's my signature.**
7    Q. Okay. Thank you.
8    MS. PETERSON: Dr. Ermakov, thank you
9 for your time today. I don't have any further
10 questions for you at this time.
11    THE WITNESS: Okay. You're welcome.
12    THE VIDEOGRAPHER: Mr. Kremen, do you
13 have any questions?
14    MR. KREMEN: No, no cross-examination.
15    MS. PETERSON: Okay. We can go off the
16 record, please.
17    THE VIDEOGRAPHER: All right. Just one
18 moment, please.
19    MR. KREMEN: Oh, I have one question,
20 though --
21    THE VIDEOGRAPHER: This marks --
22    MR. KREMEN: I have a question --
23    THE VIDEOGRAPHER: Do you want this on
24 the record, Mr. Kremen?
25    MR. KREMEN: No, let's take it off the

**126**

1 record.
2    THE VIDEOGRAPHER: This marks the end of
3 the deposition of Dr. Alexei Ermakov. We're going
4 off the record. The time is now 2:19 p.m.
5    (Off the record at 2:19 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**127**

1    A C K N O W L E D G E M E N T
2
3 STATE OF MARYLAND    )
                       ss
4 COUNTY OF MONTGOMERY )
5
6    I, ALEXEI ERMAKOV, PH.D.,
7 hereby certify, I have read the transcript of my
8 testimony taken under oath in my deposition of
9 October 26, 2022; that the transcript is a true,
10 complete and correct record of what was asked,
11 answered and said during this deposition, and that
12 the answers on the record as given by me are true
13 and correct.
14
15    _____
      ALEXEI ERMAKOV, PH.D.
16
17
18 Sworn and subscribed to before me
19    this _____ day of _____, 2022.
20
21    _____
      Notary Public
22
23
24
25

**128**

1 STATE OF MARYLAND    )
2                       ss:
3 COUNTY OF MONTGOMERY )
4
5    I, Matthew Goldstein, Notary Public
6 within and for the State of Maryland, do hereby
7 certify:
8
9    That I reported the proceedings in the
10 within entitled matter, and that the within
11 transcript is a true record of said proceedings.
12
13    I further certify that I am not related
14 to any of the parties to the action by blood or
15 marriage, and that I am in no way interested in
16 the outcome of this matter.
17
18    IN WITNESS WHEREOF, I have hereunto set
19 my hand this 6th day of November, 2022.
20
21    _____
      Matthew Goldstein, RMR, CRR
22
23
24
25