# EXHIBIT 5

Transcript of Shane Burns
October 25, 2022

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                   SOUTHERN DIVISION
4   --------------------------------X
5   TRUTEK CORP.,                    :
6       Plaintiff/Counter-Defendant,:
                                     :  Case No.:
7       v.                           :
                                     : 2:21-cv-10312
8   BLUEWILLOW BIOLOGICS, INC.       :
9       Defendant/Counter-Plaintiff,:
10  ROBIN ROE 1 through 10           :
11  (fictitious names); ABC          :
12  CORPORATION 1 through 10         :
13  (fictitious names),              :
14      Defendants.                  :
15  --------------------------------X
16
17           Deposition of SHANE BURNS
18             Conducted Remotely
19           Tuesday, October 25, 2022
20                 10:17 a.m.
21
22
23  Job No.: 468439
24  Pages: 1-168
25  Reported by: Matthew Goldstein, RMR, CRR
```

**Page 2**

```
1        Deposition of SHANE BURNS, conducted
2   remotely:
3
4
5
6
7
8
9        Pursuant to Notice, before Matthew Goldstein,
10  RMR, CRR, Notary Public in and for the State of
11  Maryland.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF, TRUTEK CORP.:
3       STANLEY H. KREMEN, ESQUIRE
4       4 Lenape Lane
5       East Brunswick, New Jersey 08816
6       732.593.7294
7
8   ON BEHALF OF THE DEFENDANT, BLUEWILLOW
9       BIOLOGICS, INC.:
10      LIANE M. PETERSON, ESQUIRE
11      FOLEY & LARDNER
12      3000 K Street, NW
13      Suite 600
14      Washington, D.C. 20007
15      202.672.5300
16
17  ALSO PRESENT:
18      JENNIFER PODIS - REMOTE TECHNICIAN
19      JOHN PARKMAN - VIDEOGRAPHER
20      ASHOK WAHI
21
22
23
24
25
```

**Page 4**

```
1                C O N T E N T S
2   EXAMINATION OF SHANE BURNS              PAGE
3
4   By MS. PETERSON                          8
5              E X H I B I T S
6                (Attached)
7   BURNS        DEPOSITION EXHIBIT          PAGE
8
9   Exhibit 13   Previously Marked, Plaintiff's   106
                 Opening Technical Report of Dr.
                 Edward A. Lemmo
10
11  Exhibit 23   Surface Electrostatic Charge     64
                 Evaluation of Nasal Application
                 Products Technical Report
12
     Exhibit 24   Deposition Notice               80
13
     Exhibit 25   Professional Profile of Shane    88
14                Burns
15  Exhibit 26   Photograph of NasalGuard         101
16  Exhibit 27   Determination of Surface        158
17               Electrostatic Charge on Nasal
                 Application Test Products Test
18               Conducted and Report Prepared
                 by Alexei Ermakov; Ph. D.
                 (Physics), Sr. Consultant
19
20  --------TRANSCRIPT INFORMATION/REQUESTS----------
21  DOCUMENT/DATA REQUESTS:              (Page/Line)
22                                       120    13
23
24
25
```

---

5

1   THE REMOTE TECHNICIAN:  Thank you to
2 everyone for attending this proceeding remotely,
3 which we anticipate will run smoothly.  Please
4 remember to speak slowly and do your best not to
5 talk over one another.
6       Please be aware that we are recording
7 this proceeding for backup purposes.  Any
8 off-the-record discussions should be had away from
9 the computer.  Please remember to mute your mic
10 for those conversations.
11       Please have your video enabled so the
12 reporter can identify who is speaking.  If you are
13 unable to connect with video and are connecting
14 via phone, please identify yourself each time
15 before speaking.
16       I apologize in advance for any
17 technical-related interruptions we might have.
18       Thank you.
19       THE VIDEOGRAPHER:  Just a moment,
20 please.
21       MR. KREMEN:  I'm sorry.
22       THE VIDEOGRAPHER:  Go ahead, Mr. Kremen.
23       MR. KREMEN:  I just want to do one
24 housekeeping matter.  Just as yesterday, we do not
25 agree to the usual stipulations.  However, we do

---

6

1 agree to, except for objection to form of the
2 question, all other objections will be reserved at
3 time of trial.
4       MS. PETERSON:  Okay.
5       THE VIDEOGRAPHER:  All right.  Just a
6 moment, please, and I'll get us on the record.
7       Here begins Media No. 1 in the video
8 recorded deposition of Shane Burns, in the matter
9 of Trutek Corporation versus BlueWillow Biologics
10 Incorporated, et al., in the United States
11 District Court Eastern District of Michigan
12 Southern Division, Case No. 2:21-cv-10312.
13       Today's date is Tuesday, October 25th,
14 2022.  The time on the video monitor is now
15 10:17 a.m. Eastern Time.
16       The remote videographer today is John
17 Parkman representing Planet Depos.
18       All parties of this video deposition are
19 attending remotely.
20       Would counsel please voice identify
21 themselves and state whom they represent.
22       MR. KREMEN:  Stanley Kremen for the
23 plaintiff, Trutek Corporation.
24       MS. PETERSON:  Liane Peterson from Foley
25 & Lardner LLP, on behalf of the defendant,

---

7

1 BlueWillow Biologics.
2       THE VIDEOGRAPHER:  The court reporter
3 today is Matthew Goldstein, also representing
4 Planet Depos.
5       Would the reporter please swear in the
6 witness.

---

8

1       P R O C E E D I N G S
2 Whereupon,
3       SHANE BURNS,
4 being first duly sworn or affirmed to testify to
5 the truth, the whole truth, and nothing but the
6 truth, was examined and testified as follows:
7 EXAMINATION BY COUNSEL FOR THE DEFENDANT
8 BY MS. PETERSON:
9    Q.  Thank you.
10       Good morning.  Could you please state
11 your full name and address for the record?
12    A.  My name is Shane Burns.  I'm presently
13 at 700 West Park Avenue in Perkasie, Pennsylvania.
14 That's where the company is located.  You wanted
15 my business address; correct?
16    Q.  That's fine.  Thank you.
17       And just to introduce myself, my name is
18 Liane Peterson.  I'm one of the lawyers that's
19 representing the defendant, BlueWillow Biologics,
20 in this litigation matter that's pending in
21 Michigan.  And I will be taking your deposition
22 today.
23       So I understand you're located currently
24 at your place of employment; is that correct?
25    A.  Yes.

**9**

1    Q.  Okay.  Is there anybody else in the room
2  with you today?
3    A.  No.
4    Q.  Mr. Burns, have you had your deposition
5  taken before?
6    A.  Yes.
7    Q.  How many times?
8    A.  One time.
9    Q.  And was that in connection with your
10  employment at ETS or in some other capacity?
11    A.  No, it was at a previous employer
12  relating -- unrelated to anything having to do
13  with my own work.
14    Q.  Okay.  So you were deposed in connection
15  with a matter with respect to your prior
16  employment?
17    A.  It was in respect to a matter connected
18  to another employee.
19    Q.  Okay.  And would this be your prior
20  employment at EFE Laboratories?
21    A.  Yes.
22    Q.  Okay.  And then would it be fair to
23  assume that your deposition, the subject matter of
24  it, didn't have anything to do with any particular
25  test or equipment that you used?

**10**

1    A.  No, it had nothing to do with anything I
2  actually did at all.
3    Q.  Okay.  Fair enough.
4        And then you've never had your
5  deposition taken on any type of personal matter
6  either; is that correct?
7    A.  No.
8    Q.  Okay.  How long ago was that deposition?
9    A.  It would have been 2014.
10    Q.  Well, given that that was some time ago,
11  I'll just go through a few rules just to remind
12  you about how the deposition will proceed today.
13  I would ask that you wait until I finish my
14  questions before responding, and I will try to do
15  the same when you're speaking, as well.  Okay?
16    A.  Sure.
17    Q.  And I'm going to ask that you answer my
18  questions verbally rather than shaking your head
19  or nodding or saying "uh-huh," just so that we can
20  have a clean record.  Okay?
21    A.  Understood.
22    Q.  And if at any point in time you do not
23  understand one of my questions, let me know.  I
24  can rephrase.  Otherwise, I'll assume that you
25  understood the question.  Okay?

**11**

1    A.  Okay.
2    Q.  And then, finally, as was explained
3  earlier, let's try to speak slowly, not talk over
4  each other so that the court reporter can take
5  down a clean record of the deposition today.
6  Okay?
7    A.  Agreed.
8    Q.  Are you aware of any reason why you
9  would be unable to provide complete and truthful
10  testimony during the deposition today?
11    A.  No, I can't think of any reason.
12    Q.  Okay.  Mr. Burns, have you been retained
13  to provide any testing services in connection with
14  a litigation in the past four years?
15    A.  You mean -- I didn't know that it had
16  anything to do with litigation.  I have performed
17  testing services for Ashok Wahi's company, Trutek.
18    Q.  Okay.  And you're saying that at that
19  time you were engaged to perform those testing
20  services for Trutek, you were unaware that it was
21  related to any litigation?
22    A.  Correct.
23    Q.  Okay.  Now, in connection with your
24  other work at ETS, are you aware of whether the
25  testing that you conducted was related to any

**12**

1  litigation matters?
2    A.  No, I don't believe so.
3    Q.  Okay.  So to the best of your knowledge,
4  the testing that Trutek retained you to conduct is
5  the only time that you've performed testing in
6  support of a litigation matter; is that right?
7    A.  That I have been informed of.
8    Q.  Fair enough.  Thank you.
9        And just for completeness, I assume that
10  same answer would hold for whether or not you've
11  knowingly prepared a report concerning any testing
12  related to a litigation matter?
13    A.  As far as I know.
14    Q.  So this is the only instance that
15  you're aware of?
16    A.  As far as I know.
17    Q.  Okay.  And you prepared two reports in
18  connection with testing that was conducted on
19  behalf of Trutek; correct?
20    A.  I performed two rounds of testing for
21  Trutek and created reports to go with those tests,
22  yes.
23    Q.  Have you been asked by Trutek to perform
24  any other testing apart from those two rounds of
25  testing that you just identified?

Transcript of Shane Burns
October 25, 2022

13

1      A.  I don't believe so.  Unless he's got --
2  you know, people contact me often through their
3  companies.  So I don't necessarily know who the
4  owners of those companies are.
5      Q.  Okay.
6      A.  But as far as I know, just the two,
7  yeah.
8      Q.  Okay.  So to the best of your knowledge,
9  you are not aware of anyone at Trutek or any
10  lawyers for Trutek requesting you to conduct any
11  other testing apart from the two rounds of testing
12  that you identified earlier?
13      A.  As far as I know, I don't know of any
14  other instances of people trying to contact me
15  relating to Trutek.
16      Q.  Okay.  And then I assume that you have
17  not been retained or engaged by Trutek's counsel
18  to provide testing on any other matter?
19      A.  No, my first time speaking with
20  Mr. Kremen was in relation to this deposition and
21  this litigation that's going on here.
22      Q.  Okay.  And when were you first retained
23  or engaged to conduct testing services on behalf
24  of Trutek?
25      MR. KREMEN:  Objection to the form of

14

1  the question.
2      Do you mean in general or specifically
3  for this litigation?
4      MS. PETERSON:  In general.
5      THE WITNESS:  I've not been retained for
6  anything else other than this litigation.
7  BY MS. PETERSON:
8      Q.  Okay.  And I'm just asking you when that
9  occurred?  When were you first contacted?
10      A.  Oh, I believe Mr. Kremen reached out to
11  me a few weeks ago.  I don't recall the exact
12  date, but not long ago.  Less than a month ago.
13      Q.  Okay.  And --
14      A.  Sorry.
15      Q.  Okay.  So you said Mr. Kremen reached
16  out to you a few weeks ago.  And what was the
17  purpose of that communication?
18      A.  He told me that he would need me to
19  testify as an expert witness or at least as the
20  person who created the test reports.
21      Q.  Oh, okay.
22      So approximately two weeks ago
23  Mr. Kremen reached out to you to explain that you
24  would need to give this deposition?
25      A.  I don't know if it was two weeks ago,

15

1  but I can look it up if you would like.
2      Q.  I don't need to know the exact -- I'm
3  just -- approximately two weeks ago, a few weeks
4  ago?
5      A.  Yeah.
6      Q.  Okay.
7      A.  Recently.
8      Q.  Okay.  So what I would like to know is
9  when were you first contacted to conduct the
10  testing that you did?
11      A.  Oh, the first time Mr. Wahi contacted me
12  I was at the previous facility.  We moved at the
13  end of 2019, beginning of 2020.  So he had
14  actually contacted me before we changed locations.
15  So that would have been in 2019.
16      Q.  Okay.  And did Mr. Wahi contact you
17  directly, or did he reach out to ETS?
18      A.  So he reached out to -- through the ETS
19  e-mail.  So I'm the contact at ETS where people --
20  customers often first reach us.  But it was
21  through the ETS e-mail system, yeah.
22      Q.  Okay.  So he did not identify you
23  personally and reach out to you personally.  He
24  just reached out generally to ETS?
25      A.  Yeah, I believe so.

16

1      Q.  Okay.
2      A.  It was a while ago, but from what I
3  recall, he wasn't -- he did not reach my personal
4  e-mail.  He reached my work e-mail.
5      Q.  Okay.  And how was it determined then
6  that you would be the employee of ETS that would
7  conduct the testing?
8      A.  Well, we're a small business, and so I'm
9  the employee at the time who was conducting
10  testing.
11      Q.  Okay.  How many -- at that time how many
12  people were employed by ETS?
13      A.  Between 8 and 12.  Not many.
14      Q.  Okay.  And at the time, you were the
15  only -- well, let me back up.
16      What kind of business is ETS engaged in
17  generally?
18      A.  Well, we do four different types of -- I
19  guess you could say products and services.  We
20  perform testing and consulting.  We also perform
21  calibration.  And that's the service side of the
22  business.  And then on the products side of the
23  business, we manufacture lab equipment.  We'll
24  manufacture environmental control lab equipment,
25  and we'll also manufacture electrostatic

17

1 characterization and testing lab equipment.
2    Q.  Okay.  And so at the time that Mr. Wahi
3 contacted you sometime in 2019, you were the only
4 employee at ETS who provided those testing and
5 consulting services; is that correct?
6       MR. KREMEN:  Objection to the form of
7 the question.
8       You may answer.
9       THE WITNESS:  Okay.  We had a retiring
10 former owner named Stan Whites, he retired in
11 2020.  So when we moved, beginning of 2020, Stan
12 retired.  And he had been doing testing and some
13 consulting, but by 2019, his work for us had
14 tapered off to the point where he was practically
15 not doing anything at all.
16       So you could say in 2019 Stan Whites,
17 the former owner, was still performing some
18 testing.  But at the time that I was performing it
19 for Mr. Wahi, Stan was pretty much out of the
20 picture.  He was preparing to move to Florida, and
21 he was finishing up the transfer of his portion of
22 the business and what he was involved in so he
23 could step out.
24 BY MS. PETERSON:
25    Q.  I understand.  Thank you.

18

1       So at the time that you conducted that
2 first round of testing then, would it be fair to
3 say that you were the only employee at ETS who was
4 providing the testing and consulting services?
5    A.  Correct.
6    Q.  Okay.  And do you have an understanding
7 of why Mr. Wahi decided to reach out to ETS for
8 these testing services that he requested?
9    A.  Yes.
10    Q.  And what is that?
11    A.  We're an electrostatic characterization
12 lab.  We perform testing on electrostatic
13 phenomena.  And we've been doing that for a very
14 long time.  The previous owner, Stan Whites, I'm
15 told by Mr. Wahi, was someone that Mr. Wahi knew
16 of and had heard of.  Stan Whites was known in the
17 industry.  He invented a number of machines that
18 people commonly use today to perform testing.
19    Q.  Okay.
20    A.  So our business is well known to be
21 connected to the electrostatic testing industry.
22    Q.  Okay.  Speaking of the electrostatic
23 testing industry, I saw a number of references in
24 your résumé to ESD.  What does that stand for?
25    A.  Electrostatic discharge.

19

1    Q.  Okay.  And so that would be the amount
2 of, I guess, the transfer of energy when two
3 terminals come in contact with each other?
4    A.  No.
5    Q.  Okay.  Can you just explain it for me
6 then?
7    A.  Sure.  Electrostatic discharge is simply
8 any time you have -- you have a discharge of
9 energy if you want to describe it as that, from a
10 place of higher potential to a place of lower
11 potential or from one potential to another,
12 electrostatic potential.  And there's a lot of
13 types of electrostatic discharge.
14    Q.  Okay.  I mean, would one example of that
15 be when you're walking along a carpet or something
16 and then you touch a metal object and get a shock?
17    A.  That is one type of electrostatic
18 discharge.
19    Q.  Okay.  And that's -- that electrostatic
20 discharge, that's what ETS is primarily focused on
21 and known for with respect to its testing
22 services?
23    A.  So that's partly true.  It's not the
24 entirety of it.  There are other elements to what
25 we're known for.

20

1    Q.  Okay.  Can you explain what those other
2 elements are?
3    A.  Yes.  Stan Whites invented a number of
4 stimulators of electrostatic discharge.  And those
5 simulators helped to make a name for the company.
6 He was also involved in the founding of the
7 ESD/EOS Association, and he was a founding member
8 of that organization.  And they now write many of
9 the test standards and test methods and document
10 those and perform studies on characterizing
11 different kinds of electrostatic discharge.
12    Q.  Okay.
13    A.  And resistance testing and static decay
14 testing, those are also things that Stan Whites
15 was instrumental in helping to standardize in the
16 industry.
17    Q.  Okay.  Thank you for that explanation.
18       So with respect to the testing that you
19 were asked to conduct for Trutek, would you
20 characterize that as ESD testing?
21    A.  It's electrostatic characterization
22 testing.  It's not technically ESD testing.
23    Q.  Okay.  And then I would assume that all
24 of those standards that you were mentioning for
25 electrostatic discharge testing, those don't

21

1  necessarily apply to the testing that you did for
2  Trutek?
3      **A.  Some do, some don't.**
4      Q.  Okay.  Mr. Burns, do you intend to
5  testify at the trial in this matter if you're
6  asked to do so?
7      **A.  If I'm asked to do so, I will.**
8      Q.  Okay.  And when were you contacted about
9  conducting the second round of testing for Trutek?
10     **A.  I don't remember exactly when I was**
11 **contacted.  I do have the date when the testing**
12 **was performed, though.**
13     Q.  Okay.
14     **A.  I can probably look it up if you want.**
15     Q.  Yeah, I don't necessarily need an exact
16 date.  I mean, if you have a general recollection
17 of the time frame, I mean, if it was roughly
18 around that same time frame that you did the
19 testing?
20     **A.  It would have been late 2020, because**
21 **the testing was performed -- or completed in**
22 **January of 2021.**
23     Q.  Okay.  And was it Mr. Wahi who contacted
24 you again to request the second round of testing?
25     **A.  I believe so.  I know his daughter was**

22

1  **involved in that second round.**
2      Q.  How was Mr. Wahi's daughter involved in
3  the second round of testing?
4      **A.  I believe she has an official position**
5  **at his company and she was present, actually.**
6      Q.  So she was present when you conducted
7  the test?
8      **A.  I believe so.**
9      Q.  Did you personally conduct the test?
10     **A.  Yeah.  Yes.**
11     Q.  And do you know why Mr. Wahi's daughter
12 personally attended that second round of testing?
13     MR. KREMEN:  Objection to the form of
14 the question.
15     You may answer.
16     THE WITNESS:  Customers commonly, very
17 often, want to see the testing performed.
18 Sometimes it's to see how the testing is performed
19 should they wish to reproduce the test themselves.
20 Other times they're simply curious.  And there are
21 also other reasons, of course.  Sometimes a test
22 specimen is exceptionally costly and they can't
23 afford for it to be damaged or ruined and they
24 wish to be present to instruct us on the care and
25 handling of their specimen.

23

1  BY MS. PETERSON:
2      Q.  Okay.  Did Mr. -- actually, do you know
3  Mr. Wahi's daughter's first name or her name?
4      **A.  I can't recall it off the top of my head**
5  **right now, but I can look it up for you.  Or I can**
6  **just ask Mr. Wahi.**
7      Q.  Well, he's not being questioned at this
8  deposition.  So that's fine.
9      I just didn't know if he had a name that
10 we could refer to her instead of just calling her
11 Mr. Wahi's daughter.
12     **A.  I can probably look it up if you'd like.**
13     Q.  That's okay.  We don't need to do that
14 right now, but thank you.
15     So I assume she did not personally
16 attend to observe the first round of testing that
17 you conducted; is that correct?
18     MR. KREMEN:  Objection to the form of
19 the question.
20     You may answer.
21     THE WITNESS:  Actually, I believe she
22 was, as well as Mr. Wahi himself were both present
23 at the first test.
24 BY MS. PETERSON:
25     Q.  Okay.  So both Mr. Wahi and his daughter

24

1  were present at the first test, and only
2  Mr. Wahi's daughter was present at the second
3  test?
4      **A.  There was another employee present with**
5  **her, as well, at the second test.  I don't**
6  **remember this person's name.**
7      Q.  Okay.  Was it a man or a woman?
8      **A.  It was a man.**
9      Q.  And it was definitely an employee of
10 Trutek?
11     **A.  Yes, I believe so.**
12     Q.  Do you know what that person's role was
13 within the company?
14     **A.  I apologize, but I don't remember the**
15 **exact title or name of the person.**
16     Q.  Okay.  So do you know specifically why
17 Mr. Wahi and his daughter and this other Trutek
18 employee decided to attend the testing?
19     MR. KREMEN:  Objection to the form of
20 the question.
21     You may answer.
22     THE WITNESS:  My presumption was that
23 they were curious how to perform the test
24 themselves should they need to reproduce the
25 results.

25

1  BY MS. PETERSON:
2      Q.  Okay.  And so you didn't ask them?
3      **A.  It didn't seem important.  Customers**
4  **very often want to witness the test occur.  That's**
5  **not unusual in the least.**
6      Q.  Yeah, I'm not suggesting that it's
7  unusual.  I'm just trying to understand what
8  happened.
9          And I assume they -- or did they explain
10 to you why they chose to attend?
11     **A.  I don't know why they should have to.**
12     Q.  Okay.  That really -- we're not debating
13 whether or not they should have to.  I'm just
14 asking a simple question.  Did they tell you
15 anything about why they asked and chose to attend
16 the testing?
17     **A.  I don't remember.  I don't think they**
18 **did.  I usually don't require customers to give me**
19 **a reason for why they should want to witness a**
20 **test.  All they have to do is say that they would**
21 **like to see the test.  And I tell them usually,**
22 **Okay, let's just schedule a time.**
23     Q.  Okay.  Fair enough.  Thank you.
24         And what hourly rate did you charge
25 Trutek for the testing services that you provided

26

1  in this matter?
2      **A.  There's a standard testing rate, and**
3  **then there's custom testing rates.  And custom**
4  **test rates usually are charged by the day.**
5  **Standard test rates are usually by the specimen,**
6  **plus some setup and equipment fees and so on.**
7      Q.  Okay.  And what did you charge Trutek
8  for the testing that you conducted?
9      **A.  I don't remember, but I can look that up**
10 **for you if you would like.**
11     Q.  We will need that information, perhaps
12 you can look that up on a break for us.
13     **A.  Standard testing is considerably less**
14 **expensive than custom testing.  And I believe that**
15 **this was considered custom testing.**
16     Q.  Okay.
17     **A.  I could be mistaken about that, but I**
18 **can look up the test.**
19     Q.  I will need to know that information.
20 So at some point during the deposition during a
21 break if you can look that up and let me know when
22 we reconvene, I would appreciate it.
23     **A.  Uh-huh.**
24     Q.  And --
25     **A.  I'm just writing it down.**

27

1      Q.  Yeah, sure.
2          Then do you -- approximately how much
3  time have you spent working on the testing that
4  you conducted for Trutek?
5      **A.  One of them was at least a day.  And**
6  **then I spent more time after that working on the**
7  **report.  The second one I think was more like -- I**
8  **think it was also about a day working on that one.**
9      Q.  About a day for working on the test?
10     **A.  Yeah, I can look it up on my calendar if**
11 **you would like to know the exact amount of time**
12 **that I spent on it.**
13     Q.  Yeah, if you can -- you know, it doesn't
14 have to be an exact amount of time down to the
15 minute or anything, but an approximate number of
16 hours that you spent working on it, that would be
17 great.
18     **A.  Okay.**
19     Q.  When you spoke with Mr. Wahi to --
20 actually, never mind.
21         Before you started the testing, did you
22 speak with anybody else at Trutek other than
23 Mr. Wahi?
24     **A.  Mr. Wahi was the main contact that I**
25 **had.  I don't recall speaking to anyone other than**

28

1  **himself, his daughter, and that other employee**
2  **that I mentioned.**
3      Q.  Okay.  And when was the first time that
4  you spoke with Mr. Kremen?  Was it that instance a
5  few weeks ago?
6      **A.  Yes.**
7      Q.  Okay.  And to the best of your
8  knowledge, have you ever had any communications
9  with any other attorneys representing Trutek
10 regarding the testing that you conducted for them?
11     **A.  No, I'm not aware that there were any**
12 **other attorneys.**
13     Q.  And the same would be true for the first
14 round of testing; is that right?
15     **A.  I did not speak with any attorneys for**
16 **either round of testing.  I've only spoken with**
17 **attorneys in connection with this deposition.**
18     Q.  Great.  Thank you.
19     **A.  As far as Trutek is concerned anyway.**
20     Q.  And then specifically within ETS, did
21 anybody within the company assist you or work with
22 you in designing the test or conducting the test?
23     **A.  Anyone else at Trutek?**
24     Q.  No, at ETS.
25     **A.  Oh, at ETS.  I don't recall anyone other**

Transcript of Shane Burns
October 25, 2022

29

1  than maybe my general manager, I may have bounced
2  an idea or two off of him.  Stan Whites, even at
3  the end I was asking him for advice on a regular
4  basis.  But I don't think for this test I got any
5  significant input from either of them.
6      Q.  Okay.
7      A.  I could be mistaken, but I don't
8  remember getting any advice from either of them
9  regarding this.
10     Q.  Okay.  So to the best of your knowledge
11 today, you do not recall getting any significant
12 input or advice from anybody within ETS; correct?
13     A.  Correct.
14     Q.  Okay.  Now, with respect to your
15 assignment for the testing services, what were you
16 asked to do?
17         MR. KREMEN:  Objection to the form.
18         Do you mean in the -- for this
19 particular case or the first round of testing?
20         MS. PETERSON:  We can talk about this
21 particular round of testing.
22 BY MS. PETERSON:
23     Q.  So for your assignment for the second
24 round of testing that you did for Trutek, what
25 were you asked to do?

30

1      A.  So I was asked by Trutek to measure the
2  charge of materials that he would apply -- or that
3  Trutek would apply to some pigskin specimens.  And
4  then basically these pigskin specimens with
5  material applied to them would be used in my
6  equipment to measure charge in nanocoulombs.
7      Q.  Okay.  So you were specifically asked to
8  measure the charge of the materials on pigskin
9  specimens?
10     A.  I was measured -- I was measuring the
11 charge of the materials and the pigskin specimens
12 together.  So in order to accurately do that, I
13 believe we also measured the pigskin specimens by
14 themselves or neutralized.  At any rate, before
15 applying the material, the pigskin specimens were
16 neutralized using an ionizer.
17     Q.  Okay.
18     A.  So there would be no charge on the
19 pigskin specimens.
20     Q.  Yeah.  I guess I was wondering something
21 a little bit different.
22         You were instructed to use pigskin?
23     A.  The customer provided the pigskin.
24     Q.  Oh, okay.
25         So it wasn't your choice or your

31

1  selection to use pigskin as the substrate?
2      A.  No.
3      Q.  Okay.
4      A.  I'm not sure how that changes anything.
5      Q.  It doesn't change anything.  I just
6  wanted to know whether that was a request from
7  Trutek or whether that was a decision that you
8  made.
9          And is the same true for the first round
10 of testing, Trutek requested you to measure the
11 charge of materials on pigskin specimens using
12 your equipment?
13     A.  Yeah.
14     Q.  And did they also provide the pigskin
15 samples to you for that first round of testing?
16     A.  Yes.
17     Q.  Okay.  Were you told anything at the
18 time about how Trutek would use the results of
19 your testing?
20     A.  I don't believe so, no.
21     Q.  And apart from that basic instruction to
22 measure the charge of materials on pigskin
23 specimens using your equipment, were you asked to
24 design the test in any particular way by Trutek?
25     A.  I don't remember them asking me to

32

1  change anything or alter anything from what's
2  effectively a very common test.  The one thing
3  that was sort of I, I suppose, different about it
4  was that this was a fluid substance on pigskin,
5  and so care had to be taken to make sure that, you
6  know, there was no contamination or anything like
7  that.
8      Q.  What do you mean?
9      A.  Well, you could, you know, touch the
10 fluid or smear it on accident or something like
11 that.  So you have to be careful not to do that.
12     Q.  Oh, so you had to be careful to avoid
13 contamination of the test samples?
14     A.  Yeah, you didn't want to -- for example,
15 if you're holding the sample or the specimen, you
16 don't want it to -- you don't want to get the
17 fluid on your hands -- or get your hands on the
18 fluid, rather, because your hands would act as a
19 contaminant of the -- you know, what we were
20 trying to test.
21     Q.  Okay.  And going back to my original
22 question about whether Trutek provided any other
23 instructions, did they leave it to your discretion
24 to determine how to prepare the samples?
25     A.  No, they had decided how they were going

Transcript of Shane Burns
October 25, 2022

33

1  to cut the samples, and we were going to apply
2  either a liquid or fluid of some kind on the
3  surface. So they determined that.
4      Q.  Okay. What other instructions of that
5  nature did Trutek give you for performing the
6  test?
7      A.  I don't recall anything too specific. I
8  tried to record anything I could in the test
9  reports.
10     Q.  Do you keep lab notebooks?
11     A.  I keep test reports.
12     Q.  Okay. No, I understand that you have a
13 test report that you prepared to summarize the
14 testing once it was all complete, along with the
15 results; right?
16     A.  Uh-huh.
17     Q.  And do you keep any other records
18 associated with the testing?
19     A.  We keep data sheets, if there are data
20 sheets on certain types of tests. We keep,
21 obviously, the purchase orders from the customers.
22 Any photographs that customers wish to provide, we
23 try to keep those. And those are, of course, the
24 property of the customer and are only available if
25 the customer agrees to it. So the customer has to

34

1  be a consenting party to the release of any
2  information that they provide us.
3      Q.  Okay. So I don't think you actually
4  answered my question earlier, though.
5          Do you keep lab notebooks?
6      A.  I don't have any documentation called a
7  lab notebook that's saved or preserved anywhere,
8  no.
9      Q.  Okay. So you do not have lab notebooks;
10 is that correct?
11     A.  No, data is kept digitally on our secure
12 server.
13     Q.  Okay.
14     A.  We don't keep data in notebooks.
15     Q.  Okay. So the raw data from the test was
16 stored on a server; correct?
17     A.  Yeah.
18     Q.  And then you used that
19 information to ultimately prepare the final
20 report; is that right?
21     A.  Correct.
22     Q.  Okay. And as you were conducting the
23 testing, did you have any other notes or written
24 documents about the methods that you used to
25 perform the testing?

35

1      A.  I had phone calls and e-mails from
2  Mr. Wahi, but most of that was recorded in our
3  electronic database or in the reports themselves.
4      Q.  So the electronic database that you
5  mentioned, that would contain other records of
6  information that's pertinent to the testing?
7      A.  Yeah, it would have been the customer
8  name, number, contact information, the purchase
9  order number, things like that.
10     Q.  And would it contain any notes about the
11 scope of the testing or instructions for the
12 testing?
13     A.  We have a notes section. Sometimes that
14 contains some information, yes.
15     Q.  Okay. So going back to what
16 instructions you received, you were given
17 instructions to measure the charge of the
18 materials on pigskin, and you were also given
19 instructions on how to prepare the pigskin;
20 correct?
21     A.  Correct.
22     Q.  What other instructions did you receive
23 from Trutek or Mr. Wahi about how the testing
24 should be conducted?
25     A.  In what way, what do you mean?

36

1      Q.  Anything related to what was in your
2  report? I mean, if --
3      A.  I tried to include everything.
4      Q.  I'm just interested in knowing what --
5  what Trutek instructed you to do as opposed to
6  what was your own -- like what elements of the
7  testing was something that you devised on your
8  own?
9      A.  Well, I try not to devise anything on my
10 own in general. Most of the tests that we perform
11 use some pretty standard equipment. So we're not,
12 you know, trying to reinvent the wheel most of the
13 time. We're trying to do things that people
14 commonly do in the industry.
15     Q.  Okay.
16     A.  So what's included in the report is as
17 much as possible what was specific to the test.
18     Q.  Okay. So, for example, you mentioned
19 that the pigskin substrate was ionized; right?
20     A.  We had an ionizer, and we made sure that
21 we neutralized any charge on the pigskin by using
22 that ionizer, yes.
23     Q.  And did Mr. Wahi or anyone from Trutek
24 request you to do that, or is that part of your
25 procedure?

Transcript of Shane Burns
October 25, 2022

37

1    A.  Well, that's something that you commonly
2  do when you're performing any testing using a
3  NanoCoulomb Meter.
4    Q.  Okay.  So that's something that was your
5  input to the test?
6    A.  Yes, I guess you can say that.
7    Q.  That wasn't an instruction that you
8  received from Trutek?
9    A.  No.  I don't believe so, no.
10    Q.  Okay.  And then what about the sample
11  preparation, so the amount of test sample that was
12  applied to the pigskin, how was it determined how
13  much of the sample should be applied?
14    A.  That was determined by Trutek.
15    Q.  Okay.  And the amount of time in between
16  sample preparation and placing the substrate in
17  the test apparatus, was that provided by Trutek,
18  or is that part of your process?
19    A.  We tested the sample immediately after
20  test -- the sample is prepared.
21    Q.  Okay.
22    A.  That was the whole idea was to test the
23  material.  You know, if you waited, you have risk
24  of the environment affecting the test specimen.
25  So you can't wait.  You test it immediately.

38

1    Q.  Okay.  And then the results.  So they
2  were reported in terms of the total surface
3  electric charge as well as charge per square.  Did
4  Trutek request that the results be reported in
5  that manner, or is that how you decided to report
6  them?
7    A.  Yeah, they -- I believe that they wanted
8  somehow to quantify the material in terms of
9  relating the charge we measured to the amount or
10  surface area of material that could be spread on
11  the substrate, the pigskin.
12    Q.  Okay.
13    A.  So I think that that was something that
14  they really were desirous to have.
15    Q.  Okay.  And then in terms of, like, how
16  many samples were tested or the number of
17  replicates for each sample, did that instruction
18  come from Trutek, or was that part of your design
19  of the study?
20    A.  So I typically try to recommend that if
21  a customer is trying to collect data on a product,
22  that they use at least six data points.  And
23  there's a reason for that.  So there is something
24  called an AQL that is commonly used in
25  manufacturing and industry to try to get some kind

39

1  of reliable, repeatable results.  And there's a
2  formula that you can use to find out how reliable
3  a particular product or material is per the number
4  of repetitions that you perform.
5        And so, generally speaking, if you're
6  just doing some kind of indication test, you can
7  use three, but most test standards in the industry
8  recommend six or more.  So six was sort of the
9  bare minimum that I think is -- or that most
10  industry standards indicate is needed for good
11  reliable results.  And if you have six, then you
12  can record your minimum, maximum, and average and
13  from there figure out whether or not this is
14  something that you can rely on, this data you can
15  rely on.
16    Q.  Okay.  It looks like for this particular
17  test you had three data points for each product;
18  correct?
19    A.  I think so.  Yeah, this is an
20  indication -- more of an indication test.
21    Q.  What do you mean by an indication test?
22    A.  An indication test uses usually three
23  specimens.
24    Q.  Yeah, I understand that.  But what is an
25  indication test?

40

1    A.  It's just exactly that.  They use three
2  specimens instead of, say, one or six.
3    Q.  And what is the word "indication" -- I
4  mean, what's the relevance of that word to a --
5    A.  Indication is that you have a test that
6  you've performed.  It's not performed during the
7  manufacturing process on a regular basis every
8  day, and it's also not something that you're
9  necessarily performing for the purposes of, say, a
10  round robin study, okay, for say creating an
11  industry standard.  So it's an indication of the
12  characteristics of the material that the customer
13  can then take that information and then use it for
14  their own purposes.
15    Q.  Got it.
16        And did you recommend to Trutek that --
17  I think you said that six replicates is usually
18  what you recommend.  Is that what you recommended
19  here?
20    A.  You try to get as many replicates as you
21  possibly can.
22    Q.  And so why did you only use three in
23  this instance?
24    A.  Probably because that's about how much
25  sample we've had.  Although, they may have just

Transcript of Shane Burns
October 25, 2022

41

1 needed three data points for the purposes of
2 knowing what the characteristics were of their
3 material. You can do 100 data points, and it
4 doesn't change necessarily what the material is
5 like or how it's going to behave.
6     Q. So you advised Trutek that there would
7 be three replicates, and they were okay with that?
8     A. Yeah.
9     Q. Okay.
10    A. I believe so.
11    Q. Were you told anything else by Trutek
12 about the sample products other than that they
13 were a solution and a spray containing permanently
14 ionized molecules?
15        MR. KREMEN: Objection to the form of
16 the question.
17        You may answer.
18        THE WITNESS: I was told by Trutek that
19 this was a cationically charged substance or a
20 charged substance, but that didn't matter to me.
21 Ultimately, all I need to know is that I have a
22 substance and I need to perform a test and I'm
23 going to provide them results of the test.
24 BY MS. PETERSON:
25    Q. Okay.

42

1     A. I don't really need to know what they're
2 using it for or what the substance even
3 necessarily is other than how to properly handle
4 it.
5     Q. Okay. Were you told that the test
6 substances were pharmaceutical products?
7     A. I was not aware that they were
8 pharmaceutical in nature --
9     Q. Okay.
10    A. -- necessarily.
11    Q. Were you -- well, what do you mean by
12 "not necessarily"?
13    A. Well, I don't know. I don't know what
14 the materials were for. So, you know -- I know
15 one was a gel and one was a spray, and to me it
16 doesn't matter what the purposes of that material
17 is, how does that affect the test.
18    Q. Okay. Fair enough. I understand.
19        Were you told by Trutek that the test
20 products were intended to be used for
21 administration to human skin?
22    A. They did mention that, yes.
23    Q. Okay. And did they -- why did they tell
24 you that?
25        MR. KREMEN: Objection to the form. You

43

1 may answer.
2        THE WITNESS: They wanted to explain why
3 they were using pigskin as a substrate.
4 BY MS. PETERSON:
5     Q. Okay.
6     A. Or skin at all. It didn't really -- it
7 was sort of an odd substrate. So I suppose I must
8 have asked about it, and they explained that to
9 me.
10    Q. Fair enough.
11        So what did they explain to you about
12 why they wanted to use pigskin?
13    A. It's similar enough, I guess, to human
14 skin. That was their explanation.
15    Q. Okay. So you said that pigskin or skin
16 at all, it was sort of an odd substrate; right?
17        MR. KREMEN: Objection to the form.
18        You may answer.
19        THE WITNESS: It's unique certainly. I
20 don't have a lot of people coming in with any kind
21 of pigskin as a substrate.
22 BY MS. PETERSON:
23    Q. Have you ever conducted any testing over
24 the course of your career using pigskin as a
25 substrate?

44

1     A. Well, typically, people aren't testing
2 biologics. So it's not really a surprise to me
3 that I wouldn't have had that before, but that's,
4 you know, an easy explanation.
5     Q. Okay. Is that because your testing
6 typically involves, like, electronics equipment,
7 not biologic or pharmaceutical products?
8        MR. KREMEN: Objection to the form of
9 the question.
10        You may answer.
11        THE WITNESS: This kind of testing where
12 you are using a NanoCoulomb Meter and a Faraday
13 cup, all kinds of substances are tested. I've had
14 everything from carbon powders to peanut butter,
15 believe it or not. So what the material is does
16 not change how the test is performed necessarily
17 except in how to handle it, in how to handle the
18 material.
19 BY MS. PETERSON:
20    Q. Okay. Well, when I asked you -- let me
21 ask you the question again. Have you ever
22 conducted any testing over the course of your
23 career using pigskin as a substrate?
24    A. No.
25    Q. No.

Transcript of Shane Burns
October 25, 2022

45

1  And then you said that it's not
2  surprising that I wouldn't have had that before
3  because typically people aren't testing biologics.
4  What did you mean by that?
5  **A. Well, people test all kinds of things,**
6  **but not usually things that are going to be used**
7  **on a person or -- I have had a handful of tests**
8  **that involved the pharmaceutical industry, but**
9  **it's unusual when it occurs, but it happens from**
10 **time to time.**
11 Q. Okay. And to the best of your
12 recollection, is this the only instance when you
13 were asked to test a pharmaceutical product that
14 was going to be administered to human skin?
15 **A. As far as I --**
16 MR. KREMEN: Objection to form.
17 THE WITNESS: Go ahead.
18 MR. KREMEN: Go ahead, answer.
19 THE WITNESS: As far as I know, I don't
20 think I have tested anything like this. I have
21 tested other things that were applied to human
22 skin. I've tested lotions, but not in this way.
23 And I've tested perfumes -- we've tested perfumes
24 as a company. And that also was tested a little
25 differently from that.

46

1  BY MS. PETERSON:
2  Q. Okay.
3  **A. Because they were looking for different**
4  **characteristics. They were not concerned about**
5  **charge.**
6  Q. Okay.
7  **A. So charge is not typically something**
8  **that people are looking to measure when it comes**
9  **to things that are applied to a skin.**
10 Q. Understood. Thank you.
11 Now, when you were contacted to conduct
12 the second round of testing by Trutek, were you
13 asked to modify the test procedure at all?
14 **A. I don't recall any specific changes. I**
15 **know that there was -- the second round, there was**
16 **an attempt to provide more consistency in the**
17 **amount of material applied. So that was really**
18 **important. Because the first time, you know,**
19 **other than controlling the surface area it was**
20 **applied to, the actual quantity of fluid or gel**
21 **applied was difficult to control.**
22 **So the second time we had some**
23 **containers of specified volumes, I believe, that**
24 **were provided. And so that allowed us to control**
25 **the quantity of material a little bit more**

47

1  consistently.
2  Q. Okay. And why was it important to
3  control the quantity of the fluid or the gel that
4  was applied?
5  **A. I don't know, and it doesn't matter.**
6  Q. Okay. Well, you said it was important.
7  **A. It was important to the customer.**
8  Q. Was it important to you? Okay.
9  **A. It was important to the customer.**
10 Q. So Trutek told you it was important to
11 control the quantity of the test sample that's
12 applied to the substrate?
13 **A. Yes.**
14 Q. Okay. And for the second round of
15 testing, you said you were provided containers
16 with specified volumes? Is that what you said?
17 **A. Yeah, they had some small tubes of**
18 **material with -- sometimes with a swab or**
19 **applicator already inside of the tube --**
20 Q. Okay.
21 **A. -- I believe.**
22 Q. So the containers that you received from
23 Trutek had just a specific amount of volume in
24 them, and you were instructed to take that entire
25 volume of material and apply it to the test

48

1  substrate?
2  **A. Yes.**
3  Q. Okay. So you were --
4  **A. After the substrate had been**
5  **neutralized.**
6  Q. Of course.
7  So the containers that you were provided
8  by Trutek, they weren't the original containers
9  that the product was sold in; right?
10 **A. I don't know. They looked like, I don't**
11 **know, what you would call samples.**
12 Q. Did they have any type of labeling on
13 them?
14 **A. I don't remember. There were -- they**
15 **probably -- yeah, I think they did. I think they**
16 **may have had some small amount of printing on**
17 **them.**
18 Q. Did it look like labeling that would be
19 on a commercial product that would be sold to a
20 customer, or did it look like a label that was
21 just printed out with a name and a volume?
22 **A. I don't know that it had the volume**
23 **printed on it.**
24 Q. Okay. But did it look like a --
25 **A. They knew what the volume was, though.**

Transcript of Shane Burns
October 25, 2022

49

1    Q.  Okay.  So the containers you were
2  provided had a preset volume that matched the
3  amount that you applied to the substrate in the
4  case -- in the test; correct?
5    **A.  Yes.**
6    Q.  Okay.  And it had a label on it, and
7  that label --
8    **A.  May have had a label on it.**
9    Q.  May have had a label.
10   **A.  I don't know that they all had labels**
11 **even.  If they did, it seems like some of them**
12 **didn't.**
13   Q.  Okay.
14   **A.  But they knew which ones were which.**
15   Q.  And how did you keep track of which ones
16 were which during the test?
17   **A.  I believe they were separated physically**
18 **from one another, either in Ziploc bags or in**
19 **separate groups.  And I believe the Ziploc bags**
20 **were alphanumerically labeled.  And so it was**
21 **pretty clear which ones went with which group.**
22   Q.  Okay.
23   **A.  At the time, yeah.**
24   Q.  Okay.  Do you have photos of the samples
25 and the containers that you were provided for the

50

1  second round of testing?
2    **A.  I was not asked to take any photographs**
3  **of those particular specimens for this purpose.**
4    Q.  Okay.
5    **A.  And they were -- some of the containers**
6  **once broken up and emptied were useless anyway.**
7  **So they were just thrown away.**
8    Q.  Some of the containers when you received
9  them were already broken --
10   **A.  No, no.  No.  No, not when we received**
11 **them.  After they had been used, they were**
12 **obviously emptied of fluid.  So there was no**
13 **reason to keep them or photograph them.  So they**
14 **were simply thrown in the trash.**
15   Q.  Okay.  Did you take any photos of the
16 pigskin substrate that you received from Trutek?
17   **A.  Other than what's in the report?**
18   Q.  Correct.
19   **A.  No, I think I tried to include any**
20 **photographs of the pigskin in the report.**
21   Q.  Okay.
22   **A.  Some dotted lines or something were**
23 **included to show how we cut the pieces up of the**
24 **pigskin.**
25   Q.  So do you have any photos of what the

51

1  pigskin looked like after it was cut up?
2    **A.  No, I don't think so.**
3    Q.  Do you have any photos of what the
4  pigskin looked like after the test samples were
5  applied to it?
6    **A.  No, I don't believe so.**
7    Q.  And did you apply the test samples to
8  the pigskin directly, or did someone from Trutek
9  handle the application?
10   **A.  I had the customer apply the samples**
11 **themselves, and I watched them do it so that we**
12 **could keep track of -- it helped having more than**
13 **one person to keep track of which one was which.**
14   Q.  And why did you have Trutek personnel
15 apply the samples rather than doing it yourself?
16   **A.  They were their samples.**
17   Q.  Okay.  So that wasn't unusual to you at
18 all to have the customer not just observe the test
19 but also directly participate in the test and --
20   **A.  It's very common.**
21   Q.  -- perform steps of the test?
22   **A.  Yes, that's very common.**
23   Q.  Okay.  Are there any other aspects of
24 the test that the Trutek personnel handled
25 themselves as opposed to you?

52

1    **A.  No, the handling -- the working of the**
2  **machine itself was handled by me.**
3    Q.  Who cut the pigskin?
4    **A.  And I recorded the data.**
5       **I believe that Trutek cut the pigskin.**
6  **So they were the same size, roughly.**
7    Q.  Were the pigskin samples measured after
8  they were cut?
9    **A.  Yeah, I believe we did measure them.**
10   Q.  Did you measure them, or did the Trutek
11 personnel measure them?
12   **A.  I believe I measured them.**
13   Q.  And how were those measurements
14 recorded?
15   **A.  I believe it's in the test report how**
16 **big the test substrates were.**
17   Q.  There's an approximate measurement, but
18 I'm asking did you record the actual measurements
19 that you took after each of the pigskin samples
20 were cut?
21   **A.  No.**
22      MR. KREMEN:  Objection to form.
23      You may answer.
24      THE WITNESS:  No, I don't think I
25 recorded the precise measurements.

Transcript of Shane Burns
October 25, 2022

53

1  BY MS. PETERSON:
2      Q.  Okay.  So for the first round of testing
3  that you did, were you provided containers of the
4  test samples with a preset amount of material in
5  each sample container?
6      **A.  You said for the first round?**
7      Q.  For the first round, yes.
8      **A.  No.  On the different materials they**
9  **tested in -- I believe it was 2019, those**
10 **materials were, I believe, in larger containers.**
11     Q.  Okay.  And did they --
12     **A.  Slightly larger containers, yeah.**
13     Q.  Sure.
14         Did they contain the type of, like,
15 printing and labeling that had you would typically
16 expect to see on a product that would be purchased
17 commercially?
18     **A.  I believe one did.  The others were in**
19 **sort of white, blank containers.**
20     Q.  Okay.  But for the second round of
21 testing that you did, the test samples were
22 provided to you by Trutek in generic, blank
23 containers that may have had some other label
24 printed on it; is that right?
25     **A.  I don't know that they were generic**

54

1  **containers.  They looked like -- I mean, they were**
2  **small, and you sort of -- on some of them you**
3  **snapped off the end to remove the applicator that**
4  **was inside of them.  Of course, once you -- you**
5  **remove the applicators and, of course, once you**
6  **did that, it was -- basically you applied it, and**
7  **then that was it.  It was, I believe, single-use**
8  **sort of containers.**
9      Q.  Okay.  Did it look like something
10 that -- like if you were to go online to Amazon
11 and purchase one of Trutek's NasalGuard products,
12 I mean, is that what the container looked like to
13 you?
14     **A.  I'm going to be totally honest with you,**
15 **I have no idea what Trutek's products look like**
16 **when they're being sold on Amazon.**
17     Q.  Okay.
18     **A.  I've never seen the retail version of**
19 **whatever it is that it comes in.**
20     Q.  Fair enough.
21         So did the containers you received, did
22 they look like a retail version, or did it look
23 like --
24     **A.  How would I answer that?  No, I don't**
25 **know what it looks like.  I'm sorry, I don't know**

55

1  what the retail version looks like.
2      Q.  I mean, did it have, like, a logo
3  printed on it, or did it just -- was it just a
4  general container?
5      **A.  I don't think it was what would be**
6  **called a general container, but I don't recall**
7  **specifically any logos being printed on it.**
8      Q.  Okay.  So you can't say for sure whether
9  or not the samples you received were, you know,
10 samples that would have been available for retail
11 purchase and not opened and unmodified?  You can't
12 say that for certain one way or the other?
13         MR. KREMEN:  Objection to the form.
14         You may answer.
15         THE WITNESS:  Well, the second round of
16 testing, several of the containers, they could not
17 have been opened.  Because you literally broke off
18 the end of them, I believe, to remove the
19 applicator.
20 BY MS. PETERSON:
21     Q.  Okay.  And were those the Trutek
22 NasalGuard samples or the BlueWillow --
23     **A.  I don't know.**
24     Q.  -- NanoBio Protect samples?
25     **A.  I don't remember which was which.**

56

1      Q.  Okay.  So some of the -- for the second
2  round of testing, some of the containers could not
3  have been opened, but that statement, that -- that
4  just applies to some of the containers?
5      **A.  Yeah, I mean, some of them were -- I**
6  **guess you could say you squeezed it out or**
7  **something like that and -- you know, there was**
8  **like a small tube or something like that that they**
9  **were in.  And they weren't really -- they didn't**
10 **seem to me like they had been tampered with, if**
11 **that's what you're asking.**
12     Q.  Yeah, I'm not suggesting that they were
13 tampered with.
14     **A.  I'm misunderstanding what the --**
15     Q.  Okay.  Let me back up.
16         So this all goes back to when you said
17 that the Trutek had a desire to ensure that there
18 was more consistency in the amount applied.
19         Do you remember that?
20     **A.  Yeah.  Yeah.**
21     Q.  And so you were given samples in
22 containers that had a preset amount?
23     **A.  Yes.**
24     Q.  Okay.  And was that preset amount, I
25 mean, do you know if that was different than the

57

1  amount in the typical retail version?
2       **A.   No.**
3       MR. KREMEN:  Objection to the form.
4       THE WITNESS:  I wouldn't know that.
5  BY MS. PETERSON:
6       Q.   Okay.
7       **A.   I don't know what the retail version**
8  **looks like.**
9       Q.   Sure.
10       And so what I -- do you know if Trutek
11  prepared the samples in these containers for
12  use -- specifically for use in the testing, or
13  were these, you know, off-the-shelf samples of the
14  product?
15       MR. KREMEN:  Objection to the form of
16  the question.
17       You may answer.
18       THE WITNESS:  I don't know.
19  BY MS. PETERSON:
20       Q.   Okay.  Fair enough.  That's fine.  If
21  you don't know, you don't know.
22       So you have no idea if these were
23  off-the-shelf products or if they were prepared
24  specifically for the testing?
25       MR. KREMEN:  Asked and answered.

58

1       You may answer.
2       THE WITNESS:  I don't know how I would
3  know that.
4  BY MS. PETERSON:
5       Q.   I mean, perhaps someone from Trutek
6  explained that to you?
7       MR. KREMEN:  Objection.
8       You may answer.
9       THE WITNESS:  They didn't tell me how
10  they got the samples or how they put them in the
11  containers.
12  BY MS. PETERSON:
13       Q.   Okay.  Did they --
14       **A.   They brought containers and told me what**
15  **they wanted them to be labeled as, and so that is**
16  **how I labeled them in the test report.**
17       Q.   Okay.  Did Trutek explain to you how
18  they were preparing the samples in order to ensure
19  the consistency in the amount applied for the
20  second round of testing?
21       **A.   Well, I watched them apply it.  I don't**
22  **know how they had prepared it before they gave me**
23  **the containers.**
24       Q.   Okay.
25       MS. PETERSON:  I'm at a good breaking

59

1  point right now.  How about we go off the record.
2       THE VIDEOGRAPHER:  We're going off the
3  record.  The time is now 11:29 a.m.
4       (Recess from the record.)
5       THE VIDEOGRAPHER:  We're back on the
6  record.  The time is now 11:45 a.m.
7       THE WITNESS:  I did get that information
8  for you.  If it's all right from Mr. Wahi to share
9  this information, I can share it with you.
10  BY MS. PETERSON:
11       Q.   You're talking about the --
12       **A.   The cost.**
13       Q.   Okay.
14       MS. PETERSON:  Stan, do you have any
15  objection to that?
16       MR. KREMEN:  Ashok, could you unmute,
17  please?
18       MR. WAHI:  No, I don't have any
19  objection.
20       MR. KREMEN:  Okay.  Neither do I.  You
21  can mute again.
22       THE WITNESS:  So if you'd like to know,
23  the cost of custom testing is $300 per hour.  And
24  it is what we charged him for both tests.  And
25  that was for three hours on July 30th and for

60

1  two hours -- that's July 30th of 2019.  And for
2  two hours on June 13th of 2021 -- or January,
3  sorry, not June.  My A looks like a U.
4  January 13th of 2021.  I apologize.
5  BY MS. PETERSON:
6       Q.   Okay.  So that first time frame billed
7  of three hours, that would be for the first round
8  of testing?
9       **A.   That's correct.**
10       Q.   And then the second amount of time of
11  two hours, that would be for the second round of
12  testing?
13       **A.   That's correct.**
14       Q.   Okay.  And did you bill them any further
15  time for preparation of the report, or is that
16  included in those time frames?
17       **A.   So normally these days we would be**
18  **charging them for the report, but at that time for**
19  **some reason we waived it.**
20       Q.   Okay.  So the total amount that you've
21  billed to Trutek is five hours at a rate of $300
22  per hour?
23       **A.   Correct.**
24       Q.   Okay.  Thank you for that.
25       Before the break -- actually, let me

61

1  just ask you while we were on the break just now,
2  did you speak to anyone about the substance of the
3  testimony that you provided so far?
4      **A. No.**
5      Q. So you didn't speak with Mr. Kremen or
6  Mr. Wahi during the break?
7      **A. I went to the bathroom.**
8      Q. Okay. Thank you. I did, too, if we're
9  sharing.
10     Okay. Before the break, we were talking
11 about changes that you made from the first round
12 of testing to the second round of testing. And
13 you mentioned ensuring the consistency in the
14 amount applied. Were there any other changes to
15 the testing for the second round?
16     **A. I don't recall any specific changes**
17 **other than anything that was mentioned in the**
18 **report. The point of the report is so that I**
19 **would be able to record anything that was a**
20 **deviation or so that it's in writing so you could**
21 **go back and refer to it.**
22     Q. Okay. So the purpose for the report is
23 to document any changes that were made to the
24 testing procedure?
25     **A. As well as the results and any**

62

1  **conclusions that might be drawn from it, yes.**
2      Q. Okay. So if there were any other
3  changes to the testing procedure in the second
4  round, it would be reflected in your report?
5      Is that a "yes"?
6      **A. Yes, I'm sorry.**
7      Q. That's okay.
8      **A. Verbal, yeah.**
9      Q. Do you recall whether you documented
10 anything about the need to maintain consistency in
11 the amount applied when preparing your second
12 report?
13     **A. I don't remember documenting that in the**
14 **report. If it's there, then that's fine. But it**
15 **was the purpose of the customer to have that**
16 **controlled. I didn't place that requirement on**
17 **them.**
18     Q. So the report doesn't necessarily
19 document everything that the customer provided
20 input on then. Is that what you're saying?
21     **A. No, my job with the report was mostly as**
22 **much as possible to record things that the**
23 **customer provided to me that they wanted in the**
24 **report, but also the data as I recorded it.**
25     Q. Okay.

63

1      **A. So it's mostly electrostatic**
2  **characterization testing, not whatever else other**
3  **information that may be there. If they wish to**
4  **provide other information, I can record it, but**
5  **the point of the test that we were providing was**
6  **electrostatic characterization.**
7      Q. Sure.
8      But you would agree, though, that the
9  manner in which the samples were prepared is also
10 important to the testing and the results that are
11 obtained from the testing; right?
12     **A. Sure.**
13     Q. Now, specifically with respect to the
14 pigskin substrate that was used in the testing,
15 did you handle the pigskin at all over the course
16 of the second round of testing?
17     **A. Yeah, there's a pair of plastic tongs.**
18 **They're regular tongs that you can get at the**
19 **dollar store. And those were the main thing I**
20 **believe that we handled them with. And I believe**
21 **I also had gloves. But by and large, we were**
22 **trying to hold them with the plastic tongs to**
23 **neutralize in front of the ionizer and then**
24 **provide the substance and --**
25     Q. Okay. So, for example, when the

64

1  substrates were transferred into the apparatus,
2  did you do that, or did the Trutek personnel do
3  that?
4      **A. I did that.**
5      Q. Okay.
6      MS. PETERSON: Let's mark Mr. Burns'
7  report for BlueWillow as Exhibit No. 24 [sic].
8      (Burns Deposition Exhibit 23 was marked
9  for identification and attached to the
10 transcript.)
11     MR. KREMEN: The last one was 21.
12     MS. PETERSON: No, I think the last
13 exhibit we used yesterday was 22, Stan.
14     MR. KREMEN: 22 was the --
15     THE REMOTE TECHNICIAN: Yes, that's --
16 that's correct, counsel.
17     THE WITNESS: I'm sorry, what report for
18 BlueWillow? I don't recall working for
19 BlueWillow.
20 BY MS. PETERSON:
21     Q. Let me -- yeah, I should have explained
22 this to you. So, Mr. Burns, I have some documents
23 I'm going to show you. We're going to mark them
24 with exhibit numbers. They're going to be
25 displayed on the screen so you can see them. And

65

1  at the same time we're also going to put copies of
2  them into the chat window. So if you want to, you
3  can open them up directly on your own to look
4  through them; or if you would rather just have us,
5  you know, scroll through the document on the
6  screen.
7      **A. I have copies of the reports.**
8      Q. Okay. Well, if you have copies sitting
9  there right in front of you, you're free to look
10 at those, too. But we are going to display them
11 on the screen just so that everybody can make sure
12 we're looking at the correct document.
13     **A. Right. My question was not how -- my**
14 **question was which report is being referred to as**
15 **the one as pertains to BlueWillow?**
16     Q. Yeah, and just to clarify again, I
17 described it that way so that the deposition
18 technician could find it. I'll further identify
19 it on the record for you, Mr. Burns, so that you
20 can make sure you have the right one.
21     **A. Thank you.**
22     MS. PETERSON: So, Jennifer, let's pull
23 up the document -- it has my item number 03.
24     THE REMOTE TECHNICIAN: Yes, I see it.
25 Stand by, please.

66

1  BY MS. PETERSON:
2      Q. Okay. And for the record, this is a
3  document titled "Surface Electrostatic Charge
4  Evaluation of Nasal Application Products Technical
5  Report." And it has a report issue date of
6  January 18, 2021.
7      MS. PETERSON: And we will mark this as
8  Deposition Exhibit 23.
9      MR. KREMEN: 23.
10 BY MS. PETERSON:
11     Q. So, Mr. Burns, do you recognize this
12 report that we have marked as Exhibit 23?
13     **A. Yeah. Yes.**
14     Q. Okay. And this is the report that you
15 prepared --
16     MS. PETERSON: Could we put it back up
17 on the screen, please.
18     THE REMOTE TECHNICIAN: Yes, I'm sorry,
19 Counsel. That was a mistake.
20     MS. PETERSON: That's okay.
21 BY MS. PETERSON:
22     Q. Mr. Burns, this is the report that you
23 prepared for the second round of testing; correct?
24     **A. Correct.**
25     Q. Okay. And I referred to this as the

67

1  BlueWillow report because this is the round of
2  testing where you tested the BlueWillow NanoBio
3  Protect product; right?
4      **A. Sure, if that's what the report says.**
5      MS. PETERSON: Okay. Let's scroll down
6  to page 5.
7  BY MS. PETERSON:
8      Q. Okay. Do you see up here the product
9  test samples are listed?
10     **A. Yes.**
11     Q. And the first product is TTK-NS, which
12 is NasalGuard misting spray, and then the second
13 product is BW-NBP, BlueWillow NanoBio Protect;
14 right?
15     **A. Yes.**
16     Q. Okay. So this is the report that we've
17 been talking about in terms of the second round of
18 testing; right?
19     **A. Yes.**
20     MS. PETERSON: Okay. And I see -- if we
21 go to the second page. And maybe we can just go
22 out to the full screen view, I mean, just to show
23 the entire -- yeah, there we go.
24 BY MS. PETERSON:
25     Q. So here is one photo included. And this

68

1  is a photo of the NanoCoulomb Meter that you used?
2      **A. NanoCoulomb Meter, yes.**
3      Q. NanoCoulomb Meter. Thank you for that.
4  Okay.
5      MS. PETERSON: Second page -- or sorry,
6  go to the next page, page 3.
7  BY MS. PETERSON:
8      Q. There's another photo of the Faraday cup
9  that you used in the test; is that right?
10     **A. Yes.**
11     MS. PETERSON: And then let's go to
12 page 4.
13 BY MS. PETERSON:
14     Q. And here --
15     **A. Right.**
16     Q. -- there is a depiction of the pigskin.
17 Is this an actual photo of the pigskin sample?
18     **A. So I think this one was -- I can't**
19 **remember. I think this is a diagram mostly to**
20 **show how he cut it up.**
21     Q. Okay.
22     MS. PETERSON: And then if we go to the
23 next page.
24 BY MS. PETERSON:
25     Q. Here we have the results that you

69

1  report; correct?
2  **A. Yeah.**
3  Q. And then go to the last page. And here
4  we have the conclusions; right?
5  **A. Correct.**
6  Q. So I see two photos in total in this
7  report; is that right?
8  **A. Correct.**
9  Q. Do you know if you took any other photos
10 during the course of the second round of testing
11 that were not included in this report?
12 **A. I don't believe so, no.**
13 Q. And feel free to look at your own
14 version of the report or take a look at it
15 directly through the chat, but I don't see that
16 you recorded anywhere in this report who else
17 attended or participated in the testing; is that
18 right?
19 **A. No, I don't see why that would be**
20 **necessary.**
21 Q. So just to confirm, you did not include
22 in your report the fact that there were personnel
23 from Trutek present at the testing; right?
24 **A. That's correct. I did not record anyone**
25 **else as having been present at the test.**

70

1  Q. And you also did not record in the
2  report the fact that Trutek personnel performed
3  some of the steps that are described in your
4  report; correct?
5  MR. KREMEN: Objection to the form of
6  the question.
7  You may answer.
8  THE WITNESS: No, I did not record that
9  in the report.
10 BY MS. PETERSON:
11 Q. Why not?
12 **A. The report was for them. It was their**
13 **report.**
14 Q. Okay.
15 **A. They knew they were present.**
16 Q. Were you instructed by Trutek to not
17 include that information?
18 **A. No.**
19 Q. So that was a decision all on your own
20 that it would not be necessary to include the
21 information because they knew they were there?
22 **A. It is not common to include in the**
23 **report the names of all people present at a test.**
24 Q. Is it common to include in the report
25 the names of people who actively participate and

71

1  perform steps of the test?
2  **A. The main test technician is recorded.**
3  **The test technician is recorded in the test, yes.**
4  Q. And if other people perform steps of the
5  process, would it be common to include their names
6  and to indicate what steps they performed?
7  **A. That depends on the steps. If you're**
8  **talking about providing samples or providing**
9  **materials or preparing samples, no. Every**
10 **customer sends me samples that they prepared, and**
11 **then I perform tests on the samples.**
12 Q. Have you ever had --
13 **A. And if that means cutting a sample or**
14 **molding a sample or putting it into a package, I'm**
15 **not going to include all of those people's names**
16 **on the report.**
17 Q. Okay. Did the Trutek personnel cut the
18 pigskin samples in your presence, or were they
19 already precut by the time they arrived at your
20 laboratory?
21 **A. I don't remember. They may have cut**
22 **them for me in this case before they arrived.**
23 Q. Okay. And did the Trutek personnel
24 apply the test samples to the pigskin substrate in
25 your laboratory?

72

1  **A. Yeah. Yeah, they applied the material**
2  **to the substrate in the lab.**
3  Q. So if you have a customer who attends a
4  test in your laboratory and they perform the
5  sample preparation in front of you in your
6  laboratory, would you commonly include that
7  information in your report?
8  **A. No, not necessarily.**
9  Q. Are there circumstances where you would
10 include that information?
11 **A. Yes.**
12 Q. And what circumstances would those be?
13 **A. If the customer feels as though that**
14 **information will differentiate one result from**
15 **another, sometimes that helps. For example, if we**
16 **were testing, say, the triboelectric charging of,**
17 **for example, a substance of some kind and one**
18 **person, say, is stronger or faster than the other**
19 **person in triboelectrically charging a material,**
20 **you would want to record who the person was that**
21 **was performing the charging.**
22 Q. Okay. And just to complete this out,
23 did you provide -- or did you receive any
24 instructions from Trutek in any manner with
25 respect to whether this information about how the

Transcript of Shane Burns
October 25, 2022

73

1  samples were prepared should be included in your
2  report?
3      A.  Can you restate that question?
4      Q.  Did you receive any instructions from
5  Trutek in any manner about whether to include
6  information in the report about who handled the
7  sample preparation?
8      A.  No, I did not receive instructions from
9  Trutek regarding this.
10     Q.  Okay.  So you weren't instructed by
11 Trutek to include it, and you weren't instructed
12 by Trutek to not include it; is that correct?
13     A.  That's correct.
14     Q.  Okay.  Now, you're aware that Trutek
15 hired another individual to conduct electrostatic
16 testing of the Trutek and BlueWillow products;
17 right?
18     A.  I am aware of that.
19     Q.  His name is Dr. Alexi Ermakov; right?
20     A.  Yes.
21     Q.  And did you review his report that he
22 prepared in this matter directed to the testing
23 that he conducted?
24     A.  I've seen the report.
25     Q.  When did you first see the report?

74

1      A.  It was either after the first test or at
2  the time of the first test.
3      Q.  Okay.  So you saw it before you
4  conducted your second round of testing; right?
5      A.  I definitely saw it before I saw the --
6  before I performed the second round of testing,
7  yes.
8      Q.  And are you aware that Dr. Ermakov, just
9  like you did, he also performed two rounds of
10 testing on the same products?
11     A.  Yes.  I believe he performed -- I only
12 have the one report, though.  I didn't see two
13 reports, but I believe he did test multiple
14 substances --
15     Q.  Okay.
16     A.  -- in his test.
17     Q.  Do you know -- the report that you saw
18 from Mr. Ermakov, would it have been a report that
19 was prepared -- actually, I assume it was a report
20 prepared around the time that you did your first
21 round of testing; right?
22     A.  I don't know the exact date that
23 Dr. Ermakov performed his testing, I'm sorry.
24     Q.  Okay.  Well, I can represent to you -- I
25 can show you the reports, as well, but I can

75

1  represent to you that the first round of testing
2  was in July of 2019.  That's around the time that
3  you did your first round of testing; correct?
4      A.  That's correct.
5      Q.  And his second round of testing was
6  conducted in January of 2021.  That's the same
7  time that you conducted your second round of
8  testing; right?
9      A.  Yes, I was unaware that he had performed
10 another round of testing at that time.
11     Q.  Okay.  So you know about the first round
12 of testing, but you did not know that he performed
13 a second round of testing; is that --
14     A.  Correct.
15     Q.  Okay.  Thank you.
16         Do you know Dr. Ermakov?
17     A.  No.
18     Q.  Have you ever heard of him before?
19     A.  I don't know.
20     Q.  Outside of the context of this matter?
21     A.  I don't know.
22     Q.  Okay.
23     A.  I've -- I meet with a lot of people who
24 are involved in electrostatic characterization.
25 So it would be difficult for me to recall whether

76

1  or not I've met him.
2      Q.  Okay.  But you don't have any specific
3  recollection of having met him?
4      A.  No, I don't believe so.
5      Q.  Did you ever speak with Dr. Ermakov
6  about the testing that he conducted or that you
7  conducted on behalf of Trutek?
8      A.  I've never spoken to Dr. Ermakov, as far
9  as I recall.
10     Q.  Okay.  And you understand that
11 Dr. Ermakov -- he used a different method to test
12 the surface electrostatic charge of the products;
13 correct?
14     A.  I'm aware of that.
15     Q.  He used different equipment?
16     A.  Correct.
17     Q.  And he used a different substrate to
18 test the materials?
19     A.  Correct.
20         MR. KREMEN:  Objection to the form of
21 the question.
22 BY MS. PETERSON:
23     Q.  And what is your assessment of
24 Dr. Ermakov's testing?
25     A.  I will not make an assessment of

77

1  Dr. Ermakov's testing.
2     Q.  Why not?
3     A.  I'm not familiar with his equipment.  I
4  haven't tested it myself.  I haven't tried that
5  experiment myself.  I am not familiar with his
6  history with this particular methodology.  And I'm
7  not, I believe, adequately educated on his
8  particular line of reasoning about this to make
9  comment on it.
10    Q.  That's all fair.  Thank you for that.
11       When you say that you're not adequately
12  educated on his particular line of reasoning, is
13  there some aspect of his testing method that
14  you're thinking about?
15    A.  I'm not familiar --
16       MR. KREMEN:  You're calling for
17  speculation on something that he said that he's
18  not qualified to answer.  If you can --
19       MS. PETERSON:  He's pointed to an aspect
20  of Dr. Ermakov's testing methodology that he's not
21  adequately educated about.  I'm just asking him
22  what aspect of the testing methodology he's
23  speaking about.
24       THE WITNESS:  I've not reviewed the
25  construction of the machine that he used.

78

1  BY MS. PETERSON:
2     Q.  Okay.
3     A.  I'm not familiar with the equipment that
4  he's using.
5     Q.  And what about the choice of using paper
6  as a substrate, are you familiar with using
7  printer paper as a substrate on which to measure
8  the surface electrostatic charge of a product?
9     A.  People use insulative materials
10  frequently to measure charge of other items
11  because insulators are not going to -- of
12  themselves, unless they're triboelectrically
13  charged, are not going to conduct electricity or
14  allow electrons to flow across the surface of the
15  material.  So that's not uncommon.  It does occur.
16  It's not -- well, it is used.  So there are
17  examples of this, of people doing this.
18    Q.  Okay.  And just some terminology, I
19  apologize, this is not my particular area of
20  expertise like it is for you, but you referred
21  using insulative material?
22    A.  Right.  So things like paper, wood pulp,
23  other compounds, glass is an insulator unless it's
24  treated.  And so some people who are developing
25  treatments for glass to make it more conductive or

79

1  to make it dissipative will often use an
2  insulative glass substrate.
3     Q.  Okay.  And so printer paper would fall
4  in that category?
5     A.  Yes, it's an insulator.  It does not
6  conduct electricity by itself.
7     Q.  Okay.  So if printer paper is an
8  insulator and doesn't conduct electricity by
9  itself, would you expect to see an electrostatic
10  surface charge measured on just a plain piece of
11  printer paper?
12    A.  You could, but that's why people
13  generally neutralize it first, just like we did
14  with the pigskin, remember.
15    Q.  Okay.  And have you ever used printer
16  paper as a substrate for measuring surface
17  electrostatic charge of a composition, a liquid?
18    A.  I've used cellulose, which is
19  effectively a similar material.
20    Q.  But you haven't used printer paper for
21  this type of testing?
22    A.  Not personally, no.
23    Q.  Okay.
24       MS. PETERSON:  We can take that document
25  down for now.  We'll be referring to it later

80

1  because I have some more specific questions.  But
2  for now let's -- I'd like to mark just for the
3  record a copy of the deposition notice.  We'll
4  mark this as Exhibit 24.
5       (Burns Deposition Exhibit 24 was marked
6  for identification and attached to the
7  transcript.)
8       THE REMOTE TECHNICIAN:  Counsel, would
9  you like me to screen share that for you or just
10  mark it?
11       MS. PETERSON:  Let's mark it and screen
12  share it, please.
13       THE REMOTE TECHNICIAN:  Okay.  Stand by,
14  please.
15  BY MS. PETERSON:
16    Q.  Dr. Burns --
17    A.  I'm not a doctor.
18    Q.  Mr. Burns, I'm sorry.  I kept doing that
19  yesterday, too.
20       Mr. Burns, this is just a court document
21  indicating that BlueWillow noticed your deposition
22  to take place today.  Have you seen this document
23  before?
24    A.  Yes, I believe that this was among the
25  exhibits that you and the other attorney had

Transcript of Shane Burns
October 25, 2022

81

1    agreed upon.  And this was submitted to everybody
2    involved, I think.
3        Q.  Okay.  And you understand that you are
4    attending here, the deposition today, pursuant to
5    this deposition notice?
6        A.  Yes.
7        Q.  Okay.  Thank you.
8        MS. PETERSON:  We can take that down.
9    BY MS. PETERSON:
10       Q.  Mr. Burns, what did you do to prepare
11   for your deposition today?
12       A.  I had to retype effectively a résumé, a
13   list of my qualifications.  And so I created that.
14   And I printed out and reviewed some of the test
15   reports.  I reread them.
16       Q.  Those would be your two test reports?
17       A.  Correct.
18       Q.  Did you review any other test reports?
19       A.  I believe there was a couple of
20   documents that were provided to me as part of
21   these exhibits.  There was the one by
22   Dr. Ermakov -- or contained the report of
23   Dr. Ermakov, there's some information from a
24   Dr. Lemmo, and there was some information from a
25   Dr. Amiji.

82

1        Q.  And did you review all of those
2    documents?
3        A.  I read them as best I could, yes.
4        Q.  Okay.  And with respect to Dr. Ermakov,
5    you said you only received one report?
6        A.  Well, I have the same reports that
7    everybody else had in the exhibits that you
8    provided.
9        Q.  I didn't provide you with anything.  So
10   I don't know what it is that had you were given.
11       A.  Yeah, I believe I have one report from
12   Dr. Ermakov.
13       Q.  Okay.  And it's the 2019 report?
14       A.  Let me look, I don't know if a date is
15   on it.  Yeah, I think it's 2019.
16       Q.  I think the date is all the way down at
17   the bottom.
18       A.  Yeah, there it is.
19       Q.  Okay.  Apart from your two reports and
20   the Ermakov, Lemmo, and Amiji reports, did you
21   review any other documents to prepare for your
22   deposition today?
23       A.  There was a résumé of sorts or a list of
24   qualifications from Dr. Amiji.  It was quite long.
25       Q.  It is.

83

1        Anything else?
2        A.  I don't believe I can remember anything
3    else.  But I think there were a total of 11
4    documents that were provided to me.  Several of
5    them were simply notices of -- that I'd be
6    depose -- like there was one that says I would be
7    deposed and so on.
8        Q.  Okay.  Did you review any scientific
9    articles or publications?
10       A.  No.
11       Q.  Okay.  And did you meet with anyone to
12   prepare for the deposition today?  And that could
13   be a meeting in person or by video or by
14   telephone.
15       A.  Well, obviously I met with Stanley
16   Kremen, who spoke with me about this.
17       Q.  When was that meeting?
18       A.  I'll bring it up on my calendar.  It was
19   last week.  I believe it was Monday.
20       Q.  And do you recall how long you spoke to
21   him, approximately?
22       A.  It was Monday.  And it was, I don't
23   know, a few hours.
24       Q.  So apart from the discussion with
25   Mr. Kremen last Monday for a few hours, did you

84

1    meet with or speak to anybody else as you were
2    preparing for today's deposition?
3        A.  I had a couple of phone calls with
4    Mr. Kremen.  There was some uncertainty as to
5    whether the deposition would be today or if it
6    would be later on.
7        Q.  Okay.
8        A.  And there was a request that I change
9    the format of my résumé because numbered
10   formatting was better for him.
11       Q.  Okay.  Did you meet with or have any
12   conversations with any Trutek personnel?
13       A.  I did speak with Mr. Wahi briefly.
14       Q.  And when was that conversation?
15       A.  The other night, last night.
16       Q.  Last night?
17       A.  Uh-huh.
18       Q.  And what did you discuss with Mr. Wahi?
19       A.  I would be coming in and I would be
20   deposed today and that I was ready to be deposed.
21       Q.  What else?  What else did you talk
22   about?
23       A.  There had been a deposition yesterday.
24       Q.  Did you review the transcript of that
25   deposition?

Transcript of Shane Burns
October 25, 2022

85

1      **A.   No.**
2      Q.   And what did Mr. Wahi tell you about
3   yesterday's deposition?
4      **A.   Nothing, really.  I believe Dr. Lemmo**
5   **had been deposed.**
6      Q.   That's correct.
7           Did Mr. Wahi discuss the substance of
8   Dr. Lemmo's deposition testimony with you in any
9   way?
10     **A.   I have no idea what Dr. Lemmo said.**
11     Q.   Okay.  So he didn't -- did Mr. Wahi talk
12  to you about the types of questions that I asked
13  Dr. Lemmo yesterday?
14     **A.   I don't believe he mentioned anything**
15  **specific, no.**
16     Q.   And this conversation was last night;
17  right?
18     **A.   Yes.**
19     Q.   So you feel fairly certain that you can
20  recall the conversation?
21     **A.   Yes, he didn't mention any specific**
22  **questions, I don't believe.**
23     Q.   Did he mention anything general about
24  the questions that were discussed at the
25  deposition?

86

1      **A.   I don't believe he mentioned anything,**
2   **no.**
3      Q.   Did he provide any advice to you or any
4   guidance as to how to prepare for the deposition
5   or how to answer questions today?
6          MR. KREMEN:  Objection.
7          You may answer.
8          THE WITNESS:  Just be truthful and, you
9   know, answer truthfully.  That's just as a matter
10  of course.
11  BY MS. PETERSON:
12     Q.   Did he say anything else?
13     **A.   I don't remember him mentioning anything**
14  **that I wasn't already aware of.  You would be**
15  **asking me questions.  And it went for a long time**
16  **yesterday, I guess.  So...**
17     Q.   How long was your conversation with
18  Mr. Wahi last night?
19     **A.   I don't know, two minutes.**
20     Q.   So it was really short?
21     **A.   Yeah.**
22     Q.   Okay.  And did you have any other
23  conversations with Trutek's lawyers or any Trutek
24  personnel yesterday?
25     **A.   It was a conference call.  Mr. Kremen**

87

1   and Mr. Wahi were on the phone.  So...
2      Q.   Okay.  And it was just that one call?
3      **A.   I believe so, yeah.**
4      Q.   And was there anybody else present for
5   that phone call besides Mr. Kremen and Mr. Wahi?
6      **A.   No, I was at home with my family.  So we**
7   **really didn't have time to talk to anybody at any**
8   **length.**
9      Q.   Okay.  Did Mr. Wahi or Mr. Kremen ask
10  you to do anything else before your deposition
11  started today to prepare?
12     **A.   They told me to look over the documents**
13  **provided, but that was it.  Why, do I seem**
14  **prepared?**
15     Q.   You do seem prepared, but it also, you
16  know, seems like you're really struggling to come
17  up with an answer to these questions.  So I'm just
18  trying to explore, you know, what it is that was
19  discussed.
20     **A.   No, I'm answering as best as I can.**
21  **Most of the things I have to say pertain to what's**
22  **been written down.  The whole point of writing it**
23  **down is so I wouldn't have to remember it.  That's**
24  **why I write reports.**
25     Q.   Yeah.

88

1      **A.   There's something, like, a 100 or so**
2   **customers that I deal with every year that I**
3   **perform testing for.**
4      Q.   Sure.  Yeah.
5      **A.   So, you know, that's the whole point of**
6   **the report, so I don't have to off the top of my**
7   **head remember a particular test.**
8      Q.   Yeah.  No, I can tell from your résumé
9   you've certainly done a lot of this.  So I
10  understand the need to have it documented so that
11  you can recall, absolutely.
12          So you said that most of the things that
13  you have to say pertain to what's been written
14  down.  You mean most of the things that you had to
15  say during the deposition today?
16     **A.   Well, regarding this particular test.**
17     Q.   Okay.
18          MS. PETERSON:  Okay.  Let's go ahead and
19  mark a copy of that résumé.  We'll mark that as
20  Exhibit 25.
21          (Burns Deposition Exhibit 25 was marked
22  for identification and attached to the
23  transcript.)
24          THE REMOTE TECHNICIAN:  Okay.  Stand by
25  please.

89

1  BY MS. PETERSON:
2      Q.  Mr. Burns, do you recognize Exhibit 25
3  as a copy of the résumé that you just updated?
4      **A.  Yeah, I have it.**
5      Q.  Okay.  And do you have any other changes
6  or updates to make to this résumé?
7      **A.  I don't think so, no.**
8      Q.  And how would you describe your current
9  occupation?
10     **A.  My title is test lab manager.**
11     Q.  And what would you consider to be your
12 field of expertise?
13     **A.  Mostly electrostatic characterization**
14 **testing, calibration of equipment, and things**
15 **having to do with electrostatics, electronics, and**
16 **resistance voltage, triboelectric charge, things**
17 **like that.**
18     Q.  Okay.  Thank you.
19         Have you ever had a patent applied for
20 in your name?
21     **A.  I don't think so, no.**
22     Q.  And do you recall if you've ever had any
23 papers or presentations or posters published?
24     **A.  Nothing worth bragging about.**
25     Q.  Okay.  I didn't mean to imply there

90

1  shouldn't be anything.  There's just some things
2  that I need to check off my list.
3         And I see that you have a bachelor's
4  degree in history that you received in 2006;
5  right?
6      **A.  Yeah.**
7      Q.  And it looks like you have an Associate
8  of Applied Science degree in engineering
9  technology that you received in 2014; right?
10     **A.  Correct.**
11     Q.  Okay.  Under "Certifications," where it
12 refers to ESD Program Manager certification,
13 that's what you were explaining earlier before
14 about electrostatic discharge?
15     **A.  That's one way that I have some training**
16 **in this.**
17     Q.  No, I just meant the ESD.  That stands
18 for electrostatic discharge?
19     **A.  Yes.**
20     Q.  Okay.  At the bottom of the
21 certification list, there's a reference to an
22 IPC 610 Certified IPC Specialist.  What is that?
23     **A.  So when I first got involved in the**
24 **electronics industry, this was a training that was**
25 **available where they would train you on proper**

91

1  acceptance criteria for assemblies, electronic
2  **assemblies.**
3      Q.  Okay.
4      **A.  So printed circuit boards, wiring, you**
5  **know, things like that.  Along with that came some**
6  **handling and expertise on what electrostatic**
7  **phenomena was.  It was very nice to get that kind**
8  **of training.**
9      Q.  Okay.  And then it looks like you've got
10 a section on industry standards committees.  So
11 you're a member of that particular committee, and
12 you have been since 2019?
13     **A.  Yeah, Working Group 11.  I would sit in**
14 **and listen before that, but I don't believe I was**
15 **a member until that point.  Because the rules of**
16 **the ESDA are that you have to attend, I believe,**
17 **at least one meeting in person, and at the time I**
18 **was pretty distant from them.  So I was only able**
19 **to attend virtually most of the time.**
20     Q.  Okay.  And what is Working Group 11?
21     **A.  So this is the working group that**
22 **oversees -- they're called the packaging**
23 **committee, but they actually oversee the standards**
24 **that tell you certain types of test methods.  Any**
25 **test method in their group that starts with 11,**

92

1  **most of it having to do with resistance, static**
2  **shielding and triboelectric charge.  And so they**
3  **oversee the test standards and documentation**
4  **regarding those test methods.**
5      Q.  Okay.  And it looks like you've been
6  with Electro-Tech Systems since September 2016.
7  So that's a little over six years; right?
8      **A.  Yeah, I don't know why I put four years.**
9  **I apologize for that.**
10     Q.  That's okay.
11         And this is your current job title, test
12 laboratory manager?
13     **A.  Yes.**
14     Q.  And you've had that position since 2020;
15 right?
16     **A.  That's correct.**
17     Q.  Okay.  If we look down at item No. 7 at
18 the bottom of the page, I see you have listed here
19 that you performed hands-on standard and custom
20 testing -- and this is since 2000- -- and then I
21 guess since 2016, that would be your time as lead
22 test technician; is that right?
23     **A.  Correct.**
24     Q.  And so this is what you were referring
25 to earlier about having different categories of

Transcript of Shane Burns
October 25, 2022

93

1  testing within the company, either standard or
2  custom?
3      A.  Yeah.  Yeah, that's correct.
4      Q.  So can you -- what's the difference
5  between the standard and the custom testing
6  services that ETS provides?
7      A.  Standard testing is testing which one
8  that there is already an industry standard
9  document for; right?  And there's customization to
10  it.  You're literally following the document
11  verbatim.
12        Custom testing is usually testing in
13  which the customer has some requirements where
14  there's an unusual element to it that does not fit
15  within common industry test standards.  And so
16  what you try to do is you try to make it fit as
17  best you can, but noting anything that, say, is
18  not something that was documented in the standard.
19      Q.  Okay.  So for custom -- and I think you
20  confirmed earlier that the testing that you did
21  for Trutek was custom testing; right?
22      A.  That's correct.
23      Q.  And are there any common -- actually,
24  just are there any industry test standards that
25  you followed when conducting the Trutek testing?

94

1      A.  We were trying to imitate as much as we
2  could common industry standards or common industry
3  practices for measuring electrostatic charge on an
4  object.  However, most of these test standards
5  weren't really written with a gel or a liquid in
6  mind necessarily.
7      Q.  Okay.  And are there any common industry
8  test standards for measuring electrostatic charge
9  on pigskin?
10      A.  At this time, none have been written
11  yet.
12      Q.  So there were at least two aspects to
13  the testing that were custom in the sense that
14  you're using it, you know, the use of liquids for
15  electrostatic surface charge and the testing on
16  pigskin as the substrate; is that right?
17      A.  Correct.  At least I'm not aware of any.
18      Q.  Okay.  And are there any other elements
19  or aspects to the testing that you performed for
20  Trutek that did not precisely match up with an
21  industry standard?
22      A.  Can you rephrase that question?
23      Q.  Okay.  So we identified two aspects to
24  the testing that don't match up with an industry
25  standard.  Are there any others?

95

1      A.  Well, it's difficult because the
2  industry standards are mostly dealing with taking
3  a solid object and charging it in some way, often
4  by rolling it down an incline plane or by rubbing
5  it on something to measure the electrostatic
6  charge.  And a lot of documentation on how to
7  measure a charge on the material is still being
8  developed.
9      Q.  Okay.  So can you identify -- I mean,
10  let me rephrase that.
11        Are there any elements of the testing
12  that you conducted for Trutek that do fit with an
13  industry standard?
14      A.  Yes.  So the use of a Faraday cup and a
15  NanoCoulomb Meter is a pretty standard piece of
16  equipment that people use.
17      Q.  Okay.
18      A.  That's common.
19      Q.  Okay.
20      A.  And the use of the ionizer, that's
21  typical when you're performing this kind of
22  testing.
23      Q.  Okay.  When you say that the ionizer is
24  typical, are you talking about the particular
25  equipment that you used that's a standard piece of

96

1  equipment?
2      A.  The ionizer was used to neutralize the
3  pigskin in this case.  I believe I mentioned that
4  earlier.  So it's an air ionizer, and it's blowing
5  air so that there's movement of ions that it's
6  emitting.  And it's emitting an equal amount of
7  positive and negative ions so that if there's a
8  positive charge on a material, it attracts the
9  negative ions.  If there's a negative charge on
10  the material, it attracts the positive ions and
11  thus neutralizes any charge that may preexist on a
12  material.  And this would enable us to measure
13  just the substance we were applying, not the
14  substrate.
15      Q.  Okay.  And so you had said earlier that
16  the use of the ionizer, that's typical when you're
17  performing this kind of testing?
18      A.  Correct.
19      Q.  Okay.  So, basically, using an ionizer
20  on the substrate --
21      A.  To neutralize --
22      Q.  -- before you applied the test material
23  to the substrate, that's in your view a pretty
24  typical standard approach?
25      A.  Yes.  So you're neutralizing any

Transcript of Shane Burns
October 25, 2022

97

1  preexisting charge on any object to which you're
2  applying a substance or a charge.
3     Q.  Okay.  Are you aware of any formal
4  written standards describing that?
5     A.  Yes.  Uh-huh.
6     Q.  What are they?
7     A.  So if you looked up, you could see that
8  one of the standards that I referenced was
9  ANSI/ESD ADV11.2.  And that's a document that was
10 written in 1995, and it was written by the ESD
11 association.  And what they were attempting to do
12 at the time was create a document that contained a
13 set of test methods for recording charge on
14 objects.
15    Q.  Okay.  And this particular standard test
16 method also describes the ionization process that
17 you referred to?
18    A.  Yes.
19    Q.  Okay.
20    A.  It mentions an ionizer.
21    Q.  Does this test method address the use of
22 pigskin as a substrate?
23    A.  No.
24    Q.  What does it say about the substrate?
25    A.  So there are actually several different

98

1  test methods listed in that document.  And some of
2  the substrates are insulators, such as silica --
3  glass -- glass and -- sorry, glass and Teflon is
4  another one mentioned.
5     Q.  Okay.  But it doesn't address the use of
6  pigskin?
7     A.  No.
8     Q.  Does it address the use of any
9  alternative skin models?
10    A.  No.
11    Q.  So, like, no other animal skin; right?
12    A.  No.
13    Q.  Or human cadaver skin?
14    A.  No.
15    Q.  Have you ever performed a test using
16 human cadaver skin as the substrate?
17       MR. KREMEN:  Yuck.
18       THE WITNESS:  No.
19 BY MS. PETERSON:
20    Q.  Okay.  Still looking at Exhibit 25 and
21 Item 7 of your résumé, if we could scroll -- well,
22 actually, in Item 7D it says that you've tested a
23 wide variety of materials for material and product
24 qualification.
25       And then partway down through that list,

99

1  I see that you identify liquids; right?
2     A.  I have performed tests on liquids, yeah.
3     Q.  Okay.  Have you performed tests on
4  liquids to measure the -- to measure its
5  electrostatic charge before?
6     A.  Not in this way.
7     Q.  When you say "not in this way," what way
8  are you talking about?
9     A.  I don't remember doing it -- doing --
10 measuring charge, specifically.  Voltage and other
11 things, but that was -- those were other
12 applications.  This was -- those applications
13 would not have applied here.
14    Q.  Okay.  And then before you were employed
15 at ETS, it looks like you worked for several years
16 at EFE Laboratories; right?
17    A.  Yes.
18    Q.  And it looks like you were involved in
19 production work there, is that generally correct?
20    A.  I started in production work there.  I
21 didn't stay in production work there the entire
22 time, but yes, I was involved --
23    Q.  Okay.
24    A.  -- in production there for a while.
25    Q.  Okay.  Yeah.

100

1        So on your résumé, it looks like you
2  also -- yeah, I know there's a lot of other stuff
3  listed there, but it doesn't look like you were
4  performing any type of testing or consulting
5  services while at EFE Laboratories; right?
6     A.  No, I didn't really do any testing or
7  consulting while I was -- well, not as relates to
8  this particular topic.
9     Q.  Okay.
10    A.  I did do some what could be called
11 consulting, but it didn't have to do with
12 electrostatic decay or a charge or anything like
13 that.
14    Q.  Okay.
15       MS. PETERSON:  I'm at another good
16 breaking point right now.  How about we go off the
17 record.
18       THE VIDEOGRAPHER:  We're going off the
19 record.  The time is now 12:44 p.m.
20       (Recess from the record.)
21       THE VIDEOGRAPHER:  We're back on the
22 record.  The time is now 1:32 p.m.
23       MS. PETERSON:  Just one housekeeping
24 matter, Matthew, if we could make sure that the
25 transcript also indicates that Mr. Wahi is present

Transcript of Shane Burns
October 25, 2022

101

1 for the deposition, I would appreciate that,
2 because I don't think he was introduced earlier.
3         Okay.  And then, Jennifer, I dropped
4 into the folder a new exhibit over lunch.  I was
5 wondering if we could pull that up and mark it as
6 Exhibit 26.
7         (Burns Deposition Exhibit 26 was marked
8 for identification and attached to the
9 transcript.)
10        THE REMOTE TECHNICIAN:  Sure.  Is that
11 in the repository, the link that Planet Depos --
12        MS. PETERSON:  Yeah, I used the link to
13 upload it.  The file name says NasalGuard.
14        THE REMOTE TECHNICIAN:  Okay.  Just give
15 me a minute or two to download it.  Do you want it
16 marked and presented right now?
17        MS. PETERSON:  Yeah.
18        THE REMOTE TECHNICIAN:  Okay.  Okay.
19 Yeah, just give me a minute.  I need to go to the
20 link and download it from the repository.
21        MS. PETERSON:  Okay.
22        THE REMOTE TECHNICIAN:  Thank you.
23        MR. KREMEN:  And what is that exhibit?
24        MS. PETERSON:  We'll be displaying it,
25 Stan, once she has it.

102

1         I guess in the meantime, Jennifer, while
2 you're doing that, I can go forward with some
3 other questions so we're not wasting everyone's
4 time.
5         THE REMOTE TECHNICIAN:  Okay.
6 BY MS. PETERSON:
7     Q.  Mr. Burns, do you have any experience in
8 testing oil-in-water nanoemulsions?
9     A.  Not that I know of.
10    Q.  And that would also --
11    A.  The customers don't typically tell me --
12 well, sometimes they tell me, but they don't
13 always tell me what the materials are made of --
14    Q.  Okay.
15    A.  -- that I'm testing.
16    Q.  So you're not aware of having ever
17 tested an oil-in-water nanoemulsion.
18    A.  No one has informed me that I was
19 testing that.
20    Q.  Okay.  And so I would assume that also
21 means you're not aware of ever having tested an
22 oil-in-water nanoemulsion for electrostatic charge
23 either; right?
24    A.  No.
25    Q.  Okay.  What percentage of your work at

103

1 ETS over the last six years approximately has been
2 devoted to measuring the surface electrostatic
3 charge of products?
4     A.  A lot of it.  Measuring the charge of
5 products?
6     Q.  Well, measuring the surface
7 electrostatic charge.
8     A.  Yeah, I don't know the exact number of
9 hours.  Are you looking for a number of hours or
10 how many years?  I was performing testing on
11 objects for a charge using a NanoCoulomb Meter and
12 Faraday cup from 2017 onward.
13    Q.  Okay.  I mean, and I guess looking back
14 at your résumé -- which I don't appear to have up
15 anymore.
16    A.  They can put it up on the screen like we
17 had it on the screen before.
18        THE REMOTE TECHNICIAN:  Yeah, Counsel,
19 I'm ready for you whenever.
20        MS. PETERSON:  Okay.  We'll come back to
21 that then.  So, yeah, let's pull up this new
22 exhibit.
23 BY MS. PETERSON:
24    Q.  Okay.  So we've marked as Exhibit 26 an
25 image -- or a picture of one of the NasalGuard

104

1 products.
2         Do you see that, Mr. Burns?
3     A.  Yeah, I see it.
4     Q.  And you see that there's -- there
5 appears to be a box, the packaging, plus a
6 container containing this fine mist nasal spray;
7 right?
8     A.  I see that, yes.
9     Q.  So for the products that you tested in
10 your first round of testing, did the samples come
11 to you in packaging like this?
12    A.  No.
13    Q.  Okay.  So they weren't contained within,
14 like, the retail box?
15    A.  If this is what the retail box is, no, I
16 didn't get it in the retail box.
17    Q.  Okay.  And then the mist container
18 that's sitting there to the right, did you receive
19 the samples that you tested in this retail
20 container?
21    A.  There was a white bottle.  I don't
22 remember it having that nozzle on it, and I don't
23 recall it having a label like this.
24    Q.  Okay.  And did you receive the products
25 in this form of packaging or in this container for

Transcript of Shane Burns
October 25, 2022

105

1 the second round of testing that you did?
2 **A. No.**
3     MS. PETERSON: Okay. And let's scroll
4 down to the next -- this document actually has two
5 pages.
6 BY MS. PETERSON:
7     Q. So this is another -- an image of
8 another NasalGuard product, the Airborne Particle
9 Blocker. And it looks like there's two types of
10 packaging, but you could see there's a picture of
11 the tube that the product comes in; right?
12 **A. Yeah, the tube looks a little familiar,**
13 **but I don't recall having one that had a green cap**
14 **like that or -- and I didn't really examine the**
15 **writing on the package too closely at the time**
16 **that we performed testing. So...**
17     Q. Okay. So you can't be sure whether it
18 has this same logo and image --
19 **A. No.**
20     Q. -- and writing that's shown here on the
21 retail packaging?
22 **A. No. And as I said, that was not**
23 **relevant to the test that I performed. The**
24 **packaging --**
25     Q. Yeah, I understand that you don't think

106

1 it's relevant to the test that you performed. I'm
2 just trying to get a better understanding of the
3 samples that were provided to you.
4     But they did not look exactly like this?
5 **A. No.**
6     Q. Okay.
7     MS. PETERSON: We could take that
8 exhibit down.
9     And then I'd like to pull up an exhibit
10 that was marked yesterday during Dr. Lemmo's
11 deposition. It would be Exhibit 13 --
12     (Deposition Exhibit 13, Previously
13 Marked.)
14     MS. PETERSON: -- which for the record
15 is Dr. Lemmo's opening report.
16     THE REMOTE TECHNICIAN: Stand by,
17 Counsel.
18     MS. PETERSON: And if we go to page 8,
19 which is page 11 of the PDF. And maybe zoom in on
20 that picture at the bottom.
21 BY MS. PETERSON:
22     Q. Mr. Burns, this is a picture that was
23 included in Dr. Lemmo's expert report of the
24 packaging for NanoBio Protect. Okay?
25 **A. Okay.**

107

1     Q. When you received the BlueWillow NanoBio
2 Protect samples for testing, did it come in
3 packaging like this?
4 **A. I don't remember this box, no. I'm**
5 **pretty sure it wasn't in a -- is this a cardboard**
6 **box we're looking at? Yeah.**
7     Q. Yeah.
8 **A. I don't think it came in a box like**
9 **this -- or at least --**
10     Q. Okay.
11 **A. -- they didn't have the box with them at**
12 **the time that they used it.**
13     Q. Okay.
14 **A. Is that fair?**
15     Q. Sure.
16     And the -- whatever container you
17 received for the NanoBio Protect product, did it
18 contain that NanoBio Protect kind of logo in
19 colors?
20 **A. No.**
21     Q. Okay.
22     MS. PETERSON: You can take that down.
23 BY MS. PETERSON:
24     Q. And then let's go back to your résumé,
25 which has been marked as Exhibit 25. And let's

108

1 look at page 2. All the way down at the bottom
2 under Item 7, I see that you have listed here that
3 you've performed over 640 individual standard and
4 custom tests.
5 **A. Yes.**
6     Q. Does that sound about right?
7 **A. Uh-huh.**
8     Q. Okay. And just roughly speaking, what
9 percentage of those tests involved measuring the
10 surface electrostatic charge of a material?
11 **A. I don't know the percentage. I would**
12 **have to look that up. But I do a few a year, say**
13 **four, five a year that's charged instead of**
14 **voltage or some other phenomena, electrostatic**
15 **phenomena.**
16     Q. Okay. And out of those four or five a
17 year, how many typically would involve testing the
18 electro -- the surface electrostatic charge of a
19 liquid?
20 **A. I don't think more than one or two,**
21 **ever.**
22     Q. So one or two over the entire course of
23 your six --
24 **A. Yes.**
25     Q. -- years at --

Transcript of Shane Burns
October 25, 2022

109

1    A.  Correct.
2    Q.  -- at ETS?
3        Okay.  And does that include the tests
4  that you ran for Trutek, or is that in addition to
5  the tests that you ran for Trutek?
6    A.  Excluding the tests I ran for Trutek.
7  Typically liquids are not tested this way, only
8  rarely.
9    Q.  Okay.  So -- well, you did two tests for
10 Trutek.  So does that mean that apart from --
11   A.  So if you include the two tests from
12 Trutek, that would be something like four, a
13 handful at most.
14   Q.  Oh, okay.  That's what I was trying to
15 understand.  So there were the two tests for
16 Trutek, and then apart from that, you've done it
17 maybe one or two other times?
18   A.  Yeah, and I'm not going to name those
19 customers, by the way.  That's -- I'm not going to
20 bring them up, but --
21   Q.  That's --
22   A.  As far as liquids -- the charge on
23 liquids being measured, it's not common.
24   Q.  Yeah, that's fine.  And I don't need to
25 know the customer.

110

1        But in those one or two other instances,
2  was it a standard test or a custom test that you
3  performed?
4    A.  It was custom.  Yeah, it would be
5  custom.
6    Q.  Okay.  And would you say that the test
7  method that you performed in those one or two
8  other instances, was it consistent with the
9  testing that you conducted for Trutek?
10   A.  No.
11   Q.  How was it different?
12   A.  Well, as you've indicated or what you're
13 really asking is:  Did I use pigskin in those?
14 No, I did not use pigskin in any other test.
15   Q.  Actually, that wasn't even what I was
16 getting at.
17   A.  Oh --
18   Q.  I was wondering about the other aspects
19 of the testing procedure.  Like the number of
20 samples that were tested or the number of
21 replicates or the equipment that you used, was
22 that all generally consistent?
23   A.  That varies from one customer to the
24 next.
25   Q.  Okay.  And just to confirm, I apologize

111

1  I keep bringing this up, but your testimony is
2  that you have never tested the electrostatic
3  charge of a product on pigskin before; right?
4    A.  Correct.
5    Q.  Okay.  Would you expect that a product
6  applied to human skin would exhibit the same
7  surface electrostatic charge as when it's applied
8  to pigskin?
9    A.  I don't know.  I'd have to perform that
10 test.
11   Q.  And I assume you were not asked to
12 perform any test to establish that relationship.
13   A.  How do you propose to perform such a
14 test?  No, I did not perform any test on actual
15 human flesh.
16   Q.  Okay.  That's not -- okay.
17       So when you say that you can't answer
18 the question because you would have to perform
19 that test, you're saying you would have to
20 actually test the product on human skin?
21   A.  You're asking me what kinds of tests --
22 if it was similar -- if a test on the pigskin is
23 similar to a test on human skin, I don't know.  I
24 don't know.  I don't know the answer to that
25 question.  It might be identical.  It might be the

112

1  same.  I don't know.  I have not performed that
2  test.
3    Q.  Okay.
4    A.  You're asking me to talk about something
5  I don't know anything about.
6    Q.  That's a fair answer.  If you don't
7  know, you don't know.  That's quite all right.  We
8  can move on.  Don't worry about it.
9        So before you conducted the testing for
10 Trutek, did anybody else test the technique that
11 you were planning to use for accuracy?
12   A.  The identical technique or -- a
13 similar -- the same equipment has been used on
14 other tests before, yes.  A lot of people have
15 performed tests using a NanoCoulomb Meter and
16 Faraday cup.
17   Q.  Okay.  And did anybody test, you know,
18 the technique that you used involving pigskin?
19   A.  I am unaware of anyone testing pigskin
20 of any kind at any time.  I don't know.
21   Q.  Okay.  And that would be true for people
22 within ETS, as well as just generally outside the
23 company?
24   A.  I don't know.  I never asked the prior
25 ownership whether they had ever tested pigskin.

Transcript of Shane Burns
October 25, 2022

113

1  It's not something that occurred to me to ask
2  them.
3      Q.  Are you aware of whether anybody has
4  published on a technique for testing the
5  electrostatic charge of a liquid on pigskin?
6      A.  There are published techniques that talk
7  about testing electrostatic charge on an object.
8  It doesn't matter what the object is necessarily.
9  It's the same technique.  You take the object and
10 you put it in the Faraday cup and it's connected
11 to a NanoCoulomb Meter and then you record the
12 reading.
13     Q.  Okay.
14     A.  It doesn't matter what the thing is that
15 you stick in the cup.
16     Q.  Okay.  Well, apart from that, are you
17 aware of anybody publishing on a technique for
18 measuring electrostatic charge of a liquid
19 specifically on pigskin?  Have you ever seen that
20 published anywhere?
21     A.  There are no techniques anywhere that
22 specify pigskin --
23     Q.  Okay.
24     A.  -- as far as I know.
25     Q.  Okay.  And do you know if there are any

114

1  known error rates associated with measuring
2  electrostatic charge of a liquid on pigskin?
3      A.  No.  Because if they had not published a
4  paper specifically on testing with pigskin, how
5  would they have published documentation on the
6  error rate.
7      Q.  So your answer is no, you're not aware
8  of anything?
9      A.  No, I'm not aware of any.
10     Q.  Okay.  Mr. Burns, do you have any
11 understanding as to the fact this this litigation
12 involving Trutek involves a patent?  Are you aware
13 of that?
14     A.  A patent, I believe, was one of the
15 documents that has been discussed.
16     Q.  Okay.
17     A.  Or was provided with the -- along with
18 the test report from Dr. Ermakov and the immensely
19 long résumé from Dr. Amiji.  So, yes, it's one of
20 the many documents that I believe is involved.  I
21 did not read the patent, sorry.
22     Q.  That's okay.  I wouldn't have expected
23 you to.
24         Did you look at the patent at all?
25     A.  I glanced at it long enough to realize

115

1  that it was a patent, and I'm not an expert in
2  patents.  So I can't even tell you what it is
3  trying to say.
4      Q.  Okay.  Did Mr. Wahi ever explain
5  anything to you about the patent?
6      A.  I believe that he mentioned that he had
7  a patent on his NasalGuard product when he first
8  began working with me.  So it did come up that he
9  had patented or was patenting products that he
10 makes --
11     Q.  Okay.
12     A.  -- and that they were among the
13 substances that I was going to be testing.
14     Q.  Okay.  Did he provide you with any other
15 information about the subject matter of the
16 patent?
17     A.  No, and I don't believe he even -- had
18 not even provided me that document at that time.
19     Q.  Okay.
20     A.  So I don't even know if it was written
21 yet.  I didn't look at the date on the document as
22 provided to me.
23     Q.  Sure.
24         Did Mr. Kremen ever provide you with any
25 explanation of the subject matter of the patent?

116

1      A.  It is a patent, and it's a patent for
2  Mr. Wahi's product.  I know that.  But, otherwise,
3  I didn't feel as though it was necessary for me to
4  know anything further.
5      Q.  No, I agree, that makes sense.  I'm just
6  wondering if anybody did explain the patent to
7  you?
8      A.  If they did, it's all lawyer talk to me
9  so I have no idea what it says.
10     Q.  Well, do you remember if anyone
11 explained the patent to you?
12     A.  If they did, I wasn't listening, I'm
13 sorry.
14     Q.  Okay.
15     A.  I'm sorry, I don't know anything about
16 patents.  I apologize.
17     Q.  You don't need to apologize for it.  I'm
18 just trying to understand what other information
19 you were given to consider as part of your
20 testing.
21     A.  I don't think that the contents of a
22 patent would have affected the test outcome.
23     Q.  Okay.
24     A.  The test -- they could have labeled the
25 substances A, B, C, and D and I still would have

Transcript of Shane Burns
October 25, 2022

117

1   performed the test and the results would have been
2   recorded and then they could decipher what A, B,
3   C, and D meant, so which substance is which. In
4   fact, some customers do that. They provide me
5   materials for blind testing so that they and
6   another person have an objective third party who
7   is unaware as to which one is which.
8       Q. Okay. Let's go back to your report now.
9       MS. PETERSON: So this is Exhibit 23.
10  If we could pull that up.
11  BY MS. PETERSON:
12      Q. Mr. Burns, when you prepared this
13  report, did you review any other materials or
14  information apart from what's recorded directly in
15  the report?
16      A. I tried to record in the report anything
17  that I knew of and that I had information on.
18      Q. Okay.
19      A. So I don't think any other outside
20  materials were involved or else I would have
21  wanted to reference that.
22      Q. Okay. And I see the report is dated
23  January 18, 2021. Is that the same day that the
24  testing occurred?
25      A. Testing occurred on January 13th. So

118

1   the report was released five days later.
2       Q. Okay. And was the testing started and
3   completed all in the same day?
4       A. Yeah.
5       Q. And I see that there is a signature here
6   saying that the report was reviewed by Troy
7   Anthony. Who is that?
8       A. He's my general manager. When I
9   complete a report, the report has to be reviewed
10  by somebody else so that major mistakes, typos,
11  and the like are caught, as well as, let's say,
12  some other kind of mistake. But I submit it to
13  someone else for review. So a second pair of
14  eyes, basically, sometimes a fresh pair of eyes
15  can catch mistakes that I otherwise wouldn't after
16  I've looked at a report for too long.
17      Q. Okay. And do you recall how long it
18  took you to prepare the report?
19      A. No. Probably half an hour or an hour,
20  perhaps.
21      Q. And at the bottom of this page, there's
22  a report revision history. Do you see that?
23      A. Yeah.
24      Q. And there's a report version 1, which
25  looks like that's this version?

119

1       A. Yes.
2       Q. Are there any further -- sorry, were
3   there any earlier versions of the report created?
4       A. I wouldn't remember that unless I
5   recorded it there in that revision history. So
6   typically if there is a revision, I would record
7   it right there in that box.
8       Q. Okay. And have you made any further
9   revisions to the report?
10      A. What you have there is, I believe, the
11  actual final version.
12      Q. Okay. So it has -- you have not issued
13  any further revisions?
14      A. As far as I know, no. There was an
15  earlier version of the report. So there are
16  actually two reports that were done the same day,
17  and these were determined to be separate topics.
18  So they were split. So this is A, and then
19  there's a B. So they're actually -- there's a
20  whole nother item, I think, that's tested -- or a
21  couple of items.
22      Q. And what were those items?
23      A. I don't know. I don't think it's
24  relevant to this at all. I can probably look, if
25  that's okay with Trutek. But, otherwise, I don't

120

1   believe it has any relevance to this.
2       Q. Did it involve testing of Trutek
3   products?
4       A. Yes.
5       Q. Did it involve testing of BlueWillow
6   products?
7       A. I don't believe so.
8       Q. Okay.
9       MS. PETERSON: Counsel, we would ask for
10  a copy of that report.
11      MR. KREMEN: I'll take it under
12  advisement.
13  DOCUMENT/DATA REQUESTED:
14      MS. PETERSON: Okay. Can we go to the
15  next page.
16  BY MS. PETERSON:
17      Q. So the very first section, "Test
18  Objective," it states that "The purpose of this
19  test was to determine the magnitude (amount) of
20  surface electrostatic charge created by means of
21  the application of solution and spray containing
22  permanently ionized molecules"; right?
23      MR. KREMEN: Where are you reading from?
24      MS. PETERSON: "Test Objective" right at
25  the top.

Transcript of Shane Burns
October 25, 2022

121

1        MR. KREMEN:  Oh, okay.  I see.
2   BY MS. PETERSON:
3        Q.  Did I accurately identify the test
4   objective, Mr. Burns?
5        A.  Yeah.
6        Q.  Okay.  So the purpose of the test was
7   not just to determine whether the solution and
8   spray exhibited a surface electrostatic charge,
9   but also to measure the magnitude or amount of
10  that charge; right?
11       A.  Correct.
12       Q.  Okay.  And was this test objective
13  provided to you by Trutek, or did you draft this?
14       A.  That was provided by Trutek, yeah.
15       Q.  Okay.  And it looks like we've got a
16  section -- Section II describes the test equipment
17  that you used; right?
18       A.  Yeah.
19       Q.  So on this section page, I see that
20  there is a last calibration date of April 2nd,
21  2020, for the NanoCoulomb Meter; right?
22       A.  Correct.
23       Q.  How often is that equipment calibrated?
24       A.  We try to do it once a year.  The
25  exception is that if for some reason the equipment

122

1   falls out of use, we have to mark it as for
2   reference only and set it aside.  So, typically,
3   if the equipment is out of use for long periods of
4   time, at the next point in time in which the
5   equipment needs to be calibrated at the one-year
6   mark, we check to see, basically, has it been used
7   often enough, and then we'd set it aside.  So
8   under normal circumstances, the equipment is
9   calibrated annually.
10       Q.  Okay.  And just, generally speaking, how
11  is it calibrated?
12       A.  So there's -- typically, the way that
13  you'd do it is you're taking a measurement.  And
14  if the measurement is incorrect on a controlled
15  amount of charge, then you have to make
16  adjustments, and that requires us to open it up
17  and make some adjustments inside, and we have a
18  procedure for that.
19           But the way that you make the accurate
20  measurement is you take a controlled capacitor,
21  something that has a very tight tolerance, as
22  stated by the manufacturer.  And you charge that
23  up to a specified voltage, usually 1 volt.  And
24  then you put it into the input of the machine.
25  You can even do this by putting it directly into

123

1   the interior of a connected Faraday cup.
2           And what you'd read out on the screen
3   should be the voltage times the capacitance, and
4   that should give you the charge.  So it's a
5   NanoCoulomb Meter.  So if you're trying to use
6   something in nanocoulombs say, for example, then
7   you want a capacitor that's comparable.  So...
8        Q.  Okay.  So the readout on the screen
9   gives you the voltage and the capacitance that's
10  being measured?  Did I hear you correctly?
11       A.  No, what's on the screen is the charge,
12  which is the product of voltage times capacitance.
13       Q.  Okay.  So the readout on the screen is
14  the charge?
15       A.  Yes, Q equals CV.
16       Q.  Okay.  Are there ever any instances
17  where you would -- apart from when the equipment
18  has been marked out of use, are there any
19  instances where you would calibrate a piece of
20  equipment more frequently than once a year?
21       A.  Oh, yes.
22       Q.  When would you do that?
23       A.  So let's say you're performing your
24  functional test shortly before beginning the test.
25  So this is typically what you do.  So what you

124

1   would do is you'll take that capacitor.  You'll
2   charge it up using the provided voltage coming out
3   of the front of the machine.  There's a little red
4   output.  And then you test the machine.
5           And let's say you're -- the charge you
6   read on the screen is out of the tolerance of the
7   machine's specified accuracies and the tolerance
8   of the capacitor that you're measuring.  Well,
9   that's an indicator that something has gone wrong
10  in the machine.  So you can't perform testing at
11  that point, you have to stop, and you have to
12  figure out what's wrong with the machine and
13  retake the test.
14       Q.  Okay.
15       A.  If the machine needs to be calibrated
16  and you recalibrate it, you know, then you have to
17  basically update the calibration date, fill out a
18  new certificate, all of that.  So...
19       Q.  Okay.  Thank you for that explanation.
20           Other than that functional test, do you
21  do any other types of tests prior to using a piece
22  of equipment to ensure it's operating correctly?
23       A.  I mean, you want to make sure that it's
24  on and operates properly, and that functional test
25  really covers quite a lot.

Transcript of Shane Burns
October 25, 2022

125

1    Q.  Okay.
2    **A.  You're making sure that the voltage**
3    **output is correct.  You're making sure that the**
4    **machine is reading the right amount of charge on a**
5    **specified capacitor.  And, of course, you know,**
6    **along with that, you're making sure that**
7    **everything is connected properly.  So --**
8    Q.  Okay.
9    **A.  -- it's not really -- it's pretty**
10   **comprehensive by just performing a very simple**
11   **test.**
12   Q.  And I don't see that recorded anywhere
13   in your report that that type of functional test
14   was performed here; was it?
15   **A.  No, I don't see that I've recorded that**
16   **here in the report.**
17   Q.  So do you recall if you performed that
18   functional test prior to running your -- prior to
19   running the test described in this test report?
20   **A.  Yeah, you have to perform that test**
21   **every time.**
22   Q.  So even though it's not recorded here,
23   you believe that you did run it.
24   **A.  Oh, yes.**
25   Q.  Okay.

126

1    MS. PETERSON:  Let's go to the next
2    page.
3    BY MS. PETERSON:
4    Q.  And here we have some information on the
5    Faraday cup.  And it looks like it has the same
6    last date of calibration of April 2nd, 2020.  Is
7    that piece of equipment also typically
8    recalibrated once a year?
9    **A.  It's part of the system.  So they get**
10   **calibrated together.**
11   Q.  Okay.  So that functional test you
12   described would also be ensuring that the Faraday
13   cup is operating properly?
14   **A.  The cup has to be connected to the**
15   **machine in order to perform that test.**
16   Q.  Okay.
17   **A.  Right.**
18   MS. PETERSON:  Let's go to the next
19   page.
20   BY MS. PETERSON:
21   Q.  So here we have a depiction of
22   the piece of pigskin which measured approximately
23   12 inches by 12 inches; right?
24   **A.  That's what it says, yes.**
25   Q.  Okay.  And so there was just one piece

127

1    of pigskin used in this experiment?
2    **A.  Yes.  I guess you could say one original**
3    **piece.  It's clearly -- it was cut into smaller**
4    **pieces in order to make the thing work.**
5    Q.  Of course.  And the skin was cut into
6    those smaller pieces by the Trutek personnel;
7    right?
8    **A.  Yeah.**
9    Q.  And you don't recall whether that
10   happened in your laboratory or before they
11   arrived; right?
12   **A.  No, I don't remember.  I think that it**
13   **was cut before they arrived, but it might have**
14   **been done in the lab.  We always keep a pair of**
15   **scissors around in case samples do need to be cut.**
16   **So it wouldn't surprise me if it was cut in the**
17   **lab.**
18   Q.  Okay.  But you don't recall necessarily
19   watching them cut the skin into the 12 samples;
20   right?
21   **A.  No, I don't understand why this is**
22   **important.  But, no, I don't remember whether or**
23   **not I watched them cut the samples.**
24   Q.  Okay.  So you don't know what instrument
25   was used to cut the samples?

128

1    **A.  It could be a pair of scissors.  It**
2    **could be, I don't know, a box cutter, perhaps.  I**
3    **have no idea what -- at this point what was used**
4    **to cut the samples.  I did not specify that in the**
5    **report.  It did not seem like something I needed**
6    **to include here.**
7    Q.  And I assume you also then don't know
8    how the pigskin was handled, whether it was you
9    using some other object or with gloves or bare
10   hands?
11   **A.  Well, I know I was wearing gloves, but I**
12   **don't know that I actually handled the samples**
13   **with gloves, because we have a pair of plastic**
14   **tongs that we would use typically for this test.**
15   **So other versions of this test, other types of**
16   **testing that involve, say, a Faraday cup and a**
17   **NanoCoulomb Meter often uses plastic tongs.  That**
18   **way any charge that's on your person doesn't get**
19   **transferred.  So I may have used gloves.  We may**
20   **have only handled them with the tongs.  I don't**
21   **know.**
22   Q.  Okay.  But you don't know how the Trutek
23   personnel handled the pigskin when it was cut into
24   the 12 pieces; right?
25   MR. KREMEN:  Calls for speculation.

129

1         THE WITNESS:  I don't know.
2   BY MS. PETERSON:
3         Q.   And then I understand that because there
4   were two products, three tests each, does that
5   mean that there were six sections of pigskin used
6   in your test?
7         **A.   I believe so.  That's what it says.**
8         Q.   Okay.  Do you know what happened or what
9   was done with the remaining six pieces of pigskin?
10        **A.   Well, I assume they were used -- yeah,**
11  **they were used in the other test.**
12        Q.   Okay.  And then below that picture, it
13  says that each product test sample created was 4
14  inches by 3 inches, and then it says it was
15  uniformly coated with test product.
16        Do you see that?
17        **A.   Yes.**
18        Q.   So does that mean that the test product
19  was uniformly spread over the entire surface area
20  of the 4-by-3-inch piece?
21        **A.   Yes, that's what that's intended to**
22  **mean.  The idea being that the substance wouldn't**
23  **be unevenly distributed on the substrate.**
24        Q.   Okay.  I'm sorry, the idea being that
25  the substance would not be unevenly distributed.

130

1         **A.   That's a double negative, right.  The**
2   **idea being that the substance would be evenly**
3   **applied.**
4         Q.   Across the entire substrate?
5         **A.   Across the entire substrate, yes.**
6         Q.   Great.  Thank you.
7         And the pigskin itself, it was dried.
8         **A.   I don't know what that means, but it was**
9   **dry.  I guess it wasn't wet.**
10        Q.   Like, there wasn't some other apparatus
11  being used in your lab to moisten or keep the skin
12  wet during the testing procedure; right?
13        **A.   No.  No, nothing like that.**
14        Q.   Okay.  Do you know where the pigskin
15  sample was obtained from?
16        **A.   No.**
17        Q.   Do you know when it was obtained?
18        **A.   No.**
19        Q.   Do you know how it was stored prior to
20  the test?
21        **A.   No.  I don't remember anything**
22  **particular being said about that.**
23        Q.   Okay.  Do you -- I'm sorry, I have to
24  ask these questions, but do you know what part of
25  the pig the skin came from?

131

1         MR. KREMEN:  Oh, God.
2         THE WITNESS:  No, I don't know.
3   BY MS. PETERSON:
4         Q.   Okay.  If you don't know, that's fine.
5         Do you know how old the sample was?
6   Like how much time had passed from when the sample
7   was first prepared to when it was used in your
8   lab?
9         **A.   No.**
10        Q.   Okay.  Did you do anything to check the
11  integrity of the pigskin before completing the
12  test?
13        **A.   No.**
14        Q.   Do you know if the Trutek personnel did
15  anything to check the integrity of the pigskin
16  before the test?
17        **A.   I don't know.  I can't answer that.**
18        Q.   Okay.  At the bottom of the section, it
19  indicates that all testing was performed at a
20  control temperature of 72 degrees plus or minus
21  2 degrees Fahrenheit and 12 degrees percent
22  relative humidity plus or minus 2 degrees -- or
23  I'm sorry, 2 percent relative humidity -- let me
24  start over again.
25        **A.   Sure.**

132

1         Q.   Testing was performed at a control
2   temperature of 72 degrees plus or minus 2 degrees
3   Fahrenheit?
4         **A.   Correct.**
5         Q.   And the relative humanity was 12 percent
6   plus or minus 2 percent?
7         **A.   Correct.**
8         Q.   Okay.  How were those conditions
9   selected?
10        **A.   Because those are the standard**
11  **conditions for performing testing on electrostatic**
12  **charge on an object in a Faraday cup.**
13        Q.   Okay.
14        **A.   The reason for that is if you let the**
15  **humidity go too high, then humidity suppresses**
16  **electrostatic fields.  If you have a high**
17  **humidity, it would alter the reliability of the**
18  **test.**
19        Q.   Okay.
20        **A.   And the temperature was just picked**
21  **because I like it.  No, that's not true.  I'm**
22  **joking.  That temperature is actually a really**
23  **standard temperature used in all ANSI documents,**
24  **in ANSI standards.  So it's very typical for ANSI**
25  **documents to reference 72 degrees plus or minus**

133

1   2 degrees Fahrenheit.  Someone picked that a long
2   time ago and that's been generally recognized as
3   what's called room temperature, even though
4   obviously a regular room isn't necessarily going
5   to be exactly 72 degrees.  But that's the
6   temperature at which you have to hold the chamber
7   at in order to have repeatability.
8        So -- and the two humidities that are
9   usually chosen by ANSI, they're almost in all of
10  the ANSI documents have a 12 percent set point and
11  a 50 percent set point in some, but that's not --
12  that's not always the case.  But 12 percent is in
13  nearly every ANSI document.  And that includes the
14  one that describes this test method.
15      Q.  Okay.  And that's because I think you
16  said that if the humidity is any higher, then it
17  messes with the electrostatic fields.  I can't
18  remember how --
19      A.  Yeah, if you get up to 55 percent
20  humidity, then you're going to start seeing the
21  humidity suppressing the electrostatic fields.  So
22  things that were -- so materials that were, for
23  example, insulators at very low humidity, say
24  12 percent, begin becoming dissipative or even
25  conductive depending on how porous they are at

134

1   very high humidities.
2        So you have to keep the humidity in a
3   controlled state.  And the generally accepted
4   state has been 12 percent because this was
5   actually crafted by the electronics industry.
6   This is sort of like an air-conditioned room in
7   the wintertime.  So that's why 12 percent was
8   chosen.
9       Q.  Okay.
10      A.  There were round robin tests to try to
11  establish that.
12      Q.  Okay.  Looking at the next section under
13  "Methodology" now.  I see in Item 1 that's talking
14  about the ionization process that you referred to
15  earlier; correct?
16      A.  Correct.
17      Q.  Okay.  And so it looks like the test
18  substrates were ionized to neutralize existing
19  charge.  And then it says they were measured
20  repeatedly to see how much the substrate material
21  of the pigskin would affect the result; right?
22      A.  Correct.
23      Q.  Okay.  So how many -- I mean, how many
24  times -- it says "measured repeatedly."  How many
25  times is that?

135

1       A.  I mean, at least three times, but
2   probably -- probably at least three times, yeah.
3   I'm sure I recorded that somewhere perhaps or --
4   but at any rate, I did it in front of the
5   customer.
6       Q.  Okay.
7       A.  They saw that I had done it.
8       Q.  Okay.  So each of the six individual
9   sections that was used in this test was measured
10  repeatedly after being neutralized?
11      A.  Yeah.
12      Q.  Okay.  And in Item No. 2, it says,
13  "Before applying any test product sample, the
14  substrate was neutralized again."
15       Why was that?
16      A.  Well, you've just taken the substrate,
17  right, and tested it by itself repeatedly after
18  ionizing it to see that it was indeed neutralized;
19  right?  But in the process of performing that
20  test, you've moved it.  You've pushed it through
21  the air and possibly triboelectrically charged it
22  removing it from the cup.  So you need to
23  neutralize it again before you apply the substance
24  to it, or else it's going to have some base charge
25  to it.

136

1       Q.  Okay.  And how much time typically would
2   it -- or how much time did it take to complete
3   this first step, the neutralizing and testing of
4   the neutralized substrate?
5       A.  Well, we did each one, right.  So you
6   would do this with one substrate, and then you
7   would apply the material.  And then you would test
8   the material, and then grab another substrate and
9   do the same process again.  So it wasn't all
10  done -- you didn't perform all of the
11  neutralization of charge on all of the materials
12  at the same exact time.  You did each one.
13      Q.  Okay.
14      A.  Right?  So logically you're trying to --
15  you're performing the neutralization on the
16  substrate, testing it, neutralizing it again,
17  applying the substance that you're actually trying
18  to get the test data on, and then putting it in
19  the Faraday cup, testing that, and then -- and
20  then removing that, resetting the system, and then
21  moving to the next substrate.
22      Q.  Okay.  And so for each substrate,
23  approximately how long does that process take?
24      A.  I don't know.  Maybe half a minute.
25      Q.  Half a minute to ionize it and then test

Transcript of Shane Burns
October 25, 2022

137

1  it?
2      A.  Yeah, maybe a minute or two at most, but
3  not a huge amount of time.
4      Q.  Okay.  So once it's placed in the
5  Faraday cup, I mean, how long does it take to
6  record the measurement?  That's pretty quick?
7      A.  Yeah, like one, maybe two seconds.  A
8  few seconds.
9      Q.  Okay.
10     A.  Yeah, you're reading it off the screen,
11 and then you're typing it into your spreadsheet or
12 database or whatever it is.
13     Q.  Okay.  And is it correct that you did
14 not measure the charge on an unionized sample of
15 the pigskin as a control in this experiment?
16     A.  No, the control was the ionized sample
17 of the pigskin.  The control --
18     Q.  Yeah, I understand that.  But you did
19 not also measure or test an unionized piece of
20 pigskin; right?
21     MR. KREMEN:  Objection to the form.
22     You can answer.
23     THE WITNESS:  Okay.  I think we may have
24 actually at some point tested the pigskin by
25 itself.  I don't think that we recorded that,

138

1  though, here in this report.
2  BY MS. PETERSON:
3      Q.  Why not?
4      A.  Because ultimately that was not what was
5  part of the test.  We were testing the substance
6  on neutralized pigskin.
7      Q.  Okay.  So why did you at some point test
8  the pigskin by itself?
9      A.  I think we may have done it just to make
10 sure we were set up and ready to work.  We
11 didn't -- I don't think we were doing it in
12 particular to test the -- I think we may have done
13 it one time or maybe a couple of times, but it was
14 just to make sure that we had everything up and
15 operating and ready to go.
16     Q.  Okay.
17     A.  We were practicing because the issue is,
18 is we were about to spread something kind of messy
19 on the substrate, you know, and you can't practice
20 once you've got -- once you've got the gunk spread
21 on there, so to speak, you know, you mess that up.
22 There's no undoing it.
23     Q.  Yeah, sure.
24     But you could have also practiced with
25 the ionized pigskin, as well; right?

139

1      A.  Well, we did.  You know, we did because
2  that part we understood was actually data that
3  could affect the result.
4      Q.  Okay.
5      A.  So we wanted to record that.
6      Q.  Okay.  And then next in Item 3, it
7  explains that the solution and spray test products
8  were coated using a cotton swab with approximately
9  1.5 milliliters for a smooth and uniform
10 application.  And that coating process, again,
11 that was conducted by the Trutek personnel?
12     A.  Yeah.
13     Q.  Okay.  And the specific pigskin
14 substrates that were used were those same six
15 samples that had previously been ionized and
16 measured in Step 1?
17     A.  Yes, like I said, we didn't ionize them
18 all at once.  This is a series of steps that we
19 performed on each individual substrate; right?  So
20 we didn't -- I just want to make sure we're clear.
21 We applied the material on one specimen, on one
22 substrate, tested that, and then started over
23 again at Step 1 with the next substrate.
24     Does that make sense?
25     Q.  That does, yeah.  And that wasn't

140

1  spelled out in your report.  So thank you for
2  clarifying that.
3      A.  Yeah, because you couldn't apply it to
4  all of them at once and then test them because the
5  time it would take to do that, you know, they
6  might -- you know, the environment might dry them
7  out or something, you know.
8      Q.  Okay.  And then looking at Step 4, it
9  says that after waiting for four minutes --
10     A.  Yeah.
11     Q.  -- or three to five minutes after
12 coating, then the samples were placed into the
13 cup.  So why -- what was going on in that
14 four-minute time frame?
15     A.  So my understanding was that what we
16 were trying to accomplish was we're sort of trying
17 to imitate something that happens in,
18 quote-unquote, real life, let's call it.
19     Q.  Okay.
20     A.  So, you know, you're applying this
21 substance and waiting for it to, I guess, absorb
22 or take hold or whatever the case may be.  But
23 you're doing something similar to what would
24 happen in, say, a real life situation.
25     Q.  Okay.  So that waiting time of

Transcript of Shane Burns
October 25, 2022

141

1  four minutes, that was intentional as opposed to
2  just a function of the time that it takes to get
3  the equipment set up?
4     **A.  The equipment was already set up.  So we**
5  **were -- what we were doing was trying to, I guess,**
6  **simulate a behavior or simulate a pattern of what**
7  **someone would actually do with this product.**
8     Q.  Okay.  And that time period of waiting
9  four minutes, I assume that was something that was
10 requested by Trutek?
11    **A.  Yeah.**
12    Q.  That wasn't your suggestion?
13    **A.  No.**
14    Q.  Okay.  Just below this, we've got an
15 indication of which samples were measured or
16 tested; correct?
17    **A.  Yes.**
18    Q.  Okay.  Do you know when the Trutek
19 samples were manufactured?
20    **A.  No.**
21    Q.  Do you know their expiration date?
22    **A.  No.**
23    Q.  Do you know when the BlueWillow products
24 were manufactured?
25    **A.  No.**

142

1     Q.  Do you know their expiration date?
2     **A.  No.**
3     Q.  When you're testing products for your
4  customers, do you typically want to make sure that
5  you're testing products that have not expired?
6     **A.  Electrostatic products for the most part**
7  **don't usually have a listed expiration date.  And**
8  **those that do, typically we're applying it or the**
9  **customer is applying it not very long before we**
10 **actually test it.  And those are mostly -- for the**
11 **most part those are materials that have not been**
12 **manufactured very long before.**
13    Q.  Okay.  Now, in the course of this second
14 round of testing, were you ever asked to test any
15 other products of Trutek?
16    **A.  Well, there was a spray and there was**
17 **some kind of gel; right?**
18    Q.  Okay.
19    **A.  So there was those two things.  And then**
20 **this report all we tested was, it looks like, the**
21 **spray.  But I know there was that first test that**
22 **we did back in 2019.  I'd have to look at the**
23 **report, but it seems like there were a couple, at**
24 **least two different products that were tested in**
25 **that report, as well.**

143

1     Q.  Okay.  Yeah, you actually have a pretty
2  good memory about that.  Yeah.
3     **A.  I don't remember what they were called.**
4  **So I don't have that great a memory.**
5     Q.  Okay.
6     **A.  That's why we write things down; right?**
7     Q.  Okay.  But so certainly in this second
8  round of testing, there's only one Trutek product
9  described in the report; right?
10    **A.  Yes, it's identified as TTK-NS; right?**
11    Q.  I'm sorry, my phone just rang.  I didn't
12 hear what you said.  So TTK-NS, yes.  Okay.  So
13 you did not test a second Trutek product as part
14 of this second round testing?
15    **A.  No, nothing else.**
16    Q.  Okay.
17    **A.  If I did, I certainly didn't include it**
18 **in the report; did I?  No, I don't have anything**
19 **else listed.**
20    Q.  And if you had tested it, it would have
21 been included in the report?
22    **A.  Yeah, unless it was just -- I can't**
23 **think of a reason why it wouldn't be included,**
24 **but, you know, the customer requested that this be**
25 **what was tested and included.  So I assume this is**

144

1  all that was tested.
2     Q.  Okay.  Let's take a look at Section V
3  now, the "Testing."  So for each product we have a
4  total surface electrostatic charge recorded here
5  for three experiments for each sample; right?
6     **A.  Correct.**
7     Q.  So those would be the three replicates?
8     **A.  Correct.**
9     Q.  Okay.  And just to confirm -- oh, and I
10 guess that would be the three samples of pigskin?
11    **A.  Correct.**
12    Q.  Okay.  And so each sample of pigskin, it
13 was only tested and measured once; is that
14 correct?
15    **A.  Well, I certainly couldn't measure it**
16 **twice once we had coated it in all of that fluid.**
17 **You know, I mean, you put the fluid on and you**
18 **toss it in that cup and now it's touched the wall**
19 **of a cup.  You can't retest that.**
20    Q.  No, I'm just checking to make sure that
21 there was one test per sample.
22    **A.  Yeah.**
23    Q.  Okay.  And then there's a note at the
24 bottom of the table.  Can you read that?
25    **A.  Yeah.**

Transcript of Shane Burns
October 25, 2022

145

1    Q.  Okay.  It says that the "Neutralized
2  substrates' total electrostatic charge was
3  measured at the beginning and at the end."
4        What do you mean "at the end"?  At the
5  end of each test, it says.
6    A.  I don't know why it says at the end,
7  but -- because I don't know how we would have
8  tested them at the end.  It's got to be a typo.
9  But, yeah, we neutralized the substrates, and
10  we -- I guess "at the end" must mean after we've
11  applied the coating to it.  But at any rate, yeah.
12       Well, at the end -- beginning and end
13  of, what, ionization.  I don't know.  But -- yeah,
14  we measured them before we applied the substance,
15  and then we applied the substance and then tested
16  them with the substance.
17       That's a poorly written sentence; isn't
18  it?  I apologize for that.  That's got to be my
19  fault.
20    Q.  That's okay.
21       So do you remember or do you think you
22  have an idea of what happened?
23    A.  Well, I described it earlier.  We
24  neutralized the substrate, and then we measured
25  them; right?  And applied the material to the

146

1  substrate and then performed the test.  So we have
2  the measurement for the test, and then we have the
3  measurement up above in the table after we had
4  applied the material.
5    Q.  But you're not sure based on this -- or
6  do you know, were the samples -- were the
7  substrates neutralized again after?
8    A.  No, you didn't neutralize them after you
9  applied the goop to them, the liquid.
10    Q.  Okay.
11    A.  That wouldn't make any sense.
12    Q.  Okay.  Okay.  So anyways, the
13  measurements for the neutralized substrates, you
14  report that they were measured to have less than
15  minus 0.07 nanocoulombs?
16    A.  Correct.  Yeah.
17    Q.  Okay.  In all cases.
18       And then averaging minus 0.023
19  nanocoulombs?
20    A.  Right.  Very small charges on the actual
21  substrates themselves.  So the substrates are not
22  significantly charged is what we're saying here.
23    Q.  Okay.  And so they -- the neutralized
24  substrates, they had a negative charge?
25    A.  You can have a negative charge in

147

1  relation to your reference.  So your reference is
2  the outside of the Faraday cup and the inside of
3  the Faraday cup.  So it's a cup within a cup
4  separated by an air gap and sometimes spacers, in
5  this case they were Teflon spacers.  So they
6  wouldn't be contributing to the measurement;
7  right?
8    Q.  Okay.
9    A.  And so what you have is basically -- if
10  it's a negative charge, you have slightly more
11  electrons on the -- which are negatively charged,
12  on the surface of the material than you would have
13  on your reference point.
14    Q.  Okay.  And so --
15    A.  So if you had slightly fewer electrons
16  on the surface of the material than you would have
17  on your reference point, it would be a positive
18  charge.
19    Q.  Okay.  And for all of the neutralized
20  substrate measurements, were they all negatively
21  charged?
22    A.  Yeah, this is to say -- well, yeah, it
23  looks like they were.  So the average was negative
24  .028.  So that's not very big at all.  So, yeah,
25  small amounts of charge, nothing significant.

148

1    Q.  Because it looks like you only have the
2  maximum charge and the average charge reported
3  here?
4    A.  Yeah.  So -- well, I suppose you could
5  say it would be possible for there to be a
6  positive charge in there, but it couldn't have
7  been a very large one.
8    Q.  Okay.  And this would be the highest
9  measurement as well as the average of all six of
10  the substrate samples that were prepared?
11    A.  Yeah.
12    Q.  Okay.  So you don't have any
13  measurements reported here based on each piece of
14  skin separately?
15    A.  It doesn't look like I recorded that in
16  the report.
17    Q.  Okay.  And then the -- I would also
18  assume then that means that the charge that was
19  measured for the neutralized substrate was not
20  subtracted out or removed from the total surface
21  electrostatic charge that's reported in the table
22  for each of those samples?
23    A.  It doesn't look like it here, no.
24    Q.  Okay.  And then the final table, "Data
25  Results," here you just took the average total

149

1  surface electrostatic charge for each product
2  divided by the total surface area of the substrate
3  in square centimeters to come up with a charge per
4  square centimeter?
5      A.  Yeah, so we were basically trying to
6  figure out how much you had based on surface area.
7  And, you know, obviously the law of averages had
8  to apply.  So you took the total charge of the
9  applied substance and the substrate, and then you
10 divided it by the amount of surface area that you
11 had.
12      So it wasn't -- there's not a very
13 clear-cut way of doing this if you wanted to
14 associate, say, a square centimeter-age, I guess,
15 or a surface area to the amount of charge.  So
16 what we're trying to do is estimate the amount of
17 charge that you might find in any given average
18 square of the material.
19     Q.  Okay.  And then it looks like the
20 average charge per square of material, it was
21 higher for the BlueWillow product than it was for
22 the Trutek product; right?
23     A.  Yeah.
24     Q.  Okay.  And then if we go back and look
25 at the table above it real quick, the total

150

1  surface electrostatic charge measurements reported
2  for the three samples of the Trutek product, those
3  are all pretty close to each other?
4      A.  Yeah.  Yeah.
5      Q.  For the BlueWillow product, though,
6  that's a pretty -- it's a much bigger range;
7  right?
8      A.  Yeah.  There's a pretty small one there
9  on the second experiment.  So it's -- it's got
10 some inconsistency to that material.
11     Q.  When you said there's a -- I'm sorry,
12 you said there's a pretty small one there on the
13 second experiment.  What are you talking about?
14     A.  Yeah, so Experiment 1 had .85
15 nanocoulombs; right?  And then Experiment 2 had
16 only .09 of the BlueWillow product.  Both the same
17 amount of substance was applied in both
18 situations.  That means that your chances of
19 having consistency -- or a consistent charge from
20 that substance is not great.  And what you're
21 hoping for is that you get the same charge or
22 close to the same charge repeatedly.  So that
23 proves that you have consistency in the material.
24     Q.  Okay.  So I just want to make sure I
25 understand.  So the variation between Experiment 1

151

1  and 2, we're assuming that a consistent amount of
2  the material was applied.  So you think one
3  explanation for the difference in surface
4  electrostatic charge might be the consistency in
5  the material -- the test material itself?
6      A.  Yeah.  And I believe we used the same
7  amount each time on this one because I think -- in
8  fact, I think it even says that we took a pipette
9  and tried to draw out material out of the
10 containers using a pipette that would measure the
11 exact same amount.
12      So we had consistency in the amount, but
13 we didn't get the same consistency in the measured
14 charge.  So we knew that it was, I think,
15 something like 1.5 milliliters of fluid applied to
16 each substrate.
17     Q.  So given that a consistent amount of
18 each sample was applied to the substrate, you were
19 expecting to get a similar surface electrostatic
20 charge for each sample; right?
21     A.  Yeah.
22     Q.  Can you think of -- or did you have any
23 other ideas for why the discrepancies for the
24 BlueWillow product?
25     A.  No, that would be speculation.  I didn't

152

1  really want to guess at that.
2      Q.  Did anybody ever ask you to repeat the
3  test in view of the variability and results
4  reported for the BlueWillow product?
5      A.  No, but if you're interested, I can try
6  to come up with a quote.
7      Q.  No, that's okay, but thank you.
8      Okay.  Let's look at the last page.  And
9  here we have the conclusions.  It looks like
10 Conclusion 1 just, again, restates the results
11 that you objected; right?
12     A.  Sure.  Yeah.
13     Q.  All right.  And then the second
14 conclusion, you state that the two test products
15 both demonstrated the presence of a surface
16 electrostatic charge of similar order of
17 magnitude; right?
18     A.  Yeah, they are similar order of
19 magnitude.
20     Q.  Okay.  What exactly are you using to
21 determine whether it's a similar order of
22 magnitude?
23     A.  My order of magnitude we're saying that
24 it's the same power of 10, right.  That's what
25 order of magnitude means.  So let's say you've got

153

1 two variables -- or two measurements that you're
2 measuring. Let's say you're measuring something
3 that's -- I don't know, that's 100 nanocoulombs
4 and another one that's 200 nanocoulombs. Well,
5 they're in the same order of magnitude; right?
6          There's a big difference between
7 something that's 100 nanocoulombs and something
8 that's a thousand nanocoulombs. Now they're in
9 different order of magnitude. So that's what that
10 means.
11    Q. Okay. Thank you.
12          And were you asked by Trutek to provide
13 a conclusion as to whether the surface
14 electrostatic charge of the Trutek and the
15 BlueWillow products were of the same order of
16 magnitude?
17    A. I don't remember if they specifically
18 asked for that. I provided it because I felt as
19 though it was -- that basically what we were
20 trying to talk about -- I mean, you remember at
21 the very beginning of this, we were trying to find
22 out what the magnitude was. That was our stated
23 goal, was to find out what the magnitude was of
24 the charge. So if they were the same order of
25 magnitude, then that would be stated in our

154

1 conclusion.
2    Q. Okay.
3    A. If they were in a different order of
4 magnitude, we would have to say that too.
5    Q. And that's exactly why I was wondering,
6 because the test objective doesn't say anything
7 about comparing the surface charge of the two
8 products. It just says that the purpose of the
9 test was to determine the magnitude of the surface
10 electrostatic charge. So --
11    A. That's fair.
12    Q. So I was wondering why your conclusion
13 contains the -- you know, not just the magnitude
14 of the surface charge that was measured, but also
15 an assessment of the order of magnitude relative
16 between the two?
17    A. That's just typical stuff that people
18 ask for in a test or expect to see in the test
19 anyway, is they send me a bunch of, say,
20 materials, foam or plaques or something like that,
21 and they label them with some alphanumeric group
22 number. And I tell them -- I'll test and tell
23 them which one is the largest or the smallest or
24 whatever the case may be or if I noticed anything
25 unusual, and that's stated in the conclusions. It

155

1 doesn't mean that one is preferred or better or
2 worse. It doesn't matter to me.
3    Q. Okay.
4    A. That's something somebody else can
5 bicker about. But which one is bigger or which
6 one is smaller in terms of measurement, that's
7 important to note because you want to be able to
8 differentiate what stands out.
9    Q. Okay. And then one last question on
10 this report. After you prepared it, who did you
11 provide it to, Mr. Wahi or --
12    A. I provided it to Mr. Wahi. Yeah, he was
13 the customer.
14    Q. Okay. And did Mr. Wahi or anybody else
15 from Trutek request any revisions or changes to
16 the report?
17    A. Well, I already told you, there was a
18 version of this where there were actually a whole
19 bunch of -- basically two tests and one report --
20 or two separate test reports that he explained to
21 me clearly were intended to be two separate
22 reports, not the same. And so I had to split that
23 out.
24          So what I did is I had a report No. 337,
25 and we split it into an A and a B because they

156

1 were separate -- of separate interests to him.
2 They were not the same. It was comparing the same
3 substance to two other substances, and he didn't
4 want them to be compared. There was something
5 that wasn't relevant to having them both in the
6 same report.
7    Q. Okay. Sorry, you just mentioned a 337A
8 and 337B. Is that something written on this
9 report?
10    A. Yes.
11    Q. Where?
12    A. So in the footer of every single page, I
13 say what report number this is.
14    Q. Yeah, it looks like it's 215.
15    A. Okay. So you're looking at --
16    Q. Oh, I'm looking at the wrong one, I'm
17 sorry.
18    A. Okay. What we have on display is 337A.
19    Q. Yeah, I'm looking at my own copy. I
20 apologize, I have the wrong one up. So, yeah, I
21 see that, 337A. Thank you.
22          MS. PETERSON: Okay. Let's go off the
23 record and take a short break.
24          THE VIDEOGRAPHER: We're going off the
25 record. The time is now 2:46 p.m.

157

1       (Recess from the record.)
2       THE VIDEOGRAPHER: We're back on the
3 record. The time is now 2:59 p.m.
4 BY MS. PETERSON:
5       Q. Mr. Burns, I'm just going to ask you
6 again, did you speak to anybody during the prior
7 break or any other break today --
8       A. No.
9       Q. -- about the testimony you provided
10 today at the deposition?
11      A. No.
12      MS. PETERSON: Okay. I'd like to mark
13 one last exhibit. Let's pull up Dr. Ermakov's
14 report. This is my Item No. 4, Jennifer --
15 actually, sorry, my Item No. 5.
16      THE REMOTE TECHNICIAN: Okay. Thank
17 you.
18      MS. PETERSON: Okay. And we will mark
19 this as Exhibit -- actually, is it Exhibit 26?
20      MR. KREMEN: It's 27. 26 was the image
21 of the NanoBio Protect -- the NasalGuard -- the
22 NanoBio Protect product and the NasalGuard
23 product.
24      MS. PETERSON: You're right. That's
25 right. Exhibit 26 was the two images of the

158

1 NasalGuard product. Okay. So we will mark
2 Dr. Ermakov's January 11th, 2021, report as
3 Exhibit 27.
4       (Burns Deposition Exhibit 27 was marked
5 for identification and attached to the
6 transcript.)
7 BY MS. PETERSON:
8       Q. Okay. Mr. Burns, I know you said
9 earlier that you recall receiving and reviewing
10 Dr. Ermakov's earlier report from 2019. This is a
11 second report prepared by Dr. Ermakov testing the
12 Trutek and BlueWillow products dated January 11th,
13 2021.
14      Did you ever receive a copy of this
15 report?
16      A. I believe I've got a copy of it, yes.
17      Q. Okay. And so you've looked at it
18 before.
19      A. I've looked at it, yes.
20      Q. Okay. And you understand that
21 Dr. Ermakov tested the same NasalGuard product
22 that you tested, as well; right? Is that your
23 understanding?
24      A. He tested a NasalGuard product. Is it
25 the same -- I don't know if it's the same one.

159

1 I'm not aware of that.
2       Q. Okay.
3       MS. PETERSON: Well, let's take a look
4 at the last page.
5 BY MS. PETERSON:
6       Q. So you can see test results that are
7 reported here. There's a section for "Blank
8 Uncoated Substrate"; right?
9       Do you see that?
10      MR. KREMEN: Where are we talking about?
11 What page?
12      MS. PETERSON: Page 3. It's up on the
13 screen.
14      THE WITNESS: Yeah, I see it there.
15 BY MS. PETERSON:
16      Q. Okay. And then there's two NasalGuard
17 products listed here; right?
18      A. I see that.
19      Q. Okay. So there's a NasalGuard Airborne
20 Particle Blocker and a NasalGuard Misting Spray.
21 Do you see those listed?
22      A. I see those.
23      Q. Okay. Now, the NasalGuard Misting Spray
24 is designated as TTK-NS. That's the same
25 designation that you used in your report for the

160

1 Trutek product; correct?
2       A. Yes, that's what I was told to -- so
3 there was one material that had that label, and
4 that's what I was told to label that as --
5       Q. Okay.
6       A. -- by the customer.
7       Q. Okay.
8       A. Like I said, the customer could have
9 called it A, B, and C. It doesn't matter to me,
10 I'll label it some alphanumeric code that makes it
11 easy for them to determine which substance is
12 which.
13      Q. Okay. And you see here in this table
14 that Dr. Ermakov has reported the average surface
15 charge per square inch for each of those four --
16 well, each of those three test samples plus the
17 blank substrate; right?
18      Do you see that?
19      A. I do see that.
20      Q. Okay.
21      MR. KREMEN: Per square -- is it per
22 square inch? Where do you see per square inch?
23      THE WITNESS: It's at the top of the
24 column on the far right-hand side.
25      MR. KREMEN: Yeah, but it's per square.

161

1  It's per square plus or minus.  There's no inch
2  there.
3        THE WITNESS:  I-N period square period.
4  I don't know that that I-N stands for inches, but
5  it does say I-N and then period and then S-Q
6  period.
7  BY MS. PETERSON:
8     Q.  Okay.  And then looking at the average
9  results reported for the two NasalGuard products,
10  would you agree that the surface charge that
11  Dr. Ermakov reported from his testing is higher
12  for the NasalGuard products than it is for the
13  BlueWillow product?
14        MR. KREMEN:  Objection to form.
15  BY MS. PETERSON:
16     Q.  You can answer.
17     A.  So according to what he's written here,
18  you know, if I'm looking at this, it does look
19  like he's got an average line here.  And he's
20  reported over on the far right-hand column for
21  the -- let's go at the top.  So his blank uncoated
22  substrate had a very small measurement of 6.67
23  times 10 to the negative 15th.  So it's very
24  small.
25        And then if you look at the substance

162

1  that he's labeled TTK-APV, the average was
2  something more like 8.32 times 10 to the negative
3  14th.  So it's slightly larger.  It's one order of
4  magnitude larger.
5        And then similar order of magnitude for
6  the TTK-NS 7.19 times 10 to the negative 14th.
7  So, again, 10 to the negative 14th.
8        And then when you look at the BlueWillow
9  NanoBio Protect solution, BW-NBP, they average on
10  the very far right-hand side is, again, 4.35 times
11  10 to the negative 14th.  And you're right that
12  the number itself is -- you know, the actual
13  average number itself is smaller, but the order of
14  magnitude is the same --
15     Q.  Okay.
16     A.  -- on those three products.
17     Q.  Yeah, so same order of magnitude, but
18  the NasalGuard products are reported to have a
19  higher surface charge according to Dr. Ermakov's
20  testing; correct?
21     A.  Yes.
22     Q.  And that's the opposite result that you
23  reached; right?  In your testing, you found that
24  the BlueWillow product had a higher surface
25  charge --

163

1     A.  Well, keep in mind --
2     Q.  -- than the NasalGuard product?
3        MR. KREMEN:  Objection.
4        Shane Burns said that he was not
5  qualified to comment on Ermakov's report or his
6  method of testing.  The method of testing could
7  have given all of that.  So I don't see where that
8  is a relevant question.
9        MS. PETERSON:  Stan, please refrain from
10  making any speaking objections.  I'm not asking
11  him to comment on Dr. Ermakov's testing
12  methodology.  I'm simply asking him to look at the
13  numbers that are reported.
14  BY MS. PETERSON:
15     Q.  So, Mr. Burns, would you agree that
16  Dr. Ermakov's results reached the opposite
17  conclusion showing that the NasalGuard product has
18  a higher surface charge than the BlueWillow
19  product?
20     A.  I won't say opposite, but you are
21  correct in that saying -- if you're saying that
22  his report says that over here on the average
23  underneath the "Charge Coulomb/in period sq period
24  plus or minus," you go all the way down to where
25  it says the BlueWillow solution's average, it was

164

1  4.35 times 10 to the negative 14th power.
2        And the TTK-NS was 7.19 times 10 to the
3  negative 14th.  And that's an average.
4        And then the TTK-APB is 8.32 times 10 to
5  the negative 14th.
6     Q.  Okay.  So you agree with me that the
7  average charge reported for the TTK-NS product is
8  greater than the average charge reported for the
9  BlueWillow NanoBio Protect product; right?
10     A.  I can read what his report says, yes.
11     Q.  Okay.  And so, yes, that's what his
12  report says that the TTK-NS product has a higher
13  charge; right?
14     A.  That's what his report says.
15     Q.  Okay.  Only if you can, if you can't
16  answer it, that's fine.  But do you have any
17  explanation for why the results are different
18  between your two tests, why NasalGuard was a
19  higher surface charge in Dr. Ermakov's test and
20  why you found that it had a lower charge?
21        MR. KREMEN:  Objection to form.
22        THE WITNESS:  I don't care to speculate
23  on the reasons why he came up with different
24  results because that has something intrinsically
25  off with his method of measurement.  However, I

165

1  do notice that his report is measuring the same
2  orders of magnitude, so 10 to the negative 14th
3  for all three substances.  So his methodology
4  somehow came up with the same order of magnitude
5  for all of them.
6       Now, the actual averages for them are
7  different, and that's fine.  But this has
8  something to do with how -- how he came up with
9  these measurements has something to do with his
10  methodology.  And like I said, I'm not familiar
11  with this machine.  So, you know, if you're asking
12  me for reasons why he came up with different
13  readings, you'd have to talk to him.
14  BY MS. PETERSON:
15  Q.  Okay.  Fair enough.  Thank you for that.
16       MS. PETERSON:  Dr. Burns -- Mr. Burns,
17  I've elevated you to having additional degrees.
18  Anyways, thank you for your time today.  I don't
19  have any other questions for you.
20       MR. KREMEN:  I don't have any questions.
21       MS. PETERSON:  Okay.  So we can go off
22  the record.
23       THE VIDEOGRAPHER:  This marks the end of
24  deposition of Shane Burns.  We're going off the
25  record.  The time is now 3:11 p.m.

166

1  (Off the record at 3:11 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

167

1           A C K N O W L E D G E M E N T
2
3  STATE OF MARYLAND      )
                           ss
4  COUNTY OF MONTGOMERY  )
5
6       I, SHANE BURNS, hereby
7  certify, I have read the transcript of my
8  testimony taken under oath in my deposition of
9  October 25, 2022; that the transcript is a true,
10  complete and correct record of what was asked,
11  answered and said during this deposition, and that
12  the answers on the record as given by me are true
13  and correct.
14
15       _____
            SHANE BURNS
16
17
18  Sworn and subscribed to before me
19  this _____ day of _____, 2022.
20
21  _____
       Notary Public
22
23
24
25

168

1  STATE OF MARYLAND     )
2                          ss:
3  COUNTY OF MONTGOMERY  )
4
5       I, Matthew Goldstein, Notary Public
6  within and for the State of Maryland, do hereby
7  certify:
8
9       That I reported the proceedings in the
10  within entitled matter, and that the within
11  transcript is a true record of said proceedings.
12
13       I further certify that I am not related
14  to any of the parties to the action by blood or
15  marriage, and that I am in no way interested in
16  the outcome of this matter.
17
18       IN WITNESS WHEREOF, I have hereunto set
19  my hand this 3rd day of November, 2022.
20
21  _____
       Matthew Goldstein, RMR, CRR
22
23
24
25