EXHIBIT 3

OUTSIDE COUNSEL ATTORNEY EYES ONLY

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TRUTEK CORP.,

                Plaintiff,

v.

BLUEWILLOW BIOLOGICS, INC.,
ROBIN ROE 1 through 10, gender
neutral fictitious names, and ABC
CORPORATION 1 through 10
(fictitious names).

                Defendants.

Case No. 2:21-cv-10312-SJM-RSW

Hon. Stephen J. Murphy, III

**PLAINTIFF'S OPENING TECHNICAL REPORT**

**Dr. Eward A. Leomo**

OUTSIDE COUNSEL ATTORNEY EYES ONLY

# Dr. Edward A. Lemmo
**60 Gilroy Street**
**Staten Island, NY 10309**
**(718) 967-3426**
*edlemmo@gmail.com*

June 27, 2022

Stanley H. Kremen, Esq.
4 Lenape Lane
East Brunswick, NJ 08816

RE:   Trutek Corp. *v.* BlueWillow Biologics, Inc.
       Civil case No. 2:21-cv-10312

Dear Mr. Kremen:

You engaged my services to investigate allegations of infringement of Trutek's U.S. Patent No. 8,163,802 by BlueWillow's Nanobio Protect product that was purportedly on sale between January 2020 and April 2021.

My qualifications to perform this investigation are as follows:

I received a B.S. degree in Chemistry in 1973 from St. Francis College in Brooklyn, New York, and both an M.S. and Ph.D. in Nutrition Science in 1977 and 1979, respectively, from Rutgers University in New Brunswick, New Jersey. My resume is attached to this report as Exhibit A.

As part of my previous professional activities, I evaluated patent disclosures and claims both in an employment and consulting capacity. I am familiar with patents. I am familiar with, and I have worked with nanoemulsions, the technology upon which Nanobio Protect relies. I am also acquainted with the technology upon which Trutek's patent is based. I researched a number of scientific articles, and I relied upon reports produced by Dr. Alexei Ermakov and Shane Burns. The materials and scientific articles that I reviewed are listed in Exhibit B.

I hereby submit the following report of my investigation for your review.

Very truly yours,

*Edward A. Lemmo*

Edward A. Lemmo

OUTSIDE COUNSEL ATTORNEY EYES ONLY

## TABLE OF CONTENTS

**Page**

Findings and Conclusions .......................................................................   1

Results of Investigation ...........................................................................   4

1. Discussion ...........................................................................................   4

2. The '802 Patent ..................................................................................   4

     a.  Claim 1 .........................................................................................   6

     b.  Claim 2 .........................................................................................   6

     c.  Claim 6 .........................................................................................   7

     d.  Claim 7 .........................................................................................   7

3.  Nanoemulsion Technology .................................................................   8

4.  The Nanobio Protect Product ............................................................   8

5.  Summary ............................................................................................  13

## LIST OF EXHIBITS

Exhibit A - Resume of Dr. Edward A. Lemmo

Exhibit B - Materials reviewed in preparing this report

Exhibit C - U.S. Patent No. 8,163,802

Exhibit D - Copy of website *www.bluewillow.com* pertaining to Nanobio Protect
           product as it existed on February 7, 2021.

Exhibit E - Copy of online information pertaining to Nanobio Protect as it existed
           on February 10, 2021.

OUTSIDE COUNSEL ATTORNEY EYES ONLY

## FINDINGS AND CONCLUSIONS

1.    BlueWillow's Nanobio Protect product is sold in the form of a liquid that is administered into a user's nasal passages.

2.    The claims of Trutek's '802 Patent recite a method for nasally administering a formulation and for the formulation itself.  The formulation of Trutek's '802 Patent is administered in and around a user's nasal passages.

3.    BlueWillow's Nanobio Protect product exhibits an electrostatic charge, and once applied, creates an electrostatic field that extends from the skin or tissue of the user's nasal passages.

4.    The formulation of Trutek's '802 Patent claims exhibits an electrostatic charge.  Once applied, the formulation creates an electrostatic field in the vicinity of the user's nasal passages.

5.    BlueWillow's Nanobio Protect product forms a thin film in the user's nasal passages.  The thin film adheres to the skin or tissue of the user's nasal passages.

6.    Trutek's '802 Patent claims that its formulation forms a thin film in and around the user's nasal passages.  The thin film adheres to the skin or tissue of the user's nasal passages.

7.    The formulation of BlueWillow's Nanobio Protect product contains at least one cationic agent.  A cationic agent creates a positive electrostatic charge.  According to BlueWillow's published literature and the Nanobio

1

OUTSIDE COUNSEL ATTORNEY EYES ONLY

Protect product packaging, the formulation contains benzalkonium chloride,  Benzalkonium chloride is a known cationic agent.

8.   The formulation of BlueWillow's Nanobio Protect product contains at least one biocidic agent or biocide.  A biocidic is a substance that destroys or inhibits the growth or activity of living organisms.   According to BlueWillow's published literature and the Nanobio Protect product packaging, the formulation contains benzalkonium chloride, Benzalkonium chloride is a known biocidic agent.

9.   The Nanobio Protect product comprises nano-droplets that electrostatically attract and hold "germs" (*i.e.,* harmful particles).   The nano-droplets further contain benzalkonium chloride (a known biocide), which renders the "germs" harmless.

10.   Claims 1 and 2 of the '802 Patent recite a formulation that electrostatically attracts and holds harmful particles and renders them harmless.

11.   The Nanobio Protect product reads upon the '802 Patent's method claim 1 when it is administered nasally because its formulation forms a thin film that it (1) adheres to the skin or tissue of the user's nasal passages; (2) electrostatically attracts harmful particulate matter; (3) holds the harmful particulate matter; and (4) inactivates the harmful particulate matter, and renders it harmless.

12.   The Nanobio Protect product reads upon claim 2 of the '802 Patent's formulation because it (1) is intended to be applied to the skin or tissue of the user's nasal passages; (2) forms a thin film that adheres to the skin or

OUTSIDE COUNSEL ATTORNEY EYES ONLY

tissue of the user's nasal passages; (3) comprises at least one cationic agent; (4) comprises at least one biocidic agent; (5) electrostatically attracts harmful particulate matter; (6) holds the harmful particulate matter; and (7) inactivates the harmful particulate matter, and renders it harmless.

13.   The Nanobio Protect product reads upon claim 6 of the '802 Patent because it contains benzalkonium chloride, which is a cationic agent.

14.   The Nanobio Protect product reads upon claim 7 of the '802 Patent because it contains benzalkonium chloride, which is a biocidic agent.

OUTSIDE COUNSEL ATTORNEY EYES ONLY

## RESULTS OF INVESTIGATION

I.   DISCUSSION

In conducting my investigation, I read and understood:

- the complaint filed on February 10, 2021,

- Trutek's U.S. Patent No. 8,163,802 ("the '802 Patent"),

- a report prepared by Alexei Ermakov on January 11, 2021,

- a report prepared by Shane Burns of Electro-Tech Systems ("ETS") on January 18, 2021,

- copies of the portion of the BlueWillow website (*www.bluewillow.com*) relating to the Nanobio Protect product, which was in existence on January 7, 2021.

- information on the Nanobio Protect product packaging,

- U.S. Patent Nos. 8,226,965, 8,703,164, 9,131,680, 9,144,606, 9,492,525, 9,561,271, 10,206,996, 10,525,121, 10,596,251, all of which were assigned by the inventors to Nanobio Corporation[1], and

- several articles relating to nanoemulsions appearing in prominent scientific publications.

2.   THE '802 PATENT

The '802 Patent was issued to Ashok Wahi on April 24, 2012, and assigned to Plaintiff, Trutek Corp. ("Trutek").  It was allowed to issue from a non-provisional patent application filed on May 16, 2009.  The application was published by the USPTO on January 7, 2010.  The earliest priority date of the

---

[1] BlueWillow Biologics, Inc. ("BlueWillow"), a Delaware corporation, is the successor to Nanobio.Corporation, a Michigan corporation.

OUTSIDE COUNSEL ATTORNEY EYES ONLY

'802 Patent Is July 7, 2008.  The '802 Patent will expire on March 28, 2030.  The '802 Patent is attached to this report as Exhibit C.

The '802 Patent has twenty-three claims.   Claims 1, 2, and 8 are independent claims.  Claims 3-7 are dependent claims that depend from claim 2. Claims 9-23 are dependent claims that depend from claim 8.  A dependent claim incorporates all of the limitations from its base claim by reference.  For example, when trying to understand claim 3, one must first understand claim 2, and see claim 3 as further limiting claim 2.   Independent claims are broad and generic. Dependent claims are limiting and specific.   Based on my knowledge and experience, all of the claims of the '802 Patent were easy for me to understand from a technical standpoint.

The Complaint asserts that three claims (*i.e.,* claims 1, 2, and 7) are infringed.  That means that the allegedly infringing product reads on those claims (*i.e.,* the product does what the claim recites).  In my opinion, claim 6 should be added to the list, because the product also reads on claim 6.

Unfortunately, discovery in this case has not yet revealed all of the ingredients in the formulation of the Nanobio Protect product.  Thus, I was not able to ascertain whether the Nanobio Protect product reads on any of the other claims.   Thus, I confined my investigation to comparing the Nanobio Protect product with claims 1, 2, 6, and 7 of the '802 Patent.  However, should further information about the Nanobio Protect product ingredients become available, I reserve the privilege of supplementing my report.

5

OUTSIDE COUNSEL ATTORNEY EYES ONLY

a.    CLAIM 1

Claim 1 is a method claim.  It does not recite a manufactured product.
Instead, it recites a method of <u>electrostatically preventing a user from being
infected</u> by harmful particles by <u>applying a formulation to the skin or tissue of the
user's nasal passages</u>.  Once applied, the formulation forms a thin film or
substrate that adheres (or sticks) to the skin or tissue of the user's nasal
passages.  The adhesion of the thin film can be adjusted by addition of a
thickener.  However, even without a thickener, the thin film will adhere to the skin
or tissue.

Once applied, the formulation exhibits a static electrical charge, and it
creates an electrostatic field in the vicinity of the skin or tissue.  The thin film
attracts oppositely charged harmful particles within the vicinity of the electrostatic
field and in close proximity to the substrate.  The thin film captures and holds the
particles.  An ingredient in the formulation that inactivates the harmful particles
and renders them harmless.

b.    CLAIM 2

Claim 2 is a claim for a formulation intended to be applied to the skin or
tissue of a user's nasal passages.  The ingredients of the formulation are recited
generically, and their concentrations are adjusted to provide specific
characteristics.  Among the ingredients of the formulation are at least one
cationic agent and at least one biocidic agent.  However, additional ingredients
are not excluded.

OUTSIDE COUNSEL ATTORNEY EYES ONLY

Once applied, the formulation possesses a static electric charge, which creates an electrostatic field in the vicinity of the user's nasal passages.  When applied, the formulation forms a statically charged thin film.  The cationic agent in the thin film produces a positively charged electrostatic field in the vicinity of the nasal passages.  Negatively charged harmful particles (including living microorganisms) are electrostatically attracted to the thin film.  Ingredients in the formulation adjust the adhesion of the thin film so as to capture and hold the harmful particles.  Ingredients in the formulation adjust the cohesion of the thin film to provide adequate impermeability.  The biocidic agent in the formulation functions to inactivate or inhibit the captured harmful particles so as to render them harmless.

   c. <u>CLAIM 6</u>

Claim 6 is a dependent claim, which depends from claim 2.  Thus, claim 6 recites a formulation having all of the same characteristics and limitations of claim 2.  However, it is further limited by reciting that benzalkonium chloride is among the cationic agents in the formulation.  Benzalkonium chloride is a well known cationic agent.  It produces a positively charged electrostatic field.

   d. <u>CLAIM 7</u>

Claim 7 is a dependent claim, which depends from claim 2.  Thus, claim 7 recites a formulation having all of the same characteristics and limitations of claim 2.  However, it is further limited by reciting that benzalkonium chloride is among the biocidic agents in the formulation.  Benzalkonium chloride is a well known biocide.

OUTSIDE COUNSEL ATTORNEY EYES ONLY

3.    <u>NANOEMULSION TECHNOLOGY</u>

Based on my education and experience, I am very familiar with technology associated with, *inter alia*, nanoemulsions, surfactants, adjuvants, electrostatic charges, cationic agents, biocidic agents, biocides, and preservatives.

Nanoemulsions are oil-in-water emulsions that are stabilized by emulsifying agents.  They are also referred to as ultrafine emulsions.  They exist as extremely small sub-micron sized droplets.  Nanoemulsions are widely used in applications such as food products, cosmetics, and pharmaceuticals. Nanoemulsions may be engineered to improve the biological accessibility of bioactive molecules that are either entombed within them or maybe consumed alongside them.  Nanoemulsions exhibit remarkable droplet stability due to their nanoscopic dimensions.  By their very nature, <u>nanoemulsion droplets exhibit an electrostatic charge which causes them to repel one-another</u>.  If the nanodroplets are not electrostatically charged, they would coalesce into a single liquid mass.

4.    <u>THE NANOBIO PROTECT PRODUCT</u>



OUTSIDE COUNSEL ATTORNEY EYES ONLY

Nanobio Protect was manufactured and sold as a "nasal antiseptic solution" by BlueWillow. I understand that the product was discontinued sometime around April 2021, and that It is no longer being sold. The front of the product packaging is shown in the above photograph. As may be observed, the product contains "benzalkonium chloride (0.13%) antiseptic." The product claims to "kill 99.9% of germs." As an added claim, it "persists on skin for 4+ hours." On the rear of the product packaging, benzalkonium chloride is listed as the active ingredient.

Trutek, the owner of the '802 Patent, manufactured and sold a product named NasalGuard Airborne Particle Blocker, both the formulation of which and the nasal administration of which were protected by the '802 Patent. BlueWillow's Nanobio Protect product was sold in the same online and retail venues as Trutek's NasalGuard product. They competed with one another.

On January 11, 2021, Dr. Alexei Ermakov prepared a report describing his experimentation that compared electrostatic charges produced on paper substrates by Nanobio Protect, NasalGuard Misting Spray, and NasalGuard Airborne Particle Blocker products. Dr. Ermakov's report is separately produced for discovery. I reviewed this report and found Dr. Ermakov's methodology and conclusions to be sound. Dr. Ermakov concluded that all products exhibited an electrostatic charge of the same order of magnitude. I relied on Dr. Ermakov's work in forming my opinions.

On January 18, 2021, Shane Burns of Electro-Tech Systems (ETS) prepared a report describing his experimentation that compared charges

**OUTSIDE COUNSEL ATTORNEY EYES ONLY**

produced on pig skin substrates by Nanobio Protect and NasalGuard Misting Spray products.  The use of pig skin is more predictive than paper regarding how the product would behave on human skin.  Notwithstanding, Mr. Burns reached the same conclusion as Dr. Ermakov.  The electrostatic charges exhibited by both products were of the same order of magnitude.  Mr. Burns' (ETS) report is separately produced for discovery.  I reviewed this report and found Mr. Burns' methodology and conclusions to be sound.  I relied on Mr. Burns' work in forming my opinions.

Copies of a portion of the BlueWillow website (*www.bluewillow.com*) from February 7, 2021 relating to the Nanobio Protect product are attached to this report as Exhibits D and E.  On Page 2 of Exhibit D, the following statements are made by BlueWillow:

> *The unique effectiveness of NanoBio Protect is derived from BlueWillow's patented nanotechnology.  NanoBio Protect places the BZK antiseptic[2] on the surface of nano-droplets, which results in at least four key advantages:*
>
> 1. *The nano-droplets are attracted to germs by electro-kinetic charge and present the BZK in such a way to enable killing of germs on contact.*
> 2. *The droplets persist on skin for 4 or more hours, enabling long lasting effectiveness.*
> 3. *The droplets significantly hydrate skin to avoid dryness and cracking that can allow germs in.*
> 4. *And lastly, when bound to nano droplets, BZK is non-irritating to the skin.*
>
> *NanoBio Protect kills germs via membrane disruption.  Nanobio Protect is comprised of positively charged droplets that are 300-600 nm in size.  the droplets are attracted to negatively charged germs in the skin.*

---

[2] "BZK" is BlueWillow's abbreviation for benzalkonium chloride.

OUTSIDE COUNSEL ATTORNEY EYES ONLY

Here, the Nanobio Protect product is a liquid nanoemulsion consisting of nano-droplets that range between 300-600 nanometers in size (*Id.*).   These droplets are extremely small.  A nanometer is one-billionth of a meter.  When administered to a user's nostrils, the product forms a thin film that adheres to the skin or tissue of his nasal passages.  If that were not the case, the liquid would instantly drip out of the user's nose.  Instead, "the droplets persist on the skin for four or more hours."  Further, the "droplets significantly hydrate skin to avoid dryness and cracking that can allow germs in."  Thus the product exhibits impermeability.

The product is cationic (*i.e.,* positively charged).   Most harmful microorganisms are anionic (*i.e.,* negatively charged).  The formulation contains benzalkonium chloride (a cationic agent) as its active ingredient.  The positively charged thin film of nano-droplets inside the user's nostrils electrostatically attracts the negatively charged microorganisms. According to BlueWillow, the germs are "bound" to the nano-droplets.  Therefore, they are held in place by the formulation.  Finally, the benzalkonium chloride (a biocidic agent) "kills germs via membrane disruption."

Therefore, the Nanobio Protect product reads upon the '802 Patent's method claim 1 when it is administered nasally because its formulation forms a thin film that (1) adheres to the skin or tissue of the user's nasal passages; (2) electrostatically attracts harmful particulate matter; (3) holds the harmful particulate matter; and (4) inactivates the harmful particulate matter, and renders it harmless.

**OUTSIDE COUNSEL ATTORNEY EYES ONLY**

Further, the Nanobio Protect product reads upon claim 2 of the '802 Patent's formulation because it (1) is intended to be applied to the skin or tissue of the user's nasal passages; (2) forms a thin film that adheres to the skin or tissue of the user's nasal passages; (3) comprises at least one cationic agent; (4) comprises at least one biocidic agent; (5) electrostatically attracts harmful particulate matter; (6) holds the harmful particulate matter; and (7) inactivates the harmful particulate matter, and renders it harmless.

Finally, the Nanobio Protect product reads upon both claims 6 and 7 because its formulation contains benzalkonium chloride, which is both a cationic agent and a biocidic agent.

OUTSIDE COUNSEL ATTORNEY EYES ONLY

## **SUMMARY**

As a result of my investigation, I concluded that the Nanobio Protect Nasal Antiseptic Solution marketed and sold by BlueWillow reads on claims 1, 2, 6, and 7 of the '802 Patent.  Moreover, that product performed the same functions and competed with Trutek's NasalGuard Airborne Particle Blocker, which is protected by the '802 Patent.

Respectfully submitted,

Edward A. Lemmo

# EXHIBIT A

**Edward A. Lemmo, Ph.D.**
60 Gilroy Street
Staten Island, New York 10309
(917) 837-1470
Email: edlemmo@gmail.com

## EDUCATION

Ph.D.  Nutrition Science, Rutgers University, New Brunswick, NJ (1979)
M.S.   Nutrition Science, Rutgers University, New Brunswick, NJ (1977)
B.S.   Chemistry, St. Francis College, Brooklyn, NY (1973)

## EXECUTIVE TRAINING COURSES

Executive Leadership Program, Princeton, NJ
Time Management Skills, Teaneck, NJ
Media Communication Skills, New York City, NY

## EMPLOYMENT EXPERIENCE

2007-Present    **Consumer Healthcare Corporate Consultant**
                Self-employed Consultant - Consumer Healthcare

2005-2007       **BioBalance Corporation**, New York, NY
                **Vice President, Product Development**

                Person primarily responsible for investigating its probiotic product PROBACTRIX™ to be used for treating pouchitis and other gastrointestinal disorders. Probiotic products are an optional alternative to the probiotic Lactobacillus acidophilus. In charge of all scientific product evaluation conducted at company headquarters.

1999-2005       **Wyeth Consumer Healthcare**, Leonia and Madison, NJ
                **Vice President, Product Development**

                Division of American Home Products
                Formerly Whitehall-Robbins Consumer Healthcare

                Managed product development for SOLGAR®, and contributed towards CENTRUM®, and CALTRATE®, brands. Responsible role in scientific affairs and new business

development opportunities.   Further, responsible for evaluation of acquisition of new business entities.

1992-1999            **General Nutrition Centers, Inc.**, Pittsburg, PA
                     **Director, Nutritional Sciences**

Analyzed safety of amino acid products for presentation to the FDA and FTC and other U.S. government agencies. Evaluated and made recommendations regarding nutritional and homeopathic products.   Performed quality assurance activities related to label claims and product safety. Responsible for introduction of the new PRO-PERFORMANCE sports nutrition product line into the GNC retail marketplace.

In 1993, for Quigley Corporation, I evaluated the safety and efficacy of Cold-EEZE® zinc lozenges to be used to shorten a common cold as a possible line of homeopathic products exclusively marketed by GNC.

1989-1992            **Pall Biomedical Products**, Glen Cove, NY
                     **Marketing Manager**

Responsible for marketing activities of Intravenous filtration devices, and Heat and Moisture exchange respiratory products.  Wrote all scientific evaluation documents related to Heat and Moisture Exchange respiratory product for presentation to anesthesiologists regarding prevention of injury from patients breathing cold dry gas during surgery. Developed scientific presentations, videos, and product marketing material for use by healthcare professionals.

1984-1989            **ICN Pharmaceuticals**, Costa Mesa, CA
                     **Director of Nutritional Technology**

**Faraday Laboratories Division**

Product development of nutritional supplements for use by chiropractic and alternative health practitioners throughout the United States and Canada.   Product brands included Nutridyn® and Sivad Bioresearch®.   Responsible for new product development, wrote technical literature, and prepared and delivered scientific educational presentations to practitioners at chiropractic colleges and chiropractic meetings.

1976-1977          **Pharmacia Laboratories**, Piscataway, NJ
                   **Clinical Trials Coordinator**

                   Assisted veterinarian in analysis of equine blood samples.
                   Performed evaluation analysis of HEALON® products
                   comprising hyaluronic acid, and their effect on tissues.

### CORPORATE CONSULTING EXPERIENCE

2011               **Matrixx Initiatives, Inc.**, Princeton, NJ
                   **Scientific Affairs Consultant**

                   Performed research associated with ZICAM® oral zinc
                   product.  Provided guidance for coordinating research trials.
                   Managed human efficacy clinical trials.

1998-1999          **Church & Dwight**, Princeton, NJ
                   **Scientific Advisor**

                   Evaluated consumer healthcare products.  Explored and
                   determined market for magnesium based organo-metalic
                   agents for use in dietary supplements.

1998-1999          **IVC Industries**, Freehold, NJ

                   IVC is a contract manufacturer of generic vitamins.
                   Responsible for new product development.  Assisted the
                   marketing staff with product label claims.

1996               **Nutrition 21**, Purchase, NY

                   Company is a supplier to GNC.  Performed consulting work
                   regarding their products.

1996               **Nutramerica**, Lincoln Park, NJ

                   Technical advisor for the development of a dietary
                   supplement product line.

## CORPORATE CONSULTING EXPERIENCE (continued)

1996            **American Vitamin**, Ramsey, NJ

                Company is a contract manufacturer.  Performed new product development and assistance with evaluation of raw materials from India.

## COLLEGE TEACHING EXPERIENCE

2013-2018       **Touro College,** New York City, NY

                Taught in nursing school.Courses included pathophysiology, genetics, anatomy and physiology and tutored microbiology

2008-2014       **University of Medicine & Dentistry of New Jersey (UMDNJ)**, Newark, NJ

                Taught innutrition program. Courses includedgeneral chemistry, anatomy and physiology, biochemistry, and microbiology.

1977 and        **New York University,** New York, NY

2000-2003       Taught in graduate nutrition program, vitamin and mineral metabolism

2011-2012       **Cedar Crest College**, Allentown, PA

                Taught courses in nutritional biochemistry and metabolism.

1984-1989       **University of New Haven**, West Haven, CT

                Taught graduate level course in vitamin and mineral nutrition.

1974-1984       **Brooklyn College, CUNY**, Brooklyn, NY
                **Assistant Professor**

                Taught nutrition courses to pre-medical and nutrition students.

1973-1977       **Rutgers University**, Piscataway, NJ

                Taught general biology lab and mineral metabolism.

# EXHIBIT B

## <u>MATERIALS REVIEWED FOR REPORT PREPARATION</u>

1. the complaint filed on February 10, 2021,

2. Trutek's U.S. Patent No. 8,163,802 ("the '802 Patent"),

3. a report prepared by Alexei Ermakov on January 11, 2021,

4. a report prepared by Shane Burns of Electro-Tech Systems ("ETS") on January 18, 2021,

5. copies of the portion of the BlueWillow website (*www.bluewillow.com*) relating to the Nanobio Protect product, which was in existence on January 7, 2021.

6. information on the Nanobio Protect product packaging,

7. U.S. Patent Nos. 5,618,840, 5,853,763, 5,951,970, 7,314,624, 8,226,965, 8,703,164, 9,131,680, 9,144,606, 9,492,525, 9,561,271, 10,206,996, 10,525,121, and 10,596,251.

8. U.S. Patent Application Publication No. 2007/0036831 A1.

9. Schulman, J.H., *et.al.*, "Mechanism of Formation and Structure of Micro Emulsions by Elecron Microscopy," J. Phys. Chem. 1959, 63, 10, 1677-1680, Publication Date: October 1, 1959.

10. Peek, L.J., *et.al.,* "Nanotechnology in Vaccine Delivery," Advanced Drug Delivery Reviews 60 (2008) 915-928, published February 2008

11. Rosano, H.I., *et.al.*, "Microemulsions: A commentary on their preparation," J. Soc. Cosmet. Chem., 39, 201-209, (May/June 1988).

12. Martins, S., *et.al.*, "Lipid-based colloidal carriers for peptide and protein delivery – liposomes versus lipid nanoparticles," Int'l Jour of Nanomedicine, 2007:2(4) 595-607.

13. Yaghmur, A., *et.al.*, "Phase behavior of microemulsions based on food-grade nonionic surfactants: effect of polyols and short-chain alcohols,"

# EXHIBIT C

US008163802B2

(12) **United States Patent**        (10) **Patent No.:**      **US 8,163,802 B2**

Wahi                                 (45) **Date of Patent:**        **Apr. 24, 2012**

(54) **ELECTROSTATICALLY CHARGED MULTI-ACTING NASAL APPLICATION, PRODUCT, AND METHOD**

(75) Inventor:   **Ashok Wahi**, Hillsborough, NJ (US)

(73) Assignee:   **Trutek Corp.**, Hillsborough, NJ (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 316 days.

(21) Appl. No.:   **12/467,271**

(22) Filed:   **May 16, 2009**

(65)              **Prior Publication Data**

US 2010/0004337 A1      Jan. 7, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/085,855, filed on Aug. 3, 2008, provisional application No. 61/078,478, filed on Jul. 7, 2008.

(51) **Int. Cl.**
*A61K 31/198*      (2006.01)
*A61K 31/14*       (2006.01)

(52) **U.S. Cl.** ...................................... **514/564**; 514/643

(58) **Field of Classification Search** ................. 514/564, 514/643; 128/206.11
See application file for complete search history.

(56)              **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,071,015 | A | 8/1913 | Adler |
| 2,237,954 | A | 4/1941 | Wilson |
| 2,433,565 | A | 12/1947 | Korman |
| 2,751,906 | A | 10/1953 | Irvine |
| 2,777,442 | A | 1/1957 | Zelano |
| 3,145,711 | A | 8/1964 | Beber |
| 3,513,839 | A | 5/1970 | Vacante |
| 4,030,491 | A | 6/1977 | Mattila |
| 4,052,983 | A | 10/1977 | Bovender |
| 4,267,831 | A | 5/1981 | Aguilar |
| 4,401,117 | A | 8/1983 | Gershuny |
| 4,789,504 | A | 12/1988 | Ohmori et al. |
| 4,874,659 | A | 10/1989 | Ando et al. |
| 5,468,488 | A | 11/1995 | Wahi |
| 5,674,481 | A | 10/1997 | Wahi |
| 6,844,005 | B2 | 1/2005 | Wahi |
| 2003/0223934 | A1 | 12/2003 | Wahi |

*Primary Examiner* — Raymond Henley, III
(74) *Attorney, Agent, or Firm* — Stanley H. Kremen

(57)              **ABSTRACT**

A product to reduce and method of reducing the risk of inhalation of harmful substances by applying a formulation composition to a substrate or the skin in close proximity of one or more nostrils. This formulation, when applied creates an electrostatic field having a charge. The electrostatic field attracts airborne particulates of opposite charge to the substrate that are in close proximity to the substrate close to the skin and a biocidic agent renders microorganisms coming in contact the substrate or skin less harmful.

**23 Claims, No Drawings**

US 8,163,802 B2

1

# ELECTROSTATICALLY CHARGED MULTI-ACTING NASAL APPLICATION, PRODUCT, AND METHOD

## CROSS REFERENCE TO RELATED APPLICATIONS

a) The Present application is the non-provisional counterpart of my pending U.S. Provisional Patent Application Ser. No. 61/085,555 (the '555 application) filed on Aug. 3, 2008 which is incorporated by reference in its entirety herein. The Present application claims the benefit of and priority to said '555 application.

b) The Present application is also the non-provisional counterpart of my pending U.S. Provisional Patent Application Ser. No. 61/078,478 (the '478 application) filed on Jul. 7, 2008 which is incorporated by reference in its entirety herein. The Present application claims the benefit of and priority to said '478 application.

c) The Present application is likewise related to my prior U.S. Provisional Patent Application Ser. No. 60/570,103 (the '103 application) filed on May 12, 2004 (now expired), and which is incorporated by reference in its entirety herein. The '478 application provides a virtually identical disclosure to the '103 application.

d) Furthermore, the Present application is related to my pending U.S. Provisional Application Ser. No. 61/078,472 filed on Jul. 7, 2008, which is incorporated by reference in its entirety herein.

e) The Present application is also related to my prior U.S. Provisional Patent Application Ser. No. 60/598,462 filed on Aug. 3, 2004 (now expired), and which is incorporated by reference in its entirety herein.

f) The Present application is additionally related to my U.S. Pat. No. 5,468,488, entitled "ELECTROSTATICALLY CHARGED NASAL APPLICATION PRODUCT AND METHOD" issued on Nov. 21, 1995. This patent is incorporated by reference in its entirety herein.

g) The Present application is further related to my U.S. Pat. No. 5,674,481, entitled "ELECTROSTATICALLY CHARGED NASAL TOPICAL APPLICATION PRODUCT" issued on Oct. 7, 1997. This patent is incorporated by reference in its entirety herein.

h) The Present application is moreover related to my U.S. Pat. No. 6,844,005 entitled "ELECTROSTATICALLY CHARGED NASAL APPLICATION PRODUCT WITH INCREASED STRENGTH" issued on Jan. 18, 2005. This patent is incorporated by reference in its entirety herein.

i) Finally, this application is furthermore related to US Non-Provisional Utility patent application Ser. No. 10/082,978 entitled "ELECTROSTATICALLY CHARGED NASAL APPLICATION PRODUCT WITH INCREASED STRENGTH" filed on Feb. 25, 2002. This patent application is incorporated by reference in its entirety herein.

## FIELD OF THE INVENTION

The Present Invention relates to the field of protective compositions against assault by various irritants and noxious substances as well as against assault by assorted microorganisms that typically gain entry into the body through the airway and/or nasal mucosa. The Present Invention also relates to anti-viral, anti-bacterial, and anti-microbial products and methods that involve the use of products heretofore developed for restricting the flow of airborne contaminants into the nasal passages by creating an electrostatic field in an area near about the nasal passages. This reduced the inflow of airborne contaminants to the nasal passages by capturing the contaminants and keeping them from entering the body. In the present invention, these electrostatically charged nasal application products capture and hold the contaminants including viruses, bacteria, and other harmful microorganisms or toxic particulates, inactivate them dermally outside the body and render them harmless.

## BACKGROUND OF THE INVENTION

The nasal passages and nasal mucosa serve as body entry points for a wide variety of noxious and toxic substances. The body's immune system responds with certain relatively harmless irritants to the nasal passages and airways with reflex responses such as coughing and sneezing. This merely re-introduces the irritants into the environment. However, when the irritant comprises microorganisms, especially those that reproduce within the body and that are transmitted by coughing and sneezing, others may become infected. When a person feels a cough or a sneeze coming on, he merely covers his nose and mouth. However, if that person is contagious, this action does little to prevent others from also becoming infected. Furthermore, the use of a tissue or handkerchief for this purpose is extremely inefficient. This limits the protection of an individual from becoming infected or infecting others.

Other means of dealing with preventing inhalation of harmful or irritating substances or of infections agents include wearing facemasks to filter out these irritants. An example of this is the simple dust mask, typically found in the hardware store or medical supply store. However, even these are inadequate and inefficient. In many localities, during flu season, one can see a large number of people wearing these dust masks in public places. The dust masks are now known to be ineffective. Another example of this preventative method is the gas mask, which is more efficient than the dust mask. Yet, even gas masks are not highly efficient with respect to microscopic and sub-microscopic microorganisms. Furthermore, they are extremely cumbersome and cannot generally be used during normal day-to-day activities.

Patents such as U.S. Pat. No. 6,844,005 describe electrostatically charged compositions that may be applied externally in the vicinity of the nostril and attract oppositely charged materials that would otherwise be inhaled. However, those compositions simply create an electrostatic field that helps to filter out oppositely charged materials. While this action may offer suitable protection against particles that are inhaled passively, they suffer from the fact that they cannot completely deal with particulates that have their own internal means of overcoming the electrostatic forces, such as microorganisms that are motile within the air stream. Furthermore, actions by the person having those electrostatic compositions in the vicinity of the nostrils can sufficiently displace the offending particles or organisms, especially in such instances as blowing or wiping the nose, so that particles that were held captive by the former compositions could become dislodged, again set free, and be inhaled.

## OBJECTS OF THE INVENTION

It is therefore an object of the invention to provide a composition that can be readily applied to the exterior region around the nostril and/or slightly inside the edge of the nostril or near the vicinity of the source of release with method and compositions capable of capturing particulates and microorganisms.

US 8,163,802 B2

3

It is another object of the invention to have the capability to hold it for a duration from being dislodged in to the air stream again.

It is a further object of the invention to provide a composition that can be applied near the vicinity of the source of release or to the area around the exterior of and/or slightly inside the edge of the nostril that will inactivate, kill, or render harmless a microorganism, which has been captured and held by the composition.

It is yet another object of the invention to provide a composition that can be applied to a filter substrate for improving the substrates ability to trap and hold particulates and microorganisms and to simultaneously inactivate, kill, or render harmless the microorganisms so trapped. Such filter substrate could be placed in the close proximity of the skin near the path of inhalation, near the source of release of such particulates while the inhaler is at a distance or both.

It is still another object of the invention to provide a method of prophylactically preventing or of substantially reducing the risk of infection by an infectious agent without the utilization of ingested antiviral and/or antibacterial agents.

Yet other objects of the invention will be apparent to those of ordinary skill once having benefit of the instant disclosure. In all of the foregoing objects, the deficiencies of the previously mentioned prior art are overcome by the teachings of this invention.

SUMMARY OF THE INVENTION

These and other objects of the invention are unexpectedly achieved by an electrostatically charged composition having at least one polymeric quaternary compound in an aqueous or non-aqueous based formulation, which when applied to a surface, creates an electrostatic field such that oppositely charged airborne particulates (including microorganisms) in the vicinity of the surface are electrostatically trapped, held thereto and one or more of the microorganisms so captured is neutralized, killed, inactivated, and rendered harmless.

DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to anti-microorganism, antiviral/anti-bacterial products and methods that involve the use of products that restrict the flow of airborne contaminants into the nasal passages by creating an electrostatic field in an area near about the nasal passages. Additionally, in the present invention, these electrostatically charged nasal application products are used to hold the contaminants including microorganisms, viruses, bacteria, and other harmful or toxic particulate outside the body and render them harmless.

Emergencies of Anthrax lead to the concept of avoidance of inhaling airborne microscopic and sub-microscopic contaminants. It is the intention of the Present Invention to filter and render harmless materials such as anthrax spores, human corona virus, smallpox virus, influenza virus, avian flu virus, swine flu virus, rhino virus, and other biological or chemical elements/toxins/irritants, and the like, prior to their entering the nasal passages.

Airborne microorganisms are a major cause of respiratory ailments in humans, causing allergies, asthma, and pathogenic infections of the respiratory tract. Airborne fungal spores are also important agents that spread diseases. Respiratory diseases cause many fatalities and are a cause of great concern. During a sneeze, millions of tiny droplets of water and mucus are expelled at a high velocity. The droplets contain viral particles and/or bacteria. This is a means of transmission of several diseases by inhaled airborne particles as follows:

| VIRAL DISEASES (virus type in brackets) | BACTERIAL DISEASES (bacterial name in brackets) |
| --- | --- |
| Chickenpox (Varicella) | Whooping cough (*Bordetella pertussis*) |
| Flu (Influenza) | Meningitis (*Neisseria* species) |
| Measles (Rubeola) | Diphtheria (*Corynebacterium diphtheriae*) |
| German measles (Rubella) | |
| Mumps (Mumps) | Pneumonia (*Mycoplasma pneumoniae*, *Streptococcus* species) |
| Smallpox (Variola) | |
| SARS (Human Corona) | Tuberculosis (*Mycobacterium tuberculosis*) |
| | Anthrax (*Anthracsis* bacterium) |

Diseases caused by environmental particulates include, but are not limited to the following:

| ENVIRONMENTAL PARTICULATE DISEASES | SOURCE |
| --- | --- |
| Psittacosis (*Chlamydia psittaci*) | Dried, powdery droppings from infected birds (parrots, pigeons, etc.) |
| Legionnaire's disease (*Legionella pneumophila*) | Droplets from air-conditioning systems, water storage tanks, etc., where the fixture grows. |
| Acute allergic alveolitis (various fungal and actinomycete spores) | Fungal or actinomycete spores from decomposing organic matter (composts, grain stores, hay, etc.) |
| Aspergillosis (*Aspergillus fumigatus, A. flavus, A. niger*) | Fungal spores inhaled from decomposing organic matter. |
| Histoplasmosis (*Histoplasma capsulatum*) | Spores of the fungus, in old, weathered bat or bird droppings. |
| Coccidioidomycosis (*Coccidioides immitis*) | Spores in air-blown dust in desert regions (Central, South and North America) where the fungus grows in the soil. |

To accomplish the present invention, a formulation having at least one polyquaternary ammonium compound is prepared, such compounds, alone or together capable of creating an electrostatic field on and around a surface to which it is applied, including surfaces such as skin, textile (woven and non-woven), and hard surfaces, such as floors, walls, wood, metal, plastic, etc. The formulation is generally aqueous based, but may include non-aqueous solvents used which are compatible with the other formulation components and the application surface to which it is applied. Preferably, the formulation is an aqueous formulation. In addition to the polyquaternary ammonium compound, the composition includes at least. Furthermore, the composition may contain, but is not required to contain various thickeners, gellants, fragrances, colorants, emollients, humectants, and generally other suitable components that are compatible with the end use application and the other components of the formulations. Thus, a composition of the invention that is intended to be applied to a filter substrate that is perhaps used as a mask with an additional liner between a user and the filter substrate may utilize materials that would not be compatible with direct contact with skin, although it is preferable that all of the components are compatible with direct application to the skin as a means of limiting reaction due to inadvertent contact between the composition and the skin.

A formulation of the invention comprises:

water,

at least one quaternary thickener,

US 8,163,802 B2

**5**

a preservative,

a conditioner,

an emulsifier,

a biocidal agent, and

a neutralizing agent added to adjust and achieve a pH in the range of 5.0 to 6.8.

It may further comprise without limitation a combination of the following:

a surfactant,

a thickener,

an emollient,

a humectant, and

a binder.

In an exemplary embodiment of such a formulation, a quaternary thickener may comprise without limitation, at least one of the following:

Polyquaternium-10

Polyquaternium-22

Polyquaternium-67

Polyquaternium-70

Polyquaternium-72

Polyquaternium-88

Cocodimonium Hydroxypropyl Hydrolyzed Keratin

Hydroxypropyltrimonium Wheat Protein

Benzalkonium Chloride may also serve the same function, but it is also a cationic agent as well as a biocide. Another biocide that may be used is Lysine HCL.

In an exemplary embodiment of such a formulation, an emulsifier may comprise without limitation, at least one of the following:

Cetyl Alcohol (which can also serve as a thickener)

Cetearyl Alcohol

Glyceryl Stearate

Ceteareth-20

PEG-40 Stearate

Dicetyl Phosphate

Ceteth-10 Phosphate

In an exemplary embodiment of such a formulation, the emollient may be Isocetyl Behenate without limitation. The thickener may be Cetyl Alcohol or Stearyl Alcohol without limitation.

In an exemplary embodiment of such a formulation, a preservative may comprise without limitation, at least one of the following:

Phenoxyethanol;

Methylparaben;

Butylparaben;

Ethylparaben;

Propylparaben;

Isobutylparaben.

Examples of typical formulations found to be effective appear in the ten tables that follow. Percentages are given by weight.

**6**

TABLE 1-continued

| Ingredient | Percent Range | Function |
|---|---|---|
| Stearyl Alcohol | 1%–3% | Thickener |
| Cetyl Alcohol | 0.25%–1% | Thickener |
| Ceteareth - 20, | 1%–2% | Emulsifier |
| PEG - 40 Stearate, | | |
| Cetearyl Alcohol | | |
| Water, | 0.5%–1.5% | Conditioner |
| Hydrolyzed Algin | | |
| Hydrolized Soy Protein | 0.25%–1% | Conditioner |

TABLE 2

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 72%–88% | Solvent, Moisturizer |
| Phenoxyethanol | 1% | Preservative |
| Methylparaben, | | |
| Propylparaben, | | |
| Butylparaben, | | |
| Ethylparaben, | | |
| Isobutylparaben | | |
| Lysine HCL | 1% | Conditioner, Biocide |
| Polyquaternium - 67 | 3%–6% | Conditioner, Quaternary |
| Nonoxynol - 10 | 2%–4% | Surfactant |
| Cocodimonium | 0.5%–2% | Conditioner, Quaternary |
| Hydroxypropyl | | |
| Hydrolyzed Keratin | | |
| Polyquaternium - 72 | 0.5%–2% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%–4% | Conditioner, Quaternary |
| Cetearyl Alcohol, | 1%–4% | Emulsifier |
| Glyceryl Stearate | | |
| Emulsifier, | | |
| PEG - 40 Stearate, | | |
| Ceteareth - 20 | | |
| Cetearyl Alcohol, | 0.5% | Emulsifier |
| Dicetyl Phosphate, | | |
| Ceteth - 10 Phosphate | | |
| Benzalkonium Chloride | 0.25%–1% | Cationic, Quaternary, Biocide |
| Hydroxypropyltrimonium | 1% | Conditioner, Quaternary |
| Wheat Protein | | |
| Sodium Hydroxide | 0.01%–0.05% | Neutralizing Agent |

TABLE 3

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 67%–87% | Solvent, Moisturizer |
| Phenoxyethanol, | 1% | Preservative |
| Methylparaben, | | |
| Propylparaben, | | |
| Butylparaben, | | |
| Ethylparaben, | | |
| Isobutylparaben | | |
| Lysine HCL | 1% | Conditioner, Biocide |
| Polyquaternium - 67 | 3%–7% | Conditioner, Quaternary |
| Polyquaternium - 72 | 3%–7% | Conditioner, Quaternary |
| Cocodimonium | 1%–4% | Conditioner, Quaternary |
| Hydroxypropyl | | |
| Hydrolyzed Keratin | | |
| Polyquaternium - 88 | 1%–4% | Conditioner, Quaternary |
| Cetyl Alcohol | 1.5%–2.5% | Thickener |
| Cetearyl Alcohol, | 1%–4% | Emulsifier |
| Glyceryl PEG - 40 | | |
| Stearate, | | |
| Ceteareth - 20 | | |
| Benzalkonium Chloride | 0.25%–1% | Cationic, Quaternary, Biocide |
| Hydroxypropyltrimonium | 1% | Conditioner, Quaternary |
| Wheat Protein | | |
| Sodium Hydroxide | .025%–.075% | Neutralizing Agent |

TABLE 1

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 62%–80% | Solvent, Moisturizer |
| Gluconolactone, | 1% | Preservative |
| Sodium Benzoate | | |
| Lysine HCL | 1% | Conditioner |
| Polyquaternium - 67 | 3%–6% | Conditioner |
| Octoxynol - 9 | 2%–5% | Surfactant |
| Polyquaternium - 72 | 6%–10% | Conditioner |
| Polyquaternium - 72 | 0.5%–1% | Conditioner |
| Dipropylene Glycol | | |
| Isocetyl Behenate | 4%–6% | Emollient |

US 8,163,802 B2

7

### TABLE 4

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 71%-83% | Solvent, Moisturizer |
| Phenoxyethanol, Methylparaben, Propylparaben, Butylparaben, Ethylparaben, Isobutylparaben | 1% | Preservative |
| Lysine HCL | 1% | Conditioner, Biocide |
| Polyquaternium - 67 | 4%-6% | Conditioner, Quaternary |
| Polyquaternium - 72 | 4%-6% | Conditioner, Quaternary |
| Cocodimonium Hydroxypropyl Hydrolyzed Keratin | 2%-4% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-3% | Conditioner, Quaternary |
| Cetyl Alcohol | 2% | Thickener |
| Cetearyl Alcohol, Glyceryl Stearate, PEG - 40 Stearate, Ceteareth - 20 | 1%-3.5% | Emulsifier |
| Benzalkonium Chloride | 0.25%-1% | Cationic, Quaternary, Biocide |
| Hydroxypropyltrimonium Wheat Protein | 1% | Conditioner, Quaternary |
| Sodium Hydroxide | .025%-.075% | Neutralizing Agent |

### TABLE 5

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 73%-85% | Solvent, Moisturizer |
| Phenoxyethanol, Methylparaben, Propylparaben, Butylparaben, Ethylparaben, Isobutylparaben | 1% | Preservative |
| Lysine HCL | 1% | Conditioner, Biocide |
| Polyquaternium - 67 | 2%-3% | Conditioner, Quaternary |
| Polyquaternium - 72 | 4%-6% | Conditioner, Quaternary |
| Cocodimonium Hydroxypropyl Hydrolyzed Keratin | 2%-4% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-3% | Conditioner, Quaternary |
| Cetyl Alcohol | 2% | Thickener |
| Cetearyl Alcohol, Glyceryl Stearate, PEG - 40 Stearate, Ceteareth - 20 | 1%-3% | Emulsifier |
| Benzalkonium Chloride | 0.25%-1% | Cationic, Quaternary, Biocide |
| Hydroxypropyltrimonium Wheat Protein | 1% | Conditioner, Quaternary |
| Sodium Hydroxide | 0.05%-0.75% | Neutralizing Agent |

### TABLE 6

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 69%-85% | Solvent, Moisturizer |
| Phenoxyethanol, Methylparaben, Propylparaben, Butylparaben, Ethylparaben, Isobutylparaben | 1% | Preservative |
| Lysine HCL | 1% | Conditioner, Biocide |
| Polyquaternium - 10 | 0.25%-0.85% | Conditioner, Quaternary |
| Polyquaternium - 67 | 1.5%-3.5% | Conditioner, Quaternary |
| Polyquaternium - 72 | 4%-6% | Conditioner, Quaternary |
| Cetyl Alcohol | 1%-3% | Thickener |
| Cocodimonium Hydroxypropyl Hydrolyzed Keratin | 2%-4% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 22 | 1%-3% | Conditioner, Quaternary |

8

### TABLE 6-continued

| Ingredient | Percent Range | Function |
|---|---|---|
| Cetearyl Alcohol, Glyceryl Stearate, PEG - 40 Stearate, Ceteareth - 20 | 1%-3% | Emulsifier |
| Benzalkonium Chloride | 0.25%-1% | Conditioner, Quaternary, Biocide |
| Hydroxypropyltrimonium Wheat Protein | 1% | Conditioner, Quaternary |
| Sodium Hydroxide | 0.05%-0.75% | Neutralizing Agent |

### TABLE 7

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 67%-86% | Solvent, Moisturizer |
| Phenoxyethanol, Methylparaben, Butylparaben, Ethylparaben, Isobutylparaben | 1% | Preservative |
| Lysine HCL | 1% | Conditioner, Biocide |
| Polyquaternium - 10 | 1%-4% | Conditioner, Quaternary |
| Polyquaternium - 67 | 1%-4% | Conditioner, Quaternary |
| Polyquaternium - 72 | 0.5%-1.5% | Conditioner, Quaternary |
| Cocodimonium Hydroxypropyl Hydrolized Keratin | 0.5%-1.5% | Conditioner, Quaternary |
| Microcare Quat CTC 30 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 22 | 1%-3% | Conditioner, Quaternary |
| Cetyl Alcohol | 3%-5% | Thickener |
| Cetearyl Alcohol, Glyceryl Stearate, PEG - 40 Stearate, Ceteareth - 20 | 2%-3% | Emulsifier |
| Benzalkonium Chloride | 0.25%-1% | Conditioner, Quaternary, Biocide |
| Hydroxypropyltrimonium Wheat Protein | 1% | Conditioner, Quaternary |
| Sodium Hydroxide | 0.05%-0.1% | Neutralizing Agent |

### TABLE 8

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 58%-74% | Solvent, Moisturizer |
| Phenoxyethanol, Methylparaben, Propylparaben, Butylparaben, Ethylparaben, Isobutylparaben | 1% | Preservative |
| Lysine HCL | 1% | Conditioner, Biocide |
| Glycerin | 10% | Humectant |
| Glyceryl Acetate/Acrylic Acid Copolymer | 1% | Conditioner, Humectant |
| Polyquaternium - 10 | 1%-4% | Conditioner, Quaternary |
| Polyquaternium - 67 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 72 | 0.5%-1.5% | Conditioner, Quaternary |
| Cocodimonium Hydroxypropyl Hydrolyzed Keratin | 0.5%-1.5% | Conditioner, Quaternary |
| Cetrimonium Chloride | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 22 | 1%-3% | Conditioner, Quaternary |
| Cetyl Alcohol | 4% | Thickener |
| Cetearyl Alcohol, Glyceryl Stearate, PEG - 40 Stearate, Ceteareth - 20 | 2%-3% | Emulsifier |
| Polybutene | 4% | Binder |
| Benzalkonium Chloride | 0.25%-1% | Conditioner, Quaternary, Biocide |

US 8,163,802 B2

9

TABLE 8-continued

| Ingredient | Percent Range | Function |
|---|---|---|
| Hydroxypropyltrimonium Wheat Protein | 1% | Conditioner, Quaternary |
| Sodium Hydroxide | .05%-0.1% | Neutralizing Agent |

TABLE 9

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 54%-73% | Solvent, Moisturizer |
| Phenoxyethanol, Methylparaben, Propylparaben, Butylparaben, Ethylparaben, Isobutylparaben | 1% | Preservative |
| Lysine HCL | 1% | Conditioner, Biocide |
| Glycerin | 8% | Humectant |
| Glyceryl Acetate/Acrylic Acid Copolymer | 1% | Conditioner, Humectant |
| Polyquaternium - 10 | 1%-4% | Conditioner, Quaternary |
| Polyquaternium - 67 | 1%-4% | Conditioner, Quaternary |
| Polyquaternium - 72 | 0.5%-2% | Conditioner, Quaternary |
| Cocodimonium Hydroxypropyl Hydrolyzed Keratin | 0.5%-2% | Conditioner, Quaternary |
| Cetrimonium Chloride | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 22 | 1%-3% | Conditioner, Quaternary |
| Cetyl Alcohol | 4% | Thickener |
| Cetearyl Alcohol, Glyceryl Stearate, PEG - 40 Stearate, Ceteareth - 20 | 2%-3% | Emulsifier |
| Polybutene | 3%-4% | Binder |
| Benzalkonium Chloride | 0.25%-1% | Conditioner, Quaternary, Biocide |
| Hydroxypropyltrimonium Wheat Protein | 1% | Conditioner, Quaternary |
| Sodium Hydroxide | 0.05%-0.1% | Neutralizing Agent |

TABLE 10

| Ingredient | Percent Range | Function |
|---|---|---|
| Water | 52%-71% | Solvent, Moisturizer |
| Phenoxyethanol, Methylparaben, Propylparaben, Butylparaben, Ethylparaben, Isobutylparaben | 1% | Preservative |
| Lysine HCL | 1% | Conditioner, Biocide |
| Glycerin | 9% | Humectant |
| Glyceryl Acetate/Acrylic Acid Copolymer | 1% | Conditioner, Humectant |
| Polyquaternium - 10 | 1%-3.5% | Conditioner, Quaternary |
| Polyquaternium - 67 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 72 | 0.5%-2% | Conditioner, Quaternary |
| Cocodimonium Hydroxypropyl Hydrolyzed Keratin | 0.5%-2% | Conditioner, Quaternary |
| Cetrimonium Chloride | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 88 | 1%-3% | Conditioner, Quaternary |
| Polyquaternium - 22 | 1%-3% | Conditioner, Quaternary |
| Cetyl Alcohol | 4% | Thickener |
| Cetearyl Alcohol, Glyceryl Stearate, PEG - 40 Stearate, Ceteareth - 20 | 1%-4% | Emulsifier |
| Polybutene | 5%-6% | Binder |
| Benzalkonium Chloride | 0.25%-1% | Conditioner, Quaternary, Biocide |
| Hydroxypropyltrimonium | 1% | Conditioner, Quaternary |

10

TABLE 10-continued

| Ingredient | Percent Range | Function |
|---|---|---|
| Wheat Protein Sodium Hydroxide | 0.05%-0.1% | Neutralizing Agent |

All of the formulations described in TABLE 1-10 representing various embodiments of the Present Invention operate in the manner that was disclosed herein. The same results may be achieved by varying the percentages for the active and inactive ingredients. Varying the percentages for the active ingredients affects the potency of the formulation. Varying the percentages for the inactive ingredients affects the consistency of the formulation. The desired results may be achieved by varying the ingredients and their amounts by those skilled in the art without undue experimentation.

I claim:

1. A method for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein a formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said method comprising:

a) electrostatically attracting the particulate matter to the thin film;

b) holding the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and,

c) inactivating the particulate matter by adding at least one ingredient that would render said particulate matter harmless.

2. A formulation for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein the formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said formulation comprising at least one cationic agent and at least one biocidic agent, and wherein said formulation, once applied:

a) electrostatically attracts the particulate matter to the thin film;

b) holds the particulate matter in place by adjusting the adhesion of the thin film to permit said thin film to stick to the skin or tissue and by adjusting the cohesion of the formulation to provide adequate impermeability to the thin film; and,

c) inactivates the particulate matter and renders said particulate matter harmless.

3. The formulation of claim 2 wherein the at least one cationic agent is a polymeric quaternary ammonium compound.

4. The formulation of claim 3 wherein the at least one polymeric quaternary ammonium compound is taken from the group consisting of:

Polyquaternium-10,
Polyquaternium-22,
Polyquaternium-67,
Polyquaternium-70,
Polyquaternium-72, and
Polyquaternium-88.

5. The formulation of claim 2 wherein the at least one cationic agent is Cocodimonium Hydroxypropyl Hydrolyzed Keratin or Hydroxypropyltrimonium Wheat Protein.

6. The formulation of claim 2 wherein the at least one cationic agent is Benzalkonium Chloride.

7. The formulation of claim 2 wherein the at least one biocidic agent is Benzalkonium Chloride or Lysine HCL.

US 8,163,802 B2

11

**8**. A formulation for electrostatically inhibiting harmful particulate matter from infecting an individual through nasal inhalation wherein the formulation is applied to skin or tissue of nasal passages of the individual in a thin film, said formulation comprising:

a) at least one biocidic agent, and

b) at least one quaternary thickener.

**9**. The formulation of claim **8** wherein the at least one biocidic agent is Benzalkonium Chloride or Lysine HCL.

**10**. The formulation of claim **8** wherein the at least one quaternary thickener is taken from the group consisting of:

Polyquaternium-10,
Polyquaternium-22,
Polyquaternium-67,
Polyquaternium-70,
Polyquaternium-72, and
Polyquaternium-88.

**11**. The formulation of claim **8** wherein the at least one cationic agent is Cocodimonium Hydroxypropyl Hydrolyzed Keratin or Hydroxypropyltrimonium Wheat Protein.

**12**. The formulation of claim **8** wherein the at least one cationic agent is Benzalkonium Chloride.

**13**. The formulation of claim **8** further comprising:

a) water,

b) a preservative,

c) a conditioner, and

d) an emulsifier.

**14**. The formulation of claim **13** further comprising a neutralizing agent added to adjust a pH in the range of 5.0 to 6.8.

**15**. The formulation of claim **13** further comprising a surfactant.

**16**. The formulation of claim **13** further comprising a thickener.

12

**17**. The formulation of claim **13** further comprising an emollient.

**18**. The formulation of claim **13** further comprising a humectant.

**19**. The formulation of claim **13** further comprising a binder.

**20**. The formulation of claim **13** wherein the preservative is taken from the group consisting of:

Phenoxyethanol,
Methylparaben,
Butylparaben,
Ethylparaben, and
Isobutylparaben.

**21**. The formulation of claim **13** wherein the emulsifier is taken from the group consisting of:

Cetyl Alcohol,
Cetearyl Alcohol,
Glyceryl Stearate,
Ceteareth-20,
PEG-40 Stearate,
Dicetyl Phosphate,
Ceteth-10 Phosphate.

**22**. The formulation of claim **16** wherein the thickener is Cetyl Alcohol or Stearyl Alcohol.

**23**. The formulation of claim **13** wherein:

a) the amount of water ranges from 54% to 90% by weight

b) the amount of the quaternary thickener ranges from 0.5% to 5.0% by weight,

c) the amount of biocidic agent ranges from 0.25% to 2% by weight,

d) the amount of emulsifier ranges from 0.5% to 4% by weight.

\* \* \* \* \*

# EXHIBIT D



Bringing Nanoscience to Life

Company ▾    NanoBio® Protect    NanoVax® Platform ▾    News ▾



# NanoBio® Protect Nasal Antiseptic Solution



NanoBio® Protect is an alcohol-free nasal antiseptic solution that can be used to help reduce germs on skin that can cause infections. The product is easy to apply with any cotton swab for use on the skin around the rim of your nose as well as the skin up to one-half inch inside each nostril. It is non-irritating, fragrance-free and leaves no residue after application.

NanoBio® Protect is an FDA regulated over-the-counter skin antiseptic that incorporates the active ingredient benzalkonium chloride (BZK), which has been used in humans as a topical skin antiseptic since the 1940's. NanoBio®



Protect is similar in concept to a hand sanitizer but is designed for use on the skin inside and around the nose where germs frequently enter the body.

The unique effectiveness of NanoBio® Protectis derived from BlueWillow's patented nanotechnology. NanoBio® Protect places the BZK antiseptic on the surface of nano-droplets, which results in at least four key advantages:

1. The nano-droplets are attracted to germs by electro-kinetic charge and present the BZK in such a way to enable killing of germs on contact,
2. The droplets persist on skin for 4 or more hours, enabling long-lasting effectiveness,
3. The droplets significantly hydrate skin to avoid dryness and cracking that can allow germs in.
4. And lastly, when bound to nano-droplets, BZK is non-irritating to the skin.

NanoBio® Protect kills germs via membrane disruption. NanoBio® Protect is comprised of positively charged droplets that are 300–600nm in size. The droplets are attracted to negatively charged germs in the skin. As shown to the right, the nano-droplets



physically disrupt the outer membrane of germs, killing on contact.

NanoBio® Protect is applied by thoroughly swabbing the skin up to one-half inch inside of each nostril and is recommended for use to help reduce germs on the skin in and around the nose that can cause infections. It should be used in conjunction with frequent handwashing, limited touching of the face, and social distancing to help minimize infection. Each 0.75 oz bottle of NanoBio® Protect will provide 40 or more treatments. A single application should involve the use of two swabs, including one for each nostril, or the use of a double-sided swab.

The product can be applied to the skin every 4–8 hours as needed, and is recommended for use during periods of increased risk of exposure to germs. For example, a healthcare worker might apply NanoBio® Protect two or more times a day. A flight attendant might apply the product 1–2 times during a long flight. Whereas, someone that is mostly staying at home in isolation may only need to apply it once a day or every few days prior to heading to the store or to an appointment.

## Scientific Research Behind NanoBio® Protect

BlueWillow's
nasal
antiseptic

has not been clinically tested to confirm protection against COVID-19 infection in humans. It has



demonstrated both anti-bacterial and anti-viral activity in laboratory tests making it a potentially important additive measure to reduce the risk of infection

Standard *in vitro* lab experiments demonstrate that NanoBio® Protect kills more than 99.99% of germs within 60 seconds of exposure, as shown in the graph to the right.

Recent studies conducted by Public Health England also demonstrate NanoBio® Protect's ability to kill COVID-19 virus in laboratory tests. However, as stated above, studies to test for protection in humans have not yet been performed.

In addition, *ex vivo* tests in human skin (Figure A below) demonstrate that NanoBio® Protect persists on skin up to 7x better than commercial products and aqueous solutions containing the same BZK antiseptic agent. In vivo studies conducted in human volunteers (Figure B below) demonstrate that a single application of NanoBio® Protect significantly increases skin hydration for at least 3 hours, as compared to common hand sanitizer products:



Figure A

*Ex vivo* levels of BZK (µg/g tissue) in
human abdominal skin following one application
(dose of 100 µl/cm², measured at 24 hours)

Figure B

Measured following 1mL application to
the arms of human volunteers



## Safety

NanoBio® Protect and similar NanoBio® formulations have been tested extensively in animal and human studies involving topical application to skin. These studies demonstrate that topical NanoBio® products are non-irritating and are not absorbed systemically. The products are alcohol-free and are comprised of nanodroplets that have been optimized to provide significant advantages when used as topical antiseptic products, without being absorbed through the skin and into the bloodstream.

NanoBio® Protect's active ingredient is 0.13% benzalkonium chloride, which is regulated by the FDA as a skin antiseptic and has been used in humans for over 75 years. Unlike alcohol-based products, NanoBio® Protect does not irritate or dry out the skin, and instead provides a moisturizing and comforting experience. The product should be applied with any cotton swab to the skin around the nose and up to one-half inch inside of each nostril where germs frequently enter the body.

## Peer-Reviewed Scientific Publications

Other scientific publications describe the extensive research conducted with topical NanoBio formulations, as listed below:

- *"A Nanoemulsion as an Effective Treatment Against Human Pathogenic Fungi". Therapeutics and Prevention. 2019, Nov/Dec 4:6*
- *"Screening of Nanoemulsion Formulations and Identification of NB-201 as an Effective Topical Antimicrobial for Staphylococcus aureus in a Mouse Model of Infected Wounds". Military Medicine. 2016, May: 181, 5S:259-264*
- *"Nanoemulsion Therapy for Burn Wounds Is Effective as a Topical Antimicrobial Against Gram-Negative and Gram-Positive Bacteria". Burn Care Res. 2016, March /April: 37(2); 104-114*
- *"Treatment With a Novel Topical Nanoemulsion (NB-001) Speeds Time to Healing of Recurrent Cold Sores". Drugs Dermatol. 2012 Aug; 11(8):970-7*
- *"In Vitro Antibacterial Activity of NB-003 against Propionibacterium acnes". Antimicrobial Agents And Chemotherapy, Sept. 2011,Vol. 55, No. 9, p. 4211–4217*
- *"Topical Nanoemulsion Therapy Reduces Bacterial Wound Infection And Inflammation After Burn Injury". Surgery. 2010*
- *"NB-002, A Novel Nanoemulsion With Broad Antifungal Activity Against Dermatophytes, Other Filamentous Fungi, And Candida Albicans". Antimicrobial Agents And Chemotherapy, Aug. 2009, Vol. 53, No. 8, p. 3273–3279*
- *"In Vitro Activities of a Novel Nanoemulsion against Burkholderia and Other Multidrug-Resistant Cystic Fibrosis-Associated Bacterial Species". Antimicrobial Agents And Chemotherapy, Jan. 2009, Vol. 53, No. 1, p. 249–255*
- *"The Fungicidal Activity Of Novel Nanoemulsion (X8W60PC) Against Clinically Important Yeast And Filamentous Fungi". Mycopathologia 155: 195–201, 2001*
- *"A Novel Surfactant Nanoemulsion With A Unique Non-Irritant Topical Antimicrobial Activity Against Bacteria, Enveloped Viruses And Fungi". Microbiol. Res. (200l) 156, l-7*
- *"Inactivation Of Ebola Virus With A Surfactant Nanoemulsion". Acta Tropica 87 (2003) 315/320*
- *"Antimicrobial Mechanism Of Action Of Surfactant Lipid Preparations In Enteric Gram-Negative Bacilli". Journal of Applied Microbiology 2000, 89, 397-403*
- *"Prevention of Murine Influenza A Virus Pneumonitis by Surfactant Nano-emulsions". Antiviral Chemistry & Chemotherapy, 2000, 11:41-49*
- *"A Novel Surfactant Nanoemulsion with Broad-Spectrum Sporicidal Activity Against Bacillus Species". The Journal of Infectious Diseases, 1999, 180:1939–49*

BlueWillow Biologics

2311 Green Road | Ann Arbor, Michigan 48105

Telephone: 734-302-4000 | Fax: 734-302-9150

© 2021 BlueWillow Biologics. All rights reserved. NanoVax and NanoBio are registered trademarks of BlueWillow Biologics. Site design by Nelson Creations.

# EXHIBIT E





**BUY NOW**

NanoBio® Protect uses proprietary nanotechnology to deliver a common skin antiseptic in a new way. Learn more about the research behind NanoBio Protect

**How is nanotechnology used in NanoBio Protect?** 

NanoBio Protect works because of its patented nano-formulation. The product's unique, oil-based nanodroplets enhance the antiseptic's antimicrobial activity, optimizing its ability to kill germs on the skin. The nanodroplets are small enough to be effective on the skin, but too large to be absorbed into the bloodstream — creating a layer of lasting protection.

NanoBio Protect adds BZK antiseptic to the surface of nanodroplets. This technology offers four distinct advantages over conventional BZK antiseptics:

- The Nanodroplets optimize the ability of the antiseptic to kill germs.

- The droplets sit on skin after application, enabling protection for up to 8 hours (in lab testing).

- Dry skin allows germs to penetrate. Nanodroplets hydrate the skin, preventing dryness and cracking.

- When bound to the oil-based Nanodroplets, the antiseptic does not irritate the skin.

- When bound to the oil-based Nanodroplets, the antiseptic does not irritate the skin.

---

**Can you provide more detail on how the nano-technology works?** 

NanoBio Protect is composed of positively-charged droplets that are 300-600nm in size. These droplets are attracted to negatively-charged germs on the skin. The nanodroplets deliver the antiseptic BZK to the surface of the germs where the germ is inactivated via membrane disruption.

Other conventional BZK antiseptics often combine BZK with water, causing crystallization. When crystallization occurs, it rapidly inactivates the antiseptic and can lead to skin irritation. But because each NanoBio Protect droplet carries a positive charge, the droplets repel each other — keeping the BZK molecules separated and preventing crystallization.

---

**Is nano-technology as used in this product safe?** 

---

NanoBio® Protect uses proprietary nanotechnology to deliver a common skin antiseptic in a new way.



### Effectiveness

The nanodroplets are optimized for size and charge in order to maximize their germ-killing impact. The positively-charged droplets deliver the antiseptic to the negatively-charged germs on the skin, inactivating them via membrane disruption.



### Duration

NanoBio Protect's nanodroplets are positively charged, enabling them to stay active on the surface of the skin for significantly longer than common water-based BZK antiseptic solutions.



### Safety

NanoBio Protect's nanodroplets are small enough to reach germs that hide in the deep layers of skin, but big enough to prevent absorption through the skin into the bloodstream.

EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

# SOUTHERN DIVISION

|  |  |
|---|---|
| TRUTEK CORP.,<br>Plaintiff,<br><br>v.<br><br>BlueWillow Biologics, Inc.<br>ROBIN ROE 1 through 10,<br>gender neutral fictitious names,<br>and ABC CORPORATION 1<br>through 10 (fictitious names).<br><br>Defendants. | **CIVIL ACTION No. 2:21-cv-10312-SJM-RSW** |

**PLAINTIFF'S  EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.
RESPONSIVE TO AND IN REBUTTAL OF DEFENDANT'S
OPENING EXPERT REPORT OF MANSOOR M. AMIJI**

## RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.

### <u>INTRODUCTION</u>

I have been engaged by Trutek Corp. as a technical expert in the legal matter of Trutek Corp. ("Trutek") *v.* BlueWillow Biologics, Inc. ("BlueWillow") currently being litigated in federal court in the Eastern District of Michigan.

By means of discovery, BlueWillow submitted an expert report by Mansoor M. Amiji, Ph.D. setting forth his opinions that claims 1, 2, 6, and 7 of Trutek's U.S. Patent No. 8,163,802 ("the '802 Patent") are invalid. I read and understood Dr. Amiji's report as well as the exhibits that he submitted with the report. Further, I am familiar with the teachings and claims of the '802 Patent.

In light of Dr. Amiji's report, Trutek's lead counsel, Stanley H. Kremen, Esq., asked me to opine on four topics that are related to the Amiji report:

1. The level of skill required by a person having ordinary skill in the art ("PHOSITA") related to the claims of the '802 Patent.

2. The scientific and technical aspects of the "hold" function recited in Elements (b) in claims 1 and 2 of the '802 Patent and why the "hold" function is critical to the patented invention.

3. Enablement of the disclosure contained in U.S. Patent Application Publication No. 2004/0071757 A1 by David Rolf.

Page 1 of 13

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

4. Relevance of the commercial success of Trutek's products to nonobviousness of the claims of the '802 Patent.

I am opining on each of the above four topics as a rebuttal to Dr. Amiji's report and the opinions expressed therein.

Regarding my qualifications, I received my B.S. in chemistry in 1973, my M.S. in nutrition science in 1977, and my Ph.D. in nutrition science in 1979. Beginning in 1984 and continuing until 2007, I was responsible for development, strategic planning, and marketing activities related to over-the-counter nutritional and supplemental products for major producers in the field. Since 2007, I have been an independent consumer healthcare corporate consultant. I have had extensive experience related to products somewhat similar in scope and application to products manufactured by Trutek based on the '802 Patent. I am very familiar with products of this type. My resume is attached to this report as an exhibit.

My opinions regarding the four assigned topics follow.

1. **A Person Having Ordinary Skill In The Art**

A person having ordinary skill in the art ("PHOSITA") is essentially a fictitious individual considered to have a general or working knowledge of the subject matter in question. The operative word in this context is "ordinary." This is a person who does not possess special or distinctive knowledge or capability in a discipline. This person would have a basic skill

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

set or talent related to the technology related to the art. In addition, a PHOSITA knows of and understands all the prior art in his field of endeavor prior to the time that he is asked to evaluate the teachings of a patent. He must have sufficient experience in his art so as to be competent to understand and interpret the prior art related to a patent so that he can make and use the invention described and claimed in the patent. A PHOSITA is primarily a technician in his chosen field, and his skills are those ordinarily associated with such a technician. He is not an inventor. However, he is not a robot either. He must be able to understand and interpret the teachings associated with the type of structures and chemical compositions described in a document such as a patent. That document may possess directives for creating a product including the step by step protocol for making or assembling the product. In some instances, a PHOSITA may apply his fundamental skills in a procedure to follow instructions provided by a person possessing extraordinary skill. That extraordinarily skilled person may be a person having an advanced degree in a specific discipline who can educate others in that specific skill.

Having been a college professor for more than 30 years, I have taught numerous students on basic scientific concepts who were either majors in the discipline or students who were non-majors who wanted to gain a working general knowledge or skill. The students who majored in the discipline

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

would be expected to reach a level of extraordinary skill. Those who were non-majors were not expected to develop extraordinary skill but were expected to have a working knowledge of the subject matter. Hopefully, the example provided takes the imaginary or fictitious person to a real life individual who has a working knowledge of a subject matter and can understand and interpret the subject matter.

It is important to determine the level of skill of a person who would be considered a PHOSITA with regard to the '802 Patent. It is essential that this person cannot be a person having extraordinary skill in the art. A PHOSITA would not have the same knowledge or motivation to invent as a person having extraordinary skill.

In Paragraph 68 on Page 28 of his report, Dr. Amiji opined on the level of skill, experience, and education of a PHOSITA. He stated that such an individual should have "at least an M.S. degree in chemical engineering, pharmaceutical sciences, or a related field (or the equivalent) with several years of experience with pharmaceutical formulation. Also, a person of ordinary skill in the art may have worked as part of a multidisciplinary team— including a chemical engineer, microbiologist, or polymer chemist— and drawn upon not only his or her own skills, but also taken advantage of certain specialized skills of others on the team, e.g., to solve a given problem."

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

Having read and understood the teachings of the '802 Patent, I concluded that Dr. Amiji described a person of extraordinary skill in the art and technology of that patent. The level of skill possessed by a PHOSITA is that of a chemical or pharmaceutical formulator. This person would have two related but separate qualifications. First, after reading the '802 Patent, he should be able to create the formulations described in the patent, and then be able to use the formulations as prescribed. Second, the PHOSITA must be positioned in time just prior to effective filing date of the '802 Patent. Based on this second requirement, the PHOSITA could not have read the '802 Patent itself. Based on his knowledge and experience, this person would be familiar with all the ingredients listed in the ten formulations shown in the '802 Patent. He would have the skill and experience to duplicate those formulations once having seen their list of ingredients. He must know enough chemistry and biology to be familiar with cationic agents and biocidic agents. He must have knowledge of the various airborne "harmful particles," such as bacteria, viruses, pollen, and other allergens. He must know enough undergraduate physics to understand electrostatic fields as well as the principles of electrostatic attraction and repulsion, adhesion, and cohesion. To that end, he needs to know of ingredients that are surfactants, thickeners, and binders.

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

Based on my knowledge and experience, it is my opinion that this PHOSITA need not possess an advanced degree. Further, he does not even need to possess an undergraduate degree. He must be a technician with several years of experience as a formulator. The key requirement is his acquired experience necessary to create a wide variety of formulations from the class of ingredients disclosed in the '802 Patent.

**2.    The "Hold" Function Described and Claimed in the '802 Patent**

The 802 patent expresses the term "hold" in the claim statements related to the multi-action mechanism of the invention. While the product attracts particulate matter from the airflow before entering the nasal passageway utilizing electrostatic forces, this alone is insufficient to protect the individual from harmful particulate matter entering the body's respiratory system. Holding is a protective concept based on adhesive and cohesive properties. Adhesion of the formulation can be viewed in two ways: first adhesion to the skin of the individual applying the formulation in and around the nasal passageway; and second, adhesion of the particles in the airflow to the formulation itself. Cohesion provides a tackiness that incorporates the concept of adhesion. Adhesion concerns the forces bonding dissimilar molecules together. Cohesion concerns the forces bonding similar molecules together. Adhesion considers particles of opposite charge, and cohesion goes beyond this concept to include particles of like charge. This

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

sets up a barrier of impermeability trapping a significant number of these particles outside the nasal passageway. If the formulation is applied to the skin or tissue inside a person's nostrils, the holding function prevents these particles from either being inhaled into the respiratory system or from contacting the skin or tissue directly. Therefore, holding is a critical aspect of the patent claims since the power of the electrostatic forces to attract airborne particles must be enhanced using the principles of adhesion and cohesion. This interaction of the formulation with foreign particles found in the air, by electrostatically attracting and capturing them and then holding them in place, sets up the opportunity for the formulation's ingredients to inactivate them prior to entry into the respiratory system. The formulation contains a cationic agent to attract bioactive particles such as bacteria, viruses and other biologically harmful particulates found in the air. It also contains a biocidic agent that acts to destroy or neutralize the captured bioactive particles.

Essentially, the mechanism of the formulation to carry out the protection it claims to afford the user would be incomplete if the formulation did not have the adhesive and cohesive properties required to hold the particles in place. Attraction by electrostatic forces is enhanced by the holding properties of adhesion and cohesion, and the holding properties set

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

up the formulation's biocidic ingredients to inactivate and kill bioactive particles that are held in place by the formulation.

Most harmful airborne particles have a negative electrostatic charge. The formulation is applied to the skin or tissue of the nasal cavities as a thin film. The presence of a cationic agent in the formulation produces a positive electrostatic charge, which attracts and captures the negatively charged particles. A biocide in the formulation would ordinarily be expected to inactivate and kill the captured bioactive particles. But, to be effective, biocidic action requires contact with bioactive particles for a certain time period. If the captured particles happen to dislodge from the formulation's thin film, they would remain active and be inhaled. Even if they were in contact with the biocide for a sufficient time to be inactivated, the dislodged inactivated particles would still be able to be inhaled. Thus the "hold" function is critical to usefulness of the invention.

An analogy would be a mouse trap. If the trap merely attracts a mouse which mounts the trap to eat the cheese, unless the trap can hold and bind the mouse to the trap, the trap would be useless. If the formulation of the '802 Patent merely has a cationic agent to attract airborne bioactive particles and a biocidic agent to inactivate and kill the particles, it would be useless unless it can hold the particles in place long enough to inactivate

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

them and to prevent them from entering the respiratory system. The hold function is a critical part of the claimed invention.

3.    **The Rolf Patent Application**

The Rolf patent application discusses the use of essential oils applied to an adhesive patch placed in the vicinity of the nose to act as a biocidic agent against respiratory pathogens. Historically, essential oils have been used for centuries. Their use in modern times relates to aromatherapy. The literature includes references for their use in a variety of conditions. Essential oils are useful in a variety of applications related to cosmetics, natural products, and household products. They are produced by distillation from plant-based sources.

Rolf discusses the role of essential oils acting against bacteria and viruses. The most commonly used essential oils with antimicrobial action are: β-caryophyllene, eugenol, eugenol acetate, carvacrol, linalool, thymol, geraniol, geranyl acetate, bicyclogermacrene, cinnamaldehyde, geranial, neral, 1,8-cineole, methyl chavicol, methyl cinnamate, methyl eugenol, camphor, α-thujone, viridiflorol, limonene, (Z)-linalool oxide, α-pinene, p-cymene, (E)-caryophyllene, γ-terpinene.

Some essential oils are effective antimicrobials and have been evaluated for food incorporation *in vitro*. However, actual deployment is rare because much higher concentrations are required in real foods. Some or

Page 9 of 13

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

all of this lower effectiveness is due to large differences between culture medium and foods in: chemistry (especially lipid content), viscosity, and duration of inoculation/storage.

    The limitations associated with the use of essential oils relate to the amount or concentration of the oil. Reports in the literature suggest essential oils have skin irritating properties when applied, and others suggest more severe toxicity profiles, putting the user at risk for more serious medical problems.

    While the patent application suggests a mechanism of biocidic action by using these essential oils applied to a patch and placed in the vicinity of the nose, there is no reference to how this invention attracts and holds the biologic pathogen before entering the respiratory system. Consider the fact that essential oils are used in the production of perfumes, room air fresheners, and in the natural products industry as aromatherapy products. All of these would be of a similar function in acting to destroy pathogens found in the air.

    The biocidic action is concentration dependent and specific to the type of essential oil used. The claims in the Rolf patent application for the use of essential oils as a biocidic agent are not related to the '802 Patent because there is no discussion of electrostatic forces attracting airborne particles, the ability of the formulation to hold the airborne particles using adhesion and

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

cohesion concepts, or inactivation of the particles using biocidic components.

Furthermore, the patch would not function as described by Rolf. As I mentioned in the last section, to be effective, biocidic action requires contact with bioactive particles for a certain minimum time period. If the particles are not held in place by the patch, they would continue to float around, remain active, and be inhaled. The only adhesive property of Rolf's patch is its ability to adhere to the skin in the region just below the nose. The side of the patch facing the airborne particles has no adhesive properties. The Rolf invention will not work for its intended purpose.

4. **Commercial Success**

I understand that commercial success of a patented product tends to show that the patented claims are not obvious provided that the commercial success is due solely to the patented claims. Since the time the '802 patent was issued in 2012, approximately seven million units of the product based on this patent, have been sold in the United Sates and internationally. This clearly is a measure of commercial success. When evaluating commercial success, a key factor is repeat sales of a product and the length of time the product remains on the market. Having been involved in product development for OTC products and as a member of the business development team for a major pharmaceutical company OTC division, I had

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

the opportunity to evaluate technologies and products that the company was interested in licensing from an inventor.  Also, as a product development scientist, I know the challenges and difficulties to create a unique and effective product.  Patent protection offers additional support for a product to be considered as a success.  Since the Trutek products have patent protection and have been marketed successfully for ten years, this product line stands tall among products in this category.  The product has a domestic and international presence which demonstrates that it has been reviewed for human use without prescription for the claimed properties established in the patent.  When marketing in foreign countries, usually the ministry of health of these countries reviews the merits of the product claims before it gets approval for marketing the product to the population.

The commercial success of this product stands on the sales number and the lack of adverse events reported by the user.  The '802 Patent claims a product that electrostatically inhibits harmful airborne particles from infecting an individual.  The particles might be microbes, pollen, allergens, or mites that float in the air and are usually inhaled.  This product effectively prevents that from happening by creating a positive electrostatic charge that attracts the particles and holds the particles in place until a biocide can inactivate them and render them harmless.  Trutek does little or no advertising.  The products are either sold online or in retail outlets.  The

**RESPONSIVE EXPERT REPORT OF EDWARD A. LEMMO, Ph.D.**

patent number of the '802 Patent is clearly marked for every unit sold in the

United States.  Based on what the '802 Patent claims and what the products

actually do, I conclude that the commercial success of the products is due

solely to the performance and features of the claimed invention of the '802

Patent.


Dated: August 23, 2022


Edward A. Lemmo, Ph.D.

**Edward A. Lemmo, Ph.D.**
60 Gilroy Street
Staten Island, New York 10309
(917) 837-1470
Email: edlemmo@gmail.com

## EDUCATION

Ph.D.  Nutrition Science, Rutgers University, New Brunswick, NJ (1979)
M.S.   Nutrition Science, Rutgers University, New Brunswick, NJ (1977)
B.S.   Chemistry, St. Francis College, Brooklyn, NY (1973)

## EXECUTIVE TRAINING COURSES

Executive Leadership Program, Princeton, NJ
Time Management Skills, Teaneck, NJ
Media Communication Skills, New York City, NY

## EMPLOYMENT EXPERIENCE

2007-Present    **Consumer Healthcare Corporate Consultant**
                Self-employed Consultant - Consumer Healthcare

2005-2007       **BioBalance Corporation**, New York, NY
                **Vice President, Product Development**

                Person primarily responsible for investigating its probiotic
                product PROBACTRIX™ to be used for treating pouchitis
                and other gastrointestinal disorders.  Probiotic products are
                an optional alternative to the probiotic Lactobacillus
                acidophilus.  In charge of all scientific product evaluation
                conducted at company headquarters.

1999-2005       **Wyeth Consumer Healthcare**, Leonia and Madison, NJ
                **Vice President, Product Development**

                Division of American Home Products
                Formerly Whitehall-Robbins Consumer Healthcare

                Managed product development for SOLGAR®, and
                contributed towards CENTRUM®, and CALTRATE®, brands.
                Responsible role in scientific affairs and new business

development opportunities. Further, responsible for evaluation of acquisition of new business entities.

1992-1999 **General Nutrition Centers, Inc.**, Pittsburg, PA
**Director, Nutritional Sciences**

Analyzed safety of amino acid products for presentation to the FDA and FTC and other U.S. government agencies. Evaluated and made recommendations regarding nutritional and homeopathic products. Performed quality assurance activities related to label claims and product safety. Responsible for introduction of the new PRO-PERFORMANCE sports nutrition product line into the GNC retail marketplace.

In 1993, for Quigley Corporation, I evaluated the safety and efficacy of Cold-EEZE® zinc lozenges to be used to shorten a common cold as a possible line of homeopathic products exclusively marketed by GNC.

1989-1992 **Pall Biomedical Products**, Glen Cove, NY
**Marketing Manager**

Responsible for marketing activities of Intravenous filtration devices, and Heat and Moisture exchange respiratory products. Wrote all scientific evaluation documents related to Heat and Moisture Exchange respiratory product for presentation to anesthesiologists regarding prevention of injury from patients breathing cold dry gas during surgery. Developed scientific presentations, videos, and product marketing material for use by healthcare professionals.

1984-1989 **ICN Pharmaceuticals**, Costa Mesa, CA
**Director of Nutritional Technology**

**Faraday Laboratories Division**

Product development of nutritional supplements for use by chiropractic and alternative health practitioners throughout the United States and Canada. Product brands included Nutridyn® and Sivad Bioresearch®. Responsible for new product development, wrote technical literature, and prepared and delivered scientific educational presentations to practitioners at chiropractic colleges and chiropractic meetings.

| | |
|---|---|
| 1976-1977 | **Pharmacia Laboratories**, Piscataway, NJ<br>**Clinical Trials Coordinator** |

Assisted veterinarian in analysis of equine blood samples. Performed evaluation analysis of HEALON[®] products comprising hyaluronic acid, and their effect on tissues.

### CORPORATE CONSULTING EXPERIENCE

| | |
|---|---|
| 2011 | **Matrixx Initiatives, Inc.**, Princeton, NJ<br>**Scientific Affairs Consultant** |

Performed research associated with ZICAM[®] oral zinc product. Provided guidance for coordinating research trials. Managed human efficacy clinical trials.

| | |
|---|---|
| 1998-1999 | **Church & Dwight**, Princeton, NJ<br>**Scientific Advisor** |

Evaluated consumer healthcare products. Explored and determined market for magnesium based organo-metalic agents for use in dietary supplements.

| | |
|---|---|
| 1998-1999 | **IVC Industries**, Freehold, NJ |

IVC is a contract manufacturer of generic vitamins. Responsible for new product development. Assisted the marketing staff with product label claims.

| | |
|---|---|
| 1996 | **Nutrition 21**, Purchase, NY |

Company is a supplier to GNC. Performed consulting work regarding their products.

| | |
|---|---|
| 1996 | **Nutramerica**, Lincoln Park, NJ |

Technical advisor for the development of a dietary supplement product line.

**CORPORATE CONSULTING EXPERIENCE** (continued)

1996                **American Vitamin**, Ramsey, NJ

Company is a contract manufacturer. Performed new product development and assistance with evaluation of raw materials from India.

**COLLEGE TEACHING EXPERIENCE**

2013-2018           **Touro College,** New York City, NY

Taught in nursing school.Courses included pathophysiology, genetics, anatomy and physiology and tutored microbiology

2008-2014           **University of Medicine & Dentistry of New Jersey (UMDNJ)**, Newark, NJ

Taught innutrition program. Courses includedgeneral chemistry, anatomy and physiology, biochemistry, and microbiology.

1977 and            **New York University,** New York, NY

2000-2003           Taught in graduate nutrition program, vitamin and mineral metabolism

2011-2012           **Cedar Crest College**, Allentown, PA

Taught courses in nutritional biochemistry and metabolism.

1984-1989           **University of New Haven**, West Haven, CT

Taught graduate level course in vitamin and mineral nutrition.

1974-1984           **Brooklyn College, CUNY**, Brooklyn, NY
                    **Assistant Professor**

Taught nutrition courses to pre-medical and nutrition students.

1973-1977           **Rutgers University**, Piscataway, NJ

Taught general biology lab and mineral metabolism.

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

**SOUTHERN DIVISION**

|  |
|---|
| TRUTEK CORP.,<br>Plaintiff,<br><br>v.<br><br>BlueWillow Biologics, Inc.<br>ROBIN ROE 1 through 10, gender<br>neutral fictitious names, and ABC<br>CORPORATION 1 through 10<br>(fictitious names).<br><br>Defendants. |

**CIVIL ACTION No. 2:21-cv-10312-SJM-RSW**

<u>CERTIFICATE OF SERVICE</u>

Undersigned hereby states that on August 15, 2022, the attorneys for Plaintiff caused the foregoing document to be served upon all counsel of record, via electronic service.

Stanley H. Kremen
Attorney at Law
4 Lenape Lane
East Brunswick, NJ 08816
Telephone: (732) 593-7294
shk@shk-dplc.com
Attorney for the Plaintiff

Keith Altman
The Law Office of Keith Altman
38228 West 12 Mile Road, Suite 375
Farmington Hills, Michigan 48334
Telephone: (248) 987-8929
keithaltman@kaltmanlaw.com
Attorney for the Plaintiff

EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| |
|---|
| TRUTEK CORP., |
| Plaintiff, |
| v. |
| BlueWillow Biologics, Inc. ROBIN ROE 1 through 10, gender neutral fictitious names, and ABC CORPORATION 1 through 10 (fictitious names). |
| Defendants. |

CIVIL ACTION No. 2:21-cv-10312-SJM-RSW

**REPORT OF EDWARD A. LEMMO, Ph.D.**

**IN REPLY TO DEFENDANT'S EXPERT REPORT ON NON-INFRINGEMENT**

My name is Edward Lemmo.  I was engaged by counsel for Plaintiff, Trutek Corp. ("Trutek") as an expert witness in the above captioned matter where Trutek alleges that Defendant BlueWillow Biologics, Inc. ("BlueWillow") infringed on claims 1, 2, 6, and 7 of its U.S. Patent No. 8,163,802 ("the '802 Patent") by making and selling a product labeled Nanobio Protect.

On June 27, 2022, I submitted a document entitled, "Plaintiff's Opening Technical Report," in which I provided the following findings and conclusions:

1.  BlueWillow's Nanobio Protect product is sold in the form of a liquid that is administered into a user's nasal passages.

2.  The claims of Trutek's '802 Patent recite a method for nasally administering a formulation and for the formulation itself.  The formulation of Trutek's '802 Patent is administered in and around a user's nasal passages.

3.  BlueWillow's Nanobio Protect product exhibits an electrostatic charge, and once applied, creates an electrostatic field that extends from the skin or tissue of the user's nasal passages.

4.  The formulation of Trutek's '802 Patent claims exhibits an electrostatic charge. Once applied, the formulation creates an electrostatic field in the vicinity of the user's nasal passages.

5.  BlueWillow's Nanobio Protect product forms a thin film in the user's nasal passages.  The thin film adheres to the skin or tissue of the user's nasal passages.

6.  Trutek's '802 Patent claims that its formulation forms a thin film in and around the user's nasal passages.  The thin film adheres to the skin or tissue of the user's nasal passages.

7.  The formulation of BlueWillow's Nanobio Protect product contains at least one cationic agent.  A cationic agent creates a positive electrostatic charge. According to BlueWillow's published literature and the Nanobio Protect product packaging, the formulation contains benzalkonium chloride.  Benzalkonium chloride is a known cationic agent.

8.  The formulation of BlueWillow's Nanobio Protect product contains at least one biocidic agent or biocide.  A biocide is a substance that destroys or inhibits the growth or activity of living organisms.  According to BlueWillow's published literature and the Nanobio Protect product packaging, the formulation contains benzalkonium chloride.  Benzalkonium chloride is a known biocidic agent.

9.  The Nanobio Protect product comprises nano-droplets that electrostatically attract and hold "germs" (*i.e.,* harmful particles).  The nano-droplets further contain benzalkonium chloride (a known biocide) which renders the "germs" harmless.

10.  Claims 1 and 2 of the '802 Patent recite a formulation that electrostatically attracts and holds harmful particles and renders them harmless.

11.  The Nanobio Protect product reads upon the '802 Patent's method claim 1 when it is administered nasally because its formulation forms a thin film that it (1) adheres to the skin or tissue of the user's nasal passages; (2) electrostatically

attracts harmful particulate matter; (3) holds the harmful particulate matter; and (4) inactivates the harmful particulate matter and renders it harmless.

12.   The Nanobio Protect product reads upon claim 2 of the '802 Patent's formulation because it (1) is intended to be applied to the skin or tissue of the user's nasal passages; (2) forms a thin film that adheres to the skin or tissue of the user's nasal passages; (3) comprises at least one cationic agent; (4) comprises at least one biocidic agent; (5) electrostatically attracts harmful particulate matter; (6) holds the harmful particulate matter; and (7) inactivates the harmful particulate matter, and renders it harmless.

13.   The Nanobio Protect product reads upon claim 6 of the '802 Patent because it contains benzalkonium chloride, which is a cationic agent.

14.   The Nanobio Protect product reads upon claim 7 of the '802 Patent because it contains benzalkonium chloride, which is a biocidic agent.


The remainder of my report provides the bases for my opinions expressed therein.  Other than my restatement of my findings and conclusions (above), I shall not restate my opinions.

On August 15, 2022, defense expert, Mansoor M. Amiji, Ph.D. submitted a document entitled, "Responsive Expert Report of Mansoor M. Amiji, Ph.D. on Non-Infringement."  In that document, Dr. Amiji criticized my findings and conclusions, and asserted that the Nanobio Protect product does not infringe the claims of the '802 Patent.

The purpose of my present submission is to rebut statements made by Dr. Amiji in his responsive expert report. Among the various comments made by Dr. Amiji regarding non-infringement of the NanoBio Protect product on the '802 Patent, Dr. Amiji states, "I have also considered the information provided in the Lemmo report dated June 27, 2022, the Ermakov report dated January 11, 2021, and the Burns report dated January 18, 2021, in addition to the other information and references described and discussed herein."

The gist of Dr. Amiji's criticism focuses on the validity of the works by Ermakov and Burns conducted separately in 2021. One of the key features of the '802 Patent claim 1 is the electrostatic attraction of particles from the air. This is a key feature of the patent that is expressed in claim 1, since it is the principal mechanism or method by which the technology can be applied to a product such as the Trutek/NasalGuard product.

The purpose of the 2021 Ermakov study was to determine the magnitude (amount) of the surface electrostatic charge created by means of application of solution, serum, and spray containing permanently ionized molecules. For each of the three nasal test products, a plain sheet of identical printer paper was used as a substrate. Each of these samples was prepared by coating the test product on a 1-inch square substrate by a product under test. Three samples for each item/product were tested identically, an average calculated and recorded. The surface charge was calculated using the following formula: $Q=V*C/A$, where Q is charge per unit area, V is measured voltage on the sensing electrode, C is capacitance, and A is the area of the sample under the sensing electrode.

The validity of the Ermakov test protocol was questioned by Dr. Amiji.  In the study conducted by Dr. Ermakov, a Coulombmeter was used as the tool for measuring the electrostatic charge of the material.  A Coulombmeter was used in combination with a Faraday cup (or a metal probe) for making charge measurements of a material.  A Nanocoulombmeter is a Coulombmeter that is capable of measuring electrostatic charge down to the accuracy of a fraction of a nanocoulomb.  This is a standard method of conducting this type of experiment.   Electrostatic charge on an object can be measured by placing it inside a Faraday Cup.  The charge is transferred to the cup and displayed on the meter's display.  The Faraday Cup of the Coulombmeter has an outer, grounded metal shield that surrounds an inner electrode.  The inner electrode, which is electrically isolated from the shield, is connected to a meter to measure the charge. The coulombmeter allows this electrostatic buildup to be easily measured simply by applying the instrument's probe to its lead.  The Faraday cup is a metal (conductive) cup designed to catch charged particles in vacuum.  The resulting current can be measured and used to determine the number of ions or electrons hitting the cup.

Dr. Ermakov findings indicate that 1) The test products i.e., Blank, NasalGuard Airborne Particle Blocker Gel, NasalGuard Misting Spray, and NanoBio Protect Solution, **all demonstrated the presence of a surface electrostatic charge**; and 2) **the surface electrostatic charge measured was determined to be approximately (in order of magnitude) similar in all three product samples tested.**

In 2021, Burns conducted a study to measure the surface electrostatic charge of nasal application products.  The test equipment used in this trial was the ETS model 230 Nanocoulomb meter with a Faraday cup.  The Model 230 measures electrical

charge directly, displaying the result in nanocoulombs. The evaluation of triboelectric charge generation is performed by measuring the amount of charge developed on a material. When used with a suitable Faraday cup, the charge on a wide range of material types and sizes can be measured accurately by the Model 230 Nanocoulombmeter. The Model 230 meets the requirements for charge measurement as specified in applicable ESDA, ASTM, EIA, DOD, as well as many other industry standards. The Model 230 is a complete instrument for measuring charge directly in nanocoulombs. This instrument may be used with a Faraday cup or pail, or a detector probe. It can also be used alone to measure the charge on capacitors or from capacitive discharge systems (with adequate protection).

The results of the Burns study demonstrated the presence of a surface electrostatic charge of similar order of magnitude between the Nasal Guard Spray product of Trutek and the Blue Willow NanoBio Protect Solution. **Both studies independently reached the same conclusions.**

Another comment made by Dr. Amiji in his report questioned the work of Ermakov and Burns measuring conductivity and not electrostatic charge. Dr. Amiji states, "[a]s an initial matter, both of the Ermakov and Burns tests measure the conductivity of the test formulations, not surface electrostatic charge."

The Encyclopedia of Separation Science is the most comprehensive resource available on the theory, techniques, and applications of separation science. The work presents information on three levels. The Encyclopedia of Separation Science is the first truly comprehensive work covering the whole of separation theory, methods, and techniques.

Page 6

Salama, A.I.A., in the Encyclopedia of Separation Science, 2000 is the author of Mechanical Techniques: Particle Size Separation.  Salama claims electrostatic charge represents an excess or deficiency of electrons on the particle surface.  This charge may be assumed to reside on the particle surface in an absorbed gas or moisture film.  The electrostatic charge generated on a particle is proportional to the particle surface area.  This is the principle used in the design of electrostatic classifiers and precipitators.  Furthermore, the presence of electrostatic charge on particle surfaces controls the behavior of particles in an electrostatic field.

## CHARGE DENSITY MEASUREMENT THEORY

Electrostatic field strength is a direct measure of electrostatic charge.  The electrostatic field strength of the samples was too small to measure directly.  Instead, an ETS (Model 860) Wide Range Resistance Indicator was used to measure the resistivity of the card surfaces (both with and without the product coatings) in ohms per square, which is a unit for sheet resistance.  It is a measure of the resistivity between parallel edges of a thin film resistive material.  The film conductivity is the reciprocal of the resistivity.  Electrical conductivity is the measure of a material's ability to conduct an electric current.  When an electrical potential difference is placed across a conductor, the movable charges flow, giving rise to an electric current.  The conductivity $\sigma$ is defined as the ratio of the current density $J$ to the electric field strength $E$.  Therefore, the electrostatic field strength is expressed as: $J = \sigma E$.

Therefore, the electrostatic field strength is expressed as $E = J/\sigma$.  Now, $E \propto 1/\sigma$. (i.e. the electrostatic field $E$ is inversely proportional to the conductivity $\sigma$).  Greater conductivity means lower electrostatic field strength.   The charge density and

electrostatic field strength are directly proportional to one another.   Therefore, the charge density and the electrical conductivity are inversely proportional to one another.

Conductivity of a nanoemulsion is usually measured to determine the stability of the nanoemulsion over time.   In 2011, Bernardi *et.al.*, published a paper regarding the formation and stability of oil-in-water nanoemulsions containing rice bran oil: in vitro and in vivo assessments.   A copy of the paper is attached to this report as Exhibit 1.

Dr. Amiji questioned the validity of using in vitro skin models.   In his report, Dr. Amiji stated, "[i]n addition, neither of the Ermakov or Burns tests were conducted under circumstances that would mimic real life use of NanoBio Protect® in  individuals.  Both experiments were performed at room temperature, which is significantly lower than body temperature.  Similarly, testing the surface charge of  NanoBio Protect® as applied on paper and/or a piece of dried pig skin is not indicative or predictive of how the product will operate on human nasal skin or tissue.  In this regard, I disagree with Dr. Lemmo's assertion that the "use of pig skin is more predictive than paper regarding how the product would behave on human skin," particularly in view of how Mr. Burns conducted the experiment."

In a review paper by Abd *et al.*, the review discusses the alternative skin models that have been developed as surrogates for normal and diseased skin and examines the concepts of using model systems for in vitro–in vivo correlation and the demonstration of bioequivalence.   A copy of the paper is attached to this report as Exhibit 2.

## UNDERSTANDING OF A PERSON OF ORDINARY SKILL

Dr. Amiji and I disagree on the level of education and experience of a person of ordinary skill. I will not re-argue my opinion in this matter. However in my forty-six years experience supervising pharmaceutical formulations, I have never encountered one with that level of education combined with experience. Typically, many of them have Bachelor's degrees or certifications. People with Dr. Amiji's qualifications would be performing developmental science and would have higher executive positions within a corporation.

Dr. Amiji expresses a number of opinions regarding the role of a person of ordinary skill in the matter of infringement. For example, in Paragraph 32, Dr. Amiji opines:

> [I]n my opinion, a person of ordinary skill in the art reviewing the Ermakov and Burns testing would not understand the test results to establish that NanoBio Protect® satisfies the claim limitations and/or infringes the asserted claims of the '802 Patent.

And, in Paragraph 52, he states:

> Even if a person of skill in the art were to accept the results of the Ermakov and Burns testing as demonstrating that NanoBio Protect® exhibits an electrostatic charge when "applied to the skin or tissue of nasal passages" of an individual (a point which I dispute for the reasons explained above), the Ermakov and Burns testing does not demonstrate that the purported electrostatic charge operates to "inhibit[] harmful particulate matter from infecting an individual" or "electrostatically attracts the particulate matter to the thin film."

As I understand it, the comprehension of test results or even of the claim language of the '802 Patent by a person of ordinary skill is not relevant to the issue of infringement. An activity of the Defendant or a product produced by the Defendant either infringes or it doesn't. That is an objective determination – not a subjective one.

**ADMISSIONS MADE DIRECTLY BY BLUEWILLOW**

The tests performed first by Ashok Wahi and then independently by Ermakov and Burns provided evidence to bolster Trutek's position that BlueWillow, via its Nanobio Protect product infringes the claims of the '802 Patent. In his critique of the opinions of Ermakov, Burns, and myself, Dr. Amiji's comments seek to deny, *inter alia*, that the Nanobio Protect product exhibits an electrostatic charge when applied to the skin or tissue of the nasal passages, or that there is an electrostatic attraction of the product's nano-particles to germs (*i.e.,* harmful particulate matter), or that the germs are inactivated by the benzalkonium chloride biocide contained in the nanoemulsion droplets. However, in doing so, he ignores the statements of admission made by BlueWillow itself on its website and its product packaging.

Dr. Amiji makes comments regarding the statements made by BlueWillow regarding their NanoBio Protect product. In my opinion, the admissions made by BlueWillow confirm infringement of the claims of the '802 Patent independent of the confirming tests. Samples of the BlueWillow website are attached as exhibits to my opening report. This following link provides admissions made by Blue Willow on the product:   https://www.prnewswire.com/news-releases/bluewillow-biologics-launches-nanobio-protect-nasal-antiseptic-solution-301148517.html.   A copy of the webpage is attached as Exhibit 3. A warning letter sent to BlueWillow by the Food and Drug Administration ("FDA") attests to the claims made by BlueWillow. A copy of this FDA generated letter is attached as Exhibit 4.

Nanobio Protect is produced as a nanoemulsion with nano-droplets that are positively charged. The nanoemulsion contains benzalkonium chloride, which is both a cationic agent and a biocidic agent. Exhibit D of my opening report states:

- *The Nanodroplets optimize the ability of the antiseptic to kill germs.*

- *The droplets sit on skin after application, enabling protection for up to 8 hours (in lab testing).*

- *Dry skin allows germs to penetrate. Nanodroplets hydrate the skin, preventing dryness and cracking.*

- *When bound to the oil-based Nanodroplets, the antiseptic does not irritate the skin.*

It is well-known that most harmful particles (including microorganisms) are negatively charged. It is basic physics that there would electrostatic attraction between the nano-droplets and the harmful particles. Once applied to the skin or tissue of the individual's nasal passages, the nano-droplets remain active in the nose for up to 8 hours. The Nanobio Protect product adheres to the nasal tissue in a tin film. If this were not so, the liquid would immediately drip out. The nanoemulsion becomes impermeable, not allowing "germs to penetrate." The "germs" become in contact with the benzalkonium chloride biocide and are held there long enough to be deactivated and rendered harmless. In my opinion, considering the written admissions of the properties of the Nanobio Protect product as well as the tests performed in the laboratory to confirm those claims, the Nanobio Protect product reads on claims 1, 2, 6, and 7 of the '802 Patent.

Dated:   September 29, 2022

Edward A. Lemmo, Ph.D.

# EXHIBIT 1

Bernardi et al. Journal of Nanobiotechnology 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44



JOURNAL OF
NANOBIOTECHNOLOGY

**RESEARCH**                                                                                      **Open Access**

# Formation and stability of oil-in-water nanoemulsions containing rice bran oil: *in vitro* and *in vivo* assessments

Daniela S Bernardi[1*], Tatiana A Pereira[1], Naira R Maciel[1], Josiane Bortoloto[1,2], Gisely S Viera[1], Gustavo C Oliveira[1] and Pedro A Rocha-Filho[1]

## Abstract

**Background:** Nanoemulsions have practical application in a multitude of commercial areas, such as the chemical, pharmaceutical and cosmetic industries. Cosmetic industries use rice bran oil in sunscreen formulations, anti ageing products and in treatments for skin diseases. The aim of this study was to create rice bran oil nanoemulsions using low energy emulsification methods and to evaluate their physical stability, irritation potential and moisturising activity on volunteers with normal and diseased skin types.

**Results:** The nanoemulsion developed by this phase diagram method was composed of 10% rice bran oil, 10% surfactants sorbitan oleate/PEG-30 castor oil, 0.05% antioxidant and 0.50% preservatives formulated in distilled water. The nanoemulsion was stable over the time course of this study. *In vitro* assays showed that this formulation has a low irritation potential, and when applied to human skin during *in vivo* studies, the nanoemulsion improved the skin's moisture and maintained normal skin pH values.

**Conclusion:** The results of irritation potential studies and *in vivo* assessments indicate that this nanoemulsion has potential to be a useful tool to treat skin diseases, such as atopic dermatitis and psoriasis.

## Background

Nanoemulsions are obtained when the size of an emulsion globule reaches approximately 20-500 nm. The small droplet size can resist the physical destabilisation caused by gravitational separation, flocculation and/or coalescence. It also avoids the creaming process because the droplet's Brownian motion is enough to overcome the gravitational separation force [1,2]. The size and polydispersity of nanoemulsions can affect properties such as particle stability, rheology, appearance, colour, texture and shelf life [3]. In nanoemulsions, the most frequent instability phenomenon is Ostwald ripening [4,5], which can be calculated according to the Lifshitz-Slezov and Wagner theory (LSW) using the following equation [6,7]:

$$\omega = \frac{dr^3 n}{dt} = k \frac{Dc_\infty \gamma M}{\rho^2 RT} \tag{1}$$

Where $\omega$ is defined as the rate of change of the cube of the number average radius, $D$ is the diffusion coefficient of the dispersed oil phase in the aqueous phase, $\gamma$ is the interfacial tension between the two phases, $c_\infty$ is the bulk solubility of the oil in the water and $\rho$ is the oil density. $k$ is a constant that has the value of 8/9 in the LSW.

Nanoemulsions are well characterised and are a promising drug delivery system with practical applications for pharmaceutical, cosmetic and chemical industry applications. They have been used in intravenous, oral and ocular drug administrations and have reduced drug side effects and improved the pharmacological effects of the drugs given [8-10,4]. Nanoemulsions are primarily produced either by high-energy emulsification (e.g., high-pressure homogenisation) or by low-energy emulsification (using physicochemical properties of the components) [11]. This work focuses on the latter method for nanoemulsion synthesis.

* Correspondence: danibernardi81@yahoo.com.br
[1]Departamento de Ciências Farmacêuticas, Faculdade de Ciências Farmacêuticas de Ribeirão Preto, Universidade de São Paulo, Ribeirão Preto, São Paulo, Brazil
Full list of author information is available at the end of the article



© 2011 Bernardi et al; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Bernardi *et al. Journal of Nanobiotechnology* 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44

Rice (*Oryza sativa*) bran oil has unsaponifiable fractions that contain high levels of antioxidant-rich components, such as tocopherols/tocotrienols and gamma-oryzanol, which could be useful for topical formulations [12]. The cosmetics industry has used rice bran oil in sunscreen formulations [13], in topical aging prevention products [14] and in treatments for skin diseases [15].

When skin is affected by diseases such as atopic dermatitis and psoriasis, it exhibits a compromised skin barrier function that causes increased transepidermal water loss [16-18]. Moisturisers can help improve the skin's function by relieving the cutaneous manifestations of these diseases [18-20]. Measuring the *stratum corneum* (SC) hydration degree gives important information about the biophysical properties and the function of the skin [21].

*In vitro* studies, such as the HET-CAM (Hen's Egg Test on the Chorioallantoic Membrane), are used to evaluate cosmetics products by immediately showing whether or not a solid or liquid substance irritates the hen's egg chorioallantoic membrane [22].

The aim of this study was to obtain nanoemulsions of rice bran oil and to evaluate their physical stability, irritating potential and *in vivo* moisturising activity.

## Materials and methods
### Materials
Sorbitan oleate (HLB 4.3) and rice bran oil were kindly provided from Lipo do Brasil (Brazil). PEG-30 castor oil (HLB 11.7) was donated by Oxiteno (Brazil). The preservative DMDM Hydantoin (and) Iodopropynyl Butylcarbamate (Glydant® plus) was obtained from Chemyunion (Brazil), and the antioxidant Butyl Hydroxy Toluene (BHT) was purchased from Synth (Brazil).

### Preparation of nanoemulsion
The following surfactant mixtures were evaluated to find a stable nanoemulsion formulation: polysorbate 80/sorbitan oleate, polysorbate 60/sorbitan oleate, ceteareth-20 OE/ceteth-2, PEG-15 castor oil/sorbitan oleate, PEG-30 castor oil/sorbitan oleate and PEG-40 castor oil/sorbitan oleate. The PEG-30 castor oil/sorbitan oleate (HLB$_{resulting}$= 8.0) was the only surfactant combination that resulted in a stable formulation and therefore was chosen for further study.

The phase diagram method was used with different concentration of constituents to result in 42 different emulsion formulations. All emulsions were prepared according the Emulsion Phase Inversion (EPI) method, where the water and oil phases were heated separately at 75°C, the water phase was added into the oil phase (rice bran oil and surfactants) while stirring at 600 rpm (Fisatom, 713-Dmodel, Brazil), and the mixture was then cooled to 25°C while stirring.

### Determination of nanoemulsion droplet size
The mean droplet size and polydispersity index of the nanoemulsions were determined by dynamic light scattering (DLS) (Zetasizer, modelo ZS, Malvern Instruments, UK). Measurements were performed at 25°C using a scattering angle of 90°. Samples were considered polydisperse when the polydispersity index was higher than 0.2 [23].

### Stability study
The preliminary stability of the nanoemulsion preparation was evaluated at 24 hours by centrifuge and thermal stress analyses. Stability was assessed by macroscopic emulsion observation and droplet size analysis. The purpose of these tests was to select a stable, low-surfactant formulation with a nanoemulsion-size droplet and stable physicochemical properties. The selected nanoemulsion was prepared in triplicate, and the samples were stored at 25 ± 2°C, 40 ± 2°C and 5 ± 2°C. Tests were performed at 24 hours, 7, 15, 30, 60 and 90 days after preparation. The analysis measurements were droplet size, pH value and electrical conductivity.

### Physical-chemical analyses
To perform the thermal stress test, nanoemulsions were heated in an ultra bath thermostat (Nova Técnica, Brazil) at temperatures ranging from 40 to 80°C. The temperature was increased by 5°C every 30 minutes. The nanoemulsions were centrifuged (Fanem 206-R, Brazil) at 1000, 2500 and 3500 rpm (70, 440 and 863 G, respectively) for 15 minutes in each rotation to accelerate possible instability phenomena. A pH meter (PM608 model - Analion, Brazil) was used to measure the pH of the nanoemulsions at 25 ± 2°C. The electrical conductivity was evaluated at 25 ± 2°C by a portable conductivity meter (mCA-150 model, Tecnopon, Brazil).

### Irritant test in an organotypic model - HET-CAM (Hen's Egg Test on the Chorioallantoic Membrane)
The HET-CAM test is routinely used to evaluate the potential eye irritation of raw materials but can in some cases be used to evaluate skin irritation, e.g. in the case of surfactants. Irritation causes alterations in the vascular system of the HET-CAM that result in membrane discoloration, haemorrhaging and increased perfusion. The method used in this manuscript is a modification of the method described by Luepke [24] and adapted by Mehling [25] that allows the immediate evaluation of irritation by solid or liquid substances in the hen's egg chorioallantoic membrane. Each substance was tested on three fertilised eggs that were incubated for 9 days prior to testing. The CAM (Chorioallantoic Membrane) was exposed to 300 μL of one of the following

Bernardi *et al. Journal of Nanobiotechnology* 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44

substances: (1) nanoemulsion (pH 6.54), (2) surfactant solution blend (5% sorbitan oleate, 5% PEG-30 castor oil and 90% water (pH 6.32), (3) Sodium lauryl sulphate (SLS) 10% w/w (positive control, pH 6.05) and (4) saline solution (negative control, pH 6.0). The CAM was rinsed with physiological saline solution after 30 seconds of exposure to each substance, and the intensity of the reactions (hyperaemia, haemorrhage and coagulation) was semi-quantitatively assessed on a scale of 0.5, 2 and 5 minutes after treatment; longer observation times give no additional important information. The numerical time-dependent scores for hyperaemia, haemorrhage and coagulation are summed to give a single numerical value indicating the irritation potential of the test substance on a scale with a maximum value of 21. The mean value of four tests makes possible an assessment by a classification scheme analogous to the Draize categories (Table 1).

### In vivo assessment

Approval to conducted the *in vivo* studies was obtained from the Ethics Committee of Faculdade de Ciências Farmacêuticas de Ribeirão Preto, Ribeirão Preto, São Paulo, Brazil, under protocol number CEP/FCFRP n°. 147.

Seventeen Caucasian volunteers with healthy skin (all women, 20-29 years old), five patients with atopic dermatitis (all women, 21-30 years old), and four psoriasis patients (1 man and 3 women, 28-56 years old) without skin lesions on the forearm were included in the study. The forearm area was washed with mild soap two hours before the analysis. The volunteers were kept for 10 min in a controlled room at ambient temperature (25 ± 2°C; 29-34% relative humidity) before starting the assay. Baseline values were determined using a Corneometer CM 820, a Sebumeter SM 810 and a Skin-pH-meter PH 900 instruments (Courage &Khazaka, Köln, Germany) before applying the formulation. Then, 50 μL of nanoemulsion was applied to the right forearm in three rectangular areas of 13.80 cm$^2$ and distributed for 20 seconds by rubbing the test area using a circular motion. Excess nanoemulsion was left on the skin. The treated skin of each patient was measured 30, 60, 90, 120 and 150 minutes after nanoemulsion application, with one measure for sebum content and triplicate measurements of electrical capacitance and skin pH.

**Table 1 Classification of cumulative scores in the chorioallantoic membrane test (According Luepke 1985 [24])**

| Cumulative Score | Irritation assessment |
|---|---|
| 0-0.9 | Practically none |
| 1-4.9 | Slight |
| 5-8.9 | Moderate |
| 9-21 | Strong |

## Results and discussion

### Preparation of nanoemulsion

The phase diagram with the rice bran oil, surfactants sorbitan oleate/PEG-30 castor oil and water shows formation of five different areas: (I) O/W (Oil/Water) nanoemulsion, (II) phase separation, (III) gel phase, (IV) W/O (Water/Oil) emulsions and (V) O/W emulsions (Figure 1).

Table 2 shows the composition and the droplet size of the nanoemulsion systems.

All of the nanoemulsions (Table 2) were stable when tested using the centrifugation test. The only formulation that showed signs of instability at high temperatures (70°C) was the nanoemulsion composed of 10:20:70 (oil, surfactants and water, respectively).

A surfactant concentration of 5.00% was not sufficient to form a nanoemulsion, even with smaller amounts of oil. The surfactant amount affects the stabilisation and size of the emulsion droplets. From the experimental results, the nanoemulsion that used the lowest possible surfactant concentration while still maintaining thermal stability, centrifugal stability and small droplet size was selected as the working formulation.

Based on these preliminary results, we chose a formulation composed of 10% rice bran oil, 10% surfactant blend and 80% water and proceeded with further stability tests and *in vitro* and *in vivo* evaluations.

### Stability study

The formulation composed of 10:10:80 (rice bran oil, surfactant blend and water) was supplemented with 0.05% antioxidants and 0.50% preservatives. The formulation was tested at three different storage temperatures: 25 ± 2°C, 40 ± 2°C and 5 ± 2°C. By granulometric analysis the particles maintained a mono-disperse, monomodal peak after 24 hours (Figure 2). The formulation was stable for up to 90 days as determined by macroscopic analysis.

Droplet size measurements are a good indicator of the formulation stability. A fast droplet size increase indicates low system stability. The droplet size for this formulation remained constant over 90 days for all temperature conditions (Figure 3).

The nanoemulsions had polydispersity index values below 0.2 throughout the 90-day testing period, indicating the high fidelity of the system (low polydispersity), which may reflect the overall stability of this formulation and synthesis method. Polydispersity values near 1.0 are indicative of a polydisperse system [26]. The long term stability of nanoemulsions was previously evaluated and was also verified by stability studies conducted over three months. The W/O nanoemulsion produced by low energy emulsification showed no difference in droplet size over the study period at both 25°C and 4°C [27]. The W/O nanoemulsion demonstrated high physical stability,

Bernardi *et al. Journal of Nanobiotechnology* 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44



**Figure 1 Phase diagram with rice bran oil, sorbitan oleate/PEG-30 castor oil and water**. Region I: nanoemulsion, II: phase separation, III: gel phase, IV: W/O emulsions; V: O/W emulsions.

corroborating our results for temperatures of 5 ± 2°C and 25 ± 2°C.

Low-energy emulsification is better at producing stable nanoemulsions than its higher energy counterpart. When nanoemulsions were prepared using a high pressure homogeniser, the droplet size was initially around 100 nm; however, the particles increased in size after 30 days at either 25 or 4°C. This phenomenon was attributed to the preparation method [28]. The low-energy emulsification method used in our study showed high stability with respect to the droplet size and polydispersity index.

**pH value determination**

Monitoring the pH value is important for determining the emulsions' stability because pH changes indicate the occurrence of chemical reactions that can compromise the quality of the final product. Emulsions produced with vegetable oils may experience a decrease in pH due to the hydrolysis of fatty acid esters into free fatty acid degradation products [29].

The nanoemulsions had stable pH values for almost all conditions tested (Figure 4). Only at a temperature of 40 ± 2°C and 90 days of incubation was there a statistically significant decrease in the pH of the nanoemulsion. The high temperature might have destabilised the nanoemulsion by hydrolysis, but it did not affect the overall quality of the nanoemulsions because the pH values remained around pH 6.0, which is an acceptable, non-skin irritating pH value.

**Electrical conductivity**

The nanoemulsion showed changes in electrical conductivity at all storage conditions (Figure 5).

**Table 2 Composition of formulation characterised as nanoemulsions**

| Rice bran oil (% w/w) | Sorbitan oleate/PEG-30 castor oil (% w/w) | Purified water (% w/w) | Droplet size (nm) ± (Standard Deviation) |
|---|---|---|---|
| 10.00 | 30.00 | 60.00 | 91 ± 19 |
| 10.00 | 20.00 | 70.00 | 45 ± 12 |
| **10.00** | **10.00** | **80.00** | **69 ± 17** |
| 20.00 | 10.00 | 70.00 | 303 ± 32 |
| 10.00 | 15.00 | 75.00 | 121 ± 13 |

Bernardi *et al. Journal of Nanobiotechnology* 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44



**Figure 2** Droplet size distribution of nanoemulsions after 24 hours.

Changes in the electrical conductivity can indicate nanoemulsion instability and may influence the nanoemulsion droplet size [30]. In these studies, changes in electrical conductivity did not affect the nanoemulsion droplet size (Figure 3). It is difficult to assess the emulsion stability solely by electrical conductivity because the relationship between an increase in electrical conductivity and emulsion instability is not linear [31].

Thus, we could not conclusively determine the nanoemulsion's stability by this parameter. However, because the particle size and the pH value did not significantly change across different conditions, we considered our nanoemulsion to be stable. Nanoemulsion stability is a crucial parameter in determining the moisturising activity of the nanoemulsions *in vivo*.

### Irritant test in an organotypic model - HET-CAM (Hen's Egg Test on the Chorioallantoic Membrane)

Topical application products must have a low ocular/mucous membrane and a low dermal irritation potential.



**Figure 3** Nanoemulsion droplet size under different storage conditions during a 90-day stability test.

Bernardi *et al. Journal of Nanobiotechnology* 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44



**Figure 4** pH values for nanoemulsions over time under different storage conditions.

The irritation potential depends on the concentration of the substance as well as the chemical composition and the pH of the formulation [25].

The HET-CAM test can help evaluate the irritation potential of substances *in vitro* and *in vivo* [32]. The CAM showed no signs of irritation after application of either the nanoemulsion or the negative control substance, so the nanoemulsion was therefore considered practically non-irritating. The surfactant solution by itself caused mild hyperaemia, which suggests that the presence of rice bran oil in the nanoemulsion may have protected the chorioallantoic membrane from the irritating effects of the surfactant solution (Table 3). The pH

values were the same for all samples tested to eliminate pH as a variable in the HET-CAM results.

Previous studies showed that O/W microemulsions containing linoleic acid were only barely irritating in the HET-CAM test, indicated by a slight discoloration of the chorioallantoic membrane [33]. The HET-CAM test showed that the nanoemulsion containing rice bran oil was essentially non-irritating.

### *In vivo* assessment

The formulation composed of 10:10:80 (rice bran oil, surfactant blend and water) was chosen for the *in vivo* study due to its high stability and lack of irritation in



**Figure 5** Electrical conductivity of nanoemulsions over time under different storage conditions.

Bernardi *et al. Journal of Nanobiotechnology* 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44

Page 7 of 9

**Table 3 Scores and assessments of irritation potential of nanoemulsions and surfactant solution tested in the chorioallantoic membrane test**

| Formulation | Cumulative Score (average) | Assessment |
|---|---|---|
| Nanoemulsion[1] | 0 | Practically none |
| Surfactant Solution[2] | 5 | Moderate |
| Positive control[3] | 15 | Strong |
| Negative control[4] | 0 | Practically none |

[1]10.00% of rice bran oil, 5.00% of sorbitan oleate, 5.00% of PEG-30 castor oil, 0.05% of BHT antioxidant, 0.50% of preservative and 79.45% of distilled water
[2]5.00% of sorbitan oleate, 5.00% of PEG-30 castor oil and 90.00% of distilled water
[3]10% of SLS and 90% of distilled water
[4]Saline solution

the HET-CAM test. This nanoemulsion formulation was applied to volunteers with either normal or affected skin (atopic dermatitis or psoriasis).

### Moisturising activity

The moisturising activity of the *stratum corneum* is measured by skin capacitance. It is also an important tool in evaluating healthy and diseased skin such as patients with atopic dermatitis or psoriasis [34-36]. The moisturising variance in healthy volunteers increased both 30 and 60 minutes after nanoemulsion application and then decreased over the remainder of the study. Volunteers with atopic dermatitis or psoriasis showed increased moisturising variance in the first 30 minutes and maintained this increase up to 90 minutes after application. Then, the moisturising capacitance decreased after 90 minutes until the end of test (Figure 6). Skin affected by atopic dermatitis or psoriasis had a lower basal hydration value compared with healthy skin. People with these drying skin conditions have increased dryness in their

skin outside of the regions with lesions [37-39]. The rice bran oil nanoemulsion increased the moisturising variance by about 38% in normal skin volunteers and by 30% in volunteers with atopic dermatitis or psoriasis, which is a satisfactory result because a high-quality commercial moisturiser only increased skin hydration by about 20% after 14 days of application [40]. These improved effects may be caused by the nanoemulsion droplets adhering to the skin and forming a dense film that inhibits water evaporation from the skin [41].

The rice bran oil nanoemulsion significantly increased the skin hydration in volunteers suffering from atopic dermatitis and psoriasis. Although the skin hydration measurements should be conducted over a longer period of time, 8 - 24 h, this study indicates that the nanoemulsion may provide long-term skin hydration.

### Oily Skin

The oiliness values of nanoemulsion-treated skin increased considerably 30 minutes after treatment and then decreased in both the healthy and affected skin groups. The increase may be related to the amount of rice bran oil (10%) in the formulation (Figure 7). Cosmetic emulsions form an oily layer on the skin that can protect the lipid barrier, which is desirable in dry skin conditions [42]. Therefore, the oiliness of the nanoemulsion may provide an alternative treatment for psoriasis.

### Skin pH determination

Forearm skin testing is standard in most clinical studies of skin and has pH values in the range of 4.2 to 5.9 for both sexes [43]. The pH values of volunteers' skin tested during this study ranged from 4.9 to 5.2 after treatment for both groups. Thus, the pH changes due to the nanoemulsion



**Figure 6** Moisturising variance after nanoemulsion treatment in volunteers with either normal skin or skin affected by atopic dermatitis or psoriasis.

Bernardi *et al. Journal of Nanobiotechnology* 2011, **9**:44
http://www.jnanobiotechnology.com/content/9/1/44



**Figure 7** Oiliness of the skin after nanoemulsion treatment in volunteers with either normal skin or skin affected by atopic dermatitis or psoriasis.

were within the accepted pH range for forearm skin found in the literature, so this formulation does not significantly alter the skin pH (Figure 8).

## Conclusion

The nanoemulsion developed in this study using the phase diagram method was composed of 10% rice bran oil, 10% surfactants sorbitan oleate/PEG-30 castor oil, 0.05% antioxidants and 0.50% preservatives formulated in distilled water. The nanoemulsion was stable during the period of study and was found to be practically non-irritating in the organotypic HET-CAM model. When applied to the skin of volunteers, the nanoemulsion increased the relative hydration of the skin, the

skin oiliness and maintained normal skin pH values. This nanoemulsion could serve as an alternative treatment for skin diseases such as atopic dermatitis and psoriasis.

**Acknowledgements**
This work was supported by FAPESP (Fundação de Amparo à Pesquisa do Estado de São Paulo) protocol numbers: 2009/01922-3, 2008/10382-0, 2009/05774-9, 2009/07817-7 and 2010/09618-9, CNPq (Conselho Nacional de Desenvolvimento Científico e Tecnológico) and CAPES (Coordenação de Aperfeiçoamento de Pessoal de Nível Superior).

**Author details**
[1]Departamento de Ciências Farmacêuticas, Faculdade de Ciências Farmacêuticas de Ribeirão Preto, Universidade de São Paulo, Ribeirão Preto,



**Figure 8** Skin pH value after nanoemulsion treatment in volunteers with normal skin or skin affected by atopic dermatitis or psoriasis.

Bernardi et al. Journal of Nanobiotechnology 2011, 9:44
http://www.jnanobiotechnology.com/content/9/1/44

São Paulo, Brazil. [2]Universidade de Ribeirão Preto, Ribeirão Preto, São Paulo, Brazil.

## Authors' contributions
DSB selected the nanoemulsion composition through the phase diagram study. JB and DSB contributed to the stability study of formulation. NRM and DSB performed the irritant test in the organotypic model - HET-CAM. TAP and GSV performed the in vivo assessment. PARF and NRM guided the studies. The manuscript has been read and approved by all the authors.

## Competing interests
The authors declare that they have no competing interests.

Received: 11 April 2011 Accepted: 28 September 2011
Published: 28 September 2011

## References
1. Forgiarini A, Esquena J, González C, Solans C: Formation of nano-emulsions by low-energy emulsification methods at constant temperature. Langmuir 2001, 17(Suppl 7):2076-2083.
2. Thadros T, Izquierdo P, Esquena J, Solans C: Formation and stability of nanoemulsions. Advance in Colloid and Interface Science 2004, 108-109:303-318.
3. Becher P: Emulsions: Theory and pratice Oxford: Oxford University Press; 2001.
4. Solans C, Izquierdo P, Nolla J, Azemar N, Garcia-Celma MJ: Nano-emulsions. Current Opinion in Colloid and Interface Science 2005, 10(Suppl 3-4):102-110.
5. Taylor P: Ostwald ripening in emulsions. Colloids and Surfaces A: Physicochemical and Engineering Aspects 1995, 99(Suppl 2-3):175-185.
6. Lifshitz IM, Slesov VV: The kinetics of precipitation from supersaturated solid solutions. Journal of Physics and Chemistry of Solids 1961, 19(Suppl 1/2):35-50.
7. Wagner C: Theory of precipitate change by redissolution. Zeitschrift Fur Elektrochemie 1961, 65:581-591.
8. Abdulrazik M, Tamilvanan S, Khoury K, Benita S: Ocular delivery of ciclosporin A. II. Effect of submicron emulsion's surface charge on ocular distribution of topical cyclosporin. STP Pharma Science 2001, 11:427-432.
9. Gershanik T, Benita S: Positively charged self-emulsifying oil formulation for improving oral bioavailability of progesterone. Pharmaceutical Development and Technology 1996, 1:147-157.
10. Klang S, Benita S: Design and evaluation of submicron emulsion as colloidal drug carriers for intravenous administration. In Submicron emulsions in drug targeting and delivery Edited by: Benita S 1998, 119-152.
11. Solans C, Esquena J, Forgiarini A, Izquierdo P, Morales D, Uson N, Azemar N, Garcia-Celma MJ: Surfactants in solution: Fundamentals and applications. In Surfactant Science Series. New York Edited by: Mittal KL, Shah D, Dekker M 2002.
12. Lilitchan S, Tangprawat C, Aryusuk K, Krisnangkura S, Chokmoh S, Krisnangkura K: Partial extraction method for the rapid analysis of total lipids and gamma-oryzanol contents in rice bran. Food Chemistry 2008, 106:752-759.
13. Coppini D, Paganizzi P, Santi P, Ghirardini A: Capacità protettiva Nei confronti delle radiazioni Solari di derivati di origine vegetable. Cosmetic News 2001, 136:15-20.
14. Patel M, Naik SN: Gamma-oryzanol from rice bran oil: a review. Journal of Scientific & industrial Research 2004, 63:569-578.
15. Lerma-García MJ, Herrero-Martínez JM, Simó-Alfonso EF, Mendonça CRB, Ramis-Ramos G: Composition industrial processing and applications of rice bran gamma-oryzanol. Food Chemistry 2009, 115:389-404.
16. Leung DYM: Atopic dermatitis: new insights and opportunities for therapeutic intervention. Journal of Allergy and Clinical Immunology 2000, 105(Suppl 5):860-876.
17. Leung DYM, Boguniewicz M, Howell MD, Nomura I, Hamid QA: New insights into atopic dermatitis. Journal of Clinical Investigation 2004, 113(Suppl 5):651-657.
18. Lodén M: The skin barrier and use of moisturizers in atopic dermatitis. Clinics in Dermatology 2003, 21(Suppl 2):145-157.
19. Mchenry PM, Williams HC, Bingham EA: Management of atopic eczema: Joint Workshop of the British Association of Dermatologists and the Research Unit of the Royal College of Physicians of London. British Medical Journal 1995, 310:843-847.
20. Rudolph R, Kownatzi E: Corneometric, sebumetric and TEWL, measurements following the cleaning of atopic skin with a urea emulsion versus a detergent cleanser. Contact Dermatitis 2004, 50:354-358.
21. Alanen E, Nuutinen J, Nicklén K: Measurement of hydration in the stratum corneum with the MoistureMeter and comparison with the Corneometer. Skin Research and Technology 2004, 10(Suppl 1):32-7.
22. Steiling W, Bracher M, Courtellemont P, De Silva O: The HET-CAM, a useful in vitro assay for assessing the eye irritation properties of cosmetic formulations and ingredients. Toxicology in vitro 1999, 12:375-384.
23. Izquierdo P, Feng J, Esquena J, Tadros TF, Dederen JC, Garcia MJ, Azemar N, Solans C: The influence of surfactant mixing ratio on nano-emulsion formation by the pit method. Journal of Colloid and Interface Science 2005, 285:388-394.
24. Luepke NP: Hen's egg chorioallantoic membrane test for irritation potential. Food and Chemical Toxicology 1985, 23:287-291.
25. Mehling A, Kleber M, Hensen H: Comparative studies on the ocular and dermal irritationpotential of surfactants. Food and Chemical Toxicology 2007, 45:747-758.
26. Jafari SM, Assadpoor E, He Y, Bhandari B: Re-coalescence of emulsion droplets during high-energy emulsification. Food Hydrocolloids 2008, 22:1191-1202.
27. Shakeel F, Baboota S, Ahuja A, Ali J, Faisal MS, Shafiq S: Stability evaluation of celecoxib nanoemulsion containing Tween 80. Thai Journal of Pharmaceutical Science 2008, 32:4-9.
28. Yuan Y, Gao Y, Zhao J, Mao L: Characterization and stability evaluation of b-carotene nanoemulsions prepared by high pressure homogenization under various emulsifying conditions. FoodResearchInternational 2008, 41:61-68.
29. Martini E: Nanoemulsões catiônicas como sistemas de liberação de oligonucleotídeos: formulação e caracterização físico-química. Dissertação (mestrado). Universidade do Rio Grande do Sul, Porto Alegre; 2005.
30. ANVISA (Agência Nacional de Vigilância Sanitária): Guia de Estabilidade de Produtos Cosméticos. Brasília 2004.
31. Masmoud H, Dréau YL, Piccerelle P, Kister J: The evaluation of cosmetic and pharmaceutical emulsions aging process using classical techniques and a new method: FTIR. International Journal of Pharmaceutics 2005, 289:117-131.
32. Wilson TD, Steck WF: A modified HET-CAM assay approach to the assessment of anti-irritant properties of plant extracts. Food and ChemicalToxicology 2000, 38:867-872.
33. Goebel ASB, Knie U, Abels C, Wohlrab J, Neubert RHH: Dermal targeting using colloidal carrier systems with linoleic acid. European Journal of Pharmaceutics and Biopharmaceutics 2010, 75(Suppl2):162-172.
34. Agache P, Mary S, Muret P, Matta AM, Humbert P: Assessment of the water content of the stratum corneum using a sorption-desorption test. Dermatology 2001, 202:308-313.
35. Crowther JM, Sieg A, Blenkiron P, Marcott C, Matts PJ, Kaczvinskyà JR, Rawlings AV: Measuring the effects of topical moisturizers on changes in stratum corneum thickness, water gradients and hydration in vivo. British Journal of Dermatology 2008, 159:567-577.
36. Rim JH, Jo SJ, Park JY, Park BD, Youn JI: Electrical measurement of moisturizing effect on skin hydration and barrier function in psoriasis patients. Clinical and Experimental Dermatology 2005, 30:409-413.
37. Wissing SA, Muller RH: Cosmetic applications for solid lipid nanoparticles (SLN). International Journal of Pharmaceutics 2003, 254(Suppl 1):65-68.
38. Zhou H, Yue Y, Liu G, Li Y, Zhang J, Gong Q, Van Z, Duan M: Preparation and characterization of a lecithin nanoemulsion as a topical delivery system. Nanoscale Research Letters 2010, 5:224-230.
39. Bowcock AM, Cookson WOCM: The genetics of psoriasis, psoriatic arthritis and atopic dermatitis. Journal Human Molecular Genetics 2004, 13(Suppl 1): R43-R55.
40. Fluhr JW, Cavallotti C, Berardesca E: Emollients, moisturizers, and keratolytic agents in psoriasis. Clinics in Dermatology 2008, 26:380-386.
41. Proksch E: The role of emollients in the management of diseases with chronic dry skin. Skin Research and Physiology 2008, 21:75-80.
42. Machado M, Bronze MR, Ribeiro H: New cosmetic emulsions for dry skin. Journal of Cosmetic Dermatology 2007, 6:239-242.
43. Ehlers C, Ivens UI, Moller ML, Senderovitz T, Serup J: Females have lower skin surface pH than men. A study on the influence of gender, forearm site variation, right/left difference and time of the day on the skin surface pH. Skin Research and Technology 2001, 7:90-94.

doi:10.1186/1477-3155-9-44
Cite this article as: Bernardi et al.: Formation and stability of oil-in-water nanoemulsions containing rice bran oil: in vitro and in vivo assessments. Journal of Nanobiotechnology 2011 9:44.

# EXHIBIT 2

**Clinical Pharmacology: Advances and Applications**

**Dovepress**

open access to scientific and medical research

Open Access Full Text Article

REVIEW

# Skin models for the testing of transdermal drugs

Clinical Pharmacology: Advances and Applications downloaded from https://www.dovepress.com/ on 23-Aug-2022
For personal use only.

Eman Abd[1]
Shereen A Yousef[1]
Michael N Pastore[2]
Krishna Telaprolu[1]
Yousuf H Mohammed[1]
Sarika Namjoshi[1]
Jeffrey E Grice[1]
Michael S Roberts[1,2]

[1]Translational Research Institute, School of Medicine, University of Queensland, Brisbane, [2]School of Pharmacy and Medical Sciences, University of South Australia, Adelaide, Australia

**Abstract:** The assessment of percutaneous permeation of molecules is a key step in the evaluation of dermal or transdermal delivery systems. If the drugs are intended for delivery to humans, the most appropriate setting in which to do the assessment is the in vivo human. However, this may not be possible for ethical, practical, or economic reasons, particularly in the early phases of development. It is thus necessary to find alternative methods using accessible and reproducible surrogates for in vivo human skin. A range of models has been developed, including ex vivo human skin, usually obtained from cadavers or plastic surgery patients, ex vivo animal skin, and artificial or reconstructed skin models. Increasingly, largely driven by regulatory authorities and industry, there is a focus on developing standardized techniques and protocols. With this comes the need to demonstrate that the surrogate models produce results that correlate with those from in vivo human studies and that they can be used to show bioequivalence of different topical products. This review discusses the alternative skin models that have been developed as surrogates for normal and diseased skin and examines the concepts of using model systems for in vitro–in vivo correlation and the demonstration of bioequivalence.

**Keywords:** percutaneous permeation, dermal delivery, transdermal, bioequivalence, ex vivo skin models, reconstructed skin

## Introduction

The skin is a major physical, immunological, and sensory barrier to our environment. While it has long been used as a portal for drug delivery, it is a formidable barrier that requires appropriate technology for successful delivery. It is particularly effective in preventing large (ie, molecular weight >500) or polar molecules from entering the body. It is also a heterogeneous organ, with several delivery routes and sites that could be targeted for desirable pharmacological and immune responses. A key challenge is to deliver to the target site sufficient quantities of the drugs, peptides, vaccines, and dyes that are mainly larger and polar to achieve these responses. This may require the design of a specific chemical or physical delivery system to enhance the permeation of the active substance.

The assessment of percutaneous permeation is key to the successful development of new formulations intended for human use. It is also an important quality-control measure to ensure batch-to-batch uniformity in the pharmaceutical industry.[1] Clinical end-point bioequivalence studies have generally been used for bioequivalence assessments of locally acting products. However, this is not the most feasible approach, due to the high costs involved, as well as the lack of sensitivity in highlighting formulation differences. Alternative methods for evaluating product performance include a

Correspondence: Michael S Roberts
Level 5, Translational Research
Institute, 37 Kent St, Woolloongabba,
Queensland 4102, Australia
Email m.roberts@uq.edu.au

© 2016 Abd et al. This work is published and licensed by Dove Medical Press Limited. The full terms of this license are available at https://www.dovepress.com/terms.php and incorporate the Creative Commons Attribution – Non Commercial (unported, v3.0) License (http://creativecommons.org/licenses/by-nc/3.0/). By accessing the work you hereby accept the Terms. Non-commercial uses of the work are permitted without any further permission from Dove Medical Press Limited, provided the work is properly attributed. For permission for commercial use of this work, please see paragraphs 4.2 and 5 of our Terms (https://www.dovepress.com/terms.php).

range of models. More commonly used models to conduct skin-permeation studies are ex vivo human or animal skin. Through the standardization of protocols and techniques, the available skin models can be useful as surrogate models for in vivo human skin to evaluate the bioequivalence of topical products.

This review discusses the alternative skin models that have been developed as surrogates for normal and diseased skin, and examines the concepts of using model systems for in vitro–in vivo correlation (IVIVC) and the demonstration of bioequivalence. Table 1 lists a range of appropriate skin models.

## Human skin structure and function

A comprehensive review of the structure and function of skin can be found in Monteiro-Riviere.[2] The skin accounts for approximately 16% of human body weight, with a surface area of approximately 2 m[2] in adults.[3,4] It provides a physical barrier to the environment, maintains homeostasis by limiting the loss of water, electrolytes, and heat, and protects against microorganisms, toxic agents, and ultraviolet radiation.[5] There are three basic layers: the epidermis, the dermis, and the subcutaneous layer. Hair, nails, sebaceous glands, and sweat glands (apocrine and eccrine) are considered to be skin derivatives or appendages. Even though it is structurally continuous throughout the body, skin varies in thickness according to the age of the individual and the anatomical site.

The epidermal layer is formed from squamous epithelium and is subdivided into separate layers, according to the degree of keratinization of the cells. The layers of the epidermis from the bottom to the surface are stratum basale (basal cell layer), the stratum spinosum (spinous or prickle-cell layer), the stratum granulosum (granular cell layer), and the stratum corneum (SC; horny layer) (Figure 1).[6]

The outermost layer of the epidermis, the SC, consists of denucleated, nonliving, flattened cells called corneocytes. There are ten to 25 layers of stacked corneocytes, which are nonhydrated cells lying parallel to the skin surface.[5] The SC layers are united by SC lipid bilayers assembled into a "brick and mortar" arrangement.[7]

Below the SC, the remainder of the epidermis is viable tissue, called viable epidermis, containing nucleated cells called keratinocytes. The viable epidermis is a region for drug binding, metabolism, active transport, and surveillance. In addition to keratinocytes, it contains melanocytes (dendritic cells found on the basement membrane and in the basal layer), Merkel cells (functioning as mechanoreceptors involved in mediation of touch responses, found in the basal region), and Langerhans cells (dendritic cells playing a key role in protective immune function, present mainly in the stratum spinosum).[2]

The viable epidermis is separated from the dermis at the dermal–epidermal junction. The dermis is rich in collagen. The subcutaneous (hypodermis) layer is the deepest layer of the skin and is formed from loose connective tissue and fat (50% of the body fat), which may be more than 3 cm thick on the abdomen. The dermis and subcutaneous layers contain blood vessels, lymphatics, and nerve cells, in addition to skin appendages.[8]

**Table 1** Skin models

| Model | Advantages | Disadvantages |
|---|---|---|
| **Human skin** | | |
| In vivo | Gold standard | Often precluded for ethical and practical reasons |
| Ex vivo skin | Best surrogate for in vivo humans | Not readily available, variability |
| **Animal skin** | | |
| In vivo | Reasonably easy to obtain animals, can be scaled up to humans, hairless species available | Pigs: similar barrier to humans, but difficult to handle |
| | | Rodents: different barrier properties from humans |
| In vivo chimeric model | Human skin xenografts on mice allows testing on living human skin | Technically difficult |
| Ex vivo skin | Easy to obtain | Different barrier properties, variability |
| **Artificial membranes** | | |
| Simple polymeric models | Useful for studying basic diffusion mechanisms, consistent and homogenous | Not representative of human skin |
| Lipid-based models | Useful for screening | Not representative of human skin |
| **Reconstructed skin models** | | |
| Reconstructed human epidermis | Built-in barrier properties | Usually more permeable than human skin |
| Living skin equivalents | Can be engineered to include a range of normal or disease features | Usually more permeable than human skin |

**Dove**press

Skin models for transdermal drug testing



**Figure 1** Structure of the skin.

The SC acts as the primary skin barrier, with the essential functions of protecting the body from the surrounding environment, providing an efficient obstacle to the permeation of exogenous molecules[8] and microorganisms[9] and maintaining homeostasis by preventing excessive loss of water.[10] The surveillance, metabolic, and transport processes located in the deeper skin layers[11,12] also contribute to the protective functions of the skin.

## Models used to evaluate dermal absorption

### Ex vivo human skin models

Measurement of dermal absorption for the purpose of targeted skin delivery, systemic delivery, or toxicological assessment should be done under the correct conditions, ideally using the gold-standard experimental model: in vivo human skin.[13] However, this is not always possible, due to the high cost of human trials and concerns over applying substances or materials with potentially toxic effects. As well, in vivo responses may be difficult to measure and interpret and subject to significant variability. Alternative methods are needed to derive data that are reproducible and reliable and which provide a meaningful prediction of the in vivo human situation.[14] There is a large body of work based on ex vivo human skin, and as we shall discuss in more detail later, some success has been achieved in correlating in vitro and in vivo dermal absorption, often driven by regulators seeking a standard, robust assessment method.[15,16]

Excised human skin is most commonly obtained from plastic surgery or cadavers, and in both cases, appropriate ethical approval is required to use the tissue. Abdominal, breast, or back skin is most convenient, due to the large areas that may be available. There are considerable differences in skin absorption across different body sites,[17] attributed to such factors as differences in SC thickness,[18] hydration,[19,20] and lipid composition.[21] Clearly, this needs to be recognized when designing studies.

As noted earlier, the SC represents the main barrier to penetration of exogenous substances into the skin,[8] as well as controlling the loss of water from inside the body.[10] It is believed that skin may be stored for up to 6 months without loss of SC barrier function,[22] particularly if 10% glycerol is used as a preservative.[23] Nielsen et al also found little effect of freezing at −20°C for 3 weeks, with or without polyethylene glycol as a preservative, but significant damage with storage at −80°C.[24] On the contrary, other evidence suggests significant loss of barrier function, causing increased skin permeation, with frozen storage of animal skin.[25,26] Barbero and Frasch concluded that carefully handled frozen human skin was suitable for testing the passive permeation of chemicals, when skin viability and metabolic activity were not being investigated.[23] Cellular

viability and metabolic activity within the human epidermis are likely to be reduced by frozen storage or heat.[27,28] Our unpublished results from an MTT assay showed a complete elimination of epidermal viability following heat separation by the method of Kligman and Christophers.[29] For studies requiring the presence of viable epidermal tissue, such as imaging of endogenous skin autofluorescence by multiphoton tomography,[30] or investigations of skin metabolism,[28] fresh tissue is required.

Several different membrane types may be prepared from ex vivo human skin for use in permeation experiments. "Full-thickness skin" is prepared by removal of connective tissue and subcutaneous fat and consists of all layers down to and including the dermis.[31] To reduce variability while retaining significant dermal thickness, full-thickness skin may be cut to approximately 500–750 μm with a dermatome.[32] However, the presence of the hydrated dermis may introduce an additional, artificial barrier to permeation, particularly for more lipophilic molecules.

In contrast to the in vivo situation, where capillary circulation rapidly clears penetrated molecules, full-thickness or dermatomed skin mounted in a diffusion cell represents a situation analogous to vasoconstriction.[33] Consequently, the use of a membrane consisting of only the SC and the viable epidermis may be preferred. According to Cross and Roberts, this membrane represents a situation of "infinite dilatation", since all material making its way past the SC barrier is immediately available to the receptor solution.[33] Atrux-Tallau et al found that dermatomed human skin and heat-separated epidermal membranes gave the same flux for caffeine, a hydrophilic compound.[34] Results from our group where steroids were applied to epidermal membranes, full-thickness skin, and isolated dermis showed that there was a minimal effect of increasing lipophilicity on epidermal maximum flux and a trend toward decreased dermal penetration rates.[35]

Epidermal membranes are most commonly prepared by immersing full-thickness skin in hot water (~60°C) for approximately 1 minute.[29] Other techniques designed to separate the membrane at the dermal–epidermal junction include chemical treatments with ethylenediaminetetraacetic acid, ammonia, and enzymes.[32] Some researchers have used the isolated SC for permeation experiments[36] and for desorption studies designed to study SC heterogeneity,[37] and the SC reservoir for water and other substances.[38] The SC is prepared by enzymatic methods, usually by incubation with aqueous trypsin solution, after which the digested epidermal material is rinsed and wiped off.[39]

# Ex vivo human skin: use in bioequivalence studies

For the majority of topical drug products, comparative clinical end-point studies are used to demonstrate bioequivalence to a reference drug. While this provides a direct in vivo assessment, it is also associated with a number of challenges. Clinical end points are associated with high variability (intra-subject) and low sensitivity (drug-related), which makes such studies less reliable and less efficient. The other clinical alternative is to use pharmacokinetic studies to demonstrate bioequivalence for topical products, but this is limited to particular cases where significant systemic absorption of the drug occurs. Recently, the use of techniques including in vitro permeation testing (IVPT), in vivo tape stripping, or dermatopharmacokinetics, and in vivo microdialysis or microperfusion, has been advocated for testing bioequivalence.[40]

IVPT using human dermatomed skin mounted in diffusion cells is increasingly seen as a suitable tool for demonstrating bioequivalence of topical dosage forms.[40] Indeed, the generation of such data has been encouraged by regulatory agencies, such as the European Medicines Agency, the US Environmental Protection Agency, and the US Food and Drug Administration (FDA). Their utility is grounded on substantial evidence that 1) there is a good correlation between the in vitro and in vivo rates and extents of human skin absorption of a number of different substances and 2) there is good agreement on the bioequivalence of topical products seen with IVPT and in vivo clinical studies.

Currently, however, there are no approved protocols for carrying out IVPT studies. Franz et al pointed out that the demonstration of valid IVIVC is greatly dependent upon the protocols used, and they recommended that the in vitro and in vivo protocols followed should be as closely harmonized as possible to maximize the chance of achieving a good correlation.[15,41] The work on which this conclusion was based was an analysis of historical literature data that was available to the researchers, and despite the wide variation in the way in which it was collected, their conclusion was that there was compelling evidence that it was possible to correlate IVPT data with human in vivo skin-absorption data. Others who have demonstrated good IVIVC include Hadgraft et al, who compared in vitro and in vivo delivery from nitroglycerin patches,[42] and more recently Yang et al, who compared their own IVPT data with literature reports of in vivo estradiol delivery from patches.[16]

While the use of IVPT for bioequivalence has only recently been formalized, the design of in vitro permeation tests has been subject to consideration and validation for many years. In 1987, the FDA published a report on the

important factors to be considered, which included the membrane type (dermatomed skin or heat-separated epidermis?), the receptor fluid, the cell design (static or flow-through?), application (finite or infinite dose?), and temperature.[43]

The in vivo dermatopharmacokinetic (DPK) method uses tape stripping to remove SC layers. The FDA has investigated the possibility of introducing a DPK method for evaluating bioavailability and/or bioequivalence of topical dermatological drug products.[44,45] In the DPK method, it is assumed that 1) in normal circumstances, the SC is the rate-determining barrier to percutaneous absorption, 2) the SC concentration of the drug is related to the amount that diffuses into the underlying viable epidermis, and 3) SC drug levels are more useful and relevant for assessing local, dermatological efficacy than plasma concentrations.[46] It is also possible to deduce partitioning and diffusion parameters that characterize the absorption process and which can subsequently be used to predict an entire absorption profile from a single short-contact-duration experiment.[44] The technique is very operator-dependent, and care needs to be taken to apply and remove the tapes reproducibly. The success of the method is equally dependent on the development of sensitive analytical methods to quantify the amount of drug in the tapes.

Microdialysis involves the insertion of an ultrathin hollow fiber as a probe into the dermis. The probe is semipermeable and perfused with sterile buffer using a microdialysis pump. This involves the exchange of the small diffusible molecules from the extracellular fluid into the probe and vice versa. This method is used to determine the concentration of the unbound drug or biomarkers at the site to establish the concentration-versus-time profile of the applied compound. There are several issues associated with microdialysis. Probe insertion in the skin can lead to inflammatory responses, as may interactions of the perfusing buffer with the tissue.[47,48] Recovery is low for highly lipophilic molecules, which may be resolved to some extent by using albumin, cyclodextrins, and cosolvents such as ethanol and dimethyl sulfoxide in the buffer,[49] while highly protein-bound molecules may be difficult to detect, due to binding to the probe material. A major disadvantage of the method is the intrasubject variability.[50] The newer technique of dermal open-flow microperfusion (dOFM) differs from microdialysis, in that it gives continuous, membrane-free (ie, unfiltered) access to dermal fluid.[51] Like microdialysis, dOFM provides a direct estimate of the time course of delivery of the permeant near its site of application. Because of the lack of interaction with a membrane in dOFM, it can be used for a wider range of compounds than microdialysis.[40] The technical difficulty of microdialysis and

dOFM means that significant operator expertise is required, and as such they are generally only available in a research setting.

## Ex vivo animal skin models

The assessment of percutaneous absorption of molecules is an important step in the evaluation of any topical drug-delivery system or formulation. As we have already noted, if the dosage form is to be used in humans, the most relevant skin-absorption data should come from in vivo human studies. However, such studies are generally not feasible during the initial development of a novel pharmaceutical dosage form. Moreover, ex vivo human skin may not be readily available, and so researchers have relied on animal studies for much of the experimental data. This creates a major challenge in correlating results from ex vivo animal experiments with ex vivo and in vivo human studies for prediction of human percutaneous absorption.

A wide range of animal models has been used as alternatives to human skin to evaluate percutaneous permeation of substances. These include pig, mouse, rat, guinea pig, and snake models. Porcine (pig) skin is histologically similar to human skin,[52,53] with a comparable SC thickness of $21-26$ μm.[54,55] In addition, the average hair-follicle density in porcine ear skin is 20/cm$^2$ compared to $14-32$/cm$^2$ in human forehead skin.[54] As well as being similar to human skin, porcine ear skin is also convenient to obtain and has been widely used in skin-permeation studies.[56]

The SC lipids are known to be important regulators of skin permeability. With this in mind, the conformational disordering and lateral packing of lipids in isolated porcine and human SC were compared using Fourier-transform infrared spectroscopy. The SC of both species differ markedly, with porcine SC lipids being arranged predominantly in a hexagonal lattice, while lipids in human SC were predominantly packed in the denser orthorhombic lattice.[57] In human as well as porcine SC, the main lipid classes are ceramide, cholesterol, and free fatty acid, and these lipid classes are present in an approximately equimolar ratio.[58] However, the compositions of free fatty acid and ceramide in the two species are different.

In a range of studies using both lipophilic[59,60] and hydrophilic[59,61] permeants, the permeability of pig skin was found to be similar to that of human skin, but to differ to a greater extent from dog[61] or rodent skin.[59,61] Sato et al attributed the similarity in permeability to the similar SC lipids, barrier thickness, and morphological aspects of pig and human skin.[61] Nicoli et al further investigated the differences

Case 4:21-cv-10312-FKB-RSW   ECF No. 59-4, PageID.2077   Filed 03/28/23   Page 95 of 116

Abd et al                                                                                          Dovepress

between pig skin and rabbit ear skin, finding that although they had similar SC thicknesses, pig skin was four to seven times more permeable to hydrophilic compounds than rabbit ear skin, most likely due to its different SC lipid composition.[62] The relationship between permeability and SC lipids is analogous to early findings by Lampe et al,[63] who showed the total lipid-weight percentage at various human body sites (face > abdomen > leg > plantar SC) was inversely proportional to the relative permeability of skin reported for those sites by Scheuplein and Blank.[64] Caussin et al also reported the similarity in SC lipid composition, as well as in lamellar organization, between pigs and humans.[63,65] Interestingly, however, they also saw a substantial difference in lateral packing between the two species. As with human skin, permeation behavior was found to correlate with barrier function, as measured by transepidermal water loss in a study by Sekkat et al, who applied caffeine, lidocaine, and phenobarbital to tape-stripped pig skin.[66]

Skin of rodents (mice, rat, and guinea pigs) is the most commonly used in in vitro percutaneous permeation studies, due to its availability, their small size, and relatively low cost. There are different hairless strains of each species that are reported to mimic the permeation properties of human skin better than the hairy variety.[67] Among rodents, rat skin is most structurally similar to human skin and it is the most frequently used rodent model. A large number of studies comparing permeation through human and rat skin have been carried out, showing that rat skin is generally more permeable than human skin across a range of permeants of different physicochemical properties,[68–72] in some cases with differences of more than an order of magnitude. For example, for compounds with log-$P$-values ranging from 0.7 to 4.5, van Ravenzwaay and Leibold[72] found that mean in vitro permeation flux through rat skin was around elevenfold greater than through human skin, while a similar comparison by Schmook et al[71] found flux increase of 50-fold for the relatively lipophilic molecules hydrocortisone and terbinafine.

Shed snake skin is another interesting membrane that was suggested as a suitable alternative to human skin.[73] This membrane, which can be obtained without killing the animal, has some similarity to human skin, in that it consists of thin, flat squamate cells surrounded by intercellular phospholipids, although it does lack hair follicles. Rigg and Barry compared permeation of fluorouracil (5-FU) through dermatomed human abdominal skin and shed skin from two snake species.[74] The permeability coefficients were similar between human and dorsal and ventral skin of one snake species, whereas there was a 30-fold increase in dorsal skin from *Elaphe* (*Pantherophis*) *obsoleta*. These authors found no changes in 5-FU permeability in human or snake skin after acetone pretreatment, whereas Megrab et al[75] found differential responses in human and dorsal snake skin with vehicles containing different ethanol concentrations. Apart from possible interspecies differences, it is likely that solvent effects in snake skin are influenced by both the lower water content[75] and the nature of the intercellular lipids. While snake skin may be a reasonable model for human skin, it is not readily available, and doubts must exist over the quality and consistency. As Rigg and Barry noted, "[. . .] if at all possible, investigative problems should not be made more complex by selection of an animal tissue to represent human skin".[74]

It may be useful, particularly in the interpretation of dermal absorption for human risk assessment, to predict human in vivo dermal absorption from known in vitro human, in vivo animal, and in vitro animal data, the so-called triple-pack approach.[76] The animal in question is normally considered to be the rat. Human in vivo dermal absorption may be derived by the equation:

in vivo human absorption = in vivo rat absorption ×
(in vitro human absorption / in vitro rat absorption)     (1)

Here, it is assumed that 1) the factor between in vitro and in vivo dermal absorption is the same for rats and humans and 2) the factor between rat and human skin absorption is the same in vitro and in vivo, despite the morphological species differences.

## Artificial and reconstructed skin models

Artificial and reconstructed skin models are useful tools in specific circumstances, driven by the need to find convenient, reproducible alternatives to in vivo and ex vivo tests with human and animal skin. The artificial skin models range from simple homogeneous polymer materials, such as poly(dimethoxysilane) or silicone membranes through to lipid-based parallel artificial membrane-permeability assay (PAMPA) or phospholipid vesicle-based permeation-assay membranes,[77] with the latter material designed to mimic the SC. By eliminating the complexity of human or animal skin, the simple homogeneous materials are particularly useful for studying the basic mechanisms controlling passive transport though a membrane.[78–80] The main advantage they have in this regard is their relative reproducibility due to their simple standardized construction. However, they are not intended to represent, nor are they capable of, representing the multitude of in vivo skin properties.[81]

**168**   submit your manuscript | www.dovepress.com                                 Clinical Pharmacology: Advances and Applications 2016:8

Dovepress

The PAMPA can be used for rapid screening of passive transport.[82] The PAMPA assay is conducted in a 96-well filter plate coated with a liquid artificial membrane to separate two compartments: one containing a buffer solution of compounds to be tested (donor compartment) and the other containing an initial fresh buffer solution (acceptor compartment). Significant correlations with gastrointestinal absorption in humans were seen with PAMPA using filters impregnated with a solution of phospholipids or hexadecane.[82] To develop a new artificial membrane to be used in PAMPA for prediction of skin permeation, Ottaviani et al investigated the permeability coefficients of a number of compounds through human skin and the PAMPA-skin artificial membrane comprised of dimethylpolysiloxane (silicone) membranes. They reported a good correlation between the two skin models.[83]

The FDA has encouraged the use of porous synthetic membranes for evaluating the performance of topical products, as they act as a support without posing a rate-limiting barrier.[84] Shah et al from the FDA used different microporous membranes, such as pure cellulose acetate, cellulose, and polysulfone, of similar pore sizes and thicknesses to examine the permeation of hydrocortisone from two commercial creams. They found that the hydrocortisone flux was consistent irrespective of the types of synthetic membrane.[85] Nitroglycerin drug release from commercial ointments was investigated by Wu et al[86] using ten types of commercial synthetic membranes, such as polysulfone, cellulose mixed esters, polytetrafluoroethylene, and polypropylene, with different pore size and thickness. From the results obtained in this study, the synthetic membranes may be classified into two groups: group 1, consisting of polysulfone, acrylic polymer, glass fiber, silicone, and mixed cellulose ester, showed higher drug permeation compared to group 2, which included polytetrafluoroethylene–polyethylene, mixed cellulose ester (of greater thickness), and polypropylene. The effect of membrane types upon ketoprofen drug release from a gel has also been studied. It was found that nylon exhibited the least rate-limiting effects, although it is a thicker synthetic membrane compared to others.[87]

Reconstructed skin models are culture-based, with layers of human cells in culture laid down over a polymeric matrix. This allows different cell types to be incorporated to achieve a structure of the desired composition and complexity. Reconstructed models are generally designed to simulate the epidermis (reconstructed human epidermis [RHE] models) or the full human skin (living skin equivalents [LSEs]).[22,77]

Some reconstructed skin models are produced in-house for particular research purposes, such as drug-candidate or toxicological screening[88] or the assessment of photodamage and photoprotection.[89] In one particular reconstructed model, consisting of layers of human dermal fibroblasts and human epidermal HaCaT cells, there was no change in the permeability coefficients of ibuprofen after freezing the membrane over liquid nitrogen for 24 hours or 6 months. Such a property would make reconstructed membranes attractive for general screening uses. In addition, there are commercially available RHEs (eg, EpiSkin®, SkinEthic®, and EpiDerm®) and LSEs (eg, GraftSkin®, EpiDermFT®, and Pheninon®) that have been suggested as suitable candidates for in vivo and ex vivo skin models in evaluating skin absorption, testing of cosmetic products, and for the toxicological screening of topically applied compounds. A number of studies have compared LSE and HRE models with animal and human skin.[71,90,91] Schmook et al studied salicylic acid, hydrocortisone, clotrimazole, and terbinafine permeation through ex vivo human (dermatomed), porcine, and rat skin, GraftSkin LSE, and SkinEthic RHE.[71] The fluxes and skin accumulation were generally in the order human ≤ porcine < rat < GraftSkin << SkinEthic. Comparing human and pig skin with two RHE models, Schreiber et al[91] found permeation coefficients of caffeine and testosterone were both in the order human < pig < EpiDerm << SkinEthic. Schäfer-Korting et al published an extensive comparison of human epidermal membranes, porcine skin, and three RHE models – EpiDerm, EpiSkin, and SkinEthic – with a series of hydrophilic and lipophilic permeants.[90] Their general conclusions were that the RHE models, particularly SkinEthic, were significantly more permeable than the ex vivo skins, although the ranking of the permeation of the compounds through pig skin and the RHEs mirrored that through human epidermis. Interestingly, they did not observe the expected improvement in reproducibility with the RHEs compared to the ex vivo skin.

As of 2013, reconstructed skin models had received Organization for Economic Co-operation and Development approval for testing of skin corrosion, acute skin irritation, and phototoxicity.[22] None is currently approved for testing of skin absorption. Further work is needed to validate the various models, particularly the LSEs, for this purpose, although they may be useful for in vitro screening. Interestingly, Schäfer-Korting et al concluded that the tested RHEs were applicable to both finite- and infinite-dose studies.[90]

## Models for skin diseases
The skin is not only a convenient portal to the systemic circulation but also a logical site of application for treatment

of various localized skin disorders, such as skin cancers, inflammatory illnesses, and damaged skin. As the investigation of disease mechanisms and new therapies is usually difficult or impossible in humans, it is necessary to use alternative methods. Models representing normal or healthy skin are appropriate to test the delivery and targeting of topically applied drugs or other substances, often for the purpose of evaluating the delivery system used. However, models that are designed to mimic the effects of disease states can be used to study the delivery and effects of topical therapies or to gain insight into the molecular mechanisms responsible for particular diseases. In the following sections, we review some of the various animal and artificial models that have been applied to studies of skin diseases. Some recently published studies using animal and reconstructed human skin models for the study of skin diseases, including their use in therapeutic screening, are summarized in Tables 2 and 3.

## Ex vivo animal models for skin diseases

A plethora of in vivo animal models employing fish, guinea pigs, mice, rats, rabbits, and pigs have been developed to mimic human skin diseases. Some recent reviews have focused on the most widely studied areas of melanoma,[92] atopic dermatitis,[93] and psoriasis.[94] Other applications include skin infections (eg, acne, viral infections), damaged skin (eg, wounding, photo-damaged skin), hair disorders (eg, different types of alopecia), and skin cancers, such as basal and squamous cell carcinomas. A significant number of models use genetically engineered mice, due to the fact that many human skin diseases are cause by gene mutations.[95] These animal models have been extensively used for the understanding of disease mechanisms and to a lesser extent for the clinical evaluation of drug candidates. For example, epidermal VEGF-knockout mice were used to identify a specific role for epidermal VEGF in the maintenance of epidermal permeability-barrier homeostasis and pointed to the disruption of VEGF pathways in the development of psoriasis.[96] In very recent work by Rossbach et al,[97] histamine $H_4$ receptor ($H_4R$)-knockout mice showed significant reductions in ovalbumin-induced skin lesions analogous to those caused by atopic dermatitis. Their findings suggested that $H_4R$ could be a new therapeutic target in allergic skin diseases like atopic dermatitis.

In addition to melanoma, mouse models have been used particularly for the other common skin cancers, squamous cell carcinoma,[98–103] and basal cell carcinoma.[104–106] An overview of animal models for a wide range of skin conditions,

with an emphasis on their application to drug discovery, has been published by Avci et al.[107]

Of particular interest are the chimeric models, in which living human skin is grafted on to the skin of severe combined immunodeficient (SCID) mice. In this way, responses or treatments can be studied in living human skin. For example, targeted Kv1.3-cell immunotherapy was shown to be effective in reducing human epidermal thickness and the number of CD3+ lymphocytes in an SCID mouse–human psoriatic skin xenograft model, leading the authors to propose the investigated therapy for treatment of psoriasis and possibly other inflammatory skin conditions.[108] Similar investigative work in psoriasis used the SCID mouse–human psoriatic skin xenograft model to identify a role for Hsp90 in signaling pathways that are upregulated in psoriasis. Mice treated orally with the Hsp90 inhibitor Debio 0932 showed a reduction in xenograft epidermal thickness.

The xenograft model has also been used for investigation of cancer targets and therapies. Targeted oral[109] or intravenous[110] treatments in SCID mouse–human melanoma xenografts caused significant reductions in tumor proliferation and size in BRAF- and ALDH+-specific melanomas.[109,110]

## Reconstructed skin models for diseases

Today, there are increasing regulatory restrictions on the use of animals, and the availability of excised human diseased skin is limited. For these reasons and following the advances in tissue engineering, the development of artificial in vitro human skin models to mimic both healthy and diseased skin has intensified. Another important benefit of using artificial skin models is that they allow the incorporation of specific disease characteristics in a controlled and relatively reproducible manner. In vitro models have been developed for a wide range of skin diseases, such as inflammatory disorders, fungal infections, skin cancer, photodamaged skin, and wounding. A general review has recently been published by Küchler et al.[22] The models are generally developed in-house by researchers, with the goals of understanding disease mechanisms and progression, or less commonly to use as screening tools for the assessment of therapeutic modalities. A major challenge in the use of these models is to assess whether they are relevant to and predictable of the in vivo situation.

Inflammatory and autoimmune diseases for which artificial skin models have been developed include psoriasis,[111,112] atopic dermatitis,[113,114] and eczematous dermatitis.[115] In most cases, the specific pathway leading to expression of the disease state was induced by suitable interventions, such as stimulation by psoriasis-associated cytokines,[112] or in the

**Table 2** In vivo animal disease models

| Disease model | Characteristics | Drug delivered | Reference |
|---|---|---|---|
| Psoriasis mouse model | Epidermal VEGF-knockout mice used to identify specific role for VEGF in permeability-barrier maintenance | | Elias et al[96] |
| Atopic dermatitis mouse model | Histamine $H_4$ ($H_4R$)-knockout mice used to show $H_4R$ modulates inflammation in a chronic allergic dermatitis setting | $H_4R$ antagonists partially mimicked effects of $H_4R$ knockout | Rossbach et al[97] |
| Dermatophytosis guinea-pig model | Tinea corporis induced by application of *Trichophyton mentagrophytes* TIMM1189 inoculum on dorsal skin | Luliconazole | Koga et al[121] |
| Irritant dermatitis hairless guinea-pig model | Induced by daily exposure for 4 days to sodium lauryl sulfate | Basic, carbomer, isopropyl palmitate, glycerol, canola oil, and bisabolol creams | Andersen et al[122] |
| Squamous cell carcinoma mouse model | Dorsal UVB irradiation (minimal erythema dose) of SKH1 hairless mice | Diclofenac (anti-inflammatory COX2 inhibitor) as preventive drug | Burns et al[98] |
| | UV-induced T7 SCC line subcutaneously injected in the back of SKH1 hairless mice | Ingenol mebutate | Cozzi et al[99] |
| | UV radiation of SKH1 hairless mice | 17AAG (heat-shock protein 90 inhibitor) alone or in conjunction with UVR treatments | Singh et al[100] |
| | Human skin SCC cell line SRB12-p9 subcutaneously injected into severe combined immunodeficiency (SCID) mice | Curcumin | Sonavane et al[101] |
| | Two-stage skin-carcinogenesis model in FVB/N mice: 1) topical treatment with carcinogen agent (DMBA), 2) tumor-promoter treatment (TPA), and 3) oral dose with a BRAF inhibitor (PLX4270) | 5-Fluorouracil (5-FU) | Viros et al[102] |
| | Dorsal UVB irradiation (minimal erythema dose) of SKH1 hairless mice | 5-Aminolevulinic acid (5-ALA) in conjunction with photodynamic therapy (PDT) | Wang et al[103] |
| Basal cell carcinoma mouse model | Neonatally irradiated Ptch1$^{+/-}$ mice as a model of Hedgehog (Hh)-signaling pathway-dependent tumors | MK-4101, potent inhibitor of Hh-signaling pathway, had robust antitumor activity | Filocamo et al[104] |
| | BCC mouse model used to identify molecular mechanisms regulated by Sox9, leading to tumour initiation and invasion | | Larsimont et al[105] |
| | Induced in *PTCH*-knockout mice by 1) treatment by tamoxifen administered intraperitoneally and 2) ionizing irradiation | CUR61414 (an inhibitor of the Hh signal-transduction molecule Smoothened) | Tang et al[106] |
| Melanoma mouse model | Tumor spheroid of B16/F0 melanoma cells subcutaneously inoculated in the auricle of NMRINu/Nu or C57/BL6 mice | Bortezomib (inhibitor of the 26S proteasome) | Schröder et al[123] |
| | B16BL6 melanoma cells subcutaneously injected into the notum of C57BL/I mice | Curcumin | Chen et al[124] |
| | B16 melanoma cells subcutaneously injected in the hip of BALB/c nude mice | Mitoxantrone (DNA-synthesis and -transcription inhibitor) | Yu et al[125] |
| Human–SCID mouse xenograft model: psoriasis | SCID mouse–human psoriasis skin model used for targeted topical immunotherapy | Kv1.3 channel blocker PAP-1 | Kundu-Raychaudhuri et al[108] |
| Human–SCID mouse xenograft model: melanoma | Identified an intronic mutation as molecular basis for a RNA splicing-mediated RAF inhibitor-resistance mechanism and a pre-mRNA-splicing interference as a potential therapeutic strategy for drug resistance in BRAF melanoma | Vemurafenib, potent RAF-kinase inhibitor | Salton et al[109] |
| Human–SCID mouse xenograft model: melanoma | Effects of chemical inhibition of ALDH1 on the response of human melanoma xenografts to chemotherapy and the effects of ALDH1A1 RNA silencing on melanoma growth and metastasis; ALDH1 inhibition may be useful in melanoma treatment | ALDH1 inhibitors (eg, diethylaminobenzaldehyde) added to dacarbazine chemotherapy | Yue et al[110] |

**Abbreviations:** UVB, ultraviolet B; SCC, squamous cell carcinoma; DMBA, 7,12-dimethylbenz-(*α*)anthracene; BCC, basal cell carcinoma; mRNA, messenger RNA; BRAF, v-Raf murine sarcoma viral oncogene homolog B; RAF, a serine/threonine protein kinase product of BRAF gene; ALDH, aldehyde dehydrogenase; SCID, severe combined immunodeficient; VEGF, vascular endothelial growth factor.

generation of atopic dermatitis by downregulation of filaggrin[113] or treatment with an inflammatory cocktail.[114] Some of the models were developed as potential screening tools for drugs to treat the expressed disease states.[112,114]

Skin-cancer models were constructed by incorporating various tumor entities within the three-dimensional (3-D) matrix, including cultured melanoma[116] cells, an A375 metastatic melanoma cell line,[117] and melanoma-tumor

**Table 3** Reconstructed skin-disease models

| Disease model | Characteristics | Drug delivered | Reference |
|---|---|---|---|
| Psoriasis | Full-thickness skin model closely resembling in vivo epidermal architecture used to identify IL-17-responsive genes in psoriasis | Ixekizumab (IL-17 antagonist) | Chiricozzi et al[111] |
| | Human psoriatic skin equivalents used to study cytokine-induced gene expression | Retinoic acid, cyclosporine A | Tjabringa et al[112] |
| Atopic dermatitis | 3-D reconstructed human epidermis model used to show filaggrin downregulation in the epidermis of atopic patients, either acquired or innate, may be directly responsible for some of the disease-related alterations | Inflammatory cocktail (polyinosinic–polycytidylic acid, TNFα, IL-4, and IL-13) | Pendaries et al[113] |
| Atopic dermatitis | Compromised reconstructed epidermis mimicking AD-related inflammation in vitro | | Rouaud-Tinguely et al[114] |
| 3-D model of dermatitis | Human foreskin fibroblasts<br>HaCaT cells<br>Memory-effector (CD45RO+) T cells<br>Scaffold material: tail tail collagen type I, fibronectin | Dexamethasone and tacrolimus | Engelhart et al[115] |
| 3-D model of melanoma | 3-D human skin reconstruct model incorporating melanocytic cells | | Li et al[116] |
| 3-D skin-reconstruction model of metastatic melanoma | Human malignant melanoma cells (A375)<br>Normal human-derived epidermal keratinocytes (NHEKs)<br>Normal human-derived dermal fibroblasts (NHDFs)<br>Scaffold material: collagen type I | Roscovitine (cyclin-dependent kinase inhibitor) | Mohapatra et al[117] |
| 3-D organotypic skin-melanoma spheroid model | Human melanoma cell lines SBCL2 (RGP), WM-115 (VGP), and 451-LU (MM)<br>Human primary keratinocytes<br>Human primary fibroblasts<br>Scaffold material: rat tail collagen type I | TRAIL + ultraviolet B radiation<br>TRAIL + cisplatin | Vörsmann et al[118] |
| 3-D model of human cutaneous squamous cell carcinoma | Primary NHEKs<br>Primary NHDFs, SCC12B2 and SCC13 cell lines<br>Scaffold material: rat tail collagen type I<br>Pretreatment with EGF | Erlotinib (tyrosine-kinase inhibitor) | Commandeur et al[119] |
| 3-D model of scleroderma fibrosis | Model useful for testing in the progression of scleroderma and to screen for antifibrotic drugs | Nilotinib, a tyrosine kinase inhibitor; human monoclonal anti-PDGFR antibodies | Luchetti et al[120] |

**Abbreviations:** IL, interleukin; TNFα, tumor necrosis factor alpha; 3-D, three dimensional; NHEKS, Normal human-derived epidermal keratinocytes; TRAIL, tumor necrosis factor-related apoptosis-inducing ligand; SBCL-2 (RGP), an early radial growth phase cell line; WM-115 (VGP), a vertical growth phase cell line; MM, metastatic melanoma; NHDF, normal human-derived dermal fibroblasts.

spheroids,[118] as well as various cutaneous squamous cell carcinoma cell lines.[119] Like the inflammatory models, these were used to study disease progression and targeted therapeutic interventions. Mohapatra et al[117] used the cyclin-dependent kinase inhibitor roscovitine to inhibit growth of the A375 cells within the dermal layer of the 3-D matrix. Using combination therapies, Vörsmann et al[118] showed significant advantages in using their 3-D melanoma model to deliver in vivo-like responses compared to a standard 2-D monolayer culture.

A novel chimeric model consisting of a human artificial 3-D skin construct grafted onto the back of SCID mice has also been reported.[120] The bioengineered skin, containing human keratinocytes and fibroblasts isolated from skin biopsies of healthy donors or scleroderma patients, was generated ex vivo and then grafted onto the back of SCID mice. Results implicated the involvement of a PDGF receptor-mediated pathway in the disease and confirmed the suitability for testing in vivo the disease progression-screening antifibrotic drugs.

## Summary and conclusion

Despite ethical concerns, the use of animals or isolated animal skin models to assess percutaneous absorption of molecules is frequently reported. These models are generally more widely available than human skin, and prove important in basic research to improve our understanding of the processes, pathways, and driving forces of various agents across the skin barrier. However, because of a large number of animal skin models described in the literature, it may be difficult to compare the results obtained across various species, in addition to the variations in experimental methodology used with a specific skin model, such as type of diffusion cells, body site, skin temperature, receiver

media, application dose, and diffusion area. Therefore, it is important to emphasize that in vitro and animal models provide important tools for screening a series of drug formulations, evaluation of skin permeation-enhancing properties and mechanism of action of the carrier systems, and estimation of rank of skin transport for a series of drug molecules. Also, the majority of the work on synthetic membranes for transdermal and topical delivery studies has been focused on the use of polymeric materials, usually silicone based. Such membranes are ideal for replacing ex vivo skin, as they can be prepared with a defined thickness, are easy to handle and store, are comparatively cheap, inert, and provide reproducible results. Despite all of these advantages, they cannot completely replace human or animal skin for prediction of skin absorption in vivo. These membranes generally lack the type of barrier normally provided by the SC in ex vivo or in vivo skin, and this may lead to some false-positive results in toxicity studies and permeation studies. Therefore, we recommend that where possible, human skin should be used in skin-permeation studies.

A wide range of skin models for testing skin absorption for cutaneous and transdermal delivery has been developed. There is an increasing need, largely driven by regulatory authorities and industry, to ensure that the models and testing protocols are standardized and reproducible, and are validated to show that they accurately reflect the in vivo situation.

## Disclosure

The authors report no conflicts of interest in this work.

## References

1. Clowes HM, Scott RC, Heylings JR. Skin absorption: flow-through or static diffusion cells. *Toxicol In Vitro*. 1994;8(4):827–830.
2. Monteiro-Riviere NA. Structure and function of skin. In: Monteiro-Riviere NA, editor. *Toxicology of the Skin*. New York: Informa Healthcare; 2010:1–18.
3. Bensouilah J, Buck P. *Aromadermatology: Aromatherapy in the Treatment and Care of Common Skin Conditions*. London: Radcliffe; 2006.
4. Hadgraft J. Skin, the final frontier. *Int J Pharm* 2001;224(1–2):1–18.
5. Barry BW. *Dermatological Formulations: Percutaneous Absorption*. Vol 18. New York: Marcel Dekker; 1983.
6. Montagna W, Parakkal PF. *The Structure and Function of Skin*. 3rd ed. New York: Academic Press; 2012.
7. Roberts MS, Cross SE, Pellett MA, Walters KA. Skin transport. In: Walters KA, editor. *Dermatological and Transdermal Formulations*. New York: Marcel Dekker; 2002:89–196.
8. Jepps OG, Dancik Y, Anissimov YG, Roberts MS. Modeling the human skin barrier: towards a better understanding of dermal absorption. *Adv Drug Deliv Rev*. 2013;65(2):152–168.
9. Duckney P, Wong HK, Serrano J, Yaradou D, Oddos T, Stamatas GN. The role of the skin barrier in modulating the effects of common skin microbial species on the inflammation, differentiation and proliferation status of epidermal keratinocytes. *BMC Res Notes*. 2013;6:474.
10. Boer M, Duchnik E, Maleszka R, Marchlewicz M. Structural and biophysical characteristics of human skin in maintaining proper epidermal barrier function. *Postepy Dermatol Alergol*. 2016;33(1):1–5.
11. Dancik Y, Anissimov YG, Jepps OG, Roberts MS. Convective transport of highly plasma protein bound drugs facilitates direct penetration into deep tissues after topical application. *Br J Clin Pharmacol*. 2012;73(4):564–578.
12. Oesch F, Fabian E, Guth K, Landsiedel R. Xenobiotic-metabolizing enzymes in the skin of rat, mouse, pig, guinea pig, man, and in human skin models. *Arch Toxicol*. 2014;88(12):2135–2190.
13. Lai J, Maibach HI. Experimental models in predicting topical antifungal efficacy: practical aspects and challenges. *Skin Pharmacol Physiol*. 2009;22(5):231–239.
14. Walters KA, Watkinson AC, Brain KR. In vitro skin permeation evaluation: the only realistic option. *Int J Cosmet Sci*. 1998;20(5):307–316.
15. Franz TJ, Lehman PA, Raney SG. Use of excised human skin to assess the bioequivalence of topical products. *Skin Pharmacol Physiol*. 2009;22(5):276–286.
16. Yang Y, Manda P, Pavurala N, Khan MA, Krishnaiah YS. Development and validation of in vitro-in vivo correlation (IVIVC) for estradiol transdermal drug delivery systems. *J Control Release*. 2015;210:58–66.
17. Rougier A, Lotte C, Maibach HI. In vivo percutaneous penetration of some organic compounds related to anatomic site in humans: predictive assessment by the stripping method. *J Pharm Sci*. 1987;76(6):451–454.
18. Sandby-Møller J, Poulsen T, Wulf HC. Epidermal thickness at different body sites: relationship to age, gender, pigmentation, blood content, skin type and smoking habits. *Acta Derm Venereol*. 2003;83(6):410–413.
19. Marrakchi S, Maibach HI. Biophysical parameters of skin: map of human face, regional, and age-related differences. *Contact Dermatitis*. 2007;57(1):28–34.
20. Shriner DL, Maibach HI. Regional variation of nonimmunologic contact urticaria: functional map of the human face. *Skin Pharmacol*. 1996;9(5):312–321.
21. Lampe MA, Burlingame AL, Whitney J, et al. Human stratum corneum lipids: characterization and regional variations. *J Lipid Res*. 1983;24(2):120–130.
22. Küchler S, Strüver K, Friess W. Reconstructed skin models as emerging tools for drug absorption studies. *Expert Opin Drug Metab Toxicol* 2013;9(10):1255–1263.
23. Barbero AM, Frasch HF. Effect of Frozen human epidermis storage duration and cryoprotectant on barrier function using two model compounds. *Skin Pharmacol Physiol*. 2016;29(1):31–40.
24. Nielsen JB, Plasencia I, Sørensen JA, Bagatolli LA. Storage conditions of skin affect tissue structure and subsequent in vitro percutaneous penetration. *Skin Pharmacol Physiol*. 2011;24(2):93–102.
25. Abdayem R, Roussel L, Zaman N, Pirot F, Gilbert E, Haftek M. Deleterious effects of skin freezing contribute to variable outcomes of the predictive drug permeation studies using hydrophilic molecules. *Exp Dermatol*. 2015;24(12):972–974.
26. Ahlstrom LA, Cross SE, Mills PC. The effects of freezing skin on transdermal drug permeation kinetics. *J Vet Pharmacol Ther*. 2007;30(5):456–463.
27. Messager S, Hann AC, Goddard PA, Dettmar PW, Maillard JY. Assessment of skin viability: is it necessary to use different methodologies? *Skin Res Technol*. 2003;9(4):321–330.
28. Wester RC, Christoffel J, Hartway T, Poblete N, Maibach HI, Forsell J. Human cadaver skin viability for in vitro percutaneous absorption: storage and detrimental effects of heat-separation and freezing. *Pharm Res*. 1998;15(1):82–84.
29. Kligman AM, Christophers E. Preparation of isolated sheets of human stratum corneum. *Arch Dermatol*. 1963;88(6):702–705.

Abd et al

Dovepress

30. Sanchez WY, Prow TW, Sanchez WH, Grice JE, Roberts MS. Analysis of the metabolic deterioration of ex vivo skin from ischemic necrosis through the imaging of intracellular NAD(P)H by multiphoton tomography and fluorescence lifetime imaging microscopy. *J Biomed Opt*. 2010;15(4):046008.

31. Cross SE, Magnusson BM, Winckle G, Anissimov Y, Roberts MS. Determination of the effect of lipophilicity on the in vitro permeability and tissue reservoir characteristics of topically applied solutes in human skin layers. *J Invest Dermatol*. 2003;120(5):759–764.

32. Haigh JM, Smith EW. The selection and use of natural and synthetic membranes for in-vitro diffusion experiments. *Eur J Pharm Sci*. 1994;2(5–6):311–330.

33. Cross SE, Roberts MS. Use of in vitro human skin membranes to model and predict the effect of changing blood flow on the flux and retention of topically applied solutes. *J Pharm Sci*. 2008;97(8):3442–3450.

34. Atrux-Tallau N, Pirot F, Falson F, Roberts MS, Maibach HI. Qualitative and quantitative comparison of heat separated epidermis and dermatomed skin in percutaneous absorption studies. *Arch Dermatol Res*. 2007;299(10):507–511.

35. Magnusson BM, Cross SE, Winckle G, Roberts MS. Percutaneous absorption of steroids: determination of in vitro permeability and tissue reservoir characteristics in human skin layers. *Skin Pharmacol Physiol*. 2006;19(6):336–342.

36. Täuber A, Müller-Goymann CC. In vitro model of infected stratum corneum for the efficacy evaluation of poloxamer 407-based formulations of ciclopirox olamine against *Trichophyton rubrum* as well as differential scanning calorimetry and stability studies. *Int J Pharm*. 2015;494(1):304–311.

37. Anissimov YG, Roberts MS. Diffusion modeling of percutaneous absorption kinetics: 3. Variable diffusion and partition coefficients, consequences for stratum corneum depth profiles and desorption kinetics. *J Pharm Sci*. 2004;93(2):470–487.

38. Anissimov YG, Roberts MS. Diffusion modelling of percutaneous absorption kinetics: 4. Effects of a slow equilibration process within stratum corneum on absorption and desorption kinetics. *J Pharm Sci*. 2009;98(2):772–781.

39. Zhang Q, Li P, Liu D, Roberts MS. Effect of vehicles on the maximum transepidermal flux of similar size phenolic compounds. *Pharm Res*. 2013;30(1):32–40.

40. Raney SG, Franz TJ, Lehman PA, Lionberger R, Chen ML. Pharmacokinetics-based approaches for bioequivalence evaluation of topical dermatological drug products. *Clin Pharmacokinet*. 2015;54(11):1095–1106.

41. Lehman PA, Franz TJ. Assessing topical bioavailability and bioequivalence: a comparison of the in vitro permeation test and the vasoconstrictor assay. *Pharm Res*. 2014;31(12):3529–3537.

42. Hadgraft J, Beutner D, Wolff HM. In vivo-in vitro comparisons in the transdermal delivery of nitroglycerin. *Int J Pharm* 1993;89(1):R1–R4.

43. Skelly JP, Shah VP, Maibach HI, et al. FDA and AAPS report of the workshop on principles and practices of in vitro percutaneous penetration studies: relevance to bioavailability and bioequivalence. *Pharm Res*. 1987;4(3):265–267.

44. Shah V. *Topical Dermatological Drug Product NDAs and ANDAs: In Vivo Bioavailability, Bioequivalence, In Vitro Release and Associated Studies*. Rockville (MD): US Dept of Health and Human Services; 1998:1–19.

45. Alberti I, Kalia YN, Naik A, Bonny JD, Guy RH. In vivo assessment of enhanced topical delivery of terbinafine to human stratum corneum. *J Control Release*. 2001;71(3):319–327.

46. Nicoli S, Bunge AL, Delgado-Charro MB, Guy RH. Dermatopharmacokinetics: factors influencing drug clearance from the stratum corneum. *Pharm Res*. 2009;26(4):865–871.

47. Stenken JA, Church MK, Gill CA, Clough GF. How minimally invasive is microdialysis sampling? A cautionary note for cytokine collection in human skin and other clinical studies. *AAPS J*. 2010;12(1):73–78.

48. Narkar Y. Bioequivalence for topical products: an update. *Pharm Res*. 2010;27(12):2590–2601.

49. Sun L, Stenken JA. Improving microdialysis extraction efficiency of lipophilic eicosanoids. *J Pharm Biomed Anal*. 2003;33(5):1059–1071.

50. Benfeldt E, Hansen SH, Vølund A, Menné T, Shah VP. Bioequivalence of topical formulations in humans: evaluation by dermal microdialysis sampling and the dermatopharmacokinetic method. *J Invest Dermatol*. 2007;127(1):170–178.

51. Bodenlenz M, Aigner B, Dragatin C, et al. Clinical applicability of dOFM devices for dermal sampling. *Skin Res Technol*. 2013;19(4):474–483.

52. Gray G, Yardley H. Lipid compositions of cells isolated from pig, human, and rat epidermis. *J Lipid Res*. 1975;16(6):434–440.

53. Wester RC, Melendres J, Sedik L, Maibach H, Riviere JE. Percutaneous absorption of salicylic acid, theophylline, 2, 4-dimethylamine, diethyl hexyl phthalic acid, and p-aminobenzoic acid in the isolated perfused porcine skin flap compared to man in vivo. *Toxicol Appl Pharmacol*. 1998;151(1):159–165.

54. Jacobi U, Kaiser M, Toll R, et al. Porcine ear skin: an in vitro model for human skin. *Skin Res Technol*. 2007;13(1):19–24.

55. Wester RC, Maibach HI. In vivo methods for percutaneous absorption measurements. *J Toxicol Cutaneous Ocul Toxicol*. 2001;20(4):411–422.

56. Lademann J, Richter H, Meinke M, Sterry W, Patzelt A. Which skin model is the most appropriate for the investigation of topically applied substances into the hair follicles? *Skin Pharmacol Physiol*. 2010;23(1):47–52.

57. Caussin J, Gooris GS, Janssens M, Bouwstra JA. Lipid organization in human and porcine stratum corneum differs widely, while lipid mixtures with porcine ceramides model human stratum corneum lipid organization very closely. *Biochim Biophys Acta*. 2008;1778(6):1472–1482.

58. Wertz P, Downing D, Goldsmith L. *Physiology, Biochemistry, and Molecular Biology of the Skin*. Oxford: Oxford University Press; 1991.

59. Dick IP, Scott RC. Pig ear skin as an in-vitro model for human skin permeability. *J Pharm Pharmacol*. 1992;44(8):640–645.

60. Singh S, Zhao K, Singh J. In vitro permeability and binding of hydrocarbons in pig ear and human abdominal skin. *Drug Chem Toxicol*. 2002;25(1):83–92.

61. Sato K, Sugibayashi K, Morimoto Y. Species differences in percutaneous absorption of nicorandil. *J Pharm Sci*. 1991;80(2):104–107.

62. Nicoli S, Padula C, Aversa V, et al. Characterization of rabbit ear skin as a skin model for in vitro transdermal permeation experiments: histology, lipid composition and permeability. *Skin Pharmacol Physiol*. 2008;21(4):218–226.

63. Lampe MA, Williams ML, Elias PM. Human epidermal lipids: characterization and modulations during differentiation. *J Lipid Res*. 1983;24(2):131–140.

64. Scheuplein RJ, Blank IH. Permeability of the skin. *Physiol Rev*. 1971;51(4):702–747.

65. Caussin J, Gooris GS, Janssens M, Bouwstra JA. Lipid organization in human and porcine stratum corneum differs widely, while lipid mixtures with porcine ceramides model human stratum corneum lipid organization very closely. *Biochim Biophys Acta*. 2008;1778(6):1472–1482.

66. Sekkat N, Kalia YN, Guy RH. Porcine ear skin as a model for the assessment of transdermal drug delivery to premature neonates. *Pharm Res*. 2004;21(8):1390–1397.

67. Simon GA, Maibach HI. Relevance of hairless mouse as an experimental model of percutaneous penetration in man. *Skin Pharmacol Physiol*. 1998;11(2):80–86.

68. Barber E, Teetsel NM, Kolberg KF, Guest D. A comparative study of the rates of in vitro percutaneous absorption of eight chemicals using rat and human skin. *Fundam Appl Toxicol*. 1992;19(4):493–497.

69. Chowhan ZT, Pritchard R. Effect of surfactants on percutaneous absorption of naproxen I: comparisons of rabbit, rat, and human excised skin. *J Pharm Sci*. 1978;67(9):1272–1274.

70. Hughes MF, Edwards BC. In vitro dermal absorption of pyrethroid pesticides in human and rat skin. *Toxicol Appl Pharmacol*. 2010;246(1):29–37.

71. Schmook FP, Meingassner JG, Billich A. Comparison of human skin or epidermis models with human and animal skin in in-vitro percutaneous absorption. *Int J Pharm*. 2001;215(1–2):51–56.

72. van Ravenzwaay B, Leibold E. A comparison between in vitro rat and human and in vivo rat skin absorption studies. *Hum Exp Toxicol*. 2004;23(9):421–430.

73. Roberts JB. Use of squamate epidermis in percutaneous absorption studies: a review. *J Toxicol Cutaneous Ocul Toxicol*. 1986;5(4):319–324.

74. Rigg PC, Barry BW. Shed snake skin and hairless mouse skin as model membranes for human skin during permeation studies. *J Invest Dermatol*. 1990;94(2):235–240.

75. Megrab NA, Williams A, Barry B. Oestradiol permeation through human skin and silastic membrane: effects of propylene glycol and supersaturation. *J Control Release*. 1995;36(3):277–294.

76. Organization for Economic Co-operation and Development. *Guidance Notes on Dermal Absorption*. 2011. Available from: https://www.oecd.org/chemicalsafety/testing/48532204.pdf. Accessed April 25, 2016.

77. Flaten GE, Palac Z, Engesland A, Filipović-Grčić J, Vanić Ž, Škalko-Basnet N. In vitro skin models as a tool in optimization of drug formulation. *Eur J Pharm Sci*. 2015;75:10–24.

78. Zhang J, Sun M, Fan A, Wang Z, Zhao Y. The effect of solute-membrane interaction on solute permeation under supersaturated conditions. *Int J Pharm*. 2013;441(1–2):389–394.

79. Oliveira G, Hadgraft J, Lane ME. The role of vehicle interactions on permeation of an active through model membranes and human skin. *Int J Cosmet Sci*. 2012;34(6):536–545.

80. Ng SF, Rouse JJ, Sanderson FD, Eccleston GM. The relevance of polymeric synthetic membranes in topical formulation assessment and drug diffusion study. *Arch Pharm Res*. 2012;35(4):579–593.

81. Dabrowska AK, Rotaru GM, Derler S, et al. Materials used to simulate physical properties of human skin. *Skin Res Technol*. 2016;22(1):3–14.

82. Kansy M, Senner F, Gubernator K. Physicochemical high throughput screening: parallel artificial membrane permeation assay in the description of passive absorption processes. *J Med Chem*. 1998;41(7):1007–1010.

83. Ottaviani G, Martel S, Carrupt PA. Parallel artificial membrane permeability assay: a new membrane for the fast prediction of passive human skin permeability. *J Med Chem*. 2006;49(13):3948–3954.

84. US Food and Drug Administration. *Guidance for Industry: Nonsterile Semisolid Dosage Forms Scale-Up and Postapproval Changes – Chemistry, Manufacturing, and Controls: In Vitro Release Testing and In Vivo Bioequivalence Documentation*. Rockville (MD): FDA; 1997.

85. Shah VP, Elkins J, Lam SY, Skelly JP. Determination of in vitro drug release from hydrocortisone creams. *Int J Pharm*. 1989;53(1):53–59.

86. Wu ST, Shiu GK, Simmons JE, Bronaugh RL, Skelly JP. In vitro release of nitroglycerin from topical products by use of artificial membranes. *J Pharm Sci*. 1992;81(12):1153–1156.

87. Gallagher SJ, Trottet L, Carter TP, Heard CM. Effects of membrane type and liquid/liquid phase boundary on in vitro release of ketoprofen from gel formulations. *J Drug Target*. 2003;11(6):373–379.

88. van Drongelen V, Danso MO, Mulder A, et al. Barrier properties of an N/TERT-based human skin equivalent. *Tissue Eng Part A*. 2014;20(21–22):3041–3049.

89. Bernerd F, Asselineau D. An organotypic model of skin to study photodamage and photoprotection in vitro. *J Am Acad Dermatol*. 2008;58(5 Suppl 2):S155–S159.

90. Schäfer-Korting M, Bock U, Diembeck W, et al. The use of reconstructed human epidermis for skin absorption testing: results of the validation study. *Altern Lab Anim*. 2008;36(2):161–187.

91. Schreiber S, Mahmoud A, Vuia A, et al. Reconstructed epidermis versus human and animal skin in skin absorption studies. *Toxicol In Vitro*. 2005;19(6):813–822.

92. van der Weyden L, Patton EE, Wood GA, et al. Cross-species models of human melanoma. *J Pathol*. 2016;238(2):152–165.

93. Jin H, He R, Oyoshi M, Geha RS. Animal models of atopic dermatitis. *J Invest Dermatol*. 2009;129(1):31–40.

94. Schön MP. Animal models of psoriasis: a critical appraisal. *Exp Dermatol*. 2008;17(8):703–712.

95. Scharfenberger L, Hennerici T, Király G, Kitzmüller S, Vernooij M, Zielinski JG. Transgenic mouse technology in skin biology: generation of complete or tissue-specific knockout mice. *J Invest Dermatol*. 2014;134(1):1–5.

96. Elias PM, Arbiser J, Brown BE, et al. Epidermal vascular endothelial growth factor production is required for permeability barrier homeostasis, dermal angiogenesis, and the development of epidermal hyperplasia: implications for the pathogenesis of psoriasis. *Am J Pathol*. 2008;173(3):689–699.

97. Rossbach K, Schaper K, Kloth C, et al. Histamine H4 receptor knockout mice display reduced inflammation in a chronic model of atopic dermatitis. *Allergy*. 2016;71(2):189–197.

98. Burns EM, Tober KL, Riggenbach JA, et al. Preventative topical diclofenac treatment differentially decreases tumor burden in male and female Skh-1 mice in a model of UVB-induced cutaneous squamous cell carcinoma. *Carcinogenesis*. 2013;34(2):370–377.

99. Cozzi SJ, Le TT, Ogbourne SM, James C, Suhrbier A. Effective treatment of squamous cell carcinomas with ingenol mebutate gel in immunologically intact SKH1 mice. *Arch Dermatol Res*. 2013;305(1):79–83.

100. Singh A, Singh A, Sand JM, et al. Topically applied Hsp90 inhibitor 17AAG inhibits UVR-induced cutaneous squamous cell carcinomas. *J Invest Dermatol*. 2015;135(4):1098–1107.

101. Sonavane K, Phillips J, Ekshyyan O, et al. Topical curcumin-based cream is equivalent to dietary curcumin in a skin cancer model. *J Skin Cancer* 2012;2012:147863.

102. Viros A, Hayward R, Martin M, et al. Topical 5-fluorouracil elicits regressions of BRAF inhibitor-induced cutaneous squamous cell carcinoma. *J Invest Dermatol*. 2013;133(1):274–276.

103. Wang H, Li J, Lv T, Tu Q, Huang Z, Wang X. Therapeutic and immune effects of 5-aminolevulinic acid photodynamic therapy on UVB-induced squamous cell carcinomas in hairless mice. *Exp Dermatol*. 2013;22(5):362–363.

104. Filocamo G, Brunetti M, Colacci F, et al. MK-4101 – a potent inhibitor of the Hedgehog pathway – is highly active against medulloblastoma and basal cell carcinoma. *Mol Cancer Ther*. 2016;15(6):1177–1189.

105. Larsimont JC, Youssef KK, Sanchez-Danes A, et al. Sox9 controls self-renewal of oncogene targeted cells and links tumor initiation and invasion. *Cell Stem Cell*. 2015;17(1):60–73.

106. Tang T, Tang JY, Li D, et al. Targeting superficial or nodular basal cell carcinoma with topically formulated small molecule inhibitor of Smoothened. *Clin Cancer Res*. 2011;17(10):3378–3387.

107. Avci P, Sadasivam M, Gupta A, et al. Animal models of skin disease for drug discovery. *Expert Opin Drug Discov*. 2013;8(3):331–355.

108. Kundu-Raychaudhuri S, Chen YJ, Wulff H, Raychaudhuri SP. Kv1.3 in psoriatic disease: PAP-1, a small molecule inhibitor of Kv1.3 is effective in the SCID mouse psoriasis – xenograft model. *J Autoimmun*. 2014;55:63–72.

109. Salton M, Kasprzak WK, Voss T, Shapiro BA, Poulikakos PI, Misteli T. Inhibition of vemurafenib-resistant melanoma by interference with pre-mRNA splicing. *Nat Commun*. 2015;6:7103.

110. Yue L, Huang ZM, Fong S, et al. Targeting ALDH1 to decrease tumorigenicity, growth and metastasis of human melanoma. *Melanoma Res*. 2015;25(2):138–148.

111. Chiricozzi A, Nograles KE, Johnson-Huang LM, et al. IL-17 induces an expanded range of downstream genes in reconstituted human epidermis model. *PLoS One*. 2014;9(2):e90284.

112. Tjabringa G, Bergers M, van Rens D, de Boer R, Lamme E, Schalkwijk J. Development and validation of human psoriatic skin equivalents. *Am J Pathol*. 2008;173(3):815–823.

113. Pendaries V, Malaisse J, Pellerin L, et al. Knockdown of filaggrin in a three-dimensional reconstructed human epidermis impairs keratinocyte differentiation. *J Invest Dermatol*. 2014;134(12):2938–2946.

114. Rouaud-Tinguely P, Boudier D, Marchand L, et al. From the mor-
phological to the transcriptomic characterization of a compromised
three-dimensional in vitro model mimicking atopic dermatitis. *Br J
Dermatol*. 2015;173(4):1006–1014.

115. Engelhart K, El Hindi T, Biesalski HK, Pfitzner I. In vitro reproduction
of clinical hallmarks of eczematous dermatitis in organotypic skin
models. *Arch Dermatol Res*. 2005;297(1):1–9.

116. Li L, Fukunaga-Kalabis M, Herlyn M. The three-dimensional human
skin reconstruct model: a tool to study normal skin and melanoma
progression. *J Vis Exp*. 2011;(54):2937.

117. Mohapatra S, Coppola D, Riker AI, Pledger WJ. Roscovitine inhibits
differentiation and invasion in a three-dimensional skin reconstruction
model of metastatic melanoma. *Mol Cancer Res*. 2007;5(2):145–151.

118. Vörsmann H, Groeber F, Walles H, et al. Development of a human
three-dimensional organotypic skin-melanoma spheroid model for in
vitro drug testing. *Cell Death Dis*. 2013;4(7):e719.

119. Commandeur S, Drongelen V, Gruijl FR, El Ghalbzouri A. Epidermal
growth factor receptor activation and inhibition in 3D in vitro models
of normal skin and human cutaneous squamous cell carcinoma. *Cancer
Sci*. 2012;103(12):2120–2126.

120. Luchetti MM, Moroncini G, Escamez MJ, et al. Induction of sclero-
derma fibrosis in skin-humanized mice by anti-platelet-derived growth
factor receptor agonistic autoantibodies. *Arthritis Rheumatol*. Epub
2016 Apr 25.

121. Koga H, Nanjoh Y, Kaneda H, Yamaguchi H, Tsuboi R. Short-term
therapy with luliconazole, a novel topical antifungal imidazole, in
guinea pig models of tinea corporis and tinea pedis. *Antimicrob Agents
Chemother*. 2012;56(6):3138–3143.

122. Andersen F, Hedegaard K, Petersen TK, Bindslev-Jensen C, Fullerton A,
Andersen KE. The hairless guinea-pig as a model for treatment
of cumulative irritation in humans. *Skin Res Technol*. 2006;12(1):
60–67.

123. Schröder H, Komljenovic D, Hecker M, Korff T. Transdermal drug
targeting and functional imaging of tumor blood vessels in the mouse
auricle. *FASEB J*. 2016;30(2):923–932.

124. Chen Y, Wu Q, Zhang Z, Yuan L, Liu X, Zhou L. Preparation of
curcumin-loaded liposomes and evaluation of their skin permeation
and pharmacodynamics. *Molecules*. 2012;17(5):5972–5987.

125. Yu X, Du L, Zhu L, et al. Melanoma therapy with transdermal mito-
xantrone cubic phases. *Drug Deliv*. 2016;23(5):1565–1570.

**Clinical Pharmacology: Advances and Applications**

**Dove**press

## Publish your work in this journal

Clinical Pharmacology and Applications is an international,
peer-reviewed, open access journal publishing original research, reports,
reviews and commentaries on all areas of drug experience in humans.
The manuscript management system is completely online and includes
a very quick and fair peer-review system, which is all easy to use.

Visit http://www.dovepress.com/testimonials.php to read real quotes
from published authors.

Submit your manuscript here: https://www.dovepress.com/clinical-pharmacology-advances-and-applications-journal

# EXHIBIT 3

# BlueWillow Biologics® Launches NanoBio® Protect Nasal Antiseptic Solution

Provides Next-Level Protection to the Nose, A Main Gateway for Infection-Causing Germs

NEWS PROVIDED BY
**BlueWillow Biologics →**
Oct 08, 2020, 08:01 ET

ANN ARBOR, Mich., Oct. 8, 2020 /PRNewswire/ -- BlueWillow Biologics®, a clinical-stage biopharmaceutical company, is pleased to announce the launch of NanoBio® Protect (NanoBio®), the first alcohol-free, moisturizing, long-lasting over-the-counter (OTC) nasal antiseptic proven to kill 99.99% of infection-causing germs on contact.

Experience the interactive Multichannel News Release here: https://www.multivu.com/players/English/8756051-bluewillow-biologics-nanobio-protect-nasal-antiseptic-solution/

Continue Reading
⌄



NanoBio B-Roll



NanoBio Protect Antiseptic Spray



NanoBio Protect Antiseptic Spray          NanoBio Protect Antiseptic Spray

Once applied to the skin in and around the nose, the key entry point for most respiratory infections, NanoBio Protect effectively provides next-level protection for up to 8 hours. NanoBio is easy to apply with a cotton swab, pleasant to use, and the moisturizing, alcohol- and fragrance-free formula is safe for the entire family. Each 0.61fl oz (18mL) bottle provides at least 40 treatments and is currently available for purchase on Amazon.com. NanoBio Protect will also be launching in over 4,400 CVS Pharmacy stores across the U.S. beginning in November 2020.

NanoBio Protect's broad-spectrum effectiveness stems from the company's proprietary nanotechnology. The patented, natural oil nanodroplets optimize the antiseptic's (0.13% Benzalkonium chloride [BZK]) antimicrobial activity and its ability to kill germs on the skin. NanoBio® Protect works because it is scientifically formulated to be the right size and charge to kill infection-causing germs in and around the nose where they are most likely to enter the body. Uniquely, the positively charged nanodroplets remain active on the skin for up to 8 hours, attracting the negatively charged germs and killing them on contact. This phenomenon, fondly referred to by the BlueWillow scientists as the "*Dance of the Nanodroplets*," is why the product incomparably provides safe and long-lasting protection from infection.

To help NanoBio Protect fulfill its mission to help people breathe easier and live healthier lives, BlueWillow has partnered with Good360, the global leader in product philanthropy and purposeful giving, whose mission is to transform lives of those impacted by disasters or other challenging life circumstances, including the COVID-19 pandemic.

Beginning October 8, 2020, for every bottle of NanoBio Protect purchased, one bottle will be donated to Good360. In turn, Good360 will distribute NanoBio Protect to families in need and frontline workers serving economically disadvantaged and high-risk communities.

Dr. Chad Costley, physician and CEO of BlueWillow Biologics stated, "We are thrilled to launch the first-of-its-kind nasal antiseptic, NanoBio Protect, a truly revolutionary product." "It couldn't come at a more crucial time as the need to protect ourselves and our families from infection becomes even more vital," he added.

Studies* show the average person touches their face an average of 23 times per hour, providing a lot of opportunity for germs to get in the nose. Applying NanoBio Protect every day – along with frequent handwashing, wearing face coverings, and practicing distancing – is an *essential* part of a daily regimen to protect, prevent and stop the spread of contagious respiratory infections. NanoBio can play an essential role in staying healthy as we resume normal activities such as going back to school, work, travel, dining, shopping, gyms, social events and more where we are likely to pick up germs.

**About BlueWillow Biologics**
**BlueWillow Biologics** is a clinical-stage, privately-held biopharmaceutical company focused on developing and bringing to market topical antiseptics, anti-infective products, and intranasal vaccines using its proprietary nanotechnology platform.  The innovative, patented oil-in-water nanodroplets are employed in **NanoBio Protect**, the first over-the-counter, alcohol-free nasal antiseptic proven 99.99% effective to kill germs on the skin in and around the nose that cause respiratory infections. Visit www.nextlevelprotection.net for more information.

BlueWillow is also at the forefront of developing intranasal vaccines using its exclusive NanoVax® platform that elicit both systemic and mucosal immunity for several respiratory and sexually transmitted infections, including Sars-CoV-2 (Covid-19), RSV, HSV2, pandemic influenza, and anthrax, as well as intranasal immunotherapy for peanut allergy and other allergic conditions.

*[Source: Kwok et al. Am J Infect Control. 2015 Feb;43(2):112-4. doi: 10.1016/j.ajic.2014.10.015. Face Touching: A Frequent Habit That Has Implications for Hand Hygiene. https://www.ajicjournal.org/article/S0196-6553(14)01281-4/fulltext]*

SOURCE BlueWillow Biologics

Related Links

www.bluewillow.com

EXHIBIT 4

**WARNING LETTER**

# Blue Willow Biologics

**MARCS-CMS 613948 — AUGUST 03, 2021**

**Product:**

Drugs

---

**Recipient:**

Chad Costley, MD/MBA

President and Chief Executive Officer

Blue Willow Biologics

2311 Green Road
Ann Arbor, MI 48105
United States

✉ nanobio@bluewillow.com (mailto:nanobio@bluewillow.com)

**Issuing Office:**

Center for Drug Evaluation and Research

United States

---

**WARNING LETTER**

Date: August 3, 2021

RE: Unapproved New Drug Products Related to Coronavirus Disease 2019 (COVID-19)

This is to advise you that the United States Food and Drug Administration (FDA) had reviewed your websites at the Internet addresses https://nanobioprotect.com and https://bluewillow.com on March 24, 2021. The FDA observed that your websites offered a non-alcohol-based consumer antiseptic nasal product[1] for sale in the United States and that this product was intended to mitigate, prevent, treat, diagnose, or cure COVID-19[2] and other conditions in people. FDA also observed that your product is for sale in the United States on other websites, including at https://www.cvs.com/shop/nanobio-protect-nasal-antiseptic-prodid-160333. Based on our review, this product is an unapproved new drug introduced or delivered for introduction into interstate commerce in violation of section 505(a) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. § 355(a). Furthermore, this product is a misbranded drug under sections 502(a) and (ee) of the FD&C Act, 21 U.S.C. 352(a) and (ee). Introduction or delivery for introduction of such a product into interstate commerce violated sections 301(a) and (d) of the FD&C Act, 21 U.S.C. 331(a) and (d). These violations are described in more detail below.

There is currently a global outbreak of respiratory disease caused by a novel coronavirus that has been named "severe acute respiratory syndrome coronavirus 2" (SARS-CoV-2). The disease caused by the virus has been named "Coronavirus Disease 2019" (COVID-19). On January 31, 2020, the Department of Health and Human Services (HHS) issued a declaration of a public health emergency related to COVID-19 and mobilized the Operating Divisions of HHS.[3] In addition, on March 13, 2020, there was a Presidential declaration of a national emergency in response to COVID-19.[4] Therefore, FDA is taking urgent measures to protect consumers from certain products that, without approval or authorization by FDA, claim to mitigate, prevent, treat, diagnose, or cure COVID-19 in people. As described below, you sold an unapproved and unauthorized product that was intended to mitigate, prevent, treat, diagnose, or cure COVID-19 and other conditions in people.

Some examples of the claims on your product label that establish the intended use of your product (as defined in 21 CFR 201.128) and examples of the claims on your website that established the intended use of your product and misleadingly represented it as safe and/or effective for the treatment or prevention of COVID-19 and other serious infections include, but may not be limited to, the following:

**NanoBioProtect.com and Bluewillow.com websites and NanoBio Protect Nasal Antiseptic label:**

- NanoBio® Protect Over-The-Counter Nasal Antiseptic Kills COVID-19 Virus in Lab Tests." [from your website https://bluewillow.com/%ef%bb%bf%ef%bb%bfnanobio-protect-over-the-counter-nasal-antiseptic-kills-covid-19-virus-in-lab-tests/]

- "Recent studies conducted by Public Health England also demonstrate NanoBio® Protect's ability to kill COVID-19 virus in laboratory test." [from your website https://bluewillow.com/nanobio-protect/]

- "NanoBio Protect . . . Protects for up to 8 hours . . . Kills 99.99% of germs on contact . . . Reduces the risk of respiratory infection ...." [from your website https://nanobioprotect.com/]

- "KILLS GERMS THAT ENTER THE NOSE . . . PROTECTS FOR 8 HOURS . . .NEXT-LEVEL PROTECTION AGAINST INFECTION" [from your product label]

- "Get protection from infection that lasts all day." [from your website https://nanobioprotect.com/]

- "NanoBio Protect offers next-level protection to help keep you and your family healthy. It is the only alcohol-free nasal antiseptic proven to kill 99.99% of infection-causing germs when applied to the skin in and around the nose. . . NanoBio Protect uses patented, natural-oil nanodroplets that deliver the antiseptic directly to the surface of germs, killing them on contact. Uniquely, the nanodroplets remain active on the skin after application for up to 8 hours (in lab testing), providing lasting protection against the germs that cause infection." [from your website https://nanobioprotect.com/frequently-asked-questions/]

- "NanoBio Protect adds BZK antiseptic to the surface of nanodroplets. This technology offers four distinct advantages over conventional BZK antiseptics:

The Nanodroplets optimize the ability of the antiseptic to kill germs. The droplets sit on skin after application, enabling protection for up to 8 hours (in lab testing) . . ." [from your website https://nanobioprotect.com/frequently-asked-questions/]

- "Is NanoBio Protect US FDA regulated? Yes. NanoBio® Protect nasal antiseptic adheres to the OTC monograph system for topical skin antiseptics. In testing by independent FDA registered laboratories, NanoBio® Protect was shown to kill 99.99% of a broad spectrum of pathogenic organisms. To learn

more, visit https://bluewillow.com/nanobio-protect/." [from your website
https://nanobioprotect.com/frequently-asked-questions/]

We note that, as of the date of this letter, some of the claims cited above appear to have been removed. Due to the serious public health concerns related to the marketing and sale of unapproved drugs for the mitigation, prevention, treatment, diagnosis, or cure of COVID-19, it is essential that these violations do not recur.

Based on the above claims, your topical antiseptic product is a drug as defined by section 201(g)(1)(B) of the FD&C Act, 21 U.S.C. § 321(g)(1)(B), because it is intended for the diagnosis, cure, mitigation, treatment, or prevention of disease, and/or under section 201(g)(1)(C) of the FD&C Act, 21 U.S.C. § 321(g)(1)(C), because it is intended to affect the structure or any function of the body. Specifically, your product is intended for use as a consumer topical antiseptic.

This consumer topical antiseptic is a "new drug" within the meaning of section 201(p) of the FD&C Act, 21 U.S.C. 321(p), because it is not generally recognized as safe and effective (GRASE) for use under the conditions prescribed, recommended, or suggested in its labeling. New drugs may not be introduced or delivered for introduction into interstate commerce without prior approval from FDA, as described in section 505(a) of the FD&C Act, 21 U.S.C. 355(a), unless they are lawfully marketed under section 505G of the FD&C Act (which is not the case for this product, as further described below) or under other exceptions not applicable here. No FDA-approved application pursuant to section 505 of the FD&C Act, 21 U.S.C. 355, is in effect for this drug product, nor are we aware of any adequate and well-controlled clinical studies in the published literature that support a determination that your NanoBio Protect Nasal Antiseptic Solution product is GRASE for use under the conditions suggested, recommended, or prescribed in its labeling. Accordingly, this product is an unapproved new drug marketed in violation of sections 505(a) and 301(d) of the FD&C Act, 21 U.S.C 355(a) and 331(d).

We note that over-the-counter (OTC) topical antiseptic products had been the subject of rulemaking under the Agency's OTC Drug Review. In particular, such products were addressed in a tentative final monograph (TFM) entitled "Topical Antimicrobial Drug Products for Over-the-Counter Human Use; Tentative Final Monograph for Health-Care Antiseptic Drug Products," Proposed Rule, 59 FR 31402 (June 17, 1994) (1994 TFM), as further amended by "Safety and Effectiveness of Consumer Antiseptics; Topical Antimicrobial Drug Products for Over-the-Counter Human Use; Proposed Amendment of the Tentative Final Monograph; Reopening of Administrative Record," Proposed Rule, 81 FR 42912 (June 30, 2016)(Consumer Antiseptic Rubs Proposed Rule). Over the course of these rulemakings, three active ingredients (benzalkonium chloride, ethyl alcohol (ethanol), and isopropyl alcohol) were classified as Category III for use in consumer antiseptic rub products, meaning that additional safety and effectiveness data are needed to support a determination that a drug product containing one of these active ingredients would be GRASE for use as a consumer antiseptic rub.

Section 505G of the FD&C Act addresses nonprescription drugs marketed without an approved application. Under section 505G(a)(3) of the FD&C Act, drugs that were classified as Category III for safety or effectiveness in a TFM that is the most recently applicable proposal or determination for such drug issued under 21 CFR Part 330 – and that were not classified as Category II for safety or effectiveness – are not required to have an approved application under section 505 in order to be marketed, as long as they are in conformity with the relevant conditions of use outlined in the applicable TFM, including the active ingredient, and comply with all other applicable requirements.

However, your consumer topical antiseptic product does not conform to the 1994 TFM, as further amended by the 2016 Consumer Antiseptic Rubs Proposed Rule, nor any other TFM, proposed rule, or final rule, and does not meet the conditions under section 505G(a)(3) of the FD&C Act for marketing without an approved application under section 505.

Specifically, your labeling claims suggesting and depicting that your topical antiseptic product is effective in preventing infection or disease go beyond merely describing the general intended use of consumer antiseptics as set forth in the 1994 TFM.5 Your claims on the product label, suggesting your consumer antiseptic provides all day efficacy against infection, and your claims on your websites, which suggested all day protection against serious-disease related pathogens including the novel coronavirus that causes COVID-19, do not conform to the 1994 TFM or any of the amendments to the TFM discussed above. Time-specific extended efficacy claims, especially when related to serious-disease related pathogens, endanger the public health by creating a false sense of security for the general public that may result in infrequent hand washing or the substitution of these products for protective gloves and clothing, which are the principal methods for protecting against the spread of diseases caused by pathogenic microorganisms. As a result, this product may have given users the false impression that they need not rigorously adhere to interventions such as social distancing and exercising good hygienic practices that have been demonstrated to curb the spread of COVID-19. Users who did not follow these interventions were at increased risk for contracting COVID-19 and for spreading disease if they had been exposed to the virus, thereby prolonging the pandemic, and increasing its associated morbidity and mortality. In addition, according to the product labeling, NanoBio Protect Nasal Antiseptic Solution is intended to be applied inside and around the nostrils. Consumer antiseptic products intended for administration inside and around the nostrils are not permitted under the 1994 TFM, as further amended by the 2016 Consumer Antiseptic Rubs Proposed Rule[6].

We are unaware of any adequate and well-controlled clinical studies in the published literature that support a determination that your consumer topical antiseptic product is GRASE for the above-described intended uses, including the time-specific extended efficacy claims. Accordingly, your consumer topical antiseptic product is a new drug under section 201(p) of the FD&C Act. In addition, there are no FDA-approved applications in effect for your consumer topical antiseptic product and, accordingly, it is an unapproved new drug sold in violation of sections 505(a) and 301(d) of the FD&C Act, 21 U.S.C §§ 355(a) and 331(d). We note that your consumer topical antiseptic product also does not conform to any temporary policy FDA has implemented for alcohol-based hand sanitizer products during the public health emergency.[7]

This consumer topical antiseptic product was also misbranded under section 502(a) of the FD&C Act, 21 U.S.C 352(a), because the labeling was false or misleading. Specifically, labeling for this product claimed that the product "adheres to the OTC monograph system for topical skin antiseptics." As noted above, this product does not meet the conditions under section 505G(a)(3) of the FD&C Act for marketing without an approved application under section 505.

This consumer topical antiseptic products is also misbranded under section 502(ee) of the FD&C Act, 21 U.S.C. 352(ee), because it is a nonprescription drug subject to section 505G of the FD&C Act, 21 U.S.C. 355h, but does not comply with the requirements for marketing under that section and is not the subject of an application approved under section 505 of the FD&C Act, 21 U.S.C. 355.

The introduction or delivery for introduction of a misbranded drug into interstate commerce is prohibited under section 301(a) of the FD&C Act, 21 U.S.C. 331(a).

You should take immediate action to address the violations cited in this letter. This letter is not meant to be an all-inclusive list of violations that exist in connection with your products or operations. It is your responsibility to ensure that the products you sell are in compliance with the FD&C Act and FDA's implementing regulations. We advise you to review your websites, product labels, and other labeling and promotional materials to ensure that you are not misleadingly representing your products as safe and effective for a COVID-19-related use for which they have not been approved by FDA and that you do not make claims that misbrand the products in violation of the FD&C Act. **Within 48 hours, please send an email to COVID-19-Task-Force-CDER@fda.hhs.gov** describing the specific steps you have taken to prevent the recurrence of future violations. Failure to adequately correct any violations may result in legal action, including, without limitation, seizure, and injunction.

FDA is advising consumers not to purchase or use certain products that have not been approved, cleared, or authorized by FDA and that are being misleadingly represented as safe and/or effective for the treatment or prevention of COVID-19. Your firm will be added to a published list on FDA's website of firms and websites that have received warning letters from FDA concerning the sale or distribution of COVID-19 related products in violation of the FD&C Act, with a notation that, as of the date of this letter, your firm's listed products are no longer sold for the prevention, treatment, mitigation, diagnosis or cure of COVID-19. This list can be found at http://www.fda.gov/consumers/health-fraud-scams/fraudulent-coronavirus-disease-covid-19-products (http://www.fda.gov/consumers/health-fraud-scams/fraudulent-coronavirus-disease-covid-19-products).Corrective actions taken to address the sale of your unapproved and unauthorized product for the mitigation, prevention, treatment, diagnosis, or cure of COVID-19, and any appropriate corrective actions have to be confirmed by the FDA, for the published list to be updated to indicate that your firm has taken such corrective actions.

This letter notifies you of our concerns and provides you with an opportunity to address them. If you cannot complete corrective action within 48 hours, state the reason for the delay and the time within which you will complete the corrections. If you believe that your products are not in violation of the FD&C Act, include your reasoning and any supporting information for our consideration.

If you are not located in the United States, please note that products that appear to be misbranded or unapproved new drugs are subject to detention and refusal of admission if they are offered for importation into the United States. We may advise the appropriate regulatory officials in the country from which you operate that FDA considers your product(s) referenced above to be unapproved and misbranded products that cannot be legally sold to consumers in the United States.

Please direct any inquiries to FDA at COVID-19-Task-Force-CDER@fda.hhs.gov.

Sincerely,
/S/
Donald D. Ashley
Director
Office of Compliance
Center for Drug Evaluation and Research
Food and Drug Administration

---

**1** Your non-alcohol-based consumer antiseptic nasal product is NanoBio Protect Nasal Antiseptic Solution.

**2** As explained in the next paragraph, there is currently an outbreak of a respiratory disease named "Coronavirus Disease 2019" (COVID-19).

**3** Secretary of Health and Human Services, Determination that a Public Health Emergency Exists. (originally issued on Jan. 31, 2020 and subsequently renewed) available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx).

**4** Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak. (Mar. 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/)).

**5** The 1994 TFM covers health care antiseptics that are indicated for use to help reduce bacteria that potentially can cause disease and health care and consumer antiseptics that are indicated for use to decrease bacteria on the skin. 59 FR at 31443.

**6** The 2016 Consumer Antiseptic Rubs Proposed Rule covered consumer antiseptic products intended for use of without water. Under the 1994 TFM, as amended by the 2016 Consumer Antiseptic Rubs Proposed Rule, only consumer topical antiseptic products intended for use on the hands without water are permitted. Products intended for other areas of the body such as the nose are not permitted.

**7** See, e.g., *Temporary Policy for Preparation of Certain Alcohol-Based Hand Sanitizer Products During the Public Health Emergency (COVID-19)*. Because your consumer topical antiseptic product is not consistent with the formulations described in these guidances, it does not fall within any temporary Agency policy not to take action against firms manufacturing hand sanitizer products for violations of section 505 of the FD&C Act.

⬅ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| TRUTEK CORP.,<br>Plaintiff,<br><br>v.<br><br>BlueWillow Biologics, Inc.<br>ROBIN ROE 1 through 10, gender<br>neutral fictitious names, and ABC<br>CORPORATION 1 through 10<br>(fictitious names).<br><br>Defendants. | **CIVIL ACTION No. 2:21-cv-10312-SJM-RSW** |

<u>CERTIFICATE OF SERVICE</u>

Undersigned hereby states that on September 29, 2022, the attorneys for Plaintiff caused the foregoing document to be served upon all counsel of record, via electronic service.

Stanley H. Kremen
Attorney at Law
4 Lenape Lane
East Brunswick, NJ 08816
Telephone: (732) 593-7294
shk@shk-dplc.com
Attorney for the Plaintiff

Keith Altman
The Law Office of Keith Altman
38228 West 12 Mile Road, Suite 375
Farmington Hills, Michigan 48334
Telephone: (248) 987-8929
keithaltman@kaltmanlaw.com
Attorney for the Plaintiff