Page 1

1                              Pages:   1-153

2                              Exhibits: 1-11

3              UNITED STATES DISTRICT COURT

4              EASTERN DISTRICT OF MICHIGAN

5                   SOUTHERN DIVISION

6                   C.A. NO.: 2:21-cv-10312-SJM-RSW

7    ****************************************

8    TRUTEK CORP.,

9              Plaintiff,

10   vs.

11   BLUEWILLOW BIOLOGICS, INC. ROBIN ROE

12   1 THROUGH 10, GENDER NEUTRAL FICTITIOUS NAMES,

13   AND ABC CORPORATION 1 THROUGH 10

14   (FICTITIOUS NAMES).

15             Defendants.

16   ****************************************

17             DEPOSITION of DR. MANSOOR AMIJI, a

18   witness called on behalf of the Plaintiff, taken

19   pursuant to Michigan Court Rules Chapter 2, Section

20   306, before Susan Baxter, a Court Reporter and Notary

21   Public, in and for the Commonwealth of Massachusetts,

22   at Veritext Legal Solutions, 101 Arch Street, Boston,

23   Massachusetts, on Friday, October 14, 2022, commencing

24   at 8:36 a.m.

1                 A P P E A R A N C E S

2           STANLEY H. KREMEN, ESQUIRE

3           Attorney at Law

4           4 Lenape Lane

5           East Brunswick, NJ   08816

6           (732) 593-7294

7           shk@shk-dplc.com

8                   Counsel for the Plaintiff

9

10          KEITH ALTMAN, ESQUIRE

11          The Law Office of Keith Altman

12          38228 West 12 Mile Road, Suite 375

13          Farmington Hills, MI   48334

14          (248) 987-8929

15          keithaltman@kaltmanlaw.com

16                  Counsel for the Plaintiff

17

18          LIANE PETERSON, ESQUIRE

19          Foley & Lardner, LLP

20          3000 K Street NW, Suite 600

21          Washington DC   20007

22          (202) 945-6116

23          lpeterson@foley.com

24                  Counsel for the Defendant

Page 3

1                         I N D E X

2    WITNESS            DIRECT  CROSS  REDIRECT  RECROSS

3    MANSOOR AMIJI

4    (By Mr. Kremen)      4

5

6                       E X H I B I T S

7    NO.             DESCRIPTION                    PAGE

8    Exhibit 1      Notice of Deposition           4

9    Exhibit 2      US Patent 802                  13

10   Exhibit 3      Curriculum Vitae               13

11   Exhibit 4      Expert Report on Invalidity    14

12   Exhibit 5      Reply to Expert Report on      15

13                    Invalidity

14   Exhibit 6      Responsive Expert Report       16

15                    On Non-infringement

16   Exhibit 7      Declaration in Support of      17

17                    BlueWillow's Claim Construction

18                    Brief

19   Exhibit 8      US Patent 35USC101             33

20   Exhibit 9      US Patent 35USC112             48

21   Exhibit 10     NanoBio Droplet Document       72

22   Exhibit 11     Action Summary                 124

23

24         (Exhibits retained by Court Reporter)

Page 4

1                    P R O C E E D I N G S

2

3                    MANSOOR AMIJI, after being

4          satisfactorily identified and duly sworn by the

5          Notary Public, was examined and testified as

6          follows:

7

8                    DIRECT EXAMINATION

9          BY MR. KREMEN:

10    Q    Good morning, Dr. Amiji.  My name is Stanley

11         Kremen and I represent the Plaintiff, Trutek

12         Corporation in this action.  I understand that

13         you've been deposed previously; is that correct?

14    A    Yes.

15    Q    Could you please state your name for the record?

16    A    Mansoor Amiji.  Mansoor is spelled M-a-n-s-o-o-r.

17         Amiji is A-m-I-j-I.

18                    MR. KREMEN:  Can I have the notice of

19         deposition?

20

21                    (Whereupon, Notice of Deposition, was

22                    marked as Exhibit No. 1.)

23

24    Q    Have you seen it before?

Page 5

```
 1    A    No, I haven't.

 2    Q    You're here today to comply with that notice; am

 3         I correct?

 4    A    Yes, I am.

 5    Q    You understand that this is a deposition and that

 6         you're being deposed today, correct?

 7    A    Yes.

 8    Q    And before I get started on the substance of

 9         today's deposition, I'd like to go over a few

10         ground rules.  You probably know most of them

11         because you've been deposed previously, so I'll

12         go with them anyway, okay.

13                    First, the court reporter just swore

14         you in.  Do you understand that you're under

15         oath?

16    A    Yes, I do.

17    Q    Do you understand that you must tell the truth

18         and that if you do not, you are subject to

19         penalties of perjury?

20    A    Yes.

21    Q    And you understand that the testimony that you

22         give today is the same as if you were testifying

23         in court?

24    A    Yes, I do.
```

Page 6

1    Q    Do you understand that you are obligated to

2         answer my questions completely, truthfully, and

3         accurately, correct?

4    A    Yes.

5    Q    Because the court reporter is recording our

6         conversation is absolutely essential that your

7         answers be verbal.  A transcript of the

8         deposition will be generated.  When a yes or no

9         answer is required, please do not nod or shake

10        your head, and responses like Uh-huh or Mm-hmm do

11        not register as an answer. So a verbal answer is

12        required. Okay?

13   A    Yes.

14   Q    And we should not speak over each other. Let me

15        finish asking my question before you answer. I

16        will also let you finish answering without

17        interruption. Do you understand?

18   A    Yes.

19   Q    Okay.  If for any reason you need a break, please

20        let me know.  If I'm in the middle of a line of

21        questioning when you tell me that, that you need

22        a break, I will finish the line of questioning

23        and then you can go on break; is that understood?

24   A    Yes.

Page 7

```
 1   Q    And please understand that if you go to lunch or
 2        go on break, you may not discuss the case or your
 3        testimony with anyone including your attorney; is
 4        that clear?
 5   A    Yes.
 6   Q    Are you taking any medications that could
 7        interfere with your ability to concentrate on the
 8        questions and answers and to answer my questions
 9        as required?
10   A    I'm not.
11   Q    Is there any reason medical or otherwise that you
12        believe that you might not be able to answer
13        completely, truthfully and accurately?
14   A    No, there isn't.
15   Q    If for some reason that changes during the course
16        of the day, please let me know. Okay?
17   A    Yes.
18   Q    Now, your attorney may object from time to time
19        and unless she instructs you not to answer, you
20        understand that you are obligated to answer my
21        questions to the best of your ability?
22   A    Yes.
23              MR. ALTMAN:  Stan, before you continue,
24        before we had a brief discussion that we have
```

```
1        agreed that all objections are preserved other
2        than objections to form.
3                   MR. KREMEN:   Okay.
4   Q    If you don't understand one of my questions, or
5        if the question is confusing, please say so and
6        ask me for clarification; is that okay?
7   A    Yes.
8   Q    So it's fair to assume that if you answer a
9        question that you understand it?
10  A    Yes.
11  Q    As an expert, you understand that I may ask you
12       questions concerning your opinions and that some
13       of those questions may challenge your opinion; do
14       you understand that?
15  A    Yes.
16  Q    Your Notice of Deposition required you to produce
17       certain documents within seven days prior to this
18       deposition.  If you would look at that.  I know
19       that you've provided me with, I think on Monday,
20       you provided me with a whole bunch of expert
21       declarations and reports.  So I'm noting that you
22       did that.
23                   MS. PETERSON:   Yes.  We produced copies
24       of publicly available prior declarations from
```

Page 9

1        Dr. Amiji and we objected to the remaining

2        category of requests and Dr. Amiji doesn't have

3        any other documents to produce today.

4                        MR. ALTMAN:  We talked about that he'd

5        be coming with invoices.

6                        MR. KREMEN:  Right.

7                        MS. PETERSON:  No, we did not.  We said

8        that he would be prepared to talk about how much

9        time he has spent on the matter, and he is, so

10       you can ask him those questions.

11                       MR. ALTMAN:  We said that we wanted the

12       invoices.

13                       MS. PETERSON:  And I said that we were

14       not going to be producing copies of the invoices.

15       You can ask him questions about how much time he

16       spent.  And you said as long as he's prepared

17       with an answer, that's fine.  And he is prepared

18       with an answer.

19                       MR. ALTMAN:  By the way, what is your

20       objection to producing copies of the invoices?

21                       MS. PETERSON:  I don't think it's

22       called for under the rules.  And we've already --

23       we've already covered all of this and I thought

24       we had an agreement.  You can ask him the

```
                                              Page 10

 1          question and that information, he'll provide it.

 2    Q     Now, when were you hired as an expert by

 3          BlueWillow?

 4    A     Sometime in March this year.

 5    Q     Now, were you paid a flat fee?

 6    A     I'm paid by the hour.

 7    Q     Now, what is your hourly rate that you charge

 8          BlueWillow for your work?

 9    A     Nine hundred.

10    Q     Did you send BlueWillow an invoice or invoices

11          for the work that you did?

12    A     Yes, I have.

13    Q     How much did you bill them to date?

14    A     I believe for the work that I have done, all the

15          expert reports, it's about 50 hours.

16    Q     And what is the dollar amount?

17    A     Nine hundred times 50.

18    Q     Okay.  Did they pay you the full amount of your

19          invoice or invoices?

20    A     I believe they've been paid, except for maybe the

21          last month's invoice.

22    Q     You didn't bring a copy of the invoices with you;

23          is that correct?

24    A     Yes.
```

```
                                                  Page 11
 1   Q    I'd like to request a copy of the invoice that
 2          you sent to BlueWillow for your work to date.
 3                        Now, did you bill BlueWillow for all
 4          the work that you've done for them to date?
 5   A    Except for the work that I've done this month, I
 6          have not billed yet.
 7   Q    Okay.  I'd also like to request a copy of future
 8          invoices that will be submitted to BlueWillow for
 9          all work performed by you to date.
10                        MS. PETERSON:  We'll take that under
11          advisement subject to our objections.
12                        MR. KREMEN:   Okay.
13   Q    Now, what did you do to prepare for this
14          deposition today?
15   A    I read my expert reports.  I read the expert
16          report from the plaintiff side.  I read the
17          patent in suit.  Some of the prior art document
18          -- yes, mostly reading different types of
19          reports.
20   Q    Did you meet with any of BlueWillow's attorneys
21          to prepare for this deposition either in person
22          or otherwise?
23                        MS. PETERSON:  Answer that yes or no.
24   A    Yes.
```

Page 12

1    Q    Which attorneys?

2    A    Miss Peterson.

3    Q    How many times?

4    A    We met yesterday and on Wednesday.

5    Q    For how long?

6    A    About two hours each.

7    Q    Was anyone else present along with Liane Peterson

8         either in person or otherwise?

9    A    No.

10   Q    Did you speak with anyone from BlueWillow in

11        preparation for your deposition?

12   A    No.

13   Q    Did your attorney or anybody else show you any

14        documents in preparation that you did not already

15        have?

16   A    No.  I think we just went over the reports and

17        the exhibits.

18   Q    Other than your attorney, did you speak with

19        anyone from BlueWillow in preparation for your

20        deposition?

21   A    No.

22   Q    Have you ever had any conversations directly with

23        somebody from BlueWillow?

24   A    No.

Page 13

1  Q   So you never spoke with anybody from BlueWillow?

2  A   No.

3  Q   Have you spoken with any attorneys other than

4      Ms. Peterson regarding this case?

5  A   No, I have not.

6            MR. KREMEN:  Can I have the 802 patent.

7      That will be marked as Exhibit 2.

8

9            (Whereupon, United States Patent 802,

10           was marked as Exhibit No. 2.)

11

12  Q   You do understand that this litigation is about

13      infringement of this patent by your client,

14      correct?

15            MS. PETERSON:  Objection to form.

16  A   Yes, I understand this is the patent in suit.

17  Q   And this is the document that's marked as

18      plaintiff Exhibit 2.

19            MR. KREMEN:  What about his curriculum

20      vitae.

21

22            (Whereupon, Curriculum Vitae, was

23           marked as Exhibit No. 3.)

24

```
                                                    Page 14
 1    Q    This document is your curriculum vitae or resume.
 2          Would you just confirm that that is yours?
 3    A    Yes, it is.
 4    Q    And you wrote that all yourself, everything in
 5          there is something you wrote specifically, right?
 6    A    Yes.
 7                    MR. ALTMAN:  Just as a practical
 8          matter, given that we're using universal
 9          numbering, while we may bring an extra copy for
10          the witness, we're not going to bring copies of
11          exhibits that have already been marked in a
12          previous deposition for counsel.  Just to cut
13          down on the paper.
14                    MS. PETERSON:  Okay.
15                    MR. KREMEN:  Now, I need the reports.
16                    MR. ALTMAN:  We'll do one at a time.
17          Which one do you want first?
18                    MR. KREMEN:  I guess the initial
19          invalidity report.
20
21                    (Whereupon, Invalidity Report, was
22                     marked as Exhibit No. 4.)
23
24    Q    This is a report that you submitted that we have
```

```
                                                    Page 15
 1            from you.  Is this your report?
 2    A    Yes.  This is the opening invalidity report,
 3            Exhibit 4.
 4    Q    And it contains your opinions that you formed on
 5            that subject; is that correct?
 6    A    Yes, it is.
 7                     MR. KREMEN:  I need the second one.
 8
 9                     (Whereupon, Reply Expert Invalidity
10                     Report, was marked as Exhibit No. 5.)
11
12    Q    This one is labeled -- now, the first one was
13            actually labeled Opening Expert Report -- Number
14            4 was Opening Expert Report of Mansoor M. Amiji,
15            Ph.D. on Invalidity.  And this particular
16            document, the second document, will be Reply
17            Expert Report of Mansoor M. Amiji on Invalidity.
18                     Is this your report?
19    A    Yes, it is.
20    Q    Now, I noticed that both of them are reports of
21            invalidity.  What is the difference between those
22            reports?
23    A    So this is the opening report.  Exhibit 4 is
24            opening report that I provided on the invalidity
```

Page 16

1          of the patent claims, patent in suit, data.  And

2          the reply report is based on the opinions that

3          are provided by the two experts and I was

4          rebutting those opinions.

5   Q    Okay.  Now, the next one will be, I guess, 6.

6

7                       (Whereupon, Responsive Expert Report on

8                       Non-Infringement, was marked as Exhibit

9                       No. 6.)

10

11  Q    Now, I have another one called Responsive Expert

12         Report of Mansoor M. Amiji, Ph.D on Non-

13         Infringement.  That's marked as Exhibit 6.  This

14         is your report also, right?

15  A    Yes, it is.

16  Q    What is the substance of it?

17  A    So, this is a report based on opinions related to

18         non-infringement of the BlueWillow NanoBio

19         Protect product based on the comments and

20         opinions of Dr. Lemmo, the Trutek expert.

21  Q    Now, going back to Exhibit Number 5, which is the

22         Reply Export Report.  What are you replying to in

23         that report?

24  A    I'm replying to the opinions of the Trutek expert

Page 17

1        --

2    Q    Which one -- which are whom?

3    A    Dr. Lemmo and Mr. Haidri.

4    Q    And the Responsive Expert Report on Non-

5         Infringement, you're replying to whom?

6    A    To Dr. Lemmo.

7    Q    Dr. Lemmo, okay.

8                    MR. KREMEN:  Next one we'll mark as

9         seven.

10

11                   (Whereupon, Declaration in Support of

12                   BlueWillow's Claim Construction Brief,

13                   was marked as Exhibit No. 7.)

14

15   Q    This is the Declaration of Mansoor M. Amiji,

16        Ph.D. in Support of BlueWillow's Claim

17        Construction Brief.  That's your report, right?

18   A    Yes, it is.

19   Q    And the the purpose of it is to do what?

20   A    To support BlueWillow's claim construction brief.

21   Q    All right.  Now, you haven't submitted any other

22        writings that contain your opinions in this case;

23        am I correct?

24   A    That's correct.  These are the reports.

Page 18

1    Q    This is the whole domain?

2    A    These are the reports and declaration.

3    Q    Let me just put these in order here.  Now, these

4         reports contain all of your opinions to date in

5         this case; am I correct?

6    A    They do contain all the opinions to date, but if

7         there's anything new that comes from the

8         plaintiff side then I will be rebutting.

9    Q    Okay.  But as of today, these are your opinions,

10        right?

11   A    As of today, these are my opinions.

12   Q    Are you continuing to do work developing new

13        opinions?

14   A    As I said, if there is anything that comes from

15        the plaintiff side, if I'm asked to opine on it,

16        I'll be looking at that evidence.

17   Q    But as of today, you're not going to be

18        supplementing your opinions, am I correct, unless

19        some new evidence comes up; am I correct?

20   A    That's correct.

21   Q    Did you -- you're not an attorney; am I correct?

22   A    No, I'm not.

23   Q    Did you ever attend law school?

24   A    No, I have not.

Page 19

```
 1   Q    Did you ever sit for a bar examination in any
 2         state?
 3   A    No, I have not.
 4   Q    Are you a Patent Agent licensed to practice in
 5         patent matters by the United States Patent and
 6         Trademark Office?
 7   A    No, I'm not.
 8   Q    Have you ever heard the term MPEP?
 9   A    No, I have not.
10   Q    It stands for the Manual Patent Examining
11         Procedure.  Have you ever read it?
12   A    I am familiar with the patent prosecution
13         process, but I've not read the manual.
14   Q    You've not read the MPEP?
15   A    No, I have not.
16   Q    Let's see.  Exhibit Number 6, which is your
17         Responsive Report on Non-Infringement, turn to
18         page nine.
19   A    I'm here.
20   Q    In paragraph 24 you say, "I've been informed that
21         a claim must be construed under the Phillips
22         standard."
23                    Who informed you of this?
24   A    Counsel.
```

```
                                                   Page 20
 1  Q    Was this the first time that you were informed of
 2        that?
 3  A    I'm familiar with the claim construction process,
 4        but the standard specifically I was informed by
 5        counsel.
 6  Q    When were you informed of this?
 7  A    When I started working on the case, and
 8        subsequently, when I started working on my
 9        reports.
10  Q    To your understanding, what is the Phillips
11        standard?
12  A    Well, as I've stated in my report, it's the
13        standard that the claim are given their plain and
14        ordinary meaning as understood by the person of
15        skill in the art.
16  Q    Okay.  Is that always the case, that they're
17        given the plain and ordinary meaning?
18                  MS. PETERSON:  Objection to form.
19        Actually, just objection.  He's already said he's
20        not a legal --
21                  MR. KREMEN:  I'm just asking what his
22        understanding is.
23                  MS. PETERSON:  I know.  He's already
24        told you he's not a patent lawyer.  And he said
```

```
 1        that --
 2                   MR. KREMEN:  That's a speaking
 3        objection.
 4                   MS. PETERSON:  -- his understanding is
 5        provided in his report, so.
 6   Q    In paragraph 27 on page 10, would you read it to
 7        yourself?
 8   A    (Witness complies.)
 9   Q    Who informed you of this?
10   A    Counsel.
11   Q    When were you informed?
12   A    Around the same time that I was working on my
13        expert reports.
14   Q    Would you read paragraph 27 aloud for the record.
15        Would you read paragraph 27 on page 10 aloud?
16   A    Yes, paragraph 27 on page 10?
17   Q    Actually, the first sentence only.
18   A    First sentence on paragraph 27 of page 10 says,
19        "I've been informed that literal infringement
20        requires that every limitation set forth in a
21        claim must be found in an accused product."
22   Q    Keep going.  Next one.
23   A    "I'm also informed that direct infringement
24        requires a party to perform each and every step
```

Page 22

1         or element of a claimed product or method."

2    Q    And the next sentence.

3    A    "I've also been informed that for purposes of any

4         infringement analysis, the comparison is between

5         the properly construed claims and the accused

6         product."

7    Q    Now, what is your understanding of those three

8         sentences?

9    A    Based on these specific requirements in my

10        analysis, my understanding is that in order for

11        the BlueWillow product, Nano Biotech product, to

12        infringe the claims of the 802 patent, each and

13        every element of the claim has to be met.

14   Q    Okay.  Also, what about -- I've seen this --

15        strike that.

16             Would you agree that a patent is not

17        required to contain test data?

18             MS. PETERSON:  Objection.

19   A    Well, my understanding of -- and again, I'm not a

20        lawyer, so I don't know exactly what the patent

21        examiner looks for in the prosecution.  But the

22        patent does require a personal skill in the art,

23        information from there that suggests that the

24        patent does enable the full scope of --

```
                                                  Page 23
 1   Q    It has to be enabled, but is it required to have

 2         test data?

 3                      MS. PETERSON:  Objection.  He's not a

 4         lawyer.  You're asking him for opinions related

 5         to legal requirements, and that is clearly not a

 6         testimony that he's providing in this case.

 7                      MR. KREMEN:  He opines on it.

 8                      MS. PETERSON:  I disagree with that.

 9         He is not providing legal testimony.  He is

10         providing technical expert testimony on ultimate,

11         in the factual issues that underlie the legal

12         issues in the case, but he is not providing legal

13         opinions. He is not a lawyer.

14                      MR. KREMEN:  Okay.

15   Q    You would also agree -- would you agree that not

16         everyone who practices in the field of pharmacy

17         or pharmacology has a Ph.D?

18                      MS. PETERSON:  Objection to form.

19         Vague.

20   A    It depends on the practice.

21   Q    But not everyone has a Ph.D, yes?

22   A    Yes, it would depend on the practice.  If you're

23         a clinical pharmacist, you get a PharmD degree.

24         If you're a retail pharmacist, you could have a
```

Page 24

1          bachelor's degree.

2     Q    Now, what about a pharmaceutical formulator, does

3          a pharmaceutical formulator have to have a Ph.D?

4                    MS. PETERSON:  Objection to form.

5          Vague.

6     A    Again, depends on in other kinds of formulations

7          that they were developing.  They could have a

8          master's degree and then have practical

9          experience.

10    Q    So they have a bachelor's degree and practical

11         experience?

12    A    Again, if they're just simply able to develop the

13         formulation, but in the purposes of the claims of

14         the 802, that formulation also has to function in

15         specific ways.

16                    MR. KREMEN:  That is a non-responsive

17         question.  Objection.

18    Q    You have been listed as an inventor or

19         co-inventor on several patents, yes?

20    A    Yes, I am.

21    Q    Approximately, how many patents?

22    A    About 15 or so issued patents and some that are

23         in the prosecution right now.

24    Q    Were any of these US patents granted where you

```
 1          were the sole inventor, not co-inventor?
 2   A   I have two that were issued that I am the sole
 3        inventor.
 4   Q   Now, you said you're not an attorney.  Typically,
 5        when you're working on preparing patent
 6        applications, did you work with an attorney?
 7   A   Yes, I did.
 8   Q   Typically, who would draft the specification?
 9               MS. PETERSON:  Objection to form.
10   A   It depends on the specific sections of the
11        specification.  Sometimes they ask me to provide
12        examples, but in other parts of the
13        specification, the attorneys provided me and then
14        I reviewed.
15   Q   Where there would be drawings, who would do the
16        drawings?
17   A   Again, it depends on the specific drawings.  But
18        generally, if these are figures that came from
19        data, I would be the one providing those.
20   Q   Who would draft the claims?
21   A   Again, working with the attorneys, they would
22        initially come with some understanding of the
23        claim language and then they would ask my
24        opinion.
```

```
                                                    Page 26

1    Q    So they would draft it and then you would review

2         it, right?

3    A    That's correct.

4    Q    Now, just to get some shorthand considerations

5         out of the way, for the rest of the deposition,

6         I'll refer to the plaintiff as Trutek and the

7         defendant as BlueWillow; is that okay?

8    A    That's fine.

9    Q    Okay.  I'll also refer to US patent number

10        8163802, which is Exhibit 2.  And I'll refer to

11        that as the 802 patent; is that okay?

12   A    Yes.

13   Q    We'll talk about the 802 patent later.  I will

14        also refer to the United States Patent and

15        Trademark Office as the USPTO. Have you heard

16        that expression before, right?

17   A    Yes.

18   Q    And I'll refer to the USPTO Patent Trials and

19        Appeals Board as the PTAB; okay?

20   A    Yes.

21   Q    Now, you've testified in other previous legal

22        matters; is that correct?

23   A    Yes, I have.

24   Q    What percentage of your practice is litigation
```

Page 27

1       related?

2                    MS. PETERSON:  Objection to form.

3    A    So I do -- my total consulting work is around 25

4         percent.

5    Q    Okay.  Now, approximately, how many times have

6         you testified?

7    A    In depositions or trials or both?

8    Q    Both.

9    A    Maybe around 20 times.

10   Q    Did you ever testify at a trial in open court?

11   A    Yes.

12   Q    Approximately, I'm not looking for an exact

13        number, how many times did you testify at trial?

14   A    Five or six.

15   Q    Was your testimony always as an expert witness?

16   A    Yes.

17   Q    Generally, what were the subjects of your

18        testimony?

19   A    Generally, related to pharmaceutical formulations

20        and drug product development.

21   Q    Did they always involve patents in some way?

22   A    Majority of the cases that I've been on are

23        patent related, but I've also been on some

24        contract disputes.

Page 28

1    Q    Did you always generate an expert report or

2         declaration prior to your deposition or trial

3         testimony?

4    A    Again, generally, in the patent cases I have.

5    Q    Was there ever a time when a court did not permit

6         you to testify or declined to accept you as an

7         expert witness?

8    A    No.

9    Q    Has there ever been a time that your testimony

10        was limited in any way, to your knowledge?

11   A    Not to my knowledge.

12   Q    Did you ever testify in a proceeding before the

13        USPTO?

14   A    No, I have not.

15   Q    So by testimony, I'm speaking about also

16        deposition testimony.

17   A    Not in front of the USPTO.  I have provided

18        declarations for IPR cases.

19   Q    Okay.  But were you ever actually deposed in

20        those cases?

21   A    By the attorneys, not by the PTO, not by the

22        Patent and Trademark Office.

23   Q    Okay.  Now, what kind of proceedings were they?

24   A    IPR proceedings.

```
                                              Page 29
 1   Q    Well, IPR, but were they PGR interferences,

 2         appeals?

 3   A    Some of them were -- majority have been IPR.

 4   Q    So in those proceedings, any testimony you gave

 5         was always by deposition, there was no open

 6         court, right?

 7   A    That's correct.

 8   Q    Prior to testifying at the USPTO, did you always

 9         submit a report or a declaration under oath?

10   A    Yes, I did.

11   Q    Okay.  Was there ever a time when the PTAB did

12         not permit you to testify or refused to accept

13         you as an expert witness?

14   A    I don't -- I don't know, but everything that I've

15         done so far has been accepted.

16   Q    Incidentally, every time I use the word PTAB,

17         it's P-T-A-B.  Did you say that there was never

18         an instance where the PTAB did not accept your

19         testimony or limited your testimony in any way?

20   A    I'm not aware of.

21   Q    Now, you do understand that you're testifying

22         here today as an expert witness, correct?

23   A    Yes.

24   Q    And you were hired to serve in that capacity by
```

1          the defendant BlueWillow Biologics; is that

2          correct?

3    A    Yes.

4    Q    Now, what is the field of expertise to which you

5          will testify?

6    A    I'm a pharmaceutical formulator.  I develop

7          pharmaceutical products.

8    Q    Is that list exhaustive?  Do you have any other

9          fields of expertise that you're presenting

10         yourself?

11   A    No.  I'm an expert in the pharmaceutical

12         formulations and characterization, and

13         ultimately, applications of pharmaceutical

14         formulations for treatment or prevention of

15         diseases.

16   Q    Now, in your capacity as an expert in these

17         fields, you generated two reports on the validity

18         of the 802 patent on behalf of the defendant;

19         that's correct, yes?

20   A    Yes, I did.

21   Q    And that is 4 and 5.  Now, these reports, they

22         contain all your opinions concerning the validity

23         of the 802 patent; is that correct?

24   A    Yes.

Page 31

1    Q    Let's just take a look here.  Turn to Page 95 of

2         Exhibit 4.  At the top of the page, under the

3         heading subject matter eligibility, could you

4         read the sentence labeled as Roman numeral 12.

5    A    "Analysis:  Claims 1, 2, 6, and 7 are invalid for

6         being directed to ineligible subject matter under

7         35 USC Section 101."

8    Q    Okay.  And you allege that these claims are

9         directed to ineligible subject matter, right?

10   A    Yes, I do.

11   Q    Now, you would agree that because claim one

12        recites a process or a method, it falls into the

13        class of inventions that are patentable under

14        Section 101; is that correct?

15                  MS. PETERSON:  Objection to form.

16   A    Again, my analysis for the subject matter and

17        eligibility, as I discussed in my report, is

18        based on the fact that the claims are derived

19        towards the ability of this composition or to

20        attract electrostatically, which is a well known

21        phenomena in nature.

22   Q    You you express an opinion about the statute of

23        35 USC 101, what is 101?

24                  MS. PETERSON:  Objection.

                                                          Page 32

1        Mischaracterizes his opinion.  He's not a patent

2        lawyer.

3                  MR. KREMEN:  Well, he very specifically

4        mentioned the statute.  I have the right to

5        question him on that.

6                  MS. PETERSON:  He did not express an

7        opinion as to the meaning of the statute, which

8        is what you just asked him to provide.  He

9        provided technical opinions relating to the

10       patent.  If you want to ask him about those

11       opinions, I'm sure he's prepared to answer.  But

12       he's not providing -- your question was directed

13       to what is Section 101 requiring.  He's not a

14       legal expert.

15                 MR. ALTMAN:  Liane, that's a speaking

16       objection.  They're not allowed.  It's just

17       objection form.

18                 MS. PETERSON:  And I started off with

19       an objection to the form and Mr. Kremen followed

20       up, so I'm just answering his question.

21                 MR. ALTMAN:  I don't think that's what

22       took place but that's fine.

23   Q   So as it stands right now, you don't know what

24       101 says?

```
                                              Page 33

 1                    MS. PETERSON:   Objection.

 2          Mischaracterizes his testimony.

 3   A    As I mentioned in my report, I apply these

 4          standards in the standard.  I've discussed it in

 5          my report, Exhibit 4, under the specific

 6          standards that I've applied to my analysis.

 7   Q    I'm going to present you with --

 8

 9                    (Whereupon, US Code Section 101, was

10                    marked as Exhibit No. 8.)

11

12   Q    Do you know what the standard is in 101?

13                    MS. PETERSON:   Objection, form.

14   A    As I mentioned before, I was provided with these

15          standards, and I mention these in my report,

16          specifically starting on paragraph 30, how I

17          understand -- my understanding of the patent law

18          in what was provided to me.  And then subsequent

19          to that, I have discussed the various parts of

20          those standards.

21   Q    Have you ever given an opinion on this standard

22          before?

23   A    Yes, I'm sure I have.

24   Q    I'm going to give you a copy of 35 USC 101.  And
```

1       could you read the statute aloud?

2                   MS. PETERSON:  Excuse me, what

3       deposition exhibit number are we marking this as?

4                   MR. ALTMAN:  Eight.  I'm sorry.

5    A  The document says, "Whoever invents or discovers

6       any new and useful process, machine manufacturer

7       or composition of matter, or any new and useful

8       improvement thereof may obtain a patent

9       therefore, subject to the conditions and

10      requirements of this title."

11   Q  Now, is this your understanding of the standard

12      of 35 USC 101?

13                  MS. PETERSON:  Objection, vague,

14      ambiguous.

15   A  Again, if this is the standard as you have

16      presented to me, and I mentioned in my report, I

17      specifically discuss the various aspects of those

18      standards in the context of my analysis.

19   Q  Now, would you agree that because claim one is a

20      process, and claim two is a composition of

21      matter, discusses a composition of matter, that

22      the claims fall within the classification of

23      inventions patentable under the statute?

24                  MS. PETERSON:  Objection to form.

```
 1          Ambiguous.  Calls for an answer outside of the
 2          testimony and opinions that he's providing in
 3          this case.
 4                    MR. ALTMAN:  Liane, that's a speaking
 5          objection.  There's no speaking objections.
 6    A     So I'm not a lawyer, but as I read the claims,
 7          and in view of a personal skill in the art, I
 8          inform my opinions related to all of the
 9          different sections in my invalidity.
10    Q     So you wouldn't know?
11    A     I have not really looked at the specific --
12    Q     Well, you're looking at it right now.  I mean,
13          what is your -- it gives a group of
14          classifications of things, of types of things
15          that are patentable, okay.  And it says a
16          process, a machine, a manufacturer or composition
17          of matter, or any new and useful improvement
18          thereof.  Is this claim one concern a process or
19          a method?
20    A     It's a method, but it is a method of
21          electrostatically inhibiting --
22    Q     I'm not -- that's not what I'm asking.  That's
23          not responsive.  I was very specific.  Does it
24          cover a process, a method?
```

Page 36

```
 1   A   The claim covers a method, but the method of

 2        electrostatically attracting or inhibiting --

 3   Q   We'll get to that afterwards.  But it --

 4                  MS. PETERSON:  Counsel, can you please

 5        let the witness finish his question -- or finish

 6        his answer.

 7                  MR. ALTMAN:  Why don't you ask it again

 8        so we have a clean --

 9                  MR. KREMEN:  Okay.

10   Q   Is claim one a method or a process, yes or no?

11   A   Yes, it is a method, a claim.

12   Q   Okay.  And is claim two a composition of matter?

13   A   Claim two is a formulation.

14   Q   Which is a composition of matter, yes?

15   A   Yes.

16   Q   So just in terms of the category of things that

17        are patentable, that are inventions patentable,

18        those two claims fall within that category, am I

19        right?

20                  MS. PETERSON:  Objection to form.

21   A   Again, just looking at the term method or

22        formulation, they fall, but once you read the

23        entirety of the claim it doesn't.

24                  MR. KREMEN:  Objection.
```

Page 37

```
 1                   MS. PETERSON:  Mr. Kremen, again,
 2         please let the witness finish his answer.  If you
 3         have an objection to his question, that's fine,
 4         but wait until his answer is complete rather than
 5         cutting him off.
 6                   MR. KREMEN:  Objection.  The answer is
 7         non-responsive after the word but.
 8    Q    Now, in paragraph 202, you allege that the claims
 9         of the 802 patent are directed to laws of nature
10         or natural phenomenon, yes?
11                   MS. PETERSON:  Objection.
12         Mischaracterizes --
13                   MR. ALTMAN:  That's a speaking
14         objection, Liane.  It's objection form.
15                   MS. PETERSON:  It's a concise statement
16         of the objection.
17                   MR. ALTMAN:  No, it's not.  That's a
18         speaking objection.
19    A    Are you asking about paragraph two of Exhibit 4?
20    Q    Yes.
21    A    Yes, that's what I'm -- that's my opinion in
22         paragraph 202.
23    Q    Okay.  Because of this subject matter, it's your
24         opinion that the subject matter of the claims are
```

```
 1        patent ineligible; am I right?
 2   A    That's correct.
 3   Q    Okay.  And that law of nature is electrostatic
 4        traction and repulsion, yes?
 5   A    Yes.
 6   Q    Isn't it true that all inventions, patentable or
 7        not, utilize laws of nature?
 8                 MS. PETERSON:  Objection to form.
 9   A    My understanding is that for subject matter to be
10        patentable, there has to be some novelty beyond
11        what is well known to personal skill in the art
12        as occurring by nature.
13   Q    That's non-responsive.  Can you think of a patent
14        that does not involve somehow a law of nature?
15                 MS. PETERSON:  Objection to form.
16   A    Again, there has to be something on top of just
17        attracting electrostatically to be able to be
18        patentable to be novel.
19   Q    All right.  Let's try to get some examples here.
20        Would you say that centrifugal force is a law of
21        nature?
22   A    It depends on --
23   Q    Natural phenomena -- just the abstract.
24   A    Then you have to induce centrifugal force.  It's
```

Page 39

```
 1        not something that occurs just by itself.
 2   Q    Okay.  So a centrifuge, which uses centrifugal
 3        force would be patentable, right?
 4                   MS. PETERSON:  Objection to form.
 5   A    Again, it's an instrument that creates that
 6        centrifugal force.  Here you're relying simply on
 7        having negatively charged particle come to a
 8        positively charged surface.
 9   Q    Okay.
10                   MR. KREMEN:  Objection, non-responsive.
11   Q    How about a tire, can a tire do its function
12        without gravity?
13   A    Again, there are many other things that are
14        affected by gravity.  Tire is just one of them.
15   Q    Okay.  But it can't function without gravity, a
16        tire won't move a car unless it was -- unless it
17        was utilizing the law of nature, which would be
18        gravity, right?
19   A    No.  Part of the function of the tire is that it
20        allows the automobile to be driven, and so the
21        engine of the automobile and all the other
22        elements in the car also affects the function of
23        the tire.
24   Q    So does a tire require gravity in order to work?
```

Page 40

1    A    Yes, it does.

2    Q    Okay.  Now, you would agree that merely because a

3         claim invention uses a law of nature, that does

4         not make it patent ineligible; am I correct?

5    A    But there has to be something novel about it.  In

6         this case, there is nothing novel beyond the fact

7         that there is electrostatic attraction.

8                   MR. KREMEN:  Non-responsive.

9    Q    You would also agree that if a claim process

10        utilizes the law of nature and contains

11        additional steps, each of which uses a law of

12        nature, that the claim invention could be subject

13        matter eligible for patentability, yes?

14                  MS. PETERSON:  Objection to form.

15   A    I haven't -- I looked at my analysis based on the

16        elements of the claims and the language of the

17        claim.

18   Q    Would you agree that -- would you agree that if a

19        claims process uses a law of nature and contains

20        additional steps, each of which use a law of

21        nature, that the claim invention could be subject

22        matter eligible for patentability?

23                  MS. PETERSON: Objection.

24   A    Again, I have to look at the specifics of those

1       claims to make my -- looking at the 802 patent

2       claim, my opinion is that --

3  Q   I'm not speaking about the 802 patent.  I'm

4       speaking in general, that if it uses a -- if a

5       claim uses a law of nature, and it contains other

6       steps that also use a law of nature, that that

7       could be patent eligible, just because it uses a

8       law of nature it's not necessarily ineligible?

9             MS. PETERSON:  Objection.

10  A   I have to look at those claims to be explicit. I

11       don't know -- sitting here, I don't know exactly

12       what you're talking about.

13  Q   Now, in paragraph 202, you state that the claims

14       of the 802 patent utilize electrostatic

15       attraction or repulsion and that they have

16       additional steps or elements, yes?

17  A   Yes.  Those are the elements A, B, and C.

18  Q   Okay.  But you also say that each of those

19       additional claim elements are either conventional

20       steps that are well known to a person of ordinary

21       skill, or depend on the very same law of nature

22       or natural phenomenon.  That's what you wrote,

23       yes?

24  A   Yes.

Page 42

```
 1   Q    Okay.  Now, isn't it true that a patent claim

 2        having a unique combination of conventional steps

 3        can still be patentable?

 4                   MS. PETERSON:  Objection to form.

 5   A    Again, I have to look at the specifics of those

 6        patents.

 7   Q    But if it has a unique combination of steps, can

 8        -- I'm not asking you for a particular one.  I'm

 9        giving you a hypothetical, a general claim that

10        has a unique combination of steps, it can be

11        patentable, yes or no?

12                   MS. PETERSON:  Objection.

13   A    I have to look at the specifics.  I can't just

14        sit here and opine on something that's

15        hypothetical.

16   Q    But is it possible for a patent to be issued on

17        something that has a unique combination of steps

18        for a method?

19                   MS. PETERSON:  Objection.

20   A    It's certainly possible, but doesn't mean it's

21        valid.

22   Q    Is it possible that a patent, a valid patent, can

23        be issued having a unique combination of steps,

24        hypothetically, not for the 802 patent, but
```

```
                                                   Page 43

 1      hypothetically?

 2                   MS. PETERSON:  Objection.

 3   A  Again, any hypothetical patent there's a lot of

 4      possibilities out there.  I don't know until I

 5      see the specifics --

 6   Q  Have you ever written a method, a patent claim,

 7      that was a method patent?

 8   A  I'm sure I have reviewed them.  I haven't written

 9      per se, but I've reviewed them.

10   Q  None of your patents are method or process

11      patents; am I correct?

12                   MS. PETERSON:  Objection to form.

13   A  I'm sure there are some other claims within the

14      patent that teach a person of skill towards

15      method.  The majority of my patents are

16      composition of matter patents.

17   Q  Do any of your patent claims rely on any natural

18      laws?

19   A  I have to look back at those documents to give

20      you an honest opinion.

21   Q  Okay.  So we're saying that -- going back to my

22      previous question.  So each of the, in paragraph

23      202, you state that the claims of the 802 patent

24      utilize electrostatic attraction repulsion and
```

Page 44

1          that they have additional steps or elements, yes?
2     A    Yes, they do.
3     Q    In addition to that, you mentioned that the steps
4          are either conventional steps or those known to
5          purchase skills of the art, yes?
6     A    Yes.
7     Q    What does the -- you indicated that the claims,
8          1, 2, 6 and 7, are invalid for being directed to
9          ineligible subject matter on the 35 USC 101.  Is
10         the knowledge of a person of ordinary skill
11         relevant to the matter of subject matter
12         eligibility under Section 101?
13                   MS. PETERSON:  Objection.
14    A    Yes, I believe it is because it's in the analysis
15         of invalidity for all of the different aspects.
16         You have to consider that under the -- from the
17         person of skill in the art and also from the time
18         of the invention based on the priority date.
19    Q    But under 101, under Section 101 which you've
20         opined on, do you know that the knowledge of a
21         person of ordinary skill is somehow in there?
22                   MS. PETERSON:  Objection.
23    A    Again, in my analysis, you know, I considered all
24         of the different opinions that I provided based

Page 45

1           on the person of skill in the art.

2    Q    Even those under Section 101?

3    A    All of the opinions that I provided in my expert

4           report.

5    Q    Okay.  Turn to page 19.

6    A    Same exhibit?

7    Q    Yes, please.  Would you read paragraph 44 aloud?

8    A    Paragraph 44 states that, "I understand that a

9           patent claim is invalid if the specification does

10          not provide any data or other information

11          demonstrating a substantial likelihood that the

12          invention will work as described and claimed."

13   Q    What is the basis of that understanding?

14   A    Well, if you look at the patent itself, there is

15          nothing in the patent that suggests that there's

16          any demonstration of the fact that the

17          compositions would actually work the way they are

18          claimed.

19   Q    Can you point to any place in the statute or the

20          rules where this is written specifically?

21                   MS. PETERSON:  Objection.

22   A    Well, again, as I said, I'm applying the

23          understanding of credible utility analysis in

24          terms of the statements that I'm making on page

Page 46

1       19, paragraph 44, that for a person of skill to

2       be able to -- or having a patent claim that are

3       valid, there has to be demonstration in the

4       patent of likelihood of an invention.

5   Q   What is the basis of that statement?

6   A   Well, there has to be sufficient disclosure in

7       the patent to a person of skill in the art that

8       this is inventive, it is an invention --

9   Q   And that's under Section 101?

10                  MS. PETERSON:   Objection.

11  A   Again, this is based on -- the credible utility

12      analysis is based on Section 101 and I'm applying

13      it specifically to the teachings of the 802

14      patent.

15  Q   Okay.  So now turn to page 99.

16  A   I'm there.

17  Q   In paragraph 212, you state that claims 1, 2, 6

18      and 7 are invalid for lack of credible utility,

19      yes?

20  A   Yes.

21  Q   Now, you have a copy of, I think it was P8, was

22      it, which is 35 USC 101?

23  A   Yes.

24  Q   Isn't it true from reading that, that Section 101

```
                                                    Page 47

 1            requires that an invention must be new and

 2            useful?  Take a look at Exhibit 8.

 3   A    Yes.  It says new and useful process and machine

 4            manufacturer --

 5   Q    That the invention needs to be new and useful.

 6                        MS. PETERSON:  Objection.

 7   Q    Isn't it true that a formulation that actually

 8            inhibits infection due to inhalation of harmful

 9            particles is useful?

10                        MS. PETERSON:  Objection.

11   A    That formulation if it was actually --

12   Q    No, but --

13   A    -- the teaching of the 802 would be useful but

14            it's not.

15   Q    Okay.  Now, in paragraph 214 you complain that

16            there's no credible utility for claims 1, 2, 6,

17            or 7 under 35 USC Section 112 because the 802

18            patent "Does not include any data or test results

19            for any of the formulations described" to

20            demonstrate that they will work as claimed.

21            Isn't it true that no statute or rule

22            specifically required such data or test results

23            for patentability?

24                        MS. PETERSON:  Objection.  Misstates
```

```
                                                    Page 48

 1         the work.

 2    A    My opinion is that the 802 patent doesn't teach

 3         to a personal skill in the art specific

 4         composition that enables the claim.

 5                    MR. KREMEN:  Objection, non-responsive.

 6    Q    You said that you're familiar with the patent

 7         prosecution.  Now, in terms of patent

 8         prosecution, you have to comply with certain

 9         rules, certain statutes.  Is there any kind of

10         rule that you are familiar with that specifically

11         requires that such data or test results to be

12         present?

13                    MS. PETERSON:  Objection, form.

14    A    Well, the patent -- in the totality of the patent

15         it has to teach a person or skill that when you

16         are claiming certain elements, those elements are

17         actually going to be met by the specification of

18         the patent.

19    Q    Okay.

20    A    802 does not.

21                    MR. KREMEN:  Can I have a copy of 112.

22

23                    (Whereupon,  35 USC 112, was marked as

24                    Exhibit No. 9.)
```

Page 49

1    Q    This is Exhibit 9.

2                    MS. PETERSON:  Stan, is this even --

3         actually, I object to Exhibit 12 (sic).  This

4         isn't even the proper version of the statute.

5                    MR. KREMEN:  No.  I'm going to just

6         tell what it really is.  All I did was I -- this

7         is not the entire 112.  This is just Sections A

8         and B.

9                    MS. PETERSON:  Yes, but it's from the

10        wrong version.  This version of the statute

11        doesn't apply to the patent at issue in this

12        case.

13                    MR. KREMEN:  Okay.  All right.

14   Q    Are you familiar with the written description

15        requirement of 112?  Because you quoted 112 here,

16        are you familiar with the written description

17        requirement?

18   A    Yes, I am.

19   Q    Isn't it true that the written description

20        requirement of Section 112A only requires that a

21        person of ordinary skill in the art will be able

22        to make and use the invention?

23                    MS. PETERSON:  Objection.

24   A    As I stated in paragraph 46 of my expert report,

Page 50

1         the written description requirement, objectively

2         demonstrate a person of skill in the art that the

3         patent applicant actually invented or possessed

4         the full scope of the claim.

5    Q    That's the written description requirement,

6         according to you?

7    A    That's the -- based on my understanding of the

8         written description requirement is that it

9         requires that the applicant possessed, or had in

10        possession, based on the full scope of the claim.

11   Q    Isn't it true that the enablement requirement of

12        112 applies only to the written description and

13        not to the claims?

14                  MS. PETERSON:  Objection.

15   A    No.  The enable requirement also would be applied

16        too based on the fact that undue experimentation

17        was necessary by a person of skill in the art to

18        enable the claim -- the full scope of the claim.

19   Q    But it's the written description that it pertains

20        to, not to the claims.

21                  MS. PETERSON:  Objection, ambiguous.

22   A    Well, I review the patent claims and then I

23        review the specification in my analysis to see

24        where I can find support in the patent for both

Page 51

1          written description and enablement.

2     Q    Have you ever read 35 USC 112?

3     A    I'm familiar with it.  That's the code or section

4          112 is what I'm applying for all of the analysis

5          that I've done for invalidity.

6     Q    So you're applying to the first paragraph in 112

7          as far as -- because the second paragraph of 112

8          says nothing about person of skills of the art

9          being able to make them and use the invention.

10         It's only in the first paragraph.

11                    MS. PETERSON:  Objection.

12    A    Well, I'm applying based on my understanding and

13         what I've been provided by counsel in terms of

14         the standards, I'm applying those standards in my

15         analysis.

16    Q    Do you have a copy of the standards that you've

17         been provided by counsel?

18    A    I have provided that information in my expert

19         report.

20    Q    When counsel gave it to you, how was it

21         communicated?

22    A    We discussed the standards, and then

23         subsequently, I applied those standards in my

24         analysis.

Page 52

1    Q    It was verbal?

2    A    I'm not sure exactly, you know, the specifics of

3         the transmission.  Initially, it was verbal

4         discussion and then, of course, it came in the

5         report.

6    Q    So were you given a document with the standard?

7    A    No, I have not seen the document.  I discussed

8         the standards and I certainly opined on many

9         other cases as specifically related to both the

10        obviousness and non-obviousness analysis as well

11        as the 112 written description enablement and

12        definite analysis.

13   Q    So you don't know at this point, am I correct,

14        that you don't know whether section 112 requires

15        that test results that would demonstrate to a

16        person skilled in the art that there's a

17        substantial likelihood that the claim will

18        eventually work, at this point you don't know

19        whether 112 provides that; am I correct?

20                  MS. PETERSON:  Objection.

21   A    Well, what I know is that for written

22        description, the applicants of the patent should

23        have sufficient disclosure, sufficient

24        description in the patent, to inform a person or

```
 1            skill that they were in possession of the full
 2            scope.
 3    Q    Okay.  But does that demand testing?
 4                 MS. PETERSON:  Objection.
 5    A    Well, it demands the fact that there's enough
 6            description in the patent, enough disclosure,
 7            that the person of skill can understand that the
 8            patentee possess the full scope.
 9    Q    That's not what I asked.  Does it require
10            testing?
11                 MS. PETERSON:  Objection.
12    A    Again, I'm not saying that there has to be a
13            specific testing, but what I'm saying is that
14            there has to be sufficient disclosure in the
15            patent for a person of skill to know that the
16            patentee had full scope -- had possessed the full
17            scope of the claims.
18    Q    Okay.  Regarding patent claiming invalidity, do
19            you understand the difference between claim
20            anticipation on the 35 USC Section 102 and
21            obviousness under Section 103?
22                 MS. PETERSON:  Objection.
23    A    I understand the differences between based on the
24            analysis that I've done in this case related to
```

Page 54

```
 1        the 802 patent.
 2   Q    So you do understand the difference between
 3        anticipation and obviousness then?
 4                  MS. PETERSON:  Objection.
 5   A    Again, in the context of when I'm looking at it
 6        as a technical expert.
 7   Q    Now, wouldn't you agree that for a claim to be
 8        anticipated, a single prior art reference must
 9        encompass every element in that claim?
10                  MS. PETERSON:  Objection.
11   A    Yes. That's the standards that you apply for
12        anticipation.
13   Q    Wouldn't you also agree that for a claim to be
14        obvious over prior art, in Section 103, a
15        combination of prior art references must be used
16        to encompass every element of the claim?
17                  MS. PETERSON:  Objection.
18   A    That's my understanding.  And again, for
19        obviousness analysis, the prior art can be
20        combined in order to then come to all the
21        elements of the claim.
22   Q    So the combination must produce all the elements
23        of the claim?
24                  MS. PETERSON:  Objection.
```

Page 55

1    A    Must provide evidence to a person of skill in the

2         art with reasonable expectation of success.

3    Q    And that is a difference between anticipation

4         requiring a single reference that's going to do

5         everything and a combination of references, which

6         in other words, anticipation is all done with one

7         -- am I correct in terms of your understanding

8         that anticipation requires only once a single

9         reference and obviousness requires a combination

10        of references; is that your understanding?

11   A    That's generally where -- and that's the analysis

12        that I've done, that for a claim to be invalid,

13        it is anticipated by a single item of prior art.

14   Q    Okay.  So you would agree that if a single prior

15        art reference does not encompass every element of

16        the claim, that claim cannot be invalid over that

17        single prior art reference alone; am I correct?

18             MS. PETERSON:  Objection.

19   A    Only under the anticipation argument, but it can

20        certainly be invalid based on the obviousness

21        argument.

22   Q    How?

23             MS. PETERSON:  Objection.

24   A    Again, if that prior art is combined with other

Page 56

1          prior art in order to arrive --

2    Q    But -- okay.  You just previously said that in

3         order to anticipate something, you have to have a

4         single reference that encompasses all the

5         elements of the claim.  If it doesn't encompass

6         all of the elements of the claim, can it be used

7         alone to invalidate the claim?

8                   MS. PETERSON:  Objection.

9    A    Again, if it is single prior art document, and

10        the argument is only anticipation, it cannot, but

11        if that single document is combined with other

12        documents, then certainly claims could be

13        obvious.

14   Q    But it's not combined with other documents, and

15        it doesn't encompass all the elements of the

16        claim, can it be used alone without any

17        combination, can it be used alone just to

18        invalidate a patent?

19                  MS. PETERSON:  Objection.

20   A    Not alone.  If it doesn't meet all the claim

21        elements, it has to --

22   Q    Okay.

23   A    You have to have all the claim elements met.

24   Q    Good, okay.  That's -- I just wanted to

Page 57

```
 1            understand what you were looking at.
 2                       Now, isn't it true, that if for some
 3            reason it's impossible to combine two or more
 4            references, the combination of those references
 5            cannot render a claim invalid?
 6                       MS. PETERSON:  Objection.
 7    A       I'm not sure what that means to not be able to
 8            combine.
 9    Q       Well, there are certain things that can't be
10            combined no matter what you're doing.  Well, let
11            me ask you, hypothetically, if a claim has
12            elements A and B, and you have one reference that
13            has A and the second reference that has B, is it
14            always possible to combine the two references to
15            produce the claim?
16                       MS. PETERSON:  Objection.
17    A       Again, from a person of skill in the art
18            reviewing the patent, the analysis that is done
19            in these types of cases is I would look at the
20            expectation of success.
21    Q       I don't understand.  Could you clarify that,
22            please?
23    A       So in order to understand the analysis, I would
24            basically look at the claim language in my case
```

Page 58

```
 1        and for the 802 patent, look at the specification
 2        and what the specification teaches, and then see
 3        if back in the priority date, what was the
 4        general knowledge in the field and what was the
 5        available references that teach towards what the
 6        person of skill would know.
 7   Q    Isn't a true that you have to have specific
 8        references to be able to invalidate a patent
 9        under 102 and 103, which is the prior art
10        statutes?
11                   MS. PETERSON:  Objection to form.
12   Q    I'm sorry, I'll rephrase.  Isn't it true that for
13        anticipation or obviousness, you must have
14        specific references, specific prior art
15        references, to be able to invalidate it?
16                   MS. PETERSON:  Objection.
17   A    Yes.
18                   MS. PETERSON:  Stan, we've been going
19        like an hour, over an hour.
20                   MR. KREMEN:  Do you want to take a
21        break?  Okay.
22                   (Brief Recess)
23        BY MR. KREMEN:
24   Q    Now, isn't it true that if a prior art reference
```

```
                                              Page 59
 1          is not enabled, it can't be used to anticipate a
 2          claim?
 3                    MS. PETERSON:  Objection.
 4     A    I'm not sure I understand the question.  The
 5          prior art reference itself is not enabled?
 6     Q    Right.  In other words, not necessarily an issue
 7          patent is anything.  If the prior art reference
 8          is not enabled, you can't figure out how to make
 9          it, use it, or whatever, if it's not enabled, it
10          can't be used as a reference to anticipate a
11          claim?
12                    MS. PETERSON:  Objection.
13     A    Again, when I reviewed all the prior art that
14          I've relied on for my opinions in this case, I
15          found the inventions to be enabled.
16     Q    Okay.  So you actually found all of the prior art
17          in this case that you use to be enabled, correct?
18     A    Based on my understanding of the enablement
19          standards that have applied in this case.
20     Q    So in other words, on each of the prior art
21          references that you looked at, that a person of
22          ordinary skill in the art would be able to make
23          and use that invention; is that correct?
24                    MS. PETERSON:  Objection.
```

Page 60

```
 1    A    Again, based on what I've looked at as far as my

 2              obviousness analysis of the 802 patent claims, in

 3              the review of the prior art documents that I've

 4              relied on in order to tell a person of skill in

 5              the art what the claims of the 802 patent are

 6              specifically addressing, I found those documents

 7              to be valid.

 8    Q    Was any prior art given to you by counsel or did

 9              you find it all on your own?

10    A    I believe we discussed, and maybe the documents

11              were provided, I didn't go out and search

12              specific documents, but I did discuss with

13              counsel the specific matter itself that are

14              taught on this prior art, and obviously the

15              opinions that I'm providing are all mine.

16    Q    So did you find any of the prior art on your own?

17    A    I may have.  For example, the Wahi 488 and 481, I

18              may have seen them before.

19    Q    What about Wadstrom?

20    A    Wadstrom, also I've seen them before.

21    Q    And Rolf?

22    A    Yes.

23    Q    And where did you se those before?

24    A    I saw it as an expert on a prior matter between
```

Page 61

```
 1        Trutek and Matrix.
 2   Q    Did counsel give you any of those references, the
 3         prior art references?
 4                   MS. PETERSON:  Objection.
 5   A    The documents itself, maybe, you know, maybe
 6         provided by counsel through an email, but all the
 7         opinions that I'm providing are mine.  I reviewed
 8         those prior art myself.
 9   Q    But the documents would have been provided to you
10         by counsel?
11                   MS. PETERSON:  Objection.
12   A    Yes, some of the documents, certainly.  I didn't
13         go out and search for every one of them.
14   Q    Did you run any search yourself for prior art?
15   A    I don't recall searching specifically, but I do
16         recall looking at the documents and looking at
17         data to patent and being able to do the analysis.
18         The analysis is all mine and the opinions are all
19         mine.
20   Q    Now, you've expressed some of these opinions
21         before in another case; am I correct?
22   A    Sorry.  Which other case?
23   Q    (Indiscernible ) case.
24   A    Yes.
```

```
                                              Page 62
 1   Q    Did you use some of the same prior art in this
 2         case as you used in the Matrix case?
 3   A    Some of them, yes, but they're also few
 4         additional ones that are here.  For example,
 5         Baker patents, as well as Rabe, Katz, those were
 6         not -- we did not use that in the Matrix case.
 7   Q    Did you find those yourself or did counsel
 8         provide them to you?
 9   A    No.  Again, based on the information that -- the
10         documents were provided, but I reviewed the
11         documents myself and opinions that I provide in
12         my report are all mine.
13   Q    Did you search for any of those yourself?
14   A    No, I did not search for them myself.
15   Q    In terms of the Baker patents -- well, first of
16         all, in terms of the other patents, the Wadstrom
17         patent, Rolf, and the ones you used in the Matrix
18         case, did you search for them yourself or were
19         they given to you?
20   A    For this case or the Matrix?
21   Q    The other case.
22   A    Again, I think that we, you know, for that
23         counsel and I had discussions and some of those
24         documents were provided to me.
```

Page 63

| 1 | Q | Okay.  And the Baker patents were provided to you |
| 2 | | in this case during the discussion with counsel? |
| 3 | | MS. PETERSON:  Objection. |
| 4 | A | Yes. Again, I didn't go out and actually download |
| 5 | | the files. |
| 6 | Q | Okay.  Did you know about them beforehand, the |
| 7 | | Baker patents? |
| 8 | A | Yes. |
| 9 | Q | You knew about the Baker patents, how did you |
| 10 | | know about them? |
| 11 | A | So I am familiar with the Nano motion technology |
| 12 | | based on the fact that Dr. Baker was a professor |
| 13 | | at University of Michigan and he and I, we were |
| 14 | | part of the Alliance for Nano technology in |
| 15 | | cancer. |
| 16 | Q | That's very interesting.  My compliments on that. |
| 17 | | Okay.  Now, you also generated a report.  Let's |
| 18 | | see, this is Exhibit Number 6, which is a |
| 19 | | Responsive Report of Mansoor M. Amiji, Ph.D. on |
| 20 | | Non-Infringement.  You also generated this report |
| 21 | | with your opinions at BlueWillow NanoBio Protect |
| 22 | | product does not infringe the claims of the 802 |
| 23 | | patent; is that correct? |
| 24 | A | Yes, it does. |

Page 64

```
 1   Q   Okay.  Does this report contains all of your
 2       opinions supporting BlueWillow's allegations that
 3       its NanoBio Protect products do not infringe the
 4       claims of the 802 patent?
 5   A   It has all the opinions as of today, but as I
 6       said before, if there's anything new that the
 7       plaintiff's experts are able to provide, then
 8       I'll need to submit another report or we'll have
 9       rebuttal opinions.
10   Q   As of today, from what I understand, all of the
11       reports had been submitted because there was a
12       deadline of September 29th.  As of today, all of
13       the opinions that are rebutting any of the
14       reports or anything, you completely put your
15       opinions in all of your reports; am I correct?
16                   MS. PETERSON:  Objection.
17   A   Yes, as of today.
18   Q   As of today, okay.  Now, on pages 14 through 18
19       of this report, you criticize the testing of
20       electrostatic charge by Dr. Alexei Ermakov and
21       Shane Burns as long as Dr. Lemmo's -- and also
22       Dr. Lemmo's reliance on these reports; is that
23       true?
24   A   Yes, I do.
```

Page 65

1    Q    Paragraph 39 of page 15, you wrote, "A person of

2         ordinary skill in the art reviewing the Ermakov

3         and Burns testing would not understand the test

4         results to establish that NanoBio Protect

5         satisfies the claim limitations and/or infringes

6         the asserted claims of the 802 patent."

7              You wrote that, yes?

8    A    Yes, I did.

9    Q    Could you explain that, please?

10   A    Well, first of all, the tests that both

11        Dr. Ermakov and Mr. Burns did are not described

12        in the patent.  Second, these tests do not

13        provide any evidence as to the fact that the

14        NanoBio Protect product satisfies all of the

15        claim limitations.

16   Q    Specifically, what is your objection -- what did

17        Dr. Ermakov and Mr. Burns testing show?

18              MS. PETERSON:  Objection.

19   A    I'm not even sure what they -- it's a test.  Both

20        of them just concocted a test.

21   Q    Did you understand their test methodology?

22              MS. PETERSON:  Objection.

23   A    I understand what they did, but I don't

24        understand how -- whatever data that they

```
 1          obtained could be applied to the claims of data
 2          to --
 3    Q    What did they do?
 4    A    Well, Dr. Ermakov took a piece of paper and
 5          sprayed the composition and then measured
 6          conductivity.
 7    A    That is your understanding of what he did?
 8                    MS. PETERSON:  Objection.
 9    A    That is what's in his report.
10    Q    What did Mr. Burns do?
11    A    Well, Mr. Burns took a dry piece of pigskin and
12          again, sprayed some compositions and measured
13          conductivity.
14    Q    How did he measure that?
15    A    He used a Faraday cup.
16    Q    What does a Faraday cup measure?
17    A    Again, it basically allows you to pass current
18          through a material and see if the current can
19          pass through and use an equation to come up with
20          some charge value.
21    Q    And what is that equation?
22    A    It's in his report.  I mean --
23    Q    Are you familiar with the general technology?
24    A    I'm familiar with what they did, but it's nothing
```

```
                                                    Page 67
 1          to do with the teaching of data too or --
 2   Q   That's not what --
 3   A   -- the infringement analysis.
 4   Q   That's not what I'm asking.  I'm asking are you
 5          familiar with the technology?
 6   A   I am familiar with what they did in terms of
 7          measuring conductivity, yes.
 8   Q   How would you measure electrostatic charge on a
 9          surface?
10                  MS. PETERSON:  Objection.
11   A   Well, it depends on what type of surface.  And
12          first of all, it has to be relevant to the
13          teaching of the patent in suit.
14   Q   Pick a particular surface that you think is
15          relevant, how would you measure the electrostatic
16          charge?
17                  MS. PETERSON:  Objection.
18   A   Well, you know, one way that we do in our lab is
19          what's called a zeta potential measurement, which
20          looks at the surface charge of a particle and
21          gives you actually millivolts of charge.
22   Q   So essentially what you're doing is you're
23          measuring voltage in this particular case, not
24          number of coulombs; am I right?
```

Page 68

```
 1   A    We can measure specifically the charge on the
 2          surface of a particle with the instrument that we
 3          have.  But again, it's contact specific.  We are
 4          looking at it in the form of a particle.  Here,
 5          you're talking about surfaces.
 6   Q    What is the cationic agent?
 7   A    A cationic agent would be one where it could
 8          either be permanently charged, or it could be
 9          charged depending on the pH of the solution, but
10          the charge will be positive.
11   Q    Okay.  So it's a chemical substance that exhibits
12          a positive charge; is that correct?
13                  MS. PETERSON:  Objection.
14   A    Under different conditions, yes.
15   Q    Well, what conditions would it not exhibit a
16          positive charge?
17   A    Well, if the pH is such that the charge is
18          neutralized, or it's not in water.
19   Q    Cationic agents have to be in water in order to
20          be effective, correct?
21                  MS. PETERSON:  Objection.
22   A    They have to have some presence of moisture or
23          water around it to be able to exert the charge.
24   Q    Isn't it true that benzalkonium chloride is a
```

Page 69

```
 1         cationic agent?
 2    A    Benzalkonium chloride is a cationic, yes.
 3    Q    NanoBio Protect contains benzalkonium chloride,
 4         right?
 5    A    It has .13 percent of benzalkonium chloride, yes.
 6    Q    And you're aware that BlueWillow claims on its
 7         website that NanoBio Protect exhibits an
 8         electrostatic charge?
 9              MS. PETERSON:  Objection.
10    A    Well, the website information is certainly not a
11         scientific, it's just a promotional material.  It
12         does say on the website that their product has
13         electrostatic charge based on the benzalkonium
14         chloride.
15    Q    So if BlueWillow claims that their product has an
16         electrostatic charge, do you doubt their claim?
17              MS. PETERSON:  Objection.
18    A    No, I'm not doubting the claim, but it's a
19         promotional material.  It's not a scientific
20         publication.  It's not peer reviewed.
21    Q    But it is in fact true, isn't it, that it does
22         contain an electrostatic charge?
23              MS. PETERSON:  Objection.
24    A    Again, BlueWillow product, based on my
```

Page 70

1              understanding, is a nanoemulsion and the charge

2              is on the surface of the oil droplet.

3    Q    So nano emulsions in themselves, whether they

4              contain benzalkonium chloride or not, are they

5              charged, the nano droplets?

6                        MS. PETERSON:   Objection.

7    A    Again, it depends on how you make the

8              nanoemulsion.

9    Q    What prevents the nano droplets from coalescing

10             into a single -- what keeps them as droplets?

11   A    There a number of ways you can prevent the

12             aggregation or coalescence of the droplet.  You

13             can prevent by what's called steric repulsion or

14             you can --

15   Q    I didn't catch that.

16   A    Steric repulsion.

17   Q    Okay.

18   A    Or you can prevent by electrostatic repulsion.

19   Q    What is steric repulsion?

20   A    In steric repulsion, you are putting on the

21             surface of the droplet specific types of material

22             that basically extend from the surface and keep

23             two droplets from aggregating or coming in short

24             distance of each other.

Page 71

1   Q    Now, with the fact that nano droplets, or the

2        nanoemulsion, contains benzalkonium chloride,

3        this is electrostatic repulsion; am I right?

4                   MS. PETERSON:  Objection.

5   A    Again, if the benzalkonium chloride is displayed

6        on the surface of the oil, then it will have

7        positive charge, the oil droplet will have

8        positive charge.

9   Q    So the product would have a positive

10       electrostatic charge because of the benzalkonium

11       chloride; true?

12  A    Again, if the oil droplet is made in such a way

13       that the benzalkonium chloride is exposed to the

14       surface, the nitrogen on that benzalkonium

15       chloride is accessible to water that surrounds

16       the oil, and subsequently, the pH and all the

17       other conditions as such, that the ammonium ion

18       is ionized.

19  Q    Okay.  Now, isn't it true that germs are

20       negatively charged?

21                   MS. PETERSON:  Objection.

22  A    It depends on the germ.

23  Q    Do you know of any that are positively charged?

24  A    Again, it depends on, you know, specific

Page 72

1        conditions in which some germs, I don't know, I

2        have to see which germs you are talking about.

3   Q    Do you know of any germs, microorganisms, that

4        are positively charged, any of them?

5   A    Well, they can acquire different types of charge

6        depending on the environment that they're in.  If

7        you have a bacteria, for example, in solution of

8        water, you could certainly have some of the ions

9        from that solution absorbable under the bacteria.

10       I don't know what you know mean by natural

11       organisms.

12  Q    All right.  I'm going to give you a copy of this

13       page.

14

15             (Whereupon, NanoBio Droplet Document,

16              was marked as Exhibit No. 10.)

17

18  Q    I want you to assume for argument's sake at this

19       point, that this is a page that was taken as a

20       copy of from the BlueWillow website.  And if you

21       look at the very bottom of the page, you'll

22       notice it says https://bluewillow.com/nanobio-

23       protect and then there's a date given of February

24       7, 2021 at 4:40 p.m.  So I'd like you to assume

Page 73

1          that this was taken from the BlueWillow website,

2          that is a true copy.

3   A    Okay.

4   Q    Now, would you look at item number one at the top

5          of the page.  First of all, let's start at the

6          beginning.  Would you read the first paragraph on

7          that?

8   A    The first paragraph of this Exhibit 10 says, "The

9          unique effectiveness of NanoBio Protects is

10         derived from BlueWillow's patented nano

11         technology.  NanoBio Protect places the BZK

12         antiseptic on the surface of nano droplets, which

13         results in at least four key advantages."

14  Q    Now, you realize that BZK is BlueWillow's

15         abbreviation for benzalkonium chloride; am I

16         correct?  You know that?

17  A    Yes.

18  Q    Now, read the item number one.

19  A    "The nano droplets are attracted to germs by

20         electro-kinetic charge and present the BZK in

21         such a way to enable killing of germs on

22         contact."

23  Q    Now, would you call that electrostatic

24         attraction?

Page 74

```
 1                 MS. PETERSON:  Objection.
 2    A    Well, they use the term electro-kinetic charge,
 3           but the attraction is, at least based on this
 4           document, suggests that the germs attracted by
 5           electrostatic charge.
 6    Q    Now, read number two on that page.
 7    A    "The droplets persist on skin for four or more
 8           hours, enabling long lasting effectiveness."
 9    Q    Now, what does that really mean?
10                 MS. PETERSON:  Objection.
11    A    To say that if you apply this to the skin, these
12           droplets will stay there for four hours or more.
13    Q    What form do they take?
14    A    The droplets?
15    Q    Yes, on the skin.
16                 MS. PETERSON:  Objection.
17    A    I don't know.  I haven't really tested any of
18           these products to know what form they take.
19    Q    Well, any liquid, if a liquid sticks to your
20           skin, does it form a film on the skin?
21                 MS. PETERSON:  Objection to form.
22    A    Well, in this case, it's a nanoemulsion that
23           they're spraying on the skin.  So it could easily
24           remain as individual droplets assuming if those
```

Page 75

1           droplets are well stabilized.

2    Q     But the individual droplets, if they're sticking

3           to the skin, it forms a film; doesn't it?

4                     MS. PETERSON:  Objection to form.

5    A     Well, if the droplets are stabilized to remain as

6           individual droplets, then they will basically

7           spread on the skin as droplets.

8    Q     Now, isn't it true that benzalkonium chloride is

9           also a biocide, right?

10   A     It's a biocide, specifically at concentrations

11          and as long as high concentrations are used, it

12          can induce by acidic effects.

13   Q     Okay.  You see the drawings on the page, on

14          Exhibit 10.  Could you read inside the box, could

15          you read what it says there?

16   A     Sure.  It says, "Droplets surround and kill germs

17          via membrane disruption."

18   Q     Okay.  How does it do that?

19                    MS. PETERSON:  Objection to form.

20   A     Well, again, I don't know exactly -- I have not

21          analyzed any peer reviewed documents from NanoBio

22          Protect to know the nature, but from this

23          diagram, it suggests that the nanoemulsion

24          droplets are able to sequester around the germ.

Page 76

1   Q   Okay.  So they hold it in place, they hold inside

2       the droplets then?

3               MS. PETERSON:  Objection to form.

4   A   Again, I'm just looking at this diagram, and what

5       it's saying is that these nanoemulsion droplets

6       are sticking to the, assuming this is a bacteria

7       that they're sticking to.

8   Q   What do you think the role of benzalkonium

9       chloride in terms of the ability to kill the

10      germs, what is the role of the benzalkonium

11      chloride?

12  A   Well, again, it depends how benzalkonium chloride

13      is surface exposed on these droplets, then it

14      will interact with the membrane of the bacteria

15      or virus, whatever that germ is.

16  Q   Did you review the NanoBio Protect product itself

17      when you formed an opinion of non-infringement?

18             MS. PETERSON:  Objection to form.

19  A   I reviewed whatever documents that I'm describing

20      in my expert reports, those are the documents I

21      have reviewed and specifically related to the

22      NanoBio Protect product.

23  Q   What documents related to the NanoBio Protect did

24      you review, specifically to the NanoBio Protect?

Page 77

```
 1   A    I looked at the one of the applications that

 2        NanoBio Protect had.  I looked at some of the

 3        documents that are provided with the Trutek

 4

 5

 6

 7   Q    Is there anything on Exhibit 10 that is

 8        inconsistent with your understanding of the

 9        NanoBio Protect product?

10                    MS. PETERSON:  Objection to form.

11   A    This is -- again, this document is obtained from

12        a website.  It's not peer reviewed.  I don't know

13        anything about the specifics of what they're

14        describing, for example, which type of germ, how

15        much of the emulsion is put on, you know, what

16        was the nature.  This is merely a promotional

17        material.

18   Q    But I specifically asked, is there anything on

19        this document that is inconsistent with your

20        understanding of the nature of NanoBio Protect?

21                    MS. PETERSON:  Objection to form.

22   A    Well, again, the document is just obtained from

23        the website.  It's promotional.  From what is in

24        the document, what was described in the document,
```

Page 78

1          I don't have any objections or specific concerns,

2          but again, this is not describing anything

3          related to the product itself, nor is it

4          describing how much is used or does of

5          benzalkonium chloride, et cetera.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 79

```
 1

 2

 3

 4

 5              MS. PETERSON:  Objection.  And also,

 6         just real quick before I forget, since we are

 7         talking about confidential information now, I

 8         would like to designate the transcript as outside

 9         counsel eyes only.

10              MR. KREMEN:  Just that portion of it.

11              MS. PETERSON:  Well, for right now.  I

12         don't know what else is going to come up.  So for

13         right now, I'd like the transcript designated

14         accordingly.

15              MR. KREMEN:  Well, we will object to

16         that because we need to show that to certain

17         people.  So we object to that.  But I agree to

18         the discussion as to the composition that we just

19         discussed could maintain -- be confidential, but

20         other than that, I object to it.

21    Q    Let's turn to the report on non-infringement,

22         which is Exhibit 6.  On pages 12 and 13, you

23         opine on the nature and qualifications of the

24         person having ordinary skill in the art.
```

Page 80

1          According to the applicable law, do you know what
2          such a person needs to be?
3                    MS. PETERSON:  Objection.
4    A    You're asking specifically on Exhibit 6?
5    Q    Yes.  I mean, if you know.
6    A    Yes.  I'm familiar with the application of a
7          person of ordinary skill in the art, that person,
8          he or she, is based on the subject matter of the
9          patent. Would the person -- it would be a
10         hypothetical person who at the time of the
11         invention would be considered to have knowledge
12         and skills related to the art that's been taught
13         in that patent.
14   Q    What is the difference between a person having
15         ordinary skill in the art and a person having
16         extraordinary skill in the art?
17                   MS. PETERSON:  Objection, vague.
18   A    I'm not --
19                   MR. KREMEN:  No speaking objections.
20                   MS. PETERSON:  That's not a speaking
21         objection, Stan.
22   A    I'm not familiar with some of the further detail.
23         What I've done is apply, based on my
24         understanding of a person of ordinary skill in

```
 1          the art, he or she at the time of the invention,
 2          based on the knowledge and skills that they would
 3          have, their interpretation of the matter that
 4          starting this patent and patent in suit.  But I
 5          don't know about the difference between ordinary
 6          versus expert.
 7     Q    You do admit that there is a difference between
 8          someone having ordinary skill in the art and
 9          someone having extraordinary skill in the art?
10                    MS. PETERSON:  Objection.
11     A    I've heard the term extraordinary skill in the
12          art, but I don't know the details of what that
13          means.
14     Q    Would a person having extraordinary skill of the
15          art also be qualified as one having ordinary
16          skill?
17                    MS. PETERSON:  Objection.
18     A    Again, I don't know what the definition is.  I
19          applied -- my analysis is done based on my
20          knowledge of a person of ordinary skill in the
21          art.
22     Q    Okay.  Do you consider yourself a person or
23          ordinary skill or somebody with extraordinary
24          skill?
```

1          MS. PETERSON:  Objection to form.

2     A    Based on my definition of a person of ordinary

3          skill in the art, and based on the priority date

4          of this patent, I would consider myself a person

5          of ordinary skill in the art.

6     Q    You at this point are a person of ordinary skill?

7          MS. PETERSON:  Objection.

8     A    Based on the definition that I'm providing.

9     Q    Okay.  Regarding the inventions claims recited in

10         claims 1, 2, 6 and 7 of the 802 patent, in what

11         business or profession would a person of ordinary

12         skill be engaged?

13         MS. PETERSON:  Objection to form.

14    A    Well, the claims are directed towards the

15         pharmaceutical formulation and their ability to

16         electrostatically attract and inhibit or hold the

17         particle and then inactivate those particles in

18         such this would be a composition where it would

19         be a pharmaceutical formulator.

20    Q    Pharmaceutical formulator, okay.  Now, what would

21         be the tasks that such a person would be able to

22         perform?

23         MS. PETERSON:  Objection, vague.

24    A    Well,  based on the claim and the limitations, so

```
 1            claim 1, as we discussed, is a method claim.
 2            Claim 2 is a formulation claim.  So the person
 3            would be able to formulate a composition and
 4            obviously then be able to test it to show that it
 5            meets all of the claim limitation.
 6    Q     Is this person of ordinary skill typically an
 7            inventor?
 8                        MS. PETERSON:  Objection.
 9    A     It's a hypothetical person.  I don't know if
10            inventor is considered to be a person of skill in
11            the art or not.  I don't know that specifically.
12            But I know that from a perspective of analysis of
13            invalidity and specifically related to data to
14            claims I applied, the definition that I provide
15            on paragraph 35 of my expert report.
16    Q     Okay.  So you would agree that a person of
17            ordinary skill in the art is a person who
18            typically formulates chemical or pharmaceutical
19            compounds, right?
20                        MS. PETERSON:  Objection to form.
21    A     No.  What I'm saying specifically in the context
22            of the 802 patent and the claims, it's somebody
23            who formulates but also has the knowledge and
24            skills to be able to make sure that it meets the
```

Page 84

1         claim limitations, which go beyond just

2         formulation.

3     Q   Now, on page one of your CV, it says that you're

4         a registered pharmacist.  Can a registered

5         pharmacist formulate pharmaceutical compounds?

6                   MS. PETERSON:  Objection.

7     A   Again, it depends on practice of that registered

8         pharmacist.  Some pharmacists compound

9         prescriptions.

10    Q   Would you know the nature of a cationic agent and

11        what it does?

12                  MS. PETERSON:  Objection to form.

13    A   Again, it depends on the person's, not just

14        education, but also experience.  If they've been

15        working in with cationic agents and are familiar,

16        then they might not.

17    Q   Okay.  Would he know the nature of biocide or

18        biocidic agents and what it does?

19                  MS. PETERSON:  Objection to form.

20    A   Again, depends on, you know, what type of

21        qualification and experiences they have.  If

22        they've worked with biocide and are familiar,

23        then they may know what the biocide does.

24    Q   How about the same analysis of a thickener?

Page 85

1   A    Again, depends on, you know, what practice.  A

2        pharmacist working in a retail store, if they're

3        compounding, they may know what a thickener does.

4   Q    What about a binder?

5   A    Again, depends on what type of binder.  If it's a

6        binder that's using tablets, for example, retail

7        pharmacists do not make tablets.

8   Q    But they know what it is, they know what it does,

9        right?

10                  MS. PETERSON:  Objection.

11  A    Yes.  They're in school of pharmacy.  We teach

12       them what a binder does.

13  Q    What about a surfactant?

14                  MS. PETERSON:  Objection.

15  A    Again, you know, pharmacists do learn about

16       surfactants too.

17  Q    Would a registered pharmacist be considered a

18       person of extraordinary skill in the art or

19       ordinary skill in the art?  Let me rephrase that.

20       Would a registered pharmacist considered to be a

21       person of extraordinary skill in the art?

22                  MS. PETERSON:  Objection to form.

23  A    Again, as I just testified before, I don't know

24       the definition of an extraordinary skill in the

Page 86

```
 1          art.  My analysis in the context of invalidity of

 2          the 802 patents are based on what I know as a

 3          person of ordinary skill in the art.

 4    Q     So a registered pharmacist would be considered as

 5          a person of ordinary skill in the art, right?

 6                    MS. PETERSON:  Objection to form.

 7    A     Again, I define it -- I give a certain definition

 8          of person or ordinary skill in the art as someone

 9          with a master's degree in chemical engineering,

10          pharmaceutical sciences and years of experience

11          in pharmaceutical formulation.

12    Q     Okay.  How many years of experience should such a

13          person of ordinary skill have?

14    A     It varies with the type of experience also.  If

15          they are making formulations for topical use,

16          they may have a few years.  But if they are

17          somebody who is involved in other practices, they

18          may need a little bit more experience.

19    Q     So give me some sort of a figure of how many

20          years of experience you would consider a person

21          of ordinary skill in the art to have?

22    A     Again, it depends on their expertise and what

23          they do in their regular lives.  If they are

24          actually making topical products, then they may
```

```
 1         have -- they don't need a lot of experience
 2         because they have that level of skill and they
 3         may even be trained in those level of skills --
 4    Q    Now, could experience -- is it possible that
 5         experience could substitute for education?  In
 6         other words, if they don't have an advanced
 7         degree, but have a lot of experience, would that
 8         also be -- would a person of ordinary skill,
 9         would that person also be a person of ordinary
10         skill?
11                   MS. PETERSON:  Objection to form.
12    A    Not in my opinion because I see a person of
13         ordinary skill in the art having the foundation
14         knowledge and also being able to then evaluate if
15         the product is going to function the way it is
16         taught in the 802 patent.  So to me, both
17         education and  experience matter.
18    Q    Supposing that somebody who never went to high
19         school or college, but has been working in the
20         field for let's say 30 years, would that person
21         be, as a formulator, would that person be a
22         person with ordinary skill?
23                   MS. PETERSON:  Objection.
24    A    In my opinion, that person, if they're given a
```

Page 88

```
 1        recipe, they can certainly make products.  But
 2        what they won't know is different ingredients
 3        perform differently, what is the right
 4        composition to make, how would this composition
 5        actually work both as a safe and effective
 6        product.
 7   Q    What if they've already done something like?
 8             MS. PETERSON:  Objection.
 9   A    Yeah, I mean, again, these are all hypotheticals.
10        You know, individual experience and individual
11        qualifications would certainly be what I would
12        review, But in the context of the analysis that I
13        have done, you know, I define a person of
14        ordinary skill as having these qualifications and
15        experiences.
16   Q    Okay.  Now, one of the things you mentioned is
17        that the person should have a degree in chemical
18        engineering, right?
19             MS. PETERSON:  Objection.
20   Q    Like a master's degree in chemical engineering.
21        That's in your report, right?
22   A    Yes.
23   Q    That was your opinion.  What specifically in
24        chemical engineering curriculum is necessary,
```

```
 1        what qualifications would be necessary for such a
 2        person to have?
 3                  MS. PETERSON:  Objection.
 4   A    In the context of the 802 patent, specifically,
 5        and the claims, a person with a chemical
 6        engineering would understand, for example, the
 7        issues of rheology.  When you're developing a
 8        formula, how thick or thin that formulation
 9        should be, how can it be applied.  They will also
10        have a good understanding of compatibility
11        between various types of chemicals that are mixed
12        together.  Many of the chemical engineering
13        students, especially in schools like Northeastern
14        where I teach, are also interested in
15        understanding some of the pharmaceutical
16        applications.  So they will also know that these
17        are not just products that are made, but they're
18        made for actual human beings.
19   Q    What is the difference between someone who is a
20        chemical engineer and a chemist?
21                  MS. PETERSON:  Objection.
22   A    One is an engineer.  The other is a scientist.
23   Q    Right, okay.  But what is the difference in what
24        they do?
```

Page 90

1    MS. PETERSON:  Objection.

2  A   Again, engineers solve problems based on the

3      definition.  The scientist would understand the

4      problem and then engineers come up with

5      solutions.

6  Q   Doesn't a chemical engineer concern himself with

7      production aspects, how to make a product able to

8      be manufactured as opposed to someone who creates

9      a product from scratch?

10    MS. PETERSON:  Objection.

11 A   No.  I think that's not true, not in my opinion.

12 Q   Okay.  Why do you say that a person who doesn't

13     have a master's degree in chemical engineering

14     cannot be a person of ordinary skill in the art?

15 A   No.  What I'm saying is it at least a master's

16     degree in chemical engineering or pharmaceutical

17     science or related fields.  I'm not excluding

18     anyone. Q So you would be defining a person of,

19                when you say at least, a person of

20                ordinary skill in the art should have a

21                Ph.D. then?

22    MS. PETERSON:  Objection.

23 A   No.  I say anyone with a master's degree, because

24     with master's degree they would have the

Page 91

1   requisite knowledge of not just the formulation

2   and development, but actual characterization and

3   application that are a part of these claims I

4   interpret.

5 Q A person without that education would not have

6   the ability to do that kind of formulation; is

7   that correct?

8 A Well, somebody without having the knowledge of

9   what exact ingredients that are necessary as well

10   as being able to mix them in the right proportion

11   and in the right process, and to come up with a

12   composition that actually meets all of the claim

13   limitations, you need both education and

14   experience.

15 Q So would you say that a person of ordinary skill

16   would be able to do that?

17      MS. PETERSON:  Objection.

18 A I applied, based on the definition that I'm

19   providing, I applied that particular definition

20   for a person of skill in view of the prior art in

21   terms of my analysis.

22 Q What about a person who has no education, no

23   formal education beyond a certain level, but has

24   been doing those kinds of things for 30 years,

Page 92

```
 1        would that person qualify as a person of ordinary
 2        skill?
 3                  MS. PETERSON:  Objection.
 4   A    Not in my definition.  But again, the plaintiff
 5        definition is much more lower for person of skill
 6        in the art, but my definition is they need the
 7        education and they have to have experience
 8        because the claims are not just making a product.
 9        They're directed towards a product that
10        ultimately has certain features and will function
11        in the way that are taught in the claim.
12   Q    What about being able to duplicate the examples
13        that are shown in the 802 patent?
14   A    There are no examples in the 802 patent.
15   Q    There are not?
16   A    No.
17   Q    Okay.  We'll get to that afterwards.  Talk about
18        the education, what type of courses would this
19        kind of person with ordinary skill have taken?
20                  MS. PETERSON:  Objection.
21   A    Again, depends on which school they went to.
22        Some schools have -- different schools have
23        different courses that they offer their students.
24   Q    What types of chemistry courses are necessary?
```

Page 93

```
 1                  MS. PETERSON:  Objection.
 2   A    General organic chemistry.  They may even take
 3          biochemistry.
 4   Q    Are these courses ever offered on an
 5          undergraduate level?
 6                  MS. PETERSON:  Objection.
 7   A    A different levels.
 8   Q    Are they -- would they be offered on an
 9          undergraduate level?
10   A    At a much lower level, yes.
11   Q    Would this person of ordinary skill have taken
12          physics courses?
13   A    Again, depends on the school and their
14          curriculum.
15   Q    How advanced would the physics courses need to
16          be?
17                  MS. PETERSON:  Objection.
18   A    I can't speak to what courses are taught in which
19          school.  It's a complete hypothetical.
20   Q    Well, doesn't a first or second semester graduate
21          course -- first or second semester undergraduate
22          course in physics teach electrostatics --
23                  MS. PETERSON:  Objection.
24   Q    -- that opposite charges attract and light
```

Page 94

1       charges repel?

2   A    Yes.  No, electrostatics are well known to

3       students, but this is not just about

4       electrostatic.  The  patent and the claims are

5       directed towards creating a composition that

6       ultimately inhibits infection.  If you look at

7       the specification of the patent, it talks about

8       stopping anthrax.

9   Q    Okay.  What would you call a person who has not

10      the level of education that you indicated, but

11      that has been making those kinds of -- working on

12      that kind of formulation for 30 years, what would

13      you call that person?  Would you call that person

14      of ordinary skill?

15                 MS. PETERSON:  Objection.

16  A    Again, I don't know exactly what, you know, that

17      hypothetical person has done as far as education

18      or what type of field they're working on, what

19      experience they have.  So until I see the

20      qualifications and experience, I can't really

21      tell.  But what I'm opining on is a person of

22      skill based on the qualification and experiences

23      in my report.

24  Q    All right.   You do realize that a person of

Page 95

```
 1           ordinary skill in the art is a hypothetical
 2           person; don't you?
 3    A      Yes.
 4    Q      So we're dealing with a hypothetical person over
 5           here, and you're telling me that you don't know
 6           what characteristics that a hypothetical person
 7           would have to have.  In other words, whether it
 8           would be experience or education.  Can you have
 9           experience without the education?
10                   MS. PETERSON:  Objection to form.
11           Asked and answered.
12    A      Again, this is my definition that I'm applying in
13           my opinion.  I think, you know, the plaintiffs
14           have made their definition.  At one point, as we
15           move towards this litigation, the court will
16           decide which one to adopt.
17    Q      What is your basis for making that decision, that
18           definition?
19    A      Well, based on my review of the patent and what
20           the patent is teaching, I believe the patent is
21           not just teaching towards a composition.  It's
22           teaching towards a utility, and this utility
23           involves applications to prevent infection.  So a
24           person of skill has to have knowledge of what
```

Page 96

```
 1              actually can prevent infection, like what can

 2              stop anthrax, what can stop Coronavirus.  That's

 3              what the patent, the specification is teaching.

 4    Q    But if he has experience in working on that time

 5              of rheology, does he does need -- and he has

 6              experience of that, does he still need that level

 7              of education?

 8                   MS. PETERSON:  Objection.

 9    A    Again, they have to have some knowledge of both,

10              formulation, development, and application towards

11              all of the different facets that are taught in

12              the patent.

13    Q    But suppose you have a person like that, who has

14              the experience with that, but not having the

15              education, would that person be a person of

16              ordinary skill?

17    A    And this is my definition.  This is the

18              definition that I'm opining on, and this is the

19              definition that I use in my analysis.  You know,

20              if the court adopts a different definition, we

21              will address those issues then.  But right now,

22              this is the definition I've applied.

23    Q    Would a person of ordinary skill have taken

24              courses in biology?
```

```
                                                     Page 97
 1                      MS. PETERSON:  Objection.
 2    A    Yes.  For students who are doing master's,
 3          certainly they have taken courses in biology,
 4          both chemical engineering as well as
 5          pharmaceutical sciences students.
 6    Q    What are the minimum requirements of biology
 7          courses necessary for a person of ordinary skill
 8          to have taken under this -- for this test?
 9                      MS. PETERSON:  Objection.
10                      MR. ALTMAN:  Liane, what's the nature
11          of your objection?
12                      MS. PETERSON:  Oh, so now you want me
13          to say that?
14                      MR. ALTMAN:  When I want it, I'll ask
15          for it.  So can you tell me what the nature of
16          the objection is?
17                      MS. PETERSON:  I think the question is
18          vague and ambiguous and I think it's an
19          incomplete hypothetical and I could keep going.
20                      MR. ALTMAN:  Okay.
21    A    I'm sorry, can you repeat the question?
22    Q    Okay.  What are the minimum requirements of
23          biology courses necessary for a person of
24          ordinary skill to have under his belt?
```

```
                                                      Page 98

 1                   MS. PETERSON:   Objection.

 2    A    It varies with the curriculum of the school that

 3          they go to.  Typically, in a general biology one

 4          and two is what students do take, both at the

 5          bachelors level, and then if they come to the

 6          master's program, they take some advanced biology

 7          courses.

 8    Q    Now, a person who -- would a person  who has your

 9          level of education, but does not have the skill

10          of doing pharmaceutical formulation, would that

11          person also be a person of ordinary skill?

12    A    No.  My definition is that they will have several

13          years of experience.  Once they have those

14          experiences, that's how they acquire a skill.

15    Q    Now, when you say several, how many years?

16    A    As I said, it depends on, you know, the

17          qualification.  If somebody has a Ph.D, they may

18          not need many years, but if they have a master's

19          degree, they may need a little bit more.

20    Q    Would they need ten years of experience?

21    A    Again, this is a hypothetical person and what I'm

22          relying on in my analysis is the definition that

23          I'm providing here.

24    Q    Would they need more than one year experience?
```

Page 99

```
 1   A   It depends on the individual and what they -- you

 2        know, but I would say based on my analysis, I use

 3        this definition of a person with a master's

 4        degree in chemical engineering or pharmaceutical

 5        science or related field and several years of

 6        experience.

 7   Q   Okay.  So it would be more than one year, right?

 8                MS. PETERSON:  Objection.

 9   A   Again, based on my definition.

10   Q   Is that yes?

11   A   It depends on the degree of, you know, if it's at

12        least a master's degree, but sometimes if they

13        have a Ph.D degree, then they may need a little

14        bit less.

15   Q   But can it be less than one year, six months

16        maybe?

17   A   Could be.  Again, depends on the person.  Again,

18        this is the definition that I've applied in my

19        analysis.

20   Q   Could a person having a master's degree in

21        chemical engineering have no experience and still

22        be a person of ordinary skill?

23                MS. PETERSON:  Objection.

24   A   No.  My definition says with several years.  So
```

Page 100

```
1         based on the definition, they would have to have

2         some  experience.

3    Q    Would you agree that the more experience a person

4         has -- would you agree that the more relevant

5         experience a person has, the less education he

6         would need?

7    A    Lesser than master's degree?  I don't think so.

8    Q    Okay.  So in other words -- okay.  It is your

9         testimony that a person who does not have a

10        master's degree in chemical engineering does not

11        possess the necessary skills to be a person of

12        ordinary skill in the art?

13                 MS. PETERSON:  Objection to form.

14   A    No.  As I said in my report, it's not just a

15        master's degree in chemical engineering, but also

16        pharmaceutical science or related fields.  It's

17        not just excluding other disciplines.

18   Q    Is it your testimony that a person who does not

19        have a master's degree in chemical engineering

20        cannot possess the same degree of knowledge as a

21        person who does have a master's degree in

22        chemical engineering?

23                 MS. PETERSON:  Objection to form.

24   A    Again, my opinion is that the master's degree
```

1              with the caliber of courses, as well as the fact

2              that master's comes after the bachelors, and

3              their experience in pharmaceutical formulation,

4              are what I would consider to be the

5              qualifications of a person of skill in the art.

6    Q    So your answer would be no to that question; am I

7              right?

8    A    I disagree with the characterization that

9              somebody with either a less degree, less than a

10             master's would really meet the level of

11             qualifications for a person of skill in the art.

12   Q    Is it your testimony that a person who does not

13             have a master's degree cannot possess the same

14             level of knowledge as a person who has a master's

15             degree?

16   A    No.  I think that's not what I'm saying.  What

17             I'm saying is that a person who when you're

18             looking at the art that is taught in the 802

19             patent, based on the 802 specifications and

20             claims, and looking at specifically the art, it

21             is my opinion that the person has to have at

22             least a master's degree in chemical engineering,

23             pharmaceutical science or related field and has

24             to have experience in pharmaceutical formulation.

Page 102

1    Q    That's a non-responsive answer.  Is it your

2         testimony that a person who does not have a

3         master's degree in chemical engineering could not

4         have the same level of knowledge as a person who

5         has a master's degree in chemical engineering?

6                 MS. PETERSON:  Objection to form.

7    A    No.  Again, that's not what I'm answering.  What

8         I'm saying is --

9    Q    Can you answer the question that I've asked?

10   A    Yes, I can answer the question, but my answer is

11        that -- I'm saying not just master's degree in

12        chemical engineering.  It's master's degree in

13        chemical engineering, pharmaceutical sciences or

14        related field.

15   Q    I'm not asking you whether he's a person of

16        ordinary skill in the art.  I'm asking you

17        specifically, does a person -- is it your

18        testimony that a person who does not have a

19        master's degree in chemical engineering can have

20        the same level of knowledge as a person who has a

21        master's degree in chemical engineering?  Forget

22        the 802 patent.  Is it possible, or is it your

23        testimony, that a person who does not have the

24        degree in chemical engineering can have the same

1          or possibly greater knowledge than a person who

2          has a master's degree in chemical engineering?

3                    MS. PETERSON:  Objection to form.

4     A    Again, it's a hypothetical question.  You know,

5          if somebody doesn't have a degree, but has more

6          experience, and in what area.  Yes, they could

7          certainly have experience in certain area and

8          they will know how to do things in that area

9          based on their experience.  But what I'm

10         reviewing is based on the context of the 802

11         patent.

12    Q    But I want the answer to that particular

13         question.  It's a non-responsive answer.  I

14         specifically want the answer to the question.  Is

15         it your testimony that a person who does not have

16         a degree in chemical engineering cannot have the

17         same level of knowledge as a person who has a

18         degree in chemical engineering?

19                   MS. PETERSON:  Objection to form.

20    A    Again, I think I've answered that question at

21         least three times already.  But it's context

22         dependent.  It depends on what context you're

23         applying it to.  A hypothetical person may have

24         more experiences than educational requirement,

Page 104

1           but I'm looking at it in the context of --
2   Q    Okay.  So then basically, it is possible that a
3           person -- okay.  Is a person who is an expert,
4           like yourself, one who is testifying as an
5           expert, a person of ordinary skill in the art?
6                     MS. PETERSON:  Objection to form.
7   A    Based on the definition that I'm providing, yes.
8           I have at least a master's degree level education
9           in pharmaceutical sciences and I have many years
10          of experience.
11  Q    That's for you.  But any person who would be an
12          expert, who testifies as an expert, also be a
13          person who also has ordinary skill in the art?
14                    MS. PETERSON:  Objection to form.
15  A    Again, it depends on what the expertise is and
16          what they are --
17  Q    An expert in pharmaceutical formulation.
18  A    Again, depends on their definition of a person of
19          ordinary skill in the art.
20  Q    According to your definition?
21  A    Are you saying any expert would be qualified as a
22          person of skill in the art?
23  Q    Of ordinary skill if they're an expert, an expert
24          accepted by the court?

```
                                            Page 105
 1              MS. PETERSON:  Objection to form.
 2   A    Again, I don't know what the court accepts or
 3        doesn't accept. I know that based on my analysis,
 4        I meet the definition of a person of skill in the
 5        art.
 6   Q    Basically, I'm talking about knowledge now, just
 7        about knowledge.  Would you agree that a person
 8        who does not possess a master's degree in
 9        chemical engineering, could have the same or
10        possibly greater knowledge than a person who has
11        a master's degree in chemical engineering?
12              MS. PETERSON:  Objection to form.
13   A    Again, depends on what knowledge you're talking
14        about.  Some knowledge can be acquired through
15        experiences.  Others -- there's also the
16        foundational knowledge comes from education.
17   Q    And that foundation of knowledge cannot be
18        garnered through experience, can only be garnered
19        through education?
20   A    Again, depends.  It's very subjective.  It
21        depends on what experiences that person has gone
22        through.
23              MS. PETERSON:  Stan, if you're at a
24        good stopping point for this, is it a good time
```

Page 106

1          to take a break?

2                    MR. KREMEN:  Yes.

3                      (Brief Recess)

4          BY MR. KREMEN:

5     Q    The rest of this deposition is going to be

6          concerned with, I believe, your marksmen report,

7          which is Exhibit 7, and the 802 patent, which is

8          Exhibit 2.  So that's what we're looking at.

9                    Referring to your declaration marked

10         Mansoor M. Amiji, Ph.D is Support of blueWillow's

11         Claim Construction Brief as Exhibit 7.  You

12         presented yourself as an expert in the field of

13         pharmaceutical sciences and drug formulation

14         development and characterization.  Is this how

15         you're presenting expertise in this present

16         litigation?

17    A    Yes.  That's what I mentioned in the

18         qualification and experience that I'm an expert

19         in the field of pharmaceutical sciences, and drug

20         formulation development and characterization.

21    Q    Okay.  You further state that specifically, "I

22         specialize in drug formation development and

23         targeted delivery of therapeutics, and I have

24         been an expert in this field since prior to July

Page 107

```
 1        7, 2008."
 2                        Is that how you're presenting your
 3            expertise in this present litigation?
 4    A     Yes.
 5    Q     Are there any writings submitted by you other
 6            than the declaration in which express your
 7            opinions on construction of the claims of the 802
 8            patent?
 9                        MS. PETERSON:  Objection to form.
10    A     I'm not sure I understand the question.
11    Q     Is this the only writing that you have submitted
12            to in this case stating your opinions on claim
13            construction, which is an Exhibit 7?
14    A     Specifically in relation to claim construction?
15    Q     Yes.
16    A     Yes.  This is the declaration, right.
17    Q     Now, if you would turn to page 13.  Would you
18            read the first sentence in paragraph 33?  If you
19            can do that aloud, I would appreciate it.
20    A     Page 13, paragraph 33?
21    Q     Yes.
22    A     "While a person skilled in the art reading the
23            802 patent would understand that the
24            specification provides a laundry list of possible
```

1          formulations, the patent specification does not

2          include any specific examples or test results for

3          any of the formulations demonstrating that they

4          work by electrostatically attracting particulate

5          matter to a thin film applied to the nasal

6          passages and holding the particulate matter in

7          place through adhesion to the thin film in order

8          to electrostatically inhibit such harmful

9          particulate matter from infecting an individual."

10   Q    What do you mean by a laundry list?

11   A    Well, the specification and the tables that are

12        provided in the patent lists all these different

13        ingredients.

14   Q    Isn't it true that you're using the term laundry

15        list in an attempt to trivialize the ingredients

16        of the formulations described in the

17        specification?

18               MS. PETERSON:  Objection to form.

19   A    No.  I'm just stating that the specification of

20        the 802 patent provides a list of ingredients.

21   Q    A laundry list.  It's trivializing it.  It's

22        saying it's to be done with the wash.

23               MS. PETERSON:  Objection to form.

24   A    No.  What I'm saying is, you know, the 802 patent

1        is providing a list of ingredients and the tables

2        provide these ranges but there is no examples.

3   Q    Okay.  Why did you use the word laundry?

4   A    Again, it's just a list of ingredients and

5        examples.  That's what I usually refer to as a

6        laundry list.

7   Q    Do you understand what an embodiment is with

8        respect to patents?

9                  MS. PETERSON:  Objection to form.

10  A    I understand, generally, what an embodiment is,

11       but again, I don't know the exact legal

12       definition.

13  Q    What do you understand it to be?

14  A    Embodiment is one of the examples that the

15       patentee would be describing that, one or more

16       examples, that ultimately when it comes to

17       understanding the claims, that a person of skill

18       would relay that example towards the actual

19       nature of the claim language.

20  Q    Is it true that patents list one or more

21       embodiments?

22                 MS. PETERSON:  Objection to form.

23  A    It varies from patent to patent.  Some patents

24       list embodiments.  Other patents, like the 802

Page 110

```
 1            patent, doesn't have examples.  It just simply
 2            lists all these different tables with ranges.
 3   Q    We'll get into the 802 patent later.  But doesn't
 4            the patent have to at least list one embodiment?
 5   A    Again, I don't know the exact requirement, the
 6            legal requirement of a patent, but I understand
 7            the term embodiment to mean that it's a
 8            composition or, you know, whatever the patent
 9            claims are teaching towards there is some
10            language in there that supports that the patentee
11            had that particular composition or if there was a
12            method of use patent and they actually were able
13            to use that particular approach.  And there's
14            sufficient description in the patent.
15   Q    Isn't it a fact that there is no statutory
16            requirement that patents must include test data
17            or test results?
18                    MS. PETERSON:  Objection to form.
19   A    Again, you know, for me, when I'm doing an
20            analysis, I'm simply looking at what the patent
21            you are providing.  In my opinion, the patent
22            doesn't, in written description, an enablement
23            requirement, based on the fact that it doesn't --
24            the full scope of the claim is not met by what's
```

Page 111

1          in the patent.

2     Q    So I take it that you don't know whether there is

3          a statutory requirement that a patent needs to

4          have test results or test data?  Either you know

5          it or you don't know it.

6     A    No.  I do know that you don't need specific tests

7          and exact test results, but you do need to

8          convince a person of skill in the art that you

9          were able to make a composition that ultimately

10         met all the claim limitation.

11    Q    Do you understand what a marksmen proceeding is?

12    A    Yes.

13    Q    What is it?

14    A    It's a proceeding in the court where certain

15         claim terms, if there is any ambiguity in the

16         definition of the claim terms, the court is

17         provided with the claim terms analysis by both

18         the plaintiff side and defendant side, and then

19         the court decides exactly how to interpret the

20         claim terms.

21    Q    And you're aware that it's a legal determination,

22         not a fact determination of the claim terms,

23         right?

24    A    Again, I don't know exactly how the court

1          determines the claim terms, but my understanding

2          is that that's what the marksmen hearing is,

3          provided declaration in support of marksmen.

4    Q    It's a report, not a jury or a fact finding that

5          makes that determination; is that correct?  You

6          understand that?

7    A    That's been my experience so far. But I don't

8          know exactly what the legal requirement is.

9    Q    Now, you would agree that the lack of test

10         specific examples, data or test results, has

11         nothing to do with the meaning of the claim term,

12         the actual meaning of the words?

13   A    Well, for person of skill to understand the

14         meaning they have to see what the specification

15         is describing, and ultimately draw -- you know,

16         when you look at the actual claim language, you

17         don't find any support in the specification for

18         the 802 patent.

19   Q    All right.  One of the things which you mentioned

20         when we began the deposition, is you mentioned

21         the Phillips standard and you discuss that in

22         your report.  I don't remember which one.  That

23         the first page we look at it is the plain

24         language of the claim.  I think that that was

```
                                          Page 113

 1        your opinion.  I don't know if it was this report

 2        or the other one.

 3                   MS. PETERSON:  Is there somewhere where

 4        you want to point him to?

 5                   MR. KREMEN:  I don't remember.  He did

 6        testify to that.

 7   A    Yes.  I've seen that specific language related to

 8        the Phillips.

 9   Q    So for example, if we're going to use the plain

10        language of the claims, do you have to have test

11        results or test data to determine what the plain

12        language means?

13                   MS. PETERSON:  Objection to form.

14   A    Again, in my opinion, and based on the

15        declaration that I provided for the claim

16        construction brief, the patent doesn't show to a

17        person of skill I the art, doesn't explicitly

18        describe any specific embodiment or any specific

19        examples that meets all the claim limitations.

20        That's what I'm opining on in my report.

21   Q    But in terms of the claim, don't the words mean

22        what they mean in English?  Forgetting -- the

23        Phillips standard said you start out with plain

24        language of the claims.  Don't these words have
```

Page 114

1          specific definitions, specific dictionary

2          definitions?

3                    MS. PETERSON:   Objection to form.

4     A    If you just take the claim in isolation of the

5          specification, then those definitions are, you

6          know, what the plain language mean.   But a person

7          of skill looks at the patent in total.

8     Q    Okay, good.   So in other words -- so basically,

9          you start out with the plain language, okay, and

10         you can modify the plain language by, in fact, I

11         believe that the rule says that a person can be

12         his own lexicographer, which means he can find

13         define terms differently than the plain language.

14         It starts out with the plain language, but he can

15         then define terms differently.   You're aware of

16         that, right?

17    A    Yes.

18    Q    Among the things that you could define terms

19         differently is you can have a glossary, okay.   Am

20         I right, you can do that?   You can do that.   You

21         can say I know that as long as the meaning of the

22         term is not repugnant, it's ordinary meaning, you

23         can say, when I use this term, it means that; you

24         can do that, right?

Page 115

1              MS. PETERSON:  Objection to form.

2   A    Again, you know, that's maybe some, you know,

3        legal specific requirement.  Again, as I

4        mentioned, I'm a technical expert, I don't know

5        the law related to --

6   Q    But you've written patents before in which you,

7        I'm sure you defined terms in certain ways;

8        haven't you?

9   A    As I've mentioned before in my testimony, I have

10       worked with lawyers who helped me with the draft

11       of the claims and we worked together on the

12       specifications.

13  Q    Is a specification mostly written by you or is it

14       written by the attorneys?

15  A    It's mixed.  In some cases, some sections of the

16       specification I provide, especially if it's data

17       that we collected in the lab, and interpretation

18       of that data.  Others the lawyers write.

19  Q    So in the absence of a glossary, okay, we start

20       out with a plain meaning of the word in the

21       dictionary definition, an we take a look and see

22       if the specification or anything else within the

23       patent description changes the meaning in any

24       way; is that correct?

1          MS. PETERSON:  Objection to form.

2    A    I'm not an expert in this area of, you know, what

3         is the actual definition for the claim language.

4         What I'm doing is interpreting the claims in view

5         of the specification and providing my opinions in

6         my brief.

7    Q    So essentially, you're interpreting the claims as

8         a technical expert, but not as a legal expert?

9    A    Yes.  My declaration is specifically relates to a

10        person of skill in the art and how they would

11        interpret the claims.

12   Q    Yet, we know that in the marksmen hearing, the

13        definition of claim terms is a legal

14        determination.  So doesn't some legal knowledge

15        -- isn't some legal knowledge required to be able

16        to interpret the claims?

17          MS. PETERSON:  Objection to form.

18   A    Again, whatever legal standards that I've

19        applied, I mention in my declaration.  But what

20        I'm doing is to look at this in the context of a

21        person of skill in the art and my declaration is

22        in support of the construction brief from the

23        defendant's side.

24   Q    Okay.  So now the lack of test examples, or data,

Page 117

1        or test results, really has nothing to do with

2        the meaning of the words in the claim; am I

3        right?

4    A   But a person of skill would be looking at the

5        claim and seeing what the claims is teaching and

6        then they will look at the specification to see

7        what support there is.  There is no support any

8        of the elements of the claims in the

9        specification.

10   Q   Let's look at some of this, okay.  Have you ever

11       written any claims completely by yourself?

12   A   No, I have not.

13   Q   Okay.  Look at paragraph 32 on the previous page.

14       You state that the 802 patent includes 10

15       separate tables, each with numerous formulations

16       and compounds that are variable.

17   A   Yes, I see that.

18   Q   By that, you mean that the percentage for each

19       ingredient is provided as a range of values; is

20       that correct?

21   A   Well, that's what the 10 tables have.  They have

22       ranges of values.  They have, in many instances,

23       specific ingredients and then they also have

24       different number of ingredient.  And then as you

```
                                                    Page 118

1              looked at the claim, it's a comprising claim,

2              which means that it could also have other things

3              in there.

4    Q    I'm specifically looking at the 10 tables right

5              now, okay.  It's providing a percentage for each

6              ingredient as a range of values; is that correct?

7    A    Yes, it is, and the ranges can go from anywhere.

8              A case of water, for example, can go from 62 to

9              80 percent.

10   Q    That's what a range is.  Now, would you agree

11             that ranges are permitted for ingredient

12             percentages?

13                       MS. PETERSON:  Objection to form.

14   A    Permitted where?

15   Q    In a patent specification.  It doesn't have to be

16             an exact percentage; am I right?

17   A    Well, of course, they are, but again, when you're

18             developing a composition based on that range, how

19             would that meet the claim limitation?  How would

20             it electrostatically attract in particulate

21             matter?  What level of electrostatic charge do

22             you need from all of those different ranges?  How

23             would it hold?  How long would it hold?  What

24             kind of inactivation?  What type of particle
```

Page 119

```
 1          would it inactivate?  Would it inactivate the
 2          same level in anthrax or would it inactivate a
 3          coronavirus?
 4     Q    So isn't that a reason for it to be variable?
 5     A    No.  That's not -- how would a person of skill
 6          know from looking at these ranges which ones
 7          would actually function the way the patent
 8          claims?
 9     Q    You're claiming that a formulator, a
10          pharmaceutical formulator would not -- that you,
11          as a person of ordinary skill in the art, that
12          you would not be able to look at those examples
13          and develop a formulation using those ingredients
14          in the specific ranges, remember you can't go
15          beyond those ranges, developing those specific
16          ranges, to produce something that would have a
17          particular replication which is listed in the
18          patent?  You would not know how to do that?
19     A    No.  Not only me, nobody else would know.
20          Because, again, it's all over the place.  At the
21          end, you're looking at potentially applying to a
22          human being and saying oh, see if anthrax, you're
23          going to be stopped from getting infected by
24          anthrax.
```

Page 120

1    Q    Doesn't that take experimentation?  Wouldn't the

2         formulator do some experimentation to make that

3         determination?

4    A    That's the definition of undue experimentation,

5         is how many experiments would you need to do with

6         all these ranges, and which one of these

7         ingredients would you put in, which ones you can

8         exclude.  If it's a comprising claim, you could

9         even have more, and some of them may even

10        neutralize the charge.

11   Q    So in other words, as long as the experimentation

12        is not undue, you could do some experimentation

13        with those ingredients, right?

14                  MS. PETERSON:  Objection to form.

15   A    No.  Again, this is just a table that lists these

16        ingredients and ranges without any guidance to a

17        person which of these ranges are actually going

18        to be functional, and which one will ultimately

19        lead to a product that meets the claim

20        limitation.

21   Q    So in words, you're saying that you got to have

22        embodiments there with specific composition

23        percentages, right?

24   A    No, that's not what I'm saying.  I'm saying that

Page 121

```
 1          even if you have these changes, at some point,
 2          you have to inform a person of skill in the art
 3          which product out of these ranges actually meet
 4          the claim limitation.  These are just ranges of
 5          compositions without any guidance to a person of
 6          skill that they will meet the claim limitation.
 7   Q   Okay.  If the concentration of the ingredients
 8          were specific as opposed to variable, would that
 9          change the meaning of the claim term?
10   A   It wouldn't meet the concentration of being
11          specific.  The question is, you know, you still
12          have to then ask would that actually lead to a
13          thin film? Would it then meet all of the
14          different elements of the claim?  Would it
15          electrostatically attract the particulate matter,
16          which particulate, and for how long?  Would it
17          then hold the particulate matter?  And then more
18          importantly, would it inactivate?
19                  So, you have to have certain level of
20          description in there that supports these
21          compositions that says this is how we would
22          verify if we're meeting the claim limitations.
23   Q   So you're saying that you cannot, so a patent
24          cannot have a claim that is broader than what you
```

Page 122

1        disclose?

2                    MS. PETERSON:  Objection to form.

3    A    A patent cannot have something that doesn't

4         really tell a person of skill in the art that

5         there is actually a composition there.

6    Q    Okay.  You would agree that the terms

7         electrostatically attracting the particle to the

8         thin film necessarily means that particulate

9         matter and thin film are oppositely charged, that

10        there's a force of attraction between them, yes?

11   A    Again, it depends on what particle and what force

12        is necessary to create that attraction.

13   Q    I'm saying that the plain meaning of the term,

14        electrostatically attracting particle matter to

15        the thin film, what is the plain language meaning

16        of that expression?

17                    MS. PETERSON:  Objection to form.

18   A    Just means that there is some electrostatic

19        attraction between a particle and this thin film.

20   Q    Okay.  So you understand what the concept of

21        electrostatic attraction of particles with thin

22        film is; don't you?

23   A    Right.  But again, when I look at the

24        specification, it could be any particle.  It

Page 123

1            doesn't even specifically one type of particle

2            and how that attraction occurs.   You have a list

3            of different germs, different bacteria, viruses,

4            you know, different allergens.

5      Q     So if we're taking about a formulation that has a

6            cationic agent in it of sufficient concentration,

7            and we talk about harmful particles that are

8            negatively charged, okay, then you would

9            understand the term electrostatic attraction

10           meaning that these unlike charges attract each

11           other; would you not?

12                      MS. PETERSON:   Objection to form.

13     A     I would understand it.  It will just be

14           electrostatic interaction between negatively

15           charged particles and positively charged surface.

16           But when you look at the entirety of the claim,

17           it's not just attraction.  It's holding, it's

18           inactivating.

19     Q     Okay.  We'll get to that.  But certainly

20           electrostatic attraction, you understand what

21           that means, what the term means?

22     A     Yes, I understand what electrostatic attraction

23           means.

24     Q     Okay, good.

Page 124

1           (Whereupon, Action Summary, was marked

2           as Exhibit No. 11.)

3

4    Q    Do you recognize this document?

5    A    Yes, I do.

6    Q    What is this?

7    A    This is, I believe, the prosecution -- the USPTO

8         providing the examination of the 802 patent in

9         providing a communication based on the

10        examination.

11   Q    You use this as an exhibit in your own report; am

12        I correct?

13   A    Yes, I believe I had used this as one of the

14        exhibits in the report, but I don't recall

15        exactly which.

16   Q    But you recognize the document?

17   A    Yes, I do.

18   Q    And do you recognize it as the office action

19        pertaining to the application that ultimately

20        issued as the 802 patent; is that correct?

21   A    That's my understanding, yes.

22   Q    I represent to you that this document is a true

23        copy of the USPTO non-file office action, dated

24        August 25, 2011, with a patent application that

Page 125

```
 1        ultimately issued as the 802 patent.  Now, please
 2        read pages two through four of this document to
 3        yourself and tell me when you're done.
 4   A    Okay.
 5   Q    Now, look at the patent, look at the preamble of
 6        claim one. It says, "Method for electrostatically
 7        inhibiting harmful particles from infecting an
 8        individual through," et cetera.  And the other
 9        one in claim number two says, "A  formulation for
10        electrostatically inhibiting harmful particles,
11        harmful particulate matter from infecting an
12        individual."
13                  You see that, right?
14   A    Yes.
15   Q    Are you aware that prior to this office action,
16        instead of the word inhibiting, it was the word
17        preventing; are you aware of that?
18   A    Yes.  That's what the examiner has quoted here.
19   Q    The examiner rejected the claim on the 112 first
20        paragraph indicating that there is not an
21        adequate written description or enablement to
22        support the term electrostatically preventing; is
23        that correct?
24                  MS. PETERSON:  Objection to form.
```

Page 126

```
 1   A    That's what the examiner is stating in this
 2        office action.
 3   Q    Okay.  Now, on page three, last paragraph, it
 4        starts with the words -- page three, last
 5        paragraph. It's a short paragraph, why don't you
 6        read it aloud?
 7   A    On page three, you said, right?
 8   Q    Right.
 9   A    The paragraphs says, "In reading the present
10        specification as a whole, it appears the tenor
11        thereof is that infections, whether they cause
12        pathology or not, may be inhibited rather than be
13        prevented.  The former allowing at least one
14        infectious material to pass into the system of
15        the host rather than the latter, which indicates
16        that not even one of the infectious material is
17        allowed to infect, that is to pass into the
18        system of the host."
19   Q    What does that paragraph mean to you?
20   A    Well, according to this examiner, it seems that
21        the word inhibited, as opposed to prevented,
22        allows for partial, there's some sort of -- it
23        allows for some of the infectious materials to
24        pass and others to be prevented.  But if you use
```

Page 127

```
 1          the term prevented, according to his analysis, is
 2          that everything has to be prevented.
 3    Q    Okay.  So in other words, what you're saying is
 4          that by -- and, in fact, if we look at the bottom
 5          of page -- let's say the examiner did indicate
 6          that to cure the problem, you can amend the claim
 7          if you change the word prevented to inhibited; is
 8          that right?
 9                    MS. PETERSON:  Objection to form.
10    A    I'm not sure they're using the term cure, but it
11          says overcoming the rejection below, delete the
12          term preventing and replacing it with the term
13          inhibiting.
14    Q    Okay.  In other words, the difference between
15          preventing and inhibiting is that some harmful
16          particles under the inhibiting standard, some
17          harmful particles could get through, and others
18          would be prevented from -- would not infect the
19          individual; is that what -- do you see that
20          there?
21                    MS. PETERSON:  Objection to form.
22    A    You know, I'm reading the examiner's opinion
23          here.  You know, I don't agree.  You could have
24          similarly preventing.  You can have partial
```

Page 128

1        prevention or full prevention.

2   Q    But inhibiting, according to the examiner, seems

3        to mean that you have partial prevention.

4   A    Again, you can still use partial prevention or

5        full prevention.  I don't see why inhibiting

6        somehow overcomes that.  But again, looking at

7        the totality of this claim, you know, to me, the

8        term inhibiting also supports this idea that

9        somehow you're going to be resisting that

10       infection.

11  Q    Okay. So you can see that the examiner understood

12       what the word inhibiting meant in the context of

13       the claim, right?

14                  MS. PETERSON:  Objection to form.

15  A    I understand what the examiner meant.  I don't

16       agree with the examiner, but I understand what he

17       means.

18  Q    Do you believe that the examiner is a person of

19       ordinary skill in the art?

20  A    I don't know what -- I don't know what his

21       qualifications are.

22  Q    But you do understand what he means by the term

23       inhibiting, right?

24  A    I understand what's in the office action, yes.

Page 129

1    Q    And as a matter of fact, that's when the patent
2         office says that that's what it means, that's
3         what it means, correct?
4                        MS. PETERSON:  Objection to form.
5    A    That's their opinion that they are providing in
6         the office action.  But clearly, when I review
7         the claims from a person of skill in the art, to
8         me, inhibiting means you're able to prevent
9         infection.
10   Q    Okay.  So now, electrostatically inhibiting,
11        doesn't that mean that it uses electrostatics?
12   A    You know, that would be the interpretation that
13        it uses electrostatics, yes.
14   Q    So from a plain and ordinary meaning, in light of
15        this office action, electrostatically inhibiting
16        is a definite term, it's something that you can
17        understand that's inhibiting, which you
18        understand what it means, using electrostatics;
19        am I correct?
20                        MS. PETERSON:  Objection to form.
21   A    Again, if you're just looking at those two terms
22        outside of the totality of the claims and in view
23        of the specification, that's what it means,
24        electrostatically inhibiting, meaning inhibiting

```
 1            based on electrostatic.  But you have to read the
 2            entirety of the claim and you have to look at in
 3            view of the specification.
 4    Q   Is there anything in the specification that would
 5            change that definition?
 6    A   Well, the fact that when you're talking about
 7            harmful particulate, it is a list of harmful,
 8            which ones would be inhibited and at what degree
 9            would it -- you know, is the allergens inhibited
10            through the same level as anthrax?
11    Q   Okay.  That's a very good question.  Do you
12            believe that one can patent a general medication
13            or a general pharmaceutical formulation that
14            would cover a wide range of pathogens or harmful
15            particles or does it have to be restricted, does
16            the patent have to be restricted to a single
17            harmful particle or can it be general?
18                    MS. PETERSON:  Objection to form.
19    A   Again, I have to look at the specifics of that
20            patent and the claims of that patent to make that
21            opinion.  What I'm doing is I'm reviewing data
22            too, and my opinions for the 802 is that when
23            you're looking at the claims in view of the
24            specification, you have to consider everything
```

Page 131

1          that's in the specification as well.

2    Q    Okay.  But you did say that understood what

3          electrostatically inhibiting means, and when I

4          asked you is there anything in the specification

5          that would conflict with that understanding of

6          the definition, as was in the office action, as

7          well as the word electrostatic?

8                    MS. PETERSON:  Objection to form.

9    A    Again, when I look at the meaning of the claim in

10         view of what is in the 802 patent, it says

11         harmful particulates.  Those harmful

12         particulates, there's a spectrum.  Some are more

13         harmful than others.  So when you say inhibiting,

14         how much do you need to inhibit?

15   Q    That's not what I'm asking.  I'm asking, is there

16         anything in this specification that would

17         conflict with that meaning of the term?

18   A    Meaning of just the term electrostatically

19         inhibiting?

20   Q    Yes.

21   A    Well, the fact that, you know, again, what level

22         of electrostatic field do you need?

23   Q    That's not what I'm asking.  I specifically

24         asked, is there anything in the specification,

```
 1        written down in the specification, that would

 2        conflict with that meaning of the term?

 3                  MS. PETERSON:  Objection to form.

 4   A    Again, I have to look at the entirety of the

 5        specification.  I don't look at just two terms in

 6        the entire claim.  I look at the totality of the

 7        claim and then I look at the totality of the

 8        patent.

 9   Q    Okay.  Now, you're looking at the totality of

10        claim one.  Okay, let's take a look at --

11        electrostatically inhibiting we know that --

12        essentially, this is a use.  In other words, it

13        is a -- we're looking for a method for

14        electrostatically inhibiting, and essentially,

15        it's a use for the method, and it's also a use

16        for the formulation.  So we're saying that this

17        is what the formulation does.  It

18        electrostatically inhibits, okay.  There is not -

19        - is there anything in the specification that

20        will conflict with what we're trying to do with

21        the formulation or the method?

22                  MS. PETERSON:  Objection to form.

23   A    Again, the fact that the term, just

24        electrostatically inhibiting is, you know,
```

 1          meaning that it is stopping these particles and

 2          there's phenomena of electrostatic.  But other

 3          than that, you know, the specification doesn't

 4          tell anything about, any of the other properties

 5          that are necessary to meet the claim limitations.

 6    Q    Doesn't electrostatically inhibiting, as it's

 7          used in the claim, mean that it stops some

 8          harmful particles from protecting an individual,

 9          according to what the examiner came -- isn't that

10          what it means?

11                    MS. PETERSON:  Objection to form.

12    A    Again, that's what the examiner is suggesting in

13          the office action, but a person of skill would

14          look at this and say when you look at the list of

15          different harmful pathogens, when you say

16          inhibiting, and inhibiting means allowing some of

17          them to go, what's the value?  If you allow one

18          anthrax to go into your body, you still get

19          infected.

20    Q    Right.  But that's -- isn't that why the examiner

21          specifically changed preventing to inhibiting?

22    A    No.  But if the claim is directed towards

23          inhibiting and also inactivating, you have to

24          look at it in the context of specification.  You

Page 134

1       know, if you get one Coronavirus in your body,

2       you still get infected.

3  Q    But you are aware that the examiner made a ruling

4       in this particular case that if it was changed to

5       inhibiting, it would be acceptable; is that

6       correct?

7                  MS. PETERSON:   Objection to form.

8  A    It would be acceptable to him.

9  Q    Okay.  But he is essentially an official in the

10      U.S. Government; is he not?

11 A    I mean, this is his opinion.  That's what he's

12      providing in the office action.

13 Q    Let's take a look at the claim, and we're going

14      to talk about claim -- take a look at claim

15      number two.  We know for the plain meaning of the

16      term, of what electrostatically inhibiting

17      harmful particulate matter, in other words,

18      that's the intended use of the formulation, okay.

19      So in other words, you understand that

20      electrostatically inhibiting harmful particulate

21      matter from infecting an individual through nasal

22      inhalation is an intended use of the formulation;

23      is that correct?

24                 MS. PETERSON:  Objection to form.

Page 135

```
 1    A    Again, that's mentioned here in the claim, but
 2              you have to look at it in the context of the
 3              other limitations.  It's formulation comprising
 4              at least one cationic agent and a biocidic agent,
 5              and then it's attracting the particulate matter
 6              into a thin film holding that particulate matter
 7              and adjusting for the adhesion of the thin film.
 8    Q    All right.
 9    A    All of those other elements have to be met as
10              well.
11    Q    Let's take a look at the formulation itself,
12              okay.  We're speaking about a formulation that
13              has an intended use, okay.  And where the
14              formulation is applied to the skin or tissue of
15              the nasal passage; you understand that, don't
16              you?
17    A    Are you just asking me to see what's in the
18              claim?
19    Q    Yes.  In other words, I'm looking at the preamble
20              of the claim two.  The formulation applied to the
21              skin or tissue of the nasal passages of the
22              individual, right?
23    A    That's what the claim is written.  That's the way
24              it was written.
```

Page 136

```
 1   Q    You understand that, right?  Is there some reason
 2        that you don't understand that?
 3                    MS. PETERSON:  Objection to form.
 4   A    I understand what's written.  But what I'm trying
 5        to explain is the fact that when you look at that
 6        preamble, you also have to look at the other
 7        elements.
 8   Q    What is in the preamble is applied to thin film,
 9        okay.  And formulation comprises at least one
10        cationic agent and at least one biocidic agent.
11        Is that understandable?
12                    MS. PETERSON:  Objection to form.
13   A    Yes.  I can read what's written in the claim.
14   Q    What does it mean?
15   A    That in this formulation, the ingredients of the
16        composition should have at least one cationic
17        agent and at least one biocidic agent.  And then
18        wherein said formulation once applied, has other
19        elements.
20   Q    So basically, you would agree that examples of
21        the cationic agents and biocidic agents are
22        included in the specification; is that not
23        correct?
24   A    Again, this is a laundry list of different kinds
```

```
 1            of cationic agents, and certainly laundry lists

 2            of some of these that are biocidic as well.

 3    Q    Okay.  But there's at least one of each, right?

 4    A    But it doesn't tell you which one and it doesn't

 5            say anything about how much --

 6    Q    That's not what I asked.  Specifically, it says

 7            it has to have, that the formulation has to have

 8            a cationic agent and a biocidic agent.  And

 9            examples of that, of those agents, are given in

10            the specification. They're listed in the

11            specification; am I correct?

12    A    Those examples are given, but again, for person

13            of skill looking at this claim too, they will

14            look at which ones of those will actually do the

15            function that are described in element A, B, and

16            C.

17    Q    All right, that's reasonable.  That's reasonable.

18            Now, let's go on to element A, okay.

19            Electrostatically attracts the particulate matter

20            to the thin film.  Before you said you know what

21            that means?

22                    MS. PETERSON:  Objection to form.

23    A    No.  What I'm saying is that is, that element,

24            when you look at in the context of these
```

1     composition without any specific amounts of any

2     specific type of ingredient, you don't know which

3     particulate matter in the specification.  They

4     have all kinds of particulate matters.

5  Q  Is a claim supposed to be a manufacturing

6     specification?

7  A  No, it's not a manufacturer.  It's a function

8     claim, and therefore, to function in this way,

9     when you have so many different kinds of

10    particulate matter, how would all of those

11    particulate matter somehow bind electrostatic?

12 Q  Okay.  We know that the formulation has a

13    cationic agent; is that correct?  Because it says

14    so, all right.  A cationic agent.  One of those

15    that are listed there.  We know that the

16    formulation has that, okay.

17               Now, if we have the cationic agent and

18    we know some harmful particles are negatively

19    charged, would they be attracted to the thin

20    film?

21 A  Again, depends on whether the cationic agent is

22    actually exposed to the outside of the thin film.

23 Q  But it could be -- electrostatic attraction could

24    be there; am I correct?

Page 139

1    A    Again, depends on what type of charge you have

2         and which type of particulate matter.  Would you

3         get the same level of attraction irrespective of

4         any particulate matter?  No.

5    Q    Is it required that it would have the same

6         effective quantity or effect for all cationic

7         agents for all harmful particles or can it vary?

8    A    Again, I mean, I read the claim in view of all

9         the different elements, if there is something

10        that will actually attract and hold and

11        inactivate.  And you look at the specification

12        and it says all of these different bacteria and

13        viruses and allergens are inhibited, that's how I

14        interpret the claim.

15   Q    If there was only one cationic agent and one

16        bacteria, would this be a valid --

17   A    That's not the claim.  I'm reading the claim of

18        the 802.  I'm not reading some other hypothetical

19        patent.

20   Q    If the claim consists of one of the cationic

21        agents that is listed in the specification, one

22        of them, and it contains one specific harmful

23        particle that is also listed in the

24        specification, and it contains a sufficient

Page 140

1       quantity, would that expressions be

2       understandable to you?

3                MS. PETERSON:  Objection to form.

4   A   Again, that's not the claim of the 802.  I'm

5       reading the claim as written by the patentee.  So

6       to me, I interpret what's on the paper, not some

7       hypothetical.

8   Q   Okay.  Let's look at B.  One of the things that

9       you indicated was that the term adequate

10      impermeability is not evident.  Why do you say

11      that?

12  A   Well, again, looking at the claim element, if

13      you're looking at 2B, where it holds the

14      particulate matter in place by adjusting the

15      adhesion of the thin film to permit said thin

16      film to stick to the skin or tissue and by

17      adjusting the cohesion of the formulation to

18      provide adequate impermeability to the thin film.

19      So when you look at in totality, that claim

20      element, what it's saying is that it's going to

21      be a thin film that will basically prevent these

22      harmful particulate matter from passing from one

23      side or the other.   I believe that adequate

24      impermeability is indefinite because it doesn't

Page 141

```
 1           say what level of impermeability is acceptable.
 2    Q    Well, isn't adequate a term of degree?
 3    A    A degree of what?  Again, for anthrax, what level
 4           of impermeability do you need?
 5    Q    Do you understand that in a patent you could have
 6           terms of degree, for example, like sufficient
 7           quantity or adequate efficiency?  Is it possible
 8           to have terms of degree like that in a claim, in
 9           a patent claim?
10                    MS. PETERSON:  Objection to form.
11    Q    Do you know whether it's possible?
12    A    Again, maybe in some of those other patents,
13           again, depending on the teaching, the art, to
14           those patents.  Here, I'm focusing on the 802.
15    Q    Okay, fine.  Let's deal with that.  What does the
16           term adequate mean?  Give me a dictionary
17           definition in your mind what the term adequate
18           means.
19                    MS. PETERSON:  Objection to form.
20    A    Again, I don't know exactly, you know, in terms
21           of the impermeability, what the claim language
22           here suggests is that it's some level of
23           impermeability, but it doesn't explicitly state
24           what that means.  And if you looked at in the
```

1           context of preventing infection, then it becomes

2           indefinite because if --

3   Q   Well --

4   A   Let me finish.

5   Q   Go ahead.  Sure.

6   A   Different particulates have different

7           pathogenicity.  So what impermeability are you

8           looking for if you're thinking potentially a

9           very, very deadly pathogen?

10  Q   Okay.  So basically what adequate impermeability

11          should mean, and correct me if I'm wrong, should

12          be that the permeability has to be adequate for

13          the purpose of preventing the pathogen from

14          penetrating the thin film, is that not correct?

15          Wouldn't that be the definition of adequate in

16          this case for that particular purpose?

17  A   Well, again, if that's the definition, then --

18          and that's why it's indefinite, because different

19          pathogens require different levels of

20          impermeability depending on how potent they are.

21  Q   But for a given pathogen, let's say any given

22          pathogen, the term adequate impermeability would

23          not be indefinite; would it, for a given

24          pathogen?

Page 143

1           MS. PETERSON:   Objection to form.

2    A    Again, but that's not here.   In context of the

3          802 and these claims, it doesn't explicitly say,

4          this is the pathogen.   It says all of these

5          pathogens and allergens.

6    Q    So in other words, you can't come with a claim

7          that would be general then?   You couldn't claim

8          more broadly than is in the specification; is

9          that correct?

10   A    But you have to inform a person of skill what

11         that meaning of the claim is in view of the

12         specification.   Right now the specification is

13         listing all of these different particulate

14         matter, harmful particulate matter, and you have

15         a term like adequate impermeability, doesn't say

16         to a person of skill in the art, doesn't explain

17         of what level of impermeability you need.

18   Q    So in other words, you're saying that because the

19         specification in this patent is not definite as

20         to exactly what pathogen you're going to use and

21         exactly what cationic agent you're going to use,

22         and what the exact concentration is, that the

23         whole thing, the claim is indefinite?

24           MS. PETERSON:   Objection to form.

Page 144

1  A    No.  What I'm looking at is interpreting the

2       claims in view of the specification, and I'm

3       basically opining in my declaration the specific

4       sections that I feel, for example, adequate

5       impermeability is indefinite, because each of

6       these different pathogens in particulate matter

7       will have differential impermeability that would

8       be necessary to prevent them from infecting the

9       host.

10 Q    Okay.  So that is what you believe adequate

11      impermeability to be?  In other words, you've

12      just given me a definition of adequate

13      impermeability, where you said it depends on the

14      specific pathogen and the specific adjustments of

15      the adhesion and cohesion?  You just gave me that

16      definition.

17 A    Again, that would be, you know, the way I would

18      interpret specifically the term claim, the claim

19      language of adequate impermeability in the

20      context of the specific type of particulate

21      matter.  But the claims are not directed to any

22      type of particulate matter.  They're directed to

23      broad.  The claims are very broad, and when you

24      look at the claims in view of the specification,

1       you see that those particulate matter can be

2       anything.

3   Q   And you feel that that's not permissible?

4   A   Well, in that sense, for a person of skill in the

5       art, the claim would be indefinite for that

6       reason.

7   Q   But you, as a person of skill in the art, would

8       be able to perform experimentation using those

9       ingredients and to develop a -- would you be able

10      to develop a formulation using those ingredients

11      that would do what you need to do?

12                  MS. PETERSON:  Objection to form.

13  A   Not based on the teaching of the 802.  Again, as

14      I've testified before, the 802 has a list of

15      different ingredients and ranges.  So I would

16      have to -- you know, this is the definition of a

17      new experimentation.

18  Q   Wouldn't different percentages have different

19      effects on different people?

20                  MS. PETERSON:  Objection.

21  A   I'm not sure what you mean by that.

22  Q   Okay.  Let's continue.  The next thing that we're

23      speaking about is renders said particular matter

24      harmless.  Now, we know what the definition, the

1      dictionary definition of harmless is.  But can

2      the prosecution history change that definition?

3                MS. PETERSON:  Objection to form.

4   A   Again, I don't know if that's, you know, a legal

5      interpretation.  As I do my analysis, I look at

6      it from a technical and from a person of skill in

7      the art.  And harmless is also subjective.

8   Q   Okay.  Subjective.  As a matter of fact, if you

9      look on page one of the patent, the very first

10     page.  Why don't you read the abstract, the full

11     abstract?

12  A   You want me to read it aloud?

13  Q   Please.

14  A   "A product to reduce, a method of reducing the

15     risk of inhalation of harmful substances by

16     applying a formulation composition to a substrate

17     or the skin in close proximity of one or more

18     nostrils.  This formulation when applied creates

19     an electrostatic field having a charge.  The

20     electrostatic field attracts airborne

21     particulates of opposite charge to the substrate

22     and are in close proximity to the substrate close

23     to the skin.  And a biocidic agent renders

24     microorganisms coming in contact the substrate or

Page 147

1       skin less harmful."

2    Q  Less harmful, okay.  So basically, that was the

3       -- because it were inhibiting, and not

4       preventing, the term less harmful means that

5       perhaps some can get through, some can't; am I

6       right?

7               MS. PETERSON:  Objection to form.

8    A  Again, if you look at the specification about

9       some of those harmful agents, you know, these

10      could be anything from allergens to bacteria to

11      viruses, to all different kinds of pathogens.  So

12      what is less harmful for, you know, fungals or

13      what is less harmful for Coronavirus getting in?

14      What's less harmful for smallpox virus?  What's

15      less harmful for influenza virus?

16   Q  Okay.  When you read scientific articles, do the

17      scientific articles have an abstract?

18   A  They do.

19   Q  When you read an abstract, do you typically

20      understand what it is that the article is trying

21      to convey before you read it?

22   A  I usually read the abstract, but I also look at

23      the conclusion and also look at, if I'm

24      interested in that particular research, I would

Page 148

1        look at the methods.

2    Q   But reading the abstract that you just read, as a

3        separate item, forget the rest of the patent, if

4        you were looking at this abstract trying to

5        figure out whether you were going to read this

6        patent, is that abstract understandable?

7    A   Again, when a person of skill looks at the

8        patent, they look at the entirety of the patent.

9        They're not just looking at the abstract.  So you

10       have to look at the patent in total, and you look

11       at the abstract in the context of other sections

12       of the specification.

13   Q   Doesn't this abstract specifically state what the

14       formulation and the methodology is going to do?

15       Doesn't it say it in black and white?

16   A   Again, abstract by itself has certain sentences,

17       but you don't just look at the abstract.  You

18       look at the claims.  You look at other sections

19       of the specification.  And when you start to

20       interpret these harmful particulates in the

21       specification column three, you have descriptions

22       of what those harmful particulates are.  It's

23       right on line 44 up to -- continues all the way

24       up to line 65.

Page 149

1           MR. KREMEN:  I have nothing more.

2           MS. PETERSON:  I don't have any

3     questions.  The witness will review and reserve

4     the right to make corrections to the deposition

5     and will sign it.

6

7           (Whereupon, the deposition in the

8     above-entitled matter concluded at 12:20 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 150

1                    C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    COUNTY OF PLYMOUTH, SS

4         I, Susan Baxter, a Professional Court Reporter

5    and Notary Public in and for the Commonwealth of

6    Massachusetts, do hereby certify that the foregoing

7    deposition of MANSOOR AMIJI, was taken before me on

8    October 14, 2022.  The said witness was satisfactorily

9    identified and duly sworn before the commencement of

10   his testimony; and that such deposition is a true

11   record of the testimony given by the witness.

12        I am not connected by blood or marriage with any

13   of the said parties, nor interested directly or

14   indirectly in the matter in controversy.

15        In witness whereof, I have hereunto set my hand

16   and Notary Seal this 17th day of October, 2022.

17

18        *Susan Baxter*

19   Susan Baxter, Notary Public

20   My Commission Expires:

21   February 21, 2025

22

23

24

Page 151

1   CASE:   TRUTEK CORP. VS. BLUEWILLOW BIOLOGICS, INC.

2   DEPOSITION OF:   MANSOOR AMIJI

3   DATE:   October 14, 2022

4         The above-referenced transcript is available for

5   review.

6         Within the applicable timeframe, the witness

7   should read the testimony to verify its accuracy.  If

8   there are any changes, the witness should note those

9   with the reason on the attached Errata Sheet.

10         The witness should sign the Acknowledgment of

11   Deponent and Errata and return to the deposing

12   attorney.  Copies should be sent to all counsel, and

13   to Veritext at CS-NY@veritext.com.

14         Return completed errata within 30 days from

15   receipt of testimony.

16         If the witness fails to do so within the time

17   allotted, the transcript may be used as if signed.

18                         Yours,

19                         Veritext Legal Solutions

20

21

22

23

24

Page 152

1   CASE:   TRUTEK CORP. VS. BLUEWILLOW BIOLOGICS, INC.

2   DEPOSITION OF:   MANSOOR AMIJI

3                     E R R A T A   S H E E T

4   PAGE    LINE      PRESENTLY READS        SHOULD READ

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

```
                                                    Page 153

1    CASE:  Trutek Corp. Vs. BlueWillow Biologics, Inc.

2    DEPOSITION OF:  Mansoor Amiji

3                    Acknowledgment of Deponent

4              I, Mansoor Amiji, do hereby declare that I

5         have read the foregoing transcript, I have made

6         any corrections, additions, or changes I deemed

7         necessary as noted above to be appended hereto,

8         and that the same is a true, correct and complete

9         transcript of the testimony given by me.

10   _____          _____

11   Mansoor Amiji                             Date

12   *If notary is required

13                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

14                    _____ DAY OF _____, 20___.

15                    _____

16                    Notary Public

17

18

19

20

21

22

23

24
```

**&**

**&**   2:19

**0**

**08816**   2:5

**1**

**1**   1:12,13 3:8
4:22 31:5 44:8
46:17 47:16
82:10 83:1
**1-11**   1:2
**1-153**   1:1
**10**   1:12,13 3:21
21:6,15,16,18
72:16 73:8
75:14 77:7
117:14,21 118:4
**100**   78:24
**101**   1:22 31:7,14
31:23,23 32:13
32:24 33:9,12,24
34:12 44:9,12,19
44:19 45:2 46:9
46:12,22,24
**102**   53:20 58:9
**103**   53:21 54:14
58:9
**10312**   1:6
**11**   3:22 124:2
**112**   47:17 48:21
48:23 49:7,15,15
50:12 51:2,4,6,7
52:11,14,19
125:19
**112a**   49:20
**12**   2:12 31:4
49:3 79:22

**124**   3:22
**12:20**   149:8
**13**   3:9,10 69:5
79:22 107:17,20
**14**   1:23 3:11
64:18 150:8
151:3
**15**   3:12 24:22
65:1
**16**   3:14
**17**   3:16
**17th**   150:16
**18**   64:18
**19**   45:5 46:1

**2**

**2**   1:19 3:9 13:7
13:10,18 26:10
31:5 44:8 46:17
47:16 82:10
83:2 106:8
**20**   27:9 153:14
**20007**   2:21
**2008**   107:1
**2011**   124:24
**202**   2:22 37:8,22
41:13 43:23
**2021**   72:24
**2022**   1:23 150:8
150:16 151:3
**2025**   150:21
**21**   150:21
**212**   46:17
**214**   47:15
**24**   19:20 78:16
**248**   2:14
**25**   27:3 124:24

**27**   21:6,14,15,16
21:18
**28196**   150:18
**29th**   64:12
**2:21**   1:6
**2b**   140:13

**3**

**3**   3:10 13:23
**30**   33:16 87:20
91:24 94:12
151:14
**3000**   2:20
**306**   1:20
**32**   117:13
**33**   3:19 107:18
107:20
**35**   31:7,23 33:24
34:12 44:9
46:22 47:17
48:23 51:2
53:20 83:15
**35usc101**   3:19
**35usc112**   3:20
**375**   2:12
**38228**   2:12
**39**   65:1

**4**

**4**   2:4 3:4,8,11
14:22 15:3,14,23
30:21 31:2 33:5
37:19
**44**   45:7,8 46:1
148:23
**46**   49:24
**48**   3:20
**481**   60:17

**48334**   2:13
**488**   60:17
**4:40**   72:24

**5**

**5**   3:12 15:10
16:21 30:21
78:15
**50**   10:15,17
**593-7294**   2:6

**6**

**6**   3:14 16:5,9,13
19:16 31:5 44:8
46:17 47:16
63:18 79:22
80:4 82:10
**6.279**   79:4
**600**   2:20
**62**   118:8
**65**   148:24

**7**

**7**   3:16 17:13
31:5 44:8 46:18
47:17 72:24
82:10 106:7,11
107:1,13
**72**   3:21
**732**   2:6

**8**

**8**   3:19 33:10
47:2
**80**   118:9
**802**   3:9 13:6,9
22:12 24:14
26:11,13 30:18
30:23 37:9 41:1
41:3,14 42:24

**[802 - allege]**

43:23 46:13
47:13,17 48:2,20
54:1 58:1 60:2,5
63:22 64:4 65:6
82:10 83:22
86:2 87:16 89:4
92:13,14 101:18
101:19 102:22
103:10 106:7
107:7,23 108:20
108:24 109:24
110:3 112:18
117:14 124:8,20
125:1 130:22
131:10 139:18
140:4 141:14
143:3 145:13,14
**8163802**   26:10
**8:36**   1:24

**9**

**9**   3:20 48:24
49:1
**91**   79:2
**91.805**   79:2
**945-6116**   2:22
**95**   31:1
**987-8929**   2:14
**99**   46:15

**a**

**a.m.**   1:24
**abbreviation**
73:15
**abc**   1:13
**ability**   7:7,21
31:19 76:9
82:15 91:6

**able**   7:12 24:12
38:17 46:2
49:21 51:9 57:7
58:8,15 59:22
61:17 64:7
68:23 75:24
78:6 82:21 83:3
83:4,24 87:14
90:7 91:10,16
92:12 110:12
111:9 116:15
119:12 129:8
145:8,9
**absence**   115:19
**absolutely**   6:6
**absorbable**   72:9
**abstract**   38:23
146:10,11
147:17,19,22
148:2,4,6,9,11
148:13,16,17
**accept**   28:6
29:12,18 105:3
**acceptable**   134:5
134:8 141:1
**accepted**   29:15
104:24
**accepts**   105:2
**accessible**   71:15
**accuracy**   151:7
**accurately**   6:3
7:13
**accused**   21:21
22:5
**acidic**   75:12
**acknowledgm...**
151:10 153:3

**acquire**   72:5
98:14
**acquired**   105:14
**action**   3:22 4:12
124:1,18,23
125:15 126:2
128:24 129:6,15
131:6 133:13
134:12
**actual**   89:18
91:2 109:18
112:12,16 116:3
**addition**   44:3
**additional**   40:11
40:20 41:16,19
44:1 62:4
**additions**   153:6
**address**   96:21
**addressing**   60:6
**adequate**   125:21
140:9,18,23
141:2,7,16,17
142:10,12,15,22
143:15 144:4,10
144:12,19
**adhesion**   108:7
135:7 140:15
144:15
**adjusting**   135:7
140:14,17
**adjustments**
144:14
**admit**   81:7
**adopt**   95:16
**adopts**   96:20
**advanced**   87:6
93:15 98:6

**advantages**
73:13
**advisement**
11:11
**agent**   19:4 68:6
68:7 69:1 84:10
123:6 135:4,4
136:10,10,17,17
137:8,8 138:13
138:14,17,21
139:15 143:21
146:23
**agents**   68:19
84:15,18 136:21
136:21 137:1,9
139:7,21 147:9
**aggregating**
70:23
**aggregation**
70:12
**agree**   22:16
23:15,15 31:11
34:19 40:2,9,18
40:18 54:7,13
55:14 79:17
83:16 100:3,4
105:7 112:9
118:10 122:6
127:23 128:16
136:20
**agreed**   8:1
**agreement**   9:24
**ahead**   142:5
**airborne**   146:20
**alexei**   64:20
**allegations**   64:2
**allege**   31:8 37:8

**allergens** 123:4
130:9 139:13
143:5 147:10
**alliance** 63:14
**allotted** 151:17
**allow** 133:17
**allowed** 32:16
126:17
**allowing** 126:13
133:16
**allows** 39:20
66:17 126:22,23
**aloud** 21:14,15
34:1 45:7
107:19 126:6
146:12
**altman** 2:10,11
7:23 9:4,11,19
14:7,16 32:15,21
34:4 35:4 36:7
37:13,17 97:10
97:14,20
**ambiguity**
111:15
**ambiguous**
34:14 35:1
50:21 97:18
**amend** 127:6
**amiji** 1:17 3:3
4:3,10,16,17 9:1
9:2 15:14,17
16:12 17:15
63:19 106:10
150:7 151:2
152:2 153:2,4,11
**ammonium**
71:17

**amount** 10:16,18
**amounts** 138:1
**analysis** 22:4,10
31:5,16 33:6
34:18 40:15
44:14,23 45:23
46:12 50:23
51:4,15,24 52:10
52:12 53:24
54:19 55:11
57:18,23 60:2
61:17,18 67:3
81:19 83:12
84:24 86:1
88:12 91:21
96:19 98:22
99:2,19 105:3
110:20 111:17
127:1 146:5
**analyzed** 75:21
**answer** 6:2,9,11
6:11,15 7:8,12
7:19,20 8:8 9:17
9:18 11:23
32:11 35:1 36:6
37:2,4,6 101:6
102:1,9,10,10
103:12,13,14
**answered** 95:11
103:20
**answering** 6:16
32:20 102:7
**answers** 6:7 7:8
**anthrax** 94:8
96:2 119:2,22,24
130:10 133:18
141:3

**anticipate** 56:3
59:1,10
**anticipated** 54:8
55:13
**anticipation**
53:20 54:3,12
55:3,6,8,19
56:10 58:13
**antiseptic** 73:12
**anybody** 12:13
13:1
**anyway** 5:12
**appeals** 26:19
29:2
**appears** 126:10
**appended** 153:7
**applicable** 80:1
151:6
**applicant** 50:3,9
**applicants** 52:22
**application** 77:4
80:6 91:3 96:10
124:19,24
**applications**
25:6 30:13 77:1
89:16 95:23
**applied** 33:6
50:15 51:23
59:19 66:1
81:19 83:14
89:9 91:18,19
96:22 99:18
108:5 116:19
135:14,20 136:8
136:18 146:18
**applies** 50:12
**apply** 33:3 49:11
54:11 74:11

80:23
**applying** 45:22
46:12 51:4,6,12
51:14 95:12
103:23 119:21
146:16
**appreciate**
107:19
**approach** 110:13
**approximately**
24:21 27:5,12
**aqueous** 79:1,2
**arch** 1:22
**area** 103:6,7,8
116:2
**argument** 55:19
55:21 56:10
**argument's**
72:18
**arrive** 56:1
**art** 11:17 20:15
22:22 35:7
38:11 44:5,17
45:1 46:7 48:3
49:21 50:2,17
51:8 52:16 54:8
54:14,15,19 55:2
55:13,15,17,24
56:1,9 57:17
58:9,14,24 59:5
59:7,13,16,20,22
60:3,5,8,14,16
61:3,8,14 62:1
65:2 79:24 80:7
80:12,15,16 81:1
81:8,9,12,15,21
82:3,5 83:11,17
85:18,19,21 86:1

86:3,5,8,21
87:13 90:14,20
91:20 92:6 95:1
100:12 101:5,11
101:18,20
102:16 104:5,13
104:19,22 105:5
107:22 111:8
113:17 116:10
116:21 119:11
121:2 122:4
128:19 129:7
141:13 143:16
145:5,7 146:7
**article** 147:20
**articles** 147:16
147:17
**asked** 18:15 32:8
53:9 77:18
95:11 102:9
131:4,24 137:6
**asking** 6:15
20:21 23:4
35:22 37:19
42:8 67:4,4 80:4
102:15,16
131:15,15,23
135:17
**aspects** 34:17
44:15 90:7
**asserted** 65:6
**assume** 8:8
72:18,24
**assuming** 74:24
76:6
**attached** 151:9
**attempt** 108:15

**attend** 18:23
**attorney** 2:3 7:3
7:18 12:13,18
18:21 25:4,6
151:12
**attorneys** 11:20
12:1 13:3 25:13
25:21 28:21
115:14
**attract** 31:20
82:16 93:24
118:20 121:15
123:10 139:10
**attracted** 73:19
74:4 138:19
**attracting** 36:2
38:17 108:4
122:7,14 135:5
**attraction** 40:7
41:15 43:24
73:24 74:3
122:10,12,19,21
123:2,9,17,20,22
138:23 139:3
**attracts** 137:19
146:20
**august** 124:24
**automobile**
39:20,21
**available** 8:24
58:5 151:4
**aware** 29:20
69:6 111:21
114:15 125:15
125:17 134:3

**b**

**b** 3:6 29:17
41:17 49:8
57:12,13 137:15
140:8
**bachelor's** 24:1
24:10
**bachelors** 98:5
101:2
**back** 16:21
43:19,21 58:3
**bacteria** 72:7,9
76:6,14 123:3
139:12,16
147:10
**baker** 62:5,15
63:1,7,9,12
**bar** 19:1
**based** 16:2,17,19
22:9 31:18
40:15 44:18,24
46:11,12 50:7,10
50:16 51:12
53:23 55:20
59:18 60:1 62:9
63:12 69:13,24
74:3 79:1 80:8
80:23 81:2,19
82:2,3,8,24 86:2
90:2 91:18
94:22 95:19
99:2,9 100:1
101:19 103:9,10
104:7 105:3
110:23 113:14
118:18 124:9
130:1 145:13

**basically** 57:24
66:17 70:22
75:6 104:2
105:6 114:8
136:20 140:21
142:10 144:3
147:2
**basis** 45:13 46:5
95:17
**baxter** 1:20
150:4,19
**began** 112:20
**beginning** 73:6
**behalf** 1:18
30:18
**beings** 89:18
**believe** 7:12
10:14,20 44:14
60:10 95:20
106:6 114:11
124:7,13 128:18
130:12 140:23
144:10
**belt** 97:24
**benzalkonium**
68:24 69:2,3,5
69:13 70:4 71:2
71:5,10,13,14
73:15 75:8 76:8
76:10,12 78:5
**best** 7:21
**beyond** 38:10
40:6 84:1 91:23
119:15
**bill** 10:13 11:3
**billed** 11:6
**bind** 138:11

**binder** 85:4,5,6
85:12
**biochemistry**
93:3
**biocide** 75:9,10
84:17,22,23
**biocidic** 84:18
135:4 136:10,17
136:21 137:2,8
146:23
**biologics** 1:11
30:1 151:1
152:1 153:1
**biology** 96:24
97:3,6,23 98:3,6
**biotech** 22:11
**bit** 86:18 98:19
99:14
**black** 148:15
**blood** 150:12
**bluewillow** 1:11
10:3,8,10 11:2,3
11:8 12:10,19,23
13:1 16:18
22:11 26:7 30:1
63:21 69:6,15,24
72:20 73:1
151:1 152:1
153:1
**bluewillow's**
3:17 11:20
17:12,16,20 64:2
73:10,14 106:10
**bluewillow.com**
72:22
**board** 26:19
**body** 133:18
134:1

**boston** 1:22
**bottom** 72:21
127:4
**box** 75:14
**break** 6:19,22,23
7:2 58:21 106:1
**brief** 3:18 7:24
17:12,17,20
58:22 106:3,11
113:16 116:6,22
**bring** 10:22 14:9
14:10
**broad** 144:23,23
**broader** 121:24
**broadly** 143:8
**brunswick** 2:5
**bunch** 8:20
**burns** 64:21 65:3
65:11,17 66:10
66:11
**business** 82:11
**bzk** 73:11,14,20

**c**

**c** 2:1 4:1 41:17
137:16 150:1,1
**c.a.** 1:6
**caliber** 101:1
**call** 73:23 94:9
94:13,13
**called** 1:18 9:22
16:11 67:19
70:13
**calls** 35:1
**cancer** 63:15
**capacity** 29:24
30:16

**car** 39:16,22
**case** 7:2 13:4
17:22 18:5 20:7
20:16 23:6,12
35:3 40:6 49:12
53:24 57:24
59:14,17,19
61:21,22,23 62:2
62:2,6,18,20,21
63:2 67:23
74:22 79:3
107:12 118:8
134:4 142:16
151:1 152:1
153:1
**cases** 27:22 28:4
28:18,20 52:9
57:19 115:15
**catch** 70:15
**category** 9:2
36:16,18
**cationic** 68:6,7
68:19 69:1,2
84:10,15 123:6
135:4 136:10,16
136:21 137:1,8
138:13,14,17,21
139:6,15,20
143:21
**cause** 126:11
**centrifugal**
38:20,24 39:2,6
**centrifuge** 39:2
**certain** 8:17 48:8
48:9,16 57:9
79:16 86:7
91:23 92:10
103:7 111:14

115:7 121:19
148:16
**certainly** 42:20
52:8 55:20
56:12 61:12
69:10 72:8 88:1
88:11 97:3
103:7 123:19
137:1
**certify** 150:6
**cetera** 78:5
125:8
**challenge** 8:13
**change** 121:9
127:7 130:5
146:2
**changed** 133:21
134:4
**changes** 7:15
115:23 121:1
151:8 153:6
**chapter** 1:19
**characteristics**
95:6
**characterization**
30:12 91:2
101:8 106:14,20
**charge** 10:7
64:20 66:20
67:8,16,20,21
68:1,10,12,16,17
68:23 69:8,13,16
69:22 70:1 71:7
71:8,10 72:5
73:20 74:2,5
118:21 120:10
139:1 146:19,21

**charged** 39:7,8
68:8,9 70:5
71:20,23 72:4
122:9 123:8,15
123:15 138:19
**charges** 93:24
94:1 123:10
**chemical** 68:11
83:18 86:9
88:17,20,24 89:5
89:12,20 90:6,13
90:16 97:4 99:4
99:21 100:10,15
100:19,22
101:22 102:3,5
102:12,13,19,21
102:24 103:2,16
103:18 105:9,11
**chemicals** 89:11
**chemist** 89:20
**chemistry** 92:24
93:2
**chloride** 68:24
69:2,3,5,14 70:4
71:2,5,11,13,15
73:15 75:8 76:9
76:11,12 78:5
**claim** 3:17 17:12
17:16,20 19:21
20:3,13 21:21
22:13 25:23
31:11 34:19,20
35:18 36:1,10,11
36:12,13,23 40:3
40:9,12,17,21
41:2,5,19 42:1,9
43:6 45:9 46:2
48:4 50:4,10,18

50:18 52:17
53:19 54:7,9,13
54:16,21,23
55:12,16,16 56:5
56:6,7,16,20,23
57:5,11,15,24
59:2,11 65:5,15
69:16,18 78:9
82:24 83:1,1,2,2
83:5 84:1 91:12
92:11 106:11
107:12,14
109:19 110:24
111:10,15,16,17
111:20,22 112:1
112:11,16,24
113:15,19,21
114:4 116:3,13
117:2,5 118:1,1
118:19 120:8,19
121:4,6,9,14,22
121:24 123:16
125:6,9,19 127:6
128:7,13 130:2
131:9 132:6,7,10
133:5,7,22
134:13,14,14
135:1,18,20,23
136:13 137:13
138:5,8 139:8,14
139:17,17,20
140:4,5,12,19
141:8,9,21 143:6
143:7,11,23
144:18,18 145:5
**claimed** 22:1
45:12,18 47:20

**claiming** 48:16
53:18 119:9
**claims** 16:1 22:5
22:12 24:13
25:20 31:5,8,18
34:22 35:6
36:18 37:8,24
40:16,19 41:1,10
41:13 43:13,17
43:23 44:7
46:17 47:16
50:13,20,22
53:17 56:12
60:2,5 63:22
64:4 65:6 66:1
69:6,15 82:9,10
82:14 83:14,22
89:5 91:3 92:8
94:4 101:20
107:7 109:17
110:9 113:10,24
115:11 116:4,7
116:11,16 117:5
117:8,11 119:8
129:7,22 130:20
130:23 143:3
144:2,21,23,24
148:18
**clarification** 8:6
**clarify** 57:21
**class** 31:13
**classification**
34:22
**classifications**
35:14
**clean** 36:8
**clear** 7:4

**clearly** 23:5
129:6
**client** 13:13
**clinical** 23:23
**close** 146:17,22
146:22
**coalescence**
70:12
**coalescing** 70:9
**code** 33:9 51:3
**cohesion** 140:17
144:15
**collected** 115:17
**college** 87:19
**column** 148:21
**columns** 78:17
**combination**
42:2,7,10,17,23
54:15,22 55:5,9
56:17 57:4
**combine** 57:3,8
57:14
**combined** 54:20
55:24 56:11,14
57:10
**come** 25:22 39:7
54:20 66:19
79:12 90:4
91:11 98:5
143:6
**comes** 18:7,14
18:19 78:24
101:2 105:16
109:16
**coming** 9:5
70:23 146:24
**commencement**
150:9

commencing
  1:23
comments  16:19
commission
  150:20
commonwealth
  1:21 150:2,5
communicated
  51:21
communication
  124:9
comparison  22:4
compatibility
  89:10
complain  47:15
complete  37:4
  93:19 153:8
completed
  151:14
completely  6:2
  7:13 64:14
  117:11
complies  21:8
compliments
  63:16
comply  5:2 48:8
composition
  31:19 34:7,20,21
  35:16 36:12,14
  43:16 48:4 66:5
  77:5 79:18
  82:18 83:3 88:4
  88:4 91:12 94:5
  95:21 110:8,11
  111:9 118:18
  120:22 122:5
  136:16 138:1
  146:16

compositions
  45:17 66:12
  121:5,21
compound  84:8
compounding
  85:3
compounds
  83:19 84:5
  117:16
comprises  136:9
comprising
  118:1 120:8
  135:3
concentrate  7:7
concentration
  121:7,10 123:6
  143:22
concentrations
  75:10,11
concept  122:20
concern  35:18
  90:6
concerned  106:6
concerning  8:12
  30:22
concerns  78:1
concise  37:15
concluded  149:8
conclusion
  147:23
concocted  65:20
conditions  34:9
  68:14,15 71:17
  72:1
conductivity
  66:6,13 67:7
confidential  79:7
  79:19

confirm  14:2
conflict  131:5,17
  132:2,20
confusing  8:5
connected
  150:12
consider  44:16
  81:22 82:4
  86:20 101:4
  130:24
considerations
  26:4
considered
  44:23 80:11
  83:10 85:17,20
  86:4
consists  139:20
construction
  3:17 17:12,17,20
  20:3 106:11
  107:7,13,14
  113:16 116:22
construed  19:21
  22:5
consulting  27:3
contact  68:3
  73:22 146:24
contain  17:22
  18:4,6 22:17
  30:22 69:22
  70:4
contains  15:4
  40:10,19 41:5
  64:1 69:3 71:2
  139:22,24
context  34:18
  54:5 83:21 86:1
  88:12 89:4

103:10,21,22
  104:1 116:20
  128:12 133:24
  135:2 137:24
  142:1 143:2
  144:20 148:11
continue  7:23
  145:22
continues  148:23
continuing  18:12
contract  27:24
controversy
  150:14
conventional
  41:19 42:2 44:4
conversation  6:6
conversations
  12:22
convey  147:21
convince  111:8
copies  8:23 9:14
  9:20 14:10
  151:12
copy  10:22 11:1
  11:7 14:9 33:24
  46:21 48:21
  51:16 72:12,20
  73:2 124:23
coronavirus
  96:2 119:3
  134:1 147:13
corp  1:8 151:1
  152:1 153:1
corporation  1:13
  4:12
correct  4:13 5:3
  5:6 6:3 10:23
  13:14 15:5

17:23,24 18:5,18
18:19,20,21 26:3
26:22 29:7,22
30:2,19,23 31:14
38:2 40:4 43:11
52:13,19 55:7,17
59:17,23 61:21
63:23 64:15
68:12,20 73:16
91:7 112:5
115:24 117:20
118:6 124:12,20
125:23 129:3,19
134:6,23 136:23
137:11 138:13
138:24 142:11
142:14 143:9
153:8

**corrections**
149:4 153:6

**coulombs** 67:24

**counsel** 2:8,16
2:24 14:12
19:24 20:5
21:10 36:4
51:13,17,20 60:8
60:13 61:2,6,10
62:7,23 63:2
79:9 151:12

**county** 150:3

**course** 7:15 52:4
93:21,22 118:17

**courses** 92:18,23
92:24 93:4,12,15
93:18 96:24
97:3,7,23 98:7
101:1

**court** 1:3,19,20
3:24 5:13,23 6:5
27:10 28:5 29:6
95:15 96:20
104:24 105:2
111:14,16,19,24
150:4

**cover** 35:24
130:14

**covered** 9:23

**covers** 36:1

**create** 122:12

**creates** 39:5 90:8
146:18

**creating** 94:5

**credible** 45:23
46:11,18 47:16

**criticize** 64:19

**cross** 3:2

**cs** 151:13

**cup** 66:15,16

**cure** 127:6,10

**current** 66:17,18

**curriculum** 3:10
13:19,22 14:1
88:24 93:14
98:2

**cut** 14:12

**cutting** 37:5

**cv** 1:6 84:3

**d**

**d** 3:1 4:1

**data** 16:1 22:17
23:2 25:19
45:10 47:18,22
48:11 61:17
65:24 66:1 67:1

83:13 110:16
111:4 112:10
113:11 115:16
115:18 116:24
130:21

**date** 10:13 11:2
11:4,9 18:4,6
44:18 58:3
72:23 82:3
151:3 153:11

**dated** 124:23

**day** 7:16 150:16
153:14

**days** 8:17 151:14

**dc** 2:21

**deadline** 64:12

**deadly** 142:9

**deal** 141:15

**dealing** 95:4

**decide** 95:16

**decides** 111:19

**decision** 95:17

**declaration** 3:16
17:11,15 18:2
28:2 29:9 106:9
107:6,16 112:3
113:15 116:9,19
116:21 144:3

**declarations**
8:21,24 28:18

**declare** 153:4

**declined** 28:6

**deemed** 153:6

**defendant** 2:24
26:7 30:1,18
111:18

**defendant's**
116:23

**defendants** 1:15

**define** 86:7
88:13 114:13,15
114:18

**defined** 115:7

**defining** 90:18

**definite** 52:12
129:16 143:19

**definition** 81:18
82:2,8 83:14
85:24 86:7 90:3
91:18,19 92:4,5
92:6 95:12,14,18
96:17,18,19,20
96:22 98:12,22
99:3,9,18,24
100:1 104:7,18
104:20 105:4
109:12 111:16
115:21 116:3,13
120:4 130:5
131:6 141:17
142:15,17
144:12,16
145:16,24 146:1
146:2

**definitions** 114:1
114:2,5

**degree** 23:23
24:1,8,10 86:9
87:7 88:17,20
90:13,16,23,24
98:19 99:4,11,12
99:13,20 100:7
100:10,15,19,20
100:21,24 101:9
101:13,15,22
102:3,5,11,12,19

102:21,24 103:2
103:5,16,18
104:8 105:8,11
130:8 141:2,3,6
141:8
**delete**  127:11
**delivery**  106:23
**demand**  53:3
**demands**  53:5
**demonstrate**
47:20 50:2
52:15
**demonstrating**
45:11 108:3
**demonstration**
45:16 46:3
**depend**  23:22
41:21
**dependent**
103:22
**depending**  68:9
72:6 141:13
142:20
**depends**  23:20
24:6 25:10,17
38:22 67:11
70:7 71:22,24
76:12 84:7,13,20
85:1,5 86:22
92:21 93:13
98:16 99:1,11,17
103:22 104:15
104:18 105:13
105:20,21
122:11 138:21
139:1 144:13
**deponent**  151:11
153:3

**deposed**  4:13 5:6
5:11 28:19
**deposing**  151:11
**deposition**  1:17
3:8 4:19,21 5:5
5:9 6:8 8:16,18
11:14,21 12:11
12:20 14:12
26:5 28:2,16
29:5 34:3 106:5
112:20 149:4,7
150:7,10 151:2
152:2 153:2
**depositions**  27:7
**derived**  31:18
73:10
**describe**  113:18
**described**  45:12
47:19 65:11
77:24 108:16
137:15
**describing**  76:19
77:14 78:2,4
109:15 112:15
**description**  3:7
49:14,16,19 50:1
50:5,8,12,19
51:1 52:11,22,24
53:6 110:14,22
115:23 121:20
125:21
**descriptions**
148:21
**designate**  79:8
**designated**  79:13
**detail**  80:22
**details**  81:12

**determination**
111:21,22 112:5
116:14 120:3
**determine**
113:11
**determines**
112:1
**develop**  24:12
30:6 119:13
145:9,10
**developing**
18:12 24:7 89:7
118:18 119:15
**development**
27:20 91:2
96:10 106:14,20
106:22
**diagram**  75:23
76:4
**dictionary**  114:1
115:21 141:16
146:1
**difference**  15:21
53:19 54:2 55:3
80:14 81:5,7
89:19,23 127:14
**differences**
53:23
**different**  11:18
35:9 44:15,24
68:14 72:5 88:2
92:22,23 93:7
96:11,20 108:12
110:2 117:24
118:22 121:14
123:3,3,4 133:15
136:24 138:9
139:9,12 142:6,6

142:18,19
143:13 144:6
145:15,18,18,19
147:11
**differential**
144:7
**differently**  88:3
114:13,15,19
**direct**  3:2 4:8
21:23
**directed**  31:6,9
32:12 37:9 44:8
82:14 92:9 94:5
133:22 144:21
144:22
**directly**  12:22
150:13
**disagree**  23:8
101:8
**disciplines**
100:17
**disclose**  122:1
**disclosure**  46:6
52:23 53:6,14
**discovers**  34:5
**discuss**  7:2 34:17
60:12 112:21
**discussed**  31:17
33:4,19 51:22
52:7 60:10
79:19 83:1
**discusses**  34:21
**discussion**  7:24
52:4 63:2 79:18
**discussions**
62:23
**diseases**  30:15

**displayed** 71:5
**disputes** 27:24
**disruption** 75:17
**distance** 70:24
**district** 1:3,4
**division** 1:5
**document** 3:21
  11:17 13:17
  14:1 15:16,16
  34:5 52:6,7 56:9
  56:11 72:15
  74:4 77:11,19,22
  77:24,24 124:4
  124:16,22 125:2
**documents** 8:17
  9:3 12:14 43:19
  56:12,14 60:3,6
  60:10,12 61:5,9
  61:12,16 62:10
  62:11,24 75:21
  76:19,20,23 77:3
**doing** 57:10
  67:22 91:24
  97:2 98:10
  110:19 116:4,20
  130:21
**dollar** 10:16
**domain** 18:1
**doubt** 69:16
**doubting** 69:18
**download** 63:4
**dplc.com** 2:7
**dr** 1:17 4:10 9:1
  9:2 16:20 17:3,6
  17:7 63:12
  64:20,21,22
  65:11,17 66:4

**draft** 25:8,20
  26:1 115:10
**draw** 112:15
**drawings** 25:15
  25:16,17 75:13
**driven** 39:20
**droplet** 3:21
  70:2,12,21 71:7
  71:12 72:15
**droplets** 70:5,9
  70:10,23 71:1
  73:12,19 74:7,12
  74:14,24 75:1,2
  75:5,6,7,16,24
  76:2,5,13
**drug** 27:20
  106:13,19,22
**dry** 66:11
**due** 47:8
**duly** 4:4 150:9
**duplicate** 92:12

**e**

**e** 2:1,1 3:1,6 4:1
  4:1 150:1,1
  152:3,3,3
**easily** 74:23
**east** 2:5
**eastern** 1:4
**education** 84:14
  87:5,17 91:5,13
  91:22,23 92:7,18
  94:10,17 95:8,9
  96:7,15 98:9
  100:5 104:8
  105:16,19
**educational**
  103:24

**effect** 139:6
**effective** 68:20
  88:5 139:6
**effectiveness**
  73:9 74:8
**effects** 75:12
  145:19
**efficiency** 141:7
**eight** 34:4
**either** 11:21 12:8
  41:19 44:4 68:8
  101:9 111:4
**electro** 73:20
  74:2
**electrostatic**
  38:3 40:7 41:14
  43:24 64:20
  67:8,15 69:8,13
  69:16,22 70:18
  71:3,10 73:23
  74:5 94:4
  118:21 122:18
  122:21 123:9,14
  123:20,22 130:1
  131:7,22 133:2
  138:11,23
  146:19,20
**electrostatically**
  31:20 35:21
  36:2 38:17
  82:16 108:4,8
  118:20 121:15
  122:7,14 125:6
  125:10,22
  129:10,15,24
  131:3,18 132:11
  132:14,18,24
  133:6 134:16,20

  137:19
**electrostatics**
  93:22 94:2
  129:11,13,18
**element** 22:1,13
  54:9,16 55:15
  137:15,18,23
  140:12,20
**elements** 39:22
  40:16 41:16,17
  41:19 44:1
  48:16,16 54:21
  54:22 56:5,6,15
  56:21,23 57:12
  117:8 121:14
  135:9 136:7,19
  139:9
**eligibility** 31:3
  31:17 44:12
**eligible** 40:13,22
  41:7
**email** 61:6
**embodiment**
  109:7,10,14
  110:4,7 113:18
**embodiments**
  109:21,24
  120:22
**emulsion** 77:15
**emulsions** 70:3
**enable** 22:24
  50:15,18 73:21
**enabled** 23:1
  59:1,5,8,9,15,17
**enablement**
  50:11 51:1
  52:11 59:18
  110:22 125:21

**enables** 48:4
**enabling** 74:8
**encompass** 54:9
    54:16 55:15
    56:5,15
**encompasses**
    56:4
**engaged** 82:12
**engine** 39:21
**engineer** 89:20
    89:22 90:6
**engineering** 86:9
    88:18,20,24 89:6
    89:12 90:13,16
    97:4 99:4,21
    100:10,15,19,22
    101:22 102:3,5
    102:12,13,19,21
    102:24 103:2,16
    103:18 105:9,11
**engineers** 90:2,4
**english** 113:22
**entire** 49:7 132:6
**entirety** 36:23
    123:16 130:2
    132:4 148:8
**entitled** 149:8
**environment**
    72:6
**equation** 66:19
    66:21
**ermakov** 64:20
    65:2,11,17 66:4
**errata** 151:9,11
    151:14
**especially** 89:13
    115:16

**esquire** 2:2,10
    2:18
**essential** 6:6
**essentially** 67:22
    116:7 132:12,14
    134:9
**establish** 65:4
**et** 78:5 125:8
**evaluate** 87:14
**eventually** 52:18
**evidence** 18:16
    18:19 55:1
    65:13
**evident** 140:10
**exact** 27:12 91:9
    109:11 110:5
    111:7 118:16
    143:22
**exactly** 22:20
    41:11 52:2
    75:20 94:16
    111:19,24 112:8
    124:15 141:20
    143:20,21
**examination** 4:8
    19:1 124:8,10
**examined** 4:5
**examiner** 22:21
    125:18,19 126:1
    126:20 127:5
    128:2,11,15,16
    128:18 133:9,12
    133:20 134:3
**examiner's**
    127:22
**examining** 19:10
**example** 60:17
    62:4 72:7 77:14

85:6 89:6
    109:18 113:9
    118:8 141:6
    144:4
**examples** 25:12
    38:19 92:12,14
    108:2 109:2,5,14
    109:16 110:1
    112:10 113:19
    116:24 119:12
    136:20 137:9,12
**exclude** 120:8
**excluding** 90:17
    100:17
**excuse** 34:2
**exert** 68:23
**exhaustive** 30:8
**exhibit** 3:8,9,10
    3:11,12,14,16,19
    3:20,21,22 4:22
    13:7,10,18,23
    14:22 15:3,10,23
    16:8,13,21 17:13
    19:16 26:10
    31:2 33:5,10
    34:3 37:19 45:6
    47:2 48:24 49:1
    49:3 63:18
    68:15 72:16
    73:8 75:14 77:7
    78:15 79:22
    80:4 106:7,8,11
    107:13 124:2,11
**exhibits** 1:2 3:24
    12:17 14:11
    68:11 69:7
    124:14

**expectation** 55:2
    57:20
**experience** 24:9
    24:11 84:14
    86:10,12,14,18
    86:20 87:1,4,5,7
    87:17 88:10
    91:14 92:7
    94:19,20 95:8,9
    96:4,6,14 98:13
    98:20,24 99:6,21
    100:2,3,5 101:3
    101:24 103:6,7,9
    104:10 105:18
    106:18 112:7
**experiences**
    84:21 88:15
    94:22 98:14
    103:24 105:15
    105:21
**experimentation**
    50:16 120:1,2,4
    120:11,12 145:8
    145:17
**experiments**
    120:5
**expert** 3:11,12
    3:14 8:11,20
    10:2,15 11:15,15
    15:9,13,14,17
    16:7,11,20,24
    17:4 21:13
    23:10 27:15
    28:1,7 29:13,22
    30:11,16 32:14
    45:3 49:24
    51:18 54:6
    60:24 76:20

[expert - form]                                                                                 Page 12

77:4 78:14 81:6
83:15 104:3,5,12
104:12,17,21,23
104:23 106:12
106:18,24 115:4
116:2,8,8
**expertise** 30:4,9
86:22 104:15
106:15 107:3
**experts** 16:3
64:7
**expires** 150:20
**explain** 65:9
136:5 143:16
**explicit** 41:10
**explicitly** 113:17
141:23 143:3
**export** 16:22
**exposed** 71:13
76:13 138:22
**express** 31:22
32:6 107:6
**expressed** 61:20
**expression** 26:16
122:16
**expressions**
140:1
**extend** 70:22
**extra** 14:9
**extraordinary**
80:16 81:9,11,14
81:23 85:18,21
85:24
**eyes** 79:9

**f**

**f** 150:1

**facets** 96:11
**fact** 31:18 40:6
45:16 50:16
53:5 63:12
65:13 69:21
71:1 101:1
110:15,23
111:22 112:4
114:10 127:4
129:1 130:6
131:21 132:23
136:5 146:8
**factual** 23:11
**fails** 151:16
**fair** 8:8
**fall** 34:22 36:18
36:22
**falls** 31:12
**familiar** 19:12
20:3 48:6,10
49:14,16 51:3
63:11 66:23,24
67:5,6 80:6,22
84:15,22
**far** 29:15 51:7
60:1 94:17
112:7
**faraday** 66:15
66:16
**farmington** 2:13
**features** 92:10
**february** 72:23
150:21
**fee** 10:5
**feel** 144:4 145:3
**fictitious** 1:12,14
**field** 23:16 30:4
58:4 87:20

94:18 99:5
101:23 102:14
106:12,19,24
131:22 146:19
146:20
**fields** 30:9,17
90:17 100:16
**figure** 59:8
86:19 148:5
**figures** 25:18
**file** 124:23
**files** 63:5
**film** 74:20 75:3
108:5,7 121:13
122:8,9,15,19,22
135:6,7 136:8
137:20 138:20
138:22 140:15
140:16,18,21
142:14
**find** 50:24 60:9
60:16 62:7 78:7
112:17 114:12
**finding** 112:4
**fine** 9:17 26:8
32:22 37:3
141:15
**finish** 6:15,16,22
36:5,5 37:2
142:4
**first** 5:13 14:17
15:12 20:1
21:17,18 51:6,10
62:15 65:10
67:12 73:5,6,8
93:20,21 107:18
112:23 125:19
146:9

**five** 27:14 78:16
78:22
**flat** 10:5
**focusing** 141:14
**foley** 2:19
**foley.com** 2:23
**followed** 32:19
**follows** 4:6
**force** 38:20,24
39:3,6 122:10,11
**foregoing** 150:6
153:5
**forget** 79:6
102:21 148:3
**forgetting**
113:22
**form** 8:2 13:15
20:18 23:18
24:4 25:9 27:2
31:15 32:17,19
33:13 34:24
36:20 37:14
38:8,15 39:4
40:14 42:4
43:12 48:13
58:11 68:4
74:13,18,20,21
75:4,19 76:3,18
77:10,21 82:1,13
83:20 84:12,19
85:22 86:6
87:11 95:10
100:13,23 102:6
103:3,19 104:6
104:14 105:1,12
107:9 108:18,23
109:9,22 110:18
113:13 114:3

**[form - good]**                                                                 Page 13

115:1 116:1,17
118:13 120:14
122:2,17 123:12
125:24 127:9,21
128:14 129:4,20
130:18 131:8
132:3,22 133:11
134:7,24 136:3
136:12 137:22
140:3 141:10,19
143:1,24 145:12
146:3 147:7
**formal**   91:23
**formation**
106:22
**formed**   15:4
76:17
**former**   126:13
**forms**   75:3
**formula**   89:8
**formulate**   83:3
84:5
**formulates**
83:18,23
**formulation**
24:13,14 36:13
36:22 47:7,11
78:9,18,23 82:15
83:2 84:2 86:11
89:8 91:1,6
94:12 96:10
98:10 101:3,24
104:17 106:13
106:20 119:13
123:5 125:9
130:13 132:16
132:17,21
134:18,22 135:3

135:11,12,14,20
136:9,15,18
137:7 138:12,16
140:17 145:10
146:16,18
148:14
**formulations**
24:6 27:19
30:12,14 47:19
86:15 108:1,3,16
117:15
**formulator**   24:2
24:3 30:6 82:19
82:20 87:21
119:9,10 120:2
**forth**   21:20
**found**   21:21
59:15,16 60:6
78:14
**foundation**
87:13 105:17
**foundational**
105:16
**four**   73:13 74:7
74:12 125:2
**friday**   1:23
**front**   28:17
**full**   10:18 22:24
50:4,10,18 53:1
53:8,16,16
110:24 128:1,5
146:10
**function**   24:14
39:11,15,19,22
87:15 92:10
119:7 137:15
138:7,8

**functional**
120:18
**fungals**   147:12
**further**   80:22
106:21
**future**   11:7

**g**

**g**   4:1
**garnered**   105:18
105:18
**gender**   1:12
**general**   41:4
42:9 58:4 66:23
93:2 98:3
130:12,13,17
143:7
**generally**   25:18
27:17,19 28:4
55:11 109:10
**generate**   28:1
**generated**   6:8
30:17 63:17,20
**germ**   71:22
75:24 76:15
77:14
**germs**   71:19
72:1,2,3 73:19
73:21 74:4
75:16 76:10
123:3
**getting**   119:23
147:13
**give**   5:22 33:24
43:19 61:2
72:12 78:6 86:7
86:19 141:16

**given**   14:8 20:13
20:17 33:21
52:6 60:8 62:19
72:23 87:24
137:9,12 142:21
142:21,23
144:12 150:11
153:9
**gives**   35:13
67:21
**giving**   42:9
**glossary**   114:19
115:19
**go**   5:9,12 6:23
7:1,2 60:11
61:13 63:4 84:1
98:3 118:7,8
119:14 133:17
133:18 137:18
142:5
**going**   9:14 14:10
16:21 18:17
21:22 33:7,24
43:21 48:17
49:5 55:4 58:18
72:12 78:16
79:12 87:15
97:19 106:5
113:9 119:23
120:17 128:9
134:13 140:20
143:20,21 148:5
148:14
**good**   4:10 56:24
89:10 105:24,24
114:8 123:24
130:11

government
134:10
graduate 93:20
granted 24:24
gravity 39:12,14
39:15,18,24
greater 103:1
105:10
ground 5:10
group 35:13
guess 14:18 16:5
guidance 120:16
121:5

**h**

h 2:2 3:6 152:3
haidri 17:3
hand 150:15
harmful 47:8
108:8 123:7
125:7,10,11
127:15,17 130:7
130:7,14,17
131:11,11,13
133:8,15 134:17
134:20 138:18
139:7,22 140:22
143:14 146:15
147:1,2,4,9,12
147:13,14,15
148:20,22
harmless 145:24
146:1,7
he'll 10:1
head 6:10
heading 31:3
heard 19:8 26:15
81:11

hearing 112:2
116:12
help 78:6
helped 115:10
hereto 153:7
hereunto 150:15
high 75:11 87:18
hills 2:13
hired 10:2 29:24
history 146:2
hmm 6:10
hold 76:1,1
82:16 118:23,23
121:17 139:10
holding 108:6
123:17 135:6
holds 140:13
honest 43:20
host 126:15,18
144:9
hour 10:6 58:19
58:19
hourly 10:7
hours 10:15 12:6
74:8,12
https 72:22
huh 6:10
human 89:18
119:22
hundred 10:9,17
hypothetical
42:9,15 43:3
80:10 83:9
93:19 94:17
95:1,4,6 97:19
98:21 103:4,23
139:18 140:7

hypothetically
42:24 43:1
57:11
hypotheticals
88:9

**i**

idea 128:8
identified 4:4
150:9
impermeability
140:10,18,24
141:1,4,21,23
142:7,10,20,22
143:15,17 144:5
144:7,11,13,19
importantly
121:18
impossible 57:3
improvement
34:8 35:17
inactivate 82:17
119:1,1,2 121:18
139:11
inactivating
123:18 133:23
inactivation
118:24
incidentally
29:16
include 47:18
108:2 110:16
included 78:8
136:22
includes 117:14
including 7:3
incomplete
97:19

inconsistent 77:8
77:19
indefinite 140:24
142:2,18,23
143:23 144:5
145:5
indicate 127:5
indicated 44:7
94:10 140:9
indicates 78:9
126:15
indicating
125:20
indirectly
150:14
indiscernible
61:23
individual 74:24
75:2,6 88:10,10
99:1 108:9
125:8,12 127:19
133:8 134:21
135:22
induce 38:24
75:12
ineligible 31:6,9
38:1 40:4 41:8
44:9
infect 126:17
127:18
infected 119:23
133:19 134:2
infecting 108:9
125:7,11 134:21
144:8
infection 47:8
94:6 95:23 96:1
128:10 129:9

**[infection - jury]** Page 15

142:1
**infections**
126:11
**infectious**
126:14,16,23
**influenza** 147:15
**inform** 35:8
52:24 121:2
143:10
**information**
10:1 22:23
45:10 51:18
62:9 69:10 77:5
79:7
**informed** 19:20
19:23 20:1,4,6
21:9,11,19,23
22:3
**infringe** 22:12
63:22 64:3
**infringement**
3:15 13:13 16:8
16:13,18 17:5
19:17 21:19,23
22:4 63:20 67:3
76:17 79:21
**infringes** 65:5
**ingredient**
117:19,24 118:6
118:11 138:2
**ingredients** 88:2
91:9 108:13,15
108:20 109:1,4
117:23 119:13
120:7,13,16
121:7 136:15
145:9,10,15

**inhalation** 47:8
134:22 146:15
**inhibit** 82:16
108:8 131:14
**inhibited** 126:12
126:21 127:7
130:8,9 139:13
**inhibiting** 35:21
36:2 125:7,10,16
127:13,15,16
128:2,5,8,12,23
129:8,10,15,17
129:24,24 131:3
131:13,19
132:11,14,24
133:6,16,16,21
133:23 134:5,16
134:20 147:3
**inhibits** 47:8
94:6 132:18
**initial** 14:18
**initially** 25:22
52:3
**inside** 75:14 76:1
**instance** 29:18
**instances** 117:22
**instructs** 7:19
**instrument** 39:5
68:2
**intended** 134:18
134:22 135:13
**interact** 76:14
**interaction**
123:14
**interested** 89:14
147:24 150:13
**interesting** 63:16

**interfere** 7:7
**interferences**
29:1
**interpret** 91:4
111:19 116:11
116:16 139:14
140:6 144:18
148:20
**interpretation**
81:3 115:17
129:12 146:5
**interpreting**
116:4,7 144:1
**interruption**
6:17
**invalid** 31:5 44:8
45:9 46:18
55:12,16,20 57:5
**invalidate** 56:7
56:18 58:8,15
**invalidity** 3:11
3:13 14:19,21
15:2,9,15,17,21
15:24 35:9
44:15 51:5
53:18 78:15
83:13 86:1
**invented** 50:3
**invention** 40:3
40:12,21 44:18
45:12 46:4,8
47:1,5 49:22
51:9 59:23
80:11 81:1
**inventions** 31:13
34:23 36:17
38:6 59:15 82:9

**inventive** 46:8
**inventor** 24:18
24:19 25:1,1,3
83:7,10
**invents** 34:5
**invoice** 10:10,19
10:21 11:1
**invoices** 9:5,12
9:14,20 10:10,19
10:22 11:8
**involve** 27:21
38:14
**involved** 86:17
**involves** 95:23
**ion** 71:17
**ionized** 71:18
**ions** 72:8
**ipr** 28:18,24
29:1,3
**irrespective**
139:3
**isolation** 114:4
**issue** 49:11 59:6
**issued** 24:22
25:2 42:16,23
124:20 125:1
**issues** 23:11,12
89:7 96:21
**item** 55:13 73:4
73:18 148:3

**j**

**j** 4:17
**july** 106:24
**jury** 112:4

| k | | | |
|---|---|---|---|
| **k** 2:20 | 81:5,12,18 83:9 | 105:17 116:14 | **laundry** 107:24 |
| **kaltmanlaw.com** | 83:11,12 84:10 | 116:15 | 108:10,14,21 |
| 2:15 | 84:17,20,23 85:1 | **known** 31:20 | 109:3,6 136:24 |
| **katz** 62:5 | 85:3,8,8,15,23 | 38:11 41:20 | 137:1 |
| **keep** 21:22 70:22 | 86:2 88:2,10,13 | 44:4 94:2 | **law** 2:3,11 18:23 |
| 97:19 | 89:16 94:16,16 | **kremen** 2:2 3:4 | 33:17 38:3,14,20 |
| **keeps** 70:10 | 95:5,13 96:19 | 4:9,11,18 8:3 | 39:17 40:3,10,11 |
| **keith** 2:10,11 | 98:16 99:2,11 | 9:6 11:12 13:6 | 40:19,20 41:5,6 |
| **keithaltman** | 103:4,8 105:2,3 | 13:19 14:15,18 | 41:8,21 80:1 |
| 2:15 | 108:24 109:11 | 15:7 17:8 20:21 | 115:5 |
| **key** 73:13 | 110:5,8,19 111:2 | 21:2 23:7,14 | **laws** 37:9 38:7 |
| **kill** 75:16 76:9 | 111:4,5,6,24 | 24:16 32:3,19 | 43:18 |
| **killing** 73:21 | 112:8,15 113:1 | 36:9,24 37:1,6 | **lawyer** 20:24 |
| **kind** 28:23 48:9 | 114:6,21 115:2,2 | 39:10 40:8 48:5 | 22:20 23:4,13 |
| 91:6 92:19 | 115:4 116:2,12 | 48:21 49:5,13 | 32:2 35:6 |
| 94:12 118:24 | 119:6,18,19 | 58:20,23 79:10 | **lawyers** 115:10 |
| **kinds** 24:6 91:24 | 121:11 123:4 | 79:15 80:19 | 115:18 |
| 94:11 136:24 | 127:22,23 128:7 | 106:2,4 113:5 | **layer** 79:2,3 |
| 138:4,9 147:11 | 128:20,20 | 149:1 | **lead** 120:19 |
| **kinetic** 73:20 | 129:12 130:9 | | 121:12 |
| 74:2 | 131:21 132:11 | **l** | **learn** 85:15 |
| **knew** 63:9 | 132:24 133:3 | **lab** 67:18 115:17 | **legal** 1:22 20:20 |
| **know** 5:10 6:20 | 134:1,15 137:20 | **labeled** 15:12,13 | 23:5,9,11,12 |
| 7:16 8:18 20:23 | 138:2,12,15,18 | 31:4 | 26:21 32:14 |
| 22:20 29:14 | 141:11,20,20 | **lack** 46:18 112:9 | 109:11 110:6 |
| 32:23 33:12 | 144:17 145:16 | 116:24 | 111:21 112:8 |
| 35:10 41:11,11 | 145:24 146:4,4 | **lane** 2:4 | 115:3 116:8,13 |
| 43:4 44:20,23 | 147:9,12 | **language** 25:23 | 116:14,15,18 |
| 52:2,13,14,18,21 | **knowledge** 28:10 | 40:16 57:24 | 146:4 151:19 |
| 53:15 58:6 61:5 | 28:11 44:10,20 | 109:19 110:10 | **lemmo** 16:20 |
| 62:22 63:6,10 | 58:4 80:11 81:2 | 112:16,24 113:7 | 17:3,6,7 |
| 67:18 71:23,24 | 81:20 83:23 | 113:10,12,24 | **lemmo's** 64:21 |
| 72:1,3,10,10 | 87:14 91:1,8 | 114:6,9,10,13,14 | 64:22 |
| 73:16 74:17,18 | 95:24 96:9 | 116:3 122:15 | **lenape** 2:4 |
| 75:20,22 77:12 | 100:20 101:14 | 141:21 144:19 | **lesser** 100:7 |
| 77:15 78:20 | 102:4,20 103:1 | **lardner** 2:19 | **level** 87:2,3 |
| 79:12 80:1,5 | 103:17 105:6,7 | **lasting** 74:8 | 91:23 93:5,9,10 |
| | 105:10,13,14,16 | | 94:10 96:6 98:5 |

98:9 101:10,14
102:4,20 103:17
104:8 118:21
119:2 121:19
130:10 131:21
139:3 141:1,3,22
143:17
**levels**   93:7
142:19
**lexicographer**
114:12
**liane**   2:18 12:7
32:15 35:4
37:14 97:10
**licensed**   19:4
**light**   93:24
129:14
**likelihood**   45:11
46:4 52:17
**limitation**   21:20
83:5 111:10
118:19 120:20
121:4,6
**limitations**   65:5
65:15 82:24
84:1 91:13
113:19 121:22
133:5 135:3
**limited**   28:10
29:19
**line**   6:20,22
148:23,24 152:4
**liquid**   74:19,19
**list**   30:8 107:24
108:10,15,20,21
109:1,4,6,20,24
110:4 123:2
130:7 133:14

136:24 145:14
**listed**   24:18
119:17 137:10
138:15 139:21
139:23
**listing**   143:13
**lists**   108:12
110:2 120:15
137:1
**literal**   21:19
**litigation**   13:12
26:24 95:15
106:16 107:3
**little**   86:18 98:19
99:13
**lives**   86:23
**llp**   2:19
**long**   9:16 12:5
64:21 74:8
75:11 114:21
118:23 120:11
121:16
**look**   8:18 31:1
40:24 41:10
42:5,13 43:19
45:14 47:2
57:19,24 58:1
72:21 73:4 94:6
112:16,23
115:21 116:20
117:6,10,13
119:12 122:23
123:16 125:5,5
127:4 130:2,19
131:9 132:4,5,6
132:7,10 133:14
133:14,24
134:13,14 135:2

135:11 136:5,6
137:14,24
139:11 140:8,19
144:24 146:5,9
147:8,22,23
148:1,8,10,10,17
148:18,18
**looked**   35:11
40:15 59:21
60:1 77:1,2
118:1 141:24
**looking**   18:16
27:12 35:12
36:21 41:1 54:5
57:1 61:16,16
68:4 76:4
101:18,20 104:1
106:8 110:20
117:4 118:4
119:6,21 128:6
129:21 130:23
132:9,13 135:19
137:13 140:12
140:13 142:8
144:1 148:4,9
**looks**   22:21
67:20 114:7
148:7
**lot**   43:3 87:1,7
**lower**   92:5 93:10
**lpeterson**   2:23
**lunch**   7:1

**m**

**m**   4:16,17 15:14
15:17 16:12
17:15 63:19
106:10

**machine**   34:6
35:16 47:3
**maintain**   79:19
**majority**   27:22
29:3 43:15
**making**   45:24
86:15,24 92:8
94:11 95:17
**mansoor**   1:17
3:3 4:3,16,16
15:14,17 16:12
17:15 63:19
106:10 150:7
151:2 152:2
153:2,4,11
**manual**   19:10,13
**manufactured**
90:8
**manufacturer**
34:6 35:16 47:4
138:7
**manufacturing**
138:5
**march**   10:4
**mark**   17:8
**marked**   4:22
13:7,10,17,23
14:11,22 15:10
16:8,13 17:13
33:10 48:23
72:16 106:9
124:1
**marking**   34:3
**marksmen**   106:6
111:11 112:2,3
116:12
**marriage**   150:12

**massachusetts**
1:21,23 150:2,6
**master's** 24:8
86:9 88:20
90:13,15,23,24
97:2 98:6,18
99:3,12,20 100:7
100:10,15,19,21
100:24 101:2,10
101:13,14,22
102:3,5,11,12,19
102:21 103:2
104:8 105:8,11
**material** 66:18
69:11,19 70:21
77:17 126:14,16
**materials** 126:23
**matrix** 61:1 62:2
62:6,17,20
**matter** 9:9 14:8
31:3,6,9,16 34:7
34:21,21 35:17
36:12,14 37:23
37:24 38:9
40:13,22 43:16
44:9,11,11 57:10
60:13,24 80:8
81:3 87:17
108:5,6,9 118:21
121:15,17 122:9
122:14 125:11
129:1 134:17,21
135:5,6 137:19
138:3,10,11
139:2,4 140:14
140:22 143:14
143:14 144:6,21
144:22 145:1,23

146:8 149:8
150:14
**matters** 19:5
26:22 138:4
**mean** 35:12
42:20 66:22
72:10 74:9 80:5
88:9 108:10
110:7 113:21,22
114:6 117:18
126:19 128:3
129:11 133:7
134:11 136:14
139:8 141:16
142:11 145:21
**meaning** 20:14
20:17 32:7
112:11,12,14
114:21,22
115:20,23 117:2
121:9 122:13,15
123:10 129:14
129:24 131:9,17
131:18 132:2
133:1 134:15
143:11
**means** 57:7
81:13 113:12
114:12,23 118:2
122:8,18 123:21
123:21,23
128:17,22 129:2
129:3,8,18,23
131:3 133:10,16
137:21 141:18
141:24 147:4
**meant** 128:12,15

**measure** 66:14
66:16 67:8,15
68:1
**measured** 66:5
66:12
**measurement**
67:19
**measuring** 67:7
67:23
**medical** 7:11
**medication**
130:12
**medications** 7:6
**meet** 11:20
56:20 101:10
105:4 118:19
121:3,6,10,13
133:5
**meeting** 121:22
**meets** 83:5,24
91:12 113:19
120:19
**membrane**
75:17 76:14
**mention** 33:15
116:19
**mentioned** 32:4
33:3,14 34:16
44:3 88:16
106:17 112:19
112:20 115:4,9
135:1
**merely** 40:2
77:16
**met** 12:4 22:13
48:17 56:23
110:24 111:10
135:9

**method** 22:1
31:12 35:19,20
35:20,24 36:1,1
36:10,11,21
42:18 43:6,7,10
43:15 83:1
110:12 125:6
132:13,15,21
146:14
**methodology**
65:21 148:14
**methods** 148:1
**mi** 2:13
**michigan** 1:4,19
63:13
**microorganisms**
72:3 146:24
**middle** 6:20
**mile** 2:12
**millivolts** 67:21
**mind** 141:17
**mine** 60:15 61:7
61:18,19 62:12
**minimum** 97:6
97:22
**mischaracterizes**
32:1 33:2 37:12
**misstates** 47:24
**mix** 91:10
**mixed** 89:11
115:15
**mm** 6:10
**modify** 114:10
**moisture** 68:22
**moment** 78:6
**monday** 8:19
**month** 11:5

**month's**  10:21
**months**  99:15
**morning**  4:10
**motion**  63:11
**move**  39:16
  95:15
**mpep**  19:8,14

**n**

**n**  2:1 3:1 4:1,16
**name**  4:10,15
**names**  1:12,14
**nano**  22:11
  63:11,14 70:3,5
  70:9 71:1 73:10
  73:12,19
**nanobio**  3:21
  16:18 63:21
  64:3 65:4,14
  69:3,7 72:15,22
  73:9,11 75:21
  76:16,22,23,24
  77:2,6,9,20
  78:10,18,23
**nanoemulsion**
  70:1,8 71:2
  74:22 75:23
  76:5
**nasal**  108:5
  134:21 135:15
  135:21
**natural**  37:10
  38:23 41:22
  43:17 72:10
**nature**  31:21
  37:9 38:3,7,12
  38:14,21 39:17
  40:3,10,12,19,21

41:5,6,8,21
75:22 77:16,20
79:23 84:10,17
97:10,15 109:19
**necessarily**  41:8
  59:6 122:8
**necessary**  50:17
  88:24 89:1 91:9
  92:24 97:7,23
  100:11 122:12
  133:5 144:8
  153:7
**need**  6:19,21
  14:15 15:7 64:8
  79:16 86:18
  87:1 91:13 92:6
  93:15 96:5,6
  98:18,19,20,24
  99:13 100:6
  111:6,7 118:22
  120:5 131:14,22
  141:4 143:17
  145:11
**needs**  47:5 80:2
  111:3
**negatively**  39:7
  71:20 123:8,14
  138:18
**neutral**  1:12
**neutralize**
  120:10
**neutralized**
  68:18
**never**  13:1 29:17
  87:18
**new**  18:7,12,19
  34:6,7 35:17
  47:1,3,5 64:6

145:17
**nine**  10:9,17
  19:18
**nitrogen**  71:14
**nj**  2:5
**nod**  6:9
**non**  3:15 16:8,12
  16:18 17:4
  19:17 24:16
  37:7 38:13
  39:10 40:8 48:5
  52:10 63:20
  76:17 79:21
  102:1 103:13
  124:23
**northeastern**
  89:13
**nostrils**  146:18
**notary**  1:20 4:5
  150:5,16,19
  153:12,16
**note**  151:8
**noted**  153:7
**notice**  3:8 4:18
  4:21 5:2 8:16
  72:22
**noticed**  15:20
**noting**  8:21
**novel**  38:18 40:5
  40:6
**novelty**  38:10
**number**  15:13
  16:21 19:16
  26:9 27:13 34:3
  63:18 67:24
  70:11 73:4,18
  74:6 78:15
  117:24 125:9

134:15
**numbering**  14:9
**numeral**  31:4
**numerous**
  117:15
**nw**  2:20
**ny**  151:13

**o**

**o**  4:1,16,16
**oath**  5:15 29:9
**object**  7:18 49:3
  79:15,17,20
**objected**  9:1
**objection**  9:20
  13:15 20:18,19
  21:3 22:18 23:3
  23:18 24:4,17
  25:9 27:2 31:15
  31:24 32:16,17
  32:19 33:1,13
  34:13,24 35:5
  36:20,24 37:3,6
  37:11,14,14,16
  37:18 38:8,15
  39:4,10 40:14,23
  41:9 42:4,12,19
  43:2,12 44:13,22
  45:21 46:10
  47:6,10,24 48:5
  48:13 49:23
  50:14,21 51:11
  52:20 53:4,11,22
  54:4,10,17,24
  55:18,23 56:8,19
  57:6,16 58:11,16
  59:3,12,24 61:4
  61:11 63:3

64:16 65:16,18
65:22 66:8
67:10,17 68:13
68:21 69:9,17,23
70:6 71:4,21
74:1,10,16,21
75:4,19 76:3,18
77:10,21 79:5
80:3,17,21 81:10
81:17 82:1,7,13
82:23 83:8,20
84:6,12,19 85:10
85:14,22 86:6
87:11,23 88:8,19
89:3,21 90:1,10
90:22 91:17
92:3,20 93:1,6
93:17,23 94:15
95:10 96:8 97:1
97:9,11,16 98:1
99:8,23 100:13
100:23 102:6
103:3,19 104:6
104:14 105:1,12
107:9 108:18,23
109:9,22 110:18
113:13 114:3
115:1 116:1,17
118:13 120:14
122:2,17 123:12
125:24 127:9,21
128:14 129:4,20
130:18 131:8
132:3,22 133:11
134:7,24 136:3
136:12 137:22
140:3 141:10,19
143:1,24 145:12

145:20 146:3
147:7
**objections** 8:1,2
11:11 35:5 78:1
80:19
**objectively** 50:1
**obligated** 6:1
7:20
**obtain** 34:8
**obtained** 66:1
77:11,22
**obvious** 54:14
56:13
**obviously** 60:14
83:4
**obviousness**
52:10,10 53:21
54:3,19 55:9,20
58:13 60:2
**occurring** 38:12
**occurs** 39:1
123:2
**october** 1:23
150:8,16 151:3
**offer** 92:23
**offered** 93:4,8
**office** 2:11 19:6
26:15 28:22
124:18,23
125:15 126:2
128:24 129:2,6
129:15 131:6
133:13 134:12
**official** 134:9
**oh** 97:12 119:22
**oil** 70:2 71:6,7
71:12,16 79:3,4

**okay** 5:12 6:12
6:19 7:16 8:3,6
10:18 11:7,12
14:14 16:5 17:7
18:9 20:16
22:14 23:14
26:7,9,11,19
27:5 28:19,23
29:11 31:8
35:15 36:9,12
37:23 38:3 39:2
39:9,15 40:2
41:18 42:1
43:21 45:5
46:15 47:15
48:19 49:13
53:3,18 55:14
56:2,22,24 58:21
59:16 63:1,6,17
64:1,18 68:11
70:17 71:19
73:3 75:13,18
76:1 78:24
81:22 82:9,20
83:16 84:17
86:12 88:16
89:23 90:12
92:17 94:9
97:20,22 99:7
100:8,8 104:2,3
106:21 109:3
114:8,9,19
115:19 116:24
117:10,13 118:5
121:7 122:6,20
123:8,19,24
125:4 126:3
127:3,14 128:11

129:10 130:11
131:2 132:9,10
132:18 134:9,18
135:12,13 136:9
137:3,18 138:12
138:16 140:8
141:15 142:10
144:10 145:22
146:8 147:2,16
**once** 36:22 55:8
98:13 136:18
**ones** 62:4,17
119:6 120:7
130:8 137:14
**open** 27:10 29:5
**opening** 15:2,13
15:14,23,24
**opine** 18:15
42:14 79:23
**opined** 44:20
52:8
**opines** 23:7
**opining** 94:21
96:18 113:20
144:3
**opinion** 8:13
25:24 31:22
32:1,7 33:21
37:21,24 41:2
43:20 48:2
76:17 87:12,24
88:23 90:11
95:13 100:24
101:21 110:21
113:1,14 127:22
129:5 130:21
134:11

**opinions**  8:12
   15:4 16:2,4,17
   16:20,24 17:22
   18:4,6,9,11,13
   18:18 23:4,13
   30:22 32:9,11
   35:2,8 44:24
   45:3 59:14
   60:15 61:7,18,20
   62:11 63:21
   64:2,5,9,13,15
   107:7,12 116:5
   130:22
**opposed**  90:8
   121:8 126:21
**opposite**  93:24
   146:21
**oppositely**  122:9
**order**  18:3 22:10
   39:24 54:20
   56:1,3 57:23
   60:4 68:19
   108:7
**ordinary**  20:14
   20:17 41:20
   44:10,21 49:21
   59:22 65:2
   79:24 80:7,15,24
   81:5,8,15,20,23
   82:2,5,6,11 83:6
   83:17 85:19
   86:3,5,8,13,21
   87:8,9,13,22
   88:14 90:14,20
   91:15 92:1,19
   93:11 94:14
   95:1 96:16,23
   97:7,24 98:11

99:22 100:12
   102:16 104:5,13
   104:19,23
   114:22 119:11
   128:19 129:14
**organic**  93:2
**organisms**  72:11
**outside**  35:1
   79:8 129:22
   138:22
**overcomes**  128:6
**overcoming**
   127:11

**p**

**p**  2:1,1 4:1 29:17
**p.m.**  72:24 149:8
**p8**  46:21
**page**  3:7 19:18
   21:6,15,16,18
   31:1,2 45:5,24
   46:15 65:1
   72:13,19,21 73:5
   74:6 75:13
   78:16 84:3
   107:17,20
   112:23 117:13
   126:3,4,7 127:5
   146:9,10 152:4
**pages**  1:1 64:18
   79:22 125:2
**paid**  10:5,6,20
**paper**  14:13 66:4
   140:6
**paragraph**  19:20
   21:6,14,15,16,18
   33:16 37:8,19,22
   41:13 43:22

45:7,8 46:1,17
   47:15 49:24
   51:6,7,10 65:1
   73:6,8 83:15
   107:18,20
   117:13 125:20
   126:3,5,5,19
**paragraphs**
   126:9
**part**  39:19 63:14
   91:3
**partial**  126:22
   127:24 128:3,4
**particle**  39:7
   67:20 68:2,4
   82:17 118:24
   122:7,11,14,19
   122:24 123:1
   130:17 139:23
**particles**  47:9
   82:17 122:21
   123:7,15 125:7
   125:10 127:16
   127:17 130:15
   133:1,8 138:18
   139:7
**particular**  15:15
   42:8 67:14,23
   79:3 91:19
   103:12 110:11
   110:13 119:17
   134:4 142:16
   145:23 147:24
**particulate**
   108:4,6,9 118:20
   121:15,16,17
   122:8 125:11
   130:7 134:17,20

135:5,6 137:19
   138:3,4,10,11
   139:2,4 140:14
   140:22 143:13
   143:14 144:6,20
   144:22 145:1
**particulates**
   131:11,12 142:6
   146:21 148:20
   148:22
**parties**  150:13
**parts**  25:12
   33:19
**party**  21:24
**pass**  66:17,19
   126:14,17,24
**passage**  135:15
**passages**  108:6
   135:21
**passing**  140:22
**patent**  3:9,19,20
   11:17 13:6,9,13
   13:16 16:1,1
   19:4,5,5,10,12
   20:24 22:12,16
   22:20,22,24 25:5
   26:9,11,13,14,18
   27:23 28:4,22
   30:18,23 32:1,10
   33:17 34:8 37:9
   38:1,13 40:4
   41:1,3,7,14 42:1
   42:16,22,22,24
   43:3,6,7,14,17
   43:23 45:9,14,15
   46:2,4,7,14
   47:18 48:2,6,7
   48:14,14,18

49:11 50:3,22,24
52:22,24 53:6,15
53:18 54:1
56:18 57:18
58:1,8 59:7 60:2
60:5 61:17
62:17 63:23
64:4 65:6,12
67:13 77:4 80:9
80:13 81:4,4
82:4,10 83:22
87:16 89:4
92:13,14 94:4,7
95:19,20,20 96:3
96:12 101:19
102:22 103:11
106:7 107:8,23
108:1,12,20,24
109:23,23 110:1
110:3,4,6,8,12
110:14,20,21
111:1,3 112:18
113:16 114:7
115:23 117:14
118:15 119:7,18
121:23 122:3
124:8,20,24
125:1,5 129:1
130:12,16,20,20
131:10 132:8
139:19 141:5,9
143:19 146:9
148:3,6,8,8,10
**patentability**
40:13,22 47:23
**patentable** 31:13
34:23 35:15
36:17,17 38:6,10

38:18 39:3 42:3
42:11
**patented** 73:10
**patentee** 53:8,16
109:15 110:10
140:5
**patents** 24:19,21
24:22,24 27:21
42:6 43:10,11,15
43:16 62:5,15,16
63:1,7,9 86:2
109:8,20,23,24
110:16 115:6
141:12,14
**pathogen** 142:9
142:13,21,22,24
143:4,20 144:14
**pathogenicity**
142:7
**pathogens**
130:14 133:15
142:19 143:5
144:6 147:11
**pathology**
126:12
**pay** 10:18
**peer** 69:20 75:21
77:12
**penalties** 5:19
**penetrating**
142:14
**people** 79:17
145:19
**percent** 27:4
69:5 79:1,2,2,4
118:9
**percentage**
26:24 117:18

118:5,16
**percentages**
118:12 120:23
145:18
**perform** 21:24
82:22 88:3
145:8
**performed** 11:9
**perjury** 5:19
**permanently**
68:8
**permeability**
142:12
**permissible**
145:3
**permit** 28:5
29:12 140:15
**permitted**
118:11,14
**persist** 74:7
**person** 11:21
12:8 20:14
41:20 43:14
44:10,17,21 45:1
46:1,7 48:15
49:21 50:2,17
51:8 52:16,24
53:7,15 55:1
57:17 58:6
59:21 60:4 65:1
79:24 80:2,7,7,9
80:10,14,15,24
81:14,20,22 82:2
82:4,6,11,21
83:2,6,9,10,16
83:17 85:18,21
86:3,5,8,13,20
87:8,9,9,12,20

87:21,22,24
88:13,17 89:2,5
90:12,14,18,19
91:5,15,20,22
92:1,1,5,19
93:11 94:9,13,13
94:17,21,24 95:2
95:4,6,24 96:13
96:15,15,23 97:7
97:23 98:8,8,11
98:11,21 99:3,17
99:20,22 100:3,5
100:9,11,18,21
101:5,11,12,14
101:17,21 102:2
102:4,15,17,18
102:20,23 103:1
103:15,17,23
104:3,3,5,11,13
104:18,22 105:4
105:7,10,21
107:22 109:17
111:8 112:13
113:17 114:6,11
116:10,21 117:4
119:5,11 120:17
121:2,5 122:4
128:18 129:7
133:13 137:12
143:10,16 145:4
145:7 146:6
148:7
**person's** 84:13
**personal** 22:22
35:7 38:11 48:3
**perspective**
83:12

**pertaining**
  124:19
**pertains**  50:19
**peterson**  2:18
  8:23 9:7,13,21
  11:10,23 12:2,7
  13:4,15 14:14
  20:18,23 21:4
  22:18 23:3,8,18
  24:4 25:9 27:2
  31:15,24 32:6,18
  33:1,13 34:2,13
  34:24 36:4,20
  37:1,11,15 38:8
  38:15 39:4
  40:14,23 41:9
  42:4,12,19 43:2
  43:12 44:13,22
  45:21 46:10
  47:6,10,24 48:13
  49:2,9,23 50:14
  50:21 51:11
  52:20 53:4,11,22
  54:4,10,17,24
  55:18,23 56:8,19
  57:6,16 58:11,16
  58:18 59:3,12,24
  61:4,11 63:3
  64:16 65:18,22
  66:8 67:10,17
  68:13,21 69:9,17
  69:23 70:6 71:4
  71:21 74:1,10,16
  74:21 75:4,19
  76:3,18 77:10,21
  79:5,11 80:3,17
  80:20 81:10,17
  82:1,7,13,23

  83:8,20 84:6,12
  84:19 85:10,14
  85:22 86:6
  87:11,23 88:8,19
  89:3,21 90:1,10
  90:22 91:17
  92:3,20 93:1,6
  93:17,23 94:15
  95:10 96:8 97:1
  97:9,12,17 98:1
  99:8,23 100:13
  100:23 102:6
  103:3,19 104:6
  104:14 105:1,12
  105:23 107:9
  108:18,23 109:9
  109:22 110:18
  113:3,13 114:3
  115:1 116:1,17
  118:13 120:14
  122:2,17 123:12
  125:24 127:9,21
  128:14 129:4,20
  130:18 131:8
  132:3,22 133:11
  134:7,24 136:3
  136:12 137:22
  140:3 141:10,19
  143:1,24 145:12
  145:20 146:3
  147:7 149:2
**pgr**  29:1
**ph**  68:9,17 71:16
**ph.d**  16:12 23:17
  23:21 24:3
  98:17 99:13
  106:10

**ph.d.**  15:15
  17:16 63:19
  90:21
**pharmaceutical**
  24:2,3 27:19
  30:6,7,11,13
  82:15,19,20
  83:18 84:5
  86:10,11 89:15
  90:16 97:5
  98:10 99:4
  100:16 101:3,23
  101:24 102:13
  104:9,17 106:13
  106:19 119:10
  130:13
**pharmacist**
  23:23,24 84:4,5
  84:8 85:2,17,20
  86:4
**pharmacists**
  84:8 85:7,15
**pharmacology**
  23:17
**pharmacy**  23:16
  85:11
**pharmd**  23:23
**phenomena**
  31:21 38:23
  133:2
**phenomenon**
  37:10 41:22
**phillips**  19:21
  20:10 112:21
  113:8,23
**physics**  93:12,15
  93:22

**pick**  67:14
**piece**  66:4,11
**pigskin**  66:11
**place**  32:22
  45:19 76:1
  108:7 119:20
  140:14
**places**  73:11
**plain**  20:13,17
  112:23 113:9,11
  113:23 114:6,9
  114:10,13,14
  115:20 122:13
  122:15 129:14
  134:15
**plaintiff**  1:9,18
  2:8,16 4:11
  11:16 13:18
  18:8,15 26:6
  92:4 111:18
**plaintiff's**  64:7
**plaintiffs**  95:13
**please**  4:15 6:9
  6:19 7:1,16 8:5
  36:4 37:2 45:7
  57:22 65:9
  125:1 146:13
**plymouth**  150:3
**point**  45:19
  52:13,18 72:19
  78:7 82:6 95:14
  105:24 113:4
  121:1
**portion**  79:10
**positive**  68:10,12
  68:16 71:7,8,9
**positively**  39:8
  71:23 72:4

[positively - provide]                                                    Page 24

123:15
possess  53:8
  100:11,20
  101:13 105:8
possessed  50:3,9
  53:16
possession  50:10
  53:1
possibilities  43:4
possible  42:16
  42:20,22 57:14
  87:4 102:22
  104:2 107:24
  141:7,11
possibly  103:1
  105:10
potent  142:20
potential  67:19
potentially
  119:21 142:8
practical  14:7
  24:8,10
practice  19:4
  23:20,22 26:24
  84:7 85:1
practices  23:16
  86:17
preamble  125:5
  135:19 136:6,8
preparation
  12:11,14,19
prepare  11:13
  11:21
prepared  9:8,16
  9:17 32:11
preparing  25:5
prescriptions
  84:9

presence  68:22
present  12:7
  33:7 48:12
  73:20 106:15
  107:3 126:9
presented  34:16
  106:12
presenting  30:9
  106:15 107:2
presently  152:4
preserved  8:1
prevent  70:11,13
  70:18 95:23
  96:1 129:8
  140:21 144:8
prevented
  126:13,21,24
  127:1,2,7,18
preventing
  125:17,22
  127:12,15,24
  133:21 142:1,13
  147:4
prevention
  30:14 128:1,1,3
  128:4,5
prevents  70:9
previous  14:12
  26:21 43:22
  117:13
previously  4:13
  5:11 56:2
prior  8:17,24
  11:17 28:2 29:8
  54:8,14,15,19
  55:13,14,17,24
  56:1,9 58:9,14
  58:24 59:5,7,13

59:16,20 60:3,8
  60:14,16,24 61:3
  61:8,14 62:1
  91:20 106:24
  125:15
priority  44:18
  58:3 82:3
probably  5:10
problem  90:4
  127:6
problems  90:2
procedure  19:11
proceeding
  28:12 111:11,14
proceedings
  28:23,24 29:4
process  19:13
  20:3 31:12 34:6
  34:20 35:16,18
  35:24 36:10
  40:9,19 43:10
  47:3 91:11
produce  8:16 9:3
  54:22 57:15
  119:16
produced  8:23
producing  9:14
  9:20
product  16:19
  21:21 22:1,6,11
  22:11 27:20
  63:22 65:14
  69:12,15,24 71:9
  76:16,22 77:9
  78:3 87:15 88:6
  90:7,9 92:8,9
  120:19 121:3
  146:14

production  90:7
products  30:7
  64:3 74:18
  86:24 88:1
  89:17
profession  82:11
professional
  150:4
professor  63:12
program  98:6
promotional
  69:11,19 77:16
  77:23
proper  49:4
properly  22:5
properties  133:4
proportion
  91:10
prosecution
  19:12 22:21
  24:23 48:7,8
  124:7 146:2
protect  16:19
  63:21 64:3 65:4
  65:14 69:3,7
  72:23 73:11
  75:22 76:16,22
  76:23,24 77:2,6
  77:9,20 78:10,18
  78:23
protecting  133:8
protects  73:9
provide  10:1
  25:11 32:8
  45:10 55:1 62:8
  62:11 64:7
  65:13 83:14
  109:2 115:16

140:18
**provided** 8:19
  8:20 15:24 16:3
  21:5 25:13
  28:17 32:9
  33:14,18 44:24
  45:3 51:13,17,18
  60:11 61:6,9
  62:10,24 63:1
  77:3 108:12
  111:17 112:3
  113:15 117:19
**provides** 52:19
  107:24 108:20
**providing** 23:6,9
  23:10,12 25:19
  32:12 35:2
  60:15 61:7 82:8
  91:19 98:23
  104:7 109:1
  110:21 116:5
  118:5 124:8,9
  129:5 134:12
**proximity**
  146:17,22
**ptab** 26:19 29:11
  29:16,18
**pto** 28:21
**public** 1:21 4:5
  150:5,19 153:16
**publication**
  69:20
**publicly** 8:24
**purchase** 44:5
**purpose** 17:19
  142:13,16
**purposes** 22:3
  24:13

**pursuant** 1:19
**put** 18:3 64:14
  77:15 120:7
**putting** 70:20
  78:12

**q**

**qualification**
  84:21 94:22
  98:17 106:18
**qualifications**
  79:23 88:11,14
  89:1 94:20
  101:5,11 128:21
**qualified** 81:15
  104:21
**qualify** 92:1
**quantity** 139:6
  140:1 141:7
**question** 6:15
  8:5,9 10:1 24:17
  32:5,12,20 36:5
  37:3 43:22 59:4
  97:17,21 101:6
  102:9,10 103:4
  103:13,14,20
  107:10 121:11
  130:11
**questioning** 6:21
  6:22
**questions** 6:2 7:8
  7:8,21 8:4,12,13
  9:10,15 149:3
**quick** 79:6
**quoted** 49:15
  125:18

**r**

**r** 2:1 4:1,16
  150:1 152:3,3
**rabe** 62:5
**range** 117:19
  118:6,10,18
  130:14
**ranges** 109:2
  110:2 117:22
  118:7,11,22
  119:6,14,15,16
  120:6,16,17
  121:3,4 145:15
**rate** 10:7
**ratio** 78:21
**read** 11:15,15,16
  19:11,13,14 21:6
  21:14,15 31:4
  34:1 35:6 36:22
  45:7 51:2 73:6
  73:18 74:6
  75:14,15 107:18
  125:2 126:6
  130:1 136:13
  139:8 146:10,12
  147:16,19,21,22
  148:2,5 151:7
  152:4 153:5
**reading** 11:18
  46:24 107:22
  126:9 127:22
  139:17,18 140:5
  148:2
**reads** 152:4
**real** 79:6
**realize** 73:14
  94:24

**really** 35:11 49:6
  74:9,17 94:20
  101:10 117:1
  122:4
**reason** 6:19 7:11
  7:15 57:3 119:4
  136:1 145:6
  151:9
**reasonable** 55:2
  137:17,17
**rebuttal** 64:9
**rebutting** 16:4
  18:8 64:13
**recall** 61:15,16
  124:14
**receipt** 151:15
**recess** 58:22
  106:3
**recipe** 88:1
**recited** 82:9
**recites** 31:12
**recognize** 124:4
  124:16,18
**record** 4:15
  21:14 150:11
**recording** 6:5
**recross** 3:2
**redirect** 3:2
**reduce** 146:14
**reducing** 146:14
**refer** 26:6,9,10
  26:14,18 109:5
**reference** 54:8
  55:4,9,15,17
  56:4 57:12,13
  58:24 59:5,7,10
**referenced** 151:4

references  54:15
  55:5,10 57:4,4
  57:14 58:5,8,14
  58:15 59:21
  61:2,3
referring  106:9
refused  29:12
regarding  13:4
  53:18 82:9
register  6:11
registered  84:4,4
  84:7 85:17,20
  86:4
regular  86:23
rejected  125:19
rejection  127:11
related  16:17
  23:4 27:1,19,23
  35:8 52:9 53:24
  76:21,23 78:3
  80:12 83:13
  90:17 99:5
  100:16 101:23
  102:14 113:7
  115:5
relates  116:9
relating  32:9
relation  107:14
relay  109:18
relevant  44:11
  67:12,15 100:4
reliance  64:22
relied  59:14 60:4
rely  43:17
relying  39:6
  98:22
remain  74:24
  75:5

remaining  9:1
remember  78:11
  78:12 112:22
  113:5 119:14
render  57:5
renders  145:23
  146:23
repeat  97:21
repel  94:1
rephrase  58:12
  85:19
replacing  127:12
replication
  119:17
reply  3:12 15:9
  15:16 16:2,22
  78:14
replying  16:22
  16:24 17:5
report  3:11,12
  3:14 11:16
  14:19,21,24 15:1
  15:2,10,13,14,17
  15:18,23,24 16:2
  16:7,12,14,17,22
  16:23 17:4,17
  19:17 20:12
  21:5 28:1 29:9
  31:17 33:3,5,15
  34:16 45:4
  49:24 51:19
  52:5 62:12
  63:17,19,20 64:1
  64:8,19 66:9,22
  78:11,14 79:21
  83:15 88:21
  94:23 100:14
  106:6 112:4,22

113:1,20 124:11
  124:14
reporter  1:20
  3:24 5:13 6:5
  150:4
reports  8:21
  10:15 11:15,19
  12:16 14:15
  15:20,22 17:24
  18:2,4 20:9
  21:13 30:17,21
  64:11,14,15,22
  76:20 77:4 78:8
represent  4:11
  124:22
repugnant
  114:22
repulsion  38:4
  41:15 43:24
  70:13,16,18,19
  70:20 71:3
request  11:1,7
requests  9:2
require  22:22
  39:24 53:9
  142:19
required  6:9,12
  7:9 8:16 22:17
  23:1 47:22
  116:15 139:5
  153:12
requirement
  49:15,17,20 50:1
  50:5,8,11,15
  103:24 110:5,6
  110:16,23 111:3
  112:8 115:3

requirements
  22:9 23:5 34:10
  97:6,22
requires  21:20
  21:24 47:1
  48:11 49:20
  50:9 52:14 55:8
  55:9
requiring  32:13
  55:4
requisite  91:1
research  147:24
reserve  149:3
resisting  128:9
respect  109:8
responses  6:10
responsive  3:14
  16:7,11 17:4
  19:17 24:16
  35:23 37:7
  38:13 39:10
  40:8 48:5 63:19
  102:1 103:13
rest  26:5 106:5
  148:3
restricted
  130:15,16
results  47:18,22
  48:11 52:15
  65:4 73:13
  108:2 110:17
  111:4,7 112:10
  113:11 117:1
resume  14:1
retail  23:24 85:2
  85:6
retained  3:24

**return** 151:11,14
**review** 26:1
50:22,23 60:3
76:16,24 88:12
95:19 129:6
149:3 151:5
**reviewed** 25:14
43:8,9 59:13
61:7 62:10
69:20 75:21
76:19,21 77:12
**reviewing** 57:18
65:2 103:10
130:21
**rheology** 89:7
96:5
**right** 9:6 14:5
16:14 17:17,21
18:10 24:23
26:2,16 29:6
31:9 32:4,23
35:12 36:19
38:1,19 39:3,18
49:13 59:6
67:24 69:4 71:3
72:12 75:9
78:12 79:4,11,13
83:19 85:9 86:5
88:3,18,21 89:23
91:10,11 94:24
96:21 99:7
101:7 107:16
111:23 112:19
114:16,20,24
117:3 118:4,16
120:13,23
122:23 125:13
126:7,8 127:8

128:13,23
133:20 135:8,22
136:1 137:3,17
138:14 143:12
147:6 148:23
149:4
**risk** 146:15
**road** 2:12
**robin** 1:11
**roe** 1:11
**role** 76:8,10
**rolf** 60:21 62:17
**roman** 31:4
**rsw** 1:6
**rule** 47:21 48:10
114:11
**rules** 1:19 5:10
9:22 45:20 48:9
**ruling** 134:3
**run** 61:14

**s**

**s** 2:1 3:6 4:1,16
152:3
**safe** 88:5
**sake** 72:18
**satisfactorily** 4:4
150:8
**satisfies** 65:5,14
**saw** 60:24
**saying** 43:21
53:12,13 76:5
83:21 90:15
101:16,17 102:8
102:11 104:21
108:22,24
119:22 120:21
120:24,24

121:23 122:13
127:3 132:16
137:23 140:20
143:18
**says** 21:18 32:24
34:5 35:15 47:3
51:8 72:22 73:8
75:15,16 84:3
99:24 114:11
121:21 125:6,9
126:9 127:11
129:2 131:10
137:6 138:13
139:12 143:4
**school** 18:23
85:11 87:19
92:21 93:13,19
98:2
**schools** 89:13
92:22,22
**science** 90:17
99:5 100:16
101:23
**sciences** 86:10
97:5 102:13
104:9 106:13,19
**scientific** 69:11
69:19 147:16,17
**scientist** 89:22
90:3
**scope** 22:24 50:4
50:10,18 53:2,8
53:16,17 110:24
**scratch** 90:9
**se** 43:9 60:23
**seal** 150:16
**search** 60:11
61:13,14 62:13

62:14,18
**searching** 61:15
**second** 15:7,16
51:7 57:13
65:12 78:21
93:20,21
**section** 1:19 31:7
31:14 32:13
33:9 44:12,19
45:2 46:9,12,24
47:17 49:20
51:3 52:14
53:20,21 54:14
**sections** 25:10
35:9 49:7
115:15 144:4
148:11,18
**see** 19:16 43:5
50:23 58:2
63:18 66:18
72:2 75:13
87:12 94:19
112:14 115:21
117:6,17 119:22
125:13 127:19
128:5,11 135:17
145:1
**seeing** 78:11
117:5
**seen** 4:24 22:14
52:7 60:18,20
113:7
**semester** 93:20
93:21
**send** 10:10
**sense** 145:4
**sent** 11:2 151:12

**sentence** 21:17
21:18 22:2 31:4
107:18
**sentences** 22:8
148:16
**separate** 117:15
148:3
**september** 64:12
**sequester** 75:24
**serve** 29:24
**set** 21:20 150:15
**seven** 8:17 17:9
**shake** 6:9
**shane** 64:21
**sheet** 151:9
**shk** 2:7,7
**short** 70:23
126:5
**shorthand** 26:4
**show** 12:13
65:17 79:16
83:4 113:16
**shown** 92:13
**sic** 49:3
**side** 11:16 18:8
18:15 111:18,18
116:23 140:23
**sign** 149:5
151:10
**signature** 150:18
**signed** 151:17
**similarly** 127:24
**simply** 24:12
39:6 110:1,20
**single** 54:8 55:4
55:8,13,14,17
56:4,9,11 70:10
130:16

**sit** 19:1 42:14
**sitting** 41:11
**six** 27:14 99:15
**sjm** 1:6
**skill** 20:15 22:22
35:7 38:11
41:21 43:14
44:10,17,21 45:1
46:1,7 48:3,15
49:21 50:2,17
53:1,7,15 55:1
57:17 58:6
59:22 60:4 65:2
79:24 80:7,15,16
80:24 81:8,9,11
81:14,16,20,23
81:24 82:3,5,6
82:12 83:6,10,17
85:18,19,21,24
86:3,5,8,13,21
87:2,8,10,13,22
88:14 90:14,20
91:15,20 92:2,5
92:19 93:11
94:14,22 95:1,24
96:16,23 97:7,24
98:9,11,14 99:22
100:12 101:5,11
102:16 104:5,13
104:19,22,23
105:4 109:17
111:8 112:13
113:17 114:7
116:10,21 117:4
119:5,11 121:2,6
122:4 128:19
129:7 133:13
137:13 143:10

143:16 145:4,7
146:6 148:7
**skilled** 52:16
107:22
**skills** 44:5 51:8
80:12 81:2
83:24 87:3
100:11
**skin** 74:7,11,15
74:20,20,23 75:3
75:7 135:14,21
140:16 146:17
146:23 147:1
**smallpox** 147:14
**sole** 25:1,2
**solution** 68:9
72:7,9
**solutions** 1:22
90:5 151:19
**solve** 90:2
**somebody** 12:23
81:23 83:22
86:17 87:18
91:8 98:17
101:9 103:5
**sorry** 34:4 58:12
61:22 97:21
**sort** 86:19
126:22
**southern** 1:5
**soybean** 79:4
**speak** 6:14 12:10
12:18 93:18
**speaking** 21:2
28:15 32:15
35:4,5 37:13,18
41:3,4 80:19,20
135:12 145:23

**specialize**
106:22
**specific** 22:9
24:15 25:10,17
33:5 35:11,23
48:3 53:13 58:7
58:14,14 60:12
60:13 68:3
70:21 71:24
78:1 108:2
111:6 112:10
113:7,18,18
114:1,1 115:3
117:23 119:14
119:15 120:22
121:8,11 138:1,2
139:22 144:3,14
144:14,20
**specifically** 14:5
20:4 32:3 33:16
34:17 45:20
46:13 47:22
48:10 52:9 60:6
61:15 65:16
68:1 75:10
76:21,24 77:18
80:4 83:11,13,21
88:23 89:4
101:20 102:17
103:14 106:21
107:14 116:9
118:4 123:1
131:23 133:21
137:6 144:18
148:13
**specification**
25:8,11,13 45:9
48:17 50:23

**[specification - suite]**  Page 29

58:1,2 94:7 96:3
107:24 108:1,11
108:17,19
112:14,17 114:5
115:13,16,22
116:5 117:6,9
118:15 122:24
126:10 129:23
130:3,4,24 131:1
131:4,16,24
132:1,5,19 133:3
133:24 136:22
137:10,11 138:3
138:6 139:11,21
139:24 143:8,12
143:12,19 144:2
144:24 147:8
148:12,19,21
**specifications**
101:19 115:12
**specifics** 40:24
42:5,13 43:5
52:2 77:13
130:19
**spectrum** 131:12
**spelled** 4:16
**spent** 9:9,16
**spoke** 13:1
**spoken** 13:3
**sprayed** 66:5,12
**spraying** 74:23
**spread** 75:7
**ss** 150:3
**stabilized** 75:1,5
**stan** 7:23 49:2
58:18 80:21
105:23

**standard** 19:22
20:4,11,13 33:4
33:12,21 34:11
34:15 52:6
112:21 113:23
127:16
**standards** 33:4,6
33:15,20 34:18
51:14,14,16,22
51:23 52:8
54:11 59:19
116:18
**stands** 19:10
32:23
**stanley** 2:2 4:10
**start** 73:5 113:23
114:9 115:19
148:19
**started** 5:8 20:7
20:8 32:18
**starting** 33:16
81:4
**starts** 114:14
126:4
**state** 4:15 19:2
41:13 43:23
46:17 106:21
117:14 141:23
148:13
**stated** 20:12
49:24
**statement** 37:15
46:5
**statements** 45:24
**states** 1:3 13:9
19:5 26:14 45:8
**stating** 107:12
108:19 126:1

**statute** 31:22
32:4,7 34:1,23
45:19 47:21
49:4,10
**statutes** 48:9
58:10
**statutory** 110:15
111:3
**stay** 74:12
**step** 21:24
**steps** 40:11,20
41:6,16,20 42:2
42:7,10,17,23
44:1,3,4
**steric** 70:13,16
70:19,20
**stick** 140:16
**sticking** 75:2
76:6,7
**sticks** 74:19
**stop** 96:2,2
**stopped** 119:23
**stopping** 94:8
105:24 133:1
**stops** 133:7
**store** 85:2
**street** 1:22 2:20
**strike** 22:15
**students** 89:13
92:23 94:3 97:2
97:5 98:4
**subject** 5:18
11:11 15:5 31:3
31:6,9,16 34:9
37:23,24 38:9
40:12,21 44:9,11
80:8

**subjective**
105:20 146:7,8
**subjects** 27:17
**submit** 29:9 64:8
**submitted** 11:8
14:24 17:21
64:11 107:5,11
**subscribed**
153:13
**subsequent**
33:18
**subsequently**
20:8 51:23
71:16
**substance** 5:8
16:16 68:11
**substances**
146:15
**substantial**
45:11 52:17
**substitute** 87:5
**substrate** 146:16
146:21,22,24
**success** 55:2
57:20
**sufficient** 46:6
52:23,23 53:14
110:14 123:6
139:24 141:6
**suggesting**
133:12
**suggests** 22:23
45:15 74:4
75:23 141:22
**suit** 11:17 13:16
16:1 67:13 81:4
**suite** 2:12,20

**summary** 3:22 124:1

**supplementing** 18:18

**support** 3:16 17:11,16,20 50:24 106:10 112:3,17 116:22 117:7,7 125:22

**supporting** 64:2

**supports** 110:10 121:20 128:8

**suppose** 96:13

**supposed** 138:5

**supposing** 87:18

**sure** 32:11 33:23 43:8,13 52:2 57:7 59:4 65:19 75:16 83:24 107:10 115:7 127:10 142:5 145:21

**surface** 39:8 67:9,11,14,20 68:2 70:2,21,22 71:6,14 73:12 76:13 123:15

**surfaces** 68:5

**surfactant** 85:13

**surfactants** 85:16

**surround** 75:16

**surrounds** 71:15

**susan** 1:20 150:4 150:19

**swore** 5:13

**sworn** 4:4 150:9 153:13

**system** 126:14 126:18

**t**

**t** 3:6 29:17 150:1 150:1 152:3,3

**table** 78:8,16 120:15

**tables** 108:11 109:1 110:2 117:15,21 118:4

**tablets** 85:6,7

**take** 11:10 31:1 47:2 58:20 74:13,18 93:2 98:4,6 106:1 111:2 114:4 115:21 120:1 132:10 134:13 134:14 135:11

**taken** 1:18 72:19 73:1 92:19 93:11 96:23 97:3,8 150:7

**talk** 9:8 26:13 92:17 123:7 134:14

**talked** 9:4

**talking** 41:12 68:5 72:2 79:7 105:6,13 130:6

**talks** 94:7

**targeted** 106:23

**tasks** 82:21

**taught** 60:14 80:12 87:16 92:11 93:18 96:11 101:18

**teach** 43:14 48:2 48:15 58:5 85:11 89:14 93:22

**teaches** 58:2

**teaching** 47:13 67:1,13 95:20,21 95:22 96:3 110:9 117:5 141:13 145:13

**teachings** 46:13

**technical** 23:10 32:9 54:6 115:4 116:8 146:6

**technology** 63:11,14 66:23 67:5 73:11

**tell** 5:17 6:21 49:6 60:4 78:10 94:21 97:15 122:4 125:3 133:4 137:4

**telling** 95:5

**ten** 98:20

**tenor** 126:10

**term** 19:8 36:21 74:2 81:11 108:14 110:7 112:11 114:22 114:23 121:9 122:13 123:9,21 125:22 127:1,10 127:12,12 128:8 128:22 129:16 131:17,18 132:2 132:23 134:16 140:9 141:2,16 141:17 142:22

143:15 144:18 147:4

**terms** 36:16 45:24 48:7 51:13 55:7 62:15,16 67:6 76:9 91:21 111:15,16,17,20 111:22 112:1 113:21 114:13 114:15,18 115:7 116:13 122:6 129:21 132:5 141:6,8,20

**test** 22:17 23:2 47:18,22 48:11 52:15 65:3,19,20 65:21 83:4 97:8 108:2 110:16,17 111:4,4,7 112:9 112:10 113:10 113:11 116:24 117:1

**tested** 74:17

**testified** 4:5 26:21 27:6 85:23 145:14

**testifies** 104:12

**testify** 27:10,13 28:6,12 29:12 30:5 113:6

**testifying** 5:22 29:8,21 104:4

**testimony** 5:21 7:3 23:6,9,10 27:15,18 28:3,9 28:15,16 29:4,19 29:19 33:2 35:2

100:9,18 101:12
102:2,18,23
103:15 115:9
150:10,11 151:7
151:15 153:9
**testing** 53:3,10
53:13 64:19
65:3,17
**tests** 65:10,12
111:6
**therapeutics**
106:23
**thereof** 34:8
35:18 126:11
**thick** 89:8
**thickener** 84:24
85:3
**thin** 89:8 108:5,7
121:13 122:8,9
122:15,19,21
135:6,7 136:8
137:20 138:19
138:22 140:15
140:15,18,21
142:14
**thing** 143:23
145:22
**things** 35:14,14
36:16 39:13
57:9 88:16
91:24 103:8
112:19 114:18
118:2 140:8
**think** 8:19 9:21
12:16 32:21
38:13 46:21
62:22 67:14
76:8 90:11

95:13 97:17,18
100:7 101:16
103:20 112:24
**thinking** 142:8
**thought** 9:23
**three** 22:7
103:21 126:3,4,7
148:21
**time** 7:18,18 9:9
9:15 14:16 20:1
21:12 28:5,9
29:11,16 44:17
80:10 81:1 96:4
105:24 151:16
**timeframe** 151:6
**times** 10:17 12:3
27:5,9,13 103:21
**tire** 39:11,11,14
39:16,19,23,24
**tissue** 135:14,21
140:16
**title** 34:10
**today** 5:2,6,22
9:3 11:14 18:9
18:11,17 29:22
64:5,10,12,17,18
**today's** 5:9
**told** 20:24
**top** 31:2 38:16
73:4
**topical** 86:15,24
**total** 27:3 114:7
148:10
**totality** 48:14
128:7 129:22
132:6,7,9 140:19
**traction** 38:4

**trademark** 19:6
26:15 28:22
**trained** 87:3
**transcript** 6:7
79:8,13 151:4,17
153:5,9
**transmission**
52:3
**treatment** 30:14
**trial** 27:10,13
28:2
**trials** 26:18 27:7
**trivialize** 108:15
**trivializing**
108:21
**true** 38:6 42:1
46:24 47:7,21
49:19 50:11
57:2 58:7,12,24
64:23 68:24
69:21 71:11,19
73:2 75:8 90:11
108:14 109:20
124:22 150:10
153:8
**trutek** 1:8 4:11
16:20,24 26:6
61:1 77:3 151:1
152:1 153:1
**truth** 5:17
**truthfully** 6:2
7:13
**try** 38:19
**trying** 132:20
136:4 147:20
148:4
**turn** 19:17 31:1
45:5 46:15

79:21 107:17
**two** 12:6 16:3
25:2 30:17
34:20 36:12,13
36:18 37:19
57:3,14 70:23
74:6 98:4 125:2
125:9 129:21
132:5 134:15
135:20
**type** 67:11 77:14
84:20 85:5
86:14 92:18
94:18 118:24
123:1 138:2
139:1,2 144:20
144:22
**types** 11:18
35:14 57:19
70:21 72:5
89:11 92:24
**typically** 25:4,8
83:6,18 98:3
147:19

**u**

**u.s.** 134:10
**uh** 6:10
**ultimate** 23:10
**ultimately** 30:13
92:10 94:6
109:16 111:9
112:15 120:18
124:19 125:1
**undergraduate**
93:5,9,21
**underlie** 23:11

**understand** 4:12
5:5,14,17,21 6:1
6:17 7:1,20 8:4
8:9,11,14 13:12
13:16 29:21
33:17 45:8 53:7
53:19,23 54:2
57:1,21,23 59:4
64:10 65:3,21,23
65:24 89:6 90:3
107:10,23 109:7
109:10,13 110:6
111:11 112:6,13
122:20 123:9,13
123:20,22
128:15,16,22,24
129:17,18
134:19 135:15
136:1,2,4 141:5
147:20
**understandable**
136:11 140:2
148:6
**understanding**
20:10,22 21:4
22:7,10,19 25:22
33:17 34:11
38:9 45:13,23
50:7 51:12
54:18 55:7,10
59:18 66:7 70:1
77:8,20 78:17
80:24 89:10,15
109:17 112:1
124:21 131:5
**understood** 6:23
20:14 128:11
131:2

**undue** 50:16
120:4,12
**unique** 42:2,7,10
42:17,23 73:9
**united** 1:3 13:9
19:5 26:14
**universal** 14:8
**university** 63:13
**usc** 31:7,23
33:24 34:12
44:9 46:22
47:17 48:23
51:2 53:20
**use** 29:16 40:20
41:6 49:22 51:9
59:9,17,23 62:1
62:6 66:19 74:2
86:15 96:19
99:2 109:3
110:12,13 113:9
114:23 124:11
126:24 128:4
132:12,15,15
134:18,22
135:13 143:20
143:21
**useful** 34:6,7
35:17 47:2,3,5,9
47:13
**uses** 39:2 40:3
40:11,19 41:4,5
41:7 129:11,13
**uspto** 26:15,18
28:13,17 29:8
124:7,23
**usually** 109:5
147:22

**utility** 45:23
46:11,18 47:16
95:22,22
**utilize** 38:7
41:14 43:24
**utilizes** 40:10
**utilizing** 39:17

**v**

**vague** 23:19 24:5
34:13 80:17
82:23 97:18
**valid** 42:21,22
46:3 60:7
139:16
**validity** 30:17,22
**value** 66:20
133:17
**values** 117:19,22
118:6
**variable** 117:16
119:4 121:8
**varies** 86:14
98:2 109:23
**various** 33:19
34:17 89:11
**vary** 139:7
**verbal** 6:7,11
52:1,3
**verify** 121:22
151:7
**veritext** 1:22
151:13,19
**veritext.com.**
151:13
**version** 49:4,10
49:10

**versus** 81:6
**view** 35:7 91:20
116:4 129:22
130:3,23 131:10
139:8 143:11
144:2,24
**virus** 76:15
147:14,15
**viruses** 123:3
139:13 147:11
**vitae** 3:10 13:20
13:22 14:1
**voltage** 67:23
**vs** 1:10 151:1
152:1 153:1

**w**

**wadstrom** 60:19
60:20 62:16
**wahi** 60:17
**wait** 37:4
**want** 14:17
32:10 58:20
72:18 97:12,14
103:12,14 113:4
146:12
**wanted** 9:11
56:24
**wash** 108:22
**washington** 2:21
**water** 68:18,19
68:23 71:15
72:8 118:8
**way** 9:19 26:5
27:21 28:10
29:19 45:17
67:18 71:12
73:21 87:15

92:11 115:24
119:7 135:23
138:8 144:17
148:23
**ways** 24:15
70:11 115:7
**we've** 9:22,23
58:18
**website** 69:7,10
69:12 72:20
73:1 77:12,23
**wednesday** 12:4
**went** 12:16
87:18 92:21
**west** 2:12
**whereof** 150:15
**white** 148:15
**wide** 130:14
**witness** 1:18 3:2
14:10 21:8
27:15 28:7
29:13,22 36:5
37:2 149:3
150:8,11,15
151:6,8,10,16
**word** 29:16 37:7
109:3 115:20
125:16,16
126:21 127:7
128:12 131:7
**words** 55:6 59:6
59:20 87:6 95:7
100:8 112:12
113:21,24 114:8
117:2 120:11,21
126:4 127:3,14
132:12 134:17
134:19 135:19

143:6,18 144:11
**work** 10:8,11,14
11:2,4,5,9 18:12
25:6 27:3 39:24
45:12,17 47:20
48:1 52:18 88:5
108:4
**worked** 84:22
115:10,11
**working** 20:7,8
21:12 25:5,21
84:15 85:2
87:19 94:11,18
96:4
**write** 115:18
**writing** 107:11
**writings** 17:22
107:5
**written** 43:6,8
45:20 49:14,16
49:19 50:1,5,8
50:12,19 51:1
52:11,21 110:22
115:6,13,14
117:11 125:21
132:1 135:23,24
136:4,13 140:5
**wrong** 49:10
142:11
**wrote** 14:4,5
41:22 65:1,7

**x**

**x** 3:1,6

**y**

**yeah** 88:9
**year** 10:4 98:24
99:7,15

**years** 86:10,12
86:16,20 87:20
91:24 94:12
98:13,15,18,20
99:5,24 104:9
**yesterday** 12:4

**z**

**zeta** 67:19

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.