# EXHIBIT 3

Page 1

1                                     Pages:   1-153

2                                     Exhibits: 1-11

3                UNITED STATES DISTRICT COURT

4                EASTERN DISTRICT OF MICHIGAN

5                      SOUTHERN DIVISION

6                      C.A. NO.: 2:21-cv-10312-SJM-RSW

7    ****************************************

8    TRUTEK CORP.,

9              Plaintiff,

10   vs.

11   BLUEWILLOW BIOLOGICS, INC. ROBIN ROE

12   1 THROUGH 10, GENDER NEUTRAL FICTITIOUS NAMES,

13   AND ABC CORPORATION 1 THROUGH 10

14   (FICTITIOUS NAMES).

15              Defendants.

16   ****************************************

17              DEPOSITION of DR. MANSOOR AMIJI, a

18   witness called on behalf of the Plaintiff, taken

19   pursuant to Michigan Court Rules Chapter 2, Section

20   306, before Susan Baxter, a Court Reporter and Notary

21   Public, in and for the Commonwealth of Massachusetts,

22   at Veritext Legal Solutions, 101 Arch Street, Boston,

23   Massachusetts, on Friday, October 14, 2022, commencing

24   at 8:36 a.m.

Page 2

```
 1              A P P E A R A N C E S

 2         STANLEY H. KREMEN, ESQUIRE

 3         Attorney at Law

 4         4 Lenape Lane

 5         East Brunswick, NJ  08816

 6         (732) 593-7294

 7         shk@shk-dplc.com

 8              Counsel for the Plaintiff

 9

10         KEITH ALTMAN, ESQUIRE

11         The Law Office of Keith Altman

12         38228 West 12 Mile Road, Suite 375

13         Farmington Hills, MI  48334

14         (248) 987-8929

15         keithaltman@kaltmanlaw.com

16              Counsel for the Plaintiff

17

18         LIANE PETERSON, ESQUIRE

19         Foley & Lardner, LLP

20         3000 K Street NW, Suite 600

21         Washington DC  20007

22         (202) 945-6116

23         lpeterson@foley.com

24              Counsel for the Defendant
```

Page 3

1                           I N D E X

2    WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

3    MANSOOR AMIJI

4    (By Mr. Kremen)       4

5

6                         E X H I B I T S

7    NO.            DESCRIPTION                  PAGE

8    Exhibit 1      Notice of Deposition         4

9    Exhibit 2      US Patent 802                13

10   Exhibit 3      Curriculum Vitae             13

11   Exhibit 4      Expert Report on Invalidity  14

12   Exhibit 5      Reply to Expert Report on    15

13                    Invalidity

14   Exhibit 6      Responsive Expert Report     16

15                    On Non-infringement

16   Exhibit 7      Declaration in Support of    17

17                    BlueWillow's Claim Construction

18                    Brief

19   Exhibit 8      US Patent 35USC101           33

20   Exhibit 9      US Patent 35USC112           48

21   Exhibit 10     NanoBio Droplet Document     72

22   Exhibit 11     Action Summary               124

23

24           (Exhibits retained by Court Reporter)

Page 4

1                   P R O C E E D I N G S

2

3                   MANSOOR AMIJI, after being

4            satisfactorily identified and duly sworn by the

5            Notary Public, was examined and testified as

6            follows:

7

8                       DIRECT EXAMINATION

9            BY MR. KREMEN:

10    Q    Good morning, Dr. Amiji.  My name is Stanley

11           Kremen and I represent the Plaintiff, Trutek

12           Corporation in this action.  I understand that

13           you've been deposed previously; is that correct?

14    A    Yes.

15    Q    Could you please state your name for the record?

16    A    Mansoor Amiji.  Mansoor is spelled M-a-n-s-o-o-r.

17           Amiji is A-m-I-j-I.

18                       MR. KREMEN:  Can I have the notice of

19           deposition?

20

21                       (Whereupon, Notice of Deposition, was

22                       marked as Exhibit No. 1.)

23

24    Q    Have you seen it before?

```
                                                    Page 5
 1    A    No, I haven't.
 2    Q    You're here today to comply with that notice; am
 3          I correct?
 4    A    Yes, I am.
 5    Q    You understand that this is a deposition and that
 6          you're being deposed today, correct?
 7    A    Yes.
 8    Q    And before I get started on the substance of
 9          today's deposition, I'd like to go over a few
10          ground rules.  You probably know most of them
11          because you've been deposed previously, so I'll
12          go with them anyway, okay.
13                     First, the court reporter just swore
14          you in.  Do you understand that you're under
15          oath?
16    A    Yes, I do.
17    Q    Do you understand that you must tell the truth
18          and that if you do not, you are subject to
19          penalties of perjury?
20    A    Yes.
21    Q    And you understand that the testimony that you
22          give today is the same as if you were testifying
23          in court?
24    A    Yes, I do.
```

Page 6

1    Q    Do you understand that you are obligated to
2         answer my questions completely, truthfully, and
3         accurately, correct?
4    A    Yes.
5    Q    Because the court reporter is recording our
6         conversation is absolutely essential that your
7         answers be verbal.  A transcript of the
8         deposition will be generated.  When a yes or no
9         answer is required, please do not nod or shake
10        your head, and responses like Uh-huh or Mm-hmm do
11        not register as an answer. So a verbal answer is
12        required. Okay?
13   A    Yes.
14   Q    And we should not speak over each other. Let me
15        finish asking my question before you answer. I
16        will also let you finish answering without
17        interruption. Do you understand?
18   A    Yes.
19   Q    Okay.  If for any reason you need a break, please
20        let me know.  If I'm in the middle of a line of
21        questioning when you tell me that, that you need
22        a break, I will finish the line of questioning
23        and then you can go on break; is that understood?
24   A    Yes.

Page 7

```
 1   Q    And please understand that if you go to lunch or
 2        go on break, you may not discuss the case or your
 3        testimony with anyone including your attorney; is
 4        that clear?
 5   A    Yes.
 6   Q    Are you taking any medications that could
 7        interfere with your ability to concentrate on the
 8        questions and answers and to answer my questions
 9        as required?
10   A    I'm not.
11   Q    Is there any reason medical or otherwise that you
12        believe that you might not be able to answer
13        completely, truthfully and accurately?
14   A    No, there isn't.
15   Q    If for some reason that changes during the course
16        of the day, please let me know. Okay?
17   A    Yes.
18   Q    Now, your attorney may object from time to time
19        and unless she instructs you not to answer, you
20        understand that you are obligated to answer my
21        questions to the best of your ability?
22   A    Yes.
23            MR. ALTMAN:  Stan, before you continue,
24        before we had a brief discussion that we have
```

                                                            Page 8

1           agreed that all objections are preserved other

2           than objections to form.

3                     MR. KREMEN:   Okay.

4    Q    If you don't understand one of my questions, or

5           if the question is confusing, please say so and

6           ask me for clarification; is that okay?

7    A    Yes.

8    Q    So it's fair to assume that if you answer a

9           question that you understand it?

10   A    Yes.

11   Q    As an expert, you understand that I may ask you

12          questions concerning your opinions and that some

13          of those questions may challenge your opinion; do

14          you understand that?

15   A    Yes.

16   Q    Your Notice of Deposition required you to produce

17          certain documents within seven days prior to this

18          deposition.  If you would look at that.  I know

19          that you've provided me with, I think on Monday,

20          you provided me with a whole bunch of expert

21          declarations and reports.  So I'm noting that you

22          did that.

23                     MS. PETERSON:   Yes.  We produced copies

24          of publicly available prior declarations from

Page 9

```
 1        Dr. Amiji and we objected to the remaining
 2        category of requests and Dr. Amiji doesn't have
 3        any other documents to produce today.
 4                MR. ALTMAN:  We talked about that he'd
 5        be coming with invoices.
 6                MR. KREMEN:  Right.
 7                MS. PETERSON:  No, we did not.  We said
 8        that he would be prepared to talk about how much
 9        time he has spent on the matter, and he is, so
10        you can ask him those questions.
11                MR. ALTMAN:  We said that we wanted the
12        invoices.
13                MS. PETERSON:  And I said that we were
14        not going to be producing copies of the invoices.
15        You can ask him questions about how much time he
16        spent.  And you said as long as he's prepared
17        with an answer, that's fine.  And he is prepared
18        with an answer.
19                MR. ALTMAN:  By the way, what is your
20        objection to producing copies of the invoices?
21                MS. PETERSON:  I don't think it's
22        called for under the rules.  And we've already --
23        we've already covered all of this and I thought
24        we had an agreement.  You can ask him the
```

Page 10

```
 1        question and that information, he'll provide it.
 2   Q    Now, when were you hired as an expert by
 3        BlueWillow?
 4   A    Sometime in March this year.
 5   Q    Now, were you paid a flat fee?
 6   A    I'm paid by the hour.
 7   Q    Now, what is your hourly rate that you charge
 8        BlueWillow for your work?
 9   A    Nine hundred.
10   Q    Did you send BlueWillow an invoice or invoices
11        for the work that you did?
12   A    Yes, I have.
13   Q    How much did you bill them to date?
14   A    I believe for the work that I have done, all the
15        expert reports, it's about 50 hours.
16   Q    And what is the dollar amount?
17   A    Nine hundred times 50.
18   Q    Okay.  Did they pay you the full amount of your
19        invoice or invoices?
20   A    I believe they've been paid, except for maybe the
21        last month's invoice.
22   Q    You didn't bring a copy of the invoices with you;
23        is that correct?
24   A    Yes.
```

Page 11

1   Q    I'd like to request a copy of the invoice that

2        you sent to BlueWillow for your work to date.

3                    Now, did you bill BlueWillow for all

4        the work that you've done for them to date?

5   A    Except for the work that I've done this month, I

6        have not billed yet.

7   Q    Okay.  I'd also like to request a copy of future

8        invoices that will be submitted to BlueWillow for

9        all work performed by you to date.

10                   MS. PETERSON:  We'll take that under

11       advisement subject to our objections.

12                   MR. KREMEN:  Okay.

13  Q    Now, what did you do to prepare for this

14       deposition today?

15  A    I read my expert reports.  I read the expert

16       report from the plaintiff side.  I read the

17       patent in suit.  Some of the prior art document

18       -- yes, mostly reading different types of

19       reports.

20  Q    Did you meet with any of BlueWillow's attorneys

21       to prepare for this deposition either in person

22       or otherwise?

23                   MS. PETERSON:  Answer that yes or no.

24  A    Yes.

Page 12

```
 1    Q    Which attorneys?

 2    A    Miss Peterson.

 3    Q    How many times?

 4    A    We met yesterday and on Wednesday.

 5    Q    For how long?

 6    A    About two hours each.

 7    Q    Was anyone else present along with Liane Peterson

 8         either in person or otherwise?

 9    A    No.

10    Q    Did you speak with anyone from BlueWillow in

11         preparation for your deposition?

12    A    No.

13    Q    Did your attorney or anybody else show you any

14         documents in preparation that you did not already

15         have?

16    A    No.  I think we just went over the reports and

17         the exhibits.

18    Q    Other than your attorney, did you speak with

19         anyone from BlueWillow in preparation for your

20         deposition?

21    A    No.

22    Q    Have you ever had any conversations directly with

23         somebody from BlueWillow?

24    A    No.
```

Page 13

1   Q    So you never spoke with anybody from BlueWillow?

2   A    No.

3   Q    Have you spoken with any attorneys other than

4        Ms. Peterson regarding this case?

5   A    No, I have not.

6                    MR. KREMEN:   Can I have the 802 patent.

7         That will be marked as Exhibit 2.

8

9                    (Whereupon, United States Patent 802,

10                   was marked as Exhibit No. 2.)

11

12  Q    You do understand that this litigation is about

13       infringement of this patent by your client,

14       correct?

15                   MS. PETERSON:   Objection to form.

16  A    Yes, I understand this is the patent in suit.

17  Q    And this is the document that's marked as

18       plaintiff Exhibit 2.

19                   MR. KREMEN:   What about his curriculum

20        vitae.

21

22                   (Whereupon, Curriculum Vitae, was

23                   marked as Exhibit No. 3.)

24

Page 14

1    Q    This document is your curriculum vitae or resume.

2          Would you just confirm that that is yours?

3    A    Yes, it is.

4    Q    And you wrote that all yourself, everything in

5          there is something you wrote specifically, right?

6    A    Yes.

7                    MR. ALTMAN:  Just as a practical

8          matter, given that we're using universal

9          numbering, while we may bring an extra copy for

10         the witness, we're not going to bring copies of

11         exhibits that have already been marked in a

12         previous deposition for counsel.  Just to cut

13         down on the paper.

14                    MS. PETERSON:  Okay.

15                    MR. KREMEN:  Now, I need the reports.

16                    MR. ALTMAN:  We'll do one at a time.

17         Which one do you want first?

18                    MR. KREMEN:  I guess the initial

19         invalidity report.

20

21                    (Whereupon, Invalidity Report, was

22                    marked as Exhibit No. 4.)

23

24   Q    This is a report that you submitted that we have

1     from you.  Is this your report?

2  A    Yes.  This is the opening invalidity report,

3        Exhibit 4.

4  Q    And it contains your opinions that you formed on

5        that subject; is that correct?

6  A    Yes, it is.

7                    MR. KREMEN:  I need the second one.

8

9                    (Whereupon, Reply Expert Invalidity

10                   Report, was marked as Exhibit No. 5.)

11

12  Q    This one is labeled -- now, the first one was

13        actually labeled Opening Expert Report -- Number

14        4 was Opening Expert Report of Mansoor M. Amiji,

15        Ph.D. on Invalidity.  And this particular

16        document, the second document, will be Reply

17        Expert Report of Mansoor M. Amiji on Invalidity.

18                   Is this your report?

19  A    Yes, it is.

20  Q    Now, I noticed that both of them are reports of

21        invalidity.  What is the difference between those

22        reports?

23  A    So this is the opening report.  Exhibit 4 is

24        opening report that I provided on the invalidity

Page 16

```
 1          of the patent claims, patent in suit, data.  And

 2          the reply report is based on the opinions that

 3          are provided by the two experts and I was

 4          rebutting those opinions.

 5   Q    Okay.  Now, the next one will be, I guess, 6.

 6

 7                      (Whereupon, Responsive Expert Report on

 8                       Non-Infringement, was marked as Exhibit

 9                       No. 6.)

10

11   Q    Now, I have another one called Responsive Expert

12          Report of Mansoor M. Amiji, Ph.D on Non-

13          Infringement.  That's marked as Exhibit 6.  This

14          is your report also, right?

15   A    Yes, it is.

16   Q    What is the substance of it?

17   A    So, this is a report based on opinions related to

18          non-infringement of the BlueWillow NanoBio

19          Protect product based on the comments and

20          opinions of Dr. Lemmo, the Trutek expert.

21   Q    Now, going back to Exhibit Number 5, which is the

22          Reply Export Report.  What are you replying to in

23          that report?

24   A    I'm replying to the opinions of the Trutek expert
```

```
 1              --
 2    Q    Which one -- which are whom?
 3    A    Dr. Lemmo and Mr. Haidri.
 4    Q    And the Responsive Expert Report on Non-
 5         Infringement, you're replying to whom?
 6    A    To Dr. Lemmo.
 7    Q    Dr. Lemmo, okay.
 8                   MR. KREMEN:  Next one we'll mark as
 9       seven.
10
11                   (Whereupon, Declaration in Support of
12                   BlueWillow's Claim Construction Brief,
13                   was marked as Exhibit No. 7.)
14
15    Q    This is the Declaration of Mansoor M. Amiji,
16         Ph.D. in Support of BlueWillow's Claim
17         Construction Brief.  That's your report, right?
18    A    Yes, it is.
19    Q    And the the purpose of it is to do what?
20    A    To support BlueWillow's claim construction brief.
21    Q    All right.  Now, you haven't submitted any other
22         writings that contain your opinions in this case;
23         am I correct?
24    A    That's correct.  These are the reports.
```

Page 18

1    Q    This is the whole domain?

2    A    These are the reports and declaration.

3    Q    Let me just put these in order here.  Now, these

4         reports contain all of your opinions to date in

5         this case; am I correct?

6    A    They do contain all the opinions to date, but if

7         there's anything new that comes from the

8         plaintiff side then I will be rebutting.

9    Q    Okay.  But as of today, these are your opinions,

10        right?

11   A    As of today, these are my opinions.

12   Q    Are you continuing to do work developing new

13        opinions?

14   A    As I said, if there is anything that comes from

15        the plaintiff side, if I'm asked to opine on it,

16        I'll be looking at that evidence.

17   Q    But as of today, you're not going to be

18        supplementing your opinions, am I correct, unless

19        some new evidence comes up; am I correct?

20   A    That's correct.

21   Q    Did you -- you're not an attorney; am I correct?

22   A    No, I'm not.

23   Q    Did you ever attend law school?

24   A    No, I have not.

Page 19

1   Q    Did you ever sit for a bar examination in any

2        state?

3   A    No, I have not.

4   Q    Are you a Patent Agent licensed to practice in

5        patent matters by the United States Patent and

6        Trademark Office?

7   A    No, I'm not.

8   Q    Have you ever heard the term MPEP?

9   A    No, I have not.

10  Q    It stands for the Manual Patent Examining

11       Procedure.  Have you ever read it?

12  A    I am familiar with the patent prosecution

13       process, but I've not read the manual.

14  Q    You've not read the MPEP?

15  A    No, I have not.

16  Q    Let's see.  Exhibit Number 6, which is your

17       Responsive Report on Non-Infringement, turn to

18       page nine.

19  A    I'm here.

20  Q    In paragraph 24 you say, "I've been informed that

21       a claim must be construed under the Phillips

22       standard."

23                 Who informed you of this?

24  A    Counsel.

Page 20

```
 1   Q    Was this the first time that you were informed of
 2        that?
 3   A    I'm familiar with the claim construction process,
 4        but the standard specifically I was informed by
 5        counsel.
 6   Q    When were you informed of this?
 7   A    When I started working on the case, and
 8        subsequently, when I started working on my
 9        reports.
10   Q    To your understanding, what is the Phillips
11        standard?
12   A    Well, as I've stated in my report, it's the
13        standard that the claim are given their plain and
14        ordinary meaning as understood by the person of
15        skill in the art.
16   Q    Okay.  Is that always the case, that they're
17        given the plain and ordinary meaning?
18               MS. PETERSON:  Objection to form.
19        Actually, just objection.  He's already said he's
20        not a legal --
21               MR. KREMEN:  I'm just asking what his
22        understanding is.
23               MS. PETERSON:  I know.  He's already
24        told you he's not a patent lawyer.  And he said
```

Page 21

```
 1      that --
 2                  MR. KREMEN:  That's a speaking
 3      objection.
 4                  MS. PETERSON:  -- his understanding is
 5      provided in his report, so.
 6   Q  In paragraph 27 on page 10, would you read it to
 7      yourself?
 8   A  (Witness complies.)
 9   Q  Who informed you of this?
10   A  Counsel.
11   Q  When were you informed?
12   A  Around the same time that I was working on my
13      expert reports.
14   Q  Would you read paragraph 27 aloud for the record.
15      Would you read paragraph 27 on page 10 aloud?
16   A  Yes, paragraph 27 on page 10?
17   Q  Actually, the first sentence only.
18   A  First sentence on paragraph 27 of page 10 says,
19      "I've been informed that literal infringement
20      requires that every limitation set forth in a
21      claim must be found in an accused product."
22   Q  Keep going.  Next one.
23   A  "I'm also informed that direct infringement
24      requires a party to perform each and every step
```

Page 22

1       or element of a claimed product or method."

2   Q   And the next sentence.

3   A   "I've also been informed that for purposes of any

4       infringement analysis, the comparison is between

5       the properly construed claims and the accused

6       product."

7   Q   Now, what is your understanding of those three

8       sentences?

9   A   Based on these specific requirements in my

10      analysis, my understanding is that in order for

11      the BlueWillow product, Nano Biotech product, to

12      infringe the claims of the 802 patent, each and

13      every element of the claim has to be met.

14  Q   Okay.  Also, what about -- I've seen this --

15      strike that.

16              Would you agree that a patent is not

17      required to contain test data?

18              MS. PETERSON:  Objection.

19  A   Well, my understanding of -- and again, I'm not a

20      lawyer, so I don't know exactly what the patent

21      examiner looks for in the prosecution.  But the

22      patent does require a personal skill in the art,

23      information from there that suggests that the

24      patent does enable the full scope of --

Page 23

1    Q    It has to be enabled, but is it required to have

2         test data?

3                    MS. PETERSON:  Objection.  He's not a

4         lawyer.  You're asking him for opinions related

5         to legal requirements, and that is clearly not a

6         testimony that he's providing in this case.

7                    MR. KREMEN:  He opines on it.

8                    MS. PETERSON:  I disagree with that.

9         He is not providing legal testimony.  He is

10        providing technical expert testimony on ultimate,

11        in the factual issues that underlie the legal

12        issues in the case, but he is not providing legal

13        opinions. He is not a lawyer.

14                   MR. KREMEN:  Okay.

15   Q    You would also agree -- would you agree that not

16        everyone who practices in the field of pharmacy

17        or pharmacology has a Ph.D?

18                   MS. PETERSON:  Objection to form.

19        Vague.

20   A    It depends on the practice.

21   Q    But not everyone has a Ph.D, yes?

22   A    Yes, it would depend on the practice.  If you're

23        a clinical pharmacist, you get a PharmD degree.

24        If you're a retail pharmacist, you could have a

Page 24

```
 1        bachelor's degree.
 2   Q    Now, what about a pharmaceutical formulator, does
 3        a pharmaceutical formulator have to have a Ph.D?
 4                   MS. PETERSON:  Objection to form.
 5        Vague.
 6   A    Again, depends on in other kinds of formulations
 7        that they were developing.  They could have a
 8        master's degree and then have practical
 9        experience.
10   Q    So they have a bachelor's degree and practical
11        experience?
12   A    Again, if they're just simply able to develop the
13        formulation, but in the purposes of the claims of
14        the 802, that formulation also has to function in
15        specific ways.
16                   MR. KREMEN:  That is a non-responsive
17        question.  Objection.
18   Q    You have been listed as an inventor or
19        co-inventor on several patents, yes?
20   A    Yes, I am.
21   Q    Approximately, how many patents?
22   A    About 15 or so issued patents and some that are
23        in the prosecution right now.
24   Q    Were any of these US patents granted where you
```

Page 25

```
 1         were the sole inventor, not co-inventor?
 2    A    I have two that were issued that I am the sole
 3          inventor.
 4    Q    Now, you said you're not an attorney.  Typically,
 5          when you're working on preparing patent
 6          applications, did you work with an attorney?
 7    A    Yes, I did.
 8    Q    Typically, who would draft the specification?
 9                   MS. PETERSON:  Objection to form.
10    A    It depends on the specific sections of the
11          specification.  Sometimes they ask me to provide
12          examples, but in other parts of the
13          specification, the attorneys provided me and then
14          I reviewed.
15    Q    Where there would be drawings, who would do the
16          drawings?
17    A    Again, it depends on the specific drawings.  But
18          generally, if these are figures that came from
19          data, I would be the one providing those.
20    Q    Who would draft the claims?
21    A    Again, working with the attorneys, they would
22          initially come with some understanding of the
23          claim language and then they would ask my
24          opinion.
```

Page 26

1    Q    So they would draft it and then you would review

2         it, right?

3    A    That's correct.

4    Q    Now, just to get some shorthand considerations

5         out of the way, for the rest of the deposition,

6         I'll refer to the plaintiff as Trutek and the

7         defendant as BlueWillow; is that okay?

8    A    That's fine.

9    Q    Okay.  I'll also refer to US patent number

10        8163802, which is Exhibit 2.  And I'll refer to

11        that as the 802 patent; is that okay?

12   A    Yes.

13   Q    We'll talk about the 802 patent later.  I will

14        also refer to the United States Patent and

15        Trademark Office as the USPTO. Have you heard

16        that expression before, right?

17   A    Yes.

18   Q    And I'll refer to the USPTO Patent Trials and

19        Appeals Board as the PTAB; okay?

20   A    Yes.

21   Q    Now, you've testified in other previous legal

22        matters; is that correct?

23   A    Yes, I have.

24   Q    What percentage of your practice is litigation

Page 27

1      related?

2                  MS. PETERSON:  Objection to form.

3    A   So I do -- my total consulting work is around 25

4         percent.

5    Q   Okay.  Now, approximately, how many times have

6         you testified?

7    A   In depositions or trials or both?

8    Q   Both.

9    A   Maybe around 20 times.

10   Q   Did you ever testify at a trial in open court?

11   A   Yes.

12   Q   Approximately, I'm not looking for an exact

13        number, how many times did you testify at trial?

14   A   Five or six.

15   Q   Was your testimony always as an expert witness?

16   A   Yes.

17   Q   Generally, what were the subjects of your

18        testimony?

19   A   Generally, related to pharmaceutical formulations

20        and drug product development.

21   Q   Did they always involve patents in some way?

22   A   Majority of the cases that I've been on are

23        patent related, but I've also been on some

24        contract disputes.

Page 28

1   Q    Did you always generate an expert report or

2        declaration prior to your deposition or trial

3        testimony?

4   A    Again, generally, in the patent cases I have.

5   Q    Was there ever a time when a court did not permit

6        you to testify or declined to accept you as an

7        expert witness?

8   A    No.

9   Q    Has there ever been a time that your testimony

10       was limited in any way, to your knowledge?

11  A    Not to my knowledge.

12  Q    Did you ever testify in a proceeding before the

13       USPTO?

14  A    No, I have not.

15  Q    So by testimony, I'm speaking about also

16       deposition testimony.

17  A    Not in front of the USPTO.  I have provided

18       declarations for IPR cases.

19  Q    Okay.  But were you ever actually deposed in

20       those cases?

21  A    By the attorneys, not by the PTO, not by the

22       Patent and Trademark Office.

23  Q    Okay.  Now, what kind of proceedings were they?

24  A    IPR proceedings.

Page 29

1   Q    Well, IPR, but were they PGR interferences,

2        appeals?

3   A    Some of them were -- majority have been IPR.

4   Q    So in those proceedings, any testimony you gave

5        was always by deposition, there was no open

6        court, right?

7   A    That's correct.

8   Q    Prior to testifying at the USPTO, did you always

9        submit a report or a declaration under oath?

10  A    Yes, I did.

11  Q    Okay.  Was there ever a time when the PTAB did

12       not permit you to testify or refused to accept

13       you as an expert witness?

14  A    I don't -- I don't know, but everything that I've

15       done so far has been accepted.

16  Q    Incidentally, every time I use the word PTAB,

17       it's P-T-A-B.  Did you say that there was never

18       an instance where the PTAB did not accept your

19       testimony or limited your testimony in any way?

20  A    I'm not aware of.

21  Q    Now, you do understand that you're testifying

22       here today as an expert witness, correct?

23  A    Yes.

24  Q    And you were hired to serve in that capacity by

Page 30

```
 1        the defendant BlueWillow Biologics; is that
 2        correct?
 3    A   Yes.
 4    Q   Now, what is the field of expertise to which you
 5        will testify?
 6    A   I'm a pharmaceutical formulator.  I develop
 7        pharmaceutical products.
 8    Q   Is that list exhaustive?  Do you have any other
 9        fields of expertise that you're presenting
10        yourself?
11    A   No.  I'm an expert in the pharmaceutical
12        formulations and characterization, and
13        ultimately, applications of pharmaceutical
14        formulations for treatment or prevention of
15        diseases.
16    Q   Now, in your capacity as an expert in these
17        fields, you generated two reports on the validity
18        of the 802 patent on behalf of the defendant;
19        that's correct, yes?
20    A   Yes, I did.
21    Q   And that is 4 and 5.  Now, these reports, they
22        contain all your opinions concerning the validity
23        of the 802 patent; is that correct?
24    A   Yes.
```

Page 31

```
 1   Q    Let's just take a look here.  Turn to Page 95 of
 2        Exhibit 4.  At the top of the page, under the
 3        heading subject matter eligibility, could you
 4        read the sentence labeled as Roman numeral 12.
 5   A    "Analysis:  Claims 1, 2, 6, and 7 are invalid for
 6        being directed to ineligible subject matter under
 7        35 USC Section 101."
 8   Q    Okay.  And you allege that these claims are
 9        directed to ineligible subject matter, right?
10   A    Yes, I do.
11   Q    Now, you would agree that because claim one
12        recites a process or a method, it falls into the
13        class of inventions that are patentable under
14        Section 101; is that correct?
15             MS. PETERSON:  Objection to form.
16   A    Again, my analysis for the subject matter and
17        eligibility, as I discussed in my report, is
18        based on the fact that the claims are derived
19        towards the ability of this composition or to
20        attract electrostatically, which is a well known
21        phenomena in nature.
22   Q    You you express an opinion about the statute of
23        35 USC 101, what is 101?
24             MS. PETERSON:  Objection.
```

```
 1      Mischaracterizes his opinion.  He's not a patent
 2      lawyer.
 3                  MR. KREMEN:  Well, he very specifically
 4      mentioned the statute.  I have the right to
 5      question him on that.
 6                  MS. PETERSON:  He did not express an
 7      opinion as to the meaning of the statute, which
 8      is what you just asked him to provide.  He
 9      provided technical opinions relating to the
10      patent.  If you want to ask him about those
11      opinions, I'm sure he's prepared to answer.  But
12      he's not providing -- your question was directed
13      to what is Section 101 requiring.  He's not a
14      legal expert.
15                  MR. ALTMAN:  Liane, that's a speaking
16      objection.  They're not allowed.  It's just
17      objection form.
18                  MS. PETERSON:  And I started off with
19      an objection to the form and Mr. Kremen followed
20      up, so I'm just answering his question.
21                  MR. ALTMAN:  I don't think that's what
22      took place but that's fine.
23  Q   So as it stands right now, you don't know what
24      101 says?
```

Page 33

1        MS. PETERSON:  Objection.
2     Mischaracterizes his testimony.
3  A   As I mentioned in my report, I apply these
4     standards in the standard.  I've discussed it in
5     my report, Exhibit 4, under the specific
6     standards that I've applied to my analysis.
7  Q   I'm going to present you with --
8
9        (Whereupon, US Code Section 101, was
10       marked as Exhibit No. 8.)
11
12  Q   Do you know what the standard is in 101?
13       MS. PETERSON:  Objection, form.
14  A   As I mentioned before, I was provided with these
15     standards, and I mention these in my report,
16     specifically starting on paragraph 30, how I
17     understand -- my understanding of the patent law
18     in what was provided to me.  And then subsequent
19     to that, I have discussed the various parts of
20     those standards.
21  Q   Have you ever given an opinion on this standard
22     before?
23  A   Yes, I'm sure I have.
24  Q   I'm going to give you a copy of 35 USC 101.  And

Page 34

```
 1        could you read the statute aloud?
 2                 MS. PETERSON:  Excuse me, what
 3        deposition exhibit number are we marking this as?
 4                 MR. ALTMAN:  Eight.  I'm sorry.
 5   A    The document says, "Whoever invents or discovers
 6        any new and useful process, machine manufacturer
 7        or composition of matter, or any new and useful
 8        improvement thereof may obtain a patent
 9        therefore, subject to the conditions and
10        requirements of this title."
11   Q    Now, is this your understanding of the standard
12        of 35 USC 101?
13                 MS. PETERSON:  Objection, vague,
14        ambiguous.
15   A    Again, if this is the standard as you have
16        presented to me, and I mentioned in my report, I
17        specifically discuss the various aspects of those
18        standards in the context of my analysis.
19   Q    Now, would you agree that because claim one is a
20        process, and claim two is a composition of
21        matter, discusses a composition of matter, that
22        the claims fall within the classification of
23        inventions patentable under the statute?
24                 MS. PETERSON:  Objection to form.
```

Page 35

```
 1        Ambiguous.  Calls for an answer outside of the
 2        testimony and opinions that he's providing in
 3        this case.
 4                    MR. ALTMAN:   Liane, that's a speaking
 5        objection.  There's no speaking objections.
 6   A    So I'm not a lawyer, but as I read the claims,
 7        and in view of a personal skill in the art, I
 8        inform my opinions related to all of the
 9        different sections in my invalidity.
10   Q    So you wouldn't know?
11   A    I have not really looked at the specific --
12   Q    Well, you're looking at it right now.  I mean,
13        what is your -- it gives a group of
14        classifications of things, of types of things
15        that are patentable, okay.  And it says a
16        process, a machine, a manufacturer or composition
17        of matter, or any new and useful improvement
18        thereof.  Is this claim one concern a process or
19        a method?
20   A    It's a method, but it is a method of
21        electrostatically inhibiting --
22   Q    I'm not -- that's not what I'm asking.  That's
23        not responsive.  I was very specific.  Does it
24        cover a process, a method?
```

```
                                                      Page 36
 1   A    The claim covers a method, but the method of
 2         electrostatically attracting or inhibiting --
 3   Q    We'll get to that afterwards.  But it --
 4                    MS. PETERSON:  Counsel, can you please
 5         let the witness finish his question -- or finish
 6         his answer.
 7                    MR. ALTMAN:  Why don't you ask it again
 8         so we have a clean --
 9                    MR. KREMEN:  Okay.
10   Q    Is claim one a method or a process, yes or no?
11   A    Yes, it is a method, a claim.
12   Q    Okay.  And is claim two a composition of matter?
13   A    Claim two is a formulation.
14   Q    Which is a composition of matter, yes?
15   A    Yes.
16   Q    So just in terms of the category of things that
17         are patentable, that are inventions patentable,
18         those two claims fall within that category, am I
19         right?
20                    MS. PETERSON:  Objection to form.
21   A    Again, just looking at the term method or
22         formulation, they fall, but once you read the
23         entirety of the claim it doesn't.
24                    MR. KREMEN:  Objection.
```

```
                                                     Page 37
 1                    MS. PETERSON:  Mr. Kremen, again,
 2          please let the witness finish his answer.  If you
 3          have an objection to his question, that's fine,
 4          but wait until his answer is complete rather than
 5          cutting him off.
 6                    MR. KREMEN:  Objection.  The answer is
 7          non-responsive after the word but.
 8   Q    Now, in paragraph 202, you allege that the claims
 9          of the 802 patent are directed to laws of nature
10          or natural phenomenon, yes?
11                    MS. PETERSON:  Objection.
12          Mischaracterizes --
13                    MR. ALTMAN:  That's a speaking
14          objection, Liane.  It's objection form.
15                    MS. PETERSON:  It's a concise statement
16          of the objection.
17                    MR. ALTMAN:  No, it's not.  That's a
18          speaking objection.
19   A    Are you asking about paragraph two of Exhibit 4?
20   Q    Yes.
21   A    Yes, that's what I'm -- that's my opinion in
22          paragraph 202.
23   Q    Okay.  Because of this subject matter, it's your
24          opinion that the subject matter of the claims are
```

Page 38

1              patent ineligible; am I right?

2    A    That's correct.

3    Q    Okay.  And that law of nature is electrostatic

4              traction and repulsion, yes?

5    A    Yes.

6    Q    Isn't it true that all inventions, patentable or

7              not, utilize laws of nature?

8                  MS. PETERSON:  Objection to form.

9    A    My understanding is that for subject matter to be

10             patentable, there has to be some novelty beyond

11             what is well known to personal skill in the art

12             as occurring by nature.

13   Q    That's non-responsive.  Can you think of a patent

14             that does not involve somehow a law of nature?

15                 MS. PETERSON:  Objection to form.

16   A    Again, there has to be something on top of just

17             attracting electrostatically to be able to be

18             patentable to be novel.

19   Q    All right.  Let's try to get some examples here.

20             Would you say that centrifugal force is a law of

21             nature?

22   A    It depends on --

23   Q    Natural phenomena -- just the abstract.

24   A    Then you have to induce centrifugal force.  It's

Page 39

```
 1          not something that occurs just by itself.
 2     Q    Okay.  So a centrifuge, which uses centrifugal
 3          force would be patentable, right?
 4                    MS. PETERSON:  Objection to form.
 5     A    Again, it's an instrument that creates that
 6          centrifugal force.  Here you're relying simply on
 7          having negatively charged particle come to a
 8          positively charged surface.
 9     Q    Okay.
10                    MR. KREMEN:  Objection, non-responsive.
11     Q    How about a tire, can a tire do its function
12          without gravity?
13     A    Again, there are many other things that are
14          affected by gravity.  Tire is just one of them.
15     Q    Okay.  But it can't function without gravity, a
16          tire won't move a car unless it was -- unless it
17          was utilizing the law of nature, which would be
18          gravity, right?
19     A    No.  Part of the function of the tire is that it
20          allows the automobile to be driven, and so the
21          engine of the automobile and all the other
22          elements in the car also affects the function of
23          the tire.
24     Q    So does a tire require gravity in order to work?
```

Page 40

1   A    Yes, it does.

2   Q    Okay.  Now, you would agree that merely because a

3        claim invention uses a law of nature, that does

4        not make it patent ineligible; am I correct?

5   A    But there has to be something novel about it.  In

6        this case, there is nothing novel beyond the fact

7        that there is electrostatic attraction.

8             MR. KREMEN:  Non-responsive.

9   Q    You would also agree that if a claim process

10       utilizes the law of nature and contains

11       additional steps, each of which uses a law of

12       nature, that the claim invention could be subject

13       matter eligible for patentability, yes?

14            MS. PETERSON:  Objection to form.

15  A    I haven't -- I looked at my analysis based on the

16       elements of the claims and the language of the

17       claim.

18  Q    Would you agree that -- would you agree that if a

19       claims process uses a law of nature and contains

20       additional steps, each of which use a law of

21       nature, that the claim invention could be subject

22       matter eligible for patentability?

23            MS. PETERSON: Objection.

24  A    Again, I have to look at the specifics of those

Page 41

```
 1          claims to make my -- looking at the 802 patent
 2          claim, my opinion is that --
 3    Q    I'm not speaking about the 802 patent.  I'm
 4          speaking in general, that if it uses a -- if a
 5          claim uses a law of nature, and it contains other
 6          steps that also use a law of nature, that that
 7          could be patent eligible, just because it uses a
 8          law of nature it's not necessarily ineligible?
 9                   MS. PETERSON:  Objection.
10    A    I have to look at those claims to be explicit.  I
11          don't know -- sitting here, I don't know exactly
12          what you're talking about.
13    Q    Now, in paragraph 202, you state that the claims
14          of the 802 patent utilize electrostatic
15          attraction or repulsion and that they have
16          additional steps or elements, yes?
17    A    Yes.  Those are the elements A, B, and C.
18    Q    Okay.  But you also say that each of those
19          additional claim elements are either conventional
20          steps that are well known to a person of ordinary
21          skill, or depend on the very same law of nature
22          or natural phenomenon.  That's what you wrote,
23          yes?
24    A    Yes.
```

Page 42

1    Q    Okay.  Now, isn't it true that a patent claim

2          having a unique combination of conventional steps

3          can still be patentable?

4                    MS. PETERSON:  Objection to form.

5    A    Again, I have to look at the specifics of those

6          patents.

7    Q    But if it has a unique combination of steps, can

8          -- I'm not asking you for a particular one.  I'm

9          giving you a hypothetical, a general claim that

10         has a unique combination of steps, it can be

11         patentable, yes or no?

12                   MS. PETERSON:  Objection.

13   A    I have to look at the specifics.  I can't just

14         sit here and opine on something that's

15         hypothetical.

16   Q    But is it possible for a patent to be issued on

17         something that has a unique combination of steps

18         for a method?

19                   MS. PETERSON:  Objection.

20   A    It's certainly possible, but doesn't mean it's

21         valid.

22   Q    Is it possible that a patent, a valid patent, can

23         be issued having a unique combination of steps,

24         hypothetically, not for the 802 patent, but

Page 43

1        hypothetically?

2                    MS. PETERSON:  Objection.

3    A   Again, any hypothetical patent there's a lot of

4        possibilities out there.  I don't know until I

5        see the specifics --

6    Q   Have you ever written a method, a patent claim,

7        that was a method patent?

8    A   I'm sure I have reviewed them.  I haven't written

9        per se, but I've reviewed them.

10   Q   None of your patents are method or process

11       patents; am I correct?

12                   MS. PETERSON:  Objection to form.

13   A   I'm sure there are some other claims within the

14       patent that teach a person of skill towards

15       method.  The majority of my patents are

16       composition of matter patents.

17   Q   Do any of your patent claims rely on any natural

18       laws?

19   A   I have to look back at those documents to give

20       you an honest opinion.

21   Q   Okay.  So we're saying that -- going back to my

22       previous question.  So each of the, in paragraph

23       202, you state that the claims of the 802 patent

24       utilize electrostatic attraction repulsion and

Page 44

1        that they have additional steps or elements, yes?

2    A   Yes, they do.

3    Q   In addition to that, you mentioned that the steps

4        are either conventional steps or those known to

5        purchase skills of the art, yes?

6    A   Yes.

7    Q   What does the -- you indicated that the claims,

8        1, 2, 6 and 7, are invalid for being directed to

9        ineligible subject matter on the 35 USC 101.  Is

10       the knowledge of a person of ordinary skill

11       relevant to the matter of subject matter

12       eligibility under Section 101?

13                   MS. PETERSON:  Objection.

14   A   Yes, I believe it is because it's in the analysis

15       of invalidity for all of the different aspects.

16       You have to consider that under the -- from the

17       person of skill in the art and also from the time

18       of the invention based on the priority date.

19   Q   But under 101, under Section 101 which you've

20       opined on, do you know that the knowledge of a

21       person of ordinary skill is somehow in there?

22                   MS. PETERSON:  Objection.

23   A   Again, in my analysis, you know, I considered all

24       of the different opinions that I provided based

Page 45

1          on the person of skill in the art.

2     Q    Even those under Section 101?

3     A    All of the opinions that I provided in my expert

4          report.

5     Q    Okay.  Turn to page 19.

6     A    Same exhibit?

7     Q    Yes, please.  Would you read paragraph 44 aloud?

8     A    Paragraph 44 states that, "I understand that a

9          patent claim is invalid if the specification does

10         not provide any data or other information

11         demonstrating a substantial likelihood that the

12         invention will work as described and claimed."

13    Q    What is the basis of that understanding?

14    A    Well, if you look at the patent itself, there is

15         nothing in the patent that suggests that there's

16         any demonstration of the fact that the

17         compositions would actually work the way they are

18         claimed.

19    Q    Can you point to any place in the statute or the

20         rules where this is written specifically?

21                   MS. PETERSON:  Objection.

22    A    Well, again, as I said, I'm applying the

23         understanding of credible utility analysis in

24         terms of the statements that I'm making on page

Page 46

```
 1              19, paragraph 44, that for a person of skill to
 2              be able to -- or having a patent claim that are
 3              valid, there has to be demonstration in the
 4              patent of likelihood of an invention.
 5     Q    What is the basis of that statement?
 6     A    Well, there has to be sufficient disclosure in
 7              the patent to a person of skill in the art that
 8              this is inventive, it is an invention --
 9     Q    And that's under Section 101?
10                     MS. PETERSON:  Objection.
11     A    Again, this is based on -- the credible utility
12              analysis is based on Section 101 and I'm applying
13              it specifically to the teachings of the 802
14              patent.
15     Q    Okay.  So now turn to page 99.
16     A    I'm there.
17     Q    In paragraph 212, you state that claims 1, 2, 6
18              and 7 are invalid for lack of credible utility,
19              yes?
20     A    Yes.
21     Q    Now, you have a copy of, I think it was P8, was
22              it, which is 35 USC 101?
23     A    Yes.
24     Q    Isn't it true from reading that, that Section 101
```

Page 47

1        requires that an invention must be new and

2        useful?  Take a look at Exhibit 8.

3   A   Yes.  It says new and useful process and machine

4        manufacturer --

5   Q   That the invention needs to be new and useful.

6                   MS. PETERSON:  Objection.

7   Q   Isn't it true that a formulation that actually

8        inhibits infection due to inhalation of harmful

9        particles is useful?

10                  MS. PETERSON:  Objection.

11  A   That formulation if it was actually --

12  Q   No, but --

13  A   -- the teaching of the 802 would be useful but

14       it's not.

15  Q   Okay.  Now, in paragraph 214 you complain that

16       there's no credible utility for claims 1, 2, 6,

17       or 7 under 35 USC Section 112 because the 802

18       patent "Does not include any data or test results

19       for any of the formulations described" to

20       demonstrate that they will work as claimed.

21       Isn't it true that no statute or rule

22       specifically required such data or test results

23       for patentability?

24                  MS. PETERSON:  Objection.  Misstates

Page 48

```
 1        the work.
 2   A    My opinion is that the 802 patent doesn't teach
 3        to a personal skill in the art specific
 4        composition that enables the claim.
 5                  MR. KREMEN:  Objection, non-responsive.
 6   Q    You said that you're familiar with the patent
 7        prosecution.  Now, in terms of patent
 8        prosecution, you have to comply with certain
 9        rules, certain statutes.  Is there any kind of
10        rule that you are familiar with that specifically
11        requires that such data or test results to be
12        present?
13                  MS. PETERSON:  Objection, form.
14   A    Well, the patent -- in the totality of the patent
15        it has to teach a person or skill that when you
16        are claiming certain elements, those elements are
17        actually going to be met by the specification of
18        the patent.
19   Q    Okay.
20   A    802 does not.
21                  MR. KREMEN:  Can I have a copy of 112.
22
23                  (Whereupon,  35 USC 112, was marked as
24                  Exhibit No. 9.)
```

Page 49

```
 1   Q    This is Exhibit 9.
 2                    MS. PETERSON:  Stan, is this even --
 3              actually, I object to Exhibit 12 (sic).  This
 4              isn't even the proper version of the statute.
 5                    MR. KREMEN:  No.  I'm going to just
 6              tell what it really is.  All I did was I -- this
 7              is not the entire 112.  This is just Sections A
 8              and B.
 9                    MS. PETERSON:  Yes, but it's from the
10              wrong version.  This version of the statute
11              doesn't apply to the patent at issue in this
12              case.
13                    MR. KREMEN:  Okay.  All right.
14   Q    Are you familiar with the written description
15              requirement of 112?  Because you quoted 112 here,
16              are you familiar with the written description
17              requirement?
18   A    Yes, I am.
19   Q    Isn't it true that the written description
20              requirement of Section 112A only requires that a
21              person of ordinary skill in the art will be able
22              to make and use the invention?
23                    MS. PETERSON:  Objection.
24   A    As I stated in paragraph 46 of my expert report,
```

Page 50

```
 1        the written description requirement, objectively
 2        demonstrate a person of skill in the art that the
 3        patent applicant actually invented or possessed
 4        the full scope of the claim.
 5   Q    That's the written description requirement,
 6        according to you?
 7   A    That's the -- based on my understanding of the
 8        written description requirement is that it
 9        requires that the applicant possessed, or had in
10        possession, based on the full scope of the claim.
11   Q    Isn't it true that the enablement requirement of
12        112 applies only to the written description and
13        not to the claims?
14                  MS. PETERSON:  Objection.
15   A    No.  The enable requirement also would be applied
16        too based on the fact that undue experimentation
17        was necessary by a person of skill in the art to
18        enable the claim -- the full scope of the claim.
19   Q    But it's the written description that it pertains
20        to, not to the claims.
21                  MS. PETERSON:  Objection, ambiguous.
22   A    Well, I review the patent claims and then I
23        review the specification in my analysis to see
24        where I can find support in the patent for both
```

```
                                              Page 51

 1          written description and enablement.
 2   Q    Have you ever read 35 USC 112?
 3   A    I'm familiar with it.  That's the code or section
 4          112 is what I'm applying for all of the analysis
 5          that I've done for invalidity.
 6   Q    So you're applying to the first paragraph in 112
 7          as far as -- because the second paragraph of 112
 8          says nothing about person of skills of the art
 9          being able to make them and use the invention.
10          It's only in the first paragraph.
11                    MS. PETERSON:  Objection.
12   A    Well, I'm applying based on my understanding and
13          what I've been provided by counsel in terms of
14          the standards, I'm applying those standards in my
15          analysis.
16   Q    Do you have a copy of the standards that you've
17          been provided by counsel?
18   A    I have provided that information in my expert
19          report.
20   Q    When counsel gave it to you, how was it
21          communicated?
22   A    We discussed the standards, and then
23          subsequently, I applied those standards in my
24          analysis.
```

Page 52

1    Q    It was verbal?

2    A    I'm not sure exactly, you know, the specifics of

3         the transmission.  Initially, it was verbal

4         discussion and then, of course, it came in the

5         report.

6    Q    So were you given a document with the standard?

7    A    No, I have not seen the document.  I discussed

8         the standards and I certainly opined on many

9         other cases as specifically related to both the

10        obviousness and non-obviousness analysis as well

11        as the 112 written description enablement and

12        definite analysis.

13   Q    So you don't know at this point, am I correct,

14        that you don't know whether section 112 requires

15        that test results that would demonstrate to a

16        person skilled in the art that there's a

17        substantial likelihood that the claim will

18        eventually work, at this point you don't know

19        whether 112 provides that; am I correct?

20                   MS. PETERSON:  Objection.

21   A    Well, what I know is that for written

22        description, the applicants of the patent should

23        have sufficient disclosure, sufficient

24        description in the patent, to inform a person or

Page 53

1        skill that they were in possession of the full

2        scope.

3   Q    Okay.  But does that demand testing?

4                  MS. PETERSON:  Objection.

5   A    Well, it demands the fact that there's enough

6        description in the patent, enough disclosure,

7        that the person of skill can understand that the

8        patentee possess the full scope.

9   Q    That's not what I asked.  Does it require

10       testing?

11                 MS. PETERSON:  Objection.

12  A    Again, I'm not saying that there has to be a

13       specific testing, but what I'm saying is that

14       there has to be sufficient disclosure in the

15       patent for a person of skill to know that the

16       patentee had full scope -- had possessed the full

17       scope of the claims.

18  Q    Okay.  Regarding patent claiming invalidity, do

19       you understand the difference between claim

20       anticipation on the 35 USC Section 102 and

21       obviousness under Section 103?

22                 MS. PETERSON:  Objection.

23  A    I understand the differences between based on the

24       analysis that I've done in this case related to

Page 54

```
 1          the 802 patent.
 2   Q   So you do understand the difference between
 3          anticipation and obviousness then?
 4                    MS. PETERSON:  Objection.
 5   A   Again, in the context of when I'm looking at it
 6          as a technical expert.
 7   Q   Now, wouldn't you agree that for a claim to be
 8          anticipated, a single prior art reference must
 9          encompass every element in that claim?
10                    MS. PETERSON:  Objection.
11   A   Yes. That's the standards that you apply for
12          anticipation.
13   Q   Wouldn't you also agree that for a claim to be
14          obvious over prior art, in Section 103, a
15          combination of prior art references must be used
16          to encompass every element of the claim?
17                    MS. PETERSON:  Objection.
18   A   That's my understanding.  And again, for
19          obviousness analysis, the prior art can be
20          combined in order to then come to all the
21          elements of the claim.
22   Q   So the combination must produce all the elements
23          of the claim?
24                    MS. PETERSON:  Objection.
```

Page 55

```
 1    A    Must provide evidence to a person of skill in the

 2          art with reasonable expectation of success.

 3    Q    And that is a difference between anticipation

 4          requiring a single reference that's going to do

 5          everything and a combination of references, which

 6          in other words, anticipation is all done with one

 7          -- am I correct in terms of your understanding

 8          that anticipation requires only once a single

 9          reference and obviousness requires a combination

10          of references; is that your understanding?

11    A    That's generally where -- and that's the analysis

12          that I've done, that for a claim to be invalid,

13          it is anticipated by a single item of prior art.

14    Q    Okay.  So you would agree that if a single prior

15          art reference does not encompass every element of

16          the claim, that claim cannot be invalid over that

17          single prior art reference alone; am I correct?

18                    MS. PETERSON:  Objection.

19    A    Only under the anticipation argument, but it can

20          certainly be invalid based on the obviousness

21          argument.

22    Q    How?

23                    MS. PETERSON:  Objection.

24    A    Again, if that prior art is combined with other
```

Page 56

```
 1        prior art in order to arrive --
 2   Q    But -- okay.  You just previously said that in
 3        order to anticipate something, you have to have a
 4        single reference that encompasses all the
 5        elements of the claim.  If it doesn't encompass
 6        all of the elements of the claim, can it be used
 7        alone to invalidate the claim?
 8                  MS. PETERSON:  Objection.
 9   A    Again, if it is single prior art document, and
10        the argument is only anticipation, it cannot, but
11        if that single document is combined with other
12        documents, then certainly claims could be
13        obvious.
14   Q    But it's not combined with other documents, and
15        it doesn't encompass all the elements of the
16        claim, can it be used alone without any
17        combination, can it be used alone just to
18        invalidate a patent?
19                  MS. PETERSON:  Objection.
20   A    Not alone.  If it doesn't meet all the claim
21        elements, it has to --
22   Q    Okay.
23   A    You have to have all the claim elements met.
24   Q    Good, okay.  That's -- I just wanted to
```

Page 57

1    understand what you were looking at.

2                    Now, isn't it true, that if for some

3    reason it's impossible to combine two or more

4    references, the combination of those references

5    cannot render a claim invalid?

6                    MS. PETERSON:  Objection.

7  A   I'm not sure what that means to not be able to

8      combine.

9  Q   Well, there are certain things that can't be

10     combined no matter what you're doing.  Well, let

11     me ask you, hypothetically, if a claim has

12     elements A and B, and you have one reference that

13     has A and the second reference that has B, is it

14     always possible to combine the two references to

15     produce the claim?

16                    MS. PETERSON:  Objection.

17 A   Again, from a person of skill in the art

18     reviewing the patent, the analysis that is done

19     in these types of cases is I would look at the

20     expectation of success.

21 Q   I don't understand.  Could you clarify that,

22     please?

23 A   So in order to understand the analysis, I would

24     basically look at the claim language in my case

Page 58

```
 1        and for the 802 patent, look at the specification
 2        and what the specification teaches, and then see
 3        if back in the priority date, what was the
 4        general knowledge in the field and what was the
 5        available references that teach towards what the
 6        person of skill would know.
 7   Q    Isn't a true that you have to have specific
 8        references to be able to invalidate a patent
 9        under 102 and 103, which is the prior art
10        statutes?
11                  MS. PETERSON:  Objection to form.
12   Q    I'm sorry, I'll rephrase.  Isn't it true that for
13        anticipation or obviousness, you must have
14        specific references, specific prior art
15        references, to be able to invalidate it?
16                  MS. PETERSON:  Objection.
17   A    Yes.
18                  MS. PETERSON:  Stan, we've been going
19        like an hour, over an hour.
20                  MR. KREMEN:  Do you want to take a
21        break?  Okay.
22                      (Brief Recess)
23        BY MR. KREMEN:
24   Q    Now, isn't it true that if a prior art reference
```

```
                                               Page 59
 1          is not enabled, it can't be used to anticipate a
 2          claim?
 3                    MS. PETERSON:  Objection.
 4    A    I'm not sure I understand the question.  The
 5          prior art reference itself is not enabled?
 6    Q    Right.  In other words, not necessarily an issue
 7          patent is anything.  If the prior art reference
 8          is not enabled, you can't figure out how to make
 9          it, use it, or whatever, if it's not enabled, it
10          can't be used as a reference to anticipate a
11          claim?
12                    MS. PETERSON:  Objection.
13    A    Again, when I reviewed all the prior art that
14          I've relied on for my opinions in this case, I
15          found the inventions to be enabled.
16    Q    Okay.  So you actually found all of the prior art
17          in this case that you use to be enabled, correct?
18    A    Based on my understanding of the enablement
19          standards that have applied in this case.
20    Q    So in other words, on each of the prior art
21          references that you looked at, that a person of
22          ordinary skill in the art would be able to make
23          and use that invention; is that correct?
24                    MS. PETERSON:  Objection.
```

Page 60

```
 1   A    Again, based on what I've looked at as far as my
 2            obviousness analysis of the 802 patent claims, in
 3            the review of the prior art documents that I've
 4            relied on in order to tell a person of skill in
 5            the art what the claims of the 802 patent are
 6            specifically addressing, I found those documents
 7            to be valid.
 8   Q    Was any prior art given to you by counsel or did
 9            you find it all on your own?
10   A    I believe we discussed, and maybe the documents
11            were provided, I didn't go out and search
12            specific documents, but I did discuss with
13            counsel the specific matter itself that are
14            taught on this prior art, and obviously the
15            opinions that I'm providing are all mine.
16   Q    So did you find any of the prior art on your own?
17   A    I may have.  For example, the Wahi 488 and 481, I
18            may have seen them before.
19   Q    What about Wadstrom?
20   A    Wadstrom, also I've seen them before.
21   Q    And Rolf?
22   A    Yes.
23   Q    And where did you se those before?
24   A    I saw it as an expert on a prior matter between
```

```
                                                 Page 61

 1         Trutek and Matrix.
 2    Q    Did counsel give you any of those references, the
 3          prior art references?
 4                     MS. PETERSON:  Objection.
 5    A    The documents itself, maybe, you know, maybe
 6          provided by counsel through an email, but all the
 7          opinions that I'm providing are mine.  I reviewed
 8          those prior art myself.
 9    Q    But the documents would have been provided to you
10          by counsel?
11                     MS. PETERSON:  Objection.
12    A    Yes, some of the documents, certainly.  I didn't
13          go out and search for every one of them.
14    Q    Did you run any search yourself for prior art?
15    A    I don't recall searching specifically, but I do
16          recall looking at the documents and looking at
17          data to patent and being able to do the analysis.
18          The analysis is all mine and the opinions are all
19          mine.
20    Q    Now, you've expressed some of these opinions
21          before in another case; am I correct?
22    A    Sorry.  Which other case?
23    Q    (Indiscernible ) case.
24    A    Yes.
```

Page 62

```
1   Q    Did you use some of the same prior art in this

2        case as you used in the Matrix case?

3   A    Some of them, yes, but they're also few

4        additional ones that are here.  For example,

5        Baker patents, as well as Rabe, Katz, those were

6        not -- we did not use that in the Matrix case.

7   Q    Did you find those yourself or did counsel

8        provide them to you?

9   A    No.  Again, based on the information that -- the

10       documents were provided, but I reviewed the

11       documents myself and opinions that I provide in

12       my report are all mine.

13  Q    Did you search for any of those yourself?

14  A    No, I did not search for them myself.

15  Q    In terms of the Baker patents -- well, first of

16       all, in terms of the other patents, the Wadstrom

17       patent, Rolf, and the ones you used in the Matrix

18       case, did you search for them yourself or were

19       they given to you?

20  A    For this case or the Matrix?

21  Q    The other case.

22  A    Again, I think that we, you know, for that

23       counsel and I had discussions and some of those

24       documents were provided to me.
```

Page 63

```
 1   Q    Okay.  And the Baker patents were provided to you
 2        in this case during the discussion with counsel?
 3                  MS. PETERSON:  Objection.
 4   A    Yes. Again, I didn't go out and actually download
 5        the files.
 6   Q    Okay.  Did you know about them beforehand, the
 7        Baker patents?
 8   A    Yes.
 9   Q    You knew about the Baker patents, how did you
10        know about them?
11   A    So I am familiar with the Nano motion technology
12        based on the fact that Dr. Baker was a professor
13        at University of Michigan and he and I, we were
14        part of the Alliance for Nano technology in
15        cancer.
16   Q    That's very interesting.  My compliments on that.
17        Okay.  Now, you also generated a report.  Let's
18        see, this is Exhibit Number 6, which is a
19        Responsive Report of Mansoor M. Amiji, Ph.D. on
20        Non-Infringement.  You also generated this report
21        with your opinions at BlueWillow NanoBio Protect
22        product does not infringe the claims of the 802
23        patent; is that correct?
24   A    Yes, it does.
```

Page 64

```
 1   Q    Okay.  Does this report contains all of your
 2        opinions supporting BlueWillow's allegations that
 3        its NanoBio Protect products do not infringe the
 4        claims of the 802 patent?
 5   A    It has all the opinions as of today, but as I
 6        said before, if there's anything new that the
 7        plaintiff's experts are able to provide, then
 8        I'll need to submit another report or we'll have
 9        rebuttal opinions.
10   Q    As of today, from what I understand, all of the
11        reports had been submitted because there was a
12        deadline of September 29th.  As of today, all of
13        the opinions that are rebutting any of the
14        reports or anything, you completely put your
15        opinions in all of your reports; am I correct?
16                    MS. PETERSON:  Objection.
17   A    Yes, as of today.
18   Q    As of today, okay.  Now, on pages 14 through 18
19        of this report, you criticize the testing of
20        electrostatic charge by Dr. Alexei Ermakov and
21        Shane Burns as long as Dr. Lemmo's -- and also
22        Dr. Lemmo's reliance on these reports; is that
23        true?
24   A    Yes, I do.
```

```
                                                        Page 65

 1   Q    Paragraph 39 of page 15, you wrote, "A person of
 2          ordinary skill in the art reviewing the Ermakov
 3          and Burns testing would not understand the test
 4          results to establish that NanoBio Protect
 5          satisfies the claim limitations and/or infringes
 6          the asserted claims of the 802 patent."
 7                       You wrote that, yes?
 8   A    Yes, I did.
 9   Q    Could you explain that, please?
10   A    Well, first of all, the tests that both
11          Dr. Ermakov and Mr. Burns did are not described
12          in the patent.  Second, these tests do not
13          provide any evidence as to the fact that the
14          NanoBio Protect product satisfies all of the
15          claim limitations.
16   Q    Specifically, what is your objection -- what did
17          Dr. Ermakov and Mr. Burns testing show?
18                       MS. PETERSON:  Objection.
19   A    I'm not even sure what they -- it's a test.  Both
20          of them just concocted a test.
21   Q    Did you understand their test methodology?
22                       MS. PETERSON:  Objection.
23   A    I understand what they did, but I don't
24          understand how -- whatever data that they
```

Page 66

```
 1          obtained could be applied to the claims of data
 2          to --
 3    Q    What did they do?
 4    A    Well, Dr. Ermakov took a piece of paper and
 5          sprayed the composition and then measured
 6          conductivity.
 7    A    That is your understanding of what he did?
 8                    MS. PETERSON:  Objection.
 9    A    That is what's in his report.
10    Q    What did Mr. Burns do?
11    A    Well, Mr. Burns took a dry piece of pigskin and
12          again, sprayed some compositions and measured
13          conductivity.
14    Q    How did he measure that?
15    A    He used a Faraday cup.
16    Q    What does a Faraday cup measure?
17    A    Again, it basically allows you to pass current
18          through a material and see if the current can
19          pass through and use an equation to come up with
20          some charge value.
21    Q    And what is that equation?
22    A    It's in his report.  I mean --
23    Q    Are you familiar with the general technology?
24    A    I'm familiar with what they did, but it's nothing
```

Page 67

1            to do with the teaching of data too or --

2    Q    That's not what --

3    A    -- the infringement analysis.

4    Q    That's not what I'm asking.  I'm asking are you

5            familiar with the technology?

6    A    I am familiar with what they did in terms of

7            measuring conductivity, yes.

8    Q    How would you measure electrostatic charge on a

9            surface?

10                   MS. PETERSON:  Objection.

11   A    Well, it depends on what type of surface.  And

12           first of all, it has to be relevant to the

13           teaching of the patent in suit.

14   Q    Pick a particular surface that you think is

15           relevant, how would you measure the electrostatic

16           charge?

17                   MS. PETERSON:  Objection.

18   A    Well, you know, one way that we do in our lab is

19           what's called a zeta potential measurement, which

20           looks at the surface charge of a particle and

21           gives you actually millivolts of charge.

22   Q    So essentially what you're doing is you're

23           measuring voltage in this particular case, not

24           number of coulombs; am I right?

```
                                                  Page 68

 1   A    We can measure specifically the charge on the

 2        surface of a particle with the instrument that we

 3        have.  But again, it's contact specific.  We are

 4        looking at it in the form of a particle.  Here,

 5        you're talking about surfaces.

 6   Q    What is the cationic agent?

 7   A    A cationic agent would be one where it could

 8        either be permanently charged, or it could be

 9        charged depending on the pH of the solution, but

10        the charge will be positive.

11   Q    Okay.  So it's a chemical substance that exhibits

12        a positive charge; is that correct?

13                   MS. PETERSON:  Objection.

14   A    Under different conditions, yes.

15   Q    Well, what conditions would it not exhibit a

16        positive charge?

17   A    Well, if the pH is such that the charge is

18        neutralized, or it's not in water.

19   Q    Cationic agents have to be in water in order to

20        be effective, correct?

21                   MS. PETERSON:  Objection.

22   A    They have to have some presence of moisture or

23        water around it to be able to exert the charge.

24   Q    Isn't it true that benzalkonium chloride is a
```

Page 69

```
 1        cationic agent?
 2   A    Benzalkonium chloride is a cationic, yes.
 3   Q    NanoBio Protect contains benzalkonium chloride,
 4         right?
 5   A    It has .13 percent of benzalkonium chloride, yes.
 6   Q    And you're aware that BlueWillow claims on its
 7         website that NanoBio Protect exhibits an
 8         electrostatic charge?
 9                  MS. PETERSON:  Objection.
10   A    Well, the website information is certainly not a
11         scientific, it's just a promotional material.  It
12         does say on the website that their product has
13         electrostatic charge based on the benzalkonium
14         chloride.
15   Q    So if BlueWillow claims that their product has an
16         electrostatic charge, do you doubt their claim?
17                  MS. PETERSON:  Objection.
18   A    No, I'm not doubting the claim, but it's a
19         promotional material.  It's not a scientific
20         publication.  It's not peer reviewed.
21   Q    But it is in fact true, isn't it, that it does
22         contain an electrostatic charge?
23                  MS. PETERSON:  Objection.
24   A    Again, BlueWillow product, based on my
```

Page 70

1          understanding, is a nanoemulsion and the charge

2          is on the surface of the oil droplet.

3    Q     So nano emulsions in themselves, whether they

4          contain benzalkonium chloride or not, are they

5          charged, the nano droplets?

6                    MS. PETERSON:   Objection.

7    A     Again, it depends on how you make the

8          nanoemulsion.

9    Q     What prevents the nano droplets from coalescing

10         into a single -- what keeps them as droplets?

11   A     There a number of ways you can prevent the

12         aggregation or coalescence of the droplet.  You

13         can prevent by what's called steric repulsion or

14         you can --

15   Q     I didn't catch that.

16   A     Steric repulsion.

17   Q     Okay.

18   A     Or you can prevent by electrostatic repulsion.

19   Q     What is steric repulsion?

20   A     In steric repulsion, you are putting on the

21         surface of the droplet specific types of material

22         that basically extend from the surface and keep

23         two droplets from aggregating or coming in short

24         distance of each other.

Page 71

1   Q   Now, with the fact that nano droplets, or the

2        nanoemulsion, contains benzalkonium chloride,

3        this is electrostatic repulsion; am I right?

4               MS. PETERSON:  Objection.

5   A   Again, if the benzalkonium chloride is displayed

6        on the surface of the oil, then it will have

7        positive charge, the oil droplet will have

8        positive charge.

9   Q   So the product would have a positive

10       electrostatic charge because of the benzalkonium

11       chloride; true?

12  A   Again, if the oil droplet is made in such a way

13       that the benzalkonium chloride is exposed to the

14       surface, the nitrogen on that benzalkonium

15       chloride is accessible to water that surrounds

16       the oil, and subsequently, the pH and all the

17       other conditions as such, that the ammonium ion

18       is ionized.

19  Q   Okay.  Now, isn't it true that germs are

20       negatively charged?

21             MS. PETERSON:  Objection.

22  A   It depends on the germ.

23  Q   Do you know of any that are positively charged?

24  A   Again, it depends on, you know, specific

Page 72

1           conditions in which some germs, I don't know, I
2           have to see which germs you are talking about.
3    Q    Do you know of any germs, microorganisms, that
4           are positively charged, any of them?
5    A    Well, they can acquire different types of charge
6           depending on the environment that they're in.  If
7           you have a bacteria, for example, in solution of
8           water, you could certainly have some of the ions
9           from that solution absorbable under the bacteria.
10          I don't know what you know mean by natural
11          organisms.
12   Q    All right.  I'm going to give you a copy of this
13          page.
14
15                    (Whereupon, NanoBio Droplet Document,
16                     was marked as Exhibit No. 10.)
17
18   Q    I want you to assume for argument's sake at this
19          point, that this is a page that was taken as a
20          copy of from the BlueWillow website.  And if you
21          look at the very bottom of the page, you'll
22          notice it says https://bluewillow.com/nanobio-
23          protect and then there's a date given of February
24          7, 2021 at 4:40 p.m.  So I'd like you to assume

Page 73

1          that this was taken from the BlueWillow website,

2          that is a true copy.

3    A     Okay.

4    Q     Now, would you look at item number one at the top

5          of the page.  First of all, let's start at the

6          beginning.  Would you read the first paragraph on

7          that?

8    A     The first paragraph of this Exhibit 10 says, "The

9          unique effectiveness of NanoBio Protects is

10         derived from BlueWillow's patented nano

11         technology.  NanoBio Protect places the BZK

12         antiseptic on the surface of nano droplets, which

13         results in at least four key advantages."

14   Q     Now, you realize that BZK is BlueWillow's

15         abbreviation for benzalkonium chloride; am I

16         correct?  You know that?

17   A     Yes.

18   Q     Now, read the item number one.

19   A     "The nano droplets are attracted to germs by

20         electro-kinetic charge and present the BZK in

21         such a way to enable killing of germs on

22         contact."

23   Q     Now, would you call that electrostatic

24         attraction?

```
                                                      Page 74

 1                    MS. PETERSON:  Objection.
 2   A   Well, they use the term electro-kinetic charge,
 3        but the attraction is, at least based on this
 4        document, suggests that the germs attracted by
 5        electrostatic charge.
 6   Q   Now, read number two on that page.
 7   A   "The droplets persist on skin for four or more
 8        hours, enabling long lasting effectiveness."
 9   Q   Now, what does that really mean?
10                    MS. PETERSON:  Objection.
11   A   To say that if you apply this to the skin, these
12        droplets will stay there for four hours or more.
13   Q   What form do they take?
14   A   The droplets?
15   Q   Yes, on the skin.
16                    MS. PETERSON:  Objection.
17   A   I don't know.  I haven't really tested any of
18        these products to know what form they take.
19   Q   Well, any liquid, if a liquid sticks to your
20        skin, does it form a film on the skin?
21                    MS. PETERSON:  Objection to form.
22   A   Well, in this case, it's a nanoemulsion that
23        they're spraying on the skin.  So it could easily
24        remain as individual droplets assuming if those
```

Page 75

```
 1        droplets are well stabilized.
 2   Q    But the individual droplets, if they're sticking
 3        to the skin, it forms a film; doesn't it?
 4                 MS. PETERSON:  Objection to form.
 5   A    Well, if the droplets are stabilized to remain as
 6        individual droplets, then they will basically
 7        spread on the skin as droplets.
 8   Q    Now, isn't it true that benzalkonium chloride is
 9        also a biocide, right?
10   A    It's a biocide, specifically at concentrations
11        and as long as high concentrations are used, it
12        can induce by acidic effects.
13   Q    Okay.  You see the drawings on the page, on
14        Exhibit 10.  Could you read inside the box, could
15        you read what it says there?
16   A    Sure.  It says, "Droplets surround and kill germs
17        via membrane disruption."
18   Q    Okay.  How does it do that?
19                 MS. PETERSON:  Objection to form.
20   A    Well, again, I don't know exactly -- I have not
21        analyzed any peer reviewed documents from NanoBio
22        Protect to know the nature, but from this
23        diagram, it suggests that the nanoemulsion
24        droplets are able to sequester around the germ.
```

Page 76

1   Q   Okay.  So they hold it in place, they hold inside

2       the droplets then?

3              MS. PETERSON:  Objection to form.

4   A   Again, I'm just looking at this diagram, and what

5       it's saying is that these nanoemulsion droplets

6       are sticking to the, assuming this is a bacteria

7       that they're sticking to.

8   Q   What do you think the role of benzalkonium

9       chloride in terms of the ability to kill the

10      germs, what is the role of the benzalkonium

11      chloride?

12   A   Well, again, it depends how benzalkonium chloride

13      is surface exposed on these droplets, then it

14      will interact with the membrane of the bacteria

15      or virus, whatever that germ is.

16   Q   Did you review the NanoBio Protect product itself

17      when you formed an opinion of non-infringement?

18            MS. PETERSON:  Objection to form.

19   A   I reviewed whatever documents that I'm describing

20      in my expert reports, those are the documents I

21      have reviewed and specifically related to the

22      NanoBio Protect product.

23   Q   What documents related to the NanoBio Protect did

24      you review, specifically to the NanoBio Protect?

Page 77

```
 1   A    I looked at the one of the applications that
 2        NanoBio Protect had.  I looked at some of the
 3        documents that are provided with the Trutek
 4
 5
 6
 7   Q    Is there anything on Exhibit 10 that is
 8        inconsistent with your understanding of the
 9        NanoBio Protect product?
10                  MS. PETERSON:  Objection to form.
11   A    This is -- again, this document is obtained from
12        a website.  It's not peer reviewed.  I don't know
13        anything about the specifics of what they're
14        describing, for example, which type of germ, how
15        much of the emulsion is put on, you know, what
16        was the nature.  This is merely a promotional
17        material.
18   Q    But I specifically asked, is there anything on
19        this document that is inconsistent with your
20        understanding of the nature of NanoBio Protect?
21                  MS. PETERSON:  Objection to form.
22   A    Well, again, the document is just obtained from
23        the website.  It's promotional.  From what is in
24        the document, what was described in the document,
```

Page 78

1          I don't have any objections or specific concerns,

2       but again, this is not describing anything

3       related to the product itself, nor is it

4       describing how much is used or does of

5       benzalkonium chloride, et cetera.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 79

1

2

3

4

5                    MS. PETERSON:  Objection.  And also,

6          just real quick before I forget, since we are

7          talking about confidential information now, I

8          would like to designate the transcript as outside

9          counsel eyes only.

10                   MR. KREMEN:  Just that portion of it.

11                   MS. PETERSON:  Well, for right now.  I

12         don't know what else is going to come up.  So for

13         right now, I'd like the transcript designated

14         accordingly.

15                   MR. KREMEN:  Well, we will object to

16         that because we need to show that to certain

17         people.  So we object to that.  But I agree to

18         the discussion as to the composition that we just

19         discussed could maintain -- be confidential, but

20         other than that, I object to it.

21  Q     Let's turn to the report on non-infringement,

22         which is Exhibit 6.  On pages 12 and 13, you

23         opine on the nature and qualifications of the

24         person having ordinary skill in the art.

Page 80

```
 1        According to the applicable law, do you know what
 2        such a person needs to be?
 3                    MS. PETERSON:  Objection.
 4   A    You're asking specifically on Exhibit 6?
 5   Q    Yes.  I mean, if you know.
 6   A    Yes.  I'm familiar with the application of a
 7        person of ordinary skill in the art, that person,
 8        he or she, is based on the subject matter of the
 9        patent. Would the person -- it would be a
10        hypothetical person who at the time of the
11        invention would be considered to have knowledge
12        and skills related to the art that's been taught
13        in that patent.
14   Q    What is the difference between a person having
15        ordinary skill in the art and a person having
16        extraordinary skill in the art?
17                    MS. PETERSON:  Objection, vague.
18   A    I'm not --
19                    MR. KREMEN:  No speaking objections.
20                    MS. PETERSON:  That's not a speaking
21        objection, Stan.
22   A    I'm not familiar with some of the further detail.
23        What I've done is apply, based on my
24        understanding of a person of ordinary skill in
```

Page 81

```
 1           the art, he or she at the time of the invention,
 2           based on the knowledge and skills that they would
 3           have, their interpretation of the matter that
 4           starting this patent and patent in suit.  But I
 5           don't know about the difference between ordinary
 6           versus expert.
 7    Q      You do admit that there is a difference between
 8           someone having ordinary skill in the art and
 9           someone having extraordinary skill in the art?
10                     MS. PETERSON:  Objection.
11    A      I've heard the term extraordinary skill in the
12           art, but I don't know the details of what that
13           means.
14    Q      Would a person having extraordinary skill of the
15           art also be qualified as one having ordinary
16           skill?
17                     MS. PETERSON:  Objection.
18    A      Again, I don't know what the definition is.  I
19           applied -- my analysis is done based on my
20           knowledge of a person of ordinary skill in the
21           art.
22    Q      Okay.  Do you consider yourself a person or
23           ordinary skill or somebody with extraordinary
24           skill?
```

```
                                                    Page 82

 1                  MS. PETERSON:  Objection to form.

 2   A    Based on my definition of a person of ordinary

 3         skill in the art, and based on the priority date

 4         of this patent, I would consider myself a person

 5         of ordinary skill in the art.

 6   Q    You at this point are a person of ordinary skill?

 7                  MS. PETERSON:  Objection.

 8   A    Based on the definition that I'm providing.

 9   Q    Okay.  Regarding the inventions claims recited in

10         claims 1, 2, 6 and 7 of the 802 patent, in what

11         business or profession would a person of ordinary

12         skill be engaged?

13                  MS. PETERSON:  Objection to form.

14   A    Well, the claims are directed towards the

15         pharmaceutical formulation and their ability to

16         electrostatically attract and inhibit or hold the

17         particle and then inactivate those particles in

18         such this would be a composition where it would

19         be a pharmaceutical formulator.

20   Q    Pharmaceutical formulator, okay.  Now, what would

21         be the tasks that such a person would be able to

22         perform?

23                  MS. PETERSON:  Objection, vague.

24   A    Well,  based on the claim and the limitations, so
```

```
                                                Page 83

 1            claim 1, as we discussed, is a method claim.

 2            Claim 2 is a formulation claim.  So the person

 3            would be able to formulate a composition and

 4            obviously then be able to test it to show that it

 5            meets all of the claim limitation.

 6    Q    Is this person of ordinary skill typically an

 7            inventor?

 8                    MS. PETERSON:  Objection.

 9    A    It's a hypothetical person.  I don't know if

10            inventor is considered to be a person of skill in

11            the art or not.  I don't know that specifically.

12            But I know that from a perspective of analysis of

13            invalidity and specifically related to data to

14            claims I applied, the definition that I provide

15            on paragraph 35 of my expert report.

16    Q    Okay.  So you would agree that a person of

17            ordinary skill in the art is a person who

18            typically formulates chemical or pharmaceutical

19            compounds, right?

20                    MS. PETERSON:  Objection to form.

21    A    No.  What I'm saying specifically in the context

22            of the 802 patent and the claims, it's somebody

23            who formulates but also has the knowledge and

24            skills to be able to make sure that it meets the
```

Page 84

1           claim limitations, which go beyond just

2           formulation.

3    Q    Now, on page one of your CV, it says that you're

4           a registered pharmacist.  Can a registered

5           pharmacist formulate pharmaceutical compounds?

6                    MS. PETERSON:  Objection.

7    A    Again, it depends on practice of that registered

8           pharmacist.  Some pharmacists compound

9           prescriptions.

10   Q    Would you know the nature of a cationic agent and

11          what it does?

12                   MS. PETERSON:  Objection to form.

13   A    Again, it depends on the person's, not just

14          education, but also experience.  If they've been

15          working in with cationic agents and are familiar,

16          then they might not.

17   Q    Okay.  Would he know the nature of biocide or

18          biocidic agents and what it does?

19                   MS. PETERSON:  Objection to form.

20   A    Again, depends on, you know, what type of

21          qualification and experiences they have.  If

22          they've worked with biocide and are familiar,

23          then they may know what the biocide does.

24   Q    How about the same analysis of a thickener?

Page 85

```
 1   A    Again, depends on, you know, what practice.  A
 2        pharmacist working in a retail store, if they're
 3        compounding, they may know what a thickener does.
 4   Q    What about a binder?
 5   A    Again, depends on what type of binder.  If it's a
 6        binder that's using tablets, for example, retail
 7        pharmacists do not make tablets.
 8   Q    But they know what it is, they know what it does,
 9        right?
10                  MS. PETERSON:  Objection.
11   A    Yes.  They're in school of pharmacy.  We teach
12        them what a binder does.
13   Q    What about a surfactant?
14                  MS. PETERSON:  Objection.
15   A    Again, you know, pharmacists do learn about
16        surfactants too.
17   Q    Would a registered pharmacist be considered a
18        person of extraordinary skill in the art or
19        ordinary skill in the art?  Let me rephrase that.
20        Would a registered pharmacist considered to be a
21        person of extraordinary skill in the art?
22                  MS. PETERSON:  Objection to form.
23   A    Again, as I just testified before, I don't know
24        the definition of an extraordinary skill in the
```

Page 86

1          art.  My analysis in the context of invalidity of

2          the 802 patents are based on what I know as a

3          person of ordinary skill in the art.

4    Q    So a registered pharmacist would be considered as

5          a person of ordinary skill in the art, right?

6                    MS. PETERSON:  Objection to form.

7    A    Again, I define it -- I give a certain definition

8          of person or ordinary skill in the art as someone

9          with a master's degree in chemical engineering,

10         pharmaceutical sciences and years of experience

11         in pharmaceutical formulation.

12   Q    Okay.  How many years of experience should such a

13         person of ordinary skill have?

14   A    It varies with the type of experience also.  If

15         they are making formulations for topical use,

16         they may have a few years.  But if they are

17         somebody who is involved in other practices, they

18         may need a little bit more experience.

19   Q    So give me some sort of a figure of how many

20         years of experience you would consider a person

21         of ordinary skill in the art to have?

22   A    Again, it depends on their expertise and what

23         they do in their regular lives.  If they are

24         actually making topical products, then they may

Page 87

```
 1          have -- they don't need a lot of experience

 2          because they have that level of skill and they

 3          may even be trained in those level of skills --

 4     Q    Now, could experience -- is it possible that

 5          experience could substitute for education?  In

 6          other words, if they don't have an advanced

 7          degree, but have a lot of experience, would that

 8          also be -- would a person of ordinary skill,

 9          would that person also be a person of ordinary

10          skill?

11                    MS. PETERSON:  Objection to form.

12     A    Not in my opinion because I see a person of

13          ordinary skill in the art having the foundation

14          knowledge and also being able to then evaluate if

15          the product is going to function the way it is

16          taught in the 802 patent.  So to me, both

17          education and  experience matter.

18     Q    Supposing that somebody who never went to high

19          school or college, but has been working in the

20          field for let's say 30 years, would that person

21          be, as a formulator, would that person be a

22          person with ordinary skill?

23                    MS. PETERSON:  Objection.

24     A    In my opinion, that person, if they're given a
```

Page 88

```
1         recipe, they can certainly make products.  But

2         what they won't know is different ingredients

3         perform differently, what is the right

4         composition to make, how would this composition

5         actually work both as a safe and effective

6         product.

7    Q    What if they've already done something like?

8              MS. PETERSON:  Objection.

9    A    Yeah, I mean, again, these are all hypotheticals.

10        You know, individual experience and individual

11        qualifications would certainly be what I would

12        review, But in the context of the analysis that I

13        have done, you know, I define a person of

14        ordinary skill as having these qualifications and

15        experiences.

16   Q    Okay.  Now, one of the things you mentioned is

17        that the person should have a degree in chemical

18        engineering, right?

19             MS. PETERSON:  Objection.

20   Q    Like a master's degree in chemical engineering.

21        That's in your report, right?

22   A    Yes.

23   Q    That was your opinion.  What specifically in

24        chemical engineering curriculum is necessary,
```

Page 89

```
 1          what qualifications would be necessary for such a
 2          person to have?
 3                    MS. PETERSON:  Objection.
 4    A     In the context of the 802 patent, specifically,
 5          and the claims, a person with a chemical
 6          engineering would understand, for example, the
 7          issues of rheology.  When you're developing a
 8          formula, how thick or thin that formulation
 9          should be, how can it be applied.  They will also
10          have a good understanding of compatibility
11          between various types of chemicals that are mixed
12          together.  Many of the chemical engineering
13          students, especially in schools like Northeastern
14          where I teach, are also interested in
15          understanding some of the pharmaceutical
16          applications.  So they will also know that these
17          are not just products that are made, but they're
18          made for actual human beings.
19    Q     What is the difference between someone who is a
20          chemical engineer and a chemist?
21                    MS. PETERSON:  Objection.
22    A     One is an engineer.  The other is a scientist.
23    Q     Right, okay.  But what is the difference in what
24          they do?
```

Page 90

```
 1              MS. PETERSON:  Objection.
 2    A    Again, engineers solve problems based on the
 3         definition.  The scientist would understand the
 4         problem and then engineers come up with
 5         solutions.
 6    Q    Doesn't a chemical engineer concern himself with
 7         production aspects, how to make a product able to
 8         be manufactured as opposed to someone who creates
 9         a product from scratch?
10              MS. PETERSON:  Objection.
11    A    No.  I think that's not true, not in my opinion.
12    Q    Okay.  Why do you say that a person who doesn't
13         have a master's degree in chemical engineering
14         cannot be a person of ordinary skill in the art?
15    A    No.  What I'm saying is it at least a master's
16         degree in chemical engineering or pharmaceutical
17         science or related fields.  I'm not excluding
18         anyone. Q So you would be defining a person of,
19                   when you say at least, a person of
20                   ordinary skill in the art should have a
21                   Ph.D. then?
22              MS. PETERSON:  Objection.
23    A    No.  I say anyone with a master's degree, because
24         with master's degree they would have the
```

Page 91

```
 1              requisite knowledge of not just the formulation

 2              and development, but actual characterization and

 3              application that are a part of these claims I

 4              interpret.

 5    Q    A person without that education would not have

 6              the ability to do that kind of formulation; is

 7              that correct?

 8    A    Well, somebody without having the knowledge of

 9              what exact ingredients that are necessary as well

10              as being able to mix them in the right proportion

11              and in the right process, and to come up with a

12              composition that actually meets all of the claim

13              limitations, you need both education and

14              experience.

15    Q    So would you say that a person of ordinary skill

16              would be able to do that?

17                    MS. PETERSON:  Objection.

18    A    I applied, based on the definition that I'm

19              providing, I applied that particular definition

20              for a person of skill in view of the prior art in

21              terms of my analysis.

22    Q    What about a person who has no education, no

23              formal education beyond a certain level, but has

24              been doing those kinds of things for 30 years,
```

```
                                           Page 92
 1        would that person qualify as a person of ordinary
 2        skill?
 3                   MS. PETERSON:  Objection.
 4   A    Not in my definition.  But again, the plaintiff
 5        definition is much more lower for person of skill
 6        in the art, but my definition is they need the
 7        education and they have to have experience
 8        because the claims are not just making a product.
 9        They're directed towards a product that
10        ultimately has certain features and will function
11        in the way that are taught in the claim.
12   Q    What about being able to duplicate the examples
13        that are shown in the 802 patent?
14   A    There are no examples in the 802 patent.
15   Q    There are not?
16   A    No.
17   Q    Okay.  We'll get to that afterwards.  Talk about
18        the education, what type of courses would this
19        kind of person with ordinary skill have taken?
20                   MS. PETERSON:  Objection.
21   A    Again, depends on which school they went to.
22        Some schools have -- different schools have
23        different courses that they offer their students.
24   Q    What types of chemistry courses are necessary?
```

Page 93

```
 1                    MS. PETERSON:  Objection.
 2   A    General organic chemistry.  They may even take
 3          biochemistry.
 4   Q    Are these courses ever offered on an
 5          undergraduate level?
 6                    MS. PETERSON:  Objection.
 7   A    A different levels.
 8   Q    Are they -- would they be offered on an
 9          undergraduate level?
10   A    At a much lower level, yes.
11   Q    Would this person of ordinary skill have taken
12          physics courses?
13   A    Again, depends on the school and their
14          curriculum.
15   Q    How advanced would the physics courses need to
16          be?
17                    MS. PETERSON:  Objection.
18   A    I can't speak to what courses are taught in which
19          school.  It's a complete hypothetical.
20   Q    Well, doesn't a first or second semester graduate
21          course -- first or second semester undergraduate
22          course in physics teach electrostatics --
23                    MS. PETERSON:  Objection.
24   Q    -- that opposite charges attract and light
```

Page 94

```
 1       charges repel?

 2    A  Yes.  No, electrostatics are well known to

 3       students, but this is not just about

 4       electrostatic.  The  patent and the claims are

 5       directed towards creating a composition that

 6       ultimately inhibits infection.  If you look at

 7       the specification of the patent, it talks about

 8       stopping anthrax.

 9    Q  Okay.  What would you call a person who has not

10       the level of education that you indicated, but

11       that has been making those kinds of -- working on

12       that kind of formulation for 30 years, what would

13       you call that person?  Would you call that person

14       of ordinary skill?

15                 MS. PETERSON:  Objection.

16    A  Again, I don't know exactly what, you know, that

17       hypothetical person has done as far as education

18       or what type of field they're working on, what

19       experience they have.  So until I see the

20       qualifications and experience, I can't really

21       tell.  But what I'm opining on is a person of

22       skill based on the qualification and experiences

23       in my report.

24    Q  All right.   You do realize that a person of
```

Page 95

```
 1         ordinary skill in the art is a hypothetical
 2         person; don't you?
 3   A     Yes.
 4   Q     So we're dealing with a hypothetical person over
 5         here, and you're telling me that you don't know
 6         what characteristics that a hypothetical person
 7         would have to have.  In other words, whether it
 8         would be experience or education.  Can you have
 9         experience without the education?
10                   MS. PETERSON:  Objection to form.
11         Asked and answered.
12   A     Again, this is my definition that I'm applying in
13         my opinion.  I think, you know, the plaintiffs
14         have made their definition.  At one point, as we
15         move towards this litigation, the court will
16         decide which one to adopt.
17   Q     What is your basis for making that decision, that
18         definition?
19   A     Well, based on my review of the patent and what
20         the patent is teaching, I believe the patent is
21         not just teaching towards a composition.  It's
22         teaching towards a utility, and this utility
23         involves applications to prevent infection.  So a
24         person of skill has to have knowledge of what
```

Page 96

```
 1          actually can prevent infection, like what can

 2          stop anthrax, what can stop Coronavirus.  That's

 3          what the patent, the specification is teaching.

 4   Q    But if he has experience in working on that time

 5          of rheology, does he does need -- and he has

 6          experience of that, does he still need that level

 7          of education?

 8               MS. PETERSON:  Objection.

 9   A    Again, they have to have some knowledge of both,

10          formulation, development, and application towards

11          all of the different facets that are taught in

12          the patent.

13   Q    But suppose you have a person like that, who has

14          the experience with that, but not having the

15          education, would that person be a person of

16          ordinary skill?

17   A    And this is my definition.  This is the

18          definition that I'm opining on, and this is the

19          definition that I use in my analysis.  You know,

20          if the court adopts a different definition, we

21          will address those issues then.  But right now,

22          this is the definition I've applied.

23   Q    Would a person of ordinary skill have taken

24          courses in biology?
```

```
                                                    Page 97

 1                    MS. PETERSON:  Objection.
 2    A    Yes.  For students who are doing master's,
 3          certainly they have taken courses in biology,
 4          both chemical engineering as well as
 5          pharmaceutical sciences students.
 6    Q    What are the minimum requirements of biology
 7          courses necessary for a person of ordinary skill
 8          to have taken under this -- for this test?
 9                    MS. PETERSON:  Objection.
10                    MR. ALTMAN:  Liane, what's the nature
11          of your objection?
12                    MS. PETERSON:  Oh, so now you want me
13          to say that?
14                    MR. ALTMAN:  When I want it, I'll ask
15          for it.  So can you tell me what the nature of
16          the objection is?
17                    MS. PETERSON:  I think the question is
18          vague and ambiguous and I think it's an
19          incomplete hypothetical and I could keep going.
20                    MR. ALTMAN:  Okay.
21    A    I'm sorry, can you repeat the question?
22    Q    Okay.  What are the minimum requirements of
23          biology courses necessary for a person of
24          ordinary skill to have under his belt?
```

Page 98

1     MS. PETERSON: Objection.

2 A It varies with the curriculum of the school that

3    they go to. Typically, in a general biology one

4    and two is what students do take, both at the

5    bachelors level, and then if they come to the

6    master's program, they take some advanced biology

7    courses.

8 Q Now, a person who -- would a person  who has your

9    level of education, but does not have the skill

10    of doing pharmaceutical formulation, would that

11    person also be a person of ordinary skill?

12 A No.  My definition is that they will have several

13    years of experience.  Once they have those

14    experiences, that's how they acquire a skill.

15 Q Now, when you say several, how many years?

16 A As I said, it depends on, you know, the

17    qualification.  If somebody has a Ph.D, they may

18    not need many years, but if they have a master's

19    degree, they may need a little bit more.

20 Q Would they need ten years of experience?

21 A Again, this is a hypothetical person and what I'm

22    relying on in my analysis is the definition that

23    I'm providing here.

24 Q Would they need more than one year experience?

Page 99

```
 1   A    It depends on the individual and what they -- you
 2        know, but I would say based on my analysis, I use
 3        this definition of a person with a master's
 4        degree in chemical engineering or pharmaceutical
 5        science or related field and several years of
 6        experience.
 7   Q    Okay.  So it would be more than one year, right?
 8                  MS. PETERSON:  Objection.
 9   A    Again, based on my definition.
10   Q    Is that yes?
11   A    It depends on the degree of, you know, if it's at
12        least a master's degree, but sometimes if they
13        have a Ph.D degree, then they may need a little
14        bit less.
15   Q    But can it be less than one year, six months
16        maybe?
17   A    Could be.  Again, depends on the person.  Again,
18        this is the definition that I've applied in my
19        analysis.
20   Q    Could a person having a master's degree in
21        chemical engineering have no experience and still
22        be a person of ordinary skill?
23                  MS. PETERSON:  Objection.
24   A    No.  My definition says with several years.  So
```

```
                                          Page 100

 1         based on the definition, they would have to have

 2         some  experience.

 3    Q    Would you agree that the more experience a person

 4         has -- would you agree that the more relevant

 5         experience a person has, the less education he

 6         would need?

 7    A    Lesser than master's degree?  I don't think so.

 8    Q    Okay.  So in other words -- okay.  It is your

 9         testimony that a person who does not have a

10         master's degree in chemical engineering does not

11         possess the necessary skills to be a person of

12         ordinary skill in the art?

13                   MS. PETERSON:  Objection to form.

14    A    No.  As I said in my report, it's not just a

15         master's degree in chemical engineering, but also

16         pharmaceutical science or related fields.  It's

17         not just excluding other disciplines.

18    Q    Is it your testimony that a person who does not

19         have a master's degree in chemical engineering

20         cannot possess the same degree of knowledge as a

21         person who does have a master's degree in

22         chemical engineering?

23                   MS. PETERSON:  Objection to form.

24    A    Again, my opinion is that the master's degree
```

1          with the caliber of courses, as well as the fact

2          that master's comes after the bachelors, and

3          their experience in pharmaceutical formulation,

4          are what I would consider to be the

5          qualifications of a person of skill in the art.

6   Q    So your answer would be no to that question; am I

7          right?

8   A    I disagree with the characterization that

9          somebody with either a less degree, less than a

10         master's would really meet the level of

11         qualifications for a person of skill in the art.

12  Q    Is it your testimony that a person who does not

13         have a master's degree cannot possess the same

14         level of knowledge as a person who has a master's

15         degree?

16  A    No.  I think that's not what I'm saying.  What

17         I'm saying is that a person who when you're

18         looking at the art that is taught in the 802

19         patent, based on the 802 specifications and

20         claims, and looking at specifically the art, it

21         is my opinion that the person has to have at

22         least a master's degree in chemical engineering,

23         pharmaceutical science or related field and has

24         to have experience in pharmaceutical formulation.

Page 102

```
 1   Q    That's a non-responsive answer.  Is it your
 2        testimony that a person who does not have a
 3        master's degree in chemical engineering could not
 4        have the same level of knowledge as a person who
 5        has a master's degree in chemical engineering?
 6                  MS. PETERSON:  Objection to form.
 7   A    No.  Again, that's not what I'm answering.  What
 8        I'm saying is --
 9   Q    Can you answer the question that I've asked?
10   A    Yes, I can answer the question, but my answer is
11        that -- I'm saying not just master's degree in
12        chemical engineering.  It's master's degree in
13        chemical engineering, pharmaceutical sciences or
14        related field.
15   Q    I'm not asking you whether he's a person of
16        ordinary skill in the art.  I'm asking you
17        specifically, does a person -- is it your
18        testimony that a person who does not have a
19        master's degree in chemical engineering can have
20        the same level of knowledge as a person who has a
21        master's degree in chemical engineering?  Forget
22        the 802 patent.  Is it possible, or is it your
23        testimony, that a person who does not have the
24        degree in chemical engineering can have the same
```

Page 103

1        or possibly greater knowledge than a person who

2        has a master's degree in chemical engineering?

3                    MS. PETERSON:  Objection to form.

4    A   Again, it's a hypothetical question.  You know,

5        if somebody doesn't have a degree, but has more

6        experience, and in what area.  Yes, they could

7        certainly have experience in certain area and

8        they will know how to do things in that area

9        based on their experience.  But what I'm

10       reviewing is based on the context of the 802

11       patent.

12   Q   But I want the answer to that particular

13       question.  It's a non-responsive answer.  I

14       specifically want the answer to the question.  Is

15       it your testimony that a person who does not have

16       a degree in chemical engineering cannot have the

17       same level of knowledge as a person who has a

18       degree in chemical engineering?

19                    MS. PETERSON:  Objection to form.

20   A   Again, I think I've answered that question at

21       least three times already.  But it's context

22       dependent.  It depends on what context you're

23       applying it to.  A hypothetical person may have

24       more experiences than educational requirement,

Page 104

1           but I'm looking at it in the context of --

2    Q   Okay.  So then basically, it is possible that a

3           person -- okay.  Is a person who is an expert,

4           like yourself, one who is testifying as an

5           expert, a person of ordinary skill in the art?

6                   MS. PETERSON:  Objection to form.

7    A   Based on the definition that I'm providing, yes.

8           I have at least a master's degree level education

9           in pharmaceutical sciences and I have many years

10          of experience.

11   Q   That's for you.  But any person who would be an

12          expert, who testifies as an expert, also be a

13          person who also has ordinary skill in the art?

14                  MS. PETERSON:  Objection to form.

15   A   Again, it depends on what the expertise is and

16          what they are --

17   Q   An expert in pharmaceutical formulation.

18   A   Again, depends on their definition of a person of

19          ordinary skill in the art.

20   Q   According to your definition?

21   A   Are you saying any expert would be qualified as a

22          person of skill in the art?

23   Q   Of ordinary skill if they're an expert, an expert

24          accepted by the court?

Page 105

1          MS. PETERSON:  Objection to form.

2   A    Again, I don't know what the court accepts or

3          doesn't accept. I know that based on my analysis,

4          I meet the definition of a person of skill in the

5          art.

6   Q    Basically, I'm talking about knowledge now, just

7          about knowledge.  Would you agree that a person

8          who does not possess a master's degree in

9          chemical engineering, could have the same or

10         possibly greater knowledge than a person who has

11         a master's degree in chemical engineering?

12         MS. PETERSON:  Objection to form.

13  A    Again, depends on what knowledge you're talking

14         about.  Some knowledge can be acquired through

15         experiences.  Others -- there's also the

16         foundational knowledge comes from education.

17  Q    And that foundation of knowledge cannot be

18         garnered through experience, can only be garnered

19         through education?

20  A    Again, depends.  It's very subjective.  It

21         depends on what experiences that person has gone

22         through.

23         MS. PETERSON:  Stan, if you're at a

24         good stopping point for this, is it a good time

Page 106

1             to take a break?

2                         MR. KREMEN:  Yes.

3                         (Brief Recess)

4             BY MR. KREMEN:

5    Q    The rest of this deposition is going to be

6         concerned with, I believe, your marksmen report,

7         which is Exhibit 7, and the 802 patent, which is

8         Exhibit 2.  So that's what we're looking at.

9                         Referring to your declaration marked

10        Mansoor M. Amiji, Ph.D is Support of blueWillow's

11        Claim Construction Brief as Exhibit 7.  You

12        presented yourself as an expert in the field of

13        pharmaceutical sciences and drug formulation

14        development and characterization.  Is this how

15        you're presenting expertise in this present

16        litigation?

17   A    Yes.  That's what I mentioned in the

18        qualification and experience that I'm an expert

19        in the field of pharmaceutical sciences, and drug

20        formulation development and characterization.

21   Q    Okay.  You further state that specifically, "I

22        specialize in drug formation development and

23        targeted delivery of therapeutics, and I have

24        been an expert in this field since prior to July

```
                                                   Page 107

 1        7, 2008."

 2                      Is that how you're presenting your

 3        expertise in this present litigation?

 4   A    Yes.

 5   Q    Are there any writings submitted by you other

 6        than the declaration in which express your

 7        opinions on construction of the claims of the 802

 8        patent?

 9                      MS. PETERSON:  Objection to form.

10   A    I'm not sure I understand the question.

11   Q    Is this the only writing that you have submitted

12        to in this case stating your opinions on claim

13        construction, which is an Exhibit 7?

14   A    Specifically in relation to claim construction?

15   Q    Yes.

16   A    Yes.  This is the declaration, right.

17   Q    Now, if you would turn to page 13.  Would you

18        read the first sentence in paragraph 33?  If you

19        can do that aloud, I would appreciate it.

20   A    Page 13, paragraph 33?

21   Q    Yes.

22   A    "While a person skilled in the art reading the

23        802 patent would understand that the

24        specification provides a laundry list of possible
```

Page 108

```
1              formulations, the patent specification does not

2              include any specific examples or test results for

3              any of the formulations demonstrating that they

4              work by electrostatically attracting particulate

5              matter to a thin film applied to the nasal

6              passages and holding the particulate matter in

7              place through adhesion to the thin film in order

8              to electrostatically inhibit such harmful

9              particulate matter from infecting an individual."

10   Q    What do you mean by a laundry list?

11   A    Well, the specification and the tables that are

12         provided in the patent lists all these different

13         ingredients.

14   Q    Isn't it true that you're using the term laundry

15         list in an attempt to trivialize the ingredients

16         of the formulations described in the

17         specification?

18                   MS. PETERSON:  Objection to form.

19   A    No.  I'm just stating that the specification of

20         the 802 patent provides a list of ingredients.

21   Q    A laundry list.  It's trivializing it.  It's

22         saying it's to be done with the wash.

23                   MS. PETERSON:  Objection to form.

24   A    No.  What I'm saying is, you know, the 802 patent
```

```
                                                 Page 109

 1              is providing a list of ingredients and the tables

 2              provide these ranges but there is no examples.

 3     Q    Okay.  Why did you use the word laundry?

 4     A    Again, it's just a list of ingredients and

 5              examples.  That's what I usually refer to as a

 6              laundry list.

 7     Q    Do you understand what an embodiment is with

 8              respect to patents?

 9                        MS. PETERSON:  Objection to form.

10     A    I understand, generally, what an embodiment is,

11              but again, I don't know the exact legal

12              definition.

13     Q    What do you understand it to be?

14     A    Embodiment is one of the examples that the

15              patentee would be describing that, one or more

16              examples, that ultimately when it comes to

17              understanding the claims, that a person of skill

18              would relay that example towards the actual

19              nature of the claim language.

20     Q    Is it true that patents list one or more

21              embodiments?

22                        MS. PETERSON:  Objection to form.

23     A    It varies from patent to patent.  Some patents

24              list embodiments.  Other patents, like the 802
```

1      patent, doesn't have examples.  It just simply

2      lists all these different tables with ranges.

3  Q   We'll get into the 802 patent later.  But doesn't

4      the patent have to at least list one embodiment?

5  A   Again, I don't know the exact requirement, the

6      legal requirement of a patent, but I understand

7      the term embodiment to mean that it's a

8      composition or, you know, whatever the patent

9      claims are teaching towards there is some

10     language in there that supports that the patentee

11     had that particular composition or if there was a

12     method of use patent and they actually were able

13     to use that particular approach.  And there's

14     sufficient description in the patent.

15  Q  Isn't it a fact that there is no statutory

16     requirement that patents must include test data

17     or test results?

18           MS. PETERSON:  Objection to form.

19  A  Again, you know, for me, when I'm doing an

20     analysis, I'm simply looking at what the patent

21     you are providing.  In my opinion, the patent

22     doesn't, in written description, an enablement

23     requirement, based on the fact that it doesn't --

24     the full scope of the claim is not met by what's

Page 111

1         in the patent.

2    Q    So I take it that you don't know whether there is

3         a statutory requirement that a patent needs to

4         have test results or test data?  Either you know

5         it or you don't know it.

6    A    No.  I do know that you don't need specific tests

7         and exact test results, but you do need to

8         convince a person of skill in the art that you

9         were able to make a composition that ultimately

10        met all the claim limitation.

11   Q    Do you understand what a marksmen proceeding is?

12   A    Yes.

13   Q    What is it?

14   A    It's a proceeding in the court where certain

15        claim terms, if there is any ambiguity in the

16        definition of the claim terms, the court is

17        provided with the claim terms analysis by both

18        the plaintiff side and defendant side, and then

19        the court decides exactly how to interpret the

20        claim terms.

21   Q    And you're aware that it's a legal determination,

22        not a fact determination of the claim terms,

23        right?

24   A    Again, I don't know exactly how the court

```
                                                Page 112

 1           determines the claim terms, but my understanding

 2           is that that's what the marksmen hearing is,

 3           provided declaration in support of marksmen.

 4    Q    It's a report, not a jury or a fact finding that

 5           makes that determination; is that correct?  You

 6           understand that?

 7    A    That's been my experience so far. But I don't

 8           know exactly what the legal requirement is.

 9    Q    Now, you would agree that the lack of test

10           specific examples, data or test results, has

11           nothing to do with the meaning of the claim term,

12           the actual meaning of the words?

13    A    Well, for person of skill to understand the

14           meaning they have to see what the specification

15           is describing, and ultimately draw -- you know,

16           when you look at the actual claim language, you

17           don't find any support in the specification for

18           the 802 patent.

19    Q    All right.  One of the things which you mentioned

20           when we began the deposition, is you mentioned

21           the Phillips standard and you discuss that in

22           your report.  I don't remember which one.  That

23           the first page we look at it is the plain

24           language of the claim.  I think that that was
```

Page 113

```
 1        your opinion.  I don't know if it was this report
 2        or the other one.
 3                    MS. PETERSON:  Is there somewhere where
 4        you want to point him to?
 5                    MR. KREMEN:  I don't remember.  He did
 6        testify to that.
 7   A    Yes.  I've seen that specific language related to
 8        the Phillips.
 9   Q    So for example, if we're going to use the plain
10        language of the claims, do you have to have test
11        results or test data to determine what the plain
12        language means?
13                    MS. PETERSON:  Objection to form.
14   A    Again, in my opinion, and based on the
15        declaration that I provided for the claim
16        construction brief, the patent doesn't show to a
17        person of skill I the art, doesn't explicitly
18        describe any specific embodiment or any specific
19        examples that meets all the claim limitations.
20        That's what I'm opining on in my report.
21   Q    But in terms of the claim, don't the words mean
22        what they mean in English?  Forgetting -- the
23        Phillips standard said you start out with plain
24        language of the claims.  Don't these words have
```

Page 114

1           specific definitions, specific dictionary

2           definitions?

3                     MS. PETERSON:  Objection to form.

4     A    If you just take the claim in isolation of the

5           specification, then those definitions are, you

6           know, what the plain language mean.  But a person

7           of skill looks at the patent in total.

8     Q    Okay, good.  So in other words -- so basically,

9           you start out with the plain language, okay, and

10          you can modify the plain language by, in fact, I

11          believe that the rule says that a person can be

12          his own lexicographer, which means he can find

13          define terms differently than the plain language.

14          It starts out with the plain language, but he can

15          then define terms differently.  You're aware of

16          that, right?

17    A    Yes.

18    Q    Among the things that you could define terms

19          differently is you can have a glossary, okay.  Am

20          I right, you can do that?  You can do that.  You

21          can say I know that as long as the meaning of the

22          term is not repugnant, it's ordinary meaning, you

23          can say, when I use this term, it means that; you

24          can do that, right?

```
                                          Page 115

 1              MS. PETERSON:  Objection to form.
 2   A    Again, you know, that's maybe some, you know,
 3        legal specific requirement.  Again, as I
 4        mentioned, I'm a technical expert, I don't know
 5        the law related to --
 6   Q    But you've written patents before in which you,
 7        I'm sure you defined terms in certain ways;
 8        haven't you?
 9   A    As I've mentioned before in my testimony, I have
10        worked with lawyers who helped me with the draft
11        of the claims and we worked together on the
12        specifications.
13   Q    Is a specification mostly written by you or is it
14        written by the attorneys?
15   A    It's mixed.  In some cases, some sections of the
16        specification I provide, especially if it's data
17        that we collected in the lab, and interpretation
18        of that data.  Others the lawyers write.
19   Q    So in the absence of a glossary, okay, we start
20        out with a plain meaning of the word in the
21        dictionary definition, an we take a look and see
22        if the specification or anything else within the
23        patent description changes the meaning in any
24        way; is that correct?
```

```
                                                    Page 116

 1                  MS. PETERSON:  Objection to form.
 2   A    I'm not an expert in this area of, you know, what
 3        is the actual definition for the claim language.
 4        What I'm doing is interpreting the claims in view
 5        of the specification and providing my opinions in
 6        my brief.
 7   Q    So essentially, you're interpreting the claims as
 8        a technical expert, but not as a legal expert?
 9   A    Yes.  My declaration is specifically relates to a
10        person of skill in the art and how they would
11        interpret the claims.
12   Q    Yet, we know that in the marksmen hearing, the
13        definition of claim terms is a legal
14        determination.  So doesn't some legal knowledge
15        -- isn't some legal knowledge required to be able
16        to interpret the claims?
17                  MS. PETERSON:  Objection to form.
18   A    Again, whatever legal standards that I've
19        applied, I mention in my declaration.  But what
20        I'm doing is to look at this in the context of a
21        person of skill in the art and my declaration is
22        in support of the construction brief from the
23        defendant's side.
24   Q    Okay.  So now the lack of test examples, or data,
```

Page 117

1           or test results, really has nothing to do with

2           the meaning of the words in the claim; am I

3           right?

4      A    But a person of skill would be looking at the

5           claim and seeing what the claims is teaching and

6           then they will look at the specification to see

7           what support there is.  There is no support any

8           of the elements of the claims in the

9           specification.

10     Q    Let's look at some of this, okay.  Have you ever

11          written any claims completely by yourself?

12     A    No, I have not.

13     Q    Okay.  Look at paragraph 32 on the previous page.

14          You state that the 802 patent includes 10

15          separate tables, each with numerous formulations

16          and compounds that are variable.

17     A    Yes, I see that.

18     Q    By that, you mean that the percentage for each

19          ingredient is provided as a range of values; is

20          that correct?

21     A    Well, that's what the 10 tables have.  They have

22          ranges of values.  They have, in many instances,

23          specific ingredients and then they also have

24          different number of ingredient.  And then as you

Page 118

```
 1            looked at the claim, it's a comprising claim,
 2            which means that it could also have other things
 3            in there.
 4     Q    I'm specifically looking at the 10 tables right
 5            now, okay.  It's providing a percentage for each
 6            ingredient as a range of values; is that correct?
 7     A    Yes, it is, and the ranges can go from anywhere.
 8            A case of water, for example, can go from 62 to
 9            80 percent.
10     Q    That's what a range is.  Now, would you agree
11            that ranges are permitted for ingredient
12            percentages?
13                    MS. PETERSON:  Objection to form.
14     A    Permitted where?
15     Q    In a patent specification.  It doesn't have to be
16            an exact percentage; am I right?
17     A    Well, of course, they are, but again, when you're
18            developing a composition based on that range, how
19            would that meet the claim limitation?  How would
20            it electrostatically attract in particulate
21            matter?  What level of electrostatic charge do
22            you need from all of those different ranges?  How
23            would it hold?  How long would it hold?  What
24            kind of inactivation?  What type of particle
```

Page 119

```
 1          would it inactivate?  Would it inactivate the
 2          same level in anthrax or would it inactivate a
 3          coronavirus?
 4    Q     So isn't that a reason for it to be variable?
 5    A     No.  That's not -- how would a person of skill
 6          know from looking at these ranges which ones
 7          would actually function the way the patent
 8          claims?
 9    Q     You're claiming that a formulator, a
10          pharmaceutical formulator would not -- that you,
11          as a person of ordinary skill in the art, that
12          you would not be able to look at those examples
13          and develop a formulation using those ingredients
14          in the specific ranges, remember you can't go
15          beyond those ranges, developing those specific
16          ranges, to produce something that would have a
17          particular replication which is listed in the
18          patent?  You would not know how to do that?
19    A     No.  Not only me, nobody else would know.
20          Because, again, it's all over the place.  At the
21          end, you're looking at potentially applying to a
22          human being and saying oh, see if anthrax, you're
23          going to be stopped from getting infected by
24          anthrax.
```

Page 120

1   Q   Doesn't that take experimentation?  Wouldn't the

2       formulator do some experimentation to make that

3       determination?

4   A   That's the definition of undue experimentation,

5       is how many experiments would you need to do with

6       all these ranges, and which one of these

7       ingredients would you put in, which ones you can

8       exclude.  If it's a comprising claim, you could

9       even have more, and some of them may even

10      neutralize the charge.

11  Q   So in other words, as long as the experimentation

12      is not undue, you could do some experimentation

13      with those ingredients, right?

14                  MS. PETERSON:  Objection to form.

15  A   No.  Again, this is just a table that lists these

16      ingredients and ranges without any guidance to a

17      person which of these ranges are actually going

18      to be functional, and which one will ultimately

19      lead to a product that meets the claim

20      limitation.

21  Q   So in words, you're saying that you got to have

22      embodiments there with specific composition

23      percentages, right?

24  A   No, that's not what I'm saying.  I'm saying that

Page 121

```
 1            even if you have these changes, at some point,
 2            you have to inform a person of skill in the art
 3            which product out of these ranges actually meet
 4            the claim limitation.  These are just ranges of
 5            compositions without any guidance to a person of
 6            skill that they will meet the claim limitation.
 7   Q    Okay.  If the concentration of the ingredients
 8            were specific as opposed to variable, would that
 9            change the meaning of the claim term?
10   A    It wouldn't meet the concentration of being
11            specific.  The question is, you know, you still
12            have to then ask would that actually lead to a
13            thin film? Would it then meet all of the
14            different elements of the claim?  Would it
15            electrostatically attract the particulate matter,
16            which particulate, and for how long?  Would it
17            then hold the particulate matter?  And then more
18            importantly, would it inactivate?
19                    So, you have to have certain level of
20            description in there that supports these
21            compositions that says this is how we would
22            verify if we're meeting the claim limitations.
23   Q    So you're saying that you cannot, so a patent
24            cannot have a claim that is broader than what you
```

Page 122

1        disclose?

2                     MS. PETERSON:  Objection to form.

3    A    A patent cannot have something that doesn't

4         really tell a person of skill in the art that

5         there is actually a composition there.

6    Q    Okay.  You would agree that the terms

7         electrostatically attracting the particle to the

8         thin film necessarily means that particulate

9         matter and thin film are oppositely charged, that

10        there's a force of attraction between them, yes?

11   A    Again, it depends on what particle and what force

12        is necessary to create that attraction.

13   Q    I'm saying that the plain meaning of the term,

14        electrostatically attracting particle matter to

15        the thin film, what is the plain language meaning

16        of that expression?

17                    MS. PETERSON:  Objection to form.

18   A    Just means that there is some electrostatic

19        attraction between a particle and this thin film.

20   Q    Okay.  So you understand what the concept of

21        electrostatic attraction of particles with thin

22        film is; don't you?

23   A    Right.  But again, when I look at the

24        specification, it could be any particle.  It

Page 123

```
 1        doesn't even specifically one type of particle

 2        and how that attraction occurs.  You have a list

 3        of different germs, different bacteria, viruses,

 4        you know, different allergens.

 5   Q    So if we're taking about a formulation that has a

 6        cationic agent in it of sufficient concentration,

 7        and we talk about harmful particles that are

 8        negatively charged, okay, then you would

 9        understand the term electrostatic attraction

10        meaning that these unlike charges attract each

11        other; would you not?

12                  MS. PETERSON:  Objection to form.

13   A    I would understand it.  It will just be

14        electrostatic interaction between negatively

15        charged particles and positively charged surface.

16        But when you look at the entirety of the claim,

17        it's not just attraction.  It's holding, it's

18        inactivating.

19   Q    Okay.  We'll get to that.  But certainly

20        electrostatic attraction, you understand what

21        that means, what the term means?

22   A    Yes, I understand what electrostatic attraction

23        means.

24   Q    Okay, good.
```

Page 124

1              (Whereupon, Action Summary, was marked

2              as Exhibit No. 11.)

3

4    Q    Do you recognize this document?

5    A    Yes, I do.

6    Q    What is this?

7    A    This is, I believe, the prosecution -- the USPTO

8         providing the examination of the 802 patent in

9         providing a communication based on the

10        examination.

11   Q    You use this as an exhibit in your own report; am

12        I correct?

13   A    Yes, I believe I had used this as one of the

14        exhibits in the report, but I don't recall

15        exactly which.

16   Q    But you recognize the document?

17   A    Yes, I do.

18   Q    And do you recognize it as the office action

19        pertaining to the application that ultimately

20        issued as the 802 patent; is that correct?

21   A    That's my understanding, yes.

22   Q    I represent to you that this document is a true

23        copy of the USPTO non-file office action, dated

24        August 25, 2011, with a patent application that

Page 125

```
 1            ultimately issued as the 802 patent.  Now, please
 2            read pages two through four of this document to
 3            yourself and tell me when you're done.
 4     A      Okay.
 5     Q      Now, look at the patent, look at the preamble of
 6            claim one. It says, "Method for electrostatically
 7            inhibiting harmful particles from infecting an
 8            individual through," et cetera.  And the other
 9            one in claim number two says, "A  formulation for
10            electrostatically inhibiting harmful particles,
11            harmful particulate matter from infecting an
12            individual."
13                      You see that, right?
14     A      Yes.
15     Q      Are you aware that prior to this office action,
16            instead of the word inhibiting, it was the word
17            preventing; are you aware of that?
18     A      Yes.  That's what the examiner has quoted here.
19     Q      The examiner rejected the claim on the 112 first
20            paragraph indicating that there is not an
21            adequate written description or enablement to
22            support the term electrostatically preventing; is
23            that correct?
24                      MS. PETERSON:  Objection to form.
```

Page 126

```
 1   A    That's what the examiner is stating in this
 2        office action.
 3   Q    Okay.  Now, on page three, last paragraph, it
 4        starts with the words -- page three, last
 5        paragraph. It's a short paragraph, why don't you
 6        read it aloud?
 7   A    On page three, you said, right?
 8   Q    Right.
 9   A    The paragraphs says, "In reading the present
10        specification as a whole, it appears the tenor
11        thereof is that infections, whether they cause
12        pathology or not, may be inhibited rather than be
13        prevented.  The former allowing at least one
14        infectious material to pass into the system of
15        the host rather than the latter, which indicates
16        that not even one of the infectious material is
17        allowed to infect, that is to pass into the
18        system of the host."
19   Q    What does that paragraph mean to you?
20   A    Well, according to this examiner, it seems that
21        the word inhibited, as opposed to prevented,
22        allows for partial, there's some sort of -- it
23        allows for some of the infectious materials to
24        pass and others to be prevented.  But if you use
```

```
                                            Page 127

 1            the term prevented, according to his analysis, is

 2            that everything has to be prevented.

 3   Q    Okay.  So in other words, what you're saying is

 4            that by -- and, in fact, if we look at the bottom

 5            of page -- let's say the examiner did indicate

 6            that to cure the problem, you can amend the claim

 7            if you change the word prevented to inhibited; is

 8            that right?

 9                     MS. PETERSON:  Objection to form.

10   A    I'm not sure they're using the term cure, but it

11            says overcoming the rejection below, delete the

12            term preventing and replacing it with the term

13            inhibiting.

14   Q    Okay.  In other words, the difference between

15            preventing and inhibiting is that some harmful

16            particles under the inhibiting standard, some

17            harmful particles could get through, and others

18            would be prevented from -- would not infect the

19            individual; is that what -- do you see that

20            there?

21                     MS. PETERSON:  Objection to form.

22   A    You know, I'm reading the examiner's opinion

23            here.  You know, I don't agree.  You could have

24            similarly preventing.  You can have partial
```

Page 128

1          prevention or full prevention.

2    Q    But inhibiting, according to the examiner, seems

3          to mean that you have partial prevention.

4    A    Again, you can still use partial prevention or

5          full prevention.  I don't see why inhibiting

6          somehow overcomes that.  But again, looking at

7          the totality of this claim, you know, to me, the

8          term inhibiting also supports this idea that

9          somehow you're going to be resisting that

10         infection.

11   Q    Okay. So you can see that the examiner understood

12         what the word inhibiting meant in the context of

13         the claim, right?

14                    MS. PETERSON:  Objection to form.

15   A    I understand what the examiner meant.  I don't

16         agree with the examiner, but I understand what he

17         means.

18   Q    Do you believe that the examiner is a person of

19         ordinary skill in the art?

20   A    I don't know what -- I don't know what his

21         qualifications are.

22   Q    But you do understand what he means by the term

23         inhibiting, right?

24   A    I understand what's in the office action, yes.

Page 129

1   Q    And as a matter of fact, that's when the patent

2        office says that that's what it means, that's

3        what it means, correct?

4                    MS. PETERSON:  Objection to form.

5   A    That's their opinion that they are providing in

6        the office action.  But clearly, when I review

7        the claims from a person of skill in the art, to

8        me, inhibiting means you're able to prevent

9        infection.

10  Q    Okay.  So now, electrostatically inhibiting,

11       doesn't that mean that it uses electrostatics?

12  A    You know, that would be the interpretation that

13       it uses electrostatics, yes.

14  Q    So from a plain and ordinary meaning, in light of

15       this office action, electrostatically inhibiting

16       is a definite term, it's something that you can

17       understand that's inhibiting, which you

18       understand what it means, using electrostatics;

19       am I correct?

20                    MS. PETERSON:  Objection to form.

21  A    Again, if you're just looking at those two terms

22       outside of the totality of the claims and in view

23       of the specification, that's what it means,

24       electrostatically inhibiting, meaning inhibiting

Page 130

```
 1            based on electrostatic.  But you have to read the
 2            entirety of the claim and you have to look at in
 3            view of the specification.
 4    Q    Is there anything in the specification that would
 5            change that definition?
 6    A    Well, the fact that when you're talking about
 7            harmful particulate, it is a list of harmful,
 8            which ones would be inhibited and at what degree
 9            would it -- you know, is the allergens inhibited
10            through the same level as anthrax?
11    Q    Okay.  That's a very good question.  Do you
12            believe that one can patent a general medication
13            or a general pharmaceutical formulation that
14            would cover a wide range of pathogens or harmful
15            particles or does it have to be restricted, does
16            the patent have to be restricted to a single
17            harmful particle or can it be general?
18                    MS. PETERSON:  Objection to form.
19    A    Again, I have to look at the specifics of that
20            patent and the claims of that patent to make that
21            opinion.  What I'm doing is I'm reviewing data
22            too, and my opinions for the 802 is that when
23            you're looking at the claims in view of the
24            specification, you have to consider everything
```

Page 131

1          that's in the specification as well.

2    Q    Okay.  But you did say that understood what

3          electrostatically inhibiting means, and when I

4          asked you is there anything in the specification

5          that would conflict with that understanding of

6          the definition, as was in the office action, as

7          well as the word electrostatic?

8                    MS. PETERSON:  Objection to form.

9    A    Again, when I look at the meaning of the claim in

10         view of what is in the 802 patent, it says

11         harmful particulates.  Those harmful

12         particulates, there's a spectrum.  Some are more

13         harmful than others.  So when you say inhibiting,

14         how much do you need to inhibit?

15   Q    That's not what I'm asking.  I'm asking, is there

16         anything in this specification that would

17         conflict with that meaning of the term?

18   A    Meaning of just the term electrostatically

19         inhibiting?

20   Q    Yes.

21   A    Well, the fact that, you know, again, what level

22         of electrostatic field do you need?

23   Q    That's not what I'm asking.  I specifically

24         asked, is there anything in the specification,

```
                                        Page 132

 1              written down in the specification, that would

 2              conflict with that meaning of the term?

 3                      MS. PETERSON:  Objection to form.

 4    A     Again, I have to look at the entirety of the

 5              specification.  I don't look at just two terms in

 6              the entire claim.  I look at the totality of the

 7              claim and then I look at the totality of the

 8              patent.

 9    Q     Okay.  Now, you're looking at the totality of

10              claim one.  Okay, let's take a look at --

11              electrostatically inhibiting we know that --

12              essentially, this is a use.  In other words, it

13              is a -- we're looking for a method for

14              electrostatically inhibiting, and essentially,

15              it's a use for the method, and it's also a use

16              for the formulation.  So we're saying that this

17              is what the formulation does.  It

18              electrostatically inhibits, okay.  There is not -

19              - is there anything in the specification that

20              will conflict with what we're trying to do with

21              the formulation or the method?

22                      MS. PETERSON:  Objection to form.

23    A     Again, the fact that the term, just

24              electrostatically inhibiting is, you know,
```

Page 133

```
 1            meaning that it is stopping these particles and

 2            there's phenomena of electrostatic.  But other

 3            than that, you know, the specification doesn't

 4            tell anything about, any of the other properties

 5            that are necessary to meet the claim limitations.

 6   Q    Doesn't electrostatically inhibiting, as it's

 7            used in the claim, mean that it stops some

 8            harmful particles from protecting an individual,

 9            according to what the examiner came -- isn't that

10            what it means?

11                   MS. PETERSON:  Objection to form.

12   A    Again, that's what the examiner is suggesting in

13            the office action, but a person of skill would

14            look at this and say when you look at the list of

15            different harmful pathogens, when you say

16            inhibiting, and inhibiting means allowing some of

17            them to go, what's the value?  If you allow one

18            anthrax to go into your body, you still get

19            infected.

20   Q    Right.  But that's -- isn't that why the examiner

21            specifically changed preventing to inhibiting?

22   A    No.  But if the claim is directed towards

23            inhibiting and also inactivating, you have to

24            look at it in the context of specification.  You
```

```
                                          Page 134

 1          know, if you get one Coronavirus in your body,

 2          you still get infected.

 3    Q    But you are aware that the examiner made a ruling

 4          in this particular case that if it was changed to

 5          inhibiting, it would be acceptable; is that

 6          correct?

 7                    MS. PETERSON:   Objection to form.

 8    A    It would be acceptable to him.

 9    Q    Okay.  But he is essentially an official in the

10          U.S. Government; is he not?

11    A    I mean, this is his opinion.  That's what he's

12          providing in the office action.

13    Q    Let's take a look at the claim, and we're going

14          to talk about claim -- take a look at claim

15          number two.  We know for the plain meaning of the

16          term, of what electrostatically inhibiting

17          harmful particulate matter, in other words,

18          that's the intended use of the formulation, okay.

19          So in other words, you understand that

20          electrostatically inhibiting harmful particulate

21          matter from infecting an individual through nasal

22          inhalation is an intended use of the formulation;

23          is that correct?

24                    MS. PETERSON:   Objection to form.
```

Page 135

```
 1   A    Again, that's mentioned here in the claim, but
 2            you have to look at it in the context of the
 3            other limitations.  It's formulation comprising
 4            at least one cationic agent and a biocidic agent,
 5            and then it's attracting the particulate matter
 6            into a thin film holding that particulate matter
 7            and adjusting for the adhesion of the thin film.
 8   Q    All right.
 9   A    All of those other elements have to be met as
10            well.
11   Q    Let's take a look at the formulation itself,
12            okay.  We're speaking about a formulation that
13            has an intended use, okay.  And where the
14            formulation is applied to the skin or tissue of
15            the nasal passage; you understand that, don't
16            you?
17   A    Are you just asking me to see what's in the
18            claim?
19   Q    Yes.  In other words, I'm looking at the preamble
20            of the claim two.  The formulation applied to the
21            skin or tissue of the nasal passages of the
22            individual, right?
23   A    That's what the claim is written.  That's the way
24            it was written.
```

Page 136

1    Q    You understand that, right?  Is there some reason
2         that you don't understand that?
3                   MS. PETERSON:  Objection to form.
4    A    I understand what's written.  But what I'm trying
5         to explain is the fact that when you look at that
6         preamble, you also have to look at the other
7         elements.
8    Q    What is in the preamble is applied to thin film,
9         okay.  And formulation comprises at least one
10        cationic agent and at least one biocidic agent.
11        Is that understandable?
12                  MS. PETERSON:  Objection to form.
13   A    Yes.  I can read what's written in the claim.
14   Q    What does it mean?
15   A    That in this formulation, the ingredients of the
16        composition should have at least one cationic
17        agent and at least one biocidic agent.  And then
18        wherein said formulation once applied, has other
19        elements.
20   Q    So basically, you would agree that examples of
21        the cationic agents and biocidic agents are
22        included in the specification; is that not
23        correct?
24   A    Again, this is a laundry list of different kinds

Page 137

```
 1        of cationic agents, and certainly laundry lists
 2        of some of these that are biocidic as well.
 3   Q    Okay.  But there's at least one of each, right?
 4   A    But it doesn't tell you which one and it doesn't
 5        say anything about how much --
 6   Q    That's not what I asked.  Specifically, it says
 7        it has to have, that the formulation has to have
 8        a cationic agent and a biocidic agent.  And
 9        examples of that, of those agents, are given in
10        the specification. They're listed in the
11        specification; am I correct?
12   A    Those examples are given, but again, for person
13        of skill looking at this claim too, they will
14        look at which ones of those will actually do the
15        function that are described in element A, B, and
16        C.
17   Q    All right, that's reasonable.  That's reasonable.
18        Now, let's go on to element A, okay.
19        Electrostatically attracts the particulate matter
20        to the thin film.  Before you said you know what
21        that means?
22               MS. PETERSON:  Objection to form.
23   A    No.  What I'm saying is that is, that element,
24        when you look at in the context of these
```

Page 138

1           composition without any specific amounts of any

2           specific type of ingredient, you don't know which

3           particulate matter in the specification.  They

4           have all kinds of particulate matters.

5      Q    Is a claim supposed to be a manufacturing

6           specification?

7      A    No, it's not a manufacturer.  It's a function

8           claim, and therefore, to function in this way,

9           when you have so many different kinds of

10          particulate matter, how would all of those

11          particulate matter somehow bind electrostatic?

12     Q    Okay.  We know that the formulation has a

13          cationic agent; is that correct?  Because it says

14          so, all right.  A cationic agent.  One of those

15          that are listed there.  We know that the

16          formulation has that, okay.

17                    Now, if we have the cationic agent and

18          we know some harmful particles are negatively

19          charged, would they be attracted to the thin

20          film?

21     A    Again, depends on whether the cationic agent is

22          actually exposed to the outside of the thin film.

23     Q    But it could be -- electrostatic attraction could

24          be there; am I correct?

Page 139

```
 1   A    Again, depends on what type of charge you have
 2            and which type of particulate matter.  Would you
 3            get the same level of attraction irrespective of
 4            any particulate matter?  No.
 5   Q    Is it required that it would have the same
 6            effective quantity or effect for all cationic
 7            agents for all harmful particles or can it vary?
 8   A    Again, I mean, I read the claim in view of all
 9            the different elements, if there is something
10            that will actually attract and hold and
11            inactivate.  And you look at the specification
12            and it says all of these different bacteria and
13            viruses and allergens are inhibited, that's how I
14            interpret the claim.
15   Q    If there was only one cationic agent and one
16            bacteria, would this be a valid --
17   A    That's not the claim.  I'm reading the claim of
18            the 802.  I'm not reading some other hypothetical
19            patent.
20   Q    If the claim consists of one of the cationic
21            agents that is listed in the specification, one
22            of them, and it contains one specific harmful
23            particle that is also listed in the
24            specification, and it contains a sufficient
```

Page 140

1          quantity, would that expressions be

2          understandable to you?

3                    MS. PETERSON:   Objection to form.

4    A    Again, that's not the claim of the 802.  I'm

5          reading the claim as written by the patentee.  So

6          to me, I interpret what's on the paper, not some

7          hypothetical.

8    Q    Okay.  Let's look at B.  One of the things that

9          you indicated was that the term adequate

10         impermeability is not evident.  Why do you say

11         that?

12   A    Well, again, looking at the claim element, if

13         you're looking at 2B, where it holds the

14         particulate matter in place by adjusting the

15         adhesion of the thin film to permit said thin

16         film to stick to the skin or tissue and by

17         adjusting the cohesion of the formulation to

18         provide adequate impermeability to the thin film.

19         So when you look at in totality, that claim

20         element, what it's saying is that it's going to

21         be a thin film that will basically prevent these

22         harmful particulate matter from passing from one

23         side or the other.   I believe that adequate

24         impermeability is indefinite because it doesn't

Page 141

1           say what level of impermeability is acceptable.

2    Q    Well, isn't adequate a term of degree?

3    A    A degree of what?  Again, for anthrax, what level

4           of impermeability do you need?

5    Q    Do you understand that in a patent you could have

6           terms of degree, for example, like sufficient

7           quantity or adequate efficiency?  Is it possible

8           to have terms of degree like that in a claim, in

9           a patent claim?

10                   MS. PETERSON:  Objection to form.

11   Q    Do you know whether it's possible?

12   A    Again, maybe in some of those other patents,

13          again, depending on the teaching, the art, to

14          those patents.  Here, I'm focusing on the 802.

15   Q    Okay, fine.  Let's deal with that.  What does the

16          term adequate mean?  Give me a dictionary

17          definition in your mind what the term adequate

18          means.

19                   MS. PETERSON:  Objection to form.

20   A    Again, I don't know exactly, you know, in terms

21          of the impermeability, what the claim language

22          here suggests is that it's some level of

23          impermeability, but it doesn't explicitly state

24          what that means.  And if you looked at in the

1        context of preventing infection, then it becomes

2        indefinite because if --

3   Q    Well --

4   A    Let me finish.

5   Q    Go ahead.  Sure.

6   A    Different particulates have different

7        pathogenicity.  So what impermeability are you

8        looking for if you're thinking potentially a

9        very, very deadly pathogen?

10  Q    Okay.  So basically what adequate impermeability

11       should mean, and correct me if I'm wrong, should

12       be that the permeability has to be adequate for

13       the purpose of preventing the pathogen from

14       penetrating the thin film, is that not correct?

15       Wouldn't that be the definition of adequate in

16       this case for that particular purpose?

17  A    Well, again, if that's the definition, then --

18       and that's why it's indefinite, because different

19       pathogens require different levels of

20       impermeability depending on how potent they are.

21  Q    But for a given pathogen, let's say any given

22       pathogen, the term adequate impermeability would

23       not be indefinite; would it, for a given

24       pathogen?

Page 143

1             MS. PETERSON:  Objection to form.

2    A   Again, but that's not here.  In context of the

3        802 and these claims, it doesn't explicitly say,

4        this is the pathogen.  It says all of these

5        pathogens and allergens.

6    Q   So in other words, you can't come with a claim

7        that would be general then?  You couldn't claim

8        more broadly than is in the specification; is

9        that correct?

10   A   But you have to inform a person of skill what

11       that meaning of the claim is in view of the

12       specification.  Right now the specification is

13       listing all of these different particulate

14       matter, harmful particulate matter, and you have

15       a term like adequate impermeability, doesn't say

16       to a person of skill in the art, doesn't explain

17       of what level of impermeability you need.

18   Q   So in other words, you're saying that because the

19       specification in this patent is not definite as

20       to exactly what pathogen you're going to use and

21       exactly what cationic agent you're going to use,

22       and what the exact concentration is, that the

23       whole thing, the claim is indefinite?

24             MS. PETERSON:  Objection to form.

1  A   No.  What I'm looking at is interpreting the

2      claims in view of the specification, and I'm

3      basically opining in my declaration the specific

4      sections that I feel, for example, adequate

5      impermeability is indefinite, because each of

6      these different pathogens in particulate matter

7      will have differential impermeability that would

8      be necessary to prevent them from infecting the

9      host.

10 Q   Okay.  So that is what you believe adequate

11     impermeability to be?  In other words, you've

12     just given me a definition of adequate

13     impermeability, where you said it depends on the

14     specific pathogen and the specific adjustments of

15     the adhesion and cohesion?  You just gave me that

16     definition.

17 A   Again, that would be, you know, the way I would

18     interpret specifically the term claim, the claim

19     language of adequate impermeability in the

20     context of the specific type of particulate

21     matter.  But the claims are not directed to any

22     type of particulate matter.  They're directed to

23     broad.  The claims are very broad, and when you

24     look at the claims in view of the specification,

Page 145

1          you see that those particulate matter can be

2          anything.

3   Q    And you feel that that's not permissible?

4   A    Well, in that sense, for a person of skill in the

5          art, the claim would be indefinite for that

6          reason.

7   Q    But you, as a person of skill in the art, would

8          be able to perform experimentation using those

9          ingredients and to develop a -- would you be able

10         to develop a formulation using those ingredients

11         that would do what you need to do?

12                   MS. PETERSON:  Objection to form.

13  A    Not based on the teaching of the 802.  Again, as

14         I've testified before, the 802 has a list of

15         different ingredients and ranges.  So I would

16         have to -- you know, this is the definition of a

17         new experimentation.

18  Q    Wouldn't different percentages have different

19         effects on different people?

20                   MS. PETERSON:  Objection.

21  A    I'm not sure what you mean by that.

22  Q    Okay.  Let's continue.  The next thing that we're

23         speaking about is renders said particular matter

24         harmless.  Now, we know what the definition, the

Page 146

 1        dictionary definition of harmless is.  But can
 2        the prosecution history change that definition?
 3                MS. PETERSON:  Objection to form.
 4   A    Again, I don't know if that's, you know, a legal
 5        interpretation.  As I do my analysis, I look at
 6        it from a technical and from a person of skill in
 7        the art.  And harmless is also subjective.
 8   Q    Okay.  Subjective.  As a matter of fact, if you
 9        look on page one of the patent, the very first
10        page.  Why don't you read the abstract, the full
11        abstract?
12   A    You want me to read it aloud?
13   Q    Please.
14   A    "A product to reduce, a method of reducing the
15        risk of inhalation of harmful substances by
16        applying a formulation composition to a substrate
17        or the skin in close proximity of one or more
18        nostrils.  This formulation when applied creates
19        an electrostatic field having a charge.  The
20        electrostatic field attracts airborne
21        particulates of opposite charge to the substrate
22        and are in close proximity to the substrate close
23        to the skin.  And a biocidic agent renders
24        microorganisms coming in contact the substrate or

1          skin less harmful."

2    Q    Less harmful, okay.  So basically, that was the

3          -- because it were inhibiting, and not

4          preventing, the term less harmful means that

5          perhaps some can get through, some can't; am I

6          right?

7                    MS. PETERSON:  Objection to form.

8    A    Again, if you look at the specification about

9          some of those harmful agents, you know, these

10         could be anything from allergens to bacteria to

11         viruses, to all different kinds of pathogens.  So

12         what is less harmful for, you know, fungals or

13         what is less harmful for Coronavirus getting in?

14         What's less harmful for smallpox virus?  What's

15         less harmful for influenza virus?

16   Q    Okay.  When you read scientific articles, do the

17         scientific articles have an abstract?

18   A    They do.

19   Q    When you read an abstract, do you typically

20         understand what it is that the article is trying

21         to convey before you read it?

22   A    I usually read the abstract, but I also look at

23         the conclusion and also look at, if I'm

24         interested in that particular research, I would

Page 148

```
 1          look at the methods.
 2    Q     But reading the abstract that you just read, as a
 3          separate item, forget the rest of the patent, if
 4          you were looking at this abstract trying to
 5          figure out whether you were going to read this
 6          patent, is that abstract understandable?
 7    A     Again, when a person of skill looks at the
 8          patent, they look at the entirety of the patent.
 9          They're not just looking at the abstract.  So you
10          have to look at the patent in total, and you look
11          at the abstract in the context of other sections
12          of the specification.
13    Q     Doesn't this abstract specifically state what the
14          formulation and the methodology is going to do?
15          Doesn't it say it in black and white?
16    A     Again, abstract by itself has certain sentences,
17          but you don't just look at the abstract.  You
18          look at the claims.  You look at other sections
19          of the specification.  And when you start to
20          interpret these harmful particulates in the
21          specification column three, you have descriptions
22          of what those harmful particulates are.  It's
23          right on line 44 up to -- continues all the way
24          up to line 65.
```

Page 149

1          MR. KREMEN:  I have nothing more.

2          MS. PETERSON:  I don't have any

3    questions.  The witness will review and reserve

4    the right to make corrections to the deposition

5    and will sign it.

6

7          (Whereupon, the deposition in the

8    above-entitled matter concluded at 12:20 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 150

                        C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF PLYMOUTH, SS

     I, Susan Baxter, a Professional Court Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, do hereby certify that the foregoing
deposition of MANSOOR AMIJI, was taken before me on
October 14, 2022.  The said witness was satisfactorily
identified and duly sworn before the commencement of
his testimony; and that such deposition is a true
record of the testimony given by the witness.

     I am not connected by blood or marriage with any
of the said parties, nor interested directly or
indirectly in the matter in controversy.

     In witness whereof, I have hereunto set my hand
and Notary Seal this 17th day of October, 2022.


                    _Susan Baxter_

Susan Baxter, Notary Public

My Commission Expires:

February 21, 2025

Page 151

1    CASE:   TRUTEK CORP. VS. BLUEWILLOW BIOLOGICS, INC.

2    DEPOSITION OF:   MANSOOR AMIJI

3    DATE:   October 14, 2022

4         The above-referenced transcript is available for

5    review.

6         Within the applicable timeframe, the witness

7    should read the testimony to verify its accuracy.   If

8    there are any changes, the witness should note those

9    with the reason on the attached Errata Sheet.

10        The witness should sign the Acknowledgment of

11   Deponent and Errata and return to the deposing

12   attorney.   Copies should be sent to all counsel, and

13   to Veritext at CS-NY@veritext.com.

14        Return completed errata within 30 days from

15   receipt of testimony.

16        If the witness fails to do so within the time

17   allotted, the transcript may be used as if signed.

18                         Yours,

19                         Veritext Legal Solutions

20

21

22

23

24

Page 152

1    CASE:  TRUTEK CORP. VS. BLUEWILLOW BIOLOGICS, INC.

2    DEPOSITION OF:  MANSOOR AMIJI

3                   E R R A T A   S H E E T

4    PAGE   LINE      PRESENTLY READS        SHOULD READ

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

```
                                              Page 153

1    CASE:  Trutek Corp. Vs. BlueWillow Biologics, Inc.

2    DEPOSITION OF:  Mansoor Amiji

3                 Acknowledgment of Deponent

4              I, Mansoor Amiji, do hereby declare that I

5         have read the foregoing transcript, I have made

6         any corrections, additions, or changes I deemed

7         necessary as noted above to be appended hereto,

8         and that the same is a true, correct and complete

9         transcript of the testimony given by me.

10   _____          _____

11   Mansoor Amiji                          Date

12   *If notary is required

13                 SUBSCRIBED AND SWORN TO BEFORE ME THIS

14                 _____ DAY OF _____, 20___.

15                 _____

16                 Notary Public

17

18

19

20

21

22

23

24
```

## &

**&**   2:19

## 0

**08816**   2:5

## 1

**1**   1:12,13 3:8
4:22 31:5 44:8
46:17 47:16
82:10 83:1
**1-11**   1:2
**1-153**   1:1
**10**   1:12,13 3:21
21:6,15,16,18
72:16 73:8
75:14 77:7
117:14,21 118:4
**100**   78:24
**101**   1:22 31:7,14
31:23,23 32:13
32:24 33:9,12,24
34:12 44:9,12,19
44:19 45:2 46:9
46:12,22,24
**102**   53:20 58:9
**103**   53:21 54:14
58:9
**10312**   1:6
**11**   3:22 124:2
**112**   47:17 48:21
48:23 49:7,15,15
50:12 51:2,4,6,7
52:11,14,19
125:19
**112a**   49:20
**12**   2:12 31:4
49:3 79:22

**124**   3:22
**12:20**   149:8
**13**   3:9,10 69:5
79:22 107:17,20
**14**   1:23 3:11
64:18 150:8
151:3
**15**   3:12 24:22
65:1
**16**   3:14
**17**   3:16
**17th**   150:16
**18**   64:18
**19**   45:5 46:1

## 2

**2**   1:19 3:9 13:7
13:10,18 26:10
31:5 44:8 46:17
47:16 82:10
83:2 106:8
**20**   27:9 153:14
**20007**   2:21
**2008**   107:1
**2011**   124:24
**202**   2:22 37:8,22
41:13 43:23
**2021**   72:24
**2022**   1:23 150:8
150:16 151:3
**2025**   150:21
**21**   150:21
**212**   46:17
**214**   47:15
**24**   19:20 78:16
**248**   2:14
**25**   27:3 124:24

**27**   21:6,14,15,16
21:18
**28196**   150:18
**29th**   64:12
**2:21**   1:6
**2b**   140:13

## 3

**3**   3:10 13:23
**30**   33:16 87:20
91:24 94:12
151:14
**3000**   2:20
**306**   1:20
**32**   117:13
**33**   3:19 107:18
107:20
**35**   31:7,23 33:24
34:12 44:9
46:22 47:17
48:23 51:2
53:20 83:15
**35usc101**   3:19
**35usc112**   3:20
**375**   2:12
**38228**   2:12
**39**   65:1

## 4

**4**   2:4 3:4,8,11
14:22 15:3,14,23
30:21 31:2 33:5
37:19
**44**   45:7,8 46:1
148:23
**46**   49:24
**48**   3:20
**481**   60:17

**48334**   2:13
**488**   60:17
**4:40**   72:24

## 5

**5**   3:12 15:10
16:21 30:21
78:15
**50**   10:15,17
**593-7294**   2:6

## 6

**6**   3:14 16:5,9,13
19:16 31:5 44:8
46:17 47:16
63:18 79:22
80:4 82:10
**6.279**   79:4
**600**   2:20
**62**   118:8
**65**   148:24

## 7

**7**   3:16 17:13
31:5 44:8 46:18
47:17 72:24
82:10 106:7,11
107:1,13
**72**   3:21
**732**   2:6

## 8

**8**   3:19 33:10
47:2
**80**   118:9
**802**   3:9 13:6,9
22:12 24:14
26:11,13 30:18
30:23 37:9 41:1
41:3,14 42:24

43:23 46:13
47:13,17 48:2,20
54:1 58:1 60:2,5
63:22 64:4 65:6
82:10 83:22
86:2 87:16 89:4
92:13,14 101:18
101:19 102:22
103:10 106:7
107:7,23 108:20
108:24 109:24
110:3 112:18
117:14 124:8,20
125:1 130:22
131:10 139:18
140:4 141:14
143:3 145:13,14
**8163802** 26:10
**8:36** 1:24

**9**

**9** 3:20 48:24
49:1
**91** 79:2
**91.805** 79:2
**945-6116** 2:22
**95** 31:1
**987-8929** 2:14
**99** 46:15

**a**

**a.m.** 1:24
**abbreviation**
73:15
**abc** 1:13
**ability** 7:7,21
31:19 76:9
82:15 91:6

**able** 7:12 24:12
38:17 46:2
49:21 51:9 57:7
58:8,15 59:22
61:17 64:7
68:23 75:24
78:6 82:21 83:3
83:4,24 87:14
90:7 91:10,16
92:12 110:12
111:9 116:15
119:12 129:8
145:8,9
**absence** 115:19
**absolutely** 6:6
**absorbable** 72:9
**abstract** 38:23
146:10,11
147:17,19,22
148:2,4,6,9,11
148:13,16,17
**accept** 28:6
29:12,18 105:3
**acceptable** 134:5
134:8 141:1
**accepted** 29:15
104:24
**accepts** 105:2
**accessible** 71:15
**accuracy** 151:7
**accurately** 6:3
7:13
**accused** 21:21
22:5
**acidic** 75:12
**acknowledgm...**
151:10 153:3

**acquire** 72:5
98:14
**acquired** 105:14
**action** 3:22 4:12
124:1,18,23
125:15 126:2
128:24 129:6,15
131:6 133:13
134:12
**actual** 89:18
91:2 109:18
112:12,16 116:3
**addition** 44:3
**additional** 40:11
40:20 41:16,19
44:1 62:4
**additions** 153:6
**address** 96:21
**addressing** 60:6
**adequate** 125:21
140:9,18,23
141:2,7,16,17
142:10,12,15,22
143:15 144:4,10
144:12,19
**adhesion** 108:7
135:7 140:15
144:15
**adjusting** 135:7
140:14,17
**adjustments**
144:14
**admit** 81:7
**adopt** 95:16
**adopts** 96:20
**advanced** 87:6
93:15 98:6

**advantages**
73:13
**advisement**
11:11
**agent** 19:4 68:6
68:7 69:1 84:10
123:6 135:4,4
136:10,10,17,17
137:8,8 138:13
138:14,17,21
139:15 143:21
146:23
**agents** 68:19
84:15,18 136:21
136:21 137:1,9
139:7,21 147:9
**aggregating**
70:23
**aggregation**
70:12
**agree** 22:16
23:15,15 31:11
34:19 40:2,9,18
40:18 54:7,13
55:14 79:17
83:16 100:3,4
105:7 112:9
118:10 122:6
127:23 128:16
136:20
**agreed** 8:1
**agreement** 9:24
**ahead** 142:5
**airborne** 146:20
**alexei** 64:20
**allegations** 64:2
**allege** 31:8 37:8

**allergens** 123:4
130:9 139:13
143:5 147:10
**alliance** 63:14
**allotted** 151:17
**allow** 133:17
**allowed** 32:16
126:17
**allowing** 126:13
133:16
**allows** 39:20
66:17 126:22,23
**aloud** 21:14,15
34:1 45:7
107:19 126:6
146:12
**altman** 2:10,11
7:23 9:4,11,19
14:7,16 32:15,21
34:4 35:4 36:7
37:13,17 97:10
97:14,20
**ambiguity**
111:15
**ambiguous**
34:14 35:1
50:21 97:18
**amend** 127:6
**amiji** 1:17 3:3
4:3,10,16,17 9:1
9:2 15:14,17
16:12 17:15
63:19 106:10
150:7 151:2
152:2 153:2,4,11
**ammonium**
71:17

**amount** 10:16,18
**amounts** 138:1
**analysis** 22:4,10
31:5,16 33:6
34:18 40:15
44:14,23 45:23
46:12 50:23
51:4,15,24 52:10
52:12 53:24
54:19 55:11
57:18,23 60:2
61:17,18 67:3
81:19 83:12
84:24 86:1
88:12 91:21
96:19 98:22
99:2,19 105:3
110:20 111:17
127:1 146:5
**analyzed** 75:21
**answer** 6:2,9,11
6:11,15 7:8,12
7:19,20 8:8 9:17
9:18 11:23
32:11 35:1 36:6
37:2,4,6 101:6
102:1,9,10,10
103:12,13,14
**answered** 95:11
103:20
**answering** 6:16
32:20 102:7
**answers** 6:7 7:8
**anthrax** 94:8
96:2 119:2,22,24
130:10 133:18
141:3

**anticipate** 56:3
59:1,10
**anticipated** 54:8
55:13
**anticipation**
53:20 54:3,12
55:3,6,8,19
56:10 58:13
**antiseptic** 73:12
**anybody** 12:13
13:1
**anyway** 5:12
**appeals** 26:19
29:2
**appears** 126:10
**appended** 153:7
**applicable** 80:1
151:6
**applicant** 50:3,9
**applicants** 52:22
**application** 77:4
80:6 91:3 96:10
124:19,24
**applications**
25:6 30:13 77:1
89:16 95:23
**applied** 33:6
50:15 51:23
59:19 66:1
81:19 83:14
89:9 91:18,19
96:22 99:18
108:5 116:19
135:14,20 136:8
136:18 146:18
**applies** 50:12
**apply** 33:3 49:11
54:11 74:11

80:23
**applying** 45:22
46:12 51:4,6,12
51:14 95:12
103:23 119:21
146:16
**appreciate**
107:19
**approach** 110:13
**approximately**
24:21 27:5,12
**aqueous** 79:1,2
**arch** 1:22
**area** 103:6,7,8
116:2
**argument** 55:19
55:21 56:10
**argument's**
72:18
**arrive** 56:1
**art** 11:17 20:15
22:22 35:7
38:11 44:5,17
45:1 46:7 48:3
49:21 50:2,17
51:8 52:16 54:8
54:14,15,19 55:2
55:13,15,17,24
56:1,9 57:17
58:9,14,24 59:5
59:7,13,16,20,22
60:3,5,8,14,16
61:3,8,14 62:1
65:2 79:24 80:7
80:12,15,16 81:1
81:8,9,12,15,21
82:3,5 83:11,17
85:18,19,21 86:1

86:3,5,8,21
87:13 90:14,20
91:20 92:6 95:1
100:12 101:5,11
101:18,20
102:16 104:5,13
104:19,22 105:5
107:22 111:8
113:17 116:10
116:21 119:11
121:2 122:4
128:19 129:7
141:13 143:16
145:5,7 146:7
**article** 147:20
**articles** 147:16
147:17
**asked** 18:15 32:8
53:9 77:18
95:11 102:9
131:4,24 137:6
**asking** 6:15
20:21 23:4
35:22 37:19
42:8 67:4,4 80:4
102:15,16
131:15,15,23
135:17
**aspects** 34:17
44:15 90:7
**asserted** 65:6
**assume** 8:8
72:18,24
**assuming** 74:24
76:6
**attached** 151:9
**attempt** 108:15

**attend** 18:23
**attorney** 2:3 7:3
7:18 12:13,18
18:21 25:4,6
151:12
**attorneys** 11:20
12:1 13:3 25:13
25:21 28:21
115:14
**attract** 31:20
82:16 93:24
118:20 121:15
123:10 139:10
**attracted** 73:19
74:4 138:19
**attracting** 36:2
38:17 108:4
122:7,14 135:5
**attraction** 40:7
41:15 43:24
73:24 74:3
122:10,12,19,21
123:2,9,17,20,22
138:23 139:3
**attracts** 137:19
146:20
**august** 124:24
**automobile**
39:20,21
**available** 8:24
58:5 151:4
**aware** 29:20
69:6 111:21
114:15 125:15
125:17 134:3

**b**

**b** 3:6 29:17
41:17 49:8
57:12,13 137:15
140:8
**bachelor's** 24:1
24:10
**bachelors** 98:5
101:2
**back** 16:21
43:19,21 58:3
**bacteria** 72:7,9
76:6,14 123:3
139:12,16
147:10
**baker** 62:5,15
63:1,7,9,12
**bar** 19:1
**based** 16:2,17,19
22:9 31:18
40:15 44:18,24
46:11,12 50:7,10
50:16 51:12
53:23 55:20
59:18 60:1 62:9
63:12 69:13,24
74:3 79:1 80:8
80:23 81:2,19
82:2,3,8,24 86:2
90:2 91:18
94:22 95:19
99:2,9 100:1
101:19 103:9,10
104:7 105:3
110:23 113:14
118:18 124:9
130:1 145:13

**basically** 57:24
66:17 70:22
75:6 104:2
105:6 114:8
136:20 140:21
142:10 144:3
147:2
**basis** 45:13 46:5
95:17
**baxter** 1:20
150:4,19
**began** 112:20
**beginning** 73:6
**behalf** 1:18
30:18
**beings** 89:18
**believe** 7:12
10:14,20 44:14
60:10 95:20
106:6 114:11
124:7,13 128:18
130:12 140:23
144:10
**belt** 97:24
**benzalkonium**
68:24 69:2,3,5
69:13 70:4 71:2
71:5,10,13,14
73:15 75:8 76:8
76:10,12 78:5
**best** 7:21
**beyond** 38:10
40:6 84:1 91:23
119:15
**bill** 10:13 11:3
**billed** 11:6
**bind** 138:11

**binder** 85:4,5,6
85:12
**biochemistry**
93:3
**biocide** 75:9,10
84:17,22,23
**biocidic** 84:18
135:4 136:10,17
136:21 137:2,8
146:23
**biologics** 1:11
30:1 151:1
152:1 153:1
**biology** 96:24
97:3,6,23 98:3,6
**biotech** 22:11
**bit** 86:18 98:19
99:14
**black** 148:15
**blood** 150:12
**bluewillow** 1:11
10:3,8,10 11:2,3
11:8 12:10,19,23
13:1 16:18
22:11 26:7 30:1
63:21 69:6,15,24
72:20 73:1
151:1 152:1
153:1
**bluewillow's**
3:17 11:20
17:12,16,20 64:2
73:10,14 106:10
**bluewillow.com**
72:22
**board** 26:19
**body** 133:18
134:1

**boston** 1:22
**bottom** 72:21
127:4
**box** 75:14
**break** 6:19,22,23
7:2 58:21 106:1
**brief** 3:18 7:24
17:12,17,20
58:22 106:3,11
113:16 116:6,22
**bring** 10:22 14:9
14:10
**broad** 144:23,23
**broader** 121:24
**broadly** 143:8
**brunswick** 2:5
**bunch** 8:20
**burns** 64:21 65:3
65:11,17 66:10
66:11
**business** 82:11
**bzk** 73:11,14,20

**c**

**c** 2:1 4:1 41:17
137:16 150:1,1
**c.a.** 1:6
**caliber** 101:1
**call** 73:23 94:9
94:13,13
**called** 1:18 9:22
16:11 67:19
70:13
**calls** 35:1
**cancer** 63:15
**capacity** 29:24
30:16

**car** 39:16,22
**case** 7:2 13:4
17:22 18:5 20:7
20:16 23:6,12
35:3 40:6 49:12
53:24 57:24
59:14,17,19
61:21,22,23 62:2
62:2,6,18,20,21
63:2 67:23
74:22 79:3
107:12 118:8
134:4 142:16
151:1 152:1
153:1
**cases** 27:22 28:4
28:18,20 52:9
57:19 115:15
**catch** 70:15
**category** 9:2
36:16,18
**cationic** 68:6,7
68:19 69:1,2
84:10,15 123:6
135:4 136:10,16
136:21 137:1,8
138:13,14,17,21
139:6,15,20
143:21
**cause** 126:11
**centrifugal**
38:20,24 39:2,6
**centrifuge** 39:2
**certain** 8:17 48:8
48:9,16 57:9
79:16 86:7
91:23 92:10
103:7 111:14

115:7 121:19
148:16
**certainly** 42:20
52:8 55:20
56:12 61:12
69:10 72:8 88:1
88:11 97:3
103:7 123:19
137:1
**certify** 150:6
**cetera** 78:5
125:8
**challenge** 8:13
**change** 121:9
127:7 130:5
146:2
**changed** 133:21
134:4
**changes** 7:15
115:23 121:1
151:8 153:6
**chapter** 1:19
**characteristics**
95:6
**characterization**
30:12 91:2
101:8 106:14,20
**charge** 10:7
64:20 66:20
67:8,16,20,21
68:1,10,12,16,17
68:23 69:8,13,16
69:22 70:1 71:7
71:8,10 72:5
73:20 74:2,5
118:21 120:10
139:1 146:19,21

**charged** 39:7,8
68:8,9 70:5
71:20,23 72:4
122:9 123:8,15
123:15 138:19
**charges** 93:24
94:1 123:10
**chemical** 68:11
83:18 86:9
88:17,20,24 89:5
89:12,20 90:6,13
90:16 97:4 99:4
99:21 100:10,15
100:19,22
101:22 102:3,5
102:12,13,19,21
102:24 103:2,16
103:18 105:9,11
**chemicals** 89:11
**chemist** 89:20
**chemistry** 92:24
93:2
**chloride** 68:24
69:2,3,5,14 70:4
71:2,5,11,13,15
73:15 75:8 76:9
76:11,12 78:5
**claim** 3:17 17:12
17:16,20 19:21
20:3,13 21:21
22:13 25:23
31:11 34:19,20
35:18 36:1,10,11
36:12,13,23 40:3
40:9,12,17,21
41:2,5,19 42:1,9
43:6 45:9 46:2
48:4 50:4,10,18

50:18 52:17
53:19 54:7,9,13
54:16,21,23
55:12,16,16 56:5
56:6,7,16,20,23
57:5,11,15,24
59:2,11 65:5,15
69:16,18 78:9
82:24 83:1,1,2,2
83:5 84:1 91:12
92:11 106:11
107:12,14
109:19 110:24
111:10,15,16,17
111:20,22 112:1
112:11,16,24
113:15,19,21
114:4 116:3,13
117:2,5 118:1,1
118:19 120:8,19
121:4,6,9,14,22
121:24 123:16
125:6,9,19 127:6
128:7,13 130:2
131:9 132:6,7,10
133:5,7,22
134:13,14,14
135:1,18,20,23
136:13 137:13
138:5,8 139:8,14
139:17,17,20
140:4,5,12,19
141:8,9,21 143:6
143:7,11,23
144:18,18 145:5
**claimed** 22:1
45:12,18 47:20

**claiming** 48:16
53:18 119:9
**claims** 16:1 22:5
22:12 24:13
25:20 31:5,8,18
34:22 35:6
36:18 37:8,24
40:16,19 41:1,10
41:13 43:13,17
43:23 44:7
46:17 47:16
50:13,20,22
53:17 56:12
60:2,5 63:22
64:4 65:6 66:1
69:6,15 82:9,10
82:14 83:14,22
89:5 91:3 92:8
94:4 101:20
107:7 109:17
110:9 113:10,24
115:11 116:4,7
116:11,16 117:5
117:8,11 119:8
129:7,22 130:20
130:23 143:3
144:2,21,23,24
148:18
**clarification** 8:6
**clarify** 57:21
**class** 31:13
**classification**
34:22
**classifications**
35:14
**clean** 36:8
**clear** 7:4

**clearly** 23:5
129:6
**client** 13:13
**clinical** 23:23
**close** 146:17,22
146:22
**coalescence**
70:12
**coalescing** 70:9
**code** 33:9 51:3
**cohesion** 140:17
144:15
**collected** 115:17
**college** 87:19
**column** 148:21
**columns** 78:17
**combination**
42:2,7,10,17,23
54:15,22 55:5,9
56:17 57:4
**combine** 57:3,8
57:14
**combined** 54:20
55:24 56:11,14
57:10
**come** 25:22 39:7
54:20 66:19
79:12 90:4
91:11 98:5
143:6
**comes** 18:7,14
18:19 78:24
101:2 105:16
109:16
**coming** 9:5
70:23 146:24
**commencement**
150:9

commencing
1:23
comments  16:19
commission
150:20
commonwealth
1:21 150:2,5
communicated
51:21
communication
124:9
comparison  22:4
compatibility
89:10
complain  47:15
complete  37:4
93:19 153:8
completed
151:14
completely  6:2
7:13 64:14
117:11
complies  21:8
compliments
63:16
comply  5:2 48:8
composition
31:19 34:7,20,21
35:16 36:12,14
43:16 48:4 66:5
77:5 79:18
82:18 83:3 88:4
88:4 91:12 94:5
95:21 110:8,11
111:9 118:18
120:22 122:5
136:16 138:1
146:16

compositions
45:17 66:12
121:5,21
compound  84:8
compounding
85:3
compounds
83:19 84:5
117:16
comprises  136:9
comprising
118:1 120:8
135:3
concentrate  7:7
concentration
121:7,10 123:6
143:22
concentrations
75:10,11
concept  122:20
concern  35:18
90:6
concerned  106:6
concerning  8:12
30:22
concerns  78:1
concise  37:15
concluded  149:8
conclusion
147:23
concocted  65:20
conditions  34:9
68:14,15 71:17
72:1
conductivity
66:6,13 67:7
confidential  79:7
79:19

confirm  14:2
conflict  131:5,17
132:2,20
confusing  8:5
connected
150:12
consider  44:16
81:22 82:4
86:20 101:4
130:24
considerations
26:4
considered
44:23 80:11
83:10 85:17,20
86:4
consists  139:20
construction
3:17 17:12,17,20
20:3 106:11
107:7,13,14
113:16 116:22
construed  19:21
22:5
consulting  27:3
contact  68:3
73:22 146:24
contain  17:22
18:4,6 22:17
30:22 69:22
70:4
contains  15:4
40:10,19 41:5
64:1 69:3 71:2
139:22,24
context  34:18
54:5 83:21 86:1
88:12 89:4

103:10,21,22
104:1 116:20
128:12 133:24
135:2 137:24
142:1 143:2
144:20 148:11
continue  7:23
145:22
continues  148:23
continuing  18:12
contract  27:24
controversy
150:14
conventional
41:19 42:2 44:4
conversation  6:6
conversations
12:22
convey  147:21
convince  111:8
copies  8:23 9:14
9:20 14:10
151:12
copy  10:22 11:1
11:7 14:9 33:24
46:21 48:21
51:16 72:12,20
73:2 124:23
coronavirus
96:2 119:3
134:1 147:13
corp  1:8 151:1
152:1 153:1
corporation  1:13
4:12
correct  4:13 5:3
5:6 6:3 10:23
13:14 15:5

**[correct - degree]**

17:23,24 18:5,18
18:19,20,21 26:3
26:22 29:7,22
30:2,19,23 31:14
38:2 40:4 43:11
52:13,19 55:7,17
59:17,23 61:21
63:23 64:15
68:12,20 73:16
91:7 112:5
115:24 117:20
118:6 124:12,20
125:23 129:3,19
134:6,23 136:23
137:11 138:13
138:24 142:11
142:14 143:9
153:8
**corrections**
149:4 153:6
**coulombs** 67:24
**counsel** 2:8,16
2:24 14:12
19:24 20:5
21:10 36:4
51:13,17,20 60:8
60:13 61:2,6,10
62:7,23 63:2
79:9 151:12
**county** 150:3
**course** 7:15 52:4
93:21,22 118:17
**courses** 92:18,23
92:24 93:4,12,15
93:18 96:24
97:3,7,23 98:7
101:1

**court** 1:3,19,20
3:24 5:13,23 6:5
27:10 28:5 29:6
95:15 96:20
104:24 105:2
111:14,16,19,24
150:4
**cover** 35:24
130:14
**covered** 9:23
**covers** 36:1
**create** 122:12
**creates** 39:5 90:8
146:18
**creating** 94:5
**credible** 45:23
46:11,18 47:16
**criticize** 64:19
**cross** 3:2
**cs** 151:13
**cup** 66:15,16
**cure** 127:6,10
**current** 66:17,18
**curriculum** 3:10
13:19,22 14:1
88:24 93:14
98:2
**cut** 14:12
**cutting** 37:5
**cv** 1:6 84:3

**d**

**d** 3:1 4:1
**data** 16:1 22:17
23:2 25:19
45:10 47:18,22
48:11 61:17
65:24 66:1 67:1

83:13 110:16
111:4 112:10
113:11 115:16
115:18 116:24
130:21
**date** 10:13 11:2
11:4,9 18:4,6
44:18 58:3
72:23 82:3
151:3 153:11
**dated** 124:23
**day** 7:16 150:16
153:14
**days** 8:17 151:14
**dc** 2:21
**deadline** 64:12
**deadly** 142:9
**deal** 141:15
**dealing** 95:4
**decide** 95:16
**decides** 111:19
**decision** 95:17
**declaration** 3:16
17:11,15 18:2
28:2 29:9 106:9
107:6,16 112:3
113:15 116:9,19
116:21 144:3
**declarations**
8:21,24 28:18
**declare** 153:4
**declined** 28:6
**deemed** 153:6
**defendant** 2:24
26:7 30:1,18
111:18
**defendant's**
116:23

**defendants** 1:15
**define** 86:7
88:13 114:13,15
114:18
**defined** 115:7
**defining** 90:18
**definite** 52:12
129:16 143:19
**definition** 81:18
82:2,8 83:14
85:24 86:7 90:3
91:18,19 92:4,5
92:6 95:12,14,18
96:17,18,19,20
96:22 98:12,22
99:3,9,18,24
100:1 104:7,18
104:20 105:4
109:12 111:16
115:21 116:3,13
120:4 130:5
131:6 141:17
142:15,17
144:12,16
145:16,24 146:1
146:2
**definitions** 114:1
114:2,5
**degree** 23:23
24:1,8,10 86:9
87:7 88:17,20
90:13,16,23,24
98:19 99:4,11,12
99:13,20 100:7
100:10,15,19,20
100:21,24 101:9
101:13,15,22
102:3,5,11,12,19

102:21,24 103:2
103:5,16,18
104:8 105:8,11
130:8 141:2,3,6
141:8
**delete** 127:11
**delivery** 106:23
**demand** 53:3
**demands** 53:5
**demonstrate**
47:20 50:2
52:15
**demonstrating**
45:11 108:3
**demonstration**
45:16 46:3
**depend** 23:22
41:21
**dependent**
103:22
**depending** 68:9
72:6 141:13
142:20
**depends** 23:20
24:6 25:10,17
38:22 67:11
70:7 71:22,24
76:12 84:7,13,20
85:1,5 86:22
92:21 93:13
98:16 99:1,11,17
103:22 104:15
104:18 105:13
105:20,21
122:11 138:21
139:1 144:13
**deponent** 151:11
153:3

**deposed** 4:13 5:6
5:11 28:19
**deposing** 151:11
**deposition** 1:17
3:8 4:19,21 5:5
5:9 6:8 8:16,18
11:14,21 12:11
12:20 14:12
26:5 28:2,16
29:5 34:3 106:5
112:20 149:4,7
150:7,10 151:2
152:2 153:2
**depositions** 27:7
**derived** 31:18
73:10
**describe** 113:18
**described** 45:12
47:19 65:11
77:24 108:16
137:15
**describing** 76:19
77:14 78:2,4
109:15 112:15
**description** 3:7
49:14,16,19 50:1
50:5,8,12,19
51:1 52:11,22,24
53:6 110:14,22
115:23 121:20
125:21
**descriptions**
148:21
**designate** 79:8
**designated** 79:13
**detail** 80:22
**details** 81:12

**determination**
111:21,22 112:5
116:14 120:3
**determine**
113:11
**determines**
112:1
**develop** 24:12
30:6 119:13
145:9,10
**developing**
18:12 24:7 89:7
118:18 119:15
**development**
27:20 91:2
96:10 106:14,20
106:22
**diagram** 75:23
76:4
**dictionary** 114:1
115:21 141:16
146:1
**difference** 15:21
53:19 54:2 55:3
80:14 81:5,7
89:19,23 127:14
**differences**
53:23
**different** 11:18
35:9 44:15,24
68:14 72:5 88:2
92:22,23 93:7
96:11,20 108:12
110:2 117:24
118:22 121:14
123:3,3,4 133:15
136:24 138:9
139:9,12 142:6,6

142:18,19
143:13 144:6
145:15,18,18,19
147:11
**differential**
144:7
**differently** 88:3
114:13,15,19
**direct** 3:2 4:8
21:23
**directed** 31:6,9
32:12 37:9 44:8
82:14 92:9 94:5
133:22 144:21
144:22
**directly** 12:22
150:13
**disagree** 23:8
101:8
**disciplines**
100:17
**disclose** 122:1
**disclosure** 46:6
52:23 53:6,14
**discovers** 34:5
**discuss** 7:2 34:17
60:12 112:21
**discussed** 31:17
33:4,19 51:22
52:7 60:10
79:19 83:1
**discusses** 34:21
**discussion** 7:24
52:4 63:2 79:18
**discussions**
62:23
**diseases** 30:15

**displayed** 71:5
**disputes** 27:24
**disruption** 75:17
**distance** 70:24
**district** 1:3,4
**division** 1:5
**document** 3:21
  11:17 13:17
  14:1 15:16,16
  34:5 52:6,7 56:9
  56:11 72:15
  74:4 77:11,19,22
  77:24,24 124:4
  124:16,22 125:2
**documents** 8:17
  9:3 12:14 43:19
  56:12,14 60:3,6
  60:10,12 61:5,9
  61:12,16 62:10
  62:11,24 75:21
  76:19,20,23 77:3
**doing** 57:10
  67:22 91:24
  97:2 98:10
  110:19 116:4,20
  130:21
**dollar** 10:16
**domain** 18:1
**doubt** 69:16
**doubting** 69:18
**download** 63:4
**dplc.com** 2:7
**dr** 1:17 4:10 9:1
  9:2 16:20 17:3,6
  17:7 63:12
  64:20,21,22
  65:11,17 66:4

**draft** 25:8,20
  26:1 115:10
**draw** 112:15
**drawings** 25:15
  25:16,17 75:13
**driven** 39:20
**droplet** 3:21
  70:2,12,21 71:7
  71:12 72:15
**droplets** 70:5,9
  70:10,23 71:1
  73:12,19 74:7,12
  74:14,24 75:1,2
  75:5,6,7,16,24
  76:2,5,13
**drug** 27:20
  106:13,19,22
**dry** 66:11
**due** 47:8
**duly** 4:4 150:9
**duplicate** 92:12

### e

**e** 2:1,1 3:1,6 4:1
  4:1 150:1,1
  152:3,3,3
**easily** 74:23
**east** 2:5
**eastern** 1:4
**education** 84:14
  87:5,17 91:5,13
  91:22,23 92:7,18
  94:10,17 95:8,9
  96:7,15 98:9
  100:5 104:8
  105:16,19
**educational**
  103:24

**effect** 139:6
**effective** 68:20
  88:5 139:6
**effectiveness**
  73:9 74:8
**effects** 75:12
  145:19
**efficiency** 141:7
**eight** 34:4
**either** 11:21 12:8
  41:19 44:4 68:8
  101:9 111:4
**electro** 73:20
  74:2
**electrostatic**
  38:3 40:7 41:14
  43:24 64:20
  67:8,15 69:8,13
  69:16,22 70:18
  71:3,10 73:23
  74:5 94:4
  118:21 122:18
  122:21 123:9,14
  123:20,22 130:1
  131:7,22 133:2
  138:11,23
  146:19,20
**electrostatically**
  31:20 35:21
  36:2 38:17
  82:16 108:4,8
  118:20 121:15
  122:7,14 125:6
  125:10,22
  129:10,15,24
  131:3,18 132:11
  132:14,18,24
  133:6 134:16,20

137:19
**electrostatics**
  93:22 94:2
  129:11,13,18
**element** 22:1,13
  54:9,16 55:15
  137:15,18,23
  140:12,20
**elements** 39:22
  40:16 41:16,17
  41:19 44:1
  48:16,16 54:21
  54:22 56:5,6,15
  56:21,23 57:12
  117:8 121:14
  135:9 136:7,19
  139:9
**eligibility** 31:3
  31:17 44:12
**eligible** 40:13,22
  41:7
**email** 61:6
**embodiment**
  109:7,10,14
  110:4,7 113:18
**embodiments**
  109:21,24
  120:22
**emulsion** 77:15
**emulsions** 70:3
**enable** 22:24
  50:15,18 73:21
**enabled** 23:1
  59:1,5,8,9,15,17
**enablement**
  50:11 51:1
  52:11 59:18
  110:22 125:21

enables  48:4
enabling  74:8
encompass  54:9
  54:16 55:15
  56:5,15
encompasses
  56:4
engaged  82:12
engine  39:21
engineer  89:20
  89:22 90:6
engineering  86:9
  88:18,20,24 89:6
  89:12 90:13,16
  97:4 99:4,21
  100:10,15,19,22
  101:22 102:3,5
  102:12,13,19,21
  102:24 103:2,16
  103:18 105:9,11
engineers  90:2,4
english  113:22
entire  49:7 132:6
entirety  36:23
  123:16 130:2
  132:4 148:8
entitled  149:8
environment
  72:6
equation  66:19
  66:21
ermakov  64:20
  65:2,11,17 66:4
errata  151:9,11
  151:14
especially  89:13
  115:16

esquire  2:2,10
  2:18
essential  6:6
essentially  67:22
  116:7 132:12,14
  134:9
establish  65:4
et  78:5 125:8
evaluate  87:14
eventually  52:18
evidence  18:16
  18:19 55:1
  65:13
evident  140:10
exact  27:12 91:9
  109:11 110:5
  111:7 118:16
  143:22
exactly  22:20
  41:11 52:2
  75:20 94:16
  111:19,24 112:8
  124:15 141:20
  143:20,21
examination  4:8
  19:1 124:8,10
examined  4:5
examiner  22:21
  125:18,19 126:1
  126:20 127:5
  128:2,11,15,16
  128:18 133:9,12
  133:20 134:3
examiner's
  127:22
examining  19:10
example  60:17
  62:4 72:7 77:14

85:6 89:6
  109:18 113:9
  118:8 141:6
  144:4
examples  25:12
  38:19 92:12,14
  108:2 109:2,5,14
  109:16 110:1
  112:10 113:19
  116:24 119:12
  136:20 137:9,12
exclude  120:8
excluding  90:17
  100:17
excuse  34:2
exert  68:23
exhaustive  30:8
exhibit  3:8,9,10
  3:11,12,14,16,19
  3:20,21,22 4:22
  13:7,10,18,23
  14:22 15:3,10,23
  16:8,13,21 17:13
  19:16 26:10
  31:2 33:5,10
  34:3 37:19 45:6
  47:2 48:24 49:1
  49:3 63:18
  68:15 72:16
  73:8 75:14 77:7
  78:15 79:22
  80:4 106:7,8,11
  107:13 124:2,11
exhibits  1:2 3:24
  12:17 14:11
  68:11 69:7
  124:14

expectation  55:2
  57:20
experience  24:9
  24:11 84:14
  86:10,12,14,18
  86:20 87:1,4,5,7
  87:17 88:10
  91:14 92:7
  94:19,20 95:8,9
  96:4,6,14 98:13
  98:20,24 99:6,21
  100:2,3,5 101:3
  101:24 103:6,7,9
  104:10 105:18
  106:18 112:7
experiences
  84:21 88:15
  94:22 98:14
  103:24 105:15
  105:21
experimentation
  50:16 120:1,2,4
  120:11,12 145:8
  145:17
experiments
  120:5
expert  3:11,12
  3:14 8:11,20
  10:2,15 11:15,15
  15:9,13,14,17
  16:7,11,20,24
  17:4 21:13
  23:10 27:15
  28:1,7 29:13,22
  30:11,16 32:14
  45:3 49:24
  51:18 54:6
  60:24 76:20

**[expert - form]** Page 12

77:4 78:14 81:6
83:15 104:3,5,12
104:12,17,21,23
104:23 106:12
106:18,24 115:4
116:2,8,8
**expertise** 30:4,9
86:22 104:15
106:15 107:3
**experts** 16:3
64:7
**expires** 150:20
**explain** 65:9
136:5 143:16
**explicit** 41:10
**explicitly** 113:17
141:23 143:3
**export** 16:22
**exposed** 71:13
76:13 138:22
**express** 31:22
32:6 107:6
**expressed** 61:20
**expression** 26:16
122:16
**expressions**
140:1
**extend** 70:22
**extra** 14:9
**extraordinary**
80:16 81:9,11,14
81:23 85:18,21
85:24
**eyes** 79:9

**f**

**f** 150:1

**facets** 96:11
**fact** 31:18 40:6
45:16 50:16
53:5 63:12
65:13 69:21
71:1 101:1
110:15,23
111:22 112:4
114:10 127:4
129:1 130:6
131:21 132:23
136:5 146:8
**factual** 23:11
**fails** 151:16
**fair** 8:8
**fall** 34:22 36:18
36:22
**falls** 31:12
**familiar** 19:12
20:3 48:6,10
49:14,16 51:3
63:11 66:23,24
67:5,6 80:6,22
84:15,22
**far** 29:15 51:7
60:1 94:17
112:7
**faraday** 66:15
66:16
**farmington** 2:13
**features** 92:10
**february** 72:23
150:21
**fee** 10:5
**feel** 144:4 145:3
**fictitious** 1:12,14
**field** 23:16 30:4
58:4 87:20

94:18 99:5
101:23 102:14
106:12,19,24
131:22 146:19
146:20
**fields** 30:9,17
90:17 100:16
**figure** 59:8
86:19 148:5
**figures** 25:18
**file** 124:23
**files** 63:5
**film** 74:20 75:3
108:5,7 121:13
122:8,9,15,19,22
135:6,7 136:8
137:20 138:20
138:22 140:15
140:16,18,21
142:14
**find** 50:24 60:9
60:16 62:7 78:7
112:17 114:12
**finding** 112:4
**fine** 9:17 26:8
32:22 37:3
141:15
**finish** 6:15,16,22
36:5,5 37:2
142:4
**first** 5:13 14:17
15:12 20:1
21:17,18 51:6,10
62:15 65:10
67:12 73:5,6,8
93:20,21 107:18
112:23 125:19
146:9

**five** 27:14 78:16
78:22
**flat** 10:5
**focusing** 141:14
**foley** 2:19
**foley.com** 2:23
**followed** 32:19
**follows** 4:6
**force** 38:20,24
39:3,6 122:10,11
**foregoing** 150:6
153:5
**forget** 79:6
102:21 148:3
**forgetting**
113:22
**form** 8:2 13:15
20:18 23:18
24:4 25:9 27:2
31:15 32:17,19
33:13 34:24
36:20 37:14
38:8,15 39:4
40:14 42:4
43:12 48:13
58:11 68:4
74:13,18,20,21
75:4,19 76:3,18
77:10,21 82:1,13
83:20 84:12,19
85:22 86:6
87:11 95:10
100:13,23 102:6
103:3,19 104:6
104:14 105:1,12
107:9 108:18,23
109:9,22 110:18
113:13 114:3

**[form - good]**                                                    Page 13

115:1 116:1,17
118:13 120:14
122:2,17 123:12
125:24 127:9,21
128:14 129:4,20
130:18 131:8
132:3,22 133:11
134:7,24 136:3
136:12 137:22
140:3 141:10,19
143:1,24 145:12
146:3 147:7
**formal** 91:23
**formation**
106:22
**formed** 15:4
76:17
**former** 126:13
**forms** 75:3
**formula** 89:8
**formulate** 83:3
84:5
**formulates**
83:18,23
**formulation**
24:13,14 36:13
36:22 47:7,11
78:9,18,23 82:15
83:2 84:2 86:11
89:8 91:1,6
94:12 96:10
98:10 101:3,24
104:17 106:13
106:20 119:13
123:5 125:9
130:13 132:16
132:17,21
134:18,22 135:3

135:11,12,14,20
136:9,15,18
137:7 138:12,16
140:17 145:10
146:16,18
148:14
**formulations**
24:6 27:19
30:12,14 47:19
86:15 108:1,3,16
117:15
**formulator** 24:2
24:3 30:6 82:19
82:20 87:21
119:9,10 120:2
**forth** 21:20
**found** 21:21
59:15,16 60:6
78:14
**foundation**
87:13 105:17
**foundational**
105:16
**four** 73:13 74:7
74:12 125:2
**friday** 1:23
**front** 28:17
**full** 10:18 22:24
50:4,10,18 53:1
53:8,16,16
110:24 128:1,5
146:10
**function** 24:14
39:11,15,19,22
87:15 92:10
119:7 137:15
138:7,8

**functional**
120:18
**fungals** 147:12
**further** 80:22
106:21
**future** 11:7

**g**

**g** 4:1
**garnered** 105:18
105:18
**gender** 1:12
**general** 41:4
42:9 58:4 66:23
93:2 98:3
130:12,13,17
143:7
**generally** 25:18
27:17,19 28:4
55:11 109:10
**generate** 28:1
**generated** 6:8
30:17 63:17,20
**germ** 71:22
75:24 76:15
77:14
**germs** 71:19
72:1,2,3 73:19
73:21 74:4
75:16 76:10
123:3
**getting** 119:23
147:13
**give** 5:22 33:24
43:19 61:2
72:12 78:6 86:7
86:19 141:16

**given** 14:8 20:13
20:17 33:21
52:6 60:8 62:19
72:23 87:24
137:9,12 142:21
142:21,23
144:12 150:11
153:9
**gives** 35:13
67:21
**giving** 42:9
**glossary** 114:19
115:19
**go** 5:9,12 6:23
7:1,2 60:11
61:13 63:4 84:1
98:3 118:7,8
119:14 133:17
133:18 137:18
142:5
**going** 9:14 14:10
16:21 18:17
21:22 33:7,24
43:21 48:17
49:5 55:4 58:18
72:12 78:16
79:12 87:15
97:19 106:5
113:9 119:23
120:17 128:9
134:13 140:20
143:20,21 148:5
148:14
**good** 4:10 56:24
89:10 105:24,24
114:8 123:24
130:11

government
134:10
graduate 93:20
granted 24:24
gravity 39:12,14
39:15,18,24
greater 103:1
105:10
ground 5:10
group 35:13
guess 14:18 16:5
guidance 120:16
121:5

**h**

h 2:2 3:6 152:3
haidri 17:3
hand 150:15
harmful 47:8
108:8 123:7
125:7,10,11
127:15,17 130:7
130:7,14,17
131:11,11,13
133:8,15 134:17
134:20 138:18
139:7,22 140:22
143:14 146:15
147:1,2,4,9,12
147:13,14,15
148:20,22
harmless 145:24
146:1,7
he'll 10:1
head 6:10
heading 31:3
heard 19:8 26:15
81:11

hearing 112:2
116:12
help 78:6
helped 115:10
hereto 153:7
hereunto 150:15
high 75:11 87:18
hills 2:13
hired 10:2 29:24
history 146:2
hmm 6:10
hold 76:1,1
82:16 118:23,23
121:17 139:10
holding 108:6
123:17 135:6
holds 140:13
honest 43:20
host 126:15,18
144:9
hour 10:6 58:19
58:19
hourly 10:7
hours 10:15 12:6
74:8,12
https 72:22
huh 6:10
human 89:18
119:22
hundred 10:9,17
hypothetical
42:9,15 43:3
80:10 83:9
93:19 94:17
95:1,4,6 97:19
98:21 103:4,23
139:18 140:7

hypothetically
42:24 43:1
57:11
hypotheticals
88:9

**i**

idea 128:8
identified 4:4
150:9
impermeability
140:10,18,24
141:1,4,21,23
142:7,10,20,22
143:15,17 144:5
144:7,11,13,19
importantly
121:18
impossible 57:3
improvement
34:8 35:17
inactivate 82:17
119:1,1,2 121:18
139:11
inactivating
123:18 133:23
inactivation
118:24
incidentally
29:16
include 47:18
108:2 110:16
included 78:8
136:22
includes 117:14
including 7:3
incomplete
97:19

inconsistent 77:8
77:19
indefinite 140:24
142:2,18,23
143:23 144:5
145:5
indicate 127:5
indicated 44:7
94:10 140:9
indicates 78:9
126:15
indicating
125:20
indirectly
150:14
indiscernible
61:23
individual 74:24
75:2,6 88:10,10
99:1 108:9
125:8,12 127:19
133:8 134:21
135:22
induce 38:24
75:12
ineligible 31:6,9
38:1 40:4 41:8
44:9
infect 126:17
127:18
infected 119:23
133:19 134:2
infecting 108:9
125:7,11 134:21
144:8
infection 47:8
94:6 95:23 96:1
128:10 129:9

142:1
**infections**
126:11
**infectious**
126:14,16,23
**influenza**  147:15
**inform**  35:8
52:24 121:2
143:10
**information**
10:1 22:23
45:10 51:18
62:9 69:10 77:5
79:7
**informed**  19:20
19:23 20:1,4,6
21:9,11,19,23
22:3
**infringe**  22:12
63:22 64:3
**infringement**
3:15 13:13 16:8
16:13,18 17:5
19:17 21:19,23
22:4 63:20 67:3
76:17 79:21
**infringes**  65:5
**ingredient**
117:19,24 118:6
118:11 138:2
**ingredients**  88:2
91:9 108:13,15
108:20 109:1,4
117:23 119:13
120:7,13,16
121:7 136:15
145:9,10,15

**inhalation**  47:8
134:22 146:15
**inhibit**  82:16
108:8 131:14
**inhibited**  126:12
126:21 127:7
130:8,9 139:13
**inhibiting**  35:21
36:2 125:7,10,16
127:13,15,16
128:2,5,8,12,23
129:8,10,15,17
129:24,24 131:3
131:13,19
132:11,14,24
133:6,16,16,21
133:23 134:5,16
134:20 147:3
**inhibits**  47:8
94:6 132:18
**initial**  14:18
**initially**  25:22
52:3
**inside**  75:14 76:1
**instance**  29:18
**instances**  117:22
**instructs**  7:19
**instrument**  39:5
68:2
**intended**  134:18
134:22 135:13
**interact**  76:14
**interaction**
123:14
**interested**  89:14
147:24 150:13
**interesting**  63:16

**interfere**  7:7
**interferences**
29:1
**interpret**  91:4
111:19 116:11
116:16 139:14
140:6 144:18
148:20
**interpretation**
81:3 115:17
129:12 146:5
**interpreting**
116:4,7 144:1
**interruption**
6:17
**invalid**  31:5 44:8
45:9 46:18
55:12,16,20 57:5
**invalidate**  56:7
56:18 58:8,15
**invalidity**  3:11
3:13 14:19,21
15:2,9,15,17,21
15:24 35:9
44:15 51:5
53:18 78:15
83:13 86:1
**invented**  50:3
**invention**  40:3
40:12,21 44:18
45:12 46:4,8
47:1,5 49:22
51:9 59:23
80:11 81:1
**inventions**  31:13
34:23 36:17
38:6 59:15 82:9

**inventive**  46:8
**inventor**  24:18
24:19 25:1,1,3
83:7,10
**invents**  34:5
**invoice**  10:10,19
10:21 11:1
**invoices**  9:5,12
9:14,20 10:10,19
10:22 11:8
**involve**  27:21
38:14
**involved**  86:17
**involves**  95:23
**ion**  71:17
**ionized**  71:18
**ions**  72:8
**ipr**  28:18,24
29:1,3
**irrespective**
139:3
**isolation**  114:4
**issue**  49:11 59:6
**issued**  24:22
25:2 42:16,23
124:20 125:1
**issues**  23:11,12
89:7 96:21
**item**  55:13 73:4
73:18 148:3

**j**

**j**  4:17
**july**  106:24
**jury**  112:4

**k**

**k** 2:20
**kaltmanlaw.com**
2:15
**katz** 62:5
**keep** 21:22 70:22
97:19
**keeps** 70:10
**keith** 2:10,11
**keithaltman**
2:15
**key** 73:13
**kill** 75:16 76:9
**killing** 73:21
**kind** 28:23 48:9
91:6 92:19
94:12 118:24
**kinds** 24:6 91:24
94:11 136:24
138:4,9 147:11
**kinetic** 73:20
74:2
**knew** 63:9
**know** 5:10 6:20
7:16 8:18 20:23
22:20 29:14
32:23 33:12
35:10 41:11,11
43:4 44:20,23
52:2,13,14,18,21
53:15 58:6 61:5
62:22 63:6,10
67:18 71:23,24
72:1,3,10,10
73:16 74:17,18
75:20,22 77:12
77:15 78:20
79:12 80:1,5

81:5,12,18 83:9
83:11,12 84:10
84:17,20,23 85:1
85:3,8,8,15,23
86:2 88:2,10,13
89:16 94:16,16
95:5,13 96:19
98:16 99:2,11
103:4,8 105:2,3
108:24 109:11
110:5,8,19 111:2
111:4,5,6,24
112:8,15 113:1
114:6,21 115:2,2
115:4 116:2,12
119:6,18,19
121:11 123:4
127:22,23 128:7
128:20,20
129:12 130:9
131:21 132:11
132:24 133:3
134:1,15 137:20
138:2,12,15,18
141:11,20,20
144:17 145:16
145:24 146:4,4
147:9,12
**knowledge** 28:10
28:11 44:10,20
58:4 80:11 81:2
81:20 83:23
87:14 91:1,8
95:24 96:9
100:20 101:14
102:4,20 103:1
103:17 105:6,7
105:10,13,14,16

105:17 116:14
116:15
**known** 31:20
38:11 41:20
44:4 94:2
**kremen** 2:2 3:4
4:9,11,18 8:3
9:6 11:12 13:6
13:19 14:15,18
15:7 17:8 20:21
21:2 23:7,14
24:16 32:3,19
36:9,24 37:1,6
39:10 40:8 48:5
48:21 49:5,13
58:20,23 79:10
79:15 80:19
106:2,4 113:5
149:1

**l**

**lab** 67:18 115:17
**labeled** 15:12,13
31:4
**lack** 46:18 112:9
116:24
**lane** 2:4
**language** 25:23
40:16 57:24
109:19 110:10
112:16,24 113:7
113:10,12,24
114:6,9,10,13,14
116:3 122:15
141:21 144:19
**lardner** 2:19
**lasting** 74:8

**laundry** 107:24
108:10,14,21
109:3,6 136:24
137:1
**law** 2:3,11 18:23
33:17 38:3,14,20
39:17 40:3,10,11
40:19,20 41:5,6
41:8,21 80:1
115:5
**laws** 37:9 38:7
43:18
**lawyer** 20:24
22:20 23:4,13
32:2 35:6
**lawyers** 115:10
115:18
**layer** 79:2,3
**lead** 120:19
121:12
**learn** 85:15
**legal** 1:22 20:20
23:5,9,11,12
26:21 32:14
109:11 110:6
111:21 112:8
115:3 116:8,13
116:14,15,18
146:4 151:19
**lemmo** 16:20
17:3,6,7
**lemmo's** 64:21
64:22
**lenape** 2:4
**lesser** 100:7
**level** 87:2,3
91:23 93:5,9,10
94:10 96:6 98:5

**[level - marriage]**                                                        Page 17

98:9 101:10,14
102:4,20 103:17
104:8 118:21
119:2 121:19
130:10 131:21
139:3 141:1,3,22
143:17
**levels**   93:7
142:19
**lexicographer**
114:12
**liane**   2:18 12:7
32:15 35:4
37:14 97:10
**licensed**   19:4
**light**   93:24
129:14
**likelihood**   45:11
46:4 52:17
**limitation**   21:20
83:5 111:10
118:19 120:20
121:4,6
**limitations**   65:5
65:15 82:24
84:1 91:13
113:19 121:22
133:5 135:3
**limited**   28:10
29:19
**line**   6:20,22
148:23,24 152:4
**liquid**   74:19,19
**list**   30:8 107:24
108:10,15,20,21
109:1,4,6,20,24
110:4 123:2
130:7 133:14

136:24 145:14
**listed**   24:18
119:17 137:10
138:15 139:21
139:23
**listing**   143:13
**lists**   108:12
110:2 120:15
137:1
**literal**   21:19
**litigation**   13:12
26:24 95:15
106:16 107:3
**little**   86:18 98:19
99:13
**lives**   86:23
**llp**   2:19
**long**   9:16 12:5
64:21 74:8
75:11 114:21
118:23 120:11
121:16
**look**   8:18 31:1
40:24 41:10
42:5,13 43:19
45:14 47:2
57:19,24 58:1
72:21 73:4 94:6
112:16,23
115:21 116:20
117:6,10,13
119:12 122:23
123:16 125:5,5
127:4 130:2,19
131:9 132:4,5,6
132:7,10 133:14
133:14,24
134:13,14 135:2

135:11 136:5,6
137:14,24
139:11 140:8,19
144:24 146:5,9
147:8,22,23
148:1,8,10,10,17
148:18,18
**looked**   35:11
40:15 59:21
60:1 77:1,2
118:1 141:24
**looking**   18:16
27:12 35:12
36:21 41:1 54:5
57:1 61:16,16
68:4 76:4
101:18,20 104:1
106:8 110:20
117:4 118:4
119:6,21 128:6
129:21 130:23
132:9,13 135:19
137:13 140:12
140:13 142:8
144:1 148:4,9
**looks**   22:21
67:20 114:7
148:7
**lot**   43:3 87:1,7
**lower**   92:5 93:10
**lpeterson**   2:23
**lunch**   7:1

**m**

**m**   4:16,17 15:14
15:17 16:12
17:15 63:19
106:10

**machine**   34:6
35:16 47:3
**maintain**   79:19
**majority**   27:22
29:3 43:15
**making**   45:24
86:15,24 92:8
94:11 95:17
**mansoor**   1:17
3:3 4:3,16,16
15:14,17 16:12
17:15 63:19
106:10 150:7
151:2 152:2
153:2,4,11
**manual**   19:10,13
**manufactured**
90:8
**manufacturer**
34:6 35:16 47:4
138:7
**manufacturing**
138:5
**march**   10:4
**mark**   17:8
**marked**   4:22
13:7,10,17,23
14:11,22 15:10
16:8,13 17:13
33:10 48:23
72:16 106:9
124:1
**marking**   34:3
**marksmen**   106:6
111:11 112:2,3
116:12
**marriage**   150:12

**massachusetts**
  1:21,23 150:2,6
**master's** 24:8
  86:9 88:20
  90:13,15,23,24
  97:2 98:6,18
  99:3,12,20 100:7
  100:10,15,19,21
  100:24 101:2,10
  101:13,14,22
  102:3,5,11,12,19
  102:21 103:2
  104:8 105:8,11
**material** 66:18
  69:11,19 70:21
  77:17 126:14,16
**materials** 126:23
**matrix** 61:1 62:2
  62:6,17,20
**matter** 9:9 14:8
  31:3,6,9,16 34:7
  34:21,21 35:17
  36:12,14 37:23
  37:24 38:9
  40:13,22 43:16
  44:9,11,11 57:10
  60:13,24 80:8
  81:3 87:17
  108:5,6,9 118:21
  121:15,17 122:9
  122:14 125:11
  129:1 134:17,21
  135:5,6 137:19
  138:3,10,11
  139:2,4 140:14
  140:22 143:14
  143:14 144:6,21
  144:22 145:1,23

146:8 149:8
  150:14
**matters** 19:5
  26:22 138:4
**mean** 35:12
  42:20 66:22
  72:10 74:9 80:5
  88:9 108:10
  110:7 113:21,22
  114:6 117:18
  126:19 128:3
  129:11 133:7
  134:11 136:14
  139:8 141:16
  142:11 145:21
**meaning** 20:14
  20:17 32:7
  112:11,12,14
  114:21,22
  115:20,23 117:2
  121:9 122:13,15
  123:10 129:14
  129:24 131:9,17
  131:18 132:2
  133:1 134:15
  143:11
**means** 57:7
  81:13 113:12
  114:12,23 118:2
  122:8,18 123:21
  123:21,23
  128:17,22 129:2
  129:3,8,18,23
  131:3 133:10,16
  137:21 141:18
  141:24 147:4
**meant** 128:12,15

**measure** 66:14
  66:16 67:8,15
  68:1
**measured** 66:5
  66:12
**measurement**
  67:19
**measuring** 67:7
  67:23
**medical** 7:11
**medication**
  130:12
**medications** 7:6
**meet** 11:20
  56:20 101:10
  105:4 118:19
  121:3,6,10,13
  133:5
**meeting** 121:22
**meets** 83:5,24
  91:12 113:19
  120:19
**membrane**
  75:17 76:14
**mention** 33:15
  116:19
**mentioned** 32:4
  33:3,14 34:16
  44:3 88:16
  106:17 112:19
  112:20 115:4,9
  135:1
**merely** 40:2
  77:16
**met** 12:4 22:13
  48:17 56:23
  110:24 111:10
  135:9

**method** 22:1
  31:12 35:19,20
  35:20,24 36:1,1
  36:10,11,21
  42:18 43:6,7,10
  43:15 83:1
  110:12 125:6
  132:13,15,21
  146:14
**methodology**
  65:21 148:14
**methods** 148:1
**mi** 2:13
**michigan** 1:4,19
  63:13
**microorganisms**
  72:3 146:24
**middle** 6:20
**mile** 2:12
**millivolts** 67:21
**mind** 141:17
**mine** 60:15 61:7
  61:18,19 62:12
**minimum** 97:6
  97:22
**mischaracterizes**
  32:1 33:2 37:12
**misstates** 47:24
**mix** 91:10
**mixed** 89:11
  115:15
**mm** 6:10
**modify** 114:10
**moisture** 68:22
**moment** 78:6
**monday** 8:19
**month** 11:5

**month's** 10:21
**months** 99:15
**morning** 4:10
**motion** 63:11
**move** 39:16
  95:15
**mpep** 19:8,14

**n**

**n** 2:1 3:1 4:1,16
**name** 4:10,15
**names** 1:12,14
**nano** 22:11
  63:11,14 70:3,5
  70:9 71:1 73:10
  73:12,19
**nanobio** 3:21
  16:18 63:21
  64:3 65:4,14
  69:3,7 72:15,22
  73:9,11 75:21
  76:16,22,23,24
  77:2,6,9,20
  78:10,18,23
**nanoemulsion**
  70:1,8 71:2
  74:22 75:23
  76:5
**nasal** 108:5
  134:21 135:15
  135:21
**natural** 37:10
  38:23 41:22
  43:17 72:10
**nature** 31:21
  37:9 38:3,7,12
  38:14,21 39:17
  40:3,10,12,19,21

41:5,6,8,21
75:22 77:16,20
79:23 84:10,17
97:10,15 109:19
**necessarily** 41:8
  59:6 122:8
**necessary** 50:17
  88:24 89:1 91:9
  92:24 97:7,23
  100:11 122:12
  133:5 144:8
  153:7
**need** 6:19,21
  14:15 15:7 64:8
  79:16 86:18
  87:1 91:13 92:6
  93:15 96:5,6
  98:18,19,20,24
  99:13 100:6
  111:6,7 118:22
  120:5 131:14,22
  141:4 143:17
  145:11
**needs** 47:5 80:2
  111:3
**negatively** 39:7
  71:20 123:8,14
  138:18
**neutral** 1:12
**neutralize**
  120:10
**neutralized**
  68:18
**never** 13:1 29:17
  87:18
**new** 18:7,12,19
  34:6,7 35:17
  47:1,3,5 64:6

145:17
**nine** 10:9,17
  19:18
**nitrogen** 71:14
**nj** 2:5
**nod** 6:9
**non** 3:15 16:8,12
  16:18 17:4
  19:17 24:16
  37:7 38:13
  39:10 40:8 48:5
  52:10 63:20
  76:17 79:21
  102:1 103:13
  124:23
**northeastern**
  89:13
**nostrils** 146:18
**notary** 1:20 4:5
  150:5,16,19
  153:12,16
**note** 151:8
**noted** 153:7
**notice** 3:8 4:18
  4:21 5:2 8:16
  72:22
**noticed** 15:20
**noting** 8:21
**novel** 38:18 40:5
  40:6
**novelty** 38:10
**number** 15:13
  16:21 19:16
  26:9 27:13 34:3
  63:18 67:24
  70:11 73:4,18
  74:6 78:15
  117:24 125:9

134:15
**numbering** 14:9
**numeral** 31:4
**numerous**
  117:15
**nw** 2:20
**ny** 151:13

**o**

**o** 4:1,16,16
**oath** 5:15 29:9
**object** 7:18 49:3
  79:15,17,20
**objected** 9:1
**objection** 9:20
  13:15 20:18,19
  21:3 22:18 23:3
  23:18 24:4,17
  25:9 27:2 31:15
  31:24 32:16,17
  32:19 33:1,13
  34:13,24 35:5
  36:20,24 37:3,6
  37:11,14,14,16
  37:18 38:8,15
  39:4,10 40:14,23
  41:9 42:4,12,19
  43:2,12 44:13,22
  45:21 46:10
  47:6,10,24 48:5
  48:13 49:23
  50:14,21 51:11
  52:20 53:4,11,22
  54:4,10,17,24
  55:18,23 56:8,19
  57:6,16 58:11,16
  59:3,12,24 61:4
  61:11 63:3

64:16 65:16,18
65:22 66:8
67:10,17 68:13
68:21 69:9,17,23
70:6 71:4,21
74:1,10,16,21
75:4,19 76:3,18
77:10,21 79:5
80:3,17,21 81:10
81:17 82:1,7,13
82:23 83:8,20
84:6,12,19 85:10
85:14,22 86:6
87:11,23 88:8,19
89:3,21 90:1,10
90:22 91:17
92:3,20 93:1,6
93:17,23 94:15
95:10 96:8 97:1
97:9,11,16 98:1
99:8,23 100:13
100:23 102:6
103:3,19 104:6
104:14 105:1,12
107:9 108:18,23
109:9,22 110:18
113:13 114:3
115:1 116:1,17
118:13 120:14
122:2,17 123:12
125:24 127:9,21
128:14 129:4,20
130:18 131:8
132:3,22 133:11
134:7,24 136:3
136:12 137:22
140:3 141:10,19
143:1,24 145:12

145:20 146:3
147:7
**objections**  8:1,2
11:11 35:5 78:1
80:19
**objectively**  50:1
**obligated**  6:1
7:20
**obtain**  34:8
**obtained**  66:1
77:11,22
**obvious**  54:14
56:13
**obviously**  60:14
83:4
**obviousness**
52:10,10 53:21
54:3,19 55:9,20
58:13 60:2
**occurring**  38:12
**occurs**  39:1
123:2
**october**  1:23
150:8,16 151:3
**offer**  92:23
**offered**  93:4,8
**office**  2:11 19:6
26:15 28:22
124:18,23
125:15 126:2
128:24 129:2,6
129:15 131:6
133:13 134:12
**official**  134:9
**oh**  97:12 119:22
**oil**  70:2 71:6,7
71:12,16 79:3,4

**okay**  5:12 6:12
6:19 7:16 8:3,6
10:18 11:7,12
14:14 16:5 17:7
18:9 20:16
22:14 23:14
26:7,9,11,19
27:5 28:19,23
29:11 31:8
35:15 36:9,12
37:23 38:3 39:2
39:9,15 40:2
41:18 42:1
43:21 45:5
46:15 47:15
48:19 49:13
53:3,18 55:14
56:2,22,24 58:21
59:16 63:1,6,17
64:1,18 68:11
70:17 71:19
73:3 75:13,18
76:1 78:24
81:22 82:9,20
83:16 84:17
86:12 88:16
89:23 90:12
92:17 94:9
97:20,22 99:7
100:8,8 104:2,3
106:21 109:3
114:8,9,19
115:19 116:24
117:10,13 118:5
121:7 122:6,20
123:8,19,24
125:4 126:3
127:3,14 128:11

129:10 130:11
131:2 132:9,10
132:18 134:9,18
135:12,13 136:9
137:3,18 138:12
138:16 140:8
141:15 142:10
144:10 145:22
146:8 147:2,16
**once**  36:22 55:8
98:13 136:18
**ones**  62:4,17
119:6 120:7
130:8 137:14
**open**  27:10 29:5
**opening**  15:2,13
15:14,23,24
**opine**  18:15
42:14 79:23
**opined**  44:20
52:8
**opines**  23:7
**opining**  94:21
96:18 113:20
144:3
**opinion**  8:13
25:24 31:22
32:1,7 33:21
37:21,24 41:2
43:20 48:2
76:17 87:12,24
88:23 90:11
95:13 100:24
101:21 110:21
113:1,14 127:22
129:5 130:21
134:11

**opinions** 8:12
15:4 16:2,4,17
16:20,24 17:22
18:4,6,9,11,13
18:18 23:4,13
30:22 32:9,11
35:2,8 44:24
45:3 59:14
60:15 61:7,18,20
62:11 63:21
64:2,5,9,13,15
107:7,12 116:5
130:22
**opposed** 90:8
121:8 126:21
**opposite** 93:24
146:21
**oppositely** 122:9
**order** 18:3 22:10
39:24 54:20
56:1,3 57:23
60:4 68:19
108:7
**ordinary** 20:14
20:17 41:20
44:10,21 49:21
59:22 65:2
79:24 80:7,15,24
81:5,8,15,20,23
82:2,5,6,11 83:6
83:17 85:19
86:3,5,8,13,21
87:8,9,13,22
88:14 90:14,20
91:15 92:1,19
93:11 94:14
95:1 96:16,23
97:7,24 98:11

99:22 100:12
102:16 104:5,13
104:19,23
114:22 119:11
128:19 129:14
**organic** 93:2
**organisms** 72:11
**outside** 35:1
79:8 129:22
138:22
**overcomes** 128:6
**overcoming**
127:11

**p**

**p** 2:1,1 4:1 29:17
**p.m.** 72:24 149:8
**p8** 46:21
**page** 3:7 19:18
21:6,15,16,18
31:1,2 45:5,24
46:15 65:1
72:13,19,21 73:5
74:6 75:13
78:16 84:3
107:17,20
112:23 117:13
126:3,4,7 127:5
146:9,10 152:4
**pages** 1:1 64:18
79:22 125:2
**paid** 10:5,6,20
**paper** 14:13 66:4
140:6
**paragraph** 19:20
21:6,14,15,16,18
33:16 37:8,19,22
41:13 43:22

45:7,8 46:1,17
47:15 49:24
51:6,7,10 65:1
73:6,8 83:15
107:18,20
117:13 125:20
126:3,5,5,19
**paragraphs**
126:9
**part** 39:19 63:14
91:3
**partial** 126:22
127:24 128:3,4
**particle** 39:7
67:20 68:2,4
82:17 118:24
122:7,11,14,19
122:24 123:1
130:17 139:23
**particles** 47:9
82:17 122:21
123:7,15 125:7
125:10 127:16
127:17 130:15
133:1,8 138:18
139:7
**particular** 15:15
42:8 67:14,23
79:3 91:19
103:12 110:11
110:13 119:17
134:4 142:16
145:23 147:24
**particulate**
108:4,6,9 118:20
121:15,16,17
122:8 125:11
130:7 134:17,20

135:5,6 137:19
138:3,4,10,11
139:2,4 140:14
140:22 143:13
143:14 144:6,20
144:22 145:1
**particulates**
131:11,12 142:6
146:21 148:20
148:22
**parties** 150:13
**parts** 25:12
33:19
**party** 21:24
**pass** 66:17,19
126:14,17,24
**passage** 135:15
**passages** 108:6
135:21
**passing** 140:22
**patent** 3:9,19,20
11:17 13:6,9,13
13:16 16:1,1
19:4,5,5,10,12
20:24 22:12,16
22:20,22,24 25:5
26:9,11,13,14,18
27:23 28:4,22
30:18,23 32:1,10
33:17 34:8 37:9
38:1,13 40:4
41:1,3,7,14 42:1
42:16,22,22,24
43:3,6,7,14,17
43:23 45:9,14,15
46:2,4,7,14
47:18 48:2,6,7
48:14,14,18

49:11 50:3,22,24
52:22,24 53:6,15
53:18 54:1
56:18 57:18
58:1,8 59:7 60:2
60:5 61:17
62:17 63:23
64:4 65:6,12
67:13 77:4 80:9
80:13 81:4,4
82:4,10 83:22
87:16 89:4
92:13,14 94:4,7
95:19,20,20 96:3
96:12 101:19
102:22 103:11
106:7 107:8,23
108:1,12,20,24
109:23,23 110:1
110:3,4,6,8,12
110:14,20,21
111:1,3 112:18
113:16 114:7
115:23 117:14
118:15 119:7,18
121:23 122:3
124:8,20,24
125:1,5 129:1
130:12,16,20,20
131:10 132:8
139:19 141:5,9
143:19 146:9
148:3,6,8,8,10
**patentability**
40:13,22 47:23
**patentable** 31:13
34:23 35:15
36:17,17 38:6,10

38:18 39:3 42:3
42:11
**patented** 73:10
**patentee** 53:8,16
109:15 110:10
140:5
**patents** 24:19,21
24:22,24 27:21
42:6 43:10,11,15
43:16 62:5,15,16
63:1,7,9 86:2
109:8,20,23,24
110:16 115:6
141:12,14
**pathogen** 142:9
142:13,21,22,24
143:4,20 144:14
**pathogenicity**
142:7
**pathogens**
130:14 133:15
142:19 143:5
144:6 147:11
**pathology**
126:12
**pay** 10:18
**peer** 69:20 75:21
77:12
**penalties** 5:19
**penetrating**
142:14
**people** 79:17
145:19
**percent** 27:4
69:5 79:1,2,2,4
118:9
**percentage**
26:24 117:18

118:5,16
**percentages**
118:12 120:23
145:18
**perform** 21:24
82:22 88:3
145:8
**performed** 11:9
**perjury** 5:19
**permanently**
68:8
**permeability**
142:12
**permissible**
145:3
**permit** 28:5
29:12 140:15
**permitted**
118:11,14
**persist** 74:7
**person** 11:21
12:8 20:14
41:20 43:14
44:10,17,21 45:1
46:1,7 48:15
49:21 50:2,17
51:8 52:16,24
53:7,15 55:1
57:17 58:6
59:21 60:4 65:1
79:24 80:2,7,7,9
80:10,14,15,24
81:14,20,22 82:2
82:4,6,11,21
83:2,6,9,10,16
83:17 85:18,21
86:3,5,8,13,20
87:8,9,9,12,20

87:21,22,24
88:13,17 89:2,5
90:12,14,18,19
91:5,15,20,22
92:1,1,5,19
93:11 94:9,13,13
94:17,21,24 95:2
95:4,6,24 96:13
96:15,15,23 97:7
97:23 98:8,8,11
98:11,21 99:3,17
99:20,22 100:3,5
100:9,11,18,21
101:5,11,12,14
101:17,21 102:2
102:4,15,17,18
102:20,23 103:1
103:15,17,23
104:3,3,5,11,13
104:18,22 105:4
105:7,10,21
107:22 109:17
111:8 112:13
113:17 114:6,11
116:10,21 117:4
119:5,11 120:17
121:2,5 122:4
128:18 129:7
133:13 137:12
143:10,16 145:4
145:7 146:6
148:7
**person's** 84:13
**personal** 22:22
35:7 38:11 48:3
**perspective**
83:12

**pertaining**
124:19
**pertains** 50:19
**peterson** 2:18
8:23 9:7,13,21
11:10,23 12:2,7
13:4,15 14:14
20:18,23 21:4
22:18 23:3,8,18
24:4 25:9 27:2
31:15,24 32:6,18
33:1,13 34:2,13
34:24 36:4,20
37:1,11,15 38:8
38:15 39:4
40:14,23 41:9
42:4,12,19 43:2
43:12 44:13,22
45:21 46:10
47:6,10,24 48:13
49:2,9,23 50:14
50:21 51:11
52:20 53:4,11,22
54:4,10,17,24
55:18,23 56:8,19
57:6,16 58:11,16
58:18 59:3,12,24
61:4,11 63:3
64:16 65:18,22
66:8 67:10,17
68:13,21 69:9,17
69:23 70:6 71:4
71:21 74:1,10,16
74:21 75:4,19
76:3,18 77:10,21
79:5,11 80:3,17
80:20 81:10,17
82:1,7,13,23

83:8,20 84:6,12
84:19 85:10,14
85:22 86:6
87:11,23 88:8,19
89:3,21 90:1,10
90:22 91:17
92:3,20 93:1,6
93:17,23 94:15
95:10 96:8 97:1
97:9,12,17 98:1
99:8,23 100:13
100:23 102:6
103:3,19 104:6
104:14 105:1,12
105:23 107:9
108:18,23 109:9
109:22 110:18
113:3,13 114:3
115:1 116:1,17
118:13 120:14
122:2,17 123:12
125:24 127:9,21
128:14 129:4,20
130:18 131:8
132:3,22 133:11
134:7,24 136:3
136:12 137:22
140:3 141:10,19
143:1,24 145:12
145:20 146:3
147:7 149:2
**pgr** 29:1
**ph** 68:9,17 71:16
**ph.d** 16:12 23:17
23:21 24:3
98:17 99:13
106:10

**ph.d.** 15:15
17:16 63:19
90:21
**pharmaceutical**
24:2,3 27:19
30:6,7,11,13
82:15,19,20
83:18 84:5
86:10,11 89:15
90:16 97:5
98:10 99:4
100:16 101:3,23
101:24 102:13
104:9,17 106:13
106:19 119:10
130:13
**pharmacist**
23:23,24 84:4,5
84:8 85:2,17,20
86:4
**pharmacists**
84:8 85:7,15
**pharmacology**
23:17
**pharmacy** 23:16
85:11
**pharmd** 23:23
**phenomena**
31:21 38:23
133:2
**phenomenon**
37:10 41:22
**phillips** 19:21
20:10 112:21
113:8,23
**physics** 93:12,15
93:22

**pick** 67:14
**piece** 66:4,11
**pigskin** 66:11
**place** 32:22
45:19 76:1
108:7 119:20
140:14
**places** 73:11
**plain** 20:13,17
112:23 113:9,11
113:23 114:6,9
114:10,13,14
115:20 122:13
122:15 129:14
134:15
**plaintiff** 1:9,18
2:8,16 4:11
11:16 13:18
18:8,15 26:6
92:4 111:18
**plaintiff's** 64:7
**plaintiffs** 95:13
**please** 4:15 6:9
6:19 7:1,16 8:5
36:4 37:2 45:7
57:22 65:9
125:1 146:13
**plymouth** 150:3
**point** 45:19
52:13,18 72:19
78:7 82:6 95:14
105:24 113:4
121:1
**portion** 79:10
**positive** 68:10,12
68:16 71:7,8,9
**positively** 39:8
71:23 72:4

[positively - provide] Page 24

123:15
possess 53:8
100:11,20
101:13 105:8
possessed 50:3,9
53:16
possession 50:10
53:1
possibilities 43:4
possible 42:16
42:20,22 57:14
87:4 102:22
104:2 107:24
141:7,11
possibly 103:1
105:10
potent 142:20
potential 67:19
potentially
119:21 142:8
practical 14:7
24:8,10
practice 19:4
23:20,22 26:24
84:7 85:1
practices 23:16
86:17
preamble 125:5
135:19 136:6,8
preparation
12:11,14,19
prepare 11:13
11:21
prepared 9:8,16
9:17 32:11
preparing 25:5
prescriptions
84:9

presence 68:22
present 12:7
33:7 48:12
73:20 106:15
107:3 126:9
presented 34:16
106:12
presenting 30:9
106:15 107:2
presently 152:4
preserved 8:1
prevent 70:11,13
70:18 95:23
96:1 129:8
140:21 144:8
prevented
126:13,21,24
127:1,2,7,18
preventing
125:17,22
127:12,15,24
133:21 142:1,13
147:4
prevention
30:14 128:1,1,3
128:4,5
prevents 70:9
previous 14:12
26:21 43:22
117:13
previously 4:13
5:11 56:2
prior 8:17,24
11:17 28:2 29:8
54:8,14,15,19
55:13,14,17,24
56:1,9 58:9,14
58:24 59:5,7,13

59:16,20 60:3,8
60:14,16,24 61:3
61:8,14 62:1
91:20 106:24
125:15
priority 44:18
58:3 82:3
probably 5:10
problem 90:4
127:6
problems 90:2
procedure 19:11
proceeding
28:12 111:11,14
proceedings
28:23,24 29:4
process 19:13
20:3 31:12 34:6
34:20 35:16,18
35:24 36:10
40:9,19 43:10
47:3 91:11
produce 8:16 9:3
54:22 57:15
119:16
produced 8:23
producing 9:14
9:20
product 16:19
21:21 22:1,6,11
22:11 27:20
63:22 65:14
69:12,15,24 71:9
76:16,22 77:9
78:3 87:15 88:6
90:7,9 92:8,9
120:19 121:3
146:14

production 90:7
products 30:7
64:3 74:18
86:24 88:1
89:17
profession 82:11
professional
150:4
professor 63:12
program 98:6
promotional
69:11,19 77:16
77:23
proper 49:4
properly 22:5
properties 133:4
proportion
91:10
prosecution
19:12 22:21
24:23 48:7,8
124:7 146:2
protect 16:19
63:21 64:3 65:4
65:14 69:3,7
72:23 73:11
75:22 76:16,22
76:23,24 77:2,6
77:9,20 78:10,18
78:23
protecting 133:8
protects 73:9
provide 10:1
25:11 32:8
45:10 55:1 62:8
62:11 64:7
65:13 83:14
109:2 115:16

140:18

**provided**  8:19
8:20 15:24 16:3
21:5 25:13
28:17 32:9
33:14,18 44:24
45:3 51:13,17,18
60:11 61:6,9
62:10,24 63:1
77:3 108:12
111:17 112:3
113:15 117:19

**provides**  52:19
107:24 108:20

**providing**  23:6,9
23:10,12 25:19
32:12 35:2
60:15 61:7 82:8
91:19 98:23
104:7 109:1
110:21 116:5
118:5 124:8,9
129:5 134:12

**proximity**
146:17,22

**ptab**  26:19 29:11
29:16,18

**pto**  28:21

**public**  1:21 4:5
150:5,19 153:16

**publication**
69:20

**publicly**  8:24

**purchase**  44:5

**purpose**  17:19
142:13,16

**purposes**  22:3
24:13

**pursuant**  1:19

**put**  18:3 64:14
77:15 120:7

**putting**  70:20
78:12

## q

**qualification**
84:21 94:22
98:17 106:18

**qualifications**
79:23 88:11,14
89:1 94:20
101:5,11 128:21

**qualified**  81:15
104:21

**qualify**  92:1

**quantity**  139:6
140:1 141:7

**question**  6:15
8:5,9 10:1 24:17
32:5,12,20 36:5
37:3 43:22 59:4
97:17,21 101:6
102:9,10 103:4
103:13,14,20
107:10 121:11
130:11

**questioning**  6:21
6:22

**questions**  6:2 7:8
7:8,21 8:4,12,13
9:10,15 149:3

**quick**  79:6

**quoted**  49:15
125:18

## r

**r**  2:1 4:1,16
150:1 152:3,3

**rabe**  62:5

**range**  117:19
118:6,10,18
130:14

**ranges**  109:2
110:2 117:22
118:7,11,22
119:6,14,15,16
120:6,16,17
121:3,4 145:15

**rate**  10:7

**ratio**  78:21

**read**  11:15,15,16
19:11,13,14 21:6
21:14,15 31:4
34:1 35:6 36:22
45:7 51:2 73:6
73:18 74:6
75:14,15 107:18
125:2 126:6
130:1 136:13
139:8 146:10,12
147:16,19,21,22
148:2,5 151:7
152:4 153:5

**reading**  11:18
46:24 107:22
126:9 127:22
139:17,18 140:5
148:2

**reads**  152:4

**real**  79:6

**realize**  73:14
94:24

**really**  35:11 49:6
74:9,17 94:20
101:10 117:1
122:4

**reason**  6:19 7:11
7:15 57:3 119:4
136:1 145:6
151:9

**reasonable**  55:2
137:17,17

**rebuttal**  64:9

**rebutting**  16:4
18:8 64:13

**recall**  61:15,16
124:14

**receipt**  151:15

**recess**  58:22
106:3

**recipe**  88:1

**recited**  82:9

**recites**  31:12

**recognize**  124:4
124:16,18

**record**  4:15
21:14 150:11

**recording**  6:5

**recross**  3:2

**redirect**  3:2

**reduce**  146:14

**reducing**  146:14

**refer**  26:6,9,10
26:14,18 109:5

**reference**  54:8
55:4,9,15,17
56:4 57:12,13
58:24 59:5,7,10

**referenced**  151:4

references   54:15
  55:5,10 57:4,4
  57:14 58:5,8,14
  58:15 59:21
  61:2,3
referring   106:9
refused   29:12
regarding   13:4
  53:18 82:9
register   6:11
registered   84:4,4
  84:7 85:17,20
  86:4
regular   86:23
rejected   125:19
rejection   127:11
related   16:17
  23:4 27:1,19,23
  35:8 52:9 53:24
  76:21,23 78:3
  80:12 83:13
  90:17 99:5
  100:16 101:23
  102:14 113:7
  115:5
relates   116:9
relating   32:9
relation   107:14
relay   109:18
relevant   44:11
  67:12,15 100:4
reliance   64:22
relied   59:14 60:4
rely   43:17
relying   39:6
  98:22
remain   74:24
  75:5

remaining   9:1
remember   78:11
  78:12 112:22
  113:5 119:14
render   57:5
renders   145:23
  146:23
repeat   97:21
repel   94:1
rephrase   58:12
  85:19
replacing   127:12
replication
  119:17
reply   3:12 15:9
  15:16 16:2,22
  78:14
replying   16:22
  16:24 17:5
report   3:11,12
  3:14 11:16
  14:19,21,24 15:1
  15:2,10,13,14,17
  15:18,23,24 16:2
  16:7,12,14,17,22
  16:23 17:4,17
  19:17 20:12
  21:5 28:1 29:9
  31:17 33:3,5,15
  34:16 45:4
  49:24 51:19
  52:5 62:12
  63:17,19,20 64:1
  64:8,19 66:9,22
  78:11,14 79:21
  83:15 88:21
  94:23 100:14
  106:6 112:4,22

113:1,20 124:11
  124:14
reporter   1:20
  3:24 5:13 6:5
  150:4
reports   8:21
  10:15 11:15,19
  12:16 14:15
  15:20,22 17:24
  18:2,4 20:9
  21:13 30:17,21
  64:11,14,15,22
  76:20 77:4 78:8
represent   4:11
  124:22
repugnant
  114:22
repulsion   38:4
  41:15 43:24
  70:13,16,18,19
  70:20 71:3
request   11:1,7
requests   9:2
require   22:22
  39:24 53:9
  142:19
required   6:9,12
  7:9 8:16 22:17
  23:1 47:22
  116:15 139:5
  153:12
requirement
  49:15,17,20 50:1
  50:5,8,11,15
  103:24 110:5,6
  110:16,23 111:3
  112:8 115:3

requirements
  22:9 23:5 34:10
  97:6,22
requires   21:20
  21:24 47:1
  48:11 49:20
  50:9 52:14 55:8
  55:9
requiring   32:13
  55:4
requisite   91:1
research   147:24
reserve   149:3
resisting   128:9
respect   109:8
responses   6:10
responsive   3:14
  16:7,11 17:4
  19:17 24:16
  35:23 37:7
  38:13 39:10
  40:8 48:5 63:19
  102:1 103:13
rest   26:5 106:5
  148:3
restricted
  130:15,16
results   47:18,22
  48:11 52:15
  65:4 73:13
  108:2 110:17
  111:4,7 112:10
  113:11 117:1
resume   14:1
retail   23:24 85:2
  85:6
retained   3:24

**return** 151:11,14
**review** 26:1
  50:22,23 60:3
  76:16,24 88:12
  95:19 129:6
  149:3 151:5
**reviewed** 25:14
  43:8,9 59:13
  61:7 62:10
  69:20 75:21
  76:19,21 77:12
**reviewing** 57:18
  65:2 103:10
  130:21
**rheology** 89:7
  96:5
**right** 9:6 14:5
  16:14 17:17,21
  18:10 24:23
  26:2,16 29:6
  31:9 32:4,23
  35:12 36:19
  38:1,19 39:3,18
  49:13 59:6
  67:24 69:4 71:3
  72:12 75:9
  78:12 79:4,11,13
  83:19 85:9 86:5
  88:3,18,21 89:23
  91:10,11 94:24
  96:21 99:7
  101:7 107:16
  111:23 112:19
  114:16,20,24
  117:3 118:4,16
  120:13,23
  122:23 125:13
  126:7,8 127:8

128:13,23
133:20 135:8,22
136:1 137:3,17
138:14 143:12
147:6 148:23
149:4
**risk** 146:15
**road** 2:12
**robin** 1:11
**roe** 1:11
**role** 76:8,10
**rolf** 60:21 62:17
**roman** 31:4
**rsw** 1:6
**rule** 47:21 48:10
  114:11
**rules** 1:19 5:10
  9:22 45:20 48:9
**ruling** 134:3
**run** 61:14

**s**

**s** 2:1 3:6 4:1,16
  152:3
**safe** 88:5
**sake** 72:18
**satisfactorily** 4:4
  150:8
**satisfies** 65:5,14
**saw** 60:24
**saying** 43:21
  53:12,13 76:5
  83:21 90:15
  101:16,17 102:8
  102:11 104:21
  108:22,24
  119:22 120:21
  120:24,24

121:23 122:13
127:3 132:16
137:23 140:20
143:18
**says** 21:18 32:24
  34:5 35:15 47:3
  51:8 72:22 73:8
  75:15,16 84:3
  99:24 114:11
  121:21 125:6,9
  126:9 127:11
  129:2 131:10
  137:6 138:13
  139:12 143:4
**school** 18:23
  85:11 87:19
  92:21 93:13,19
  98:2
**schools** 89:13
  92:22,22
**science** 90:17
  99:5 100:16
  101:23
**sciences** 86:10
  97:5 102:13
  104:9 106:13,19
**scientific** 69:11
  69:19 147:16,17
**scientist** 89:22
  90:3
**scope** 22:24 50:4
  50:10,18 53:2,8
  53:16,17 110:24
**scratch** 90:9
**se** 43:9 60:23
**seal** 150:16
**search** 60:11
  61:13,14 62:13

62:14,18
**searching** 61:15
**second** 15:7,16
  51:7 57:13
  65:12 78:21
  93:20,21
**section** 1:19 31:7
  31:14 32:13
  33:9 44:12,19
  45:2 46:9,12,24
  47:17 49:20
  51:3 52:14
  53:20,21 54:14
**sections** 25:10
  35:9 49:7
  115:15 144:4
  148:11,18
**see** 19:16 43:5
  50:23 58:2
  63:18 66:18
  72:2 75:13
  87:12 94:19
  112:14 115:21
  117:6,17 119:22
  125:13 127:19
  128:5,11 135:17
  145:1
**seeing** 78:11
  117:5
**seen** 4:24 22:14
  52:7 60:18,20
  113:7
**semester** 93:20
  93:21
**send** 10:10
**sense** 145:4
**sent** 11:2 151:12

**sentence**  21:17
   21:18 22:2 31:4
   107:18
**sentences**  22:8
   148:16
**separate**  117:15
   148:3
**september**  64:12
**sequester**  75:24
**serve**  29:24
**set**  21:20 150:15
**seven**  8:17 17:9
**shake**  6:9
**shane**  64:21
**sheet**  151:9
**shk**  2:7,7
**short**  70:23
   126:5
**shorthand**  26:4
**show**  12:13
   65:17 79:16
   83:4 113:16
**shown**  92:13
**sic**  49:3
**side**  11:16 18:8
   18:15 111:18,18
   116:23 140:23
**sign**  149:5
   151:10
**signature**  150:18
**signed**  151:17
**similarly**  127:24
**simply**  24:12
   39:6 110:1,20
**single**  54:8 55:4
   55:8,13,14,17
   56:4,9,11 70:10
   130:16

**sit**  19:1 42:14
**sitting**  41:11
**six**  27:14 99:15
**sjm**  1:6
**skill**  20:15 22:22
   35:7 38:11
   41:21 43:14
   44:10,17,21 45:1
   46:1,7 48:3,15
   49:21 50:2,17
   53:1,7,15 55:1
   57:17 58:6
   59:22 60:4 65:2
   79:24 80:7,15,16
   80:24 81:8,9,11
   81:14,16,20,23
   81:24 82:3,5,6
   82:12 83:6,10,17
   85:18,19,21,24
   86:3,5,8,13,21
   87:2,8,10,13,22
   88:14 90:14,20
   91:15,20 92:2,5
   92:19 93:11
   94:14,22 95:1,24
   96:16,23 97:7,24
   98:9,11,14 99:22
   100:12 101:5,11
   102:16 104:5,13
   104:19,22,23
   105:4 109:17
   111:8 112:13
   113:17 114:7
   116:10,21 117:4
   119:5,11 121:2,6
   122:4 128:19
   129:7 133:13
   137:13 143:10

143:16 145:4,7
   146:6 148:7
**skilled**  52:16
   107:22
**skills**  44:5 51:8
   80:12 81:2
   83:24 87:3
   100:11
**skin**  74:7,11,15
   74:20,20,23 75:3
   75:7 135:14,21
   140:16 146:17
   146:23 147:1
**smallpox**  147:14
**sole**  25:1,2
**solution**  68:9
   72:7,9
**solutions**  1:22
   90:5 151:19
**solve**  90:2
**somebody**  12:23
   81:23 83:22
   86:17 87:18
   91:8 98:17
   101:9 103:5
**sorry**  34:4 58:12
   61:22 97:21
**sort**  86:19
   126:22
**southern**  1:5
**soybean**  79:4
**speak**  6:14 12:10
   12:18 93:18
**speaking**  21:2
   28:15 32:15
   35:4,5 37:13,18
   41:3,4 80:19,20
   135:12 145:23

**specialize**
   106:22
**specific**  22:9
   24:15 25:10,17
   33:5 35:11,23
   48:3 53:13 58:7
   58:14,14 60:12
   60:13 68:3
   70:21 71:24
   78:1 108:2
   111:6 112:10
   113:7,18,18
   114:1,1 115:3
   117:23 119:14
   119:15 120:22
   121:8,11 138:1,2
   139:22 144:3,14
   144:14,20
**specifically**  14:5
   20:4 32:3 33:16
   34:17 45:20
   46:13 47:22
   48:10 52:9 60:6
   61:15 65:16
   68:1 75:10
   76:21,24 77:18
   80:4 83:11,13,21
   88:23 89:4
   101:20 102:17
   103:14 106:21
   107:14 116:9
   118:4 123:1
   131:23 133:21
   137:6 144:18
   148:13
**specification**
   25:8,11,13 45:9
   48:17 50:23

**[specification - suite]**

58:1,2 94:7 96:3
107:24 108:1,11
108:17,19
112:14,17 114:5
115:13,16,22
116:5 117:6,9
118:15 122:24
126:10 129:23
130:3,4,24 131:1
131:4,16,24
132:1,5,19 133:3
133:24 136:22
137:10,11 138:3
138:6 139:11,21
139:24 143:8,12
143:12,19 144:2
144:24 147:8
148:12,19,21
**specifications**
101:19 115:12
**specifics** 40:24
42:5,13 43:5
52:2 77:13
130:19
**spectrum** 131:12
**spelled** 4:16
**spent** 9:9,16
**spoke** 13:1
**spoken** 13:3
**sprayed** 66:5,12
**spraying** 74:23
**spread** 75:7
**ss** 150:3
**stabilized** 75:1,5
**stan** 7:23 49:2
58:18 80:21
105:23

**standard** 19:22
20:4,11,13 33:4
33:12,21 34:11
34:15 52:6
112:21 113:23
127:16
**standards** 33:4,6
33:15,20 34:18
51:14,14,16,22
51:23 52:8
54:11 59:19
116:18
**stands** 19:10
32:23
**stanley** 2:2 4:10
**start** 73:5 113:23
114:9 115:19
148:19
**started** 5:8 20:7
20:8 32:18
**starting** 33:16
81:4
**starts** 114:14
126:4
**state** 4:15 19:2
41:13 43:23
46:17 106:21
117:14 141:23
148:13
**stated** 20:12
49:24
**statement** 37:15
46:5
**statements** 45:24
**states** 1:3 13:9
19:5 26:14 45:8
**stating** 107:12
108:19 126:1

**statute** 31:22
32:4,7 34:1,23
45:19 47:21
49:4,10
**statutes** 48:9
58:10
**statutory** 110:15
111:3
**stay** 74:12
**step** 21:24
**steps** 40:11,20
41:6,16,20 42:2
42:7,10,17,23
44:1,3,4
**steric** 70:13,16
70:19,20
**stick** 140:16
**sticking** 75:2
76:6,7
**sticks** 74:19
**stop** 96:2,2
**stopped** 119:23
**stopping** 94:8
105:24 133:1
**stops** 133:7
**store** 85:2
**street** 1:22 2:20
**strike** 22:15
**students** 89:13
92:23 94:3 97:2
97:5 98:4
**subject** 5:18
11:11 15:5 31:3
31:6,9,16 34:9
37:23,24 38:9
40:12,21 44:9,11
80:8

**subjective**
105:20 146:7,8
**subjects** 27:17
**submit** 29:9 64:8
**submitted** 11:8
14:24 17:21
64:11 107:5,11
**subscribed**
153:13
**subsequent**
33:18
**subsequently**
20:8 51:23
71:16
**substance** 5:8
16:16 68:11
**substances**
146:15
**substantial**
45:11 52:17
**substitute** 87:5
**substrate** 146:16
146:21,22,24
**success** 55:2
57:20
**sufficient** 46:6
52:23,23 53:14
110:14 123:6
139:24 141:6
**suggesting**
133:12
**suggests** 22:23
45:15 74:4
75:23 141:22
**suit** 11:17 13:16
16:1 67:13 81:4
**suite** 2:12,20

**summary** 3:22
124:1
**supplementing**
18:18
**support** 3:16
17:11,16,20
50:24 106:10
112:3,17 116:22
117:7,7 125:22
**supporting** 64:2
**supports** 110:10
121:20 128:8
**suppose** 96:13
**supposed** 138:5
**supposing** 87:18
**sure** 32:11 33:23
43:8,13 52:2
57:7 59:4 65:19
75:16 83:24
107:10 115:7
127:10 142:5
145:21
**surface** 39:8
67:9,11,14,20
68:2 70:2,21,22
71:6,14 73:12
76:13 123:15
**surfaces** 68:5
**surfactant** 85:13
**surfactants**
85:16
**surround** 75:16
**surrounds** 71:15
**susan** 1:20 150:4
150:19
**swore** 5:13
**sworn** 4:4 150:9
153:13

**system** 126:14
126:18

**t**

**t** 3:6 29:17 150:1
150:1 152:3,3
**table** 78:8,16
120:15
**tables** 108:11
109:1 110:2
117:15,21 118:4
**tablets** 85:6,7
**take** 11:10 31:1
47:2 58:20
74:13,18 93:2
98:4,6 106:1
111:2 114:4
115:21 120:1
132:10 134:13
134:14 135:11
**taken** 1:18 72:19
73:1 92:19
93:11 96:23
97:3,8 150:7
**talk** 9:8 26:13
92:17 123:7
134:14
**talked** 9:4
**talking** 41:12
68:5 72:2 79:7
105:6,13 130:6
**talks** 94:7
**targeted** 106:23
**tasks** 82:21
**taught** 60:14
80:12 87:16
92:11 93:18
96:11 101:18

**teach** 43:14 48:2
48:15 58:5
85:11 89:14
93:22
**teaches** 58:2
**teaching** 47:13
67:1,13 95:20,21
95:22 96:3
110:9 117:5
141:13 145:13
**teachings** 46:13
**technical** 23:10
32:9 54:6 115:4
116:8 146:6
**technology**
63:11,14 66:23
67:5 73:11
**tell** 5:17 6:21
49:6 60:4 78:10
94:21 97:15
122:4 125:3
133:4 137:4
**telling** 95:5
**ten** 98:20
**tenor** 126:10
**term** 19:8 36:21
74:2 81:11
108:14 110:7
112:11 114:22
114:23 121:9
122:13 123:9,21
125:22 127:1,10
127:12,12 128:8
128:22 129:16
131:17,18 132:2
132:23 134:16
140:9 141:2,16
141:17 142:22

143:15 144:18
147:4
**terms** 36:16
45:24 48:7
51:13 55:7
62:15,16 67:6
76:9 91:21
111:15,16,17,20
111:22 112:1
113:21 114:13
114:15,18 115:7
116:13 122:6
129:21 132:5
141:6,8,20
**test** 22:17 23:2
47:18,22 48:11
52:15 65:3,19,20
65:21 83:4 97:8
108:2 110:16,17
111:4,4,7 112:9
112:10 113:10
113:11 116:24
117:1
**tested** 74:17
**testified** 4:5
26:21 27:6
85:23 145:14
**testifies** 104:12
**testify** 27:10,13
28:6,12 29:12
30:5 113:6
**testifying** 5:22
29:8,21 104:4
**testimony** 5:21
7:3 23:6,9,10
27:15,18 28:3,9
28:15,16 29:4,19
29:19 33:2 35:2

100:9,18 101:12
102:2,18,23
103:15 115:9
150:10,11 151:7
151:15 153:9
**testing**  53:3,10
  53:13 64:19
  65:3,17
**tests**  65:10,12
  111:6
**therapeutics**
  106:23
**thereof**  34:8
  35:18 126:11
**thick**  89:8
**thickener**  84:24
  85:3
**thin**  89:8 108:5,7
  121:13 122:8,9
  122:15,19,21
  135:6,7 136:8
  137:20 138:19
  138:22 140:15
  140:15,18,21
  142:14
**thing**  143:23
  145:22
**things**  35:14,14
  36:16 39:13
  57:9 88:16
  91:24 103:8
  112:19 114:18
  118:2 140:8
**think**  8:19 9:21
  12:16 32:21
  38:13 46:21
  62:22 67:14
  76:8 90:11

95:13 97:17,18
  100:7 101:16
  103:20 112:24
**thinking**  142:8
**thought**  9:23
**three**  22:7
  103:21 126:3,4,7
  148:21
**time**  7:18,18 9:9
  9:15 14:16 20:1
  21:12 28:5,9
  29:11,16 44:17
  80:10 81:1 96:4
  105:24 151:16
**timeframe**  151:6
**times**  10:17 12:3
  27:5,9,13 103:21
**tire**  39:11,11,14
  39:16,19,23,24
**tissue**  135:14,21
  140:16
**title**  34:10
**today**  5:2,6,22
  9:3 11:14 18:9
  18:11,17 29:22
  64:5,10,12,17,18
**today's**  5:9
**told**  20:24
**top**  31:2 38:16
  73:4
**topical**  86:15,24
**total**  27:3 114:7
  148:10
**totality**  48:14
  128:7 129:22
  132:6,7,9 140:19
**traction**  38:4

**trademark**  19:6
  26:15 28:22
**trained**  87:3
**transcript**  6:7
  79:8,13 151:4,17
  153:5,9
**transmission**
  52:3
**treatment**  30:14
**trial**  27:10,13
  28:2
**trials**  26:18 27:7
**trivialize**  108:15
**trivializing**
  108:21
**true**  38:6 42:1
  46:24 47:7,21
  49:19 50:11
  57:2 58:7,12,24
  64:23 68:24
  69:21 71:11,19
  73:2 75:8 90:11
  108:14 109:20
  124:22 150:10
  153:8
**trutek**  1:8 4:11
  16:20,24 26:6
  61:1 77:3 151:1
  152:1 153:1
**truth**  5:17
**truthfully**  6:2
  7:13
**try**  38:19
**trying**  132:20
  136:4 147:20
  148:4
**turn**  19:17 31:1
  45:5 46:15

79:21 107:17
**two**  12:6 16:3
  25:2 30:17
  34:20 36:12,13
  36:18 37:19
  57:3,14 70:23
  74:6 98:4 125:2
  125:9 129:21
  132:5 134:15
  135:20
**type**  67:11 77:14
  84:20 85:5
  86:14 92:18
  94:18 118:24
  123:1 138:2
  139:1,2 144:20
  144:22
**types**  11:18
  35:14 57:19
  70:21 72:5
  89:11 92:24
**typically**  25:4,8
  83:6,18 98:3
  147:19

| u |
|---|

**u.s.**  134:10
**uh**  6:10
**ultimate**  23:10
**ultimately**  30:13
  92:10 94:6
  109:16 111:9
  112:15 120:18
  124:19 125:1
**undergraduate**
  93:5,9,21
**underlie**  23:11

**understand** 4:12
5:5,14,17,21 6:1
6:17 7:1,20 8:4
8:9,11,14 13:12
13:16 29:21
33:17 45:8 53:7
53:19,23 54:2
57:1,21,23 59:4
64:10 65:3,21,23
65:24 89:6 90:3
107:10,23 109:7
109:10,13 110:6
111:11 112:6,13
122:20 123:9,13
123:20,22
128:15,16,22,24
129:17,18
134:19 135:15
136:1,2,4 141:5
147:20
**understandable**
136:11 140:2
148:6
**understanding**
20:10,22 21:4
22:7,10,19 25:22
33:17 34:11
38:9 45:13,23
50:7 51:12
54:18 55:7,10
59:18 66:7 70:1
77:8,20 78:17
80:24 89:10,15
109:17 112:1
124:21 131:5
**understood** 6:23
20:14 128:11
131:2

**undue** 50:16
120:4,12
**unique** 42:2,7,10
42:17,23 73:9
**united** 1:3 13:9
19:5 26:14
**universal** 14:8
**university** 63:13
**usc** 31:7,23
33:24 34:12
44:9 46:22
47:17 48:23
51:2 53:20
**use** 29:16 40:20
41:6 49:22 51:9
59:9,17,23 62:1
62:6 66:19 74:2
86:15 96:19
99:2 109:3
110:12,13 113:9
114:23 124:11
126:24 128:4
132:12,15,15
134:18,22
135:13 143:20
143:21
**useful** 34:6,7
35:17 47:2,3,5,9
47:13
**uses** 39:2 40:3
40:11,19 41:4,5
41:7 129:11,13
**uspto** 26:15,18
28:13,17 29:8
124:7,23
**usually** 109:5
147:22

**utility** 45:23
46:11,18 47:16
95:22,22
**utilize** 38:7
41:14 43:24
**utilizes** 40:10
**utilizing** 39:17

**v**

**vague** 23:19 24:5
34:13 80:17
82:23 97:18
**valid** 42:21,22
46:3 60:7
139:16
**validity** 30:17,22
**value** 66:20
133:17
**values** 117:19,22
118:6
**variable** 117:16
119:4 121:8
**varies** 86:14
98:2 109:23
**various** 33:19
34:17 89:11
**vary** 139:7
**verbal** 6:7,11
52:1,3
**verify** 121:22
151:7
**veritext** 1:22
151:13,19
**veritext.com.**
151:13
**version** 49:4,10
49:10

**versus** 81:6
**view** 35:7 91:20
116:4 129:22
130:3,23 131:10
139:8 143:11
144:2,24
**virus** 76:15
147:14,15
**viruses** 123:3
139:13 147:11
**vitae** 3:10 13:20
13:22 14:1
**voltage** 67:23
**vs** 1:10 151:1
152:1 153:1

**w**

**wadstrom** 60:19
60:20 62:16
**wahi** 60:17
**wait** 37:4
**want** 14:17
32:10 58:20
72:18 97:12,14
103:12,14 113:4
146:12
**wanted** 9:11
56:24
**wash** 108:22
**washington** 2:21
**water** 68:18,19
68:23 71:15
72:8 118:8
**way** 9:19 26:5
27:21 28:10
29:19 45:17
67:18 71:12
73:21 87:15

[way - zeta]                                                                    Page 33

92:11 115:24
119:7 135:23
138:8 144:17
148:23
**ways** 24:15
70:11 115:7
**we've** 9:22,23
58:18
**website** 69:7,10
69:12 72:20
73:1 77:12,23
**wednesday** 12:4
**went** 12:16
87:18 92:21
**west** 2:12
**whereof** 150:15
**white** 148:15
**wide** 130:14
**witness** 1:18 3:2
14:10 21:8
27:15 28:7
29:13,22 36:5
37:2 149:3
150:8,11,15
151:6,8,10,16
**word** 29:16 37:7
109:3 115:20
125:16,16
126:21 127:7
128:12 131:7
**words** 55:6 59:6
59:20 87:6 95:7
100:8 112:12
113:21,24 114:8
117:2 120:11,21
126:4 127:3,14
132:12 134:17
134:19 135:19

143:6,18 144:11
**work** 10:8,11,14
11:2,4,5,9 18:12
25:6 27:3 39:24
45:12,17 47:20
48:1 52:18 88:5
108:4
**worked** 84:22
115:10,11
**working** 20:7,8
21:12 25:5,21
84:15 85:2
87:19 94:11,18
96:4
**write** 115:18
**writing** 107:11
**writings** 17:22
107:5
**written** 43:6,8
45:20 49:14,16
49:19 50:1,5,8
50:12,19 51:1
52:11,21 110:22
115:6,13,14
117:11 125:21
132:1 135:23,24
136:4,13 140:5
**wrong** 49:10
142:11
**wrote** 14:4,5
41:22 65:1,7

**x**

**x** 3:1,6

**y**

**yeah** 88:9
**year** 10:4 98:24
99:7,15

**years** 86:10,12
86:16,20 87:20
91:24 94:12
98:13,15,18,20
99:5,24 104:9
**yesterday** 12:4

**z**

**zeta** 67:19

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.